UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 1:20-23564-MGC-JG**

DAVID WILLIAMS and CAROLL ANGLADE,
THOMAS MATTHEWS, MARTIZA ANGELES,
and HOWARD CLARK,
*individually and on behalf of all others
similarly situated*,

                                    Plaintiffs,

vs.

RECKITT BENCKISER LLC and
RB HEALTH (US) LLC,

                                    Defendants.
_____/

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs David Williams and Caroll Anglade, Thomas Matthews, Martiza Angeles, and Howard Clark ("Plaintiffs"), by and through undersigned counsel, and on behalf of themselves and all others similarly situated, file this Consolidated Amended Class Action Complaint alleging against Defendants Reckitt Benckiser LLC and RB Health (US) LLC (collectively "Defendants"), based upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

## INTRODUCTION

1.      Defendants Reckitt Benckiser LLC ("RB") and RB Health (US) LLC ("RB Health") designed and now manufacture, market, advertise, and sell Neuriva Original, Neuriva Plus, and Neuriva De-Stress, (collectively, "Neuriva" or the "Neuriva Products," all purported brain performance supplements.

2.      It is no secret that brain health and cognitive performance are issues of concern to consumers of all ages and are important public health issues.  It is, therefore, no surprise

that products promising improved brain performance, including improved memory and focus, are widely available in stores across the United States.[1]

3.      In 2016, dietary supplements claiming to benefit the brain generated $3 billion in global sales.[2]  Brain health supplement sales are forecast to increase to $5.8 billion by 2023.[3]

4.      In order to capitalize on the ballooning and lucrative brain health supplement market, Defendants raced to bring Neuriva Original and Neuriva Plus to market in April 2019, promoting Neuriva to the public as a dietary supplement that is "clinically proven" and proven by science to fuel "brain performance."  These statements are false and misleading.

5.      Defendants have engaged in such deceptive conduct in order to compete in the saturated brain health supplement market – a market driven by consumers' deep concern about this issue, which has in turn increased demand for brain health supplements across the United States. Because of this demand, Defendants have, relying on the same false and misleading claims about "proof," introduced a third product called Neuriva De-Stress. As with Neuriva Original and Neuriva Plus, Neuriva De-Stress contains false and misleading claims that it is "clinically proven" and proven by science to fuel "brain performance."

6.      In their efforts to exploit this market, Defendants have engaged in a uniformly deceptive advertising and marketing campaign – including the product label and packaging, Defendants' website, commercials, social media, and other marketing materials – trumpeting that "science proved" that Neuriva's ingredients provide brain-performance benefits to all consumers who use them. According to Defendants' repeated statements in their advertising, marketing, and labeling, Neuriva's ingredients are "backed by science" and "clinically proven" to improve consumers' focus, accuracy, memory, learning, and concentration.

7.      In fact, on the front of the Neuriva Products' packaging, Defendants tout that Neuriva contains "Clinically Proven Natural Ingredients" that improve brain performance in the areas of Focus, Memory, Learning, Accuracy, Concentration, and Reasoning.

---

[1] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7153641/
[2] *Global Council on Brain Health*, "The Real Deal on Brain Health Supplements: GCBH Recommendations on Vitamins, Minerals, and Other Dietary Supplements," p. 2 (2019) ("*Global Council on Brain Health*").  Available at:
 www.GlobalCouncilOnBrainHealth.org.DOI:https://doi.org/10.26419/pia.00094.001.
[3] *Id.* p. 2.

8.      Similarly, on the top label of the Neuriva Products' packaging, Defendants state in bold letters: "It's time to brain better."   And, on the side of each product's packaging, Defendants state: "Nature made it.  Science proved it.  Brains love it.  Our natural ingredients are GMO-free and clinically proven to enhance brain performance."

9.      To further promote their uniform message that Neuriva is clinically and scientifically proven to enhance brain performance, on the front of the Neuriva Product packages, Defendants include a large picture of a brain, where it cannot be missed by consumers:





10.     Defendants' representations are designed to induce consumers to believe that Neuriva has been proven as a matter of fact to provide meaningful brain performance benefits. And consumers purchase Neuriva solely for the purpose of obtaining these purported brain performance benefits.

11.     Defendants' highly trumpeted active ingredients are Coffee Cherry Extract (also called "Neurofactor") in all three products, Soy-based Sharp PS (Phosphatidylserine) in Neuriva Original and Neuriva Plus, and Melon Concentrate (also called "SuperOxide Dismutase") in Neuriva De-Stress.   Defendants state that each of these ingredients is "Clinically Proven" and that "Science proved" each of the Products.

12.     In reality, since none of the Neuriva Products has ever been clinically studied, "Science" has not proven Neuriva's effectiveness or even its safety. And with respect to the purportedly "Clinically Proven" ingredients, for Coffee Cherry Extract and the Melon Concentrate, scientific evidence shows that it is biochemically impossible for the ingredients to improve brain performance. Moreover, as to all the ingredients, the studies Defendants cite on their website as support for their scientific claims themselves demonstrate that Defendants' claims of clinical and scientific "proof" are false or, at least, disturbingly misleading.

13.     Indeed, as the Global Council on Brain Health, a blue-ribbon collaborative panel, has emphasized: "Despite claims to the contrary, brain health supplements have not been established to maintain thinking skills or improve brain function."[4]

14.     However, in an effort to achieve maximum profits, Defendants have used deceit in their labelling and advertising to capitalize on consumers' focus on brain health and performance together with their desire for supplements with proven performance.

15.     Plaintiffs bring this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendants' fraudulent and misleading representations, to correct the false and misleading perceptions that Defendants have created in the minds of consumers, and to obtain redress for those who have actually purchased Neuriva.

## PARTIES

16.     Plaintiff David Williams is a resident and citizen of Homestead, Florida.

17.     Plaintiff Caroll Anglade is a resident and citizen of Hialeah, Florida.

18.     Plaintiff Thomas Matthews is a resident and citizen of Modesto, California.

19.     Plaintiff Martiza Angeles is a resident and citizen of New York, New York.

20.     Plaintiff Howard Clark is a resident and citizen of San Francisco, California,

21.     Defendants RB and RB Health are Delaware corporations with their principal places of business located in Parsippany, New Jersey. Defendants' corporate parent is a British multinational company traded on the London Stock Exchange that reported net revenue of over £12.8 billion in 2019 alone. Its brand portfolio includes, among others, Mucinex, Clearasil, Lysol, Air Wick, and Woolite.

22.     In 2012, Defendant RB paid $1.4 billion to merge with Schiff Nutrition International, Inc. Schiff Nutrition was founded in 1936 as a small supplement company and grew into a multimillion-dollar vitamin and nutritional supplement company. RB's acquisition of Schiff Nutrition allowed it to join the multibillion-dollar vitamins, minerals, and supplements market.

23.     Neuriva is a registered trademark of RB Health, and RB Health holds the copyrights for the Neuriva Product labeling and for the website through which Neuriva is

---

[4] *Id.* at 20.

marketed.   RB Health also distributes the Neuriva Products and is identified as the manufacturer on Amazon.

24.    Defendants advertise, market, distribute, and/or sell the Neuriva Products to consumers in Florida and in the Southern District of Florida, as well as throughout the United States.

## JURISDICTION & VENUE

25.    This Court has general personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of doing business within the State of Florida, including within this District; have had continuous and systematic general business contacts within the state, including within this District; and can be said to have reasonably anticipated being haled into court in this forum.

26.    This Court has specific personal jurisdiction over Defendants because this action arises out of and relates to Defendants' contacts with this forum. Specifically, Defendants knowingly directed the Neuriva Products through the stream of commerce into this District. Defendants have advertised and marketed within this District through the wires and mail and via e-commerce websites through which residents of this state and District can purchase the Neuriva Products. Further, Defendants knowingly direct electronic activity into this state and District with the intent to engage in business interactions and have in fact engaged in such interactions. Moreover, Defendants' website directs each consumer to purchase Neuriva "at your local retailer," including Walgreens, Walmart, CVS, Kroger, and Rite Aid, all of which have one or more locations in this District.  Defendants also consent to jurisdiction in this District.

27.    This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Plaintiffs are diverse from Defendants, and the matter in controversy exceeds $5,000,000.00 in the aggregate, exclusive of interest and costs. Finally, "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

28.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District. Defendants caused the Neuriva Products to be offered for sale and sold to the public in this District.

29.     Venue is proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendants.

**ADDITIONAL FACTUAL ALLEGATIONS**
**Sales of Neuriva Products**

30.      Neuriva, which Defendants raced to market in only 12 months, is a growing leader in the brain supplement industry.  Neuriva is now an Amazon best seller.

31.     The Neuriva Product line includes three formulas—Neuriva Original, Neuriva Plus, and Neuriva De-Stress—all of which contain as active ingredients coffee cherry extract; two of which contain soy-based phosphatidylserine; and one of which contains melon concentrate.

32.     Neuriva Original contains the following ingredients:



33.     Neuriva Plus contains the following ingredients:



34.     Neuriva De-Stress contains the following ingredients[5]:

---

[5] Other ingredients include microcrystalline cellulose, capsule (hypromellose, titanium dioxide), silicon dioxide, magnesium stearate.

**Supplement Facts**

Serving Size 1 Capsule

|  | Amount Per Serving | % Daily Value |
|---|---|---|
| Coffee Fruit Extract (*Coffea arabica*) | 100 mg | † |
| L-Theanine | 200 mg | † |
| French Melon Concentrate (*Cucumis melo*) Fruit | 10 mg | † |

†Daily Value not established.

35.     Defendants sell Neuriva online through their website, schiffvitamins.com, and in stores nationwide, including Walgreens, Walmart, CVS, Rite Aid, Sam's Club, Target, and others, as well as on Amazon.

36.     Since Defendants first started selling Neuriva, they have uniformly and continuously represented, on both product packaging and in product advertising, that Neuriva is clinically and scientifically proven to enhance the brain health and performance of all adults in specific ways.

37.     Defendants' representations appear, among other places, on the Neuriva Product label and packaging; in widely-broadcast television commercials; on Defendants' web pages; in infomercials; in other online vending and marketing forums including sponsored videos on YouTube; and in product pamphlets and other literature distributed by Defendants.

