## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
Case No. 20-cv-23564-MGC

| | |
|---|---|
| | : |
| DAVID WILLIAMS, et al., | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| RECKITT BENCKISER LLC, et al., | : |
| | : |
| | : |
| Defendants. | : |
| | : |

## BRIEF OF AMICUS CURIAE BY
## TRUTH IN ADVERTISING, INC.

Truth in Advertising, Inc. ("TINA.org") submits this amicus curiae brief per its motion.

TINA.org therefore states the following as its amicus curiae brief:

## INTRODUCTION

The parties to this litigation have struck a deal in which plaintiffs' counsel will pocket nearly $3 million in exchange for allowing Reckitt Benckiser LLC and RB Health (US) LLC (collectively, "RB") to continue their deceptive advertising, pay a nominal sum to a small percentage of class members, and bind the hands of a nationwide class from ever holding RB accountable for the kind of deception that led to this lawsuit. For these reasons, TINA.org, a national consumer advocacy organization dedicated to protecting consumers from false and deceptive advertising, opposes the proposed settlement, and respectfully urges the Court to deny final approval.

## INTEREST OF AMICUS CURIAE

TINA.org is a 501(c)(3) nonpartisan, nonprofit consumer advocacy organization whose mission is to combat systemic and individual harms caused by deceptive marketing. To further its mission, TINA.org performs in-depth investigations and files complaints with federal and state government agencies, among others, urging them to take action to put an end to various companies' deceptive marketing practices.[1] As explained in detail in the attached Motion for Leave to File Brief as Amicus Curiae in Opposition to Proposed Settlement, TINA.org has an important interest and a valuable perspective on the issues presented in this case.[2]

## ARGUMENT

The essence of plaintiffs' complaint is that RB deceives consumers by marketing its Neuriva supplements as clinically and scientifically proven to enhance brain performance in the areas of focus, memory, learning, accuracy, concentration, and reasoning when competent scientific evidence does not support, and even contradicts, these marketing claims. Am. Consolidated Compl. at ¶¶ 7, 9, 12. Such deceptive marketing will remain unchanged if the proposed settlement agreement is granted final approval, and class members, most of whom will receive nothing from the resolution of the case, will never be able to do anything about it. Meanwhile, plaintiffs' counsel will receive nearly $3 million, and RB will continue making deceptive claims to millions of Americans concerned about cognitive decline.[3]

---

[1] Since 2015, state and federal agencies have obtained more than $250 million from companies engaged in false and deceptive marketing based on TINA.org legal actions and evidence, and returned millions in ill-gotten gains to consumers.

[2] Neither party nor their counsel played any part in the drafting of this brief or contributed in any other way.

[3] While there may be other terms of the proposed settlement agreement that are unfair to consumers, this brief focuses exclusively on the injunctive relief, monetary relief, attorneys' fees, and release provisions.

I.      __The Injunctive Relief is Valueless and Serves Only to Protect RB.__

The substance, scope, and duration of the injunctive relief in the proposed agreement is grossly inadequate and, as such, the settlement should not be approved.

### A.  The Prohibited Language in The Settlement Does Not Require RB to Make Any Material Changes and Only Serves to Protect the Company.

The proposed settlement agreement gives the mistaken impression that RB is making material changes to its marketing of Neuriva when, in reality, the injunctive relief is illusory and only benefits the company. Specifically, the settlement agreement only prohibits RB from using a single word in its marketing – "proven" – but permits RB to use the phrase "clinically tested" or any other synonym for "proven" that it cares to use. Settlement Agreement and Release, at ¶ IV.A. The elimination of a single word has absolutely no impact on the deceptive message communicated to consumers as RB has already found a phrase that conveys the exact same message as its previous marketing message – that there is scientific evidence establishing the truth of its deceptive claims. *See Removatron Int'l Corp. v. Federal Trade Comm.,* 884 F. 2d 1489, 1497 (1st Cir. 1989) ("The common-sense net impression of petitioners' advertising claims is that their machine can remove hair permanently and that this claim is supported by scientific evidence. … [P]etitioners argue that the words 'clinically tested' do not mean, and would not be taken by a reasonable person as meaning, 'supported by rigorous scientific tests.' … Regardless of any actual differences, … petitioners have offered no basis for us to find that lay people would make such a fine distinction."); *Rexall Sundown, Inc. v. Perrigo Co.,* 651 F. Supp. 2d 9, 35 (E.D.N.Y. Sept. 10, 2009) ("The Court concludes that the claim 'clinically tested' is susceptible to more than one reasonable interpretation…"). *See also e.g.,* HFL Solutions, Inc., Blood Sugar Optimizer Dietary Supplements, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 6000 (Sept. 9, 2016) (Exhibit A) ("the claim 'clinically researched,' while literally true, is misleading.

A consumer could reasonably believe that because a supplement was the subject of small human clinical trials that it is effective, a message that is not supported by the evidence in the record. Consequently, NAD recommended that the advertiser discontinue this claim."); Fiore RX, LLC, Antifungal Nail Lacquer, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 5600 (June 24, 2014) (Exhibit B) ("The establishment claim, that Propolis is 'proven effective against bacteria, viruses, and fungi,' is held to a higher standard of proof, as 'clinically proven' or 'clinically tested' claims are, in essence, a promise that there is scientific evidence that proves or establishes the truth of an advertiser's claims."); Interceuticals, Inc., BetterWOMAN, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 5485 (July 10, 2012) (Exhibit C) ("Clinically tested claims require stronger substantiation because 'they are, in essence, a promise that there is scientific evidence that proves or 'establishes' the truth of the statement.'"); NutriSystem,Inc., Nutrisystem D Program, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 5275 (Jan. 10, 2011) (Exhibit D) ("A 'clinically tested' claim is an establishment claim. These types of claims are held to a very high standard of proof because they are, in essence, a promise that there is scientific evidence that proves or 'establishes' the truth of the statement."); Ganeden Biotech, Inc., Digestive Advantage LI, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 4352 (June 29, 2005) (Exhibit E) ("While it may be argued that the claim 'clinically tested' is literally truthful since the product is currently undergoing testing, the statement 'clinically tested' appears in the context of a specific performance claim thereby giving rise to the implication that the product has been *clinically proven* to provide 24 hour relief.");[4] Hi Smile Pty Ltd, Adver. Standards

---

[4] The National Advertising Division opened up an investigation into Neuriva regarding its brain health and "clinically proven" claims but closed it due to the pending litigation. RB Health, Neuriva Dietary Supplement, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 6383 (June 25, 2020) (Exhibit F).

Auth. (Jan. 17, 2021), https://www.asa.org.uk/rulings/hismile-pty-ltd-g20-1086513-hismile-pty-ltd.html ("We therefore considered that the methodology was not robust enough to prove the claims in the ads. We believed therefore that it would not meet what consumers would understand by the claims "clinically proven" or "tested.""").

And even if the removal of the single word "tested" were sufficient to remedy the deceptive marketing at issue, which it is not, RB glosses over the minor word change in such a way that consumers are not likely to notice it, as the following screen shots illustrate.

 

*Old Neuriva packaging*          *New Neuriva packaging[5]*

In addition, there is nothing in the proposed settlement agreement that prohibits RB from using countless other synonymous terms to achieve the same misleading marketing message that its Neuriva supplements are properly substantiated by scientific evidence to improve cognitive

---

[5] Neuriva Brain + Eye is not one of the products listed in the proposed settlement agreement, which only lists Neuriva Original, Neuriva Plus, and Neuriva De-Stress as the "Neuriva Products." Settlement Agreement and Release ¶ I.U.

functioning – the very claims at issue in plaintiffs' complaint. For example, pursuant to the proposed settlement terms, RB may continue claiming Neuriva is "backed by real science" – a deceptive claim specifically identified in plaintiffs' complaint. Am. Consolidated Compl. ¶ 6 ("Defendants have engaged in a uniformly deceptive advertising and marketing campaign … According to Defendants' repeated statements in their advertising, marketing, and labeling, Neuriva's ingredients are 'backed by science' and 'clinically proven' to improve consumers' focus, accuracy, memory, learning, and concentration." ). And there is nothing that prohibits RB from claiming that there is "science behind Neuriva," "real science that's neuroscientist approved," or that its ingredients are "clinically tested…[and] shown" as it currently does. The following screen shots show some examples of current RB marketing materials, all of which are permissible pursuant to the proposed settlement agreement:

**Schiff Vitamins website as of July 14, 2021[6]**







**YouTube Video as of July 14, 2021[7]**



[Narrative by Mayim Bialik]:*"Newsflash! Not all brain supplements are created equal. But Neuriva is backed by real science and vetted by a real neuroscientist, me. ... Here's why I love the science behind Neuriva. It starts with two clinically tested ingredients. ... Neuriva Plus fuels six key indicators of brain performance to give you all sorts of big brain energy like this: memory, focus, concentration, learning, accuracy, reasoning..."*

---

[7] Neuriva ThinkBigger – Science Explained by Mayim YouTube Video, https://www.youtube.com/watch?v=Ck7NZlwrCek&t=89s.

**July 5, 2021 Instagram post[8]**



**May 17, 2021 Facebook post[9]**



---

[8] Neuriva July 5, 2021 Instagram post, https://www.instagram.com/p/CQ85BgAN4DZ/.
[9] The Science Behind Neuriva, https://fb.watch/v/3hKR6YMoj/.

Put simply, RB's agreement to stop using one word in its marketing confers no benefit to the class, and will only benefit RB by providing it with a court-sanctioned settlement approving its continued use of deceptive marketing claims.

Similar injunctive relief was flatly rejected by the Seventh Circuit in *Pearson v. NBTY, Inc.,* 772 F.3d 778 (7th Cir. 2014). In *Pearson*, Judge Posner explained that because the injunctive relief only required cosmetic word edits to the labels of the glucosamine bottles, the benefits inured solely to defendants, not consumers:

> A larger objection to the injunction is that it's superfluous—or even adverse to consumers. Given the emphasis that class counsel place on the fraudulent character of [defendant]'s claims, [defendant] might have an incentive even without an injunction to change them. The injunction actually gives it protection by allowing it, with a judicial imprimatur (because it's part of a settlement approved by the district court), to preserve the substance of the claims by making—as we're about to see—purely cosmetic changes in wording, which [defendant] in effect is seeking judicial approval of. For the injunction seems substantively empty. In place of "support[s] renewal of cartilage" [defendant] is to substitute "contains a key building block of cartilage." We see no substantive change.

*Id.* at 785. The same criticism is appropriately levied at the proposed settlement in this case; the injunctive relief is substantively empty. Specifically, the failure to include catch-all language in the agreement that would prohibit RB from suggesting or implying in any manner that its supplements are properly substantiated by competent and reliable scientific evidence to improve various measures of cognitive functioning means that changes to its marketing as a result of this settlement agreement will not affect its ability to continue with its deceptive marketing

message.[10] For this reason, the agreement is unfair to class members and should be rejected.[11]

*See Koby v. ARS Nat'l Servs., Inc.,* 846 F.3d 1071, 1080 (9th Cir. 2017) (reversing a lower

court's approval of a class-action settlement agreement and determining that injunctive relief that

---

[10] There are two flaws in RB's May 24, 2021 argument that the proposed injunction is meaningful because significant research establishes that the ingredients in Neuriva have a positive, demonstrated impact on brain health. Defendants' Supplemental Brief Regarding Injunctive Relief, May 24, 2021, Docket No. 62. First, despite the language RB cherry picks from certain studies cited in its May 24, 2021 supplemental brief, none of the clinical studies to which RB cites reached statistically significant, conclusive results about Neuriva's ingredients' impact on memory, focus, concentration, learning, accuracy, or reasoning, the six "key indicators of brain performance" that RB claims Neuriva improves. *See* Neuriva ThinkBigger – Science Explained by Mayim, Neuriva Brain Performance YouTube video, available https://www.youtube.com/watch?v=Ck7 NZlwrCek. Either they called for further studies, reached results that are not generalizable as they were based on a limited population, and/or did not study one of the cognitive functioning measurements advertised by RB.

Second, even if RB had more robust scientific studies to substantiate its cognitive improvement claims, studies examining individual ingredients may not constitute adequate substantiation for marketing claims about the specific product. *See* Federal Trade Commission, Dietary Supplements: An Advertising Guide for Industry, https://www.ftc.gov/tips-advice/business-center/guidance/dietary-supplements-advertising-guide-industry. This is because certain ingredients may not be as effective when mixed with other ingredients than they are on their own. And the dosage and/or delivery method of an ingredient tested in an ingredient study may not be the same as the dosage and/or delivery method of the ingredient in the advertised product.

And while the injunctive relief outlined in the proposed settlement agreement pertains only to claims made about the individual ingredients, as discussed above, nothing in the proposed settlement agreement prohibits RB from making deceptive substantiation claims about the overall product, as it currently does.

[11] In November 2014, TINA.org opposed the terms of a similar proposed settlement agreement regarding the alleged false advertising of glucosamine supplements. *Quinn, et al. v. Walgreen, Co., et al.,* Case No. 12-cv-8187, S.D.N.Y. Subsequently, the parties revised the injunctive relief (which previously banned only six words from the product labels for a two-year period) to include broader catch-all language and the duration of the injunctive relief was also amended to continue in perpetuity (until and unless the marketers become aware of scientific evidence to substantiate the preexisting cartilage claims and the Court allows them to reinstate the banned language). *See Quinn, et al. v. Walgreen, Co. et al.,* Case No. 12-cv-8187, S.D.N.Y., Amendment to Settlement Agreement and General Release, dated Jan. 30, 2015 (Dkt. 141-1).

"does not obligate [the defendant] to do anything it was not already doing" does not provide value to the class).

### B.  The Injunctive Relief Is Temporary While Class Members Are Forever Banned from Suing RB.

To make matters worse, RB's meaningless labeling restrictions are binding for, at most, two years, while class members are required to give up their litigation rights forever.  *See* Settlement Agreement and Release, at ¶ IV.A.3 ("The [injunctive relief] shall initiate on the date exactly six (6) months after the Final Approval Order and Judgement … and shall remain in effect for two (2) years thereafter.."); ¶ VI ("Upon the Effective Date, … the Settlement Class fully release and discharge the Settling Defendants…from all claims…Class Members ever had, now have, may have, or hereafter can, shall or may ever have against the Discharged Parties…").[12]

Allowing RB to continue with the same deceptive marketing messages that are at issue in this litigation, and banning a single word for two years, while class members are permanently prohibited from suing the company over its false marketing of the products at issue is patently unfair and reversible error. *See Pearson,* 772 F.3d at 787 ("for a limited period the labels will be changed, in trivial respects unlikely to influence or inform consumers.").[13] *See also Vassalle v.*

---

[12] In addition to giving up their right to sue RB for false marketing of the supplements at issue, class members are also waiving clear statutory rights they have under state laws, such as Section 1542 of the Civil Code of the State of California, which prohibits general releases such as this one from being extended to claims unknown at the time of executing the release, even if they would have materially affected the settlement. *See* Settlement Agreement and Release, at ¶ VI.B.

[13] After this Seventh Circuit decision, the parties in the *Pearson* case negotiated a revised settlement agreement that, among other things, included permanent injunctive relief.  *Pearson v. Rexall Sundown, Inc. and NBTY, Inc.,* 11-cv-07972, N.D. Ill., Settlement Agreement and General Release, dated April 10, 2015; Final Judgment and Order, Aug. 25, 2016, available at https://www.truthinadvertising.org/wp-content/uploads/2016/01/Pearson-v-Rexall-Sundown-final-approval-order.pdf.

*Midland Funding LLC,* 708 F.3d 747, 756 (6th Cir. 2013) ("the injunction only lasts one year, after which [the defendant] is free to resume its predatory practices should it choose to do so.").

In short, it is clear that the temporary injunctive relief proposed in this settlement functions merely as window dressing attempting to cover up the litigation restrictions being placed on the nationwide class and as justification for the nearly $3 million attorney-fee award. Accordingly, the proposed agreement is unfair to class members and, as such, this Court should not grant approval.

## II.    **The Proposed Monetary Relief is Inadequate and Unacceptably Disproportionate to the Proposed Attorneys' Fees.**

While the agreement proposes to bind all U.S. residents who purchased RB's Neuriva products for a two-year period (between January 1, 2019 and April 23, 2021), the class may only seek damages for up to four bottles of the supplements (which cost between $29.99 and $44.99 per bottle[14]), and the *most* cash any class member can obtain from this settlement is $65.[15] *See* Settlement Agreement and Release, at ¶ IV. B. And that amount assumes the class member has (1) received notice of and understands the settlement terms, (2) has filed a valid claim, and (3) has retained proof of the purchases, the combination of which is unlikely to happen.[16] For the

---

[14] Schiff Vitamins, Shop Neuriva, https://www.schiffvitamins.com/pages/where-to-buy-neuriva (last visited July 23, 2021).

[15] While class members are capped at $65, the named plaintiffs will receive more than 30 times more, or $2,000.  *See* Settlement Agreement and Release, at ¶ V. C.

[16] Receipts likely to be discarded**.** *See Pearson,* 772 F.3d at 783 (indicating that receipts for supplement purchases are likely to be discarded); *In re TJX,* 584 F. Supp. 2d 395, 405, n.15 (D. Mass. 2008) (stating "[c]ommon sense indicates that, [for] a relatively small-scale purchase, an average consumer is unlikely to keep [proof of purchase] documentation for years.")

It is rare for class members to file claims. *See, e.g., Pearson* at 783 (indicating that the "very modest monetary award that the average claimant would receive," along with the notice and claim forms, "were bound to discourage filings."); *De Leon v. Bank of Am., N.A.,* Case No. 09-cv-1251, 2012 U.S. Dist. LEXIS 91124, at *44 (M.D. Fla. Apr. 20, 2012) ("The proposed settlement administrator in this case … has indicated that the claims-rate in consumer class

vast majority of consumers who do not have receipts, the most cash that can be obtained with this settlement is $20 from a $8 million cash award fund.

At the same time, the agreement provides nearly $3 million to plaintiffs' attorneys. *Id.* at ¶ V. A. Given the meaningless – and temporary – injunctive relief and the exceedingly modest amount of monetary award, such exorbitant fees are simply not justified in this case. *See e.g., Dennis v. Kellogg Co.,* 697 F.3d 858, 861 (9th Cir. 2012) (reversing district court's approval of a settlement that provided for, among other things, $2 million in attorneys' fees and a maximum of $15 to each class member, stating "[i]n a class action … any settlement must be approved by the court to ensure that class counsel and the named plaintiffs do not place their own interests above those of the absent class members."). *See also In re Dry Max Pampers Litig.,* 724 F.3d 713, 721 (6th Cir. 2013) (reversing district court's approval of a settlement that awarded $2.73 million to class counsel while unnamed class members received relief of only negligible value, determining that the agreement benefited class counsel "vastly more than it [did] the consumers who comprise the class," and therefore was unfair); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) (reversing district court's approval of proposed consent decree that awarded $3.85 million to class counsel while awarding approximately $1,000 to each unnamed class member, and injunctive relief that largely incorporated already-existing company programs rather than creating new ones, stating "[p]recisely because the value of injunctive relief is difficult to

---

settlements range from 2% to 20%, depending on a variety of factors, including the amount a claimant will receive, the difficulty of obtaining information required to complete a claim form and even the requirement to submit a claim form."); *In re TJX,* 584 F. Supp. 2d 395, 404 (D. Mass. 2008) ("only a fraction of any given class is likely to claim the benefits provided for in a settlement. Indeed, '[i]t is not unusual for only 10 or 15% of the class members to bother filing claims'"); *Sylvester v. Cigna Corp.,* 369 F. Supp. 2d 34, 52 (D. Me. 2005) ("'[C]laims made' settlements regularly yield response rates of 10 percent or less").

quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund," and increase their fees).

The result – if the proposed agreement is approved – is that RB will be required to pay a nominal amount to the class, make absolutely no material changes to its marketing or labeling, and handsomely reward plaintiffs' counsel for providing it a clear path on which to continue its deceptive marketing.

## CONCLUSION

In sum, the proposed settlement should be rejected because it does not remedy the deceptive marketing alleged in the operative complaint and provides paltry monetary relief to class members, all while handsomely rewarding plaintiffs' counsel so they will go away.  For these reasons, TINA.org respectfully urges this Court to reject the proposed settlement.

Dated:  July 26, 2021                              Respectfully,


By:    *s/ Jon Polenberg*
Jon Polenberg, Esq.
Florida Bar No.: 653306
Becker & Poliakoff
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Telephone: (954) 987-7550
jpolenberg@beckerlawyers.com

and

Laura Smith, Legal Director
(District of Conn. Bar No. ct28002, not admitted in Florida)
Truth in Advertising, Inc.
115 Samson Rock Drive, Suite 2
Madison, CT 06443
Telephone: (203) 421-6210
lsmith@truthinadvertising.org
*Attorneys for Truth in Advertising, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification to all parties registered to receive electronic notices via the Court's CM/ECF System.

_/s/ Jon Polenberg_  _____  _____
By:   Jon Polenberg, Esq.

# EXHIBIT A

*Case# 6000  (09/09/2016)*

**HFL Solutions, Inc.**
**Blood Sugar Optimizer Dietary Supplements**

| | |
|---|---|
| *Challenger:* | *Council for Responsible Nutrition* |
| *Product Type:* | *Dietary Supplements* |
| *Issues:* | *Performance Claims; Testimonials* |
| *Disposition:* | *Modified/Discontinued* |

**Basis of Inquiry:** : As part of NAD's initiative with the Council for Responsible Nutrition[1] ("CRN") designed to expand NAD review of advertising claims for dietary supplements, CRN challenged certain Internet advertising claims disseminated by HFL Solutions, Inc. ("advertiser") for its Blood Sugar Optimizer dietary supplements.  The following claims, made on the Internet, formed the basis for this inquiry:

"Supports healthy blood sugar, insulin & A1C levels."

"Improves carb sensitivity & glucose metabolism."

"Promotes insulin sensitivity and antioxidant protection."

"Supports lower fasting & post-meal glucose levels."

"Helps diminish sugar cravings & energy fluctuations."

"We have hundreds of scientific studies demonstrating that the ingredients and formula found in Blood Sugar Optimizer can help:

      Optimize you blood sugar levels.
      Support maximum glucose metabolism.
      Provide antioxidant protection.
      Increase insulin sensitivity.
      Prevent mood swings & energy crashes.
      Reduce sugar & carbohydrate cravings."

"All natural ingredients -NO harmful drugs."

"Doctor formulated and clinically researched."

9 years proven formula & 307,000+ happy users."

---

[1] CRN files challenges with NAD regarding advertising of dietary supplements, in an effort to encourage manufacturers to provide substantiation for their advertising claims to an objective, third-party for review and evaluation and to assure that claims being promoted to consumers are truthful, not misleading and are substantiated with credible scientific evidence. Through the use of NAD's voluntary advertising review program, CRN attempts to identify advertising that may exceed the scientific support for those products and to engage those advertisers to provide their support for those claims or to withdraw those claims or modify them in such a manner that they do reflect the available evidence for substantiation. If NAD determines that the claims are all truthful, not misleading and well-substantiated, then so much the better – they have helped demonstrate to the industry's critics that these claims are credible and can be relied upon by consumers.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 2**

"Helps convert carbohydrates to energy & muscle, not fat."

Testimonials:

"Works the best for controlling blood sugar.  Makes cells more sensitive  to insulin."

"I'm taking this for my high blood sugar. Even on medication with diet and exercise my fasting blood sugar wasn't going any lower than 130. I am on metaformin and didn't want to go on insulin so thought this might help and it has.  Now my fasting  blood sugar   is around 100. Before Blood Sugar Optimizer, I took 4 other supplements and now I only take this. It's much easier and saves money too."

"I am a type 2 diabetic, and the herbs in this are listed as natural insulin assistants."

"What people have reported back to us as far as what they have 'seen' in results:

> Decreases in fasting blood glucose levels...
> Improved skin tone, less blemishes and acne, tighter  skin...
> Less hair loss and improved head hair growth...
> Improved blood sugar levels (via glucometer)...
> Weight loss and belly fat...
> Decreases in postprandial blood glucose levels,  and...
> Decreases in AlC levels too!'

"What people have reported back to us as far as what they have 'felt' in results:

> More energy and stamina...
> Stabilized mood, less highs and lows...improved outlook and sense of well-being ...Less cravings, especially for sugar and carbohydrates...
>  Less stress feeling because you have stabilized blood sugar levels throughout the day."

- 

**Challenger's Position**

The challenger requested that the NAD examine the advertising claims for Blood Sugar Optimizer to determine if there is adequate substantiation to support its claims.  The challenger noted that testimonials are considered claims and, as such, must be supported by competent and reliable scientific evidence.[2]  Further, the direct and implied benefits claimed in the testimonial must also reflect the typical results a consumer can expect when consuming the product as directed, or typical results must be clearly disclosed to the consumer.[3]

---

[2] 2 The FTC Guide, Dietary Supplements: An Advertising Guide for Industry.
[3] Philosophy, Inc. (Time in a Bottle Age Defying Serum), Report #5765,  *NAD/CARU Case Reports* (September 2014).

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 3**

Finally, the challenger was concerned that the advertiser expressly or implicitly claims that its Blood Sugar Optimizer product may be used to prevent, treat, and/or manage diabetes and other medical conditions. In addition to the need to be substantiated by competent and reliable scientific evidence, claims for dietary supplements should be consistent with federal Food and Drug Administration (FDA) regulations, which prohibit dietary supplement advertisers from making disease treatment claims.[4] The challenger stated concerns that if the claims are not adequately supported, serious health implications may ensue if consumers forgo conventional medical treatment in lieu of taking Blood Optimizer supplements to control or prevent type II diabetes.[5]

**Advertiser's Position:**

The developer of Blood Sugar Optimizer is Dr. Sam Robbins. As support for its claims, the advertiser directed NAD to review the clinical references posted on the Blood Optimizer website. The works cited by the advertiser included animal studies,[6] in vitro studies,[7] and human clinical trials on the ingredients in Blood Sugar Optimizer supplements. The advertiser also responded to NAD's request for more information by providing the full text of ingredient studies or medical literature reviewing the evidence to date on bitter melon, gymenma sylvetsre, lipoic acid, taurine, chromium picolinate, biotin, bilberry leaf, and chromium picolinate. The advertiser also conducted one unpublished study on the Blood Sugar Optimizer product that it maintained demonstrated that Blood Sugar Optimizer is effective for controlling blood glucose and HbA1c values.

**Decision**:

Blood Sugar Optimizer is a compound dietary supplement that contains a proprietary blend of magnesium, vitamins C, E, B1, B3, B5, B6, B16 and also zinc picolinate, manganese, biotin, chromium picolinate, selenium, lipoic acid, bitter melon, gymnema sylvestre, bilberry leaf, banana leaf, fenugreek, and cinnamon extract. The average recommended dosage is four capsules daily (not to exceed six capsules). The advertiser confidentially submitted to NAD the amounts of each ingredient in a Blood Optimizer tablet.

---

[4] FDA Guide to Industry, http://www.fda.gov/food/guidanceregulation/guidancedocumentsregulatoryinformation/dietarysupplements/ucm073200.htm.
[5] After the advertiser's first response, the challenger opted for an expedited proceeding, pursuant to NAD Policies and Procedures, § 2.6(B).
[6] Protective Effects of Hydroxychalcones on Free Radical-Induced Cell Damage; Grape seed proanthocyanidins correct dyslipidemia associated with a high-fat diet in rats and repress genes controlling lipogenesis and VLDL assembling in liver; Enzyme changes and glucose utilisation in diabetic rabbits: the effect of Gymnema sylvestre, R.Br.; Enzyme changes and glucose utilisation in diabetic rabbits: the effect of Gymnema sylvestre, R.Br.; hlorogenic Acid and Synthetic Chlorogenic Acid Derivatives: Novel Inhibitors of Hepatic Glucose-6-phosphate Translocase; Corosolic Acid Induces GLUT4 Translocation in Genetically Type 2 Diabetic Mice; Taurine protects transformed rat retinal ganglion cells from hypoxia-induced apoptosis by preventing mitochondrial dysfunction.
[7] A Hydroxychalcone Derived from Cinnamon Functions as a Mimetic for Insulin in 3T3-L1 Adipocytes; Chlorogenic Acid and Synthetic Chlorogenic Acid Derivatives: Novel Inhibitors of Hepatic Glucose-6-phosphate Translocase (animal and in vitro).

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 4**

A study submitted by the advertiser explained that selected the above ingredients for inclusion in its Blood Sugar Optimizer supplements for their purported abilities to reduce blood glucose, regulate HbA1C levels and insulin secretion, improved body composition and cholesterol, and oxidative stress.[8]

The advertiser's claims for Blood Sugar Optimizer include the prevention and treatment of diabetes, increases energy, and that it is doctor recommended, diminishes sugar cravings, controls mood swings, and promotes muscle building and weight loss.  Health-related claims such as the advertiser makes here should be supported by competent and reliable scientific evidence.  Generally speaking, competent and reliable scientific evidence are methodologically sound human clinical trials that obtain statistically significant results which translate into meaningful benefits for consumers and relate directly to the performance attributes promised by advertising.[9]

I.    Abstracts, and Animal and In Vitro Testing

Many of the studies relied upon by the advertiser were either abstracts of ingredient studies, animal studies or in vitro studies.

A.  Abstracts

In an NAD proceeding, the advertiser bears the burden of providing a reasonable basis for its claims.  Many of the studies and articles on the advertiser's website were abstracts. [10]  Abstracts and informal summaries do not impart enough information for NAD to properly evaluate whether the study described constitutes competent and reliable scientific evidence.   As such, NAD determined that the advertiser's study abstracts were insufficient to provide a reasonable basis for the advertiser's health-related performance claims.

B.    Animal and In Vitro Testing

NAD has consistently determined that animal studies, without more, are usually insufficient to support health-related advertising claims for products marketed for use by humans.   As the FDA Guidance for Industry: Substantiation for Dietary Supplement Claims states:

---

[8] Matthews, et al, Effectiveness of a Commercially Available Supplement in Improving Blood Glucose Levels- A Randomized, Double-Blind, Placebo-Controlled Clinical Trial, at 7.

[9] InterHealth Nutraceuticals,Inc. (Zychrome), Report #5569,  *NAD/CARU Case Reports* (April 2013)(typically, statistical significance refers to a p-vale of 0.05 or less).

[10] Protective Effects of Hydroxychalcones on Free Radical-Induced Cell Damage;  Grape seed proanthocyanidins correct dyslipidemia associated with a high-fat diet in rats and repress genes controlling lipogenesis and VLDL assembling in liver; Enzyme changes and glucose utilisation in diabetic rabbits: the effect of Gymnema sylvestre, R.Br.; Enzyme changes and glucose utilisation in diabetic rabbits: the effect of Gymnema sylvestre, R.Br.; hlorogenic Acid and Synthetic Chlorogenic Acid Derivatives: Novel Inhibitors of Hepatic Glucose-6-phosphate Translocase; Corosolic Acid Induces GLUT4 Translocation in Genetically Type 2 Diabetic Mice; Taurine protects transformed rat retinal ganglion cells from hypoxia-induced apoptosis by preventing mitochondrial dysfunction.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 5**

> Animal studies may provide useful background on the biological effects of a substance.  However, they often have limited or unknown value in predicting the effect of the substance in humans.  Care should be exercised in extrapolating results obtained in animal research directly to the human condition . . . without any data from human studies, the results of animal studies alone are not sufficient to substantiate a claim.

The FTC Guide, Dietary Supplements: An Advertising Guide for Industry, is consistent with the FDA guidance on this issue.

Similarly, in vitro studies are also unreliable predictive tools for real world human health effects and in most cases such studies cannot by themselves support health claims. Again, according to the FDA:

> In vitro studies are studies that are done outside a living body. For example, such studies might examine a product's effect on isolated cells or tissues. These studies are of limited value in predicting the effect of a substance when consumed by humans. The strongest in vitro evidence would be based on data that have been reproduced in different laboratories, but this evidence alone would not substantiate a claim.

In limited situations, in vitro and animals studies may support advertising claims where experts in the field recognize them as reliable substitute for human testing or where human research is not feasible; however, no such showing has been made here.  For these reasons, NAD determined that the animal and in vitro studies cited by the advertiser were insufficient to support its health-related performance claims.

II.      Blood Sugar Optimizer Clinical Trial

The advertiser also submitted a small study that investigated the efficacy of Blood Sugar Optimizer dietary supplements on reducing blood glucose and improving HbA1c values (a measure of glycated hemoglobin where increased levels are proportionally associated with risk for developing diabetes-related complications).  For twelve weeks, thirty diabetic and pre-diabetic (also referred to as people with impaired glucose tolerance or "IGT") participants were instructed to halt their medications, eat healthy and exercise in addition to supplementing with two pills three times a day[11] of Blood Sugar Optimizer or placebo.

Fasting blood glucose and HbA1c levels were taken at baseline and at the end of the study. Instead of reporting the individual values and the group means, the results were placed in categories that represented a range of values.  For example, of the fifteen people in the treatment group, six participants had fasting glucose levels between 109-126 mg/dL which the advertiser categorized as "IGT."  The remaining nine participants had fasting blood glucose levels that were 126 mg/dL or higher, which the advertiser claimed represented diabetic levels or "DM-2."

---

[11] The maximum recommended dosage for Blood Optimizer supplements

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 6**

By the end of the study, in the treatment group, two participants had glucose levels in the IGT category and two remained in the diabetic category. (The placebo group at baseline had seven IGT participants and eight diabetic participants; at twelve weeks, the distribution remained virtually the same).

The study took a similar approach to reporting the participants' HbA1C values. The study categorized HbA1C values under 6% (42 mmol/mol) as "good" glycemic control and those values greater than 6% (42 mmol/mol) were considered "bad" glycemic control. At baseline, in the treatment group, three participants had "good" glycemic control and twelve had "bad" glycemic control. The placebo group had two people with "good" glycemic control and thirteen with "bad" control. At the end of twelve weeks, the treatment group had thirteen people with "good" control, whereas the placebo group contained three people with "bad" control.

A table of the trial participants at baseline:

| Participants | Blood glucose levels in mg/dL | | $HbA_{1c}$ in %(mmol/L) | |
|---|---|---|---|---|
| | 109-126 (IGT) | >126 (DM-2) | <6% (<42mmol/mol) (good glycemic control) | >6% (>42mmol/mol) (bad glycemic control) |
| Test subjects (15) | 6 | 9 | 3 | 12 |
| Control subjects (15) | 7 | 8 | 2 | 13 |

A table of the twelve-week results:

| Participants | Blood glucose levels in mg/dL | | $HbA_{1c}$ in % (mmol/mol) | |
|---|---|---|---|---|
| | 109-126 (IGT) | >126 (DM-2) | <6% (<42mmol/mol) (good glycemic control) | >6% (>42mmol/mol) (bad glycemic control) |
| Test subjects (15) | 2 | 2 | 13 | 2 |
| Control subjects (15) | 8 | 7 | 3 | 12 |

No statistical analysis was performed for any measure, including the difference between the placebo group and the treatment groups with regard to either their HbA1C or fasting glucose levels.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 7**

NAD noted that fasting glucose results were missing from the study. At twelve weeks, in the treatment group, two people had fasting blood glucose levels within the 109-126 mg/dL range and two people had levels over 126 mg/dL. However, there are no results reported for the remaining eleven people.[12] For argument's sake, assuming that these eleven participants fasting blood glucose was indeed evaluated at twelve weeks and their results were below 109 mg/dL, NAD was still concerned that organizing results into fasting glucose ranges has the potential to obscure what are in reality unremarkable results. For example, participants could have had a baseline fasting glucose of 109 mg/dL, and their twelve week final result could have been 108 mg/dL. While this would technically takes them below the IGT range, this would not represent a meaningful improvement.

This example also hold true for the HbA1C results as well. Participants with glycemic control levels of 6.1% could have improved their levels to 5.9%, with hardly any difference in their health or diabetes risk profile. NAD further noted that "good" and "bad" are not recognized scientific categories of glycemic control. According to the National Institutes of Health, healthy HbA1C levels are below 5.7%, IGT or (pre-diabetes) levels are between 5.7 to 6.4% and the HbA1C threshold for a diabetes diagnosis is a value over 6.4%.

NAD further noted that the participants were told to make lifestyle changes. While they did receive some counseling on diet and exercise, there is no indication of whether they were all told to follow the same diet and exercise plan, or whether participants were left to their own devices to implement changes. Food and exercise diaries were not kept, which would help to determine if the extent of the lifestyle changes were consistent between the placebo and treatment groups. The confounding factors of diet and exercise likely contributed to any changes observed in the participants fasting glucose and HbA1C levels.

For all the foregoing reasons, NAD determined that the advertiser's study on Blood Sugar Optimizer supplements was insufficiently reliable to support its strong unqualified health-related claims.

III.   Ingredient Studies

While an advertiser may make properly qualified claims based on an ingredient in its supplement, that ingredient must be present in the products in the same amount, formulation and route of administration as the underlying ingredient studies.[13] Also, for compound products, the

---

[12] One short paragraph insinuates but does not claim outright that these missing results represent the people who have glucose levels that are no longer considered pre-diabetic (IGT). For arguments sake, even if the eleven people achieved a fasting blood glucose level below 109 mg/dL, the study was silent on whether that decrease would be meaningful to consumers. The American Diabetes Association defines healthy fasting glucose as those levels between 70 and 100 mg/dL, pre-diabetes levels are 101-125 mg/dL and 126 mg/dL and above is considered diabetic. The advertiser offered no explanation as to why 109 mg/dL was chosen as a threshold value even though it still indicates pre-diabetes. In any event, their conclusion that that they no longer exhibit signs of pre-diabetes can only be taken at face value.

[13] Prescription Vitamins, LLC (Statinzyme Cholesterol Lowering Medication Supplement ), Report #5662, NAD/CARU Case Reports (December 2013).

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 8**

advertiser should submit evidence that the efficacy of a particular ingredient won't be impeded by the presence of another vitamin, mineral or herb. Further, "the evidence used to substantiate a claim should agree with the surrounding body of evidence. Conflicting or inconsistent results raise serious questions as to whether a particular claim is substantiated."[14]

The advertiser submitted several studies on the ingredients in Blood Sugar Optimizer to support its claims that its supplements can help mitigate the symptoms of diabetes (blood glucose control, insulin sensitivity, A1C levels) or even prevent diabetes outright. NAD examined these studies to determine if the advertiser could make qualified claims regarding the ability of the ingredients in Blood Sugar Optimizer to control diabetes.

    A.  Cinnamon Extract

The article, *Cinnamon: Potential Role in the Prevention of Insulin Resistance, Metabolic Syndrome and Type 2 Diabetes*, reviewed sixteen clinical trials involving cinnamon and people with type 2 diabetes, six of which failed to demonstrate any effect on diabetic symptoms, such as glycemic control, hBa1Cserum lipids and glucose[15] Three other studies resulted with improvements on plasma glucose, serum lipids and HbA1c in people with type 2 diabetes.[16] However, these studies used large dosages cinnamon; up to six grams of cinnamon in one particular trial, which is much more cinnamon extract than that found in the recommended average or maximum daily dosage of Blood Optimizer. Further, the clinical evidence of the efficacy of cinnamon on type-2 diabetes symptoms is discordant, with six studies reporting a null effect. For these reasons, NAD determined that the submitted cinnamon studies were insufficient to support any the advertiser's health-related blood sugar control claims.

    B.  Bilberry Leaf Extract

In support of its claim that Blood Optimizer can prevent diabetes, the advertiser relied on a study that found statistically significant positive effects on lipid metabolites in pre-diabetic people who supplemented with bilberry in addition to increasing their consumption of whole grains and fish. NAD determined that this study was insufficient to support the advertiser's claims that Blood

---

[14] Ampersand Industries, LLC (Trimedisyn Prenatal Vitamin), Report #5539, NAD/CARU Case Reports (December 2012)(quoting the FDA, Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act).

[15] Suppapitiporn S, Kanpaksi N, Suppapitiporn S. The effect of cinnamon cassia powder in type 2 diabetes mellitus. J Med Assoc Thai. 2006;89(3):S200–S205; Vanschoonbeek K, Thomassen BJ, Senden JM, Wodzig WK, van Loon LJ. Cinnamon supplementation does not improve glycemic control in postmenopausal type 2 diabetes patients. J Nutr. 2006;136(4):977–980, Blevins SM, Leyva MJ, Brown J, Wright J, Scofield RH, Aston CE. Effect of cinnamon on glucose and lipid levels in non insulin-dependent type 2 diabetes. Diabetes Care. 2007;30(9):2236–2237; Mang B, Wolters M, Schmitt B, Kelb K, Lichtinghagen R, Stichtenoth DO, Hahn A. Effects of a cinnamon extract on plasma glucose, HbA, and serum lipids in diabetes mellitus type 2. Eur J Clin Invest.2006;36(5):340–344).

[16] Khan A, Safdar M, Ali Khan MM, Khattak KN, Anderson RA. Cinnamon improves glucose and lipids of people with type 2 diabetes. Diabetes Care. 2003;26(12):3215–3218. Crawford P. Effectiveness of cinnamon for lowering hemoglobin A1C in patients with type 2 diabetes: a randomized, controlled trial. J Am Board Fam Med. 2009;22(5):507–512; Stoecker BJ, Zhan Z, Luo R, Mu X, Guo X, Liu Y, Guo Q, Kong J, Anderson RA. Cinnamon extract lowers blood glucose in hyper-glycemic subjects [abstract] FASEB J. 2010.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 9**

Sugar Optimizer supplements prevents diabetes in high risk populations because it is not possible to discern what effect, if any, the bilberry leaf extract had the participant's health outcomes independent of the whole grains and fish.[17]

C.     NA-R-Alpha Lipoic Acid

NA-R-Alpha Lipoic Acid (LA) is an antioxidant that has been researched for its potential cellular effects on the body's ability to manage glucose, inflammation, hypertension, and insulin resistance.  Relevant to the challenged claims, the advertiser submitted a literature review of clinical human trials that investigated the effect of LA specifically on endothelial function, pro-inflammatory biomarkers and also diabetic polyneuropathies (nerve pain).[18]  For all three clinical endpoints, the studies referenced either surpassed the amount of LA found in Blood Sugar Optimizer or the LA was administered intravenously.  Therefore, NAD determined that the advertiser's ingredient studies on lipoic acid were insufficient to support any of its health-related claims.

D.     Momordica Charantia (Bitter Melon)

Momordica charantia (bitter melon) has been traditionally used in India to relieve a host of maladies -- diabetes, jaundice, kidney, and leprosy, to name just a few.  Bitter melon also purportedly helps with regulating blood glucose levels.[19]  However, according to the medical literature review provided by the advertiser, the human clinical trials that studied bitter melon trials administered the ingredient as an injection, or used the bitter melon fruit juice or pulp.[20]  Because the formulations of the bitter melon in the studies were not an oral dietary supplement like Blood Sugar Optimizer tablets, NAD determined that the advertiser's evidence on bitter melon was insufficient to support its health-related blood glucose claims.

E.     Gymnema Sylvestre

Gymnema Sylvetre has been investigated for possible effects on insulin resistance in people with Type II diabetes.  In a 1990 placebo-controlled trial clinical trial, 64 people with insulin-dependent diabetes supplemented their insulin therapy with either with a placebo or with 400 mg gymnema sylvestre.[21]  While the study measured fasting blood glucose, HbA1c, daily insulin doses, plasma lipids and proteins, it only conducted a statistical analysis on serum C-peptide levels in fasting blood, the results of which suggested that diabetic people who supplemented with gymnema sylvestre had statistically significantly higher endogenous insulin than the

---

[17] Also, it is unknown whether the amount of bilberry in the supplement was the same formulation and amount as the extract use din the study.
[18] Linus Pauling Institute, Alpha-lipoic acid as a dietary supplement: Molecular mechanisms and therapeutic potential, 1790(10) Biochem Biophys Acta. 1149 (2009)(the studies referenced in the article used 600-1800 mg of LA).
[19] Grover, et al, Pharmacological actions and potential uses of momordica charantia: a review, J. of Ethno-Pharm., 93 (2004) 123.
[20] Id.
[21] Shanmugasunaram, et al, Use of GS Leaf extract in The Control of Blood Glucose in Insulin-Dependent Diabetes, J. of Ethno-Pharm 30 (1990) 281.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 10**

placebo group.  While raising the insulin produced by the body is a positive health outcome, there was no indication if the level obtained by the participants in the treatment group was clinically meaningful.  In addition to the study's small size, lack of statistical analysis on most of the endpoints[22] and lack of clinical relevance, NAD was also concerned about the large percentage of participants dropped out of the study (11 people or 17%).  For all these reasons, NAD determined that the advertiser's gymnema sylvestre study was insufficient to support health-related performance claims of Blood Sugar Optimizer.

 F. Taurine

The advertiser submitted review articles that noted that taurine (an antioxidant) supplementation has been beneficial in animal models with regard to insulin resistance.  Results from human clinical trials, however, have been equivocal.[23]  According to a study from the Neurochemical Research Journal, while some trials saw some efficacy, "most of the clinical studies failed to prove the beneficial role of taurine on insulin resistance and diabetic complications… ."[24]  Therefore, NAD determined that the advertiser's evidence on taurine was insufficient to support its health-related claims regarding insulin resistance.

 G. Chromium Picolinate

The advertiser submitted a randomized, double-blind, placebo-controlled study from 1997 that demonstrated that participants who supplement with equivalent amounts of chromium picolinate as found in Blood Sugar Optimizer statistically significantly improved fasting glucose concentrations.  Some studies have shown that high dose oral biotin supplements may significantly improve glycemic control when taken in conjunction with chromium picolinate.  However, the studies cited in the advertiser's evidence used 3-16 mg of biotin daily, which is at much more biotin than the amount found in Blood Sugar Optimizer.[25]

In any event, NAD noted that overall the studies on chromium picolinate have been equivocal.  As the FDA's Office of Dietary Supplements has stated "overall, the value of chromium supplements for diabetes is in inconclusive and controversial.  The American Diabetes Association states that there is insufficient evidence to support the routine use of chromium to improve glycemic control in people with diabetes. It further notes that there is no clear scientific

---

[22] The failure to include a statistical analysis of the clinical endpoint selected before the trial began raises questions of whether the study is reliable.  (*E9 Statistical Principles for Clinical Studies, Guidance for Industry* (1998)(the most recent document on this issues)("The extent to which the procedures in the protocol are followed and the primary analysis is planned a priori will contribute to the degree of confidence in the final results and conclusions of the trial")

[23] Ito, et al, The potential usefulness of taurine on diabetes mellitus and its complications, Amino Acids (2012) 42:1529; Franconi, et al, Is Taurine Beneficial in Reducing Risk Factors for Diabetes Mellitus, Neurochemical Research, Vol. 29 Jan (2004) 143.

[24] Ito, et al, The potential usefulness of taurine on diabetes mellitus and its complications, Amino Acids (2012) 42:1529, 1535-6.  Ito noted that none of the taurine studies had a significant amount of patients. Id. At 1536.

[25] Moreover, these studies, will reaching statistically significant were not particularly robust.  MF McCarty, High dose biotin, an inducer of glucokinase, may synergize with chromium picolinate to enable a definitive therapy for type 2 diabetes, Medical Hypotheses (1999) 52(5) 401, 403-404.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 11**

evidence that vitamin and mineral supplementation benefits people with diabetes who do not have underlying nutritional deficiencies."[26]

Further, NAD noted the FDA's current thinking on the matter.  In 2005, the FDA was petitioned to authorize health claims characterizing the relationship between the consumption of chromium picolinate and insulin resistance, and blood sugar levels in people at risk for type II diabetes.  FDA experts reviewed the medical literature on chromium picolinate with regard to these clinical endpoints and authorized the following claim:

> "One small study suggests that chromium picolinate may reduce the risk of insulin resistance, and therefore possibly may reduce the risk of type 2 diabetes.  FDA concludes, however, that the existence of such a relationship between chromium picolinate and either insulin resistance or type 2 diabetes is highly uncertain."[27]

It is not within NAD's purview – nor should it be -- to decide controversial scientific topics.  The issue is whether an advertiser has provided competent and reliable scientific evidence such that there is a reasonable basis for its claims. "To determine whether the available scientific evidence is adequate to substantiate a claim, it is important to consider all relevant research, both favorable and unfavorable. Ideally, the evidence used to substantiate a claim agrees with the surrounding body of evidence. Conflicting or inconsistent results raise serious questions as to whether a particular claim is substantiated."  Here, there is conflicting evidence regarding the treatment effect of chromium picolinate on improving glucose control and insulin resistance in people with Type II diabetes.  NAD weighed this against the very strong, serious health claims the advertiser makes, such as, for example, "we have hundreds of scientific studies demonstrating that the ingredients and formula found in Blood Sugar Optimizer can help optimize you blood sugar levels."  Given the strength of this claim and the other challenged claims, and the conflicting body of research, NAD determined that the advertiser did not provide a reasonable basis for its health-related claims regarding diabetes and chromium picolinate supplementation.  However, nothing in this decision prevents the advertiser from making claims that reflect the FDA's determinations on chromium supplementation.

IV.    Applying the Evidence to the Advertiser's Claims

    A.    Diabetes-Related Claims

NAD determined that -- either because of methodological concerns, or different amounts or formulations of particular ingredients -- the clinical trial on Blood Sugar Optimizer and also the ingredients studies submitted by the advertiser were not adequate to support its health related diabetes claims.  Therefore, NAD recommended that the advertiser discontinue its claims that Blood Sugar Optimizer:

---

[26] https://ods.od.nih.gov/factsheets/Chromium-HealthProfessional/#en37.
[27] http://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm073017.htm.  Although the FDA noted that new evidence may come to light that may permit other qualified health claims, NAD noted that the advertiser's evidence pre-dates the FDA's 2005 review.

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 12**

"Supports healthy blood sugar, insulin & AlC levels."

"Improves carb sensitivity & glucose metabolism."

"Promotes insulin sensitivity."

"Supports lower fasting & post-meal glucose levels."

"Helps diminish sugar cravings & energy fluctuations."

"We have hundreds of scientific studies demonstrating that the ingredients and formula found in Blood Sugar Optimizer can help:

> Optimize you blood sugar levels.
> Support maximum glucose metabolism.
> Provide antioxidant protection.
> Increase insulin sensitivity."

However, nothing in this decision prevents the advertiser from making claims that reflect the FDA's determinations on chromium supplementation, specifically that while one study suggests that chromium picolinate may reduce the risk of insulin resistance and type II diabetes, the FDA concluded that the existence of such a relationship between chromium picolinate and either insulin resistance or type 2 diabetes is highly uncertain.

B.    Hair Growth, Weight Loss/Muscle Building, Sugar Cravings, Mood and Energy Claims

Because the advertiser failed to produce any evidence regarding hair growth, weight-loss/muscle building, mood and energy, NAD recommended that it discontinue the following claims:

"Helps diminish sugar cravings & energy fluctuations."

"Stabilized mood, less highs and lows...improved outlook and sense of well-being

"...Less cravings, especially for sugar and carbohydrates..."

"More energy and stamina..."

"Prevent mood swings & energy crashes."[28]

---

[28] While Blood Sugar Optimizer contains B vitamins which do assist the metabolism in converting food into energy at the cellular level, there is no evidence that consuming B vitamins or Blood Sugar Optimizer provides a palpable energy boost.  Nature's Way Brands, LLC (Alive! Multivitamins), Report #5739, NAD/CARU Case Reports (July 2014).

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 13**

"Reduce sugar & carbohydrate cravings."

"Helps convert carbohydrates to energy & muscle, not fat."

"Improved skin tone, less blemishes and acne, tighter skin..."

"Less hair loss and improved head hair growth..."

"Weight loss and belly fat..."

    C.    Doctor Formulated and Customer Satisfaction Claims

NAD determined that the advertiser's claim that Blood Sugar Optimizers supplements are "doctor formulated" is accurate. However, the claim " clinically researched," while literally true, is misleading. A consumer could reasonably believe that because a supplement was the subject of small human clinical trial that it is effective, a message that is not supported by the evidence in the record. Consequently, NAD recommended that the advertiser discontinue this claim.

The advertiser submitted no evidence supporting its claim that it has existed for nine years and has over 307,000 happy users. NAD recommended that the advertiser discontinue its claims "9 years proven formula & 307,000+ happy users."

    D.    Antioxidant and Drug Free Claims

Because Blood Optimizer supplements are a dietary supplement that contains antioxidants such as taurine, NAD determined that the advertiser had provided a reasonable basis for its claims that Blood Optimizer contains "all natural ingredients – NO harmful drugs" and "provide[s] antioxidant protection."

V.    <u>Testimonials</u>

The FTC Guides for Endorsements and Testimonials state that "[a]n advertisement employing endorsements by one or more consumers about the performance of an advertised product or service will be interpreted as representing that the product or service is effective for the purpose depicted in the advertisement. Therefore, the advertiser must possess and rely upon adequate substantiation."

As stated previously, with the exception of a very qualified claim regarding chromium picolinate supplementation, the advertiser's evidence did not provide a reasonable basis for the health-related performance claims in its testimonials, including:

"Works the best for controlling blood sugar. Makes cells more sensitive to insulin."

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 14**

"I'm taking this for my high blood sugar. Even on medication with diet and exercise my fasting blood sugar wasn't going any lower than 130. I am on metaformin and didn't want to go on insulin so thought this might help and it has.  Now my fasting  blood sugar   is around 100. Before Blood Sugar Optimizer, I took 4 other supplements and now I only take this. It's much easier and saves money too."

"What people have reported back to us as far as what they have 'seen' in results:

"Decreases in fasting blood glucose levels...
Improved skin tone, less blemishes and acne, tighter  skin...
Less hair loss and improved head hair growth ...
Improved blood sugar levels (via glucometer) ...
Weight loss and belly fat...
Decreases in postprandial blood glucose levels,  and...
Decreases in AlC levels too!'

"What people have reported back to us as far as what they have 'felt' in results:
        More energy and stamina ..."
        Stabilized mood, less highs and lows...improved outlook and sense of well-being
        Less cravings, especially for sugar and carbohydrates..."

"Less stress feeling because you have stabilized blood sugar levels throughout the day."

Consequently, NAD recommended that these claims be discontinued.  Lastly, NAD determined that the advertiser had provided a reasonable basis for the testimonial claims that "I am a type 2 diabetic, and the herbs in this are listed as a natural insulin assistants" as it is a description of the ingredients that are not performance related.


**Conclusions:**

NAD determined that the advertiser had provided a reasonable basis for the following claims:

"all natural ingredients -NO harmful drugs."

"provide[s] antioxidant protection."

"doctor formulated"

"I am a type 2 diabetic, and the herbs in this are listed in natural insulin assistants."

"antioxidant protection"

NAD recommended that the advertiser discontinue the following unsupported claims:

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 15**

"Supports healthy blood sugar, insulin & AlC levels."

"Improves carb sensitivity & glucose metabolism."

"Promotes insulin sensitivity."

"Supports lower fasting & post-meal glucose levels."

"Helps diminish sugar cravings & energy fluctuations."

"We have hundreds of scientific studies demonstrating that the ingredients and formula found in Blood Sugar Optimizer can help:

      Optimize you blood sugar levels.
      Support maximum glucose metabolism.
      Provide antioxidant protection.
      Increase insulin sensitivity.
      Prevent mood swings & energy crashes.
      Reduce sugar & carbohydrate cravings."

"clinically researched"

"9 years proven formula & 307,000+ happy users."

"Helps convert carbohydrates to energy & muscle, not fat."

Works the best for controlling blood sugar. Makes cells more sensitive to insulin.

I'm taking this for my high blood sugar. Even on medication with diet and exercise my fasting blood sugar wasn't going any lower than 130. I am on metaformin and didn't want to go on insulin so thought this might help and it has. Now my fasting blood sugar is around 100. Before Blood Sugar Optimizer, I took 4 other supplements and now I only take this. It's much easier and saves money too.

"What people have reported back to us as far as what they have 'seen' in results:

      Decreases in fasting blood glucose levels...
      Improved skin tone, less blemishes and acne, tighter skin...
      Less hair loss and improved head hair growth...
      Improved blood sugar levels (via glucometer)...
      Weight loss and belly fat...
      Decreases in postprandial blood glucose levels, and...
      Decreases in AlC levels too!'

**HFL SOLUTIONS, INC.**
**Blood Sugar Optimizer™ Dietary Supplements**
**Page: 16**

"What people have reported back to us as far as what they have 'felt' in results:

More energy and stamina...
Stabilized mood, less highs and lows...improved outlook and sense of well-being...Less cravings, especially for sugar and carbohydrates...
Less stress feeling because you have stabilized blood sugar levels throughout the day."

**Advertiser's Statement:**

We'd like to thank you for your detailed overview of our advertising page for our nutritional supplement, Blood Sugar Optimizer™. We have taken the NAD's recommendations into account for future advertising. We actually stopped advertising that page many months ago after receiving your letter.  **(#6000 KAD, closed 09/09/2016)**

© 2016.  Council of Better Business Bureaus, Inc.

# EXHIBIT B

*Case #5600        (06/24/14)*
**FIORE RX, LLC**
**Antifungal Nail Lacquer**
*Challenger Name:        National Advertising Division*
*Product Type:          Cosmetics/Beauty Products/ Toiletries*
*Issues:                Efficacy Claims*
*Disposition:            Modified/Discontinued*

– **It is well established that an advertiser is obligated to support all reasonable interpretations of claims made in its advertising, even messages it did not intend to convey.**

**Basis of Inquiry:**

Claims made by Fiore Rx, LLC in advertising on its website for Fiore Rx Antifungal Nail Lacquer were reviewed by the NAD as part of its ongoing monitoring program.  The following are representative of the claims that served as the basis for NAD's inquiry.

Express Claims:

- Antifungal Nail Lacquer.
- Fiore Rx has become the preferred antifungal nail polish for men and women who want antifungal nail protection as well as style and beauty.
- Beautiful on . . . Beautiful off . . .
- Fiore Rx's FDA registered formula includes dual active ingredients, Undecylenic Acid and Propolis, which draw on science and nature to protect against nail fungus.
- The Fiore Rx product line includes an antifungal toenail polish and antifungal finger nail polish that combines both beauty and protection against nail fungus.
- Stop worrying about nail fungus with Fiore Rx antifungal nail polish.
- Defend against nail fungus without sacrificing beautiful nails.
- Fiore Rx is the best antifungal nail polish for preventing toenail and finger nail fungus (onychomycosis).
- Fiore Rx products were developed by concerned podiatrists who worked collaboratively to create a line of antifungal nail polish selections that combine protection and beauty.
- Recommended by podiatrists and dermatologists.
- Fiore Rx engineers pharmaceutical grade products with an eye for beauty.
- Professionally engineered in an FDA Listed facility.
- Our mission is to inform podiatrists and dermatologists, nail salons, as well as consumers who use fingernail or toe nail polish, about the epidemic of nail fungus and offer an antifungal alternative that is preventative but also cosmetically beautiful.
- The Fiore Rx team only produces high-quality products that are FDA-registered and proven effective in the fight against nail fungus.
- Fiore Rx Antifungal Nail Polish, developed by podiatrists and chemists, is the only FDA registered formula that prevents nail fungus at the same time it

**FIORE RX, LLC**
**Antifungal Nail Lacquer**
**Page: 2**

> provides superior shine and non-chip durability comparable to the highest grade polishes in the world.

- Fiore Rx's dual active ingredients, Undecylenic Acid and Propolis, are derived from nature and have been proven effective in preventing the growth of microorganisms that cause nail fungus.
- Propolis has been proven effective against bacteria, viruses, and fungi. It is commonly used by doctors in wound care due to its antibacterial qualities.
- Salon-safe, clinically-proven formula developed by physicians and chemists with naturally-derived active ingredients, undecylenic acid and propolis.
- Enhances clearing of nail infections and provides long-term protection from bacterial and fungal infections.
- Clear antifungal base coat provides protection when used with other brands or other preferred color selections.
- Almond Milk Matte nail polish selection offers a natural nail look ideal for men who want antifungal fingernail or toenail protection.
- Provides a safe and less-expensive alternative to complicated nail infection treatments.

**Advertiser's Position:**

Fiore Rx, LLC explained that it developed the Antifungal Nail Lacquer in response to a need for improved foot and skin health. In response to this challenge, the advertiser advised NAD that it had discontinued and modified certain claims referencing the antifungal effects of its product on nails and all references to the FDA. The advertiser explained that it would continue to use the following claims in its advertising, including "Beautiful on … beautiful off," "Fiore Rx engineers pharmaceutical grade products with an eye for beauty," "Propolis has been proven effective against bacteria, viruses and fungi. It is commonly used by doctors in wound care due to its anti-bacterial qualities," and "Salon-safe formula developed by physicians and clients with naturally derived active ingredients undecylenic acid and propolis."

I.      Beautiful on . . . Beautiful off

The advertiser contended that the use of the phrase "beautiful on . . . beautiful off" is merely a tag-line for a product that promotes beauty constituting mere puffery. As such, the truth and accuracy of this statement cannot be substantiated, and no reasonable consumer would expect substantiation for this claim.

II.     Engineers pharmaceutical grade products

The advertiser argued that the statement "Fiore Rx engineers pharmaceutical grade products with an eye for beauty," is an accurate description of the activities of the company, and therefore, is not misleading to consumers. The advertiser explained that this statement reflects the history of Fiore Rx. The company was founded by three doctors actively practicing Podiatric Medicine. Each is a Fellow of the American College of Foot and Ankle Surgeons, Members of the American Podiatric Medical Association and Board Certified by the American Board of

**FIORE RX, LLC**
**Antifungal Nail Lacquer**
**Page: 3**

Podiatric Surgery. Drs. Menke and Jimenez are Faculty of The Podiatric Institute, and Dr. Morris is a member of the International Aesthetic Foot Society. According to the advertiser, the nail polish incorporates commonly used pharmaceutical ingredients that the founders use in their daily practice to treat conditions of the foot and skin. As a result, the advertiser argued, this claim accurately and truthfully described the company's objective.

III.     Propolis has been proven effective against bacteria, viruses and fungi

The advertiser contended that the claim, "Propolis has been proven effective against bacteria, viruses and fungi. It is commonly used by doctors in wound care due to its anti-bacterial qualities" is fully substantiated. In support of its position, the advertiser submitted nine published studies that concluded that propolis may be an effective ingredient against fungus, bacteria, and viruses. Thus, the advertiser argued that these claims are fully substantiated, and the disclosure of the use of propolis in its product is not misleading to the consumer.

IV.     Salon safe formula developed by physicians with naturally derived active ingredients

The advertiser argued that it is truthful, accurate and not misleading to state that the product is professionally formulated to be safe for use by professionals in a salon.  The advertiser also contended that it is truthful and not misleading to state that the active ingredients, undecylenic acid and propolis, are derived from nature. This is because undecylenic acid is extracted from castor oil when placed under pressure and fracturing the molecule. Likewise, propolis is derived from the buds of poplar and cone-bearing trees. The advertiser contended that these claims are truthful, accurate, and substantiated.

**Decision:**

NAD brought this monitoring case to review certain express and implied claims made by Fiore Rx that its nail polish can be used to prevent nail fungus because it contains anti-bacterial and anti-fungal ingredients.

As an initial matter, NAD noted its appreciation that the advertiser voluntarily discontinued certain challenged claims that its product protects against nail fungus.  The advertiser notified NAD in writing that it was willing to permanently discontinue all but four of the challenged claims, an action NAD deemed necessary and appropriate given the absence of support for such claims in the record.[1]  Given the advertiser's voluntary discontinuance of its express claims that Fiore Rx nail polish protects and prevents nail fungus, the primary issue for NAD's review was whether the remaining claims implied that Fiore Rx provides an unsupported anti-fungal or other health benefit, as well as whether the advertiser's "naturally derived" claims were truthful, accurate and not misleading.

---

[1] The advertiser discontinued 18 of the challenged claims and advised NAD that it contended the following claims were supported, "Beautiful on … beautiful off…;" "Fiore RX engineers pharmaceutical grade products with an eye for beauty;" "Propolis has been proven effective against bacteria, viruses and fungi.  It is commonly used by doctors in wound care due to its anti-bacterial qualities;" and "Salon-safe formula developed by physicians and clients with naturally derived active ingredients undecylenic acid and propolis."

**FIORE RX, LLC**
**Antifungal Nail Lacquer**
**Page: 4**

In evaluating the accuracy of the claims and representations made for Fiore Rx nail polish, NAD, not only addresses any express statements made, but also the accuracy of any messages that are reasonably conveyed by the advertising. In the absence of consumer perception evidence, NAD steps into the shoes of the consumer to determine the messages reasonably conveyed in the context of the advertising.[2]

I. "Beautiful On ... Beautiful off..."

Fiore Rx contended that the phrase "Beautiful On ... Beautiful off" did not convey any objective claims that could be substantiated and that it constitutes puffery. In evaluating whether a claim is puffery, NAD considers whether an objectively provable claim is being made or whether the claim makes representations of specific, measurable characteristics. Claims stated as opinion are puffery.[3] Certainly, the use of the word "beautiful" by itself is puffery and is not an objectively provable claim. As the cliché, "beauty is in the eye of the beholder," makes clear, beauty is by its nature an opinion. NAD was concerned, however, that the claim "beautiful on ... beautiful off...", as presented here, could reasonably be interpreted to make a claim that is specific and measurable – that nails remain beautiful after the Fiore Rx polish is removed. Although the claim "Beautiful On," standing alone, in isolation, could be deemed puffery and not an objectively provable claim, this is not the context in which this claim appears.

NAD determined that, in the context of the challenged advertisements promoting the fact that the advertiser's nail polish contains anti-bacterial and anti-fungal ingredients, a reasonable consumer takeaway is that the nail polish confers some anti-bacterial or anti-fungal benefit to the nail. Indeed, even if the nail polish did not contain anti-bacterial and anti-fungal ingredients, the claim "beautiful on ... beautiful off..." could be reasonably interpreted to convey a benefit as it is well-known that some nail polishes leave nails yellow when removed.

NAD noted that the advertiser provided no support that the anti-fungal and anti-bacterial ingredients contained in its nail lacquer provide any benefit to the nails. Anti-fungals and anti-bacterials which have a demonstrated benefit when applied to the skin cannot be assumed to provide any benefit to the nails because the thickness of the nail prevents such medications from penetrating the nail bed. Additionally, the advertiser failed to submit any evidence that its nail polish provided a benefit to nails that impacted the appearance of the nails when the nail polish was removed. Consequently, NAD recommended that the advertiser discontinue the claim "Beautiful On ... Beautiful Off...."

II. Pharmaceutical Grade

Fiore Rx contended that its product contains pharmaceutical ingredients and is manufactured in an FDA approved facility and, as a result, the product is accurately described as "pharmaceutical grade."

---

[2] Proctor and Gamble (Charmin Bathroom Tissue), Report # 3927 *NAD/CARU Case Reports* (August 2002).
[3] See Ontel Products Corp. (Pink Armor Nail Gel), Report # 5701 at 7 *NAD/CARU Case Reports* (March 2014).

**FIORE RX, LLC**
**Antifungal Nail Lacquer**
**Page: 5**

NAD determined that the claim, "pharmaceutical grade" reasonably conveys the message that the Fiore Rx product, in its entirety, was manufactured with ingredients and pursuant to procedures which were officially approved by the FDA or other agency charged with insuring the quality of ingredients and manufacturing practices.   The evidence, however, demonstrates that Fiore Rx contains only a single FDA approved ingredient, undecylenic acid, which can be described as a pharmaceutical and must be manufactured consistent with FDA regulations. There is no evidence in the record, however, that all the ingredients in Fiore Rx met a heightened standard for manufacturing practices or quality of ingredients.[4]  While the FDA requires certain manufacturing facilities to register with the FDA, manufacturing facilities are not "FDA Approved,"[5] and FDA does not certify that products manufactured in FDA registered facilities are pharmaceutical grade.  For the foregoing reasons, NAD recommended that the advertiser discontinue its use of the term "pharmaceutical grade" product  or modify its advertising to limit its "pharmaceutical grade" claim to the only FDA-approved ingredient, undecylenic acid.

III.  Propolis claims

The advertiser claims that, "[p]ropolis has been proven effective against bacteria, viruses and fungi.  It is commonly used by doctors in wound care due to its anti-bacterial qualities," and argues this claim is fully supported.  The establishment claim, that Propolis is "proven effective against bacteria, viruses, and fungi," is held to a higher standard of proof, as "clinically proven" or "clinically tested" claims are, in essence, a promise that there is scientific evidence that proves or establishes the truth of an advertiser's claims.   Further, the advertiser's claim can be reasonably interpreted by consumers to mean that the propolis as contained in the advertiser's nail lacquer confers this "proven" antibacterial, antiviral and antifungal benefit.

Establishment claims must be supported by competent and reliable scientific evidence that includes testing grounded in sound methodology.[6]  Although the advertiser's claim is simply that an ingredient in Fiore Rx has been proven to have these antibacterial, antiviral and antifungal properties, any ingredient studies upon which the advertiser relies must not only be competent and reliable, they must be relevant as to form and concentration used in the advertised product as marketed for sale.[7]

---

[4] A pharmaceutical grade compound is generally defined as on approved by the FDA or for which a chemical purity standard has been written or established by the United States Pharmacopeia/National Formulatory (USP/NF), or the British Pharmacopeia. See *About USP,* United States Pharmacopeial Convention. http://www.usp.org/about-usp; *USP Verified Pharmaceutical Ingredients*, United States Pharmacopeial Convention http://www.usp.org/usp-verification-services/usp-verified-pharmaceutical-ingredients.

[5]    See    http://www.fda.gov/food/guidanceregulation/foodfacilityregistration/default.htm;    see    also http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm047470.htm

[6] Vitaenergy, Inc. (Urinozinc Supplements), Report #5433 *NAD/CARU Case Reports* (February 2012); see also Guidance for Industry: Substantiation for Dietary Supplement Claims made under Section 403(r)(6) of the Federal Food,        Drug,        and        Cosmetic        Act        at        5;        see        also http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/DietarySupplements/ucm073200.htm.

[7]    http://business.ftc.gov/documents/bus09-dietary-supplements-advertising-guide-industry   ("Advertisers  should make sure that the research on which they rely is not just internally valid, but also relevant to the specific product being promoted and to the specific benefit being advertised. Therefore, advertisers should ask questions such as: How does the dosage and formulation of the advertised product compare to what was used in the study? Does the

**FIORE RX, LLC**
**Antifungal Nail Lacquer**
**Page: 6**

The advertiser's support for its establishment claim consisted of nine published studies on propolis and its antiviral, antifungal and antibacterial capabilities. The advertiser, however, failed to provide support regarding the concentration of propolis available in its product and whether propolis in the concentration and form available in its product had the claimed "proven" antibacterial, antiviral and antifungal capabilities. For the foregoing reasons, NAD recommended that the advertiser discontinue its establishment ("proven effective as an antibacterial, antiviral and antifungal") claim with respect to the ingredient propolis in its product.

IV.  Naturally Derived Active Ingredients Undecylenic Acid and Propolis

NAD had two concerns about the claim, "Naturally derived active ingredients undecylenic acid and propolis." First, NAD was troubled that this claim reasonably conveyed a message that the undecylenic acid and propolis conveyed some meaningful benefit to consumers. The advertiser describes the ingredients undecylenic acid and propolis as "active ingredients." The term "active ingredient" is generally used to describe an active pharmaceutical ingredient. The FDA defines "active ingredient" as "any component that provides pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man."[8]  NAD's concern was that the advertiser's use of the term "active ingredients" to describe propolis and undecylenic acid in Fiore Rx could be reasonably interpreted by consumers to mean that those ingredients cure, mitigate, treat or prevent a medical disease or condition. There is no evidence in the record that either undecylenic acid and propolis treat or prevents any disease when used on the nail.

Secondly, NAD addressed the messages reasonably conveyed by the term "naturally derived" as used by Fiore Rx to describe the propolis and undecylenic acid in its product. Claims such as "naturally derived," should be evaluated carefully, with particular consideration given to the target audience for such claims—consumers looking for "natural" products who are often willing to pay a premium for such products.[9]  As to propolis, the advertiser explained that it is a resin-like material from the buds of poplar and cone-bearing trees and that this ingredient does not undergo significant chemical alteration before being used in products. As such, NAD determined that the claim that propolis is "naturally derived" is truthful and accurate.

With respect to undecylenic acid, the advertiser explained that this is a natural fatty acid found in castor oil, extracted and cold pressed by fracturing the molecule.  In NAD's decision in Alde Associates[10] NAD expressed concern about the use of the term "natural" to describe undecylenic acid, which is chemically altered from its natural state (it is cracked to break carbon bonds) to

---

8 http://www.fda.gov/drugs/informationondrugs/ucm079436.htm
9 See McNabb Nutraceuticals LLC. (Sunology), Report #5509 *NAD/CARU Case Reports* (September 2012); Tom's of Maine (Tom's of Maine Natural Mouthwash, Report #3470 *NAD/CARU Case Reports* (June 1998).
10 Alde Assocs., LLC. (daniPro Nail Polish), Report #5565 *NAD/CARU Case Reports* (March 2013).

advertised product contain additional ingredients that might alter the effect of the ingredient in the study? Is the advertised product administered in the same manner as the ingredient used in the study? . . . If there are  significant discrepancies between the research conditions and the real life use being promoted, advertisers need to evaluate whether it is appropriate to extrapolate from the research to the claimed effect.")

**FIORE RX, LLC**
**Antifungal Nail Lacquer**
**Page: 7**

extract the acid from the oil. NAD acknowledged that, in the instant case, the advertiser uses the term "naturally derived" rather than "natural." However, a claim that an ingredient is "naturally derived" implies that the ingredient is naturally sourced and found in essentially the same state as it exists in nature.[11] In general, naturally derived claims have been treated similarly to natural claims, as the reasonable consumer takeaway from such claims is that the product or ingredients are "natural."[12] Here, NAD was concerned that the significant chemical alteration to the castor oil bean to extract undecylenic acid is inconsistent with consumer understanding of a "naturally derived" ingredient. For the foregoing reasons, NAD recommended that the advertiser's claim "naturally derived active ingredients propolis and undecylenic acid", be discontinued or modified to limit the claim "naturally derived" to the propolis in its product.

**Conclusion:**

NAD recommended that the advertiser discontinue the claim "Beautiful On … Beautiful Off…." NAD also recommended that the advertiser discontinue its use of the term "pharmaceutical grade" product or modify its advertising to limit its "pharmaceutical grade" claim to only FDA-approved ingredient, undecylenic acid. NAD further recommended that the advertiser discontinue its establishment ("proven effective as an antibacterial, antiviral and antifungal") claim with respect to the ingredient propolis in its product. Finally, NAD recommended that the advertiser's claim "naturally derived active ingredients propolis and undecylenic acid", be discontinued or modified to limit the claim "naturally derived" the propolis in its product.

**Advertiser's Statement:**

Fiore RX will take NAD's recommendations into account for future advertising, and appreciates the opportunity to participate in the self-regulatory process. **(#5600 LB, closed 06/24/2014)**

© 2014. Council of Better Business Bureaus, Inc.

---

[11] GreenPan, Inc. (Thermolon Ceramic Coated Cookware), Report #5519 *NAD/CARU Case Reports* (October 2012)(Recommending that the advertiser discontinue its "natural," "mineral," "mineral based," and "mineral materials are derived from the earth" claims.); Church & Dwight Co. Inc. (Arm & Hammer Detergent), Report #4848 *NAD/CARU Case Reports* (May 2008)(Recommending the claim "100% naturally derived surfactants" be discontinued); c.f. McNabb Nutraceuticals LLC. (Sunology), Report #5509 at 4 (Advertiser's "active ingredients derived from nature" claim supported as "NAD recognized that sunscreens using titanium dioxide and zinc oxide are often labeled as physical, natural or chemical-free sunscreens and that in this market such claims are consistent with consumer expectations.")

[12] Id.

# EXHIBIT C

*Case #5485      (07/10/12)*

**Interceuticals, Inc.**
**BetterWOMAN**

| | |
|---|---|
| *Challenger:* | *National Advertising Division* |
| *Product Type:* | *Dietary Supplement* |
| *Issues:* | *Efficacy Claims; Establishment Claims; Testimonials* |
| *Disposition:* | *Modified/Discontinued* |

- **As a general rule health-related claims must be supported by competent and reliable scientific evidence.**

**Basis of Inquiry:**  As part of its ongoing monitoring program and in conjunction with NAD's initiative with the Council for Responsible Nutrition ("CRN") designed to expand NAD's review of advertising claims for dietary supplements, NAD inquired about certain advertising claims disseminated by Interceuticals, Inc. ("Interceuticals" or "Advertiser") for its BetterWOMAN dietary supplement product.  The advertising in print, on the internet and on packaging, included the following claims:

*Express Claims:*

"Clinically Tested Chinese Herbal Supplement"
"Reduced Urinary Frequency"
"Reduced Urine Leakage"
"Sleep Better Through a Night"
"Improves Urinary Control"

**Advertiser's Position:**

The advertiser explained that Interceuticals was founded by Dr. Peipei Wu Wishnow, PhD, for the purpose of applying Western scientific methods and quality control standards to time-tested efficacious traditional Chinese medicine formulas in an effort to help health conscious consumers improve quality of life naturally.  Interceuticals distributes two products including BetterWOMAN which is the subject of this monitoring matter.

According to the advertiser, BetterWOMAN is a clinically tested chinese herbal supplement containing a proprietary blend of 20 all natural, classical Chinese herbs, specifically formulated to help women improve urinary control.  BetterWOMAN asserted that its claims are based upon a clinical study performed in 2002, the results of which were presented at The North America Menopause Society 14th Annual Conference and published in The Menopause Journal in 2003 titled "Effect of a Chinese Herbal Formula BetterWOMAN on Female Urinary Continence" (the "BetterWOMAN Study.")

The BetterWOMAN Study was conducted by Dr. Wishnow, Lawrence Dorman, DO, Applewood Medical Center, MO; Gottfried Kellerman, PhD, Neurosciences, WI; Larry Rosen, MD, Northeast Alabama Urology Center, AL.  The BetterWOMAN Study enrolled 45 women ages 35 – 78 who wished to improve their urinary function and/or sexual function.  Each participant was given a self-assessment questionnaire to evaluate the effect of  BetterWOMAN on urinary and or sexual function.   Each participant was instructed to answer a questionnaire before starting treatment and after a 60 day treatment period.  The dosage was 400 mg twice per day, with a 3 day break at every 20 day interval, consistent with the dosage instructions on the BetterWOMAN product label.

The questionnaire asked health related questions in four different areas, (1) general energy; (2) sexual functions; (3) urinary function; and (4) menopausal symptoms.  Participants scored their symptoms using a number indicating 0 = Never; 1 = Rarely; 2 = Occasionally; 3 = Frequently; 4 = Always.   For each parameter measured, the total qualified participants had to have a pre-treatment symptom score of "Frequently" or "Always."  To qualify as improved, a participant's post-treatment symptom score had to be Occasionally, Rarely or Never.

Among the 45 study participants, 45 completed the initial self-assessment questionnaire and 38 completed the self-assessment questionnaire after a 60 day treatment period.  The results as to urinary continence were as follows:

- Urinary leakage – of 45 participants 21 qualified with sufficient pretreatment symptoms. 16 of 21 reported improvement.

- Urinary urgency – of 45 participants 20 qualified with sufficient pretreatment symptoms. 14 of 20 reported improvement.

- Urinary frequency -- of 45 participants 15 qualified with sufficient pretreatment symptoms.  11 of 15 reported improvement.

The "BetterWOMAN" study results published in the Menopause Journal gave a summary of other potential health improvements and showed reduced fatigue and exhaustion (15 of 18 reported improved energy level), reduced "fuzziness" and improved ability to concentrate (10 out of 11 reported improvement); and no impact on sexual function.

The advertiser also presented letters from consumers to support its claims.  The testimonials reported users tried BetterWOMAN after trying conventional treatment for their urinary control issues, including prescription medications and bladder surgeries, and found that BetterWOMAN gave them better results:

- "BetterWOMAN works well for me.  I was taking Detrol LA and this is better for my health and budget."

- "I am so happy to find something that would help me with my bladder problem. . . I sleep better and have more energy."

- "I am sleeping better at night – even up to 5 – 7 hours.  What a relief!"

- "My GYN put me on a leading medication for OAB… [T]he side effects were almost unbearable . . . When I went to my family doctor (who deals with integrative medicine) I asked her for a recommendation.  She immediately said she had many women who had success with BW.  I tried it and never looked back."

Advertiser argued that the study results and testimonials demonstrate the efficacy of BetterWOMAN.  Advertiser further argued that the testimonials provide support that the benefits are not just a placebo effect, as many women had not found similar success on multiple other options including prescription medication.

**Decision:**

NAD reviewed the advertising claims made for BetterWOMAN, a dietary supplement, in print, on the internet and on packaging.   NAD found that Advertiser made specific health claims that BetterWOMAN improving urinary control.  The FTC published an advertising guide for dietary supplements in 2001 that provides, "advertising for <u>any</u> product – including dietary supplements – must be truthful, not misleading and substantiated. … There may be certain limited instances when a carefully qualified health claim in advertising may be permissible under FTC law, in circumstances where it has not been authorized for labeling.  However, supplement makers are cautioned that the FTC will require both strong scientific support and careful presentation for such claims."

All claims that BetterWOMAN "reduces urinary frequency," "reduces bladder leaks," "improves urinary control" and allows users to "sleep better all night" are health related product efficacy claims.  NAD has long held that such efficacy claims must be supported by reliable, competent scientific evidence.   The advertiser's claim that the product is "clinically tested" is an establishment claim.  When an advertiser claims its product is "clinically tested,' it asserts to consumers that there is clinical proof that establishes the effectiveness of its product.  Clinically tested claims require stronger substantiation because "they are, in essence, a promise that there is scientific evidence that proves or 'establishes' the truth of the statement."  NAD found that both the efficacy and establishment claims at issue here were not supported by competent and reliable scientific evidence.

In the recent decision in <u>FTC v. POM Wonderful, LLC</u>, the level of substantiation required to support efficacy or establishment claims made for nutritional supplements was reaffirmed. "Competent and reliable scientific evidence is required for claims about nutritional supplements when such products are advertised to treat diseases or medical conditions."  <u>POM</u>   at 242.

While placebo-controlled, randomized double-blind trials are not always required to establish the efficacy of a product, randomized controlled trials "are needed for a nutrient supplement if one makes a claim that the product causes the effect of treating, preventing, or reducing the risk of a disease and one offers the nutrient supplement as a replacement to medical care to treat, prevent of reduce the risk of diseases." POM at 243. Further, even if randomized controlled trials are not required, when advertisers make a medical, health-related claim, "such a claim must be based on a heightened level of substantiation." POM at 246.

The level of substantiation presented by the advertiser does not reach the level of reliability necessary to support the efficacy and establishment claims at issue here.   The scientific community generally agrees that competent and reliable scientific evidence adequate to substantiate a claim consists of information gained from studying human subjects in a sound methodological study.   Although a randomized controlled trial is the gold standard of a methodologically sound study, other types of studies can substantiate claims if those studies are adequately controlled and well-designed to establish the efficacy of a supplement.   Factors considered in determining whether the study results are sufficiently reliable to substantiate claims include the following:

- The questions to be answered by the study are clearly described at the outset.
- The methodology used in the study is clearly described and appropriate for answering the questions posed by the study.
- The duration of the study intervention or follow-up period is sufficient to detect an effect on the outcome of interest.
- Potential confounding factors are identified, assessed, and/or controlled.
- Subject attrition (subjects leaving the study before the study is completed) is assessed, explained, and reasonable.
- The population studied is large enough to provide sufficient statistical power to detect a significant effect.
- The study population is representative (with respect to factors such as age, gender distribution, race, socioeconomic status, geographic location, family history, health status, and motivation) of the population to which the claim will be targeted.
- The criteria for inclusion and exclusion of study subjects were clearly stated and appropriate.
- The background diets to which the dietary supplement was added, or the control and interventional diets, are adequately described, measured, and suitable.
- Other possible, concurrent changes in diet or health-related behavior (weight loss, exercise, alcohol intake, and smoking cessation) present during the study that could account for the outcome identified are assessed and/or controlled.
- The study's outcomes are well defined and appropriately measured.
- Efforts were made to detect harmful as well as beneficial effects.


- ### The BetterWOMAN Study

As substantiation for its claims, the advertiser relied on the results of one study, the BetterWOMAN Study, published in Menopause, the Journal of the North American Menopause Society in 2003. The BetterWOMAN Study was not a randomized, controlled trial nor did it have many of the controls used in reliable scientific research.  It was not placebo-controlled, and therefore could not distinguish between the positive results attributable to BetterWOMAN supplements and any placebo effect.  The BetterWOMAN Study also did not use objective measures to evaluate participants' symptoms.  Instead participants completed a self-evaluation questionnaire before beginning treatment and after a 60 day treatment period.  The self-evaluation questionnaire asked participants to score symptoms subjectively using a scoring system with numbers 0 through 4 to describe frequency of symptoms increasing from never, rarely, occasionally, frequently, and always.  Study results that rely on subjective measures and self-evaluation of symptoms are inherently less reliable than objective measurements.  A participant's perception of severity of symptoms and improvement is subjective, raising the possibility of inconsistencies between participants.  Using subjective criteria to assess improvement is even more troubling, where, as here, the study was not placebo controlled and blinded.  Further, a participants' evaluation of their own past symptoms necessarily relies on memory, bringing potential for additional inaccuracies or inconsistencies.  These flaws could have been alleviated by a better study design that used objective criteria to measure urinary frequency and leakage and a systematic method for reporting symptoms.

Additional weaknesses in study design include the BetterWOMAN Study's small sample size. There were 45 participants in the initial self-assessment questionnaire, and only 38 participants responded to the second self-assessment questionnaire after the 60 day treatment period – a less than 90% response.  Of the 45 total participants, less than half qualified to be evaluated for the product's effect on their urinary incontinence symptoms. The questionnaire asked the severity of a participant's urinary continence symptoms.  Participants qualified for participation if they responded that they experienced the symptom "frequently" or "always."  Different numbers of participants qualified for evaluation for different urinary incontinence symptoms; the study evaluated 21, 20, and 15, participants for the three urinary continence symptoms tested in the study.  While this small size sample may not always be inadequate substantiation for claims, in this case the advertiser relied on a sole study, conducted on a small sample size, which relied upon participants' self-evaluation of their symptoms using subjective criteria to support its results, without any blinding or placebo controls.  For all of these reasons, NAD determined that the advertiser had not presented sufficiently competent and reliable scientific evidence to support its health-related efficacy and establishment claims.

 The advertiser argued that the BetterWOMAN Study was published in a medical journal establishing the reliability of the results.  NAD did not agree.  "Advertisers should not rely simply on the fact that research is published as proof of the efficacy of a supplement.  Research may yield results that are of sufficient interest to the scientific community to warrant publication, but publication does not necessarily mean that such research is conclusive evidence of a substance's effect."  Medical journals review and publish study results for many different

reasons, including publishing studies that show promising results – not necessarily proven or effective -- for treating a medical disease or condition.  The BetterWOMAN Study showed promising results for improving urinary control, which might be of interest to the scientific community.  For the reasons explained more fully above, these were not results that establish the effectiveness of BetterWOMAN at improving urinary control.  When an advertiser makes claims that its product is <u>effective</u> or <u>clinically tested</u>, it must rely upon competent and reliable scientific evidence to prove its product is effective, not simply the fact that its evidence has been published.

- <u>Consumer Testimonials</u>

The advertiser also relies on letters from repeat customers to substantiate its claims. Testimonials cannot be used to substantiate advertising claims in the absence of competent and reliable scientific evidence.  Additionally, the FTC cautions again using testimonials endorsing a product unless the advertiser can independently substantiate that the consumer's claims are typical of most users.  "It is well established that advertisers may not make claims either through consumer testimonials or expert endorsements that could not be substantiated if made directly by the advertiser.  Advertisers must also have appropriate scientific evidence to back up the underlying claims made in those testimonials."

NAD reviewed the testimonials used by the advertiser in print and on their website.  Nearly all of the testimonials make specific claims about BetterWOMAN and improved symptoms of urinary frequency and reduced leakage.  The claims in theses testimonials are unsupported because the advertiser has not substantiated any of its product efficacy claims with competent and reliable scientific evidence.  Moreover many testimonials go much further than the advertiser claiming BetterWOMAN is a better treatment for improving urinary control than traditional medical treatments.

- "After trying expensive medications with horrible side effects . . . I was ready to resign myself to a life of bladder leaks, isolation and depression.  But then I tried BetterWOMAN."

- "I am very happy with the responses from my patients. They are mostly women over 60, and many of them saw improvements within 20 days. One young 28-year-old woman had severe stress urinary incontinence with undetectable health conditions. She did not respond to hormone treatment. I treated her with BetterWOMAN, and her stress incontinence stopped completely within one month."

- "BetterWOMAN works well for me. I was taking Detrol LA and this is much better for my health and budget. Thank you!"

Testimonials claiming that BetterWOMAN performs better than traditional, FDA approved treatments for urinary incontinence suggest that comparative testing proves BetterWOMAN is

preferred over traditional treatments.  Finally, the suggestion that a dietary supplement can act as a replacement for a medical treatment is inherently problematic. In order to make a claim that a dietary supplement can act as a replacement or alternative for a prescription drug, the supplement would have to pass through the drug approval process at the FDA.

NAD found that advertiser has not presented reliable scientific evidence to support its health claims.  As a result, testimonials and letters from customers may not be used to support those claims nor (given the lack of reliable support) can the testimonials be used in BetterWOMAN advertising to claim the efficacy of the product.

**Conclusion:**

NAD found the advertiser's evidence insufficient to support specific health claims that BetterWOMAN "Reduces Urinary Frequency," "Reduces Urine Leakage," "Improves Urinary Control" and helps customers "Sleep Better Through a Night" and, therefore, recommended the advertiser discontinue these claims.  For the same reason NAD recommended that advertiser discontinue the "clinically tested" claim and the testimonials claiming specific health results.

**Advertiser's Statement:**

Interceuticals eagerly participated in this self-regulatory process aiming at truthful, accurate advertising to benefit both consumers and companies.  Despite our lack of experience working with NAD which led us to provide incomplete supporting materials, we are still pleased to see that NAD found the published BetterWOMAN clinical study showed some promising results.

We respectfully disagree with NAD on its final assessment regarding the study.  The methodology used in the study clearly relates to the actual benefits for consumers and the parameters measured were easily verifiable by the study subjects.  Although the size of the study was small, the results were statistically significant.  However we do appreciate NAD's concerns about study size.  Be assured that Interceuticals is fully committed to providing consumers with truthful and accurate information and will continue doing so by conducting ongoing studies in this area.

With the above considerations in mind Interceuticals has decided not to appeal and will accept and take NAD's recommendations into consideration in modifying future advertising for the BetterWOMAN dietary supplement product.  **(#5485 LB, closed 07/10/2012)**

© 2012.  Council of Better Business Bureaus, Inc.

# EXHIBIT D

*Case #5275          (01/10/11)*
**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
*Challenger:          Weight Watchers International, Inc.*

- Advertising claims that report data from a published study should be very specific, accurate and clear.  In addition, claims based on clinical studies should be no broader than the clinical's conclusions, and material limitations of a claim must be adequately disclosed.

- When evaluating the message communicated by an advertising claim, NAD examines the claim at issue in the context of the entire advertisement in which it appears.

**Basis of Inquiry:**   Quantified establishment claims made in broadcast, print and Internet advertisements by Nutrisystem, Inc., for its Nutrisystem D weight loss program for individuals with Type 2 diabetes were challenged by Weight Watchers International, Inc., a competing provider of weight loss and weight management programs.

The following claims served as the basis for this inquiry:

Television

Although the featured individuals vary, the television advertising in each case intersperses footage from consumer testimonials within an exact or slight variation of the following voice-over and on screen graphics:

> V/O:   "Announcing Nutrisystem D. The clinically tested program for losing weight and reducing blood sugar ... People on Nutrisystem D lost up to 16 times more weight, reduced their A1C, and lowered their blood sugar levels five times more than following a diabetes support and education program…Mike is one of many who have lost weight and controlled their diabetes with Nutrisystem D"

These statements are accompanied by the following full-screen visuals:
- "Nutrisystem D  Reduce blood sugar"
- "Up to 16X more weight loss"
- "5X lower blood sugar"

Print

Clinically tested to lose weight and to help lower blood sugar and control type 2 diabetes.
Clinical Study Shows++ On Nutrisystem D, people with type 2 diabetes who wanted to lose weight:
    Lost 16 times more weight
    Lowered blood sugar levels 5 times more
    Lowered A1C by 0.9%
    Lowered total cholesterol level by 22.5 mg
    Lowered triglycerides level by 44.7 mg (emphasis in original)

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 2**

The associated disclaimer reads:

"++In a 3-month clinical study at Temple University School of Medicine, Nutrisystem program participants lost an average of 18 lbs, and lowered fasting blood sugar levels from 151.2 to 115.2, compared to those following a hospital-directed diet and education plan, who lost 1.1 lbs, and lowered fasting blood sugar levels from 151.4 to 144. Not all menu items were included in the study. Study funded through an unrestricted educational grant from Nutrisystem."

Internet

The television and print advertising claims are repeated almost verbatim at the website, although the online program brochure adds the following headline to the study findings:

"It's clinically tested so you know it works."


**Challenger's Position:**

According to the challenger, the challenged advertising campaign for Nutrisystem D does far more than promise overweight, diabetic consumers a successful weight loss program. Through a widespread mass media campaign encompassing broadcast, print and online advertising (the "Campaign"), Nutrisystem makes a series of precisely quantified establishment claims for its Nutrisystem D program – a program it maintains is: "The clinically tested program for losing weight and reducing blood sugar." The advertising assures consumers suffering from Type 2 diabetes that the Nutrisystem D program is "proven" to "control" their disease. Nutrisystem then describes in detail the purported clinically tested results, interspersed with superlative consumer testimonials featuring a series of individuals who have been diagnosed with Type 2 diabetes who have lost a large number of pounds and controlled their diabetes with Nutrisystem D.

The challenger argued that the challenged advertising claims for Nutrisystem D are not supported by the underlying science. According to the challenger, Nutrisystem misleads and deceives consumers by using the quantified results from a single, small scale, short-term clinical test of a weight loss program that is not the program that Nutrisystem offers to consumers. In stark contrast to the commercially-available Nutrisystem D program, the portion controlled diet program that was clinically tested included weekly behavioral treatment in groups of 8 to 12 people, led by a health care professional with experience in behavioral weight control.

The challenger went on to argue that, even had this single short-term, small-scale clinical study actually tested the weight loss program offered by Nutrisystem (and it did not), the study excluded from the testing insulin-dependent diabetics among others (who represent more than twenty-five percent of the consumers that make up the targeted Type 2 diabetic community), and provides no follow-up to determine whether the illness is indeed "controlled" beyond the short-term experimental period.

NUTRISYSTEM, INC.
Nutrisystem D Program
Page: 3

I.    _The Results of the Temple Clinical Trial Do Not Support The Advertiser's Claims_

The challenger explained that, in support of its Nutrisystem D program claims, the advertiser relies on a single, non-blinded, clinical study involving a three month cross-trial study of 69 participants with Type 2 diabetes who met various criterion for obesity.[1]   Excluded from participation in the study were insulin-dependent diabetics as well as applicants using any medications other than metformin, thiazolidinediones, and sulfonylureas to manage their diabetes.   The challenger contended that these exclusions from participation are significant, given that insulin dependent Type 2 diabetics alone account for approximately twenty-seven percent (27%) of those suffering from the disease.[2]

Following qualification, half the group were then randomly assigned to the Nutrisystem D pre-packaged portion controlled diet plan (the "PCD Group") and half to a "diabetes support and education program" (the "DSE Group").   The DSE Group were provided only three group sessions over the course of the three months, during which participants generally discussed diabetes management, physical activity and nutrition.[3]   The DSE Group received no prescribed physical activity and received no specific instruction on weight loss.   For the PCD Group, the study protocol required that all participants participate in "weekly comprehensive group behavioral treatment" in addition to eating pre-packaged portion controlled meals and engaging in prescribed physical activity.   The challenger noted that, in addition to receiving written support materials, the "PCD participants received behavioral treatment in groups of 8 to 12 people, led by a health care professional with experience in behavioral weight control."

The challenger emphasized that face to face, comprehensive group support and behavioral treatment is not a part of the Nutrisystem D program.   The significance of this treatment variable, inextricably part of the PCD treatment protocol and yet absent in the commercially available Nutrisystem D program, is carefully emphasized by the Study's actual researchers, who caution:

> _The study also had some limitations, including relatively short study duration and the inability to separate out the effects of greater professional contact among the PCD group._

The challenger contended that the importance of these face-to-face group behavioral counseling sessions cannot be overstated, a conclusion similarly reached in the report cited by Nutrisystem regarding the famous "Look AHEAD" trial, to support the benefits of weight-loss for overweight

---

[1] The study entitled the "_Effects of a Commercially Available Weight Loss Program Among Obese Patients with Type 2 Diabetes: A Randomized Study_" was published in the Postgraduate Medicine, Volume 121, Issue, 5, September 2009 (the "Temple Study").

[2] The challenger asserted that, as of 2005, a reported 27% of those with Type 2 diabetes take insulin, either alone or together with an oral agent. The challenger further noted that this does not account for additional applicants who were excluded from the Nutrisystem study because they were on non-insulin oral agents. _See_, _Optimal Initiation of Insulin in Type 2 Diabetes, Iri B. Hirsch, MD (11/15/2005)_, http://cme.medscape.com/viewarticle/515847.

[3] The study end point for comparison sake was at three months, after which the control group participants crossed-over and participated in the same portion-controlled diet plan as did the test group participants.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 4**

diabetics.[4]      According to the challenger, the Look AHEAD trial is the seminal behavior modification study in the field, examining potential cardiovascular benefits to the diabetic community of intentional weight loss and maintenance.  It is a large-scale, ongoing, long-term study, the purpose of which is to compare "intensive lifestyle intervention (ILI) involving group and individual meetings to achieve and maintain weight loss through decreased caloric intake and increased physical activity as compared to a diabetes support and education (DSE) condition."  As the Look AHEAD Report explains, ILI is "modeled on group behavioral programs developed for the treatment of obese patients with Type 2 diabetes."[5]  The study, which plans follow-up for the next dozen years, has thus far concluded at year one that those in the ILI group experienced significant changes, inter alia, in weight, A1C, cholesterol and triglycerides.[6]

The challenger asserted that, contrary to Nutrisystem's supposition, the one-year results from the Look AHEAD trial strongly support that targeted behavior modification is essential to an effective long-term program.  The challenger pointed out that Nutrisystem's Temple Study protocol adopts this core group behavior modification feature from the Look AHEAD trial, in almost identical form and in lieu of including the written materials and ad hoc "upon request" on-line and telephone support that is actually available with the Nutrisystem D program offered commercially.   The challenger argued that if it takes this kind of intervention just to help Nutrisystem D users achieve the short-term results reflected in the Temple Study, its absence in the commercially available Nutrisystem D program will likely be that much more significant.

The challenger further emphasized the study's short-term duration – just three (3) months – which, the challenger argued, cannot ground the long-term maintenance or disease "control" claims made in the Campaign.

## II.    *Neither General Literature nor Self-Generated Weight Loss Data Fill The Claims Substantiation Void Created By Reliance On The Temple Study*

The challenger further contended that the additional evidence submitted on behalf of the advertiser does not demonstrate that the results of the Temple Study are consistent with what real-world consumers should expect to achieve.  According to the challenger, this additional evidence consists of a combination of weight-loss gospel from general literature and confidentially-submitted, self-reported weight-loss data collected from Nutrisystem program participants.  In each case, the data refers only to pounds lost, and does no more than confirm that weight loss may have a beneficial effect on various diabetic markers; it does not and cannot quantify that benefit as the Campaign seeks to do.  The challenger went on to note that whether

---

[4] Pi-Sunyer X, Blackburn G, Brancati F, Bray G, et al., The Look AHEAD Research Group; Reduction in Weight and Cardiovascular Disease Risk Factors in Individuals with Type 2 Diabetes. *Diabetes Care*. 2007; 30(6): 13741383.

[5] *Id.*, at 2.

[6] The Look AHEAD Report describes specific reductions in AIC, blood pressure and LDL cholesterol which it describes as the "*ADA [American Diabetic Association] goals for [cardiovascular] risk factors*" and explains "*the ILI was extremely effective in increasing the percent of participants who met these goals.*"  *See*, Pi-Sunyer X at p. 5 – 6.  The *Look AHEAD* study combines increased physical activity, caloric and fat restrictions, and ILI. *Id.*

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 5**

or not Nutrisystem can support claims of general effectiveness for Nutrisystem's weight loss program (claims not at issue herein), the proffered support has no bearing on whether the findings of the Temple Study have been stretched far beyond their limits by the Nutrisystem D Campaign.

According to the challenger, NAD's recent Syntratech decision regarding establishment claims for a dietary supplement advertised to reduce fasting blood sugar, A1C, triglycerides and blood pressure is particularly instructive.[7]   In Syntratech, the advertiser submitted a ninety day clinical study including one hundred diabetic participants who in fact used the actual product as directed. The double blind, randomized study purportedly demonstrated that Syntra-5 resulted in a reduction of fasting blood sugar from 196 to 95, hemoglobin A1C from 7.7 to 4.66, cholesterol from 338 to 240 and triglycerides from 225 to 203.  The NAD found the study to be well designed and controlled, and, significantly, it was conducted on the product itself in accordance with labeling directions.  Nonetheless, given its small size and no evidence of reproducibility, NAD found the study "insufficient to support the[] extraordinary quantified health performance claims."  NAD recommended that Syntratech discontinue use of any quantified performance claims presented in testimonials, which testimonials were interspersed there, as they are here, with report of the quantified study results.  The challenger argued that, as in Syntratech, the advertiser here must also cease use of the quantified claims and testimonials featuring quantified results to avoid continuing consumer deception.

Finally, the challenger rejected the advertiser's assertion that the "core" message of its advertising is simply "Lose weight to help manage your diabetes."  Instead, the challenger contended that the challenged campaign claims that Nutrisystem D is "[t]he clinically tested program for losing weight and reducing blood sugar."  The advertising urges the consumer to "control" his or her disease over the long term by virtue of its "clinically tested" program, and it boldly offers the precisely quantified Temple Study Results as its proof.  The Campaign interweaves these claims with testimonials featuring consumers who have "controlled" their diabetes with Nutrisystem D over time, lending further credence to the Temple Study Results for the targeted population.  To compound the deception, Nutrisystem provides no scientifically-based follow-up data to confirm that participants can actually "control" their illness for the long term.  Clearly, "controlling" one's disease is a long-term claim the support for which appears to be no more than testimonials (e.g. "Mike is one of many who have lost weight and controlled their diabetes with Nutrisystem D").   It is the position of the challenger that the Temple Study does not provide a basis for long-term disease control claims of any kind.

**Advertiser's Position:**

 I.  *The Challenged Claims Are True, Accurate and Substantiated*

---

[7] *See*, Syntratech Corporation (Syntra-5 Total Body Solution), Case #35105, *NAD/CARU Case Reports* (March 2010).

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 6**

It is the position of the advertiser that the Temple Study was in fact conducted on the Nutrisystem D program and, regardless of certain features of the protocol, the evidence shows that the results of the Temple Study are consistent with the real world results of consumers on the Nutrisystem D program.

### A. The Temple Study was Conducted on the Nutrisystem D Program

According to the advertiser, the Temple Study was conducted by leading researchers in diabetes and obesity and published in a prestigious, peer-reviewed journal.   It found that, after three months on the Nutrisystem D program, individuals with Type 2 diabetes had statistically and clinically significant improvements in many measurements, including, but not limited to, weight ($p < 0.0001$); BMI ($p < 0.0001$); A1c ($p = 0.001$); fasting glucose (blood sugar) ($p = 0.02$); triglycerides ($p < 0.0001$); and cholesterol ($p = 0.005$).

The advertiser noted that the purpose of the clinical study was to "assess the effects of a commercially available weight loss program on weight and glycemic control among obese patients with Type 2 diabetes."   The conclusion of the study was clear:  "...patients with Type 2 diabetes will experience significant improvements in weight, glycemic control, and cardiovascular disease risk factors after the use of a commercially available weight management program."   As one of the strengths of the study the researchers noted that the study was "one of the few randomized assessments of a commercially available weight loss program."

The advertiser explained that, as part of the study protocol, participants in the study attended a group behavioral session once per week during the first 12 weeks of the study.   These sessions were included not to somehow improve the results of individual participants, but because increasing the contacts with participants helps to ensure that they complete the study, ensuring as much data as possible was collected.   The advertiser explained that, while Nutrisystem does not offer in-person group sessions, it does offer its customers extensive alternatives, including unlimited, free counseling and support on-line or by telephone, and active on-line community support groups.   Further, Nutrisystem D customers are given the "Mindset Makeover," a behavioral guide that was also given to study participants.

The advertiser asserted that basic physiology dictates that it is what the subjects ate, not what they learned or said, that was responsible for the effects seen in the study.   The participants in the study were provided with and directed to consume the same Nutrisystem D foods, in the same amounts, with the same amount and type of fresh grocery items, as consumers on the Nutrisystem D program.   In fact, the researchers opined:

> *These data suggests that obese patients with type 2 diabetes will experience significant improvements in weight, glycemic control, and cardiovascular disease risk factor after 3 months of a prepackaged, portion control meal plan such as Nutrisystem® D™.  The clinical success of this approach is likely because of the structured approach of the meal plan.  Structure has been shown to help facilitate adherence and increase weight loss compared with conventional foods.*

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 7**

The advertiser stated that, while hypothetically the group counseling sessions may have helped or encouraged subjects to follow the directions for the Nutrisystem D program to some degree, there is no reason why consumers who follow the directions in the real world would not achieve the same results.

> B.  *The Temple Study Population and Data Analyses Suggest that Consumers Should Generally Expect To Achieve Even Better Results on Nutrisystem D*

The advertiser emphasized that some aspects of the Temple Study itself suggest that, if anything, typical Nutrisystem D consumers should expect to achieve results better than the results of the Temple Study described in the advertisements.  First, as noted by the researchers, over half of the participants in the study were African Americans, and "African Americans tend to lose less weight than whites across a variety of treatment approaches."  Also, the Temple Study results were calculated on an "intent-to-treat" basis, rather than an analysis only on the participants who completed three months ("completers"), which is often done in clinical trials.  While the attrition rate was very low, one participant in the Nutrisystem D group did not complete the three months.  Therefore, for the reporting of the results and the statistical analyses, that individual was treated as having experienced absolutely no weight loss or improvements in the other outcomes evaluated.

> C.  *The Published Literature and Nutrisystem's Own Data On Its Customers Show That the Results of The Temple Study Are Consistent With Consumers' "Real World" Results With Nutrisystem D*

The advertiser asserted that an overwhelming amount of published data, as well as Nutrisystem's extensive, actual "real world" data on its own customers, demonstrate that the results of the study are consistent with "real world" use.  Thus, not only is it not misleading to describe the results of the Temple Study in advertising, it would also not be misleading to claim that consumers on Nutrisystem D can achieve the same results as participants in the study.

> > i.  A Large Body of Science Supports the Fact That Consumers on Nutrisystem D Will Have the Results Depicted in the Temple Study

As disclosed in all advertising, the Temple Study found that the Nutrisystem D program resulted in weight loss of 18 pounds in 12 weeks.  That is an average of 1.5 lbs per week.[8]   Further, numerous studies have shown that amount of weight loss is expected to result in similar reductions in A1c, blood sugar, cholesterol, and triglyceride levels found in the Temple Study.[9]

---

[8] The program is designed to produce a caloric deficit of 500-1000 calories per day.   It is scientifically established that such a caloric deficit will result in 1-2 lbs of weight loss per week.  *See*, National Heart, Lung and Blood Institute Obesity Education Initiative. 1998. Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults: The Evidence Report. US Dept of Health and Human Services. *NIH Publication No. 98-4083.*
[9] *See,* Anderson J, Kendall C, Jenkins D; Importance of Weight Management in Type 2 Diabetes: Review with Meta-analysis of Clinical Studies. J of the American College of Nutrition. 2003; 22 (5): 331-339, at page 322. *See also*, Pi-Sunyer X, *supra* note 4.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 8**

Specifically with respect to individuals with Type 2 diabetes, a 2003 Meta-analysis analyzed the 12-week results from 16 studies on the effects of calorie reduced diets on individuals with diabetes.   According to the advertiser, the results of the meta-analysis demonstrate that the results of the Temple Study are in-line with these studies:

|  | Meta-Analysis | Temple Study |
|---|---|---|
| Body Weight Decrease | 9.6% | 7.3% |
| Blood Glucose Decrease | 25.7% | 23.5% |
| Cholesterol Decrease | 9.2% | 11.6% |
| Triglyceride Decrease | 26.7% | 28% |

Thus the advertiser asserted that the results in the Temple Study are not materially different than the universe of studies on the effect of dieting for people with Type 2 diabetes.  Importantly, 37.5% of the studies in the meta-analysis included subjects dependent on insulin.   While it appears that all of the studies in the meta-analysis included some type of counseling, as noted above Nutrisystem also provides counseling, both on-line and by telephone, to Nutrisystem D program customers.  While the Meta-Analysis did not address reductions in A1c levels, the A1c results in the Temple Study are within the range reported in the literature for the amount of weight lost.[10]

   ii.   Nutrisystem's Own Data is the Best Evidence of Real World Results

     1.   2010 Survey

The advertiser explained that in March of 2010, Nutrisystem conducted a survey of its own customers on the Nutrisystem D program.    The survey was sent via email to approximately 10,000 customers, and Nutrisystem received 3,735 responses.  Among the information solicited included how much weight was lost (in 10 pound ranges, e.g. 1-10 lbs; 11-20 lbs, etc.) what type of diabetes, if any, the customer had, and what medications they were taking.   For all of the individuals with Type 2 diabetes, on the program for approximately 3 months, including individuals on insulin, the average weight loss reported was 18.2 lbs—essentially identical to the results of the Temple Study

     2.   Customer Self-Reported, On Line Data

Nutrisystem D customers can record and track their weight loss on-line at nutrisystem.com.  The advertiser explained that while participation is purely voluntary, it is a useful tool for customers and provides Nutrisystem valuable insight on the "real world" results of Nutrisystem D.

---

[10] Pi-Sunyer X, *id*.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 9**

Below is an analysis of self-reported data on three-month weight loss (both total pounds lost and percentage of initial body weight lost) for all customers on the Nutrisystem program for individuals with Type 2 diabetes ("All NS-D"), and for the subset closest demographically to the subjects enrolled in the Temple Study – men and women with a starting BMI between 35 and 40 ("BMI 35-40").   The two groups are compared to the outcomes for the Temple Study subjects ("Temple").

**Pounds Lost**

| Subjects | n | Mean |
|---|---|---|
| BMI 35-40 | 1818 | 19.9 |
| All NS-D | 7562 | 19.5 |
| Temple | 34 | 18.0 |

**Percent of Initial Body Weight Lost**

| Subjects | n | Mean |
|---|---|---|
| BMI 35-40 | 1818 | 8.2 |
| All NS-D | 7562 | 8.0 |
| Temple | 34 | 7.1 |

Thus, the advertiser contended that Nutrisystem customers are actually experiencing results at least as impressive as the subjects in the Temple Study.  In addition the advertiser emphasized that this data includes anyone on the program, whether or not they are taking insulin.

### 3.   2007 Diabetic Customer Survey

In 2007, Nutrisystem commissioned an independent survey of its customers on its diabetic program.[11]   The customers were on the program that preceded Nutrisystem D, but that program was equivalent with respect to the nutritional parameters.   The survey was sent via email to 48,094 customers and 2,899 responses were received, resulting in a 99.9% confidence level with a 3% sampling error.

The advertiser noted that the survey, which asked customers how much weight they have lost, found that customers on the program for 12 weeks lost an average of 2.4 lbs per week – actually greater than the 1.5 lbs per week found in the Temple Study.  Overall, customers lost 9% of their starting weight on average.  While the survey did not collect data specifically on diabetes control, 71% of customers noticed an improvement in their diabetes, 72% believed that it helped them take control of their blood sugars, and 25% stated that the Nutrisystem program either

---

[11] This survey was submitted confidentially pursuant to NAD Procedures §2.4(D).

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 10**

reduced or eliminated their use of medications used to control diabetes.  Importantly, this survey did not exclude customers dependent on insulin or any other medications.

>   *D.  Excluding Individuals Dependent on Insulin Does Not Suggest that the Results of the Study Do Not Reflect the Real World Results of Consumers on Nutrisystem D*

The advertiser next explained that the Temple Study excluded individuals on insulin and certain other medications because including such subjects could have complicated their medical management, as individuals with Type 2 diabetes on insulin who lose weight or dramatically change their diet may have to adjust their medications at the direction of their physician. Importantly, participants in the study were in fact taking some of the most common diabetes medications – metformin, thiazolidinediones, and sulfonylureas.  The advertiser further noted that there is no evidence demonstrating that including individuals on insulin and other diabetes medications would have had a materially negative impact on the results of the study, or, that excluding those participants means that consumers should not expect to achieve similar results on the Nutrisystem D program.

>   II.   *WWI Has Failed To Demonstrate That There Is A Material Difference Between The Temple Study And The Nutrisystem D Program*

The advertiser argued that WWI has provided no evidence demonstrating that the group sessions impacted the results of the Temple Study, or that Nutrisystem D customers should not generally expect to achieve the same results.

According to the advertiser, the challenger mischaracterizes the Look AHEAD study and the role that group sessions played in both the Look AHEAD and Temple studies.[12]  First, the advertiser contended that the "intensive lifestyle intervention" ("ILI") used in the Look AHEAD study and the group sessions in the Temple Study are not the same thing.  Group and individual counseling is but one method of behavioral modification, which in turn is but one component of the ILI evaluated in Look AHEAD.  In addition to behavioral modification, the ILI used in the Look AHEAD study included portion-controlled meal replacements, increased physical activity, and

---

[12] Also, with respect to the *Sacks et al* study offered by the challenger, the advertiser noted that the purpose of *Sacks et al* was to compare the effectiveness of four types of diets over a two year period: (1) average-protein, high-fat; (2) average protein, low-fat; (3) high-protein, high-fat; and (4) high-protein, low-fat.  The study was designed so that participants in each of the four groups were offered the opportunity to voluntarily attend individual or group sessions.  The study did not compare the effectiveness of any one of the four diets with group sessions to diets without group sessions, and certainly did not compare a three-month, portion controlled diet like Nutrisystem D with and without group sessions.  Therefore, the advertiser asserted, Sacks et al cannot be used to support the challenger's position that the group sessions in the Temple Study somehow improved the results that would have been achieved had the Study not included the sessions. Instead, the advertiser noted that the authors believed, and it makes sense, that the importance of group sessions to adherence to a diet is related to how "challenging" a diet is.  The advertiser asserted that this supports the position that the group sessions did not have a material effect on the Temple Study because the Nutrisystem D program is incredibly simple to follow – it features prepackaged, portion controlled meals, clearly labeled "Breakfast," "Lunch,"  "Dinner," or "Dessert." Nutrisystem D customers even have the added ease of having the food delivered directly to their homes on a monthly basis.  Therefore, there is no reason to believe that the group sessions in the Temple Study increased adherence to the Nutrisystem D program, and Nutrisystem's own data on its customers, which show virtually identical results as the Temple Study, confirm that.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 11**

more drastic "tool box intervention" methods.[13]   Toolbox intervention methods included "use of weight loss medicine (orlistat) and/or advanced behavioral strategies," such as the provision of subsidized gym memberships, exercise video/equipment, and reimbursement for purchase of portion controlled entrees.[14]   Contrary to WWI's characterization, the Look AHEAD researchers concluded that ILI, not just behavioral modification or counseling, caused the participant's improvement in weight, A1C, blood pressure, and LDL cholesterol.   Despite this, WWI misleadingly isolates group counseling as a core basis for the Look AHEAD study's outcomes, which enables it to make the seemingly logical leap to the conclusion that Look AHEAD study supports its position that the group sessions must have been a core factor in the Temple Study's outcomes.

III.   *The Record Shows That There Are No Material Differences Between The Temple Study and Nutrisystem D*

The advertiser contended that while WWI has provided only speculation and baseless assertions, Nutrisystem has provided extensive evidence as to why it is appropriate to use the quantitative results of the Temple Study in advertising for the Nutrisystem D program, i.e. such results are the generally expected results of Nutrisystem D customers.   The advertiser asserted that it provided significant data on how the weight loss results of the Temple Study compare to the actual weight loss achieved by Nutrisystem D customers, including those on insulin.   In addition, the advertiser noted that it provided extensive scientific literature supporting the weight loss efficacy of the program, as well as the relationship between such weight loss and an improvement in glycemic control and lipid reductions.

In addition, the advertiser asserted that WWI's characterization of the evidence on the relationship between weight loss by people with Type 2 diabetes and improvement in glycemic control as an "emerging view" suggests a fundamental lack of understanding of the scientific consensus on the management of Type 2 diabetes.   Research findings that weight loss results in improvements in diabetes-related outcomes (among a number of other metabolic parameters) are not a recent addition to the scientific literature.   For overweight individuals with Type 2 diabetes, the health benefits of even modest reductions in body weight have been demonstrated in medical literature for the past several decades and became a point of consensus in 1998 with the National Heart, Lung, and Blood Institute's publication of the "Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults: The Evidence Report."

IV.   *The Syntratech Case Is Inapplicable To This Challenge*

---

[13] Pi-Sunyer X, Blackburn G, Brancati F, Bray G, et al., The Look AHEAD Research Group; Reduction in Weight and Cardiovascular Disease Risk Factors in Individuals with Type 2 Diabetes. Diabetes Care. 2007; 30(6): 1374-1383 at page 1375.
[14] *Id*.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
Page: 12

The advertiser contended that the reasoning set forth in NAD's recent decision regarding claims for the dietary supplement Syntra-5 is inapplicable to the case at hand.[15]   For the reasons stated below, the advertiser asserted that NAD's reasoning for the finding that although Syntratech's (unpublished) study was well executed, it was "insufficient to support [the] extraordinary quantified health performance claims" because of its "small size and [lack of] evidence of reproducibility,"[16] is not applicable in this challenge.

First, the advertiser asserted that, unlike <u>Syntratech</u>, there is ample evidence that the results of the Temple Study are *reproducible*.  As explained above, the participants in the Temple Study lost about 1.5 lbs per week, which is about what Nutrisystem D customers generally lose.   That is also the expected weight loss according to the well established scientific literature, since the program produces a caloric deficit of 500-1000 calories per day.   Further, the literature shows that such weight loss will generally result in similar reductions in A1C, blood sugar, cholesterol, and triglycerides as found in the Temple Study.[17]    Therefore, the advertiser stated, there is considerable evidence of the Temple Study's "reproducibility."

Second, the quantitative results in the Nutrisystem D advertising are simply not "extraordinary." Rather, they are results that are quite expected and what the science shows is achievable by losing weight in a responsible way on a restricted calorie diet.  When placed side by side, it is clear that the claims made in Syntra-5 advertising are many orders of magnitude different than Nutrisystem D's quantitative claims.[18]   This case simply lacks the extreme numbers that would and should raise a red flag regarding the typicality of the Study results.

### V.    *The Challenged Testimonials Are Truthful, Accurate And Substantiated*

The advertiser asserted that WWI appears to make two arguments regarding testimonials: (1) by using the word "control" Nutrisystem is somehow implying a "long term" benefit; and (2) following the Syntratech decision, quantitative testimonials should not be allowed.   It is the position of the advertiser that both arguments are without merit.

The advertiser stated that there is no evidence in the record to support the challenger's argument that because Nutrisystem D advertising states that Nutrisystem D has helped consumers lose weight and "control" their diabetes, it conveys a long term "control" message.  The advertiser, on the other hand, argued that Nutrisystem D advertising makes no "long term" claims, either for weight loss or anything else.  Further, the advertiser emphasized that whenever the Temple Study

---

[15] *See, e.g.,* <u>Ross Products Division of Abbott Laboratories (Similac and Similac Advance Infant Formulas),</u> Case #4022, *NAD/CARU Case Reports* (March 2003); <u>Mead Johnson & Company (Enfamil with Iron),</u> Case #4019, *NAD/CARU Case Reports* (February 2003); <u>The Quaker Oats Company (Gatorade),</u> Case #3939, *NAD/CARU Case Reports* (August 2002).

[16] *See*, <u>Syntratech Corporation (Syntra-5 Total Body Solution),</u> Case #35105, *NAD/CARU Case Reports* (March 2010) at 17.

[17] *See*, Anderson, *supra* note 2;  Pi-Sunyer X, *supra* note 4.

[18] For example, Syntra-5 advertising claimed participants' A1C levels were lowered from 7.7% to 4.66% in three months (a 3.04 percentage point decrease); in comparison, the Nutrisystem D advertising claims a 0.9 percentage point decrease (levels reduced from 7.6% to 6.7%) found in the Temple Study.  Similarly, Syntra-5 advertising claimed a reduction in fasting blood sugar of 107 points; Nutrisystem D claims a reduction of 34 points.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 13**

is discussed, the duration of the Study (three months) is disclosed.  In addition, the advertiser argued that Nutrisystem D does help people "control" their Type 2 diabetes.   Type 2 diabetes has no cure, so individuals can only try to control (or manage) the disease by controlling their blood sugar levels (i.e. "glycemic control").[19]   According to the advertiser, losing weight is one of the best ways to control blood sugar levels, and the Temple Study found that the Nutrisystem D program was effective at glycemic control.

With respect to the challenger's argument that the Nutrisystem D testimonials should be discontinued, the advertiser stated that, unlike the <u>Syntratech</u> case, there are no extreme claims in the Nutrisystem D advertising.   Finally, the advertiser asserted that all testimonial claims, including the related disclaimers, are in full compliance with the FTC's Guidelines Concerning the Use of Endorsements and Testimonials in Advertising.

**Decision:**

According to the American Diabetes Association ("ADA"), the 2007 National Diabetes Fact Sheet ("2007 Fact Sheet") (the most recent year for which data is available) reported that a total of 23.6 million children and adults in the Unites States (or 7.8% of the population) have diabetes. These numbers include 17.9 million people who have already been diagnosed and 5.7 million people who are undiagnosed.  The 2007 Fact Sheet also reported that an astonishing 57 million people in the United States are pre-diabetic.[20]

Type 2 diabetes is the most common form of diabetes.  "In Type 2 diabetes, either the body does not produce enough insulin or the cells ignore the insulin.  Insulin is necessary for the body to be able to use glucose for energy.  When you eat food, the body breaks down all of the sugars and starches into glucose, which is the basic fuel for the cells in the body.  Insulin takes the sugar from the blood into the cells.  When glucose builds up in the blood instead of going into cells, it can lead to diabetes complications."[21]   Health complications associated with diabetes include eye, foot and skin complications, as well as heart disease, high blood pressure, gum disease, hearing loss, Gastroparesis[22], Neuropathy (nerve damage), kidney disease and stroke.

The challenged advertising campaign for the Nutrisystem D program targets overweight and obese consumers diagnosed with Type 2 diabetes, as well as consumers at risk for the disease.

---

[19] Scientific literature refers to reduction in A1C and blood glucose as markers of diabetes control, regardless of the duration of the effect.

[20] According to the ADA, before people develop Type 2 diabetes, they almost always have "prediabetes"—blood glucose levels that are higher than normal but not yet high enough to be diagnosed as diabetes. Recent research has shown that some long-term damage to the body, especially the heart and circulatory system, may already be occurring during pre-diabetes.  American Diabetes Association *available at* http://www.diabetes.org/diabetes-basics/prevention/pre-diabetes/?utm_source=WWW&utm_medium=DropDownDB&utm_content=Pre-Diabetes&utm_campaign=CON.

[21]                                                                                    http://www.diabetes.org/diabetes-basics/type2/?utm_source=WWW&utm_medium=DropDownDB&utm_content=Type2&utm_campaign=CON.

[22] Gastroparesis is a disorder affecting people with both type 1 and type 2 diabetes in which the stomach takes too long to empty its contents (delayed gastric emptying).

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 14**

The campaign (which encompasses broadcast, print and online advertising) promotes Nutrisystem D as the "clinically tested program for loosing weight and reducing blood sugar," "Clinically tested to lose weight and to help lower blood sugar and control Type 2 diabetes," and refers to Nutrisystem D consumers "who have lost weight and controlled their diabetes with Nutrisystem D." The campaign also emphasizes specific results of the Temple Study, such as: "On Nutrisystem D, People with Type 2 diabetes who wanted to lose weight: Lost 16 times more weight, Lowered blood sugar levels 5 times more, lowered AIC by 0.9%, lowered total cholesterol level by 22.5 mg, and lowered triglycerides level by 44.7 mg."[23] The challenged campaign also features various testimonials from individuals who were successful with Nutrisystem D, such as "Mike" who "lost 106 lbs." on Nutrisystem D.

The advertiser (Nutrisystem) and challenger (Weight Watchers International or "WWI") are competitive providers of weight loss and weight management programs throughout the United States. While both programs focus on weight loss they employ different methods to assist individuals in meeting their weight loss goals.

Briefly, the Nutrisystem programs[24] deliver all meals directly to consumers in portion-controlled packages. In conjunction with its food delivery plans, Nutrisystem offers its customers various types of support, including both on-line and telephonic counseling with Nutrisystem's trained counselors, nutrition and dietary teams, and on-line community support groups, as well as a copy of the 12-week, self-guided "Mindset Makeover" behavior modification guide. It is important to note, however, that individuals enrolled in one of the Nutrisystem programs do not attend weekly meetings or face-to-face sessions.

Rather than providing consumers with portion-controlled meals, Weight Watchers uses the Weight Watchers *POINT*® system to assist consumers in making healthy food choices and then uses the weekly, face-to-face meetings as well as online tools and other products to facilitate adherence to the Weight Watchers program. Group support through weekly face-to-face meetings is a distinguishing characteristic of the Weight Watchers programs.

The challenger contended that the Nutrisystem D advertising claims are not supported by the Temple University Study, which consists of a single, small scale, short-term clinical test of a weight loss program that is *not* the program Nutrisystem offers to consumers. The challenger went on to argue that, even if the Temple Study actually tested the weight loss program offered by Nutrisystem, the Study excluded from the testing insulin-dependent diabetics among others (who represent more than twenty-five percent of the consumers that make up the targeted Type 2 diabetic community), and provides no follow-up to determine whether the illness is indeed "controlled" beyond the short-term experimental period.

---

[23] Each of the challenged advertisements add the following disclosure: "++In a 3-month clinical study at Temple University School of Medicine, Nutrisystem program participants lost an average of 18 lbs, and lowered fasting blood sugar levels from 151.2 to 115.2, compared to those following a hospital-directed diet and education plan, who lost 1.1 lbs, and lowered fasting blood sugar levels from 151.4 to 144. Not all menu items were included in the study. Study funded through an unrestricted educational grant from Nutrisystem."

[24] Nutrisystem offers programs designed for men, women, seniors and for individuals with Type 2 diabetes (Nutrisystem D).

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 15**

The advertiser, on the other hand, argued that the Temple Study was, in fact, conducted on the Nutrisystem D program and fully supports the advertising claims at issue.  The advertiser argued that, basic physiology dictates that it is what the subjects ate, not what they learned or said, that was responsible for the effects seen in the Study.  The advertiser further asserted that while hypothetically the group counseling sessions may have helped or encouraged subjects to follow the directions for the Nutrisystem D program, there is no reason why consumers who follow the directions in the real world would not achieve the same results as those in the Temple Study.  Finally, the advertiser noted that an overwhelming amount of published data, as well as Nutrisystem's extensive, actual "real world" data on its own customers, demonstrate that the results of the Temple Study are consistent with "real world" use.  Thus, the advertiser asserted that, not only is it not misleading to describe the results of the Temple Study in advertising, it also is not misleading to claim that consumers on Nutrisystem D can achieve the same results as participants in the study.

## I.     *The Temple University Clinical Study*

The purpose of the Temple University Study was to assess the effects of a commercially available weight loss program on weight and glycemic control among obese patients with Type 2 diabetes.  The study consisted of 69 obese patients with Type 2 diabetes who were randomly assigned to one of two groups: 1) the Nutrisystem D prepackaged, portion-controlled diet plan ("PCD"); or 2) a diabetes support and education ("DSE") program.  Individuals taking insulin or any other medication used to treat diabetes other than metformin, thiazolidinediones, and sulfonylureas were excluded from the study.

In addition to the Nutrisystem D prepackaged food, the PCD participants received behavioral treatment in groups of 8 to 12 people, led by a health care professional with experience in behavioral weight control.  These behavioral treatment sessions were attended weekly from weeks 1 through 12; topics included self monitoring, stimulus control, goal setting, and relapse management.  PCD participants were also provided with the same 12-week behavioral-support materials that are currently provided to individuals enrolled in the Nutrisystem D program.  In contrast, the DSE participants attended 3 group sessions of 8 to 12 people over weeks 1 through 12 (weeks 1, 5 and 9) consisting of support lessons on diabetes management, physical activity, and nutrition.

The Study reported that, after three months on the Nutrisystem D program, individuals with Type 2 diabetes had statistically and clinically significant improvements (over individuals using a standard diabetes education and support program) in many measurements, including, but not limited to, weight ($p < 0.0001$); BMI ($p < 0.0001$); A1c ($p = 0.001$); fasting glucose (blood sugar) ($p = 0.02$); triglycerides ($p < 0.0001$); and cholesterol ($p = 0.005$).  The discussion section of the Study states: "[t]hese data suggest that obese patients with Type 2 diabetes will experience significant improvements in weight, glycemic control, and cardiovascular disease risk factors after 3 months use of a prepackaged, portion-controlled meal plan such as Nutrisystem D.  The clinical success of this approach is likely because of the structured approach of the meal plan.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 16**

Structure has been shown to facilitate adherence and increase weight loss compared with conventional foods."

The authors further noted that the study "had some limitations, including relatively short study duration and the inability to separate out the effects of greater professional contact among the PCD group." Finally, the authors concluded that, "[g]iven these initial impressive results, future studies should assess the efficacy of this approach beyond clinical testing and follow patients for a longer time period."

> II.     *Establishment Claims: "It's Clinically Tested So You Know It Works" and*
> *"Announcing Nutrisystem D, The Clinically Tested Program For Losing Weight and*
> *Reducing Blood Sugar"*

A "clinically tested" claim is an establishment claim. These types of claims are held to a very high standard of proof because they are, in essence, a promise that there is scientific evidence that proves or "establishes" the truth of the statement.[25]   Notably, The Federal Trade Commission ("FTC") requires at least two adequate and well-controlled clinical studies to substantiate an establishment claim, a higher standard than it requires for other claims.  While NAD does not require a specific number of studies, it has traditionally required that an advertiser produce reliable, well-controlled clinical testing on the advertised product[26] which demonstrates results that should be reasonably expected by typical consumers (reflecting the target audience) using the advertised product under normal use conditions.[27]

It is important to note that neither the methodology nor the reliability of the Temple Study is at issue in this proceeding.  The issue before NAD is whether or not the results of the Temple Study support the challenged "clinically tested" claims for the advertiser's Nutrisystem D program.

In reviewing the "clinically tested" claims, NAD considered the fact that the authors of the Temple Study attributed the results to the portion-controlled meal plan.  In addition, NAD recognized that although Nutrisystem D does not offer weekly face-to-face meetings, it does provide support through unlimited online and telephone counseling (available 24/7), online classes with a registered dietician and an online community for motivational support.[28]  NAD also considered the additional evidence provided by the advertiser to demonstrate that the results of the Temple Study (which reported an average weight loss of 18 pounds in 12 weeks, or 1.5

---

[25] *See*, Rexall Sundown, Inc. (Osteo Bi-Flex Dietary Supplement), Case #4692, *NAD/CARU Case Reports* (July 2007); Patent Health, LLC (Fluid Joint - Dietary Supplement for Joint Function), Case #4335, *NAD/CARU Case Reports* (May 2005); A.D. Pharma (notox - The All Natural Way to Reduce the Ill Effects of Alcohol), Case #4163, *NAD/CARU Case Reports* (April 2004).

[26] *See*, Patent Health, LLC (Fluid Joint - Dietary Supplement for Joint Function), supra; A.D. Pharma (notox), supra; Avon Products, Inc. (Skin-So-Soft Bug Guard Plus IR 3535 Insect Repellent), Case #3922, *NAD/CARU Case Reports* (August 2002); Virbac, AH, Inc. (Preventic Tick Control Product), Case #3603, *NAD/CARU Case Reports* (November 1999).

[27] Pacificahealth Laboratories, Inc. (Endurox R Sports Drink), Case #3671, *NAD/CARU Case Reports* (July 2000).

[28] As noted in the advertiser's position, Nutrisystem also provides consumers with the "Mindset Makeover" behavior modification program pamphlet, educational newsletters and resources to promote physical activity.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 17**

pounds per week) are consistent with the experiences of real Nutrisystem D customers,[29] as well as the scientific literature and expert statements submitted to demonstrate that such weight loss should also result in similar reductions in A1c, blood sugar, cholesterol, and triglyceride levels.[30]

Nevertheless, NAD was troubled by the fact that the challenged advertising communicates to consumers that the Temple Study was conducted *on the Nutrisystem D program*, when in fact, weekly group sessions are not offered to consumers enrolled in the Nutrisystem D program.

Although the authors of the Temple Study attributed the results to the pre-packaged portion controlled meal plans, the authors also noted that they could not separate out the effects of the weekly group sessions ("greater professional contact") from the study results.  In addition, the scientific literature cited to support the challenged claims by no means minimizes the potential effect of behavior therapy on weight loss.  For instance, the conclusion section of the Look AHEAD Study noted that "[t]he larger weight losses in Look AHEAD than in prior clinical trials may be attributable to the *combination of group and individual contact*, the higher physical activity goal that was prescribed, and/or the more intense dietary intervention …"[31] (emphasis added).  Also, the National Heart, Lung and Blood Institute Obesity Education Initiative ("NHLBI") states that "Behavior therapies provide methods for over-coming barriers to compliance with dietary therapy and/or increased physical activity, and are thus important components of weight loss therapy."[32]

After a thorough review of the evidence in the record, NAD determined that enforcing lifestyle changes is arguably one of the biggest challenges to losing weight and maintaining weight loss.[33] The necessary lifestyle changes are different for everyone but often involve adding physical activity to one's daily routine, portion control, self monitoring of both eating habits and physical

---

[29] In particular, the advertiser argued that the Nutrisystem D program is designed to produce a caloric deficit of 500-1000 calories per day, an amount sufficient to result in 1-2 pounds of weight loss per week.  The advertiser submitted: 1.) a 2010 survey of customers on the Nutrisystem D program demonstrating that individuals with Type 2 diabetes on the program for approximately 3 months reported an average weight loss of 18.2 lbs; 2.) an analysis of customer self-reported data demonstrating that customers on the Nutrisystem D program starting with a BMI between 35 and 40 lost a mean of 19.5 lbs; and 3.) a 2007 independent survey commissioned by Nutrisystem of its customers on its diabetic program which preceded Nutrisystem D which found that customers on the program for 12 weeks lost an average of 2.4 lbs per week.

[30] Such evidence included the 2003 Meta-analysis by Anderson, et al., which included 16 studies on the effects of calorie reduced diets on individuals to demonstrate that the weight loss demonstrated under the Nutrisystem D program results in similar reductions in A1c, blood sugar, cholesterol and triglyceride levels found in the Temple Study.

[31] Pi-Sunyer X, Blackburn G, Brancati F, Bray G, et al., The LOOK Ahead Research Group; Reduction in Weight and Cardiovascular Disease Risk Factors in Individuals with Type 2 Diabetes. *Diabetes Care*. 2007; at 1380.

[32] National Heart, Lung and Blood Institute Obesity Education Initiative. 1998. Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults: The Evidence Report. US Dept of Health and Human Services. *NIH Publication No. 98-4083.*  ("NHLBIOEI") at 81.

[33] In particular, NAD noted that the Clinical Guides on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults by the National Institutes of Health National Heart, Lung, and Blood Institute state that "[u]nless a patient acquires a new set of eating and physical activity habits, long-term weight reduction is unlikely to succeed." National Heart, Lung and Blood Institute Obesity Education Initiative. 1998. Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults: The Evidence Report. US Dept of Health and Human Services. *NIH Publication No. 98-4083.*  ("NHLBIOEI") at 81.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 18**

activity (objectifying one's own behavior through observation and recording), stress management, stimulus control (identifying stimuli that encourage incidental eating so individuals can limit their exposure to high-risk situations), and confronting emotional issues related to overweight or over eating.  The weekly group sessions that were attended by the Temple Study participants on the Nutrisystem D program provided face-to-face social and professional support, which is not offered through the commercially available Nutrisystem D program.  In addition, the weekly sessions forced participants to learn about self monitoring and stimulus control – two of the specific behavioral strategies recommended by the NHLBI.[34]  While it may be true that the Nutrisystem D program provides customers with a plethora of information and resources online, in hard copy and by phone – the advertiser has failed to show that adding group behavioral treatment led by a health care professional with experience in behavioral weight control to the resources already provided by the Nutrisystem D program had no impact on the Temple Study results.

The advertiser provided evidence that consumers following the Nutrisystem D program will reduce their caloric intake by 500-1000 calories a day, resulting in a weight loss of approximately 1 to 2 pounds a week.  The advertiser also provided a reasonable basis to support the assertion that moderate weight loss has been shown to have a positive affect on key diabetic markers such as A1c and blood sugar levels.  However, there is a dramatic difference between informing consumers of the potential positive health impact that losing weight can have on Type 2 diabetes, and telling consumers that your product has been clinically tested and therefore "you know it works," which implies that the program has been proven to produce the promised results.  After a thorough review of the evidence, NAD determined that the advertiser failed to demonstrate that the addition of weekly behavioral treatment sessions had no impact on the participants' ability to stay on the Nutrisystem D program, and thus, on the results of the Temple Study.

For these reasons, NAD concluded that the advertiser failed to provide clinical testing "on the advertised product… under normal use conditions," which is necessary in order to adequately support an establishment claim.  Therefore, NAD recommended that the advertiser discontinue its use of all claims which imply that the Temple Study was conducted solely on the Nutrisystem D program, extrapolate the results of the Temple Study to the Nutrisystem D program, as well as all claims which refer to the Nutrisystem D program as "clinically tested."[35]

That being said, NAD noted that nothing in this decision prevents the advertiser from discussing the results of the Temple Study, or highlighting the fact that the Study was conducted on the Nutrisystem D program *in combination with* weekly group sessions.  It is clear that consumers, as well as medical professionals, can benefit from learning about the positive impact of weight loss on Type 2 diabetes.  In addition, Nutrisystem has the right to tout the fact that its Nutrisystem D program is made specifically for people with Type 2 diabetes.

---

[34] *Id.*
[35] For example: 1.) "Announcing Nutrisystem D.  The clinically tested program for losing weight and reducing blood sugar …"; 2.) People on Nutrisystem D lost up to 16 times more weight, reduced their A1c, and lowered their blood sugar levels five times more than following a diabetes support program"; and 3.) "It's clinically tested so you know it works."

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 19**

### III.    *Quantified Performance Claims*

In addition to the establishment claims discussed above, the challenged advertisements also make the following quantified performance claims: "On Nutrisystem D, people with Type 2 diabetes: Lost Weight up to 16 times more, Lowered blood sugar 5 times more, Lowered A1C by 0.9%, Lowered cholesterol by 20.9mg/dL, Lowered triglycerides by 42.7 mg/dL."  These claims are followed by a disclosure which states: "In a 3-month clinical study at Temple University School of Medicine and published in the Journal of Postgraduate Medicine, Nutrisystem program participants lost an average of 18 lbs., and lowered fasting blood sugar levels from 149.5 to 115.2, compared to those in a control group, who lost 1.3 lbs., and lowered fasting blood sugar levels from 151.4 to 144.  Not all menu items were included in the study.  Study funded through a research grant from Nutrisystem."

As noted above, NAD concluded that the Temple Study was not solely conducted on the Nutrisystem D program.  Therefore, NAD recommended that the advertiser also modify the statement "On Nutrisystem D, people with Type 2 diabetes …" so that it is clear that the results following this statement are based on a study that was conducted on the Nutrisystem D program in conjunction with weekly group sessions, and not the Nutrisystem D program alone.

NAD next considered the study results: "Lost Weight up to 16 times more, Lowered blood sugar 5 times more, Lowered A1C by 0.9%, Lowered cholesterol by 20.9mg/dL, Lowered triglycerides by 42.7 mg/dL."

In reviewing these claims NAD noted that advertising claims that report data from a published study should be very specific, accurate and clear.[36]  In addition, claims based on clinical studies should be no broader than the clinical's conclusions, and material limitations of a claim must be adequately disclosed.[37]

As noted above, the reliability of the Temple Study (and its results) is not at issue in this proceeding.  NAD was, however, concerned that two of the statements used to describe the study results ("Lost Weight up to 16 times more" and "Lowered blood sugar 5 times more") are overly broad.  These statements appear in the challenged print advertisements and television commercials, as well as on the Nutrisystem website under the "Diabetic Plans" tab.  NAD noted that losing "16 times more" weight and lowering blood sugar "5 times more" could reasonably be interpreted by consumers to mean much more than the actual results reported – an average weight loss of 18 pounds and a drop in fasting blood sugar levels from 149.5 to 115.2 over 12 weeks respectively.  In order to avoid consumer confusion, NAD recommended that the advertiser modify these claims by adding the actual results to the main body of the claim, rather than disclosing them in fine print.

---

[36] Wyeth Consumer Healthcare, Inc. (Caltrate), Case #4153, *NAD/CARU Case Reports* (March 2004); General Mills, Inc. (Total Cereal), Case #4053, *NAD/CARU Case Reports* (July 2003).
[37] Sonex Corporation (The Ultrasonex Toothbrushes & SoniPick Flosser), Case #3656, *NAD/CARU Case Reports* (May 2000).

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
Page: 20

NAD next considered the fact that consumers viewing the challenged advertisements are not informed that insulin-dependent diabetics are excluded from the Temple Study. It is well established that advertisers must adequately disclose material limitations of their advertising claims. Such practices ensure that consumers have all relevant information necessary to make an informed purchasing decision. Given that the advertisements target consumers with Type 2 diabetes, and, 27% of all Type 2 diabetics are insulin-dependent, NAD concluded that the fact that insulin users were excluded from the Temple Study is important information consumers need in order to put the touted study results in a meaningful context for themselves.[38] For these reasons NAD recommended that the advertiser clearly and conspicuously disclose the fact that insulin users were excluded from the Temple Study.

IV.     _Consumer Testimonials and Implied Claims of Long-Term Control_

The challenged advertisements also contain various testimonials featuring Nutrisystem D customers who have lost weight using Nutrisystem D. In particular, the print advertisements use before and after photographs of several Nutrisystem D customers (including "Mike" who "lost 106 lbs", "Marianne" who "lost 63 lbs", "Christine" who "lost 221 lbs", "Bruce" who "lost 80lbs" and "Beverly" who "lost 52 lbs") which appear alongside the challenged establishment and quantified product performance claims discussed above. In the challenged television commercials these same customers share stories about being overweight and developing Type 2 diabetes and then go on to tell how they lost weight and lowered their blood sugar using Nutrisystem D.[39]

The challenger asserted that the challenged advertising campaign interweaves establishment and quantified performance claims with testimonials featuring consumers who have "controlled" their diabetes with Nutrisystem D over time, lending further credence to the Temple Study results for the targeted population. The challenger further argued that, "controlling" one's disease is a long-term claim, and, the advertiser has provided no evidence to confirm that

---

[38] NAD noted that the Look AHEAD Study reported that "insulin users, compared with noninsulin users, were less likely to achieve weight losses >10% or >7%." In addition, the authors of the Look AHEAD Study noted in the conclusion section that "[i]t appears as though individuals with diabetes (especially those on insulin) may have more difficulty losing weight and then keeping it off than those without diabetes."

[39] For example, one commercial begins with Mike who says, "I was way overweight. I had developed Type 2 diabetes." Then Christine, another Nutrisystem D customer, appears on the screen saying, "My doctors gave me the ultimatum. They said you have to lose weight or you're going to die." Mike then says, "I had to take control" as the statement "Nutrisystem D … Reduce blood sugar" appears on the screen. Next, a voiceover states, "Announcing Nutrisystem D. The clinically tested program for losing weight and reducing blood sugar" as before and after shots of Christine appear on the screen and she says, "I'm Christine and I lost 214 pounds and lowered my blood sugar." The next shot shows before and after photos of Mike with the statement "Mike lost 106 lbs" in large bold type as he says, "Lot's of people have lost weight on Nutrisystem D and lowered their blood sugar." Just as the print advertisements feature testimonials alongside the establishment and quantified performance claims based on the Temple Study, the challenged commercials also tout the results of the Temple Study. In this commercial Mike's before and after shots are followed by the statement "Up to 16x more weight loss" in large bold type across the screen as a voiceover states, "People on Nutrisystem D lost up to 16 times more weight, …" the following screen shot states "5X lower blood sugar" in large bold font across the screen as the voiceover concludes with, "… reduced their A1c, and lowered their blood sugar levels 5 times more than those in the control group." Finally, the advertiser's website features "Marianne" who "lost 63lbs" and "Mike" who "lost 106 lbs."

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 21**

participants can actually control their illness for the long term by using the Nutrisystem D program.  The advertiser, on the other hand, argued that its use of the challenged testimonials is full compliance with the FTC's Guidelines Concerning the Use of Endorsements and Testimonials in Advertising.  The advertiser further argued that the challenged campaign makes no long term claims, either for weight loss or anything else.  Finally, the advertiser stated that Nutrisystem D absolutely can and does help people "control" their Type 2 diabetes, noting that this disease has no cure and therefore individuals can only try to control (or manage) the disease by controlling their blood sugar levels.

Section 255.2 (b) of the FTC's Guidelines Concerning the Use of Endorsements and Testimonials in Advertising ("FTC Guides") states:

> *An advertisement containing an endorsement relating the experience of one or more consumers on a central or key attribute of the product or service also will likely be interpreted as representing that the endorser's experience is representative of what consumers will generally achieve with the advertised product or service in actual, albeit variable, conditions of use.*
> *Therefore, an advertiser should possess and rely upon adequate substantiation for this representation.  If the advertiser does not have substantiation that the endorser's experience is representative of what consumers will generally achieve, the advertisement should clearly and conspicuously disclose the generally expected performance in the depicted circumstances, and the advertiser must possess and rely on adequate substantiation for that representation.*

NAD noted that the challenged testimonials each contain a disclosure which states, "Results not typical.  On Nutrisystem, you can expect to lose 1-2lbs. per week. …" and therefore, are in compliance with the FTC Guides.  However, when evaluating the message communicated by an advertising claim, NAD examines the claim at issue in the context of the entire advertisement in which it appears.[40]  NAD noted that although the individual testimonials are linked to a disclosure which states the average weight loss that can be expected, the testimonials emphasize extreme weight loss results alongside very powerful claims regarding the Temple Study results.  NAD determined that, in this context, one reasonable interpretation of the challenged advertisements is that these testimonials represent the results achieved by consumers who were part of the Temple Study, which is not the case.  In addition, NAD noted that the challenged testimonials show extreme cases of weight loss in contrast to the findings of the Temple Study, which focuses on the concept that *moderate* weight loss (an average of 18 pounds over 12 weeks) can have a positive impact on blood sugar, A1c, cholesterol and triglyceride levels.  For these reasons, NAD recommended that the advertiser discontinue its use of such testimonials in conjunction with a discussion of the Temple Study results in future advertisements that discuss the results of the Temple Study.

---

[40] Bayer Healthcare LLC (Phillips' Milk of Magnesia), Case #4035, *NAD/CARU Case Reports* (May/June 2003); Big Words, Inc. (Online Textbook Sellers), Case #3687, *NAD/CARU Case Reports* (September 2000).

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
Page: 22

Finally, NAD was not troubled by the advertiser's references to "controlling" diabetes through claims such as, "With our diabetic program, Nutrisystem D, losing weight so you can help control your diabetes is easier than you think!" and "Clinically tested to help you lose weight, which helps lower blood sugar and control Type 2 diabetes."[41]   NAD noted that such claims clearly state that individuals with Type 2 diabetes can *help* control or manage the disease by losing weight – a concept which is supported by the evidence in the record.  NAD further noted that the target population, individuals who have Type 2 diabetes, are aware that there is no cure for the disease.  Given NAD's recommendation that the advertiser discontinue its use of the challenged testimonials in conjunction with descriptions or discussion of the Temple Study results, NAD determined that the remaining claims are not problematic.

**Conclusion:**

Because the Temple University Study was conducted using the Nutrisystem D prepackaged meal plan in conjunction with weekly behavioral treatment sessions, NAD recommended that the advertiser discontinue its use of all claims which imply that the Temple Study was conducted solely on the Nutrisystem D program, extrapolate the results of the Temple Study to the Nutrisystem D program, as well as all claims which refer to the Nutrisystem D program as "clinically tested."

With respect to the challenged quantified performance claims, NAD was concerned that two of the statements used to describe the study results ("Lost Weight up to 16 times more" and "Lowered blood sugar 5 times more") are overly broad.  In order to avoid consumer confusion, NAD recommended that the advertiser modify these claims by adding the actual results to the main body of the claim, rather than disclosing them in fine print.  In addition, NAD recommended that the advertiser clearly and conspicuously disclose the fact that insulin users were excluded from the Temple Study.

Finally, NAD noted that although the challenged testimonials are linked to a disclosure which states the average weight loss that can be expected, the testimonials emphasize extreme weight loss results but appear together with claims regarding the Temple Study results (which showed only moderate weight loss, i.e., an average of 18 pounds over 12 weeks).  NAD determined that, in this context, one reasonable interpretation of the challenged advertisements is that these testimonials represent the results achieved by consumers who were part of the Temple Study, which is not the case.  In addition, NAD noted that the challenged testimonials show extreme cases of weight loss in contrast to the findings of the Temple Study, which focuses on the concept that *moderate* weight loss can have a positive impact on blood sugar, A1c, cholesterol and triglyceride levels.  For these reasons, NAD recommended that the advertiser discontinue its use of such testimonials in conjunction with descriptions or discussion of the Temple Study results.

---

[41] Due to the NAD's recommendation that the advertiser discontinue use of the challenged testimonials alongside descriptions of the Temple Study results it was not necessary to consider whether the testimonials also conveyed the implied message that Nutrisystem D can provide long-term control of the illness.

**NUTRISYSTEM, INC.**
**Nutrisystem D Program**
**Page: 23**

**Advertiser's Statement:**

Nutrisystem, Inc. is pleased with NAD's finding that it may discuss the quantitative results of the study on the Nutrisystem® D™ program, conducted at Temple University School of Medicine, in its advertising. Nutrisystem is also pleased with NAD's findings that Nutrisystem D is specifically designed for individuals with Type 2 Diabetes, and that losing weight with Nutrisystem D can help individuals control their diabetes. Notwithstanding those findings, Nutrisystem is disappointed and respectfully disagrees with several of NAD's conclusions as discussed below.

Nutrisystem disagrees with NAD's conclusions regarding the significance of the inclusion of weekly counseling sessions in the Temple Study and the exclusion of insulin users from the Study. Nutrisystem provided substantial evidence (including voluminous scientific literature, expert statements, and actual data on the successes of Nutrisystem customers) proving that consumers on the Nutrisystem D program can expect to achieve at least the same results as found in the Temple Study. The challenger provided no evidence to prove otherwise.

Similarly, Nutrisystem provided ample evidence that insulin use will not impact the efficacy of the Nutrisystem D program. In our view, requiring disclosure of the exclusion of insulin users from the Study potentially suggests otherwise and could pose a public health concern as it might dissuade insulin users from losing weight and realizing all of the related health benefits from the Nutrisystem D program.

Nutrisystem also disagrees that statements that Temple Study participants "Lost Weight up to 16 times more" and "Lowered blood sugar 5 times more" are overly broad. Those are the actual results of the Study, and the specific weight loss and blood sugar reduction results are adequately disclosed in all advertisements. Finally, Nutrisystem disagrees with NAD's conclusion that the challenged testimonials should not be used in conjunction with discussions of the Temple Study. As NAD acknowledges, the testimonials are in compliance with the FTC's guidelines, and neither the challenger nor NAD provided any evidence of consumer confusion.

Despite its disagreement with these conclusions, Nutrisystem supports the self-regulatory process and will take NAD's recommendations into account in future advertising. **(#5275 KLF, closed 01/10/2011)**

© 2011.  Council of Better Business Bureaus, Inc.

# EXHIBIT E

*Case #4352 (06/29/05)*
**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
*Advertising Agency:      Undisclosed*
*Challenger:          McNeil Nutritionals*

- **Claims that a product's health benefit has been clinically proven must be supported by competent and reliable scientific evidence.**

- **Doctor Recommended claims are highly persuasive and typically require, as support, a random and statistically representative survey of doctors showing that a substantial percentage recommend the advertiser's product**

**Basis of Inquiry**:    Advertising and packaging Claims for Digestive Advantage LI, were challenged by McNeil Nutritionals, ("McNeil") the manufacturer of Lactaid® lactase enzyme supplement.  Digestive Advantage LI is a dietary supplement that is advertised as a "once a day" product" that provides 24-hour prevention of lactose intolerance.  The challenged claims include the following:

*Duration Claims for Digestive Advantage*:

- "One Per Day

- "24 hour relief"

- "You don't have to worry about taking a pill every time you eat."

- "The lactobacillus colonizes the small intestine and provides 24-hour relief by continually producing lactase enzymes."

- "One tablet in the morning and you are protected all day."

- "Digestive Advantage is taken once per day and provides 24-hour protection from symptoms such as gas, diarrhea, bloating and constipation."

*Claims that Digestive Advantage has been Clinically Tested*:

- "Clinically tested to work fast and provide 24-hour relief."

*Doctor Recommended Claims*:

- Digestive Advantage is "Doctor recommended"

*Comparative Claims:*

- "92.5% of users prefer Digestive Advantage LI."

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 2

- "94.4% of the users like Digestive Advantage better than competitive solutions for lactose intolerance."

McNeil also challenged the advertiser's use of testimonial statements regarding 24-hour duration and superior efficacy of Digestive Advantage.

**Challenger's Position:**  McNeil argued that there is no mechanism by which the advertiser's product can provide 24-hour prevention of lactose intolerance as claimed in the advertising and packaging for Digestive Advantage.   McNeil maintained that the evidence produced by the advertiser does not substantiate such a performance claim or the other claims made by the advertiser for its product.

As background,   McNeil explained that lactose intolerance results is experienced by individuals who do not produce sufficient quantities of lactase, the enzyme that digests lactose, the predominant sugar in milk and other dairy products.  Lactose intolerance can result in cramping, gas, bloating and/or diarrhea.  McNeil produces Lactaid Ultra, a lactase dietary supplement.  The principal ingredient of Lactaid Ultra is lactase enzyme (9,000 FCC units) which helps break down the lactose in dairy products eaten by the consumer.  Because the enzyme passes through the GI tract during the digestive process, an additional Lactaid tablet must be taken each time a dairy product is consumed.

The advertiser's lactose intolerance product, Digestive Advantage, also contains lactase enzyme (3,000 FCC units) but also, according to the ingredients listed on the package, "Lactobacillus cultures."  McNeil maintained that the product is actually mislabeled because the bacteria culture contained in Digestive Advantage is not truly Lactobacillus by current and commonly accepted bacterial taxonomy.[1]  It noted that the organism, claimed by the advertiser to be found in Digestive Advantage, Bacillus coagulans, is not closely genetically related to true Lactobacillus species. Moreover, argued McNeil, even if Ganeden were correct that Bacillus coagulans can be referred to as Lactobacillus, its product does not actually contain Bacillus coagulans.  McNeil submitted an independent microbial analysis of Digestive Advantage which, it claimed, revealed that the product contains a different Bacillus species.

*Duration Claims for Digestive Advantage*

McNeil maintained that there is no scientific basis for the claim that Digestive Advantage aids lactose digestion for 24 hours.   Both product ingredients, the lactase enzyme and the indeterminate bacillus species (claimed by the advertiser to be "Lactobacillus cultures"), pass through the small intestines to the colon along with any food that has been ingested. Accordingly, argued McNeil, there is no reliable scientific support for Ganeden's claim that its product can aid lactose digestion for 24 hours.  Although the advertiser purportedly relied upon

---

[1] Lactobacillus, explained McNeil, refers to a well known genus of bacteria known to utilize lactose as an energy source, with lactic acid as a byproduct.

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 3

clinical studies in support of its duration claim, McNeil noted that the none of the studies cited were designed to measure duration of action.

Significantly, argued McNeil, Ganeden's duration claim is belied by the determination of an independent microbial analysis that the product does not contain Lactobacillus. The laboratory conducting the testing Microbial ID, did not detect either Lactobacillus or Bacillus Coagulans in any of its samples. McNeil noted that Ganeden, instead of commissioning its own independent microbial analysis, raises baseless criticisms of the procedures utilized by Microbial ID. McNeil explained that the process by which Microbial ID identified the organisms in Digestive Advantage is in accordance with classical procedures in the field. Under controlled growth conditions, each bacterial species produces a complex, unique fatty acid profile. These profiles function like a fingerprint. Over the years, fatty acid profiles have been developed and defined for hundreds of different bacterial species. The profiles are collected in a "library," such as the MIDI Aerobic Bacteria Library attached as Exhibit 27. When an unknown organism is submitted to Microbial ID for identification, its fatty acid profile is established and then is matched to the profiles (or fingerprints) stored in the MIDI library.

Although Ganeden also questioned the media and protocol used by Microbial ID to isolate the bacteria in Digestive Advantage, the laboratory, according to the challenger, followed common well-recognized procedures for isolating and analyzing bacteria. In accordance with these procedures, the Digestive Advantage capsules were dissolved in a standard Trypticase Soy Broth, which is effectively a "soup" that allows bacteria to grow. The "soup" was then incubated overnight at 28 degrees Centigrade. Using accepted sterile or "aseptic" procedures, a small amount of this "soup" was taken and isolated onto the surface of Trypticase Soy Agar Plates. These plates were then incubated for 24 hours. Each colony that grew on the plates was the progeny of one bacterium. Microbial ID selected isolated colonies for further testing to determine the fatty acid profile. Again, the above work was based on standard procedures used for bacterial growth, isolation and identification for at least the past 75 years.

McNeil responded to Ganeden's argument that Microbial ID should have used special media to isolate Lactobacillus by noting that the purpose of the test was to isolate the predominant bacteria present in the product. If Lactobacillus were the predominant organism, Microbial ID's tests would have revealed it and identified it. A selective medium only would be needed if the product was massively contaminated with other microorganisms and one was attempting to determine if any Lactobacillus were present. Since massive contamination would render Digestive Advantage unfit for human consumption, the special test proposed by Ganeden clearly was not appropriate or necessary according to McNeil.

McNeil was also critical of the laboratory report submitted by Ganeden, purportedly showing that the organism was identified as Bacillus Coagulans. Unlike McNeil's laboratory analysis – where McNeil hired an independent lab to identify the predominant strains of bacteria present in the Digestive Advantage product – the laboratory report submitted by Ganeden demonstrates nothing more than a spore count. A "spore count" simply counts the total number of bacterial spores present; it does not distinguish between different strains.

In response to the Survey produced in confidence to NAD by the advertiser ("Onmark Survey"), McNeil noted that the brief description provided to the challenger did not indicate whether the

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 4

survey employed rigorous sampling procedures to ensure that a random and statistically representative population was tested. More importantly, argued McNeil, it did not appear as though the Digestive Advantage product was blinded or that a control product (such as a lactase enzyme without added bacteria) was included in the test. If Digestive Advantage was not blinded, respondents saw the "24-hour" and "clinically tested" claims on the package. In any event, the challenger maintained that a survey does not qualify as a well-controlled clinical study and hence cannot substantiate a health claim or a "clinically tested" claim in advertising.

*Claims that Digestive Advantage has been Clinically Tested*

McNeil did not dispute that Digestive Advantage may provide relief from symptoms related to lactose intolerance, but explained that this is due to the presence of lactase enzyme in the product and that the relief provided is limited to the enzyme's transit time in the small intestine. McNeil argued that the evidence did not support the claim that Digestive Advantage can be taken once and provide relief for 24 hours.

McNeil disputed the theory, offered by Ganeden, that the bacteria in Digestive Advantage germinate and proliferate in the small intestine where they allegedly reside for up to five days utilizing carbohydrates, such as lactose, thereby alleviating discomfort caused by carbohydrate malabsorption. It noted that the only support Ganeden mentions for this contention is "phenotypic studies" it claims to have performed, but which are not submitted or described. McNeil explained that a phenotypic study involves putting bacteria into a liquid broth media that contains carbohydrates. The purpose of this test is to see if the organisms grow with carbohydrates. What a microbiologist is looking for in conducting such a test is fermentation of carbohydrates into, for example, an acid end product such as lactic acid or acetic acid. Phenotypic tests were used to identify bacteria before the introduction of more modern identification techniques. They were not designed to predict *in vivo* performance. According to McNeil, Ganeden extrapolates from its supposed *in vitro* tests to draw conclusions about performance in an *in vivo* environment. At most, argued McNeil, these test show that the bacteria tested is capable of living for 24 hours in whatever *in vitro* environment was employed. They do not, however, prove that the same bacteria, when formulated into a Digestive Advantage capsule, will survive and grow in the human digestive tract and produce sufficient levels of lactase enzyme to provide clinically significant symptom relief for 24 hours. Consequently, the challenger argued that Ganeden's purported phenotypic studies do not constitute competent and reliable scientific evidence that its product aids carbohydrate digestion at all, much less that it does so to a clinically meaningful degree for 24 hours.

Although Ganeden also claimed to be conducting a placebo controlled efficacy study, McNeil noted that no information or results are provided. The only substantiation actually submitted by Ganeden for its "clinically tested" and 24-hour duration claims is a marketing survey of 108 consumers who previously had used Digestive Advantage. Far from being a clinical study, McNeil maintained, this product satisfaction survey amounts to little more than a collection of anecdotal reports from consumers.

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 5

*Doctor Recommended Claims*

McNeil argued that Ganeden provided no basis for making "Dr. Recommended" claims for Digestive Advantage.  It observed that traditionally, as support for such claims, NAD, FTC and the networks all require a random and statistically representative survey of doctors showing that a substantial percentage recommend the advertiser's product in the regular course of their medical practice. Rather than conducting an actual survey of physicians to inquire about their product recommendations in this category, observed the challenger, Ganeden provided free samples to doctors' offices and then called to see if they wanted to receive additional free samples.  McNeil argued that there is a significant difference between counting the number of doctors who agree to receive additional samples and conducting a statistically valid survey showing that a meaningful percentage of physicians recommend Digestive Advantage to their patients.  It noted that Ganeden produced no such evidence.

*Comparative Claims*

Because the efficacy of Digestive Advantage has not been tested in head-to-head blinded testing comparing  to Lactaid or any other lactase supplement, McNeil maintained that there was no substantiation for Ganeden's claims that 92.5% (or 94.4%) of users prefer Digestive Advantage to other brands.  These percentages result from the survey evidence only and do not, according the advertiser, constitute competent and reliable evidence in support of a claim of product preference.

*Consumer Testimonials*

McNeil observed that consumer testimonials on the advertiser's website are replete with express and implied claims about the product's once-a-day efficacy and its alleged superiority to other treatments such as Lactaid.  Because Ganeden does not have a reasonable basis for these claims, McNeil argued that they cannot be made via consumer testimonials.

**Advertiser's Position:**

*Duration Claims for Digestive Advantage*

Ganeden maintained that its claim that Digestive Advantage provides 24 hour relief is supported by scientific evidence and is actually a conservative claim in light of the data.  It explained that on activation of spore formation in the acidic environment of the stomach, the organism contained in the product (Lactobacillus), germinates and proliferates in the intestine.  Depending on the peristaltic rate of each individual, the cells will be resident for up to five days in the small gut where it will prevent the symptoms of lactose intolerance 24 hours per day.  Ganeden further

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 6

maintained that after ingestion, the product's Lactobacillus colonizes the small intestines.  The challenger's observation that Digestive Advantage contains less enzyme than Lactaid ignores the actual mechanism of action for the product.  The primary action of  the Digestive Advantage organism is not the production of dietary enzymes, but rather carbohydrate utilization.   In contrast to McNeil's product, Lactaid, Digestive Advantage can be taken one time per day due to the fact that the goal is only to maintain enough Lactobacillus in order to maintain enough cells to address any carbohydrate load.  Unlike Lactaid which does not break down any carbohydrates other than lactose, Digestive Advantage, according to Ganeden, has been shown in phenotypic studies to metabolize lactose, fructose, sorbitol, sucrose, glucose, raffinose, trehalose, mannans, pectins, and virtually every other carbohydrate that is associated with mal-absorption disorders.

Ganeden also argued that its Digestive Advantage product, contrary to McNeil's assertions, contains Lactobacillus.  The manufacturer of the bacteria labels the strain as a lactobacillus and, according to Ganeden, every peer-reviewed scientific journal that discusses the bacteria also calls it "Lactobacillus."  Ganeden maintained that the laboratory test relied upon by McNeil was improperly conducted.  In particular, even though the optimal temperature for the Lactobacillus organism is 35-40°C, the independent laboratory used a temperature of 28° to identify the active organism.  Moreover, argued Ganeden, the laboratory blundered by failing to "spore shock" the organism prior to incubation. Additionally, the laboratory selected a growth media that is not conducive to the growth of Lactobacillus.   Ganeden produced its own testing from an independent laboratory indicating that the average amount of Lactobacillus/Bacillus Coagulans species in the Digestive Advantage Capsules was 240 million cells.

Ganeden maintained that support for its 24 hour claim is found in its ONPG[2] assay on the ß-galatosidase activity of the organism and other phenotypic data on lactose metabolism.  The data, according to the advertiser, establishes that probiotic bacteria (ie, lactobacillus), due to their ß-galatosidase production abilities and their ability to utilize (ferment) lactose are effective supplements for the alleviation of symptoms of lactose intolerance.  Ganeden explained that the carbohydrate assays show the fermentation efficiency of the organism using a variety of carbohydrates and by modifying the dosing to ensure that the requisite number of viable cells colonize the small gut to ensure reduction of lactose load and, by extension, the symptoms of lactose intolerance.

Ganeden also noted that it completed a survey, conducted by Onmark Solutions ("Onmark Survey") of 1,420 individuals who received a one-week sample of Digestive Advantage.  The results of the survey, according to the advertiser, indicated that Digestive Advantage eliminates or significantly reduces the symptoms lactose intolerance 70% - 90% of the time.  Moreover, when respondents were asked the question "Besides the reduction for symptoms (i.e., reduction of diarrhea, constipation, etc.) what did you like best about Digestive Advantage LI?," 47.5% of the respondents said: 24 hour relief.

*Claims that Digestive Advantage has been Clinically Tested*

---

[2] ortho-nitrophenyl-beta-galactoside

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 7

Although Ganeden acknowledged that Investigational Studies are regarded as the "gold standard,"[3] it maintained that retrospective observational studies can still support a "clinically tested" claim.[4]   Ganeden also stated that it is conducting a Double-Blind Placebo controlled study at the Cleveland Clinic Research Foundation in the Department of Gastroenterology.

*Doctor Recommended Claims*

Ganeden argued that its data indicated that over 200 gastroenterologists recommend the product to their patients.    Additionally, Ganeden reported that it has sent samples of Digestive Advantage to 668 offices randomly selected offices of GI physicians and has called 350 of them on follow up.  So far, according to the advertiser, 108 of those physicians, or, more than 30% have gotten such favorable results that they have requested more samples.

*Comparative Claims*

Ganeden maintained that lactase supplementation, the method of action employed by Lactaid, is not an effective method of addressing lactose intolerance because lactase supplementation is load dependent, inconvenient, does not provide relief from many items other than foods that contain hidden lactose, and does not address symptoms of individuals who have multiple carbohydrate mal-absorption issues that include sensitivity to other dietary sugars. Digestive Advantage, on the other hand, is taken once per day and is ideal for school children and individuals who can take one pill and not worry about whether they will be eating diary that day.

Ganeden noted that it has never made an explicit claim that Digestive Advantage is preferred over Lactaid.  It nevertheless, maintained that the superiority of its product was supported by the George Mason University Study (GMU Study), a survey based on 108 respondents who received samples of Digestive Advantage for Lactose Intolerance.  The data, tabulated by George Mason University demonstrated that 92.5% prefer Digestive Advantage over competitive solutions and that 94.5% are still using the product.

*Consumer Testimonials*

Ganeden maintained that each claim made in testimonials is verifiable because the bacteria reside in the intestine for as long five days.  Ganeden argued that since over 90% of the individuals who use Digestive Advantage hold virtually identical opinions regarding efficacy and superiority of the product, these results are not the result of placebo or coincidental effect but must be attributable to the efficacy of the dietary supplement itself.

**DECISION:**

---

[3] Federal Food, Drug and Cosmetic Act, Section 403(r) (6).
[4] Ganeden's website refers to "phenotypic" studies and an "Evaluation of Digestive Advantage as a Safe & Effective Treatment for Lactose Intolerance."  National Center for Biodefense – George Mason University.

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
**Page: 8**

At the outset, NAD noted that there was an underlying dispute as to what precisely Digestive Advantage contains – in particular, what is the strain of bacterial organism found in Digestive Advantage and how is that strain accurately classified? Ganeden classifies the bacterial organism found in its Digestive Advantage interchangeably as *Lactobacillus* and *Bacillus Coagulans*. There is scientific support, argued Ganeden for referring to *Bacillus Caogulans* as *Lactobacillus*. McNeil, on the other hand, insisted that the two strains are taxonomically distinct and the names cannot be used interchangeably. Moreover, McNeil maintained that its own laboratory testing revealed the bacterial cultures in Digestive Advantage to be neither *Lactobacillus* or *Bacillus Coagulans*.[5] The matter was further complicated by the laboratory testing, which yielded contradictory results as to the proper identification of the bacterial culture found in Digestive Advantage.

It is not necessary, however, for NAD to rule on matters of microbiology nomenclature in order to conduct a review the challenged performance claims and the underlying support. The claims for Digestive Advantage are performance claims and promise a health benefit, in particular, 24 hour relief and protection from symptoms associated with lactose intolerance are health-related claims i.e., claims that must be supported by competent and reliable scientific evidence.

*Duration Claims for Digestive Advantage*:

According to Ganeden, its claim that taking Digestive Advantage once-per-day provides 24 hour relief of symptoms related to lactose intolerance is supported by scientific evidence and information provided by consumers who use the product. In particular, Ganeden, pointed to the mechanism action of the product's probiotic bacteria (*Lactobacillus* or *Bacillus Coagulans*) explaining that the bacteria has been shown to metabolize lactose and other dietary carbohydrates, an activity supported by *in vitro* studies and other phenotypic data. As further support for the product's continued efficacy, Ganeden produced consumer survey data demonstrating that consumers taking the product once-per-day reported that it was effective for 24 hours.

The claim that Digestive Advantage provides 24 hour relief is a product performance claim and requires competent and reliable evidence as support.[6] "Competent and reliable scientific evidence" is defined by the Federal Trade Commission ("FTC") as:

> "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results."[7]

---

[5] NAD noted that both *Lactobacillus* and *Bacillus Coagulans* have been regarded as "Probiotics" i.e., they are cultures of live microbes that may have a beneficial effect on humans, the host organism.
[6] *Cannon Avent Group PLC*, NAD Case Report #3552 (June 1999); *Thane International, Inc.*, NAD Case Report #4129 (December 2003); *Hills Pet Nutrition, Inc.*, NAD Case Report #4157 (March 2004);
[7] *Dietary Supplements: An Advertising Guide for Industry*, Federal Trade Commission, at 10 http://www.ftc.gov/bcp/conline/pubs/buspubs/dietsupp.htm.

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 9

As a general rule, both NAD and FTC require well-controlled human clinical studies to support efficacy claims for dietary supplements. In lieu of well-controlled human clinical studies the advertiser has submitted evidence consisting of *in vitro* studies and survey evidence. Although the data submitted is promising and merits further analysis of the role of certain probiotic bacteria in treating lactose intolerance, NAD determined that the evidence submitted did not constitute the kind of "competent and reliable evidence" that is required to support a health-related claim for a dietary supplement.

Ganeden argues that its product's efficacy has been established though the product's unique mechanism of action – the activity of lactobacillus/Bacillus Coagulans  colonizing in the small intestines and metabolizing dietary sugars that cause lactose intolerance. NAD noted first that the challenger's evidence is adequate to support the general *efficacy* of the product. It is not sufficient, however, to support the specific performance claim – that taking the product once per day provides relief of lactose intolerance symptoms for 24 hours. Although the advertiser advances a mechanism of action for its product, it is well established that a proposed mechanism of action is not typically an acceptable substitute for competent and reliable scientific evidence that a product will perform as promised.[8]  Ganeden argued that the mechanism of action for its lactobacillus/bacillus coagulans has been established by means of its ONPG assay on the ß-galatosidase activity of the organism and other phenotypic studies on lactose metabolism. NAD noted that the assay and phenotypic studies concerned the activity of the micro-organism in metabolizing carbohydrates in an *in vitro* environment, and were not designed to predict how the product works in humans. The studies did not examine how the bacteria performs in the small intestines in actual humans who have taken the product. Accordingly, while these studies submitted are undoubtedly significant, they do not establish proof that consumers who take Digestive Advantage will experience relief from symptoms of lactose intolerance for 24 hours.

Ganeden asserted that the proof of how Digestive Advantage works in consumers is established by the consumer surveys it had conducted. NAD did not agree. Although a retrospective or observational study may sometimes be considered competent and reliable evidence and an acceptable alternative to a clinical study, the surveys conducted by Ganeden did not constitute scientific studies for purposes of claim support.[9] The survey methodology in the Onmark and GMU studies contained no control or blinding. A sampling of lactose intolerant consumers were given the Digestive Advantage product and asked a series of questions about their use of the product, their lactose intolerant symptoms and their experience with other lactose intolerance products. In response to the question, "Besides the reduction for symptoms (i.e., reduction of diarrhea, constipation, etc.) what did you like best about Digestive Advantage LI?" 47.5%  said: 24 hour relief. This response, according to Ganeden, affirms the performance of the product and supports the 24-hour relief claim. Because the survey lacked any controls, NAD determined that the survey cannot be relied upon as a substitute for competent and reliable scientific evidence. For example, because the study was not blinded, each of the respondents were given the product

---

[8] Advanced Restoration Technologies (Hair Genesis) , Case Report # 3598 *NAD Case Reports* (November 1999).
[9] *Merix Pharmaceutical Corp.*, Case # 4267 at 14-15 (12/22/04) (rejecting observational study that was neither blinded nor placebo-controlled.); *Natrol, Inc.*, Case #4158 (3/19/04) (Establishment claims for dietary supplements "must typically be supported by 'reliable and well controlled clinical testing on that product that can be readily verified.'").

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
Page: 10

in its packaging displaying the statement "Fast Acting 24 Hour Relief." When consumers were then asked to identify what they liked best about the product, it is not surprising that a significant percentage responded "24 hour relief." It is precisely for this reason that the most reliable and meaningful studies are blinded and well-controlled, particularly if they are to be relied upon to support health-related performance claims.

*Claims that Digestive Advantage has been Clinically Tested*:

The evidence submitted by Ganeden in support of its performance claim included no clinical studies conducted on humans. Although Ganeden stated that it is in the course of conducting a Double-Blind Placebo controlled study at the Cleveland Clinic Research Foundation in the Department of Gastroenterology, it is well established that an advertiser must possess evidence to support its claims before the claims are made in the marketplace. While it may be argued that the claim "clinically tested" is literally truthful since the product is currently undergoing testing, the statement "clinically tested" appears in the context of a specific performance claim thereby giving rise to the implication that the product has been *clinically proven* to provide 24 hour relief. A "clinically proven" is an establishment claim which requires competent and reliable scientific evidence as support. As described above, the evidence submitted by the advertiser did not include clinical trials, and did not, NAD determined constitute competent and reliable scientific evidence sufficient to support the "clinically tested" claim. Accordingly, NAD recommended that the "clinically tested" claim be discontinued.

*Doctor Recommended Claims*:

Claims that a product is "Doctor Recommended" carry great weight with consumers and, consequently, require highly reliable supporting evidence as substantiation.[10] Such claims should be supported by a random and statistically representative survey of doctors showing that a substantial percentage recommend the product and should be based on the actual experience of physicians in their ordinary practice.[11] Here, Ganeden provided free samples of its product to over 600 physicians and, based on follow-up questions, learned that 30% have requested more of the product. Although this may be useful information, it is not a survey that establishes that the product is actually "recommended" by Doctors in the ordinary course of their practice. NAD therefore recommended that the claim "Doctor Recommended" be discontinued.

*Comparative Claims:*

Ganeden correctly noted that it did not directly compare its product to the challenger's product Lactaid, in its advertising. The advertising did however include the following comparative preference claims:

- "92.5% of users prefer Digestive Advantage LI."

---

[10] CCA Industries (Scar Zone Topical Scar Diminishing Cream), Case Report #4018, *NAD Case Reports* (February 2003).
[11] McNeil Consumer Healthcare (Extra Strength Tylenol), Case Report # 4208, *NAD Case Reports* (July 2004).

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
**Page: 11**

- "94.4% of users like Digestive Advantage better than competitive solutions for lactose intolerance."

Specific and quantified claims of consumer preference should be supported by a survey that tests a representative population sample and is well-controlled and adequately blinded.[12] The survey relied upon by the advertiser (GMU Study) to support these preference claims was not controlled or blinded but rather, was based on questions asked of 108 consumers who were given a sample of Digestive Advantage and used the product for three months or more.  As such, it was not adequate to support the advertiser's quantified preference claim.

NAD noted that the advertiser is not precluded from advertising those attributes that distinguish its product from its competitors or to tout any proven performance advantages that it possesses. However, any specific and quantified preference claim must have reliable and well-controlled survey data as support.  Because the consumer use survey evidence relied upon by the advertiser did not constitute such evidence, NAD recommended that its comparative preference claims be discontinued.

*Consumer Testimonials*

It is well established that advertisers that cannot make claims through consumer testimonials that could not be substantiated when made directly.[13]  Because the advertiser's 24 hour duration claims have not been adequately substantiated by competent and reliable scientific evidence, NAD recommended that Ganeden discontinue the use of those testimonials relating to the 24 hour duration.

**CONCLUSION:**

Because the advertiser did not establish through competent and reliable evidence that Digestive Advantage product, taken once-per-day provides relief for 24 hours, NAD recommended that the challenged 24-hour claim, clinically tested claim, doctor-recommended claims, and related testimonials be discontinued.

**Advertiser's Statement:**

Ganeden Biotech, Inc. appreciates the opportunity to participate in this proceeding and reiterates its support of the advertising industry's voluntary self-regulation program.  Even before receipt of the NAD's decision, Ganeden had notified the NAD that: Ganeden would remove the claim that Digestive Advantage for Lactose Intolerance was Clinically Tested, notwithstanding the 3 studies Ganeden has conducted; and the claim that the Product was Doctor Recommended, notwithstanding the fact that as of this date over 500 gastroenterologists are recommending the product to their patients. However, Ganeden must respectfully disagree with the conclusions of

---

[12] The Gillette Company, Case Report #3810, *NAD Case Reports* (October 2001).
[13] *Dietary Supplements: An Advertising Guide for Industry*, Federal Trade Commission, at 10 http://www.ftc.gov/bcp/conline/pubs/buspubs/dietsupp.htm ; Forever Young Again Products, Case #3471 *NAD Case Reports*.

**GANEDEN BIOTECH, INC.**
**Digestive Advantage LI**
**Page: 12**

the NAD in one important respect.  Ganeden notes that there is no evidence of consumer confusion or misunderstanding with regard to claim that the Product works for 24 hours. More importantly, Ganeden provided significant scientific and consumer data that supports that claim. Even more importantly, the proper dosing of the product requires users to ingest one per day. While Ganeden thus does not agree with NAD's conclusion, we respect the self-regulatory process and NAD's efforts.  Therefore, Ganeden will take NAD's recommendations into account in future labeling and advertising for its Digestive Advantage product for Lactose Intolerance. (#4352 DGM, closed 06/29/2005)

# EXHIBIT F

*Case #6383*          *(06/25/2020)*
**RB Health**
**Neuriva Dietary Supplement**
*Challenger:*          *National Advertising Division*
*Product Type:*          *Dietary Supplements*
*Issues:*          *Express Claims; Establishment Claims; Health & Safety Claims*
*Disposition:*          *Administratively Closed*

**Basis of Inquiry:** As part of its routine monitoring program, NAD requested substantiation for claims made in online and television advertising by RB Health for its Neuriva dietary supplement. The following claims formed the basis for NAD's inquiry:

Express Claims

- "It's time to brain better"

- "Give your brain a helping hand"

- "Clinically proven ingredients that fuel five indicators of brain performance: focus, accuracy, memory, learning and concentration."

Implied Claims

- Individuals who take Neuriva will experience a noticeable improvement in focus, memory, learning, and concentration.

**Decision:**

During the pendency of NAD's inquiry, the advertiser informed NAD of pending litigation against RB Health for advertising relating to the Neuriva product. Section 2.2(C)(1)(b) of the NAD/CARU/NARB Procedures states that if during the course of a proceeding NAD determines that the challenged claims are the subject of pending litigation, it shall administratively close the matter. Having determined that the challenged claims are the subject of pending litigation, NAD administratively closed the matter with leave to re-open its inquiry if, at the close of litigation, the applicable issues remain unresolved.  **(#6383 LCS, administratively closed 06/25/2020)**

© 2020.  BBB National Programs.