**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: 1:20-cv-23564-MGC**

DAVID WILLIAMS and CAROLL
ANGLADE, THOMAS MATTHEWS,
MARTIZA ANGELES, and HOWARD
CLARK, *on behalf of himself and all others similarly
situated*,

 Plaintiffs,

v.

RECKITT BENCKISER LLC and
RB HEALTH (US) LLC,

 Defendants.

Theodore H. Frank,

Objector.

**OBJECTION OF THEODORE H. FRANK**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

I.      Objector Frank is a Member of the Settlement Class. ...................................................... 2

II.     The Court has a Fiduciary Duty to the Absent Class Members. ...................................... 3

III.    The Injunctive Relief is Worthless and Should Not be Relied Upon to Evaluate Fairness
        or Attorneys' Fees. ........................................................................................................... 4

        A.      The defendants' submission does not answer the Court's queries and in fact,
                demonstrate that if the Court were to approve this Settlement it would only replace
                one fraudulent statement with another. ................................................................. 5

                1.      FDA guidelines governing dietary supplement labeling provide the
                        roadmap to answering the Court's queries. ............................................. 5

                2.      Defendant fails to correct the misrepresentations flagged by plaintiffs'
                        complaints. ............................................................................................... 8

                        i.      Study-by-study analysis of the studies submitted by Defendant. ....... 10

                        ii.     The Small Report raises more questions than answers ...................... 16

                3.      Neither Dr. Small's Report nor Defendant's cited studies come close to
                        supporting the Neuriva labeling claims and as such do not answer the
                        Court's third query. ............................................................................... 17

        B.      The proposed languages change is meaningless to the reasonable consumer as the
                message is still the same—clinical studies have (purportedly) "shown" that Neuriva
                works as represented. ........................................................................................ 19

        C.      The "exemplars" submitted by defendant actually show (1) why the injunctive
                relief here is meaningless, and (2) what appropriate injunctive relief should include.
                ............................................................................................................................ 22

IV.     The Settlement Benefits Attorneys More Than Their Putative Clients, a Violation of
        Rule 23. ......................................................................................................................... 25

        A.      Recent amendments to Rule 23 confirm that courts in this circuit should look to
                the ratio of fees to actual class recovery. ............................................................ 26

        B.      Counsel's fee is unfairly insulated by the combination of "clear sailing" and
                "kicker" provisions. .......................................................................................... 27

        C.      Any fee award should be based on true class benefits and cross-checked with class
                counsel's lodestar, which they do not provide. .................................................... 28

CONCLUSION ......................................................................................................................... 29

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*In re Baby Prods. Antitrust Litigation,*
  708 F.3d 163 (3d Cir. 2013) ................................................................ 25, 26

*In re Bluetooth Headset Prods. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011) ............................................................. 9, 25, 27

*Briseño v. Henderson,*
  998 F.3d 1014 (9th Cir. 2021) ........................................................ 1, 2, 25, 26, 27

*In re Carrier iQ, Inc., Consumer Privacy Litig.,*
  2016 U.S. Dist. LEXIS 114235, 2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ............................... 1

*Day v. Persels & Assocs., LLC,*
  729 F.3d 1309 (11th Cir. 2013) .............................................................. 3

*Dennis v. Kellogg Co.,*
  697 F.3d 858 (9th Cir. 2012) .............................................................. 25

*In re Dry Max Pampers Litig.,*
  724 F.3d 713 (6th Cir. 2013) ........................................................... 2, 3, 22, 27

*Duran v. Obesity Research Institute, LLC,*
  1 Cal. App. 5th 635 (Cal. Ct. App. 2016) ..............................................................

*Figueroa v. Sharper Image Corp.,*
  517 F. Supp. 2d 1292 (S.D. Fla. 2007) ............................................................ 3

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995) .............................................................. 9, 25

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ............................................................ 28

*Holmes v. Cont'l Can Co.,*
  706 F.2d 1144 (11th Cir. 1983) ............................................................. 3, 25

*In re Home Depot Inc., Customer Data Sec. Breach Litig.,*
  931 F.3d 1065 (11th Cir. 2019) ............................................................ 25

*Int'l Precious Metals Corp. v. Waters,*
  530 U.S. 1223 (2000) ............................................................ 27

*Jane Roes 1-2 v. SFBSC Mgmt., LLC,*
  944 F.3d 1035 (9th Cir. 2019) ............................................................ 3, 26

*Johnson v. NPAS Sols., LLC,*
   975 F.3d 1244 (11th Cir. 2020) ............................................................................ 3

*Johnson v. Comerica,*
   83 F.3d 241 (8th Cir. 1996) ................................................................................. 25

*Koby v. ARS Nat'l Servs., Inc,*
   846 F.3d 1071 (9th Cir. 2017) .............................................................................. 4

*Mullins v. Direct Digital, LLC,*
   795 F.3d 654 (7th Cir. 2015) .............................................................................. 20

*Norman v. Housing Auth. of Montgomery,*
   836 F.2d 1292 (11th Cir. 1988) ........................................................................... 28

*Palmer v. Dynamic Recovery Solutions, LLC,*
   No. 6:15-cv-59-Orl-40KRS, 2016 U.S. Dist. LEXIS 59229
   (M.D. Fla. May 4, 2016) ....................................................................................... 9

*Pearson v. NBTY, Inc.,*
   772 F.3d 778 (7th Cir. 2014) ...................................................... 1, 4, 25, 26, 27, 28

*Perdue v. Kenny A.,*
   559 U.S. 542, 130 S. Ct. 1662 (2010) ................................................................. 28

*Pettway v. Am. Cast Iron Pipe Co.,*
   576 F.2d 1157 (5th Cir. 1978) .............................................................................. 3

*Piambino v. Bailey II,*
   757 F.2d 1112 (11th Cir. 1985) ............................................................................ 3

*Poertner v. Gillette Co.,*
   618 F. App'x 624 (11th Cir. 2015) ...................................................................... 26

*Poertner v. Gillette Co.,*
   2014 WL 4162771, 2014 U.S. Dist. LEXIS 116616 (M.D. Fla. Aug. 21, 2014) ............................. 26

*Racies v. Quincy Bioscience, LLC,*
   No. 15-cv-00292-HSG, 2016 U.S. Dist. LEXIS 136197 (N.D. Cal. Sep. 30, 2016) ...................... 22

*Redman v. Radioshack Corp.,*
   768 F.3d 622 (7th Cir. 2014) ......................................................................... 27, 28

*Removatron Int'l Corp. v. Federal Trade Comm.,*
   884 F.2d 1489 (1st Cir. 1989) ............................................................................ 20

*Rexall Sundown, Inc. v. Perrigo Co.,*
   651 F. Supp. 2d 9 (E.D.N.Y. Sept. 10, 2009) ...................................................... 21

*In re Samsung Top-Load Washing Machine Mktg., Sales Practices & Prods. Liab. Litig.,*
    997 F.3d 1077 (10th Cir. 2021) ............................................................................. 25

*Tech. Training Assocs., Inc., v. Buccaneers Ltd. P'ship,*
    874 F.3d 692 (11th Cir. 2017) ............................................................................... 9

*Tran v. Sioux Honey Ass'n, Coop.,*
    471 F. Supp. 3d 1019 (C.D. Cal. 2020) ................................................................ 4

*Vought v. Bank of Am.,*
    901 F. Supp. 2d 1071 (C.D. Ill. 2012) ................................................................. 27

*Weinberger v. Great Northern Nekoosa Corp.,*
    925 F.2d 518 (1st Cir. 1991) ................................................................................. 27


**Statutes & Rules**

Fed. R. Civ. P. 23(a)(4) ............................................................................................. 22

Fed. R. Civ. P. 23(e) ................................................................................................. 25

Fed. R. Civ. P. 23(e)(2)(C)(ii) .................................................................................. 26

Fed. R. Civ. P. 23(e)(2)(C)(iii) ................................................................................. 26

**Other Authorities**

Brickman, Lester,
    LAWYER BARONS (2011) .....................................................................................2, 28

Burch, Elizabeth Chamblee,
    *Publicly Funded Objectors,*
    19 THEORETICAL INQUIRIES IN LAW (2018) ......................................................... 2

Estes, Andrea
    *Critics hit law firms' bills after class action lawsuits,*
    Boston Globe (Dec. 17, 2017) ............................................................................. 2

Henderson, William D.,
    *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements,*
    77 TUL. L. REV. 813 (2003) ................................................................................. 27

Manual for Complex Litigation (Fourth) § 21.7 (2004) .......................................... 25

Silver, Charles,
    *Due Process and the Lodestar Method,*
    74 TUL. L. REV. 1809 (2000) ............................................................................... 28

## INTRODUCTION

Plaintiffs—three sets of plaintiffs in three separate complaints—sued Reckitt Benckiser LLC and RB Health (US) LLC ("Defendant") because Defendant made "simply false or, in some instances, disturbingly misleading" claims on their Neuriva-branded supplements. Dkt. 36 at 4. Defendant's products falsely claimed—and under the proposed settlement will continue to claim—that Neuriva "Fuels 5 indicators of brain performance." *Id.* at 10; Dkt. 52-1, Ex. E1 (packaging under proposed settlement).

The proposed settlement retains and validates all false and misleading claims, with one cosmetic difference. Instead of saying that, for example, enhanced "indicators" of "brain performance" are "clinically proven," now the packages will say that Neuriva is "clinically tested" and "tested by science" "or similar language, such as clinical studies have 'shown'" Neuriva to boost brain performance. Dkt. 52-1 at 8 & Ex. E2. That's just as false—the product has never been "tested" or "shown" to boost anything, and Defendant does not cite a single example supporting their claims. The mish-mash of pilot and small studies involving different supplements made by different manufacturers doesn't support the claims either.

The settlement provides up to $2.9 million in attorneys' fees, but this is premised on a fictional $8 million fund that Defendant will never pay assuming typical claim rates. The settling parties do not report how many claims have been filed to date, and based upon empirical data, claims made in low-value publication-notice settlements like this one result in little money being paid to the class.[1]

The Court is rightfully concerned about the injunctive relief and (1) whether it has any value and (2) whether by approving the language change from "clinically proven" to "clinically tested" it merely replaces one fraudulent statement with another.

Objector Theodore H. Frank contends it provides no benefit, and brings this objection on behalf of the class. The settlement serves chiefly the Defendant and class counsel, which hopes to win outsized fees for a case first filed last June in California, and stayed for settlement discussions within

---

[1] *See, e.g., Briseño v. Henderson*, 998 F.3d 1014, 1026 (9th Cir. 2021); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014); *In re Carrier iQ, Inc., Consumer Privacy Litig.*, 2016 U.S. Dist. LEXIS 114235, 2016 WL 4474366 at *4 (N.D. Cal. Aug. 25, 2016) (citing administrator declaration attesting to usual sub 1% claims rates in publication notice settlements).

six months without conducting any formal discovery. In discharging its fiduciary duty to the class, the Court should deny final approval, which will return the parties to vigorously litigate the case or settle on terms less lop-sided against class interests.

## ARGUMENT

### I.    Objector Frank is a Member of the Settlement Class.

During the class period, Objector Ted Frank purchased Neuriva Products for personal consumption and not resale, within the United States, between January 1, 2019 and April 23, 2021. *See* Declaration of Theodore H. Frank, ¶ 4 (attached). Frank is not within any of the classes of persons excluded from the settlement. *Id.* at ¶ 6. He therefore has standing to object.

Frank is Director of Litigation at the Hamilton Lincoln Law Institute, whose Center for Class Action Fairness ("CCAF") represents him *pro bono*. CCAF attorney M. Frank Bednarz intends to appear at the fairness hearing on his behalf. *See* Notice of Appearance of Counsel (contemporaneously-filed). CCAF represents class members *pro bono* where class counsel employs unfair procedures to benefit themselves at the expense of the class. *See, e.g., Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021) (sustaining CCAF's client's objection to a lopsided claims-made settlement with illusory injunctive relief); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (same; noting that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) ("*Pampers*") (same; noting CCAF's client's "numerous, detailed, and substantive" objections). Since it was founded in 2009, CCAF has "develop[ed] the expertise to spot problematic settlement provisions and attorneys' fees." Elizabeth Chamblee Burch, *Publicly Funded Objectors*, 19 THEORETICAL INQUIRIES IN LAW 47, 55-57 & n.37 (2018). CCAF has recouped more than $200 million for class members by driving settling parties to reach an improved bargain or by reducing outsized fee awards. *See* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time). Frank brings this objection through CCAF in good faith to protect the interests of the class. Frank Decl. ¶ 8. His objection applies to the entire class; he adopts any objections and amicus briefs not inconsistent with this one, including the forthcoming corrected filing by Truth in Advertising, Inc. Dkts. 70 & 71.

## II.      The Court has a Fiduciary Duty to the Absent Class Members.

"Class-action settlements are different from other settlements." *Pampers*, 724 F.3d at 715. "[T]he district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class." *Id.* at 718. Instead, "[c]areful scrutiny by the court is necessary to guard against settlements that may benefit the class representatives or their attorneys at the expense of the absent class members." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983) (quotation omitted). "[T]he district judge has a heavy duty to ensure that any settlement is 'fair, reasonable, and adequate' and that the fee awarded plaintiffs' counsel is entirely appropriate." *Piambino v. Bailey II*, 757 F.2d 1112, 1139 (11th Cir. 1985) ("*Piambino II*") (Tjoflat, J.). This duty is "akin to the high duty of care that the law requires of fiduciaries." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1320 (S.D. Fla. 2007) (internal quotation omitted).

Defendants are "uninterested in what portion of the total [settlement] payment will go to the class and what percentage will go to the class attorney." *Piambino II*, 757 F.2d at 1143 (internal quotation omitted). Due to this indifference, judges must look for not only actual collusion but also "subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Pampers*, 724 F.3d at 718 (internal quotation omitted). Thus, while it is *necessary* that a settlement is at "arm's length" without express collusion between the settling parties, it is not *sufficient* for settlement approval. *Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1050 n.13, 1060 (9th Cir. 2019) ("*Roes*") (distinguishing "self-interest" from "purposeful collusion"). There is no presumption in favor of settlement approval; a rigorous analysis is required, not merely a surface-level one. *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1261-63 (11th Cir. 2020) ("*NPAS*"). The settling parties' burden to demonstrate fairness is heightened because this settlement has been proposed before class certification. *Pampers*, 724 F.3d at 721; *Roes*, 944 F.3d at 1049.

An actual showing is required, beyond a court's "complete confidence in the ability and integrity of counsel." *Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1315 (11th Cir. 2013). In sum, the Court should always keep foremost in mind that "the class settlement process is 'more susceptible than adversarial adjudications to certain types of abuse.'" *Holmes*, 706 F.2d at 1147 (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir. 1978)).

### III.    The Injunctive Relief is Worthless and Should Not be Relied Upon to Evaluate Fairness or Attorneys' Fees

The court appropriately requested that the parties submit supplemental briefing on the injunctive relief defined by the settlement and whether the relief has any value at all. Order Requiring Memoranda on Injunctive Relief, Dkt. 58. The settling parties bear the burden to quantify any degree of benefit from the injunctive relief. *Koby v. ARS Nat'l Servs., Inc*, 846 F.3d 1071, 1079 (9th Cir. 2017). They filed hundreds of pages of exhibits to obscure the simple answer: "No." Neither the class nor consumers at large benefit from the defendant continuing to assert the fanciful claim that the product is "clinically tested" and "shown" rather than "clinically proved." The latter words imply the former.

The settlement would add this Court's imprimatur to the labeling, which would still claim Neuriva "Fuels 6 Indicators of Brain Performance." Defendants simply substitute "Clinically Proved" with phrases like "Science tested it," "shown," and "Clinically Tested." Dkt. 52-1 at E-2. Just as before, no clinical tests show that Neuriva "fuels" one indicator of brain performance, let alone five or six. Not one study cited by the parties even tests a supplement with the same ingredients as Neuriva, which plaintiffs' complaint correctly observed in their complaint to be the bare-bones minimum hurdle to have "studied" a nutritional supplement under FDA guidance. Dkt. 36 at 29. Neuriva has *not* been studied, let alone "shown" to provide any of the benefits that the defendant claims. The labeling change is "substantively empty." *Pearson*, 772 F.3d at 785. And the settlement does little more than bless defendant's conduct while transferring up to $2.9 million to plaintiffs' attorneys.

Objector Frank respectfully submits that the answers to the Court's questions are quite simple:[2] (1) the injunctive relief/labeling change is worthless and (2) if the Court finally approves this settlement it will endorse continued consumer fraud, replacing one fraudulent statement with another.

First, Objector will analyze the science submitted by defendant and Dr. Small (defendant's expert) demonstrating that, at a minimum, the science submitted by defendant apparently to

---

[2] Objector Frank addresses the same inquiries that the Court requested of the settling parties—why the "proposed injunctive relief provides any meaningful benefit and why it is not illusory" (query 1); "examples of orders in other class action cases involving alleged fraudulent misrepresentations where injunctive relief similar to the relief proposed here was approved even though a supposedly worthless product would still be sold" (query 2); and "why this Court should approve this settlement (in which an allegedly ineffective brain improvement product would still be permitted to be sold as a brain enhancement supplement)" (query 3). Dkt. 58.

demonstrate that Neuriva works as represented, does nothing of the sort. In fact, if this is what defendant contends supports its Neuriva labeling claims, serious questions arise with regard to whether approval of this settlement will further an ongoing fraud by merely substituting "clinically proven" to "shown" and/or "clinically tested."

Second, Objector will discuss why the proposed labeling changes are nothing but worthless window dressing, both as a matter of common sense and as a matter of law. Reasonable consumers would interpret both phrases to mean that defendant's labeling claims are supported by competent and reliable scientific evidence, contrary to reality.

And third, Objector will show how the purported exemplars of so-called similar settlements submitted by defendant actually highlight the serious deficiencies with this settlement.

A.   **The defendants' submission does not answer the Court's queries and in fact, demonstrate that if the Court were to approve this Settlement it would only replace one fraudulent statement with another.**

1.   **FDA guidelines governing dietary supplement labeling provide the roadmap to answering the Court's queries.**

In 2009 the FDA published a guidance to dietary supplement manufacturers, "Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403 (r) (6) of the Federal Food, Drug, and Cosmetic Act." (Attached to Declaration of M. Frank Bednarz, Exhibit A). This guidance, hyperlinked in plaintiffs' complaint, provides essential background for the Court to effectively evaluate the value or lack thereof of the injunctive relief here.

In this Guidance the FDA sets forth the overriding litmus test in evaluating labeling claims: "dietary supplement manufacturers [must] carefully draft their labeling claims and carefully review the support for each claim to make sure that the support relates to the specific product and claim, is scientifically sound, and is adequate in the context of the surrounding body of evidence." *Id.* at p. 3.

Per the FDA, "The first step in determining what information is needed to substantiate a claim for a dietary supplement is to understand the meaning of the claim and to clearly identify each implied and express claim." *Id.* at p. 4. Moreover, "When a claim may have more than one reasonable interpretation, we recommend that a firm have substantiation for each interpretation." *Id.* Finally, "Although it is important that individual statements be substantiated, it is equally important to substantiate the overall 'message' contained when the claims are considered together." *Id.*

Changing "clinically proven" to "clinically tested" is no change at all. There's no "material difference" and thus no value. *Duran v. Obesity Research Institute, LLC*, 1 Cal. App. 5th 635, 652 (Cal. Ct. App. 2016). When read in context, where the packaging and advertising already intimates that Neuriva helps support brain performance, either "clinically proven" or "clinically tested"—can only be understood to mean that reliable clinical evidence supports Defendant's brain performance representations. From a reasonable consumer's perspective why would they be told that the products were "clinically tested" if it did not mean that they were clinically proven? Indeed, the fact that the Defendant can, under the settlement, use "shown" as a representation instead of "clinically tested" confirms this reading. To hold that the reasonable consumer could catch this subtle labeling change and understand that all it meant was that the product had been clinically tested and *not* proven would assume that the reasonable consumer reads labels with the linguistic sophistication of the lawyers who crafted this illusory language change. *See Tran v. Sioux Honey Ass'n, Coop.*, 471 F. Supp. 3d 1019, 1025 (C.D. Cal. 2020) ("The relevant consumer is "the ordinary consumer within the larger population," not the "least sophisticated consumer" nor one that is *"exceptionally acute and sophisticated."*) (emphasis added). And anyway **Neuriva has not even been tested**. Plaintiffs' complaint accurately observed that defendant had no testing concerning Neuriva or even a supplement with a similar composition to Neuriva, and instead relied on dubious studies concerning ingredients, many of which are dissimilar to Neuriva's ingredients anyway. Dkt. 36 at 28, 33-34. In fact, the plaintiffs pleaded that defendant's citation to purported studies of dissimilar products was itself deceptive. *Id.* at 28-29. It is deceptive! Yet the proposed settlement endorses the deception and even allows defendant to claim that a stack of *non sequitur* references has "shown" their claims true.

Per the FDA, in determining whether a particular clinical study has relevance to a claim made about a particular dietary supplement or ingredient in the supplement:

> We recommend that the studies being used as substantiation for dietary supplement claims identify a specific dietary supplement or ingredient and serving size and that the conditions of use in the studies are similar to the labeling conditions of the dietary supplement product. Factors that would tend to indicate a stronger relationship between a substance that is the subject of a study and the substance that is the subject of the dietary supplement claim includes similarities in formulation, serving size, route of administration, total length of exposure, and frequency of exposure. *Manufacturers should be aware that*

*other substances involved in the study or included in the dietary supplement product itself might also affect the dietary supplements performance or study results.*

*Id.* at pp. 5-6. (emphasis added).

As discussed below, all of studies cited by defendant run afoul of one or more of the above proscriptions. In particular, Neuriva is a product that combines several different purportedly active ingredients. Thus, reliance on trials that only studied the purported effects of an individual ingredient are automatically unreliable in determining whether that ingredient works the same when it is combined with other ingredients.

In this regard, not only has defendant not submitted any clinical trials on Neuriva but it has not even cited any clinical trials on the combinations of Neuriva ingredients—phosphatidylserine ("PS") 100mg and coffee cherry extract ("CCE") 100mg (or 200mg in Neuriva Plus).

Example 5 of the FDA guidance is directly on point. (Ex. A at 6.) FDA supposes that a dietary supplement manufacturer has "high quality studies" showing that each of the individual ingredients in the supplement, on their own, are effective in producing the claimed result, but because the studies "did not involve the dietary supplement itself" the results of these studies "are not applicable to the specific dietary supplement product." *Id.*

Every clinical study submitted by defendant suffers this defect, and even these piecemeal studies have serious flaws rendering them wholly irrelevant, as discussed below. All that defendant has submitted to the court are individual ingredient studies which, as the FDA has made clear, are not applicable to determining whether Neuriva works as represented. Because "clinically tested" refers to the individual ingredients and not Neuriva as a whole, this further misleads because it exaggerates to consumers that proof of the efficacy of the individual ingredients is proof of Neuriva's efficacy.

Likewise, there are other factors set forth by the FDA that, as seen below, cause the studies cited by defendant to run afoul of FDA requirements. Thus, in evaluating the relevance/applicability of a particular study, the FDA requires that the study be based "on a population that is similar to that which will be consuming the dietary supplement" (using the example of a study performed on young adults for a product intended for the elderly as an example of just such a disconnect). *Id.* at p. 6. Example 10 set forth by the FDA in its guidance describes an instance where a firm has high quality studies demonstrating that a product improves memory and cognitive function in the elderly but notes

that these studies cannot relied upon for school-aged children because the "patient population … is completely different from the intended population …." *Id.* at p. 7. Similarly here several of the studies cited by defendant are performed in young adults when Neuriva's intended market is the elderly concerned with memory loss or mild cognitive problems due to aging.

### 2. Defendant fails to correct the misrepresentations flagged by plaintiffs' complaints.

The Consolidated and Amended Complaint (Dkt. 51)—referred to in the Amended Settlement Agreement and Release as the Second Amended Complaint[3] makes two primary allegations (1) that defendant has falsely and misleadingly claimed that its labeling claims about Neuriva ("brain performance claims") were "clinically proven", "clinically proven natural ingredients"  or the like ("science proved", "backed by science" and so on) (Dkt. 51, ¶¶ 5-6) when, for example, none of the Neuriva Products have been clinically tested and (2) that the claims that the Neuriva products work as represented are false because Neuriva cannot and does not work as represented because its purported "natural ingredients" are food, which gets digested into constituent parts like other foods, long before they enter one's bloodstream. Neuriva key ingredients no longer exist in their original form after digestion (Dkt. 51, ¶ 71). Furthermore, plaintiffs alleged that even if molecules of Neuriva or its ingredients somehow did survive digestion they could never get into the brain and have any effect because the Blood Brain Barrier ("BBB") would prevent them from ever entering the brain at all or in any meaningful amount. Dkt. 51, ¶¶ 70, 71, 76, 77, 94, 103, 104, 120.[4]

---

[3] No such document entitled Second Amended Complaint is listed on the docket so Objector assumes that the Consolidated and Amended Complaint filed 1/27/21 is the operative complaint for purposes of evaluating the settlement.

[4] The Neuriva labeling prominently states that the two key ingredients—Phosphatidylserine (PS) and Coffee Cherry Extract (CCE)– are both plant based—or in other words—food. Putting aside the studies cited by defendant, a common-sense question can and must be asked by this Court—do the products get digested and if so how in the world can they be effective if they no longer exist in their original form once they get to the bloodstream?  In a similar instance involving another so-called brain health product, Prevagen, when pressed by the FDA, the makers of Prevagen admitted that because its main ingredient was a food, it was completely digested into its constituent parts. The same is likely true with regard to Neuriva; at a minimum, before the Court gives its blessing to this settlement

The settlement's injunctive relief must be measured in light of these allegations. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 945 n.8 (9th Cir. 2011) ("*Bluetooth*") (examining whether relief obtained in settlement matched theory of the complaint); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 810 (3d Cir. 1995) ("*GM Trucks*") ("[T]he relief sought in the complaint serves as a useful benchmark in deciding the reasonableness of a settlement.") (internal quotation omitted). Nothing about the labeling change addresses the above-listed complained of conduct.

From all appearances, Neuriva does not and cannot work as represented, but with the promise of millions in fees, plaintiffs waived the white flag before resolving one contested motion or taking a single deposition, effectively (1) agreeing that defendant could absolve itself of its prior liabilities and (2) seeking judicial blessing for the defendant to continue its fraudulent conduct. "[A]chiev[ing] the settlement after little or nodiscovery . . . raise[s] a red flag." *GM Trucks*, 55 F.3d at 806; *Palmer v. Dynamic Recovery Solutions, LLC*, No. 6:15-cv-59-Orl-40KRS, 2016 U.S. Dist. LEXIS 59229, at *33 (M.D. Fla. May 4, 2016) (denying approval of settlement reached "early in the litigation and without the benefit of meaningful discovery"). "If, as it appears, [class counsel] was indeed motivated by a desire to grab attorney's fees instead of a desire to secure the best settlement possible for the class, it violated its ethical duty to the class." *Tech. Training Assocs., Inc., v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 694 (11th Cir. 2017).

Of the clinical studies cited by defendant in response to the Court's inquiry, ***not one*** discusses or even looked into the fact that Neuriva's ingredients are foods and that when ingested it is subject to powerful digestive forces in our stomachs and intestinal tract.

What follows is a study-by-study analysis of the studies cited by defendant in support of the labeling changes agreed to in the settlement. It should be understood that the following analysis is not being submitted to prove that Neuriva does not work as represented (though it's readily apparent that it does not) but instead to show that defendant has not even answered the Court's queries; at a

---

and allows defendant to continue to market Neuriva with its brain health representations, the Court should require that defendant submit proof that Neuriva is not digested.

minimum, serious questions still remain as to the value of the injunctive relief and whether its approval would merely substitute one fraudulent representation for another.

>    **i.    Study-by-study analysis of the studies submitted by Defendant.**
>
>    **(a)    Studies on coffee cherry extract (CCE)**

**Exhibit 2 (Dkt 62-2)** – *Cognitive short – and long-term effects of coffee cherry extract in older adults with mild cognitive decline,* Robinson et al. Aging, Neurophychology, and Cognition December 2019. The study's authors did not state definitively that the CCE it studied provides cognitive benefits but instead they only concluded that the study showed the "potential" that this CCE formulation might do so. Recognizing that the study was too small (under-powered to provide reliable results), the authors ultimately concluded that larger "well-powered" studies were needed to determine whether in fact the results actually occur in the real world. *Id.* at p. 14.

**Exhibit 3 (Dkt. 62-3)**:  Neurophysiological Effects of Whole Coffee Cherry Extract in Older Adults with Subjective Cognitive Impairment: A Randomized, Double-Bling, Placebo-Controlled, Cross-Over Pilot Study, Robinson et al. MDPI January 20, 2021. The title itself demonstrates that this study cannot be relied upon to support Defendant's labeling claims as it admits to being a "Pilot Study."

> A pilot study is defined as "A small-scale test of the methods and procedures to be used on a larger scale" (Porta, *Dictionary of Epidemiology*, 5th edition, 2008). *The goal of pilot work is not to test hypotheses about the effects of an intervention, but rather, to assess the feasibility/acceptability of an approach to be used in a larger scale study. Thus, in a pilot study you are not answering the question "Does this intervention work?" Instead you are gathering information to help you answer "Can I do this?"*

NIH in its "Pilot Studies: Common Uses and Misuses" at 1 (Attached as Ex. F).

The NIH further states that "[D]ue to smaller sample sizes used in pilot studies, they are not powered to answer questions about efficacy." *Id.* Thus, Exhibit 3, the 2021 Robinson pilot study does not constitute reliable scientific support for Defendant's labeling claims about CCE. And the fact that a pilot study was still being performed in 2021 raises other questions "Why are pilot studies still being conducted on CCE and cognition as late as 2021 if, as Defendant claims, CCE has been proven to help support brain performance?" Even the authors of this study noted the limitation of it being a

pilot study in that there were only 8 subjects and thus the report states, "Additional well-powered studies should be conducted for a full assessment of WCCE's effects and mechanisms of action."

Tellingly, this appears to be the only study involving "Neurofactor," the CCE formulation used in Neuriva.[5] Yet, not one well-powered larger study is cited by defendant regarding Neurofactor, and no study at all concerns it in combination with Neuriva's other key ingredient, PS. In fact, indicative of the fact that there is insufficient scientific evidence to support brain performance claims about Neurofactor CCE, on June 7, 2019, FutureCeuticals submitted a GRAS (Generally Recognized as Safe) submission to the FDA for its Neurofactor CCE seeking its approval as a safe food. (Attached as Ex. G). In its discussion of what the use would be of its Neurofactor CCE there is no mention of marketing or using it as a brain performance substance and instead the maker of Neurofactor states to the FDA it "is intended to be used as a food ingredient and as an antioxidant in selected conventional food products, such as Flavored Water/Energy Drink; Coffee/Tea …" And this is so, even though it cites to the FDA the two Reyes studies cited by Defendant not for efficacy reasons, but instead to prove that it was safe. Ex. C. at pp. 3 (table of proposed uses) and pp. 28-29. The words "brain," "memory," "cognition," or "cognitive" are not to be found in this submission to the FDA.

**Exhibit 4 (Dkt. 62 – 4)** – Acute Low and Moderate Doses of a Caffeine-Free Polyphenol-Rich Coffeeberry Extract Improve Feelings of Alertness and Fatigue Resulting from the Performance of Fatiguing Cognitive Tasks, Journal of Cognitive Enhancement, Reed et al., November 2018. This study also cannot be used to support defendant's labeling claims for several reasons (1) it was an acute study—meaning that only one dose was administered and only short-term effects were measured such that to rely upon this as proof of what happens with the long-term use of Neuriva, violates the FDA guideline requiring that the study follow the recommend dosage regimen on the labeling, which in the case of Neuriva is an extended/long-term dosing regimen and (2) the study group was small and comprised primarily of college-aged and graduate students such that even the authors noted that "our results may not be generalizable to other groups" and this is particularly so since the target market for Neuriva is older persons with mild cognitive decline (See FDA Example 10 discussed above). Most

_____

[5] *See* https://www.schiffvitamins.com/pages/neuriva-brain-health-supplement-research?gclsrc=aw.ds&ds_rl=1279704?cb= (Defendant refers to Neurofactor as a "Rockstar" ingredient as well as the PS it uses called SharpPS.).

important, however, **this study showed that CCE did not affect memory or cognitive performance**: "The coffeeberry extract beverages had no effect on self-reported motivation to complete the cognitive tasks or either memory or sustained attention performance." Id. at p. 29 - Reckitt 000067). In fact, if anything, this larger, perhaps properly powered study, indicates that CCE does not affect memory or cognition.

      **Exhibit 5 (Dkt. 62-5)** – *Modulatory effect of coffee fruit extract on plasma level in brain-derived neurotrophic factor in health subjects*. Reyes-Izquiredo et al. British Journal of Nutrition, October 2012. This is another "pilot" study (*id*. at p1. – Reckitt000070). The title itself shows that it is not directed at the question of whether or not the whole coffee fruit concentrate powder (WCFC) it studied (different from the Neurofactor extract in Neuriva) provides any of the represented benefits of Neuriva. It merely studied whether ingesting CCE raised the levels of blood levels of brain-derived neurotrophic factor (BDNF) and even then it did not study whether the increased levels could improve memory or cognition. Like Exhibit 4, Exhibit 5 is an "acute"/single dose study and again, whatever the results, they are not relevant to whether Neuriva provides its represented benefits.

      And its final result was that "WCFC increased the blood level of BDNF during the first 60 min after treatment with a dose of 100mg." Thus, as per the FDA guidance discussed above the study was not aligned with the represented benefits on the Neuriva labeling as no representations are made about BDNF on the label. And like the other studies, the authors concluded, "In order to confirm the results of the present pilot study, further clinical testing in a larger group is required." *Id.* at p. 194 – Reckitt000073.

      **Exhibit 6 (Dkt. 62-6)** – Stimulatory Effect of Whole Coffee Fruit Concentrate Powder on Plasma Levels of Total and Exosomal Brain-Derived Neurotrophic Factor in Healthy Subjects: An Acute Within-Subject Clinical Study, Reyes-Izquierdo et al. July 2013. This is another acute dose study. Again, the endpoints it studied—whether CCE increases BDNF in the bloodstream—did not address whether any purported increase in BDNF from taking this product produced any of Defendant's brain performance claims. Other than suggesting that "it would be interesting to study the effect of WCFC [a different CCE than in Neuriva] on BDNF-mediated brain functionalities such as cognitive activity…." cognition or memory are not discussed in this report. Id. at 201 – Reckitt000079.

**(b)**       **Summary of CCE studies Submitted by Defendant.**

The 5 study reports above constitute the entirety of the studies cited by defendant that it claims support the proposition that the CCE in Neuriva provides the represented benefits on its labels. They do nothing of the sort as they (1) do not study CCE in combination with PS and (2) the studies themselves admit that they do not constitute proof of efficacy but instead are merely preliminary to larger studies that would test this question. Defendant does not cite to any larger studies showing that CCE works as it claims, much less in combination with PS. As a result, at best defendant's submissions on CCE do not answer the key question posed by the Court—whether approving this settlement will merely bless a continuing fraud and at worst they strongly indicate that a fraud has been and will continue to be perpetrated if this settlement is approved.

**(c)**       **Studies on phosphatidylserine (PS).**

**Exhibit 7 (Dkt. 62-7)** – *Effects of phosphatidylserine in age-associated memory impairment*. Crook at al. Neurology 1991. As a threshold matter this study involved bovine cortex phosphatidylserine, BC-PS—a PS that was derived from cow's brains and which, shortly thereafter was discontinued due to Mad Cow disease (bovine spongiform encephalopathy (BSE)). Thereafter, a different form of PS was used derived from soy. As such, this study does not test the ingredient contained in Neuriva and per the FDA is not applicable. But again, at best, this study was a pilot study as even the study's authors are only willing to conclude that "the results suggest" that BC-PS may help treat memory loss later in life. Moreover, this study was effectively a negative study because 14 out of 20 endpoints measured were negative such that all the authors could say was the results were "encouraging" but that "many questions" remain to be answered about BC-PS.[6]

**Exhibit 8 (Dkt. 62-8)** – *Treatment of age-related decline in cognitive capacities The effects of phosphatidylserine*. Crook 1998. This appears to be a review of prior studies, including a summary of one that Crook claims to have performed in 1997 on soy derived PS. As discussed above, Dr. Crook initially notes "following our study, [Defendant's Exhibit 7 discussed above] the research on the effect of PS produced from cow's brains (BC-PS) on the brains of humans unfortunately succumbed to the

---

[6] *See also*, discussion *infra* of Exhibit C, where it is noted that the FDA makes clear that when multiple endpoints are studied, such as is the case in many if not most of the studies cited by Defendant, statistical corrections must be made to account for this.

outbreak of bovine spongiform encephalopathy (BSE)." He then discusses a 1997 study he claims to have conducted on soy-based PS but there is no citation to it in this review document and at least circumstantially it would appear that this study did not even merit publication in a peer-reviewed journal as defendant has not cited a peer-reviewed report of this 1997 study. That in itself is odd, as one would have thought that the defendants would have cited a so-called positive study to the Court. Yet, defendant's expert uncritically treats this 1997 study as if it were a reported study in his report to the Court, but then only cites to the 1998 review article (Defendant's exhibit 8) that merely summarizes its claimed results. This is not a technical problem but an extremely material one as peer-review of published studies, prior to publication, is critical for peer-reviewers who are experts in the field to be able to scrutinize such things as the actual statistical analyses of the data as opposed to summaries of the data as presented in Defendant's Exhibit 8.

Finally, the FDA makes clear that reviews such as Defendant's Exhibit 8 cannot be relied upon to reach efficacy conclusions about dietary supplements but instead can only be used to identify clinical studies that do. Exhibit A at pp. 10-11.

Finally, again the 1997 Crook study summarized in Defendant's Exhibit 8 was only a pilot study involving 12 subjects that even Dr. Crook calls "a very small study." Id. at p. 12 – Reckitt000125. Moreover, this small study was conducted on a proprietary form of PS—Lipamin-PS—not the SharpPS used in Neuriva, and per FDA guidance cannot be applicable to the CCE/PS combination in Neuriva.

**Exhibit 9 (Dkt. 62-9)** – *Soybean-Derived Phosphatidylserine Improves Memory Function of the Elderly Japanese Subjects with Memory Complaints* – Kato-Kataoka, 2010 J. Clin. Biochem. Nutr. 47, 246-255, Nov. 2010. This study was conducted in Japan on elderly Japanese subjects on a different proprietary PS formulation from that in Neuriva. Here several of the memory and cognitive tests were only validated in Japan and are not ones used in the US. (See for example p. 230 where HDS-R is discussed). As for cognitive function, this study was a negative one as **PS was no better than placebo** at any evaluation point even though oddly all study groups' scores increased (the subjects were supposedly suffering from memory decline but this result would seem to indicate that they were actually remembering the tests and performing better as they took them over time). Either way, the authors noted, "The scores significantly increased against the baseline in all three groups, with no difference between Soy-PS and

placebo groups at any evaluation point." *Id.* at p. 5 – Reckitt000131. In other words, the PS studied here was no better than placebo or – ineffective. Dr. Small makes no mention of the above conclusions and instead discusses some sub-group analyses that were not pre-specified as endpoints to be studied. Dr. Small effectively ignores the main endpoints that were studied and instead focuses on what are known as "post-hoc" analyses - which came up negative in favor of benchmarks that the study's authors decided to look at after the fact.

**Exhibit 10 (Dkt. 62-10)** – *Research on human memory enhancement by phosphatidylserine fortified milk.* Yong (date unknown). Again, the title disqualifies this study from reaching any conclusions about PS because in this study the PS is mixed with fortified milk, and as per FDA guidelines cannot be relied upon to reach conclusions about PS alone because the effects of the numerous substances contained in fortified milk confound any possible conclusions about PS alone. Furthermore, the study subjects were Chinese high school students preventing extrapolation of the results to older adults in the United States.

### (d)    Summary of PS studies submitted by Defendants.

Only three of the articles cited by defendant attempt to support its claim that any form of PS alone provides benefits, and not one of them found positive results for a PS formulation similar to the soy-derived PS used in Neuriva. Further, two of them were conducted on populations that differed from the intended users of Neuriva. Thus, these four articles do not and cannot answer the Court's queries because they do not provide any basis to conclude that PS alone provides any of the represented benefits on the labels of Neuriva—let alone the combination of PS and CCE.

### (e)    Melon Juice Extract

For purposes of the question as to whether the proposed injunctive relief is of any value going forward, if defendant's current web site is accurate the Neuriva product containing melon juice is no longer being sold.[7] As such, whether or not melon juice provides any brain health benefits is a moot point with regard to the questions posed by the Court regarding the value of any future injunctive

---

[7]    *See*    https://www.schiffvitamins.com/pages/neuriva-brain-health-supplement-research?gclsrc=aw.ds&ds_rl=1279704?cb=.

relief. That said, defendant have not shown that its melon juice extract claims were "clinically studied" either, let alone clinically proven.

**Exhibit 11 (Dkt. 62-11)** – Effect of an oral supplementation with a proprietary melon juice concentrate (Extramel" on stress and fatigue in healthy people; a pilot, double-blind, placebo-controlled trial. Milesi et al. Nutrition Journal Sept. 2009. While this study deals with an ingredient in only one of the three Neuriva products, melon juice extract, again the title on its own shows that it cannot be used to support the Neuriva labeling claims. It's a pilot study that studies endpoints (stress and fatigue) unrelated to the brain performance claims on the Neuriva product containing melon juice and the melon juice extract studied is a proprietary product that does not appear to be contained in the (apparently discontinued) Neuriva version containing melon juice extract.

**Exhibit 12 (Dkt. 62-12)** – Dietary Supplementation with a Superoxide Dismutase-Melon Concentrate Reduces Stress, Physical and Mental Fatigue in Healthy People: A Randomized, Double-Blind, Placebo-Controlled Trial. Carrillon et al. Nutrients June 2014. The endpoints studied—stress and fatigue—are not related to the Neuriva labeling claims. And even if they were, this is another small under-powered pilot study with only 32 subjects in the treatment group and 29 in the placebo group.

### ii.      The Small Report raises more questions than answers.

While Dr. Small's declaration provides many general discussions about memory, cognitive decline and other related subjects such as the effect of BDNF on the brain, when it comes to studies on PS and CCE for the most part he is limited to the studies discussed above.[8] And one elementary but serious problem with what Dr. Small presents to the Court is that not once does he mention that any of one of the studies he and defendant cites are "pilot" studies when, in fact, the vast majority are. Instead, he misleadingly presents these to the Court as if they are studies upon which efficacy conclusions can be reached.

Moreover, the turgidity of his analysis is automatically suspect because he fails to address the serious questions regarding the digestion of the Neuriva ingredients and whether they can pass the blood-brain barrier even if they survive digestion. Thus, while he may nakedly conclude that the label

---

[8] He tries to bolster this with citation to early studies on BC-PS as well as studies on diseased populations, which per the FDA Guidance are not germane.

representations are supported by the same studies discussed above, the studies upon which he relies clearly do not. Thus, unless he is subject to the crucible of cross-examination, the true meaning and validity or lack thereof behind his report is at best oblique and is highly suspect given the clinical trials he cites and his misleading treatment thereto.[9]

3.      **Neither Dr. Small's Report nor Defendant's cited studies come close to supporting the Neuriva labeling claims and as such do not answer the Court's third query.**

The Court requested the parties submit evidence that the Court would not be giving its blessing to a worthless product and replacing one fraudulent statement with another, allowing a fraud to continue. As the above discussion demonstrates, none of the clinical trials submitted to the Court come close to supporting the labeling claims. Dkt. 58 at 2. These studies, none of which were actually done using Neuriva, simply do not constitute reliable clinical evidence on their face and when they are run through the litmus tests set forth by the FDA in its guidelines for dietary supplement manufacturers they sorely miss the mark.

Finally, and perhaps just as important, the FDA makes clear in its guidelines that a dietary supplement manufacturer cannot merely search out studies that it believes supports it labeling claims and ignore other studies that conclude that the labeling claims are false. "To determine whether the available scientific evidence is adequate to substantiate a claim, it is important to consider all relevant research, both favorable and unfavorable. Ideally, the evidence used to substantiate a claim agrees the surrounding body of evidence. Conflicting of inconsistent results raise serious questions as to whether a particular claim is substantiated… the strength of the total body of scientific evidence is the critical factor in assessing whether a claim is substantiated." Exhibit A at p. 14. Yet, Dr. Small fails to perform the required "totality of the evidence analysis" as not one negative study on PS or CCE is cited even though such studies exist. For example, in 2010, in discussing both BC-PS and soy-based PS, the European Food Safety Authority, after conducting a totality of the evidence analysis of PS and memory and cognitive functioning in the elderly concluded "[A] cause and effect relationship cannot

---

[9] And it is not as if Dr. Small can claim that he does not know what a pilot study is as he cites 4 abstracts of his that contain the phrase "pilot study" in his CV (A197, A213, A222, and A234).

be established between the consumption of phosphatidyl serine and the claimed effects considered in this opinion." (Exhibit H attached).

Likewise, there is at least one well-conducted larger study on PS that concludes that PS does not affect memory or other cognitive functions in older individuals. *See* Jorissen et al. *The Influence of Soy-derived Phosphatidylserince on Cognition in Age-Associated Memory Impairment, Nutritional Neuroscience,* 2001:Vol.4, pp. 121-134 ("In conclusion, a daily supplement of S-PS does not affect memory or other cognitive functions in older individuals with memory complaints.") (Attached as Exhibit I). Yet, no mention of this study can be found in either Dr. Small's report or cited by Defendant.

Finally, in 2002 and 2004, the FDA was requested to consider granting what is known as a qualified health claim for PS for its use in, among other things, the reduction of cognitive dysfunction in the elderly. In so doing, the FDA performed a plenary review of clinical trials conducted on the elderly and PS. Most important, after conducting this plenary review in its 2002 letter the FDA concluded, "After reviewing the scientific evidence in your petition and other relevant scientific evidence, FDA concludes that most of the evidence does not support a relationship between phosphatidylserine and reduced risk of dementia or cognitive dysfunction, and that the evidence that does support such a relationship is very limited and preliminary…".

Because only preliminary evidence existed, the FDA allowed claims to be made on PS product labeling ***only if the label prominently stated in bold print*** immediately following any brain health representations that "Very limited and preliminary scientific research suggests that phosphatidylserine may reduce the risk of cognitive dysfunction in the elderly. **FDA concludes that there is little scientific evidence supporting this claim**." Exhibit G (emphasis added). In light of this, at a minimum, if Defendant continues to insist on making similar claims on its labels, similar qualifying language should be required in any injunctive relief approved going forward.

In 2004, FDA responded to a subsequent request that it review studies of PS. The FDA concluded that all of these studies (one of which was the 1991 study conducted by Crook and cited by defendant and Dr. Small to this Court) were also unreliable. Thus, in response to this letter the FDA concluded, "Although these four studies were all double-blind, placebo-controlled intervention studies, their scientific reliability is limited by flaws in design and analysis." Exhibit C at 7.  And one of the flaws identified by the FDA was one that is replete throughout all of the studies cited by

defendant here—be they PS or CCE studies—having multiple endpoints "without applying appropriate statistical corrections to reduce the possibility of finding statistically significant relationships by chance alone…" (singling out among others Defendant's Exhibit 7, Crook 1991.)  It also noted that one study, Jorrisen 2001, was a negative study as it showed no benefit from S-PS. Exhibit I ("a daily supplement of S-PS does not affect memory or other cognitive functions in older individuals with memory complaints").

Yet, neither Dr. Small nor defendant cited this study, even though the FDA requires manufacturers to perform a totality of the evidence analysis.  Exhibit A at p. 14.

Finally, after considering this "new" evidence, including Crook 1991, the FDA reached the same conclusion it did in 2002 and required the same qualifying language anywhere on the label where such brain health benefit claims were made. Exhibit J at 6, 8.

Many of the studies cited in these publicly available documents published by the FDA about PS are not mentioned by Dr. Small or defendants, and in particular, negative studies such as Jorissen 2001. That the FDA documents and the studies discussed therein are not discussed at all by either in turn raises serious questions about Dr. Small's analysis as well as to the completeness of what the defendant has submitted to the Court.

Thus, with regard to the Court's queries, defendant has failed to answer or assuage its concern that it may very well be approving the settlement of a product that is worthless and allowing a fraud to continue for four reasons: (1) the clinical studies defendant has submitted do not answer the question, (2) none of the documents submitted, including the report of Dr. Gary Small address the serious problems posed by digestion and the BBB, (3) neither defendant nor Dr. Small have presented the totality of the evidence to the Court, and (4) from the science discussed above it is more likely than not that Neuriva does not work as represented—let alone that it was "clinically tested" to show it works as represented.

**B.      The proposed languages change is meaningless to the reasonable consumer as the message is still the same—clinical studies have (purportedly) "shown" that Neuriva works as represented.**

Whether a product label claims it was clinically *proven* or "merely" clinically *tested* and *shown* to work is of no consequence to the reasonable consumer. Consumers want a product that works as

represented because that's why they buy a product in the first place. So, in evaluating the proposed injunctive relief, changing "clinically proven" to "clinically tested" is meaningless. The Seventh Circuit has noted that "clinically tested" imparts the same message—that clinical studies have proven that the product works as represented:

> Direct Digital's objection fails because it has mischaracterized Mullins's theory of liability. Mullins does not claim that Instaflex was ineffective, ergo defendant is liable. He alleges that Direct Digital's statements representing that Instaflex has been *"clinically tested"* and "scientifically formulated" to relieve joint discomfort, improve flexibility, increase mobility, and repair cartilage are false or misleading *because they imply there was scientific support for these claims…*

*Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015).

Thus, changing the labeling claim to "clinically tested" does nothing to substantively change the message being imparted to consumers. In fact, it is more misleading as while it may be literally true as to the ingredients, consumers will read it as meaning that the product is "clinically proven" to work as represented. It's common sense, and is reinforced by the fact that the Defendant can choose to use "shown" language in lieu of "clinically tested."

Plaintiffs' response to the Court's queries about the purported value of injunctive relief rests entirely on the notion that the word "proven" implies scientific consensus, while a "tested" claim could rest on thin evidence. Dkt. 61 at 7. But other courts rightly reject this gamesmanship. *See Removatron Int'l Corp. v. Federal Trade Comm.*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("petitioners have offered no basis for us to find that lay people would make such a fine distinction."). And in drawing this distinction, plaintiffs ignore their own complaint because **_Neuriva has not been studied_**. Defendant cites only studies of (mostly dissimilar) ingredients. "No public studies have been conducted of any of the Neuriva Products and, therefore, there is no scientific or clinical evidence that the two active ingredients, when combined in any of the Neuriva Products, improve brain function or are safe for concurrent consumption." Dkt. 36 at 28. This remains true! Yet under the proposed settlement, the Defendant need not limit its claims to say that *ingredients* in their product have been clinically tested. The front panel of the packaging will continue to state "brain performance" and the back panel will continue to claim that Neuriva—which has not been the subject of a single publicly-available clinical study—in fact "fuels" indicators of brain performance.



Figure 1: From Exhibit E2 of settlement, Dkt. 52-1

The question with regard to what the phrase "clinically tested" means is a binary one—either it means that the product has been clinically tested *and* proven to work as represented or the product has been clinically tested *and* those clinical trials have failed to prove that the product works as represented. But by using this phrase in the overall context of the brain performance representations made on the front of the labeling there can only be one conclusion reached by a reasonable consumer—that the product has been clinically tested and those studies have proven that the product works as represented.

Moreover, common sense dictates that from a consumer's perspective when they see the phrase "clinically tested" it says to them that (1) the product has been tested in scientifically reliable clinical trials, and (2) that those clinical trials have proven that the product works as represented. For, to the reasonable consumer why else would the phrase "clinically tested" be stated on the labeling? Particularly when they are made smack dab in the context of defendant's brain performance

representations. Defendant cannot claim that "scientifically studied" means only that it was *studied*, not that the other claims actually have support. *See Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 35 (E.D.N.Y. Sept. 10, 2009) (rejecting similar argument).

Certainly, it cannot be concluded that consumers would parse the words on the labeling like the lawyers who have promoted this settlement to the Court and conclude that the phrase is limited solely to meaning that the product has been clinically tested as opposed to clinically proven. To hold otherwise, the Court would be finding that in reading "clinically tested" the reasonable consumer would be sophisticated enough to parse through this ambiguity and conclude that this means that Defendant was not sufficiently confident about the results of these clinical trials to affirmatively state that the trials proved the labeling claims or, in other words, the consumer would read "clinically tested" to not mean "clinically proven." "Those assertions are premised upon a fictive world." *Pampers*, 724 F.3d at 721.[10]

Moreover, common sense dictates that from a consumer's perspective when they see the phrase "clinically tested" it says to them that (1) the product has been tested in scientifically reliable clinical trials and (2) that those clinical trials have proven that the product works as represented. For, to the reasonable consumer why else would the phrase "clinically tested" be stated on the labeling?

C.   **The "exemplars" submitted by defendant actually show (1) why the injunctive relief here is meaningless, and (2) what appropriate injunctive relief should include.**

Other than the *Collins* settlement (Exhibit 13, Dkt. 62-13) no other settlement cited by Defendant comes close to this settlement agreement. While the Court approved the *Collins* settlement, the results of the settlement are not encouraging. The settling defendant in *Collins*, Quincy Bioscience, still blitzes the airwaves with false representations about a product that is completely digested into amino acids as Quincy admitted to the FDA in 2012. *Racies v. Quincy Bioscience, LLC*, No. 15-cv-00292-HSG, 2016 U.S. Dist. LEXIS 136197, at *6 (N.D. Cal. Sep. 30, 2016). But even the *Collins* settlement included a token requirement requiring the settling Defendant to possess "competent and reliable

---

[10] Even if the injunction somehow had value, class members with strictly past damages like Objector Frank (Frank Decl. ¶ 7) could never be compensated by the label change. Fed. R. Civ. P. 23(a)(4).

scientific evidence substantiating the that the representation is true…" before it could again make similar claims.  Here, Defendant is effectively being allowed to continue to sell Neuriva without qualification—proclaiming to consumers that it provides brain performance benefits when there are absolutely no competent and reliable scientific evidence to support such claims. All it has to do is switch from "clinically proven" to "clinically tested."

The next settlement cited by Defendant, the *Dennis* settlement, Exhibit 14 (Dkt. 62-14) could not be more different. First, the settlement barred the Defendant, Kellogg, from making any affirmative statement that its cereal product "is clinically shown to improve attentiveness by 20%." In its place, Kellogg could say the truth—that "Clinical studies have shown that kids who eat a filling breakfast like Frosted Mini-Wheats have an 11% better attentiveness in school than kids who skip breakfast." Nothing was allowed to be said about Frosted Mini-Wheats improving attentiveness on its own. Here, after the cosmetic change is made switching "proven" to "tested" Defendant is still being permitted to state, without qualification, that Neuriva provides the represented brain performance benefits, when as set forth above it has no competent and reliable clinical evidence to support those claims. Unlike here, the *Dennis* settlement also included a non-reversionary cash fund of $4 million, with only one-quarter of that allocated to attorneys' fees.

And the same is true about the *Genelas* settlement (Exhibit 15, Dkt. 62-15). First, the settlement provided for the defendant to actually pay $35 million into a settlement fund to be distributed out to class members. And material substantive changes to the Dannon pro-biotic labeling and advertising were agreed to such as that the (1) product was clinically proven to provide a digestive benefit if it was directly qualified that it had to be eaten daily for two weeks and even then only assisted in slow intestinal transit; (2) the Defendant would remove the word "immunity" from the product labeling as well as "they have a positive effect on your digestive tract's immune system." And these are just some of the numerous labeling and claims changes Dannon agreed to. And what should not be missed is that this settlement, unlike the current settlement, required changes to the substantive claims made about the product as opposed to changing one word "proven" to "tested."

And the same is true for the Walgreens settlement (Exhibit 16, Dkt. 62-16). First off Walgreens agreed to send out refund checks and flu shot vouchers directly to class members. Likewise, Walgreens agreed to stop making the benefit representations unless it had competent and reliable scientific

evidence to demonstrate same. Walgreens also agreed to stop making 7 different statements about how its product helped defend against the common cold, requiring that all the prohibited representations be removed from shelves within 4 months. Here no such requirements are made and instead Defendant will be allowed to continue to make all of its brain performance representations.

Exhibit 17, Dkt. 62-17 does not further Defendant's cause either. The Defendant agreed to remove all "germ kill" representations from its labeling. Yet again, another substantive change to the overall benefit representations were required where here there are none. The same is true for Exhibit 18, Dkt. 62-17 as the settling defendant agreed to materially change its benefit representations including refraining from claiming that its product strengthened muscles or prevents injury unless the defendant possessed competent and reliable scientific evidence where here it is already clear that no such evidence exists for Neuriva.

Exhibit 19, Dkt. 62-19 may present the starkest contrast as in this settlement was required to remove "clinically proven" unless *subsequently* reported clinical trials supported such claims and reliable scientific evidence "shall mean… evidence that was not originally relied on by [Defendant] to support" its clinically proven labeling claims. Applied here that would require Defendant   to remove all brain performance claims unless and until it possesses new clinical study evidence that is competent and reliable.

Finally, Exhibit 20, Dkt. 62-20 is the so-called amendment to the current settlement agreement. The only change appears to be that "clinically tested" must be limited to referring to the individual ingredients and not the product as a whole. But as noted above this is even more misleading, as the FDA has made clear that clinical testing is only relevant and permitted to be referred on the labeling if (1) the product as whole was tested and (2) the testing constituted competent and reliable scientific evidence that the product works as represented. That is not the case here and if anything, allowing Defendant to link the clinically tested to the ingredients and not the product as a whole is further misleading because it at least implies that clinical testing of individual ingredients is relevant when, in fact, the FDA has made clear it is not.

## IV.    The Settlement Benefits Attorneys More Than Their Putative Clients, a Violation of Rule 23.

Plaintiffs do not report how many claims have been received from class members, and the $2.9 million request almost certainly exceeds the amount. This Court cannot answer whether the Rule 23(e) standards are met without information about the claims rate. *See In re Baby Products Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013); *Briseño*, 998 F.3d at 1024-26; *In re Samsung Top-Load Washing Machine Mktg., Sales Practices & Prods. Liab. Litig.*, 997 F.3d 1077, 1094 (10th Cir. 2021). Contrary to plaintiffs' claims, no class settlement fund exists. While the settlement hypothetically obligates defendant to pay *up to* $8 million, the claims-made nature of the fund means that the defendant will only pay a fraction of this amount. No $8 million common fund exists; just a legal fiction, and one that plaintiffs' counsel agreed to in order to better insulate their fee request from scrutiny.

The claims-made payments and attorneys' fees are segregated and compartmentalized. This segregation requires consideration of the "constructive common fund," which comprises the "sum" of the class's benefit and the "agreed-on fee amount." *In re Home Depot Inc., Customer Data Sec. Breach Litig.*, 931 F.3d 1065, 1080 (11th Cir. 2019) ("*Home Depot*") (Tjoflat, J.) (quoting Manual for Complex Litigation (Fourth) § 21.7 (2004)); *see also Dennis v. Kellogg Co.*, 697 F.3d 858, 862-63 (9th Cir. 2012) (evaluating a similar "constructive common fund" settlement); *GM Trucks*, 55 F.3d at 820 (A severable fee structure "is, for practical purposes, a constructive common fund."); *Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal."). "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *GM Trucks*, 55 F.3d at 821. Because the settlement agreement here contains a $2.9 million cap on fees, *see* Dkt. 52-1, at 13, the payment to the class and counsel is a "package deal" that effectively reduces "the payment to the class to account for the expected payment to counsel." *Home Depot*, 931 F.3d at 1092.

A constructive common fund structure such as this is inferior for one principal reason: the segregation of parts means that the Court cannot remedy any allocation issues by reducing fee awards and or named representative payments. *See Bluetooth*, 654 F.3d at 949; *Pearson*, 772 F.3d at 786-87. Because "the adversarial process" between the settling parties cannot safeguard "the manner in which that [settlement] amount is *allocated* between the class representatives, class counsel, and unnamed class

members," it is no surprise that the most common settlement defects are ones of allocation. *Pampers*, 724 F.3d at 717 (emphasis in original); *see also Holmes*, 706 F.2d at 1147 (noting the importance of review of the fairness of allocation and not just the adequacy of settlement sum). Thus, a segregated fund structure prevents the Court from exercising its discretion, in furtherance of its fiduciary duty (one that is heightened as a result of the coupon component), to cure the most endemic settlement ailment: a malapportioned fund.

Settling parties have designed the compartmentalized settlement to benefit class counsel and the defendant, all at the expense of benefitting the class. It is this very concern that animated the Seventh Circuit to vacate the settlement in *Pearson*, the Sixth Circuit to vacate the settlement in *Pampers*, and the Ninth Circuit to vacate the settlement in *Roes*. In any class action settlement, it's a foundational principle that class members should be "the foremost beneficiaries" of the accord. *Baby Prods.*, 708 F.3d at 179. The parties ask the Court to invert this bedrock axiom, and approve a settlement that consigns absent class members to an afterthought.

### A. Recent amendments to Rule 23 confirm that courts in this circuit should look to the ratio of fees to actual class recovery.

The settling parties may argue that fees may be calculated from the amount of money allegedly "made available" by the settlement, and many district courts have misread *Poertner v. Gillette Co.* this way. 618 F. App'x 624 (11th Cir. 2015). In fact, *Poertner* did not endorse this view because the *Poertner* district court explicitly rejected it. There, plaintiffs sought payment of "only 10%" from a hypothetical $50 million fund, but the district court noted "the $50 million calculation is somewhat illusory, because the parties never expected that Gillette would actually pay anything close to that amount." *Poertner v. Gillette Co.*, 2014 WL 4162771, 2014 U.S. Dist. LEXIS 116616, *14 (M.D. Fla. Aug. 21, 2014).

So too here, and this interpretation of *Poertner*—that it requires looking at actual class recovery and not fictional sums—has been confirmed by the new 2018 Amendments to Rule 23. *Briseño*, 998 F.3d at 1024. The Court must consider the entire settlement agreement, including "the effectiveness of any proposed method of distributing relief to the class" and "the terms of any proposed award of attorney's fees, including timing of payment." Rule 23(e)(2)(C)(ii)-(iii). This is important for "assessing the fairness of the proposed settlement" because "the relief actually delivered to the class can be a

significant factor in determining the appropriate fee award." 2018 Advisory Committee Notes on Rules.

    **B.**    **Counsel's fee is unfairly insulated by the combination of "clear sailing" and "kicker" provisions.**

It is not merely that the negotiated fee is out of proportion with the class's recovery. The preferential treatment arises from the fact that class counsel has negotiated for a segregated fee fund (the "kicker") and defendant's agreement not to oppose the request (the "clear sailing"). "Provisions for clear sailing clauses 'decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery.'" *Vought v. Bank of Am.*, 901 F. Supp. 2d 1071, 1100 (C.D. Ill. 2012) (quoting *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1224 (2000) (O'Connor, J., respecting the denial of certiorari)). It indicates that the class attorneys have negotiated "red-carpet treatment" to protect their fee award while urging class settlement "at a low figure or less than optimal basis." *Pampers*, 724 F.3d at 718 (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)). "[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Briseño*, 998 F.3d at 1024.

As such, a clear-sailing clause must be considered a "questionable feature" that "at least in a case…involving a non-cash settlement award to the class…should be subjected to intense critical scrutiny." *Redman v. RadioShack Corp.*, 768 F.3d 622, 637 (7th Cir. 2014); *see also* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 TUL. L. REV. 813, 816 (2003) (courts should "adopt a per se rule that rejects all settlements that include clear sailing provisions.").

Clear-sailing is reinforced by the presence of a "kicker" clause whereby class counsel's fee fund is segregated from the class benefit such that any unawarded fees revert to the defendant rather than going to benefit the class. *Briseño*, 998 F.3d at 1027. In this case, the unawarded fees never leave defendants' pocket. A segregated fee structure is an inferior settlement structure for one principal reason: the segregation of parts means that the Court cannot remedy any allocation issues by reducing fee awards and/or named representative payments. *See Pearson*, 772 F.3d at 786; *Bluetooth*, 654 F.3d at 949 ("clear sailing… reveals the defendant's willingness to pay, but the kicker deprives the class of

that full potential benefit if class counsel negotiates too much for its fees."). Fee segregation thus has the self-serving effect of protecting class counsel by deterring scrutiny of the fee request. *See Pearson*, 772 F.3d at 786 (calling it a "gimmick for defeating objectors"). A court and potential objectors have less incentive to scrutinize a request because the kicker combined with the clear-sailing agreement means that any reversion benefits only the defendant that had already agreed to pay that initial amount. Charles Silver, *Due Process and the Lodestar Method*, 74 TUL. L. REV. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, LAWYER BARONS 522-25 (2011) (arguing that reversionary kicker is per se unethical). For these reasons, a "kicker" clause should be subject to a "strong presumption of…invalidity." *Pearson*, 772 F.3d at 787.

    **C.**    **Any fee award should be based on true class benefits and cross-checked with class counsel's lodestar, which they do not provide.**

Plaintiffs neither requests, nor submits sufficient information, for the Court to award fees on a lodestar basis. Plaintiffs fee application does not even contain the words "hours," "rates," or "lodestar," much less explain why the Court should not even consider the work actually performed in the case. This fails to meet the bare minimum of "identify[ing] the general subject matter of [their] time expenditures." *Hensley v. Eckerhart*, 461 U.S. 424, 437 n.12 (1983). "Generalized statements that the time spent was reasonable or unreasonable of course are not particularly helpful and not entitled to much weight… [T]he district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary…" *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1301 (11th Cir. 1988) (abrogated on other grounds by *Perdue v. Kenny A.*, 559 U.S. 542, 130 S. Ct. 1662 (2010)). Would class counsel have submitted such deficient records were defendants afforded the opportunity to challenge the fees? Doubtful. Where there is clear-sailing—an agreement not to challenge fees, as in this case—plaintiffs have a tendency to "handicap[]" objectors by not submitting "the details of class counsel's hours and expenses." *Redman*, 768 F.3d at 638 (holding that such a procedure violated Rule 23(h)).

Likely, billing information would confirm that class counsel negotiated for themselves an excessive $2.9 million fee request that dwarfs both class recovery and time spent on the case. The first complaint was filed in June and an agreement-in-principle was reached on November 30, 2020 before formal discovery or resolution of a single contested motion. Dkt. 69 at 4. To the extent that the $2.9

million fee request (which Defendant agreed not to challenge) rivals or exceeds actual class recovery, the Court should independently reject the settlement because it put class counsel ahead of their putative clients.

If the Court nevertheless approves the settlement, it may defer the fee award until after disclosure of payable claims and lodestar information.

## CONCLUSION

The settlement proposes injunctive relief that does not correct Defendant's misrepresentations and provides no benefit to class members like Objector Frank who may not even purchase Neuriva in the future. To the extent that the proposed settlement blesses Defendant's false advertising while providing an unopposed fee award of $2.9 million to class counsel, it disadvantages the class and final approval should be denied.

Date: July 26, 2021                    Respectfully submitted,

                                       /s/ Matthew Seth Sarelson
                                       Matthew Seth Sarelson
                                       DHILLON LAW GROUP, INC.
                                       2100 Ponce De Leon Blvd. Ste 1290
                                       Coral Gables, FL 33134
                                       Phone: 305-773-1952
                                       Email: Msarelson@dhillonlaw.com

                                       M. Frank Bednarz (*pro hac vice* admission pending)
                                       IL ARDC No. 6299073
                                       HAMILTON LINCOLN LAW INSTITUTE
                                       CENTER OF CLASS ACTION FAIRNESS
                                       1145 E. Hyde Park Blvd. Unit 3A
                                       Chicago, IL 60615
                                       Phone: 801-706-2690
                                       Email: frank.bednarz@hlli.org

                                       *Attorneys for Objector Theodore H. Frank*

Pursuant to § 2.A of the Settlement Agreement, I declare under penalty of perjury that I am a member of the Class and separately sign this objection.

Date: July 26, 2021

_____
Theodore H. Frank

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed with the Court via the CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Matthew Seth Sarelson*
Matthew Seth Sarelson