38.     Although Neuriva comes in three formulas, each formula is substantially similar to the others in form and in purported function and all are sold in substantially similar packages, with similar labels, making similar claims and including similar instructions, as can be seen throughout this Amended Complaint.

39.     The omissions and misrepresentations identified in this Amended Complaint are virtually identical across all formulations and the claims that form the basis of this action

would be the same in all essential respects regardless which formula is considered. That is to say, the formulas are substantially similar, and the means of deception is the same for all.

40.    Defendants' misrepresentations fall into two categories: (1) Defendants affirmatively represent that Neuriva's purported beneficial effects are scientifically proven and clinically proven to provide the promised and advertised improvements in brain function, and (2) Defendants make health claims (e.g., enhanced brain performance) across all adult age groups and cognitive statuses.  Both categories of representations are false and/or misleading.

41.    Defendants intend for consumers to rely upon Defendants' representations concerning the Neuriva Products' brain health benefits and Defendants' claims that the Neuriva Products and their ingredients are scientifically and clinically proven.

42.    It is reasonable for consumers to rely upon Defendants' representations concerning the Neuriva Products when deciding to purchase Neuriva Products.

43.    Defendants' claims that the Neuriva Products and their ingredients are scientifically and clinically proven and Defendants' representations concerning the Neuriva Products' brain health benefits were developed with the intent to generate sales of the Neuriva Products and capture a substantial percentage of the brain supplement market.

### Defendants' Representations about the Neuriva Products

44.    Defendants have made uniform, express and implied representations concerning the benefits of the Neuriva Products. These representations include claims that the Neuriva Products are scientifically and clinically proven to improve brain function in specified ways and that oral consumption of the Neuriva Products will result in improved brain function in as few as seven to 30 days.

45.    Defendants' express and implied representations concerning the Neuriva Products' brain performance capabilities are uniform and pervade Defendants' marketing.

46.    The exterior of the Neuriva Original packaging claims that it has "clinically proven natural ingredients" and claims that the supplement "Fuels 5 indicators of brain performance" and lists the following: Focus, Memory, Learning, Accuracy, and Concentration. The label on the bottle itself states that it is "CLINICALLY PROVEN."



47.     The side of the Neuriva Original packaging elaborates on what Defendants claim science has proven the supplement will do as a matter of fact: "Our natural ingredients are GMO-free and clinically proven to enhance brain performance." Regarding Neuriva Original's first main active ingredient, coffee cherry extract (which its ingredient list identifies as coffee fruit extract), Defendants claim on their packaging that it is "clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells." Regarding its second main active ingredient, phosphatidylserine, Defendants claim on the packaging that "[t]hese plant-sourced phospholipids make up the structure of neurons within the brain. Clinically proven to aid neuron health and fuel memory and learning ability." Defendants also prominently display Neuriva's tagline on the packaging: "Nature made it. Science proved it. Brains love it."

11



48.     The exterior of the Neuriva Plus packaging also advertises that it has "clinically proven natural ingredients" and claims that the supplement "Fuels 6 indicators of brain performance" and lists the following: "Focus," "Memory," "Learning," "Accuracy," "Concentration," and "Reasoning."



49.     The side of the Neuriva Plus packaging likewise elaborates on what Defendants claim science has proven the supplement will do as a matter of fact, which is identical to the claim made on the side panel of the Neuriva Original packaging: "Our natural ingredients are GMO-free and clinically proven to enhance brain performance." Regarding the first main active ingredient, coffee cherry extract, Defendants again claim that it is "clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells." Regarding the second main active ingredient, phosphatidylserine, Defendants again claim that "[t]hese plant-sourced phospholipids make up the structure of neurons within the brain. Clinically proven to aid neuron health and fuel memory and learning ability." As with Neuriva Original, Defendants prominently display Neuriva's tagline on the Neuriva Plus label: "Nature made it. Science proved it. Brains love it."  With respect to B6, B12, and Folic Acid, which Neuriva Plus also contains, Defendants claim they are "[k]ey nutrients to support brain health & cognitive function."



50.    The exterior of the Neuriva De-Stress packaging also advertises that it has "clinically proven naturally sourced ingredients" and claims that the supplement "Fuels 5 indicators of brain performance" and lists the following: "Everyday Stress Reduction," "Relaxation," "Focus," "Accuracy," and "Concentration."



51.     The side of the Neuriva De-Stress packaging also elaborates on what Defendants claim science has proven the supplement will do as a matter of fact: "Made with clinically proven naturally sourced ingredients to fuel brain health [in] 5 ways." Regarding the first main active ingredient, coffee cherry extract, Defendants again claim that it is "clinically proven to increase levels of the vital neuroprotein BDNF, known to strengthen connections between brain cells." Regarding Neuriva De-Stress' second main active ingredient, melon concentrate (SuperOxide Dismutase), Defendants claim: "Our proprietary Melon Concentrate is a common source of the potent antioxidant SOD (SuperOxide Dismutase) that is naturally found in the body to fight oxidative stress."



52.     Through the representations on Defendants' exterior packaging, Defendants represent to consumers that Neuriva improves specific aspects of brain performance. On Neuriva Original and Neuriva Plus, Defendants claim improvement in focus, memory, learning, accuracy, concentration and, when they add vitamins B6, B12, and Folic Acid, reasoning as well. On Neuriva De-Stress, Defendants only promise improvement in focus, accuracy, and concentration, in addition to stress reduction and relaxation.  For all three products, Defendants trumpet that their promises and Neuriva's efficacy are scientifically and clinically proven.

53.     Defendants repeat and expand on these deceptive representations on their website, www.SchiffVitamins.com. Their website includes the following representations, among others, concerning the Neuriva Products:

      a. "Our new supplement combines the best of science and nature to help brains brain better."

b. "What makes our ingredients so special? Nature made it. Science proved it. Brains love it."

c. "Our natural ingredients are decaffeinated, GMO-free, gluten-free, and clinically proven to support brain performance."

d. "This extract is GMO-free and is decaffeinated, and it's been shown to have incredible brain-supporting properties."

e. "We've studied this amazing superfruit [Coffee Cherry] and proven that it elevates the body's levels of the neuroprotein BDNF."

f. "BDNF is vital neuroprotein that is known to strengthen connections between brain cells, and help new connections flourish."

g. "Neurofactor . . . is clinically proven to increase levels of Brain-Derived Neurotrophic Factor (BDNF) that aid neuron growth and survival . . . ."

54.     If a consumer decides to research or buy Neuriva Original, Neuriva Plus, or Neuriva De-Stress on the Schiff website and clicks on the product, the website then shows another summary of purported brain performance benefits, which includes the claim that "Coffee Cherry Extract has been clinically proven to increase BDNF levels in the brain."

55.     Defendants also encourage readers of their website to "visit our science & ingredients" webpage by asking: "What makes our ingredients so special?"



56.     Under the title "Natural Ingredients Proven Through Science," Defendants elaborate on their claims that Neuriva is scientifically proven through a series of rotating slides. After a person clicks on these slides, a pop-up window appears providing additional information:

a. After clicking the slide entitled "Tale of Two Neurons," the pop-up window states: "Your brain consists of approximately 86 billion neurons. And it does its work by making connections between them. The two main ingredients in

Neuriva have been shown to support both; PS™ supports neuronal health, and coffee cherry (Neurofactor) increases BDNF."

b. After clicking the slide entitled "The Importance of BDNF," the pop-up window states: "[BDNF is] what your brain uses to strengthen connections between neurons, and has been clinically shown to play a role in cognitive performance and higher thinking. Maintaining higher levels of BDNF helps ensure maximum support for your brain."

c. After clicking the slide entitled Coffee Cherry," the pop-up window states: "This extract is GMO-free and is decaffeinated, and it's been shown to have incredible brain-supporting properties. We call it Neurofactor. We've studied this amazing superfruit and proven that it elevates the body's levels of neuroprotein BDNF. BDNF is a vital neuroprotein that is known to strengthen connections between brain cells, and help new connections flourish."

d. After clicking the slide entitled "Plant-Sourced Sharp PS™," the pop-up window states: "Dietary trends show that PS™ intake from food and diet alone has declined over the years so PS™ supplementation is a great way to help support your brain and cognitive function! Our Sharp PS™ is sourced from soybeans and the subject of many clinical studies proving its effectiveness as a cognitive aid."

57.     Defendants also create and post videos on their dedicated YouTube.com channel, Neuriva Brain Performance, through which they market Neuriva. These videos are designed and intended by Defendants to communicate claims about Neuriva's brain performance capabilities.

58.      In the video entitled "What's in Neuriva? Discover our natural ingredients to support brain health," Defendants ask: "What's the not so secret secret behind Neuriva? Our amazing clinically proven natural ingredients." Defendants continue to discuss their "clinically proven" ingredients. Regarding "Neurofactor" (a brand name for coffee cherry extract), Defendants claim it "helps increase your brain's natural levels of BDNF, a key neuroprotein crucial to your overall brain health. Now what you really need to know is BDNF is known to support connections between brain cells and help new connections flourish." Regarding "Sharp PS" (phosphatidylserine), Defendants claim it is "clinically proven to

support memory and learning. This is a no-brainer because lipids make up 60% of your brain and act as the main building blocks of cell membranes. Healthy lipids enrich the brain making PS key for health cognitive functions." Putting the ingredients together, Defendants claim that both active ingredients carry the imprimatur of science: "Neurofactor plus PS makes Neuriva an incredible brain support option. It combines the best of science and nature to help your brain be there for you when you need it most, and fuel key indicators of brain performance."

59.    Defendants have extensively advertised Neuriva on television.  A recent advertisement stated: "Do you want to brain better?  Unlike ordinary memory supplements, Neuriva has clinically proven ingredients that fuel five indicators of brain performance: memory, focus, accuracy, learning, and concentration.  Try Neuriva for 30 days and see the difference."  Defendants' commercials have appeared on various popular networks.

60.    Defendants also actively post marketing claims to its own Instagram account. For example, a March 17, 2020 post utilizes the Jeopardy game show to emphasize Defendants' claim that Neuriva is clinically proven.





61.     Another Instagram post by Defendants asked: "Did you know that nutrient-rich coffee cherry (or Neurofactor) is proven to increase levels of BDNF in the brain?



62.     On Twitter, Defendants claim, among other claims: "Let's talk about Phosphatidylserine. Sharp PS has been proven to support memory and learning in multiple clinical studies."

63.     Defendants also include descriptions next to their videos to emphasize their central uniform marketing message. For example, Defendants attempt to set Neuriva apart from competitors as a better supplement based on its "clinically proven" ingredients:

 **neuriva** ☑ We're not your ordinary memory supplement! 🥮 Neuriva's clinically proven ingredients work to fuel five indicators of 🧠 performance: focus, accuracy, memory, learning, and concentration.* Interested in how you can #BrainBetter? Check the link in our bio!

4w

64.     The singular message throughout Defendants' marketing of Neuriva is that Neuriva is scientifically and clinically proven, as a matter of fact, to increase brain performance. This overriding message promoted by Defendants has been and will continue to be read, heard, and understood by reasonable consumers whether they see it on television; research the product online through Defendants' website or through another website (such as YouTube or Instagram); or read the Product packaging or labeling in a physical store, because this primary message is consistently repeated by Defendants across all utilized media.

**Defendants' Representations are Deceptive and Misleading Because There is No Scientific or Clinical Proof Supporting Defendants' Representations**

65.     In order for a claim to be considered scientifically and clinically proven, as Defendants claim for Neuriva, the claim must be widely accepted in its applicable field and have overwhelming evidence supporting it.  Moreover, there must be a consensus in the scientific community agreeing with the representations. Such consensus would require, at a minimum, sufficiently large, randomized, controlled, double-blind studies that have been scrutinized by peer review during the publication process and subjected to scholarly debate by diverse panels of scientific experts. Additionally, scientific consensus requires that published results be independently replicated by others using rigorous experimental design and data collection practices. If specific representations do not meet these standards, they

cannot be considered "scientifically and clinically proven"; nor can they be considered to have reached scientific consensus.[6]

66.     Defendants' statements on their labels and in their advertising convey to reasonable consumers, and reasonable consumers would believe, that the state of the science regarding Neuriva and its ingredients has reached a level of scientific consensus such that Defendants' claims of increased or enhanced brain performance are established truths and statements of fact.

67.     Even just a review of Defendants' own cited scientific literature demonstrates that there is no scientific consensus or scientific or clinical "proof" that Neuriva will result in enhanced or increased brain performance or will otherwise support brain performance in any way.

68.     Neuriva Original and Neuriva Plus have two main active ingredients to which Defendants attribute its purported brain performance efficacy—coffee cherry extract and plant-sourced phosphatidylserine—while Neuriva De-Stress attributes its purported brain performance efficacy to coffee cherry extract and melon concentrate.

69.     Both versions of the active ingredients that Defendants use in Neuriva Original and Neuriva Plus are brand-name versions. Defendants' supplier of coffee cherry extract has named the ingredient "Neurofactor," while Defendants' supplier of plant-sourced phosphatidylserine has named that ingredient "Sharp PS."

70.     As a matter of basic biochemistry, which Plaintiffs will prove with expert testimony, in order to cause any improvement in brain performance, after being ingested, Neuriva's active ingredients must be absorbed into the bloodstream. From there, the active ingredients must circulate in the bloodstream, without being broken down, and ultimately cross the blood-brain barrier. Plaintiffs will present expert evidence that only after the active ingredients cross the blood-brain barrier and enter the brain can the ingredients potentially cause any improvement whatsoever in brain performance.

---

[6] Bauchner H, Golub RM, Fontanarosa PB. Reporting and Interpretation of Randomized Clinical Trials. *JAMA*. 2019;322(8):732-735; Kirman CR, Simon TW, Hays SM. Science Peer Review for the 21st century: Assessing Scientific Consensus for Decision-making while Managing Conflict of Interests, Reviewer and Process Bias. *Regul Toxicol Pharmacol*. 2019;103:73-85.

71.     As the Global Council on Brain Health has emphasized: "When researchers study prescription drugs that have an effect on the brain, a key experiment that they perform is measuring how much of the drug taken (orally or through other routes) gets into the brain. Not all substances taken by mouth survive the strong stomach acid, and not all substances that persist beyond the stomach get absorbed into the blood.  Even after absorption into the blood, the liver can further break down the substance, and the blood-brain barrier – the natural gatekeeper of the brain – may keep out what is left.  Usually it is not known how much – if any – of the supplement people take gets into the brain."[7]  Consequently, "a key step in using science to support any supplement's benefit on brain health would be to study how much of each nutrient gets to the brain."[8]

72.     A review of the relevant scientific literature shows that no valid scientific or clinical evidence exists regarding how much, if any, of Neuriva's key ingredients reaches the brain.  Because of this lack of evidence, Defendants' claims that Neuriva's ingredients are scientifically and clinically proven to benefit the brain or enhance brain performance are patently false, as well as are Defendants' claims that Neuriva has been scientifically proven to be effective. Indeed, no publicly available study of Neuriva exists, and Plaintiffs have found no indication that Neuriva's efficacy has ever been studied or tested.

73.     Instead of presenting actual scientific and clinical evidence giving rise to proof that coffee cherry extract and plant-based phosphatidylserine in fact impact brain performance, Defendants created a deceptive and misleading infographic on their website that sets out Defendants' essential claims and purported scientific support for Neuriva and its active ingredients but glosses over or misrepresents the lack of scientific or clinical proof that the Neuriva Products' active ingredients actually reach the brain or impact the function of the brain:[9]

---

[7] *Id.* at p. 20.

[8] *Id.*

[9] *See* https://www.schiffvitamins.com/blogs/health-wellness/ingredients-for-better-brain-health.



**No Scientific or Clinical Proof Exists**
**That Coffee Cherry Extract Improves Brain Performance**

74.     According to Defendants, coffee cherry extract is one of the ingredients that (a) "science proved," (b) "is clinically proven to increase levels of Brain-Derived Neurotrophic Factor (BDNF)," and (c) "is clinically proved to increase BDNF levels in the brain."[10] Also according to Defendants, "[BDNF] has been widely studied and is known to support the survival of existing neurons and encourage the growth of new neurons."[11]

75.     Defendants' claims that coffee cherry extract (or Neurofactor) is scientifically and clinically proven to improve brain performance and the implications in Defendant's infographic purporting to support those claims are deceptive and misleading because coffee cherry extract *does not* and *cannot* increase BDNF levels in the brain.

76.     Among other reasons that Defendants' claims are false, as a matter of basic biochemistry that Plaintiffs will prove with expert evidence, BDNF cannot cross the human blood-brain barrier. Therefore, it is scientifically implausible that BDNF could survive circulation in the bloodstream and be transported across the blood-brain barrier in a quantity sufficient to provide any meaningful impact on brain performance.

77.     The human blood-brain barrier acts as a sort of security system for the brain. The blood-brain barrier is highly selective and ensures that only specific substances are allowed to cross and gain access to brain tissue. Expert evidence that Plaintiffs will present will show that there is no proof, scientific or clinical, that any increase of BDNF in the blood, such as *may* be caused by oral consumption of coffee cherry extract, will result in any measurable BDNF transport across the human blood-brain barrier and, subsequently, increase the concentration of BDNF in brain tissue.

78.     Consequently, because, as Plaintiffs will establish with expert evidence, no scientific or clinical evidence exists at all, let alone scientific or clinical proof, that coffee cherry extract that is orally ingested by a consumer will increase BDNF in the brain and, therefore, improve brain performance, Defendants' express and implied claims that coffee

---

[10] *See* https://www.schiffvitamins.com/products/neuriva-original-brain-performance-clinically-proven-brain-supporting-supplement-with-natural-ingredients.
[11] *See id.*

cherry extract is scientifically or clinically proven to increase BDNF in the brain and, therefore, improve or enhance brain performance are false and misleading.

79.     Further, Defendants intentionally mislead consumers by juxtaposing (a) assertions that clinical studies show that coffee cherry extract stimulates the production of BDNF and can increase BDNF levels in the plasma (which is a component of blood) in 90 minutes with (b) statements such as "BDNF has an important role in maintaining the health of existing brain cells, inducing the growth of new neurons and synapses and **supporting overall cognitive function, including memory and learning.**" (Bold original). A reasonable consumer would erroneously understand this juxtaposition to mean that it has been scientifically proven that coffee cherry extract, if consumed, can improve cognitive functions by increasing levels of BDNF in the blood when in fact no study and certainly no scientific or clinical proof exists that increased plasma/blood levels of BDNF can result in increased BDNF levels in the brain and improved or enhanced cognitive function.

80.     Accordingly, Defendants' claims that the Neuriva Products are clinically and scientifically proven to improve brain performance are false and misleading.

<u>No Scientific or Clinical Proof</u>
<u>That Plant-Based Phosphatidylserine Improves Brain Performance</u>

81.     Defendants' claims that a second active ingredient, plant-sourced phosphatidylserine, is scientifically and clinically proven to improve brain performance are also deceptive and misleading.

82.     First, no scientific consensus exists that there is clinical and scientific proof that the soy-derived phosphatidylserine in Neuriva Original and Neuriva Plus will in fact positively affect brain functions. Defendants' claims—such as the one on their website that "PS has been heavily researched and is known to support **proper functioning of the nerve cells in the brain**" (bold original)—are misleading.  Soy-based phosphatidylserine, such as that used in Neuriva, has *not* been heavily researched, and it has *not* been scientifically proven that soy-based phosphatidylserine benefits the brain.

83.     A reasonable consumer would understand Defendants' claims that phosphatidylserine has been heavily researched to mean that the form of phosphatidylserine used in Neuriva has been heavily researched.

84.     However, Defendants fail to disclose to consumers that the "heavily researched" form of phosphatidylserine is animal-derived phosphatidylserine, which is distinct from the soy-based phosphatidylserine present in Neuriva.   The molecular composition of soy-based phosphatidylserine, the ingredient contained in Neuriva, is different from the molecular composition of animal-derived phosphatidylserine, and, as Plaintiffs' expert evidence and studies will prove, research on animal-derived phosphatidylserine cannot support any claim that soy-based phosphatidylserine will improve brain performance.

85.     There is no consensus in the scientific community and no scientific or clinical proof, based on the limited and inconclusive research to date, that soy-based phosphatidylserine can improve brain performance in adults generally, much less improve "Focus," "Memory," "Learning," "Accuracy," "Concentration," and "Reasoning."  In fact, leading scientific groups and the United States Food and Drug Administration ("FDA") have emphasized the lack of evidence – and therefore "proof" – that phosphatidylserine can enhance or improve brain health or performance.

86.     The Global Council on Brain Health, after reviewing the scientific literature, concluded: "There is not enough evidence for recommending the use of phosphatidylserine for brain health, mental functioning, or prevention or treatment of Alzheimer's disease."

87.     The FDA has concluded that "there is little scientific evidence supporting [the] claim" that "[c]onsumption of phosphatidylserine may reduce the risk of cognitive dysfunction in the elderly." The FDA has also determined that "there is little scientific evidence supporting [the] claim" that "[c]onsumption of phosphatidylserine may reduce the risk of dementia in the elderly."

88.     Defendants' assertions regarding research conducted with respect to soy-based phosphatidylserine do not disclose to consumers that the research has primarily focused on senior citizens with mild cognition deficits and, as Plaintiffs' expert evidence will establish, that such research does not indicate what impact soy-based phosphatidylserine will have for healthy adults. Defendants' failure to disclose to consumers the limitations of the research is misleading.

89.     Contrary to Defendants' claims, multiple clinical studies have found no effect on cognition from ingestion of plant-based phosphatidylserine. Defendants' failure to

acknowledge those studies while claiming that its phosphatidylserine is a clinically proven ingredient is false, deceptive, and misleading.

90.     Therefore, Defendants' assertion that the phosphatidylserine in Neuriva has been scientifically and clinically proven to support memory and learning in the general adult population is false, deceptive, and misleading.

91.     Even if there were conclusive evidence—proof—that soy-based phosphatidylserine in fact improves brain function, which there is not, there is no scientific consensus and clinical studies have not scientifically proven that (1) the amount of soy-based phosphatidylserine contained in Neuriva—100 mg—is sufficient to provide any meaningful improvement in brain performance or (2) that taking Neuriva for seven or 30 days, as advertised, can make any difference in brain function.

92.     Defendants' failure to disclose to consumers the fact that the research does not prove that Neuriva's dosage is sufficient to improve or enhance brain performance and that no study suggests that phosphatidylserine can have an impact in seven or 30 days renders its representations regarding phosphatidylserine misleading.

**No Scientific or Clinical Proof
Exists of Melon Concentrate's Effectiveness**

93.     Defendants represent to consumers that its "Melon Concentrate (SuperOxide Dismutase)" has been clinically proven to exert a positive influence over feelings of stress and fatigue.

94.     Plaintiffs' expert evidence will show that SuperOxide Dismutase ("SOD") is a large molecule and that it would be difficult, if not impossible, for the SOD molecule to pass through the gastrointestinal tract and into the blood. Studies of the melon concentrate have not proven that ingested SOD can pass into the blood. Further, Plaintiffs will produce expert evidence that even if the SOD molecule could pass into the blood (which it cannot), in order for it to have any impact on a psychological feeling of stress, it would have to pass through the blood brain barrier and the SOD molecule is too large to pass through the blood brain barrier.

95.     Defendants' statements that the effects of melon concentrate are scientifically and clinically proven are therefore false as a matter of biochemistry and are deceptive and misleading.

### No Scientific or Clinical Proof
### Exists of Neuriva's Effectiveness

96.     As Plaintiffs' expert evidence will show and the FDA and Federal Trade Commission have concluded, when a drug or supplement has more than one active ingredient, as Neuriva does, all active ingredients must be studied in conjunction with one another in order to determine whether the active ingredients in combination still provide the benefits stated in the specific claim or claims. This is important because the active ingredients may diminish each other's effectiveness or produce unexpected consequences.

97.     The FDA has emphasized that even if a manufacturer can point to a study substantiating its claims as to one ingredient contained in its supplement, "[m]anufacturers should be aware that other substances . . . included in the dietary supplement product itself might also affect the dietary supplement's performance or the study results."[12]

98.     Neuriva Original and Neuriva Plus have two active ingredients: coffee cherry extract and phosphatidylserine. Neuriva De-Stress also has two active ingredients: coffee cherry extract and melon concentrate. No public studies have been conducted of any of the Neuriva Products and, therefore, there is no scientific or clinical evidence that the two active ingredients, when combined in any of the Neuriva Products, improve brain function or are safe for concurrent consumption.   Therefore, Defendants' claims that science has proved Neuriva's effectiveness are false and misleading.

### Defendants' Citations to Studies Purportedly Supporting Their Product Claims are
### Deceptive and Misleading Statements

99.     On the Neuriva website, after repeatedly claiming that Neuriva's ingredients are scientifically and clinically proven, Defendants urge consumers "to do your research" and "[w]hen choosing a supplement, look for products that have science backing their ingredients."  Defendants then list the following five "[r]eferences" to scientific literature:[13]

---

[12] *See* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food.

[13] *See* https://www.schiffvitamins.com/blogs/health-wellness/ingredients-for-better-brain-health.

**References:**

[1] Reyes-Izquierdo, T., Argumedo, R., Shu C., Nemzer B., & Pietrzkowski, Z. (2013) Stimulatory Effect of Whole Coffee Fruit Concentrate Powder on Plasma Levels of Total and Exosomal Brain-Derived Neurotrophic Factor in Healthy

[2] Reyes-Izquierdo, T., Nemzer, B., Shu, C., Huynh, L., Argumedo, R., Keller, R., & Pietrzkowski, Z. (2013). Modulatory effect of coffee fruit extract on plasma levels of brain-derived neurotrophic factor in healthy subjects. British Journal of Nutrition, 110(3), 420-425.

[3] Brambilla, R., Cunha, C., & Thomas, K.L. (2019). A simple role of BNDF in learning and memory? Frontiers in Molecular Neuroscience, 3, 1.

[4] Crook T. Treatment of age-related decline in cognitive capacities The effects of phosphatidylserine. In: Katz, RM, Goldman, eds. Anti-Aging Medical Therapeutics, 1998:20-28.

[5] Kim, H. Y., Huang, B. X., & Spector, A. A. (2014). Phosphatidylserine in the brain: metabolism and function. Progress in lipid research, 56, 1-18.

100.    By citing to purportedly scientific and/or clinical literature, Defendants intend to communicate to consumers that Neuriva is scientifically and clinically proven by these five scientific references to support brain performance.   Defendants' implication that these references support their claims is deceptive and misleading.

101.    A reasonable consumer would be unable to easily accept Defendants' invitation to do the research and review Defendants' references and would assume that the scientific references supported Defendants' statements regarding the Neuriva Products.

102.    In fact, the five cited references do not provide any scientific or clinical proof for Defendants' claims. Rather, these references directly undermine Defendants' claim that Neuriva is scientifically and clinically proven to improve brain function and establish that Defendants' claims regarding the science are false, deceptive, and misleading.

103.    First, Defendants cite to a 2013 study conducted by employees of the company that owns and sells Neurofactor (the coffee cherry extract) entitled "Stimulatory Effect of Whole Coffee Fruit Concentrate Powder on Plasma Levels of Total and Exosomal Brain-Derived Neurotrophic Factor in Healthy Subjects: An Acute Within-Subject Clinical Study."[14] The conclusion reached in this study was that "whole coffee fruit concentrate"

---

[14] *See*
https://www.researchgate.net/publication/260944035_Stimulatory_Effect_of_Whole_Coffee_Fruit_Concentrate_Powder_on_Plasma_Levels_of_Total_and_Exosomal_Brain-Derived_Neurotrophic_Factor_in_Healthy_Subjects_An_Acute_Within-Subject_Clinical_Study.

increased BDNF in blood plasma. This study did not show any increase in BDNF in the brain or provide any evidence that BDNF in blood plasma could cross the human blood-brain barrier and achieve concentrations in brain tissue that could improve brain performance. The study also noted further research was necessary, which further shows that Defendants' claim that coffee cherry extract is scientifically and clinically "proven" is false.[15] Specifically, the studies' authors end the article with an explanation that "[f]urther studies are needed" and that "it would be interesting to study the effect of [whole coffee fruit concentrate] on BDNF-mediated brain functionalities such as cognitive activity...."[16] In other words, the study itself acknowledged that it did not address whether coffee cherry extract affects brain performance. Accordingly, Defendants' citation of this study as support for its claim that coffee cherry extract is a clinically proven ingredient and that science has proven Neuriva's efficacy is false, deceptive, and misleading.

104.    Second, Defendants cite to a 2013 study entitled "Modulatory effect of coffee fruit extract on plasma levels of brain-derived neurotrophic factor in healthy subjects," a study also conducted by employees of the company that markets Neurofactor.[17] The conclusion reached in this study was again only that "whole coffee fruit concentrate" increased BDNF in blood plasma. This study did not show any increase of BDNF in the brain or that an increase in blood plasma BDNF results in enhanced BDNF delivery across the human blood-brain barrier. Furthermore, this study provided no data in support of the assertion that coffee fruit concentrate could provide beneficial effects in the brain due to elevated BDNF blood plasma levels. This study also noted the need for "larger clinical studies" in order "to support" a possibility that whole coffee fruit concentrate – which is different from the coffee fruit extract in Neuriva – might be "used for modulation of BDNF-dependent health conditions," without any reference to the brain. Defendants' claims to consumers that this study supports their

---

[15] *Id.*

[16] *Id.*

[17] *See*

https://www.cambridge.org/core/services/aop-cambridge-core/content/view/8B291E8D053143AA5A8D33B65496B034/S0007114512005338a.pdf/modulatory_effect_of_coffee_fruit_extract_on_plasma_levels_of_brainderived_neurotrophic_factor_in_healthy_subjects.pdf.

claims that coffee cherry extract is clinically proven and Neuriva's efficacy is proven by science are false, deceptive, and misleading.

105.    Third, Defendants cite to a 2019 literature review entitled "A simple role of BDNF in learning and memory?"[18] Far from supporting Defendants' claim that Neuriva's active ingredients when orally ingested are scientifically and clinically proven to improve or enhance brain performance, this review notes that "[l]ack of a precise knowledge about the mechanisms by which BDNF influences higher cognitive functions and complex behaviors may constitute a severe limitation in the possibility to devise BDNF-based therapeutics for human disorders of the CNS."  Nothing in this recent review supports Defendants' claims that coffee cherry extract (or Neurofactor) can increase BDNF in the brain or affect brain performance. Defendants' citation of this review, knowing that reasonable consumers would not likely be able to review it or understand it, as support of their claim that coffee cherry extract is a clinically proven ingredient is false, deceptive, and misleading.

106.    Fourth, Defendants cite to an article entitled "Treatment of age-related decline in cognitive capacities: The effects of phosphatidylserine" contained in a 1998 book that is now out of print. The results of this study have been described as controversial, involved phosphatidylserine dosages three times larger than contained in Neuriva, and looked at only at a limited population.  This article does not support Defendants' claim that plant-derived phosphatidylserine is clinically proven to improve brain performance in all adults or that Neuriva can increase brain performance. Defendants' citation of this article as support for its claims regarding phosphatidylserine is false, deceptive, and misleading.

107.    Fifth, Defendants cite to a 2014 literature review entitled "Phosphatidylserine in the brain: metabolism and function."[19] This review establishes, contrary to Defendants' claims, that it is far from clear whether soy-based phosphatidylserine can increase brain performance: "[E]xperimental evidence indicating that orally or intravenously administered PS actually alters neuronal membrane properties *is lacking. How the administered PS is transported in the plasma, how much enters the brain, whether it is taken up intact, and whether it is incorporated into neurons or glia are not known....* These issues will have to be investigated in order to obtain some mechanistic insight into how dietary or intravenously administered PS

___

[18] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2821174/
[19] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4258547/

supplements function to produce cognitive improvement." (Emphasis added) This literature review establishes that Defendants' claims of scientific and clinical proof regarding the ability of soy-based phosphatidylserine to affect brain performance are at best deceptive and misleading. In addition, Defendants' citation of this literature review, which a reasonable consumer would assume provided proof for Defendants' claims, is false, deceptive, and misleading.

108.   Defendants' claims regarding these studies were so false, deceptive, and misleading that the organization Truth in Advertising wrote an article specifically discussing these false claims: "But TINA.org took a closer look at several of the ingredient studies Schiff cites on its website in support of its clinically proven claims, which also appear on Neuriva's product packaging. And here's the bombshell: the studies themselves acknowledge that further clinical research is needed before anything conclusive can be said about the cognitive benefits of the ingredients tested: whole coffee fruit concentrate powder (WCFC) and phosphatidylserine (PS). . . . Far from concluding that either ingredient is clinically proven to help with memory, focus and the others, these studies call for further clinical investigation."[20]

109.   Additionally, Defendants' claims that their ingredients are "clinically proven" and that science has proven Neuriva's efficacy are false and misleading because they misrepresent the state of the entire body of scientific literature regarding their ingredients.

110.   The lack of scientific and clinical proof for Defendants' claims regarding Neuriva is hardly surprising to anyone versed in the science. As the Global Council on Brain Health emphasized in a Consensus Statement: "Very few supplements have been carefully studied for their effect on brain health. For the handful that have been researched, several well-designed studies of supplements for brain health found no benefit in people with normal nutrient levels. *It's unclear whether people with nutritional deficiencies can benefit their brains by taking a supplement because the research is inconclusive.*"[21] (Emphasis added).

---

[20] https://www.truthinadvertising.org/neurivas-clinically-proven-ingredients-claims/.
[21] Global Council on Brain Health at p. 4.

**Defendant RB's Chief Scientific Officer Admits**
**Defendants' Marketing is Deceptive and Misleading**

111.   Defendants' persistent and uniform marketing message is that Neuriva is scientifically and clinically proven to improve brain performance as a matter of fact. This message conveys to reasonable consumers that scientists have reached a consensus through clinical research that Neuriva's ingredients will improve consumers' brain performance. This message is deceptive and misleading as implicitly acknowledged by Defendant RB's Chief Scientific Officer, Dr. Dirk Hondmann.

112.   In Defendants' press release dated April 24, 2019,[22] Dr. Hondmann claims only that "Neuriva's ingredients are supported by clinical studies"—as opposed to being scientifically and clinically proven—and also acknowledges that the Products need more testing: "But this is just the beginning – the team is committed to continuing to advance the education and science even further."

113.   In addition, in an interview published on May 6, 2019, shortly after Defendants first began marketing Neuriva, Dr. Hondmann said with regard to Neuriva's ability to improve brain function: "There are several studies supporting the effectiveness of the ingredients in Neuriva. While both ingredients have similar mechanisms of action we are eager to continue to invest in clinical research of the individual components and investigate studies on the complete product."[23]

114.   Dr. Hondmann's more limited claim that there are only studies "supporting" the effectiveness of the ingredients in improving brain function is deceptive in and of itself and is also an acknowledgement that the effectiveness of the Neuriva ingredients has not yet been proven. Scientifically, the mere existence of studies "supporting" the effectiveness of an ingredient does not "prove" that the ingredient is effective, although this distinction is not readily apparent to the average consumer, particularly when bombarded with marketing and label claims of clinical and scientific proof.

---

[22] *See* https://www.prnewswire.com/news-releases/its-time-to-brain-better-rb-launches-neuriva-a-dietary-supplement-and-holistic-approach-to-support-brain-health-300837523.html.
[23] *See* https://www.nutraingredients-usa.com/Article/2019/05/06/Reckitt-Benckiser-throws-hat-in-nootropic-ring-with-Neuriva-launch#.

115.    Dr. Hondmann further acknowledged that the effectiveness of the ingredients had not yet been proven—contrary to Defendants' uniform marketing claims—by stating that Defendants needed to fund further research on the ingredients.

116.    Dr. Hondmann also acknowledged that the effectiveness of Neuriva itself had not been proven—contrary to Defendants' uniform marketing claims that science has proven Neuriva's effectiveness—because clinical research needs to be done on Neuriva itself.

117.    By acknowledging the need for further research on Neuriva's core ingredients and on Neuriva itself, Defendant RB's Chief Scientific Officer admitted that Neuriva does not have the consensus of the scientific community necessary to state that Neuriva is scientifically or clinically "proven" to improve brain performance.

### Impact of Defendants' Wrongful Conduct

118.    As the manufacturer and distributor of Neuriva, Defendants possess exclusive and specialized knowledge regarding Neuriva's content and the effects of its ingredients as well as the state of scientific and clinical research regarding Neuriva's ingredients. As a result, Defendants are in a superior position to know whether Neuriva works as they claim in their marketing on the Products' packages and labels.

119.    Defendants knew, but failed to disclose, or should have known, that Neuriva is not scientifically or clinically proven to improve brain performance as advertised because Neuriva itself has not been studied.

120.    Defendants knew, but failed to disclose, or should have known that coffee cherry extract (or Neurofactor) has not been scientifically or clinically proven to improve brain performance and that even if orally-ingested coffee cherry extract increases levels of BDNF in the blood plasma, BDNF *cannot* cross the blood-brain barrier and impact brain performance.

121.    Defendants knew, but failed to disclose, or should have known, that soy-based phosphatidylserine is not scientifically or clinically proven to improve brain performance as advertised; that very little research has been done on soy-based phosphatidylserine; that soy-based phosphatidylserine is molecularly different than animal-derived phosphatidylserine; that the overwhelming bulk of the research has been done on animal-derived phosphatidylserine rather than soy-based phosphatidylserine; that studies exist showing that soy-based phosphatidylserine does not enhance or improve brain performance; and that even

35

if soy-based phosphatidylserine could have an impact on brain function, it would not show any brain impact within seven or 30 days as advertised.

122.   Defendants knew, but failed to disclose, that their five references to scientific literature do not support, and in several cases directly refute, Defendants' assertions that Neuriva and its ingredients are scientifically and clinically proven.

123.   Defendants knew, but failed to disclose, that some of their cited studies are funded by those who have a direct financial incentive in producing positive results.

124.   Defendants affirmatively represented that there was scientific and clinical proof for Neuriva's improved brain performance claims when no public studies exist of Neuriva and there is, therefore, no scientific or clinical proof or scientific consensus regarding those claims.

125.   Reasonable consumers would have understood from Defendants' claims that a scientific consensus exists that coffee cherry extract, soy-based phosphatidylserine, and melon concentrate will in fact improve their focus, memory, learning, accuracy, concentration, reasoning, everyday stress reduction, and relaxation. Because this reasonable understanding is intended by Defendants and not correct, Defendants' claims are false and misleading.

126.   Plaintiffs and the class members have been and will continue to be deceived or misled by Defendants' false, misleading, and deceptive brain performance representations.

127.   Defendants' brain impact representations and omissions were a material factor in influencing Plaintiffs' and the class members' decision to purchase Neuriva. In fact, the only purpose for purchasing Neuriva is to obtain the represented brain performance benefits.

128.   Defendants market Neuriva solely for use as a supplement that improves brain performance. Defendants' conduct has injured Plaintiffs and the class members because Defendants' Neuriva cannot support or benefit brain performance as advertised and is worthless.

129.   Had Plaintiffs and the class members known the truth about Defendants' Neuriva products, they would not have purchased Neuriva and would not have paid the prices they paid for Neuriva.

130.   Plaintiffs and each class member were harmed by purchasing Defendants' Neuriva because Neuriva is not capable of providing the claimed benefits to the brain.

Plaintiffs and each class member lost money and property as a result of purchasing Defendants' ineffective and worthless products.

131.    Plaintiffs and each class member did not realize the benefit of the bargain and their expectations were not met.  And Plaintiffs and each class member paid substantially more than the market value represented by the price bargained for.

132.     By use of its misleading marketing and labeling, Defendants created increased market demand for Neuriva and increased their market share relative to what the demand for Neuriva and share would have been had Defendants marketed and labeled Neuriva truthfully.

133.     Plaintiffs and the class members lost money as a result of Defendants' misrepresentations in that they did not receive what they reasonably believed they were paying for based upon the misrepresentations while Defendants realized a commensurate unearned gain because they did not deliver to Plaintiffs and the class members what Defendants led Plaintiffs and the class members to believe they would receive.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF DAVID WILLIAMS

134.    Plaintiff David Williams purchased seven to eight bottles of Neuriva Original at Walmart in about January 2020. Prior to purchasing Neuriva Original, Plaintiff Williams was exposed to and saw and relied upon Defendants' materially misleading representations in television commercials and on the Neuriva Original packaging. Based on Defendants' claims, Plaintiff Williams believed that Neuriva Original would improve his brain performance and memory.

135.    Plaintiff Williams experienced no improvement in his brain performance as a result of taking Neuriva Original.

136.    Plaintiff Williams' decision to buy Neuriva was directly impacted and caused by the materially misleading representations that Defendants made regarding Neuriva's ingredients being clinically and scientifically proven and Neuriva's ability to improve brain performance.

137.    Had Plaintiff Williams known the truth about Defendants' materially misleading representations and omissions, he would not have purchased Neuriva.

138.    By purchasing Defendants' falsely advertised Products, Plaintiff Williams suffered injury in fact and lost money.

139.    Plaintiff Williams would like to purchase Defendants' products if they truly improved brain performance. Plaintiff Williams is, however, unable to rely on Defendants' representations regarding the effectiveness of Defendants' products in deciding whether to purchase Defendants' products in the future.

### FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF CAROLL ANGLADE

140.    Plaintiff Caroll Anglade purchased Neuriva on several occasions in 2019 at Walgreens, BJ's Wholesale Club, and Costco Wholesale. She stopped using Neuriva in January 2020. Prior to purchasing Neuriva, Plaintiff Anglade was exposed to and saw and relied upon Defendants' materially misleading representations in Defendants' advertisements and on the Neuriva packaging, including Defendants' claims that Neuriva's ingredients have the ability to improve brain performance.

141.    Plaintiff Anglade experienced no improvement in her brain performance as a result of taking Neuriva.

142.    Plaintiff Anglade's decision to buy Neuriva was directly impacted and caused by the materially misleading representations that Defendants made regarding Neuriva's ingredients being clinically and scientifically proven and Neuriva's ability to improve brain performance.

143.    Had Plaintiff Anglade known the truth about Defendants' materially misleading representations and omissions, she would not have purchased Neuriva.

144.    By purchasing Defendants' falsely advertised Products, Plaintiff Anglade suffered injury in fact and lost money.

145.    Plaintiff Anglade would like to purchase Defendants' products if they truly improved brain performance. Plaintiff Anglade is, however, unable to rely on Defendants' representations regarding the effectiveness of Defendants' products in deciding whether to purchase Defendants' products in the future.

### FACTUAL ALLIGATIONS SPECIFIC TO PLAINTIFF THOMAS MATTHEWS

146.    Plaintiff Thomas Matthews purchased Neuriva Plus on Amazon.  Prior to purchasing Neuriva Plus, Plaintiff Matthews was exposed to and saw and relied upon Defendants' materially misleading representations via television commercials, the internet, the Neuriva website, on Amazon's website, and the Neuriva packaging, including

Defendants' claims that Neuriva's ingredients have been clinically and scientifically proven and that Neuriva has the avility to improve brain performance.

147.    Plaintiff Matthews experienced no improvement in his brain performance as a result to taking Neuriva.

148.    Plaintiff Matthews' decision to buy Neuriva was directly impacted and caused by the materially misleading representations that Defendants made regarding Neuriva's ingredients being clinically and scientifically proven and Neuriva's ability to improve brain performance.

149.    Had Plaintiff Matthews known the truth about Defendants' materially misleading representations and omissions, he would not have purchased Neuriva.

150.    By purchasing Defendants' falsely advertised products, Plaintiff Matthews suffered injury in fact and lost money.

151.    Plaintiff would like to purchase Defendants' products if they truly improved brain performance.   Plaintiff Matthews is, however, unable to rely on Defendants' representations regarding the effectiveness of Defendants' products in deciding whether to purchase Defendants' products in the future.

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF MARTIZA ANGELES**

152.    Plaintiff Martiza Angeles purchased Neuriva Plus on Amazon.   Prior to purchasing Neuriva Plus, Plaintiff Angeles was exposed to and saw and relied upon Defendants' materially misleading representations via television commercials, the internet, the Neuriva website, on Amazon's website, and the Neuriva packaging, including Defendants' claims that Neuriva's ingredients have been clinically and scientifically proven and that Neuriva has the ability to improve brain performance.

153.    Plaintiff Angeles experienced no improvement in her brain performance as a result of taking Neuriva.

154.    Plaintiff Angeles' decision to buy Neuriva was directly impacted and caused by the materially misleading representations that Defendants made regarding Neuriva's ingredients being clinically and scientifically proven and Neuriva's ability to improve brain performance.

155.    Had Plaintiff Angeles known the truth about Defendants' materially misleading representations and omissions, she would not have purchased Neuriva.

156.    By purchasing Defendants' falsely advertised products, Plaintiff suffered injury in fact and lost money.

157.    Plaintiff Angeles would like to purchase Defendants' products if they truly improved brain performance.  Plaintiff Angeles is, however, unable to rely on Defendants' representations regarding the effectiveness of Defendants' products in deciding whether to purchase Defendants' products in the future.

### FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF HOWARD CLARK

158.    Plaintiff Howard Clark purchased one bottle of Neuriva Original at CVS in San Francisco, California in January 2020. Prior to purchasing Neuriva Original, Plaintiff Clark was exposed to and saw and relied upon Defendants' materially misleading representations on the Neuriva Original packaging. Based on Defendants' claims, Plaintiff Clark believed that Neuriva Original would improve his brain performance and memory.

159.    Plaintiff Clark experienced no improvement in his brain performance as a result of taking Neuriva Original.

160.    Plaintiff Clark's decision to buy Neuriva was directly impacted and caused by the materially misleading representations that Defendants made regarding Neuriva's ingredients being clinically and scientifically proven and Neuriva's ability to improve brain performance.

161.    Had Plaintiff Clark known the truth about Defendants' materially misleading representations and omissions, he would not have purchased Neuriva.

162.    By purchasing Defendants' falsely advertised products, Plaintiff Clark suffered injury in fact and lost money.

### CLASS ACTION ALLEGATIONS

163.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of the following proposed Classes defined as follows:

**National Class**

All persons residing in the United States who purchased Neuriva Original, Neuriva Plus, and/or Neuriva De-Stress for personal use and not for resale.

**Florida Class**

All persons residing in the state of Florida who purchased Neuriva Original, Neuriva Plus, and/or Neuriva De-Stress for personal use and not for resale.

**California Class**

All persons residing in the state of California who purchased Neuriva Original, Neuriva Plus, and/or Neuriva De-Stress for personal use and not for resale.

**<u>New York Class</u>**

All persons residing in the state of New York who purchased Neuriva Original, Neuriva Plus, or Neuriva De-Stress for personal use and not for resale.

164.    Excluded from the Nationwide Class, the Florida Class, the California Class, and the New York Class (referred to collectively in this section as "the Class") are: Defendants, Defendants' board members, executive level officers, and attorneys, and immediate family members of any of the foregoing; governmental entities; the Court, the Court's immediate family, and staff; and any person who timely and properly excludes himself or herself from the Class.

165.    Plaintiffs reserve the right to alter the Class definition as necessary to the full extent allowed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Florida, and applicable precedent.

166.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence that individual Class members would use to prove those elements in individual actions alleging the same claims.

### *Numerosity, Rule 23(a)(1)*

167.    The size of the Class is so large that joinder of all Class members is impracticable. Plaintiffs believe there are tens of thousands or more Class members geographically dispersed Nationwide and thousands or more dispersed throughout each of the States of Florida, California, and New York.

### *Existence and* **Pre***dominance of Common Questions of Law and Fact, Rule 23(a)(2), (b)(3)*

168.   There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members. Common legal and factual questions/issues include but are not limited to:

    a.   what representations Defendants have made regarding Neuriva over time;

    b.   the state of scientific and industry knowledge, including Defendants' knowledge, regarding the ability of coffee cherry extract and/or plant-based phosphatidylserine to improve brain performance;

    c.   whether Neuriva is capable of providing or in fact provides any of the beneficial effects on brain performance that Defendants claim;

    d.   whether Neuriva is scientifically or clinically proven to have any beneficial effects on brain performance, as Defendants claim;

    e.   whether Defendants' representations and omissions regarding Neuriva are false and/or misleading;

    f.   whether Defendants have engaged in false and/or misleading advertising, marketing, packaging, and labeling in connection with Neuriva;

    g.   whether Defendants knew or reasonably should have known that their representations regarding Neuriva are false and misleading;

    h.   whether Defendants' conduct was knowing and willful;

    i.   whether the Class members have been injured and the proper measure of their damages as a result of their injuries; and

    j.   whether the Class members are entitled to other appropriate remedies, including corrective advertising and injunctive relief.

169.   Defendants engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the Class members. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate this action. Moreover, the common questions will yield common answers that will substantially advance the resolution of the case.

*Typicality, Rule 23(a)(3)*

170.    Plaintiffs' claims are typical of the claims of the Class members because, among other things, Defendants injured all Class members through the uniform misconduct described herein; all Class members suffered injury due to Defendants' misrepresentations; and Plaintiffs seek the same relief as the Class members.

171.    There are no defenses available to Defendants that are unique to the named Plaintiffs.

*Adequacy of Representation, Rule 23(a)(4)*

172.    Plaintiffs are fair and adequate representatives of the Class because Plaintiffs' interests do not conflict with the Class members' interests. Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendants. Furthermore, Plaintiffs have retained competent counsel who are experienced in class action and other complex litigation. Plaintiffs and Plaintiffs' counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.  The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

*Declaratory and Injunctive Relief, Rule 23(b)(2)*

173.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

*Superiority, Rule 23(b)(3):*

174.    The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

   a.   The damages individual Class members have suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' misconduct.

   b.   It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. Individualized litigation would unnecessarily increase the delay and

expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

    c.  The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

175.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201 et seq.**
**(On behalf of Plaintiffs individually and on behalf of the Class)**

176.   Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

177.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

178.   Plaintiffs Williams and Anglade and all Florida Class members are "consumers" and Defendants have engaged in "trade or commerce" as defined by FDUTPA. Fla. Stat. § 501.203(7)-(8).

179.   FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or

commerce." Fla. Stat. § 501.204(1).   The FDUTPA also prohibits false and misleading advertising.

180.   Defendants have violated the FDUTPA by engaging in the unfair or deceptive practices described in this Complaint, practices that offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers. Defendants' unfair or deceptive practices as described herein are likely to mislead—and have misled—consumers acting reasonably in the circumstances.

181.   Defendants engaged in unfair or deceptive practices by, among other things, making the false representations and omissions of material facts regarding Neuriva in their uniform advertising, including the packaging and labeling, as set forth more fully in this Complaint. In fact, Neuriva is not capable of conferring the brain performance benefits Defendants promised, and Defendants falsely claimed Neuriva's benefits are scientifically and clinically proven when they are not.

182.   Plaintiffs Williams and Anglade and the other Florida Class members paid for a valueless product that is not capable of conferring the benefits promised. While Plaintiffs and the other Class members were harmed, Defendants were unjustly enriched by their false representations and omissions. As a result, Defendants' conduct is "unfair."

183.   Plaintiffs Williams and Anglade and the members of the Florida Class have in fact been deceived as a result of their reliance on Defendants' material misrepresentations and omissions, which are described above.  Plaintiffs and the Class acted reasonably when they purchased Neuriva based on their belief that Defendants' representations were true and lawful.

184.   In addition, the practices employed by Defendants, whereby Defendants sold, promoted, and marketed Neuriva with the deceptive representations described in this Complaint constitute a per se violation of FDUTPA under Fla. Stat. § 501.203(3)(c) because they are in violation of the Florida Food Safety Act ("FFSA"), Fla. Stat. § 500.04 (1) and (2), in that the Neuriva Products are misbranded.

185.   Defendants' false, unlawful, and misleading product descriptions render its products misbranded under Florida law. Specifically, § 500.04 of the FFSA prohibits the manufacture, sale, or delivery of "misbranded food." Neuriva is a dietary supplement, which meets the definition of "food" under the FFSA. Fla. Stat. § 500.03(n)(5). Food is

"misbranded" when "its labeling is false or misleading in any particular." Fla. Stat. § 500.11(1)(a). A food is considered mislabeled unless the proper disclosures are made "on the outside container or wrapper" on the product. Fla. Stat. § 500.03(1)(t). Misbranded products cannot be legally sold and are legally worthless.

186.    Plaintiffs Williams and Anglade and the Florida Class members have suffered injury in fact and lost money as a result of their purchases of Defendants' Neuriva Products and Defendants' unlawful, unfair, and fraudulent practices.

187.    The harm suffered by Plaintiffs Williams and Anglade and the Florida Class members was directly and proximately caused by the deceptive, misleading, and unfair practices of Defendants, as more fully described in this Complaint.

188.    Defendants knew, or should have known, that they have no scientific evidence for their claims of definitive scientific and clinical proof as set forth above.  Defendants further knew, or should have known, that their material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Defendants for Neuriva which is valueless and incapable of actually supporting, maintaining, improving, or benefiting brain performance.

189.    As a result of their deception, Defendants were unjustly enriched by receiving payments from Plaintiffs Williams and Anglade and the Florida Class for Neuriva Products when they cannot perform as advertised and when there is no scientific or clinical evidence to support Defendants' claims of definitive scientific and clinical "proof."

190.    Unless restrained and enjoined, Defendants will continue to engage in the unlawful, unfair, and fraudulent conduct described in this Complaint. Accordingly, injunctive relief is appropriate.

191.    Plaintiffs Williams and Anglade, individually and on behalf of all others similarly situated, and on behalf of the general public, seek damages and restitution from Defendants of all money obtained from Plaintiffs and the other members of the Florida Class collected as a result of Defendants' deceptive or unfair practices, an injunction prohibiting Defendants from continuing and further engaging in their unlawful, unfair, and fraudulent conduct, requiring corrective advertising, and all other relief this Court deems appropriate.

192.    In addition to seeking recovery of their attorneys' fees and costs pursuant to Fla. Stat. § 501.2105, Plaintiffs Williams and Anglade and the Florida Class seek a declaratory

judgment pursuant to Fla. Stat. § 501.211(1) that Defendants have knowingly violated FDUTPA because their representations are false and/or misleading in that the Neuriva Products cannot perform as advertised and there is no scientific or clinical evidence to support Defendants' claims of definitive scientific and clinical "proof." Plaintiffs and the Class further seek a declaratory judgment that the Neuriva Products are a misbranded food under Florida law, and therefore Defendants have committed per se violations of the FDUTPA.

## COUNT II
### Violation of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq*.
### (On behalf of Plaintiffs Matthews and Clark individually and on behalf of the California Class

193. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

194. Plaintiffs Matthews and Clark and Defendants are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

195. Defendants are subject to California's UCL, Cal Bus. Prof. Code § 17200 et seq. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

196. Defendants' business practices, described above, violated the "unlawful" prong of the UCL. Because Defendants' representations about the Neuriva products were false and misleading, Defendants have committed unlawful business practices by violating California's Sherman Food, Drug and Cosmetic Law. Cal. Health & Safety Code §§ 109875 et seq. and the Food Drug and Cosmetic Act, 21 U.S.C. §§ 301 et seq.

197. Defendants violated the "unfair" prong of the UCL by making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding Neuriva in their marketing and on Neuriva's packaging and labeling, as set forth above. There is no societal benefit from false advertising—only harm.

198. Plaintiffs Matthews and Clark and the other California Class members paid for a valueless product that is not capable of conferring the benefits promised. While Plaintiffs Matthews and Clark and the other California Class members were harmed, Defendants were unjustly enriched by their false representations and omissions. As a result, Defendants'

conduct is "unfair" as it offended an established public policy. Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

199.    Further, Plaintiffs Matthews and Clark allege violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendants' acts and omissions violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of the Business & Professions Code § 17200, et seq.

200.    Defendants violated the fraudulent prong of the UCL by, among other things, making the false representations and omissions of material facts regarding Neuriva in their uniform advertising, including the packaging and labeling, as set forth more fully herein. In fact, Neuriva is not capable of conferring the brain performance benefits Defendants promised and Defendants falsely claimed Neuriva and its ingredients were scientifically and clinically proven when the body of relevant scientific literature shows Defendants' claims are false and/or misleading..

201.    Defendants' actions, claims, omissions, and misleading statements, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200 et seq.

202.    Plaintiffs Matthews and Clark and the members of the California Class have in fact been deceived as a result of their reliance on Defendants' material misrepresentations and omissions, which are described above.  Plaintiffs Matthews and Clark and the California Class acted reasonably when they purchased Neuriva based on their belief that Defendants' representations were true and lawful.

203.    Plaintiffs Matthews and Clark and the California Class members have suffered injury in fact and lost money as a result of their purchases of Defendants' Neuriva Products and Defendants' unlawful, unfair, and fraudulent practices.

204.    Defendants knew, or should have known, that they have no scientific evidence for their claims of definitive scientific and clinical proof as set forth above.  Defendants further knew, or should have known, that their material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments

to Defendants for Neuriva which is valueless and incapable of actually supporting, maintaining, improving, or benefiting brain performance.

205.    As a result of their deception, Defendants were unjustly enriched by receiving payments from Plaintiffs Matthews and Clark and the California Class for Neuriva when it cannot perform as advertised and when there is no scientific or clinical evidence to support Defendants' claims of definitive scientific and clinical "proof."

206.    Unless restrained and enjoined, Defendants will continue to engage in the unlawful, unfair, and fraudulent conduct described herein. Accordingly, injunctive relief is appropriate.

207.    Plaintiffs Matthews and Clark, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendants of all money obtained from Plaintiffs Matthews and Clark and the other members of the California Class collected as a result of Defendants' unfair competition, an injunction prohibiting Defendants from continuing and further engaging in their unlawful, unfair, and fraudulent conduct, requiring corrective advertising, and awarding all other relief this Court deems appropriate.

**COUNT III**
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750, et seq.**
**(On behalf of Plaintiffs Matthews and Clark individually and on behalf of the California Class)**

208.    Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

209.    Plaintiffs Matthews and Clark and California Class Members are consumers who purchased Neuriva for personal, family, or household purposes.  Plaintiffs Matthews and Clark and the California Class have been at all relevant times "consumers" within the meaning of the CLRA, Cal. Civ. Code § 1761(a), (c), and (d).

210.    Defendants are "persons" and Neuriva Products are "goods" within the meaning of the CLRA, Cal. Civ. Code § 1761(a), (c), and (d).

211.    Defendants' sale and advertisement of Neuriva constitute "transactions" within the meaning of the CLRA, Cal. Civ. Code § 1761(e).

212.    The CLRA declares as unlawful the following unfair methods of competition and unfair or deceptive acts or practices when undertaken by any person in a transaction intended to result, or which results in the sale of goods to any consumer:

 a. "Representing that goods . . . have . . . approval, characteristics, . . . uses [and] benefits . . . which [they do] not have . . . ."  Cal. Civ. Code § 1770(a)(5).

 b. "Representing that goods . . . are of a particular standard, quality or grade . . . if they are of another."  Id. (a)(7).

 c. "Advertising goods . . . with intent not to sell them as advertised."  Id. (a)(9).

 d. "Representing that [goods] have been supplied in accordance with a previous representation when [they have] not."  Id. (a)(16).

213.    Defendants violated and continue to violate the CLRA by engaging in the practices prohibited by Cal. Civ. Code § 1770(a)(5), (7), (9), and (16), which were intended to result in, and did result in, the sale of Neuriva.

214.    Defendants' foregoing acts and practices, including their deceptive and fraudulent misrepresentations and omissions in the conduct of trade or commerce, were directed at consumers, including Plaintiff and California Class Members.

215.    Defendants' violations of the CLRA proximately caused injury in fact to Plaintiff and the Class.

216.    Plaintiffs Matthews and Clark and the California Class members purchased Defendants' Neuriva on the belief that they would receive the advertised benefits to the brain from Neuriva.  Indeed, no consumer would purchase a brain health supplement unless he or she believed it was capable of providing meaningful benefits to the brain.

217.    Defendants' Neuriva, however, is worthless and cannot provide the advertised benefits. Because Neuriva lacks any value, Plaintiff and each Class member was injured by the mere fact of their purchase.

218.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiffs Matthews and Clark, individually and on behalf of the other members of the California Class, seek a Court order enjoining the above-described wrongful acts and practices of Defendants.

219.    Pursuant to Cal. Civ. Code 1782(a), Plaintiffs Matthews and Clark have notified Defendants in writing sent by certified mail of the particular violations of Section 1770 of the

CLRA, which notification demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act.  Defendants failed to take corrective action within 30 days of receipt of Plaintiffs' letters, and Plaintiffs, therefore, request an award of damages as permitted by Cal. Civ. Code § 1782(d).

220.    Pursuant to § 1780(d) of the Act, attached hereto as Exhibit A is the affidavit showing that this action has been commenced in the proper forum.

<u>COUNT IV</u>
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500,** *et seq.*
**(On behalf of Plaintiffs Matthews and Clark individually and on behalf of the California**
**Class)**

221.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

222.    The FAL, in relevant party, states that "[i]t is unlawful for ... any corporation ... with intent ... to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper, or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement ... which is untrue or misleading, and which is known or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500.

223.    The required intent is the intent to dispose of property, not the intent to mislead the public in the disposition of such property.

224.    Defendants violated the FAL by making the untrue or misleading representations described above, including that Neuriva delivers the benefits Defendants claim and that its ability to deliver such benefits has been scientifically and clinically proven when, in reality, no scientific and clinical proof of Neuriva's advertised benefits exists.

225.    As a direct and proximate result of Defendants' untrue and misleading advertising, Plaintiffs Matthews and Clark and the California Class members have suffered injury in fact and have lost money.

226.    Accordingly, Plaintiffs Matthews and Clark request that the Court order Defendants to restore the money Defendants have received from Plaintiffs Matthews and Clark and members of the California Class, and that the Court enjoin Defendants from continuing their unlawful practices, and engage in corrective advertising.

<u>COUNT V</u>
**Violation Of N.Y. General Business Law § 349**
**(On behalf of Plaintiff Angeles individually and behalf of the New York Class)**

227.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

228.    Plaintiff Angeles brings this Count on behalf of herself and the New York Class.

229.    The New York General Business Law § 349 provides, inter alia: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. Law § 349(a).

230.    Defendants engage in "trade" and "commerce" as they offer the Neuriva Products for sale to consumers.  By their wrongful acts and omissions described within this Complaint, including the deceptive marketing, packaging, labeling, distribution, and sale of the Neuriva Products as scientifically and clinically proven to improve brain performance, Defendants committed unfair methods of competition and unfair and deceptive acts and practices in the conduct of a trade or commerce.

231.    By misrepresenting that the Neuriva Products are scientifically and clinically proven to improve brain performance, Defendants made material representations of fact that they knew, or should have known, were false and misleading and that had the tendency and capacity to be misleading.

232.    Defendants' misrepresentations and false, deceptive, and misleading statements and omissions with respect to the Neuriva Products, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of the Neuriva Products in violation of the New York General Business Law.

233.    Defendants' false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase the Neuriva Products from Defendants.

234. Defendants knew at the time they made false, deceptive, and misleading statements and omissions about the Neuriva Products being scientifically and clinically proven to improve brain performance that this promise was false.

235. Defendants made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

236. Defendants' intentional concealments were designed to deceive Plaintiff Angeles and the New York Class into believing that the Neuriva Products are scientifically and clinically proven to improve brain performance. Defendants benefit from Plaintiff Angeles and the New York Class's reliance and deprives consumers from informed purchasing decisions regarding the Neuriva Products.

237. Defendants knew that their misrepresentations and omissions would induce Plaintiff Angeles and New York Class members to purchase the Neuriva Products.

238. Defendants distributed, offered for sale, and sold the Neuriva Products subject to these misrepresentations and omissions.

239. These misrepresentations and omissions became part of the basis of the bargain that Plaintiff Angeles and New York Class members reasonably and justifiably relied upon when purchasing the Neuriva Products.

240. The Neuriva Products did not conform to Defendants' representations made in advertising and marketing, on Defendants' website, and on the labels and packaging.

241. Plaintiff Angeles and New York Class members would not have paid for the Neuriva Products if they knew that the Neuriva Products did not conform to Defendants' representations.

242. Defendants' conduct constitutes unfair competition and/or unfair or deceptive acts in violation of N.Y. Gen. Bus. Law § 349.

243. Plaintiff Angeles and the other members of the New York Class purchased Defendants' Neuriva Products for personal, family, or household use, and suffered ascertainable losses as a direct and proximate result of Defendants' actions in violation of the New York General Business Law.

244. Plaintiff Angeles and the other members of the New York Class suffered an ascertainable loss caused by Defendants' misrepresentations and omissions because they

would not have purchased the Neuriva Products from Defendants if the true facts concerning the Neuriva Products had been known.

245.    By reason of the foregoing, Defendants are liable to Plaintiff Angeles and the other members of the New York Class for actual damages; injunctive relief, attorneys' fees, and the costs of this suit.

**COUNT VI**
**Unjust Enrichment**
**(On behalf of Plaintiffs individually and on behalf of the Nationwide Class and/or Florida, California, and New York Classes)**

246.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs as if fully set forth herein.

247.    Plaintiffs and the Nationwide, Florida, California, and New York Class Members (referred to collectively in this Court as "Class Members") conferred a monetary benefit on Defendants when they purchased Neuriva.

248.    By their wrongful acts and omissions described within this Complaint, including the deceptive marketing, packaging, labeling, distribution, and sale of the Neuriva Products as scientifically and clinically proven to improve brain performance, Defendants were unjustly enriched at the expense of Plaintiffs and the Class Members.

249.    Plaintiffs and the Class Members' detriment and Defendants' enrichment were related to and flowed from the wrongful conduct challenged in this Complaint.

250.    Defendants have profited from their unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and the Class Members under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit. It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct as described herein in connection with the deceptive marketing, packaging, labeling, distribution, and sale of Neuriva.

251.    Plaintiffs and the Class Members have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased Neuriva had they known that it was not scientifically and clinically proven to improve brain performance.

252.    Defendants knew and intended that Plaintiffs and the Class Members would make payments for Neuriva based on the belief that Neuriva was scientifically and clinically proven to improve brain performance, as represented by Defendants in advertising and

marketing, on Defendants' website, and on the labels and packaging. It is inequitable for Defendants to retain the benefit of payments obtained through false and misleading representations.

253.   Plaintiffs and the Class Members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants.

254.   When required, Plaintiffs and the Class Members are in privity with Defendants because Defendants' sale of Neuriva was either direct or through authorized sellers. Purchase through authorized sellers is sufficient to create such privity because such authorized sellers are Defendants' agents for the purpose of the sale of Neuriva.

255.   As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment and in the event that Plaintiffs and the Class Members do not have an adequate remedy at law, Plaintiffs and the Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the proposed Classes, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

1.   Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as class representatives, and appointing the undersigned counsel as class counsel;

2.   Ordering restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class Members as a result of Defendants' unlawful, unfair, and fraudulent business practices;

3.   Ordering injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

4.    Ordering all recoverable damages for Plaintiffs and the Class Members;

5. Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs and other members of the Class;

6. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

7. Ordering such other and further relief as may be just and proper.

Dated:  January 27, 2021    Respectfully submitted,

            */s/ Jonathan B. Cohen*
            Jonathan B. Cohen (Fla. Bar No. 27620)
            Rachel Soffin (Fla. Bar No. 18054)
            **GREG COLEMAN LAW PC**
            First Tennessee Plaza
            800 S. Gay Street, Suite 1100
            Knoxville, TN 37929
            Telephone: (865) 247-0080
            Facsimile: (865) 522-0049
            rachel@gregcolemanlaw.com
            jonathan@gregcolemanlaw.com

            Alex R. Straus
            **GREG COLEMAN LAW PC**
            16748 McCormack Street
            Los Angeles, CA  91436
            Telephone: (917) 471-1894
            Facsimile: (310) 496-3176
            alex@gregcolemanlaw.com

            Daniel K. Bryson
            Martha A. Geer
            Patrick M. Wallace
            **WHITFIELD BRYSON LLP**
            900 West Morgan Street
            Raleigh, NC 27603
            Telephone: (919) 600-5000
            Facsimile: 919-600-5035
            dan@whitfieldbryson.com
            martha@whitfieldbryson.com
            pat@whitfieldbryson.com

Matthew D. Schultz (Fla. Bar No. 640326)
**LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, PA**
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Telephone: (850) 435-7140
Facsimile: (850) 436-6140
mschultz@levinlaw.com

Nick Suciu
**BARBAT, MANSOUR, & SUCIU PLLC**
1644 Bracken Rd.
Bloomfield Hills, MI 48302
Telephone: (313) 303-3472
nicksuciu@bmslawyers.com

Jonathan Shub*
Kevin Laukaitis*
**SHUB LAW FIRM LLC**
134 Kings Hwy E, 2nd Floor
Haddonfield, NJ 08033
Telephone: (856) 772-7200
jshub@shublawyers.com
klaukaitis@shublawyers.com

L. Timothy Fisher*
Blair Reed*
Sarah Westcot*
**BURSOR & FISHER, P.A.**
1990 North California Blvd, Ste. 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
ltfisher@bursor.com
breed@bursor.com
swestcot@bursor.com

*Applications *pro hac vice* to be submitted

***Attorneys for Plaintiffs and the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2021, I caused the foregoing to be filed via the

Court's electronic filing system which will notify all counsel of record of the same.

*/s/ Jonathan B. Cohen*
Jonathan B. Cohen