# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**Case No.: 1:20-cv-23564-MGC**

DAVID WILLIAMS and CAROLL
ANGLADE, THOMAS MATTHEWS,
MARTIZA ANGELES, and HOWARD
CLARK, *on behalf of himself and all others similarly
situated*,

 Plaintiffs,

v.

RECKITT BENCKISER LLC and
RB HEALTH (US) LLC,

 Defendants.

Theodore H. Frank,

Objector.

---

## DECLARATION OF M. FRANK BEDNARZ

I, M. Frank Bednarz, declare as follows:

1.      I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      My business address is Hamilton Lincoln Law Institute, 1145 E. Hyde Park Blvd Unit 3A, Chicago, IL 60615. My telephone number is (801) 706-2690. My email address is frank.bednarz@hlli.org.

3.      Attached as Exhibit A is a true and correct copy of the Food and Drug Administration's "Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act," (January 2009) printed from https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-substantiation-dietary-supplement-claims-made-under-section-403r-6-federal-food on July 26, 2021.

4.      Attached as Exhibit B is a true and correct copy of National Institute of Health, *Pilot Studies: Common Uses and Misuses*, printed from https://www.nccih.nih.gov/grants/pilot-studies-common-uses-and-misuses on July 26, 2021.

5.      Attached as Exhibit C is a true and correct copy of FDA's "Letter Updating the Phosphatidylserine" (Nov. 24, 2004), printed from an archive service because it no longer available on the FDA website, http://wayback.archive-it.org/7993/20171114183738/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm072993.htm.

6.      Attached as Exhibit D is a true and correct copy of FutureCeuticals, Inc. correspondence dated June 7, 2019 seeking "Generally Recognized as Safe (GRAS) Notice for Coffeeberry® Coffee Fruit Extract," with appendices excluded available online at, https://www.fda.gov/media/135526/download.

7.      Attached as Exhibit E is a true and correct copy of the European Food Safety Authority's "Scientific Opinion on the substantiation of health claims related to phosphatidyl serine (ID 552, 711, 734, 1632, 1927) pursuant to Article 13(1) of Regulation (EC) No 1924/2006," available online at https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2010.1749.

8.      Attached as Exhibit F is a true and correct copy of Jorissen BL, Brouns F, Van Boxtel MP, Ponds RW, Verhey FR, Jolles J, Riedel WJ. The influence of soy-derived phosphatidylserine on cognition in age-associated memory impairment. Nutr Neurosci. 2001;4(2):121-34. doi: 10.1080/1028415x.2001.11747356. PMID: 11842880.

9.      Attached as Exhibit G is a true and correct copy of FDA's "Qualified Health Claim: Final Decision Letter - Phosphatidylserine and Cognitive Dysfunction and Dementia" (May 13, 2003), printed from the Internet Archive because it no longer available on the FDA website, https://web.archive.org/web/20171114183737/https://www.fda.gov/Food/IngredientsPackaging Labeling/LabelingNutrition/ucm072999.htm on July 26, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 26, 2021, in Kansas City, Missouri.

/s/ M. Frank Bednarz
M. Frank Bednarz

# Bednarz Decl.

# EXHIBIT A

# Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act

*Contains Nonbinding Recommendations*

December 2008

Additional copies are available from:
Office of Nutrition, Labeling, and Dietary Supplements
HFS-800
Center for Food Safety and Applied Nutrition
Food and Drug Administration
5001 Campus Drive
College Park, MD 20740
240-402-2375
http://www.cfsan.fda.gov/guidance.html

You may submit written or electronic comments regarding this guidance at any time. Submit written comments on the guidance to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. Submit electronic comments to **http://www.regulations.gov (http://www.regulations.gov)**. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Food Safety and Applied Nutrition**
**December 2008**

OMB Control No. 0910-0626
Expiration Date: 08/31/2011
See additional PRA statements in **Section III** of this guidance

---

*Contains Nonbinding Recommendations*

**Table of Contents**

I. **Introduction**

II. **Discussion**

III. **Paperwork Reduction Act of 1995**

---

*Contains Nonbinding Recommendations*

## Guidance for Industry[1]
## Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act

> This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate telephone number listed on the title page of this guidance.

## I. Introduction

### A. *What Does This Guidance Document Address?*

Section 403(r)(6) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 343(r)(6)) requires that a manufacturer of a dietary supplement making a nutritional deficiency, structure/function, or general well-being claim[2] have substantiation that the claim is truthful and not misleading.[3]

This guidance document is intended to describe the amount, type, and quality of evidence FDA recommends a manufacturer have to substantiate a claim under section 403(r) (6) of the Act. This guidance document is limited to issues pertaining to substantiation under section 403 (r)(6) of the Act; it does not extend to substantiation issues that may exist in other sections of the Act.[4]

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

### B. *Why Is Guidance on Substantiation Helpful?*

The Act, as amended by the Dietary Supplement Health and Education Act of 1994 (DSHEA) and the legislative history accompanying DSHEA do not define "substantiation." For this guidance, we drew upon our own expertise with respect to the regulations and case law regarding substantiation of various statements that may be made in the labeling of dietary supplements, conventional foods, and drug products (recognizing that conventional foods and

drugs are regulated differently from dietary supplements), the Federal Trade Commission's (FTC) experience with its policy on substantiating claims made for dietary supplements in advertising, and recommendations from the Commission on Dietary Supplement Labels.

The Commission on Dietary Supplement Labels (the Commission), a seven-member body that was established under DSHEA to "provide recommendations for...the regulation of label claims and statements for dietary supplements, including the use of literature in connection with the sale of dietary supplements and procedures for the evaluation of such claims," held public meetings around the United States from 1996 through 1997. During these meetings, several manufacturers asked the Commission to provide guidance regarding the type of information that manufacturers should have in hand to substantiate a statement of nutritional support.[5]

Under the Act, FDA has exclusive jurisdiction over the safety, and primary jurisdiction over the labeling, of dietary supplements. The FTC has primary jurisdiction over advertisements for dietary supplements. Given these jurisdictional assignments, we and the FTC share an interest in providing guidance on what "substantiation" means. In April 2001, FTC issued a guidance document entitled, "Dietary Supplements: An Advertising Guide for Industry."[6] Our guidance document is modeled on, and complements, the FTC guidance document.

Dietary supplement manufacturers should be familiar with the requirements under both DSHEA and the Federal Trade Commission Act that they have substantiation that labeling and advertising claims are truthful and not misleading. Our approach provides manufacturers flexibility in the precise amount and type of evidence that constitutes adequate substantiation. Providing a standard for substantiation may also help to preserve consumer confidence in these products. To ensure compliance with the Act, we recommend that dietary supplement manufacturers carefully draft their labeling claims and carefully review the support for each claim to make sure that the support relates to the specific product and claim, is scientifically sound, and is adequate in the context of the surrounding body of evidence.

The FTC has typically applied a substantiation standard of "competent and reliable scientific evidence" to claims about the benefits and safety of dietary supplements and other health-related products. FDA intends to apply a standard for the substantiation of dietary supplement claims that is consistent with the FTC approach. This guidance document, using examples of claims that might be made for a dietary supplement, describes criteria to be considered in evaluating the nature of the claim and the amount, type, and quality of evidence in support of the claim.

## II. Discussion

### A. *What is the Substantiation Standard?*

The FTC standard of competent and reliable scientific evidence has been defined in FTC case law as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results."[7]

Although there is no pre-established formula as to how many or what type of studies are needed to substantiate a claim, we, like the FTC, will consider what the accepted norms are in the relevant research fields and consult experts from various disciplines. If there is an existing standard for substantiation developed by a government agency or other authoritative body, we may accord some deference to that standard.

In determining whether the substantiation standard has been met with competent and reliable scientific evidence, we recommend that firms consider the following issues in their assessment:

1. The meaning of the claim(s) being made;

2. The relationship of the evidence to the claim;

3. The quality of the evidence; and

4. The totality of the evidence.

Each of these issues is discussed further in this guidance.

**B. *Identifying the Meaning of the Claim***

The first step in determining what information is needed to substantiate a claim for a dietary supplement is to understand the meaning of the claim and to clearly identify each implied and express claim. When a claim may have more than one reasonable interpretation, we recommend that a firm have substantiation for each interpretation. Consumer testing may be useful to determine consumer understanding of each claim, in context. We recommend that firms not only focus on individual statements or phrases, but also on what expected effect or benefit are being promoted when all of the statements being made for the product are considered together. Although it is important that individual statements be substantiated, it is equally important to substantiate the overall "message" contained when the claims are considered together.

*Example 1:* The label of a dietary supplement containing "X" uses the following claims: "The amino acid 'X' is the chemical precursor to nitric oxide. Blood vessel cells contain enzymes that produce nitric oxide. Nitric oxide is important in maintaining blood vessel tone." Assuming this statement were supported by sound science so that each individual statement was substantiated, the "message" conveyed by the claims, when considered together, is that taking oral "X" will affect nitric oxide production and blood vessel tone. Therefore, we recommend in this case that the dietary supplement manufacturer have substantiation that taking the amount of "X" provided by the product affect nitric oxide production and blood vessel tone under the product's recommended conditions of use.

The firm's clear understanding of the meaning of the claim is useful in ensuring that the evidentiary basis for substantiation is appropriate for the claim. Understanding the claim's meaning will help identify the appropriate study hypotheses and measurable endpoints, which can be used to ensure that the firm has appropriate studies to substantiate the claim. For example, a firm making a claim that a dietary supplement "helps maintain blood vessel tone" or "supports healthy immune system" should have a clear understanding of the claim's meaning to develop endpoints that could be measured and replicated in studies used as a basis for substantiation.

*Example 2:* The labeling of a dietary supplement includes the statement "promotes weight loss." The dietary supplement contains various vitamins and minerals and a botanical extract. The manufacturer relies on a randomized controlled double blind clinical study showing that subjects who took the botanical extract had a small but significant increase in metabolism over subjects taking a placebo over a 24 hour period. The study did not examine the effect of the extract on subjects' weight and there is no research showing that a short term increase in metabolism will translate into any measurable weight loss. The weight loss claim would likely not be adequately substantiated.

**Example 3:** The labeling for a dietary supplement contains a statement saying, "Recommended by Scientists," in connection with the product's claim. The statement gives consumers the impression that there is a body of scientists, qualified experts, who believe that the claim being made is supported by evidence. Consumers might also reasonably interpret the statement as meaning that there is general scientific agreement or consensus regarding the claim. If the manufacturer does not possess evidence to demonstrate such a consensus, the claim may not be substantiated. The opinion of a single scientist or small group of scientists is probably not adequate substantiation for such a claim.

**Example 4:** The labeling states, in connection with the product's claim, that the dietary supplement has been "studied for years" in a particular country or region and is the subject of clinical or "university" research. Here, the labeling conveys the impression that the product has been studied and also conveys the impression that there is a substantial body of competently conducted scientific research supporting the claim. We recommend that manufacturers possess evidence to substantiate both the express statements and their implied meaning.

### C. *The Relationship of the Evidence to the Claim*

Whether studies or evidence have a relationship to the specific claim being made or to the dietary supplement product itself are an important consideration in determining if a claim is substantiated. The following are some threshold questions in determining this relationship:

◦ *Have the studies specified and measured the dietary supplement that is the subject of the claim?* We recommend that the studies being used as substantiation for dietary supplement claims identify a specific dietary supplement or ingredient and serving size and that the conditions of use in the studies are similar to the labeling conditions of the dietary supplement product. Factors that would tend to indicate a stronger relationship between a substance that is the subject of a study and the substance that is the subject of the dietary supplement claim includes similarities in formulation, serving size, route of administration, total length of exposure, and frequency of exposure. Manufacturers should be aware that other substances involved in the study or included in the dietary supplement product itself might also affect the dietary supplement's performance or the study results.

**Example 5:** To illustrate this issue, assume that a firm has high quality studies that are also consistent with the totality of the scientific evidence. The firm would like to use these studies to substantiate a claim that its dietary supplement has a particular effect on the human body, but the studies involved the impact of a specific ingredient in foods on the human body, and did not involve the dietary supplement product itself. In this instance, although the studies might be of high quality, the results of these studies of conventional foods are not applicable to the specific dietary supplement product.[8]

◦ *Have the studies appropriately specified and measured the nutritional deficiency, structure/function, or general well-being that is the subject of the claim?* We recommend that the studies clearly identify the endpoints that are to be used to substantiate the claimed effect.

◦ *Were the studies based on a population that is similar to that which will be consuming the dietary supplement product?* For example, if the study involved young adults, but the product's claims involve conditions seen only in the elderly, the study might not be applicable to the claims.

◦ *Does the claim accurately convey to consumers the extent, nature, or permanence of the effect achieved in the relevant studies and the level of scientific certainty for that effect?*

Dietary Supplements > Guidance for Industry: Substantiation for Dietary Supplement Cla... Page 6 of 17
Case 1:20-cv-23564-MGC   Document 77-1   Entered on FLSD Docket 07/27/2021   Page 10 of
134

*A note on foreign research:* Foreign research could be sufficient to substantiate a claim as long as the design and implementation of the foreign research are scientifically sound and the foreign research pertains to the dietary supplement at issue. In evaluating data from studies conducted in a foreign population, care should be taken in extending the results to what might be expected in consumers in the United States who will use the product. Differences between the two populations, such as differences in diets, general health, or patterns of use, could confound the results. Also, it is important to make sure that the study examined the same dietary ingredient about which the claim is being made since there may be instances where, due to provincial or regional differences in custom, language, or dialect, the same name is given to different substances or different names to the same substance.

*Example 6:* A firm claims that its dietary supplement contains an ingredient shown to promote claim Y. The firm conducts a literature search and finds several references for carefully conducted, well-controlled studies demonstrating that the substance appears to be helpful in persons with claim Y associated with aging when the substance is applied topically to the affected area. However, there is no information provided concerning the effect of the substance when taken orally. Although the evidence may demonstrate that the product is effective when used topically, this information would generally not be useful to substantiate a claim for a dietary supplement (by definition, a product that is intended for ingestion (section 201(ff)(2)(A) of the Act (21 U.S.C. 321(ff)(1)(A))).

*Example 7:* A dietary supplement firm wants to promote an amino acid product to improve blood circulation and improve sexual performance. The firm conducts a literature search and finds many abstracts and articles about the amino acid's effect on biological mediators of circulation and a few animal and human studies designed to study the effect of the amino acid on blood flow. The firm intends to use this list of studies as substantiation for its claim.

Although the firm appears to have a significant amount of information for its claim, the list is likely not adequate because the firm has not demonstrated that the information is directly related to the claim being made. For example, in this situation we would recommend that the firm provide information to clarify the meaning of "improves blood circulation" and "improves sexual performance." We would also recommend that the firm determine whether the studies examined a dosage of product similar to the firm's product and whether any study measured outcomes (i.e., improved sexual performance) other than blood flow/blood circulation. Until the firm has reviewed the underlying studies, it should not assume that merely finding studies testing the same substance necessarily constitutes adequate substantiation.

*Example 8:* A firm wishes to market its mineral supplement by using a claim that "studies show that the mineral supplement promotes "Z." The firm has the results of a randomized, double blind, placebo-controlled study conducted in a foreign country showing that a similar product did, in fact, promote "Z," although the study indicates that the foreign study subjects had low blood levels of the mineral at the start of the study. The general U.S. population does not have such a mineral deficiency. Although this study is a high quality study, it may not be adequate to substantiate a claim about the product's use intended for consumers in the United States because it is confounded by the initial abnormal blood levels of the mineral. Since the study is not designed to answer the question of whether the effect would be expected to occur in subjects with normal blood levels of the mineral, the study may not be adequate evidence to substantiate the claim.

*Example 9:* A firm is marketing a product specifically to reduce nervousness during stressful everyday situations, such as public speaking. The firm has results from several small studies demonstrating that the product will raise blood levels of a chemical that is well known to relax

people in stressful situations. The firm also has two small, randomized, placebo-controlled studies showing that its product positively affected measurable indices of anxiety in people placed in stressful situations, including public speaking. These studies may be adequate evidence to support the product claims. Although the studies may be small in terms of the numbers of subjects tested, they are well-designed studies that resulted in statistically significant positive results that are consistent with the larger body of scientific evidence related to stress anxiety in public situations.

*Example 10:* A firm has developed a product to improve memory and cognitive ability and intends to market the product to parents for their school-aged children. The firm has several high quality clinical studies that examined the ingredient's effect in elderly people with diagnosed, age-related memory problems. These studies alone would likely not be adequate substantiation for a claim about memory improvement in young children because the patient population (elderly people with memory problems) is completely different from the intended population (children) in the claim.

*Example 11:* A dietary supplement firm is marketing an iron dietary supplement with the claim that the dietary supplement is to correct iron-deficiency anemia in the 10% of menstruating women with menorrhagia. The firm has not studied the product in this population of women directly, but has assembled and carefully reviewed the scientific literature of studies that have investigated the oral dosage and intestinal absorption of the type of iron used in its product, both in the population in general, and in women that match the target consumer of the product. Using this information, the firm has formulated its product to provide the amount of bioavailable iron needed by this population of women. Even though the firm did not test its product directly, it has examined the existing scientific literature and has formulated the product in a manner to meet the standards of products shown effective in well-controlled studies. There is, therefore, a basis to conclude that the existing literature is applicable to the product in the target population in which it is intended. Thus, the firm's claim that the product will be useful in correcting iron-deficiency anemia would likely be adequately substantiated.

*Example 12:* A firm claims that its multi-vitamin, multi-mineral product "provides the vitamins and minerals needed to promote good health and wellness." In this case, the firm's claim is likely substantiated by the substantial scientific evidence showing that certain vitamins and minerals are essential nutrients that are needed to maintain good health, even though the firm does not have data from specific scientific studies to show that its product results in any measurable outcome. Scientific evidence studying the firm's particular product formulation probably would not be needed for this claim unless the firm were to make claims that its formulation is different or superior to other formulations or confers benefits above and beyond the benefits demonstrated to be associated with adequate intake of vitamins and minerals.

## D. *The Quality of the Evidence*

In deciding whether studies substantiate a claim, an important consideration is the scientific quality of studies. Scientific quality is based on several criteria including study population, study design and conduct (e.g., presence of a placebo control), data collection (e.g., dietary assessment method), statistical analysis, and outcome measures. For example, if the scientific study adequately addressed all or most of the above criteria, it could be considered of high quality. Generally accepted scientific and statistical principles should be used to determine the quality of the studies used as evidence to substantiate a claim. The "gold" standard is randomized, double blind, placebo-controlled trial design. However, trials of this type may not always be possible, practical, or ethical. There are several systems available to rate scientific information.[8] Firms making claims are encouraged to refer to these systems

when developing substantiation for claims or relying on existing information. The following provides some commonly accepted scientific principles in evaluating the quality of scientific evidence.

### What Are the Types of Evidence that May Substantiate a Claim?

As a general principle, one should think about the type of evidence that would be sufficient to substantiate a claim in terms of what experts in the relevant area of study would consider to be competent and reliable. Competent and reliable scientific evidence adequate to substantiate a claim would consist of information derived primarily from human studies.

Human studies can be divided into two types: *intervention* studies and *observational* studies. [10] Of these types of studies, intervention studies can provide causal evidence to substantiate the effect of a dietary supplement in humans because they can evaluate the product's direct effect in the human body. Observational studies have a more limited ability than intervention studies to distinguish relationships between a substance and the outcomes being evaluated and cannot provide causal evidence.

◦ *Intervention studies*

In intervention studies, an investigator controls whether the subjects receive the treatment or intervention of interest in order to test whether the intervention or treatment supports a pre-determined hypothesis. Firms should determine the hypothesis that should be supported or tested prior to identifying supportive documentation or developing a study protocol. Randomized, double blind, parallel group, placebo-controlled trials offer the greatest assessment of a relationship between a dietary supplement and an outcome. Although intervention studies are the most reliable studies for determining a cause-and-effect relationship, generalizing from such evidence on selected populations to different populations may not be scientifically valid. For example, as described in *Example 10* above, if there is evidence to demonstrate a relationship in a specific population (elderly patients with diagnosed age-related memory problems), then such evidence should not be extrapolated to a different population (children).

◦ *Observational studies*

In observational studies, the investigator does not have control over the exposure to the treatment or intervention of interest. In prospective observational studies, investigators recruit subjects and observe them before a particular outcome occurs. In retrospective observational studies, investigators review the records of subjects and interview subjects after the outcome has occurred. Retrospective studies are usually considered to be more vulnerable to recall bias (error that occurs when subjects are asked to remember past behaviors) and measurement error, but are less likely to require large sample size, cost, or encounter the ethical problems that may occur in prospective studies. Types of observational studies include:

▪ Case reports, which describe observations of a single subject or a small number of subjects.

▪ Case-series studies, which are a descriptive account of a series of "outcomes" observed over time and reported for a group of subjects. No control group is described.

▪ Case-control studies, which compare subjects with a condition (cases) to subjects who do not have the same condition (controls). Subjects are enrolled based on their outcome rather than based on their exposure.

- Cohort studies, which compare the outcome of subjects who have been exposed to the substance to the outcome of subjects who have not been exposed.

- Cross-sectional (prevalence) studies, which compare, at a single point in time, the number of individuals with a condition who have been exposed to a substance to the number of individuals without the condition who were not exposed to the substance.

- Time-series studies, which compare outcomes during different time periods, e.g., whether the rate of occurrence of a particular outcome during one five-year period changed during a subsequent five-year period.

- Epidemiological studies, which compare the rate of a condition across different populations.

### What types of information are useful as background to support a claim?

The following additional types of information would generally be considered background information, but alone may not be adequate to substantiate a claim.

◦ *Animal studies* - Animal studies may provide useful background on the biological effects of a substance. However, they often have limited or unknown value in predicting the effect of the substance in humans. Care should be exercised in extrapolating results obtained in animal research directly to the human condition. The strongest animal evidence is based on data from studies in appropriate animal models, on data that have been reproduced in different laboratories, and on data that give a statistically significant dose-response relationship. Without any data from human studies, the results of animal studies alone are not sufficient to substantiate a claim.

◦ *In vitro studies* are studies that are done outside a living body. For example, such studies might examine a product's effect on isolated cells or tissues. These studies are of limited value in predicting the effect of a substance when consumed by humans. The strongest in vitro evidence would be based on data that have been reproduced in different laboratories, but this evidence alone would not substantiate a claim.

◦ *Testimonials and other anecdotal evidence* - This type of evidence includes descriptions of experiences of individuals using a dietary supplement product or ingredient. It might also include descriptions of the use of the product or ingredient by others, for example, by other cultures in the past or present. It might consist of an opinion or statement of an expert or someone who endorses the product. Anecdotal evidence generally would not be sufficient to substantiate claims regarding a dietary supplement's effect because each individual's experience might be attributable to factors other than the dietary supplement itself. For example, a person might have experienced a placebo or coincidental effect, rather than an effect attributable to the dietary supplement itself. Additionally, the "honest opinion" of a consumer testimonial or an expert endorsement would not be enough to substantiate a claim; rather, the endorsement should also be supported by competent and reliable scientific evidence.

◦ *Meta-analysis* is the process of systematically combining and evaluating the results of clinical trials that have been completed or terminated. Meta-analysis may identify relevant reports, which may provide substantiation for the claim.

◦ *Review articles* summarize the findings of primary reports. Review articles may identify relevant primary reports, which may provide substantiation for the claim. Review articles may also provide background information that is useful to understand the scientific issues about the relationship between the substance and the claimed effect.

◦ *Comments and Letters to the Editor* usually focus on a particular issue or issues from a study, presentation at a meeting etc. Comments generally do not present the results of a study. Comments and letters to the editor may identify relevant primary reports, which may provide substantiation for the claim. Comments and letters to the editor may also provide background information that is useful to understand the scientific issues about the relationship between the substance and the claimed effect.

◦ *Product monographs* are prepared by the manufacturer to convey specific information about a product such as its specifications. Product monographs may provide background information that is useful to understand the scientific issues about the relationship between the substance and the claimed effect.

**Example 13:** A dietary supplement claim states, "Data suggest that including Substance X in the diet may promote brain neuron health in healthy individuals." The firm cites a study in which rats were fed diets containing Substance X and the brains of all rats were examined for ischemia-induced brain damage. The study does not provide a basis that Substance X would have the same effect on brain health in otherwise healthy humans. This study alone likely would not provide adequate substantiation of the claim being made because it relies solely on animal data.

**Example 14:** A dietary supplement claim states, "Grain Y has been used effectively for centuries to promote gastrointestinal health." The firm has no clinical studies in humans, but has an industry monograph that relies only on historical descriptions of grain Y use by pre-modern civilizations. Although the monograph may be an accurate review of the historical use of grain Y, it would likely not constitute competent and reliable evidence to support the claim because it is not based on objective scientific evidence. Rather, it is largely anecdotal evidence that cannot be objectively evaluated to determine if it applies to the consumers who would use the product.

**Example 15:** A dietary supplement label claims that, in laboratory tests (i.e., in vitro tests), the enzymes in the supplement can digest up to 20 grams of protein and 15 grams of dietary fat, and the firm is promoting the supplement to assist in breaking down protein and fat that its users eat. The firm has not tested its product or the ingredients in the supplement in humans. Although this evidence may be accurate, it would generally not be adequate substantiation for the claimed effects on dietary components because it is insufficient for reaching a conclusion on whether the enzymes, when consumed, would behave equivalently in the human body. Corroborating evidence from some human studies would likely be needed to determine if the in vitro findings reflect the outcomes of the product when consumed by humans.

**Example 16:** A botanical product label uses the claim "improves vitality." The substantiation that the firm is relying upon consists of testimonial experience it has collected from consumers and descriptions of the botanical product's traditional use. Although the firm may have testimonial experience to back up the basic claim being made, the claimed benefit would likely not be adequately substantiated because neither source is based on scientific evidence. If the firm wants to make a claim of this type, we recommend that it have scientific evidence that some measurable outcome(s) associated with the general conditions cited in the claim is (are) significantly improved.

### What Design Factors Affect the Quality of a Study?

Multiple factors should be considered in study design. These include, but are not limited to:

◦ *Bias, confounders, and other limitations* - Potential sources of bias include lack of appropriate randomization and blinding, the number of subjects called for in the protocol vs.

the number of subjects who actually participated in the trial, demographics, adequacy of primary variables, compliance, control agent, drop-outs, statistical procedures, subgroup analysis, safety issues, and reproducibility of results. Confounders are factors that are associated with the outcome in question and the intervention and prevent the measured outcome from being attributed unequivocally to the intervention. Potential confounders include variability in the quantity of the dietary supplement being administered or the presence of other dietary ingredients that may have their own independent effects. These factors can limit the reliability of the study.

◦ *Quality assessment criteria* - Factors that contribute to higher quality studies include:

- Adequacy and clarity of the design

  - The questions to be answered by the study are clearly described at the outset.

  - The methodology used in the study is clearly described and appropriate for answering the questions posed by the study.

  - The duration of the study intervention or follow-up period is sufficient to detect an effect on the outcome of interest.

  - Potential confounding factors are identified, assessed, and/or controlled.

  - Subject attrition (subjects leaving the study before the study is completed) is assessed, explained, and reasonable.

- *Population studied*

  - The sample size is large enough to provide sufficient statistical power to detect a significant effect. (If the study is underpowered, it may be impossible to conclude that the absence of an effect is not due to chance.)

  - The study population is representative (with respect to factors such as age, gender distribution, race, socioeconomic status, geographic location, family history, health status, and motivation) of the population to which the claim will be targeted.

  - The criteria for inclusion and exclusion of study subjects were clearly stated and appropriate.

  - The study used recruitment procedures that minimized selection bias.

  - For controlled interventions, the subjects were randomized. If matching was employed to assign the subjects to control and treatment groups, appropriate demographic characteristics and other variables were used for the matching. The randomization was successful in producing similar control and intervention groups.

◦ *Assessment of intervention or exposure and outcomes*

- The analytical methodology and quality control procedures to assess dietary intake are adequate.

- The dietary supplement serving size is well defined and appropriately measured.

- The background diets to which the dietary supplement was added, or the control and interventional diets, are adequately described, measured, and suitable.

- In studies with cross-over designs, the "wash-out" period (the period during which subjects do not receive an intervention) between dietary supplement exposures is

appropriate. Lack of a sufficient wash-out period between interventions may lead to confusion as to which intervention produced the health outcome.

- The form and setting of the intervention are representative of the way the product will be normally used.

- Other possible, concurrent changes in diet or health-related behavior (weight loss, exercise, alcohol intake, and smoking cessation) present during the study that could account for the outcome identified are assessed and/or controlled.

- The study's outcomes are well defined and appropriately measured

- Efforts were made to detect harmful as well as beneficial effects.

◦ *Data Analysis and Assessment*

- Appropriate statistical analyses were applied to the data.

- "Statistical significance" was interpreted appropriately.

- Relative and absolute effects were distinguished.

◦ *Peer Review* - The nature and quality of the written report of the research are also important. Although studies or evidence used to substantiate a claim do not have to be published in a peer-reviewed journal or publication, such publications do give some level of assurance that qualified experts have reviewed the research and found it to be of sufficient quality and validity to merit publication. In contrast, an abstract or informal summary of an article is less reliable, because such documents usually do not give the reader enough insight into how the research was conducted or how the data were analyzed to objectively evaluate the quality of the research data and the conclusions drawn by the authors. Moreover, the mere fact that the study was published does not necessarily mean that the research is competent and reliable evidence adequate to substantiate a particular claim.

**Example 17:** A dietary supplement label claims, "Randomized, double blind, placebo-controlled studies demonstrate that herbal extract 'Z' is beneficial in relieving menopausal symptoms." The firm is relying on the results of more than one randomized, double blind, placebo-controlled intervention study using menopausal women as subjects, and the results of those studies are in general agreement. The claim would likely be substantiated because it relies on high quality studies in humans that directly addressed conditions described in the claim.

**E. *Consider the Totality of the Evidence***

**How Well Does the Totality of Evidence Support the Claims?**

In determining whether there is adequate evidence to substantiate a claim, one should consider the strength of the entire body of evidence, including criteria such as quality, quantity (number of various types of studies and sample sizes), relevance of exposure, and consistency and replication of the findings.

To determine whether the available scientific evidence is adequate to substantiate a claim, it is important to consider all relevant research, both favorable and unfavorable. Ideally, the evidence used to substantiate a claim agrees with the surrounding body of evidence. Conflicting or inconsistent results raise serious questions as to whether a particular claim is substantiated. If conflicts or inconsistencies exist in the scientific evidence, one should determine whether there are plausible explanations for such conflicts or inconsistencies. For

Dietary Supplements > Guidance for Industry: Substantiation for Dietary Supplement ...   Page 13 of 17
Case 1:20-cv-23564-MGC   Document 77-1   Entered on FLSD Docket 07/27/2021   Page 17 of
134

example, an inconsistency between two studies might be attributable to different concentrations of the dietary supplement, different test methodologies, different study populations,[11] or other factors.

There is no general rule for how many studies, or what combination of types of evidence, is sufficient to support a claim. However, the replication of research results in independently conducted studies makes it more likely that the totality of the evidence will support a claim.

Although the quality of individual pieces of evidence is important, each piece should be considered in the context of all available information; that is, the strength of the total body of scientific evidence is the critical factor in assessing whether a claim is substantiated.

*Example 18:* A firm intends to promote an herbal product "X" to "help maintain cognitive performance" of people who are fatigued. The firm has researched the scientific literature and found many studies that demonstrate that the botanical ingredient is effective. However, there are some studies that demonstrate no effect. Still other studies examined the botanical ingredient combined with other ingredients, typically caffeine, which demonstrated mixed positive and negative results. Many reports do not adequately describe the study participants and products examined. Consequently, it is not possible to explain the disparate results. However, the firm's review suggests that either the botanical and/or caffeine are the most likely dietary ingredients that act to maintain better cognition test results in fatigued study participants. As a result, the firm conducts a large, randomized, placebo-controlled study to compare the botanical ingredient against caffeine in the treatment of cognitive performance deficits associated with fatigue. The results demonstrate that caffeine improved cognition test results in all of the fatigued subjects that received caffeine, while test performance was unaffected in all subjects receiving the botanical ingredient. The study cannot explain the results reported in the earlier studies; however, it demonstrates that the botanical ingredient studied is most likely ineffective for improving or maintaining cognitive performance in fatigued people.

*Example 19:* A firm plans to promote its herbal product "to effectively relieve occasional, nocturnal leg cramps." The firm has one study demonstrating the product to be effective in ameliorating nocturnal leg cramps. The firm is also aware of several other randomized controlled trials that do not show a benefit. All these studies are of equal quality and used similar patient populations and test materials. When considered as a whole, even though some evidence to support the claim exists, the totality of the evidence does not support the proposed claim. If no plausible explanation can be found to explain the disparate results, the available evidence would probably not be considered adequate to substantiate the claim.

*Example 20:* An herbal product is promoted "to help you get to sleep when you have difficulty falling asleep." The firm has one randomized, placebo-controlled study in volunteers who had trouble falling asleep. The study showed that those who used the product decreased the amount of time needed time to fall asleep. There are several other high-quality studies, however, that found that the herbal ingredient used in the product did not consistently help people get to sleep. It is not clear whether the different results of the various studies are a consequence of differences in product formulation or dosage or some other factor. Even though the firm's single study is positive, it may not provide adequate substantiation because the totality of existing evidence suggests that the herbal ingredient does not decrease time to fall asleep in persons who have trouble falling asleep. Given the contrary evidence against the claim, it is unlikely that this sleep-related claim would be substantiated for this product.

Case 1:20-cv-23564-MGC   Document 77-1   Entered on FLSD Docket 07/27/2021   Page 18 of 134

**Example 21:** A company plans to promote its product containing ingredient X to athletes "to improve endurance performance." There are some well-designed published studies demonstrating that other products containing ingredient X are effective, but other well-designed studies show no effect for certain products containing ingredient X. The firm sponsored a randomized, blinded, six-month study comparing its product to four other products containing ingredient X in a dose (serving size)-response fashion. The findings demonstrate that the firm's product and two other products that provided the highest amount of ingredient X per day produced substantial, statistically significant improvements in athletic endurance. When the firm compared the results of this study to prior studies, the firm concluded that the explanation for previous conflicting study results is that when the serving size of ingredient X is below a certain amount, there is no measurable benefit. Taken together, the positive results from their study, and the identification of a plausible explanation to explain why some studies showed no positive effects, would likely provide evidence to substantiate adequately the endurance performance claim for the dietary supplement.

### F. *Conclusion*

Section 403(r)(6) of the Act requires dietary supplement manufacturers to have substantiation that structure/function, nutrient deficiency, and general well-being claims on a dietary supplement product's labeling are truthful and not misleading. To meet this statutory requirement, we recommend that manufacturers possess adequate substantiation for each reasonable interpretation of the claims. We intend to apply a standard that is consistent with the FTC standard of "competent and reliable scientific evidence" to substantiate a claim. We consider the following factors important to establish whether information would constitute "competent and reliable scientific evidence:"

- Does each study or piece of evidence bear a relationship to the specific claim(s)?

- What are the individual study's or evidence's strengths and weaknesses? Consider the type of study, the design of the study, analysis of the results, and peer review.

- If multiple studies exist, do the studies that have the most reliable methodologies suggest a particular outcome?

- If multiple studies exist, what do most studies suggest or find? Does the totality of the evidence agree with the claim(s)?

### III. Paperwork Reduction Act of 1995

This guidance contains information collections that are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520).

The time required to complete this information collection is estimated to range from 44 to 120 hours per response, depending on the nature of the claim, including the time to review instructions, search existing data sources, gather the data needed, and complete and review the information collection. Send comments regarding this burden estimate or suggestions for reducing this burden to:

Office of Nutrition, Labeling, and Dietary Supplements, HFS-800
Center for Food Safety and Applied Nutrition
Food and Drug Administration
5001 Campus Drive
College Park, MD 20740

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control number for this information collection is 0910-0626 (expires 08/31/2011).

---

[1] The Office of Nutrition, Labeling, and Dietary Supplements in FDA's Center for Food Safety and Applied Nutrition prepared this guidance document.

[2] Under section 403(r)(6)(A) of the Act (21 U.S.C. 343(r)(6)(A)), such a statement is one that "claims a benefit related to a classical nutritional deficiency disease and discloses the prevalence of such disease in the United States, describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, characterizes the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function, or describes general well-being from consumption for a nutrient or dietary ingredient...."

[3] Comments to the Draft Guidance published November 9, 2004 (69 FR 64942), questioned the constitutionality, under the First Amendment, of the substantiation requirement in section 403(r)(6), as interpreted by the Draft Guidance. This Guidance offers FDA's non-binding interpretation of what constitutes substantiation and does not change the statutory or Constitutional requirement in any way. We believe the statutory substantiation requirement in section 403(r)(6) is constitutional under the Supreme Court's analysis governing commercial speech in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York (447 U.S. 557 (1980)). Claims made under section 403(r)(6) are misleading when made without substantiation. The misleading nature of a claim made under section 403(r)(6) that is not substantiated cannot be cured by a disclaimer stating that the claim lacks support. For example, a product cannot claim "to promote the structure and function of the skeletal system" and then attempt to cure the misleading nature of the claim with a statement "no evidence exists that this product promotes the structure and function of the skeletal system." However, nothing in this Guidance addresses the circumstances under which a claim made under section 403(r)(6) that includes qualifying language may be substantiated.

[4] This guidance does not discuss the criteria to determine whether a statement about a dietary supplement is a structure/function claim under section 403(r)(6) of the Act or a disease claim. Please see the *Federal Register* of January 6, 2000 (65 FR 1000, codified at 21 CFR 101.93) (www.cfsan.fda.gov/~lrd/fr000106.html) for the final rule defining structure/function claims for dietary supplements and the January 9, 2002 Small Entity Compliance Guide for structure/function claims (www.cfsan.fda.gov/~dms/sclmguid.html)(Updated web reference: **Structure/Function Claims; Small Entity Compliance Guide (/Food/GuidanceRegulation/GuidanceDocu-mentsRegulatoryInformation/ucm103340.htm)**).

[5] See Report of the Commission on Dietary Supplement Labels, November 1997, at page 42. The Commission's recommendations on substantiation are at pages 42 through 45 of the report.

[6] See Bureau of Consumer Protection, Federal Trade Commission, "Dietary Supplements: An Advertising Guide for Industry," April 2001 (hereinafter referred to as "FTC Advertising Guide"), available at www.ftc.gov.

[7] *See, e.g. Vital Basics, Inc.,* C-4107 (Consent April 26, 2004); *see also In Re Schering Corp.,* 118 F.T.C. 1030, 1123 (1994).

[8] For example, a study using a conventional food or a multi-nutrient supplement would not substantiate a single ingredient dietary supplement claim. When the substance studied contains many nutrients and substances, it is difficult to study the nutrient or food components in isolation (Sempos, et al., 1999). It is not possible to accurately determine whether any observed effects of the substance were due to: 1) the substance alone; 2) interactions between the substance and other nutrients; 3) other nutrients acting alone or together; or 4) decreased consumption of other nutrients or substances contained in foods displaced from the diet by the increased intake of foods rich in the substance at issue. Furthermore, although epidemiological studies based on the recorded dietary intake of conventional foods have indicated a benefit for a particular nutrient, it has been subsequently demonstrated in an intervention study that the single ingredient nutrient-containing dietary supplement did not confer a benefit or actually was harmful. See Lichtenstein and Russell, 2005. We note that the D.C. Circuit Court in *Pearson v. Shalala*, 164 F.3d 650, 658 (D.C. Cir. 1999) indicated that FDA had "logically determined" that the consumption of a dietary supplement containing antioxidants could not be scientifically proven to reduce the risk of cancer where the existing research had examined only foods containing antioxidants as the effect of those foods on reducing the risk of cancer may have resulted from other substances. The court, however, concluded that FDA's concern with granting antioxidant vitamins a qualified health claim could be accommodated by simply adding a prominent disclaimer noting that the evidence for such a claim was inconclusive given that the studies supporting the claim were based on foods containing other substances that might actually be responsible for reducing the risk of cancer. Id. The court noted that FDA did not assert that the dietary supplements at issue would "threaten consumer's health and safety." Id. at 656. As the agency has stated in the context of qualified health claims, that is, claims regarding the relationship between a substance and the reduced risk of a disease, there is a more fundamental problem with allowing qualified health claims for nutrients in dietary supplements based solely on studies of foods containing those nutrients than the problem the D.C. Circuit held could be cured with a disclaimer. As noted in endnote 3, even if the effect of the specific component of the food constituting the dietary supplement could be determined with certainty, recent scientific studies have shown that nutrients in food do not necessarily have the same beneficial effect when taken in the form of a dietary supplement. Such studies established either that there was no benefit when the nutrients are taken as a supplement and some studies even showed an increased risk for the very disease the nutrients were predicted to prevent. We would expect similar issues with structure/functions claims made under § 403(r)(6). Thus, an observational study based on food does not provide competent and reliable scientific evidence for a dietary supplement and, and therefore, cannot substantiate a claim made under § 403(r)(6).

[9] See "Systems to Rate the Strength of Scientific Evidence. Evidence Report/Technology Assessment Number 47, "Agency for Healthcare Research and Quality and Research (AHRQ), Publication No. 02-E016, April 2002.

[10] See Spilker, B. *Guide to Clinical Trials*. Raven Press, New York, 1991.

[11] For example, with respect to human drug products, it is fairly well known that children and the elderly may experience different drug effects compared to those seen in the adult population. These differences may be due to physiological differences (such as hormonal differences, differences in kidney function, etc.) between children, adults, and the elderly.

This document supercedes the previous (draft) version, issued November 2004.

Case 1:20-cv-23564-MGC   Document 77-1   Entered on FLSD Docket 07/27/2021   Page 21 of 134

**More in Dietary Supplements
(/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/DietarySupplements/default.htm)**

# Bednarz Decl.

# EXHIBIT B

U.S. Department of Health and Human Services
National Institutes of Health



# Pilot Studies: Common Uses and Misuses

Although pilot studies are a critical step in the process of intervention development and testing, several misconceptions exist on their true uses and misuses. NCCIH has developed a Framework for Developing and Testing Mind and Body Interventions that includes brief information on pilot studies. Here we offer additional guidance specifically on the do's and don'ts of pilot work.

A pilot study is defined as "A small-scale test of the methods and procedures to be used on a larger scale" (Porta, *Dictionary of Epidemiology*, 5th edition, 2008). The goal of pilot work is not to test hypotheses about the effects of an intervention, but rather, to assess the feasibility/acceptability of an approach to be used in a larger scale study. Thus, in a pilot study you are not answering the question "Does this intervention work?" Instead you are gathering information to help you answer "Can I do this?"

## Uses of Pilot Studies

There are many aspects of feasibility and acceptability to examine to address the "Can I do this?" question. Here are some examples:

| Feasibility Questions | Feasibility Measures |
| --- | --- |
| Can I recruit my target population? | Number screened per month; number enrolled per month; average time delay from screening to enrollment; average time to enroll enough participants to form classes (group-based interventions) |
| Can I randomize my target population? | Proportion of eligible screens who enroll; proportion of enrolled who attend at least one session |
| Can I keep participants in the study? | Treatment-specific retention rates for study measures; reasons for dropouts |
| Will participants do what they are asked to do? | Treatment-specific adherence rates to study protocol (in-person session attendance, homework, home sessions, etc.); treatment-specific competence measures |
| Can the treatment(s) be delivered per protocol? | Treatment-specific fidelity rates |

| | |
|---|---|
| Are the assessments too burdensome? | Proportion of planned assessments that are completed; duration of assessment visits; reasons for dropouts |
| Are the treatment conditions acceptable to participants? | Acceptability ratings; qualitative assessments; reasons for dropouts; treatment-specific preference ratings (pre- and postintervention) |
| Are the treatment conditions credible? | Treatment-specific expectation of benefit ratings |

You may be able to think of other feasibility questions relevant to your specific intervention, population, or design. When designing a pilot study, it is important to set clear quantitative benchmarks for feasibility measures by which you will evaluate successful or unsuccessful feasibility (e.g., a benchmark for assessing adherence rates might be that at least 70 percent of participants in each arm will attend at least 8 of 12 scheduled group sessions). These benchmarks should be relevant to the specific treatment conditions and population under study, and thus will vary from one study to another. While using a randomized design is not always necessary for pilot studies, having a comparison group can provide a more realistic examination of recruitment rates, randomization procedures, implementation of interventions, procedures for maintaining blinded assessments, and the potential to assess for differential dropout rates. Feasibility measures are likely to vary between "open-label" designs, where participants know what they are signing up for, versus a randomized design where they will be assigned to a group.

In addition to providing important feasibility data as described above, pilot studies also provide an opportunity for study teams to develop good clinical practices to enhance the rigor and reproducibility of their research. This includes the development of documentation and informed consent procedures, data collection tools, regulatory reporting procedures, and monitoring procedures.

The goal of pilot studies is not to test hypotheses; thus, no inferential statistics should be proposed. Therefore, it is not necessary to provide power analyses for the proposed sample size of your pilot study. Instead, the proposed pilot study sample size should be based on practical considerations including participant flow, budgetary constraints, and the number of participants needed to reasonably evaluate feasibility goals.

This testing of the methods and procedures to be used in a larger scale study is the critical groundwork we wish to support in PAR-14-182, to pave the way for the larger scale efficacy trial. As part of this process, investigators may also spend time refining their intervention through iterative development and then test the feasibility of their final approach.

## Misuses of Pilot Studies

Rather than focusing on feasibility and acceptability, too often, proposed pilot studies focus on inappropriate outcomes, such as determining "preliminary efficacy." The most common misuses of pilot studies include:

- Attempting to assess safety/tolerability of a treatment,

- Seeking to provide a preliminary test of the research hypothesis, and

- Estimating effect sizes for power calculations of the larger scale study.

## Why can't pilot studies be used to assess safety and tolerability?

Investigators often propose to examine "preliminary safety" of an intervention within a pilot study; however, due to the small sample sizes typically involved in pilot work, they cannot provide useful information on safety except for extreme cases where a death occurs or repeated serious adverse events surface. For most interventions proposed by NCCIH investigators, suspected safety concerns are quite minimal/rare and thus, unlikely to be picked up in a small pilot study. If any safety concerns are detected, group-specific rates with 95 percent confidence intervals should be reported for adverse events. However, if no safety concerns are demonstrated in the pilot study, investigators cannot conclude that the intervention is safe.

## Why can't pilot studies provide a "preliminary test" of the research hypothesis?

We routinely see specific aims for feasibility pilot studies that propose to evaluate "preliminary efficacy" of intervention A for condition X. However, there are two primary reasons why pilot studies *cannot* be used for this purpose. First, at the time a pilot study is conducted, there is a limited state of knowledge about the best methods to implement the intervention in the patient population under study. Therefore, conclusions about whether the intervention "works" are premature because you don't yet know whether you implemented it correctly. Second, due to the smaller sample sizes used in pilot studies, they are not powered to answer questions about efficacy. Thus, any estimated effect size is uninterpretable – you do not know whether the "preliminary test" has returned a true result, a false positive result, or a false negative result (see Figure 1).

## Why can't pilot studies estimate effect sizes for power calculations of the larger scale study?

Since any effect size estimated from a pilot study is unstable, it does not provide a useful estimation for power calculations. If the effect size estimated from the pilot study was really too large (i.e., a false positive result, or Type I error), power calculations for the subsequent trial would indicate a smaller number of participants than actually needed to detect a clinically meaningful effect, ultimately resulting in a negative trial. On the other hand, if the effect size estimated from the pilot study was really too small (i.e., a false negative result, or Type II error), the subsequent trial might not even be pursued due to assumptions that the intervention does not work. If the subsequent trial was designed, the power calculations would indicate a much larger number of participants than actually needed to detect an effect, which may reduce chances of funding (too expensive), or if funded, would expose an unnecessary number of participants to the intervention arms (see Figure 1).

**Pitfalls of Estimating**
**"Preliminary Efficacy" in a Pilot Study**

Low ← Pilot Study Effect Size → High

**Type II Error**
**or False Negative Result**

Example: Pilot Study Shows
Very Weak Effect Size (~0.1)

— Power calculations indicate subsequent
efficacy study needs 500+
participants/intervention arm

**Potential Fallout:**

— May conclude intervention doesn't work
and never pursue efficacy study

— Efficacy study may be difficult to fund
(too expensive!)

— Efficacy study would involve an
unnecessarily large number of
participants (unethical risk exposure)

**Type I Error**
**or False Positive Result**

Example: Pilot Study Shows
Strong Effect Size (~1.0)

— Power calculations indicate subsequent
efficacy study only needs ~12
participants/intervention arm

**Potential Fallout:**

— Subsequent trial will be underpowered
to detect a clinically meaningful effect

Figure 1

## So what else can you do to provide effect sizes for power calculations?

Because pilot studies provide unstable estimates of effect size, the recommended approach is to base sample size calculations for efficacy studies on estimates of a clinically meaningful difference as illustrated in Figure 2. Investigators can estimate clinically meaningful differences by consideration of what effect size would be necessary to change clinical behaviors and/or guideline recommendations. In this process it might be beneficial to convene stakeholder groups to determine what type of difference would be meaningful to patient groups, clinicians, practitioners, and/or policymakers. In the determination of a clinically meaningful effect, researchers should also consider the intensity of the intervention and risk of harm vs. the expectation of benefit. Observational data and the effect size seen with a standard treatment can provide useful starting points to help determine clinically meaningful effects. For all of these methods, you should ask the question, "What would make a difference for you?" You might consider using several of these methods and determining a range of effect sizes as a basis for your power calculations.



Figure 2

## Conclusion

Pilot studies should not be used to test hypotheses about the effects of an intervention. The "Does this work?" question is best left to the full-scale efficacy trial, and the power calculations for that trial are best based on clinically meaningful differences. Instead, pilot studies should assess the feasibility/acceptability of the approach to be used in the larger study, and answer the "Can I do this?" question. You can read more about the other steps involved in developing and testing mind and body interventions on our framework Web page.

Additional Resources:

Leon AC, Davis LL, Kraemer HC. The role and interpretation of pilot studies in clinical research. *Journal of Psychiatric Research.* 2011;45(5):626-629.

Kraemer HC, Mintz J, Noda A, et al. Caution regarding the use of pilot studies to guide power calculations for study proposals. *Archives of General Psychiatry.* 2006;63(5):484-489.

Kistin C, Silverstein M. Pilot studies: a critical but potentially misused component of interventional research. *JAMA.* 2015;314(15):1561-1562.

Keefe RS, Kraemer HC, Epstein RS, et al. Defining a clinically meaningful effect for the design and interpretation of randomized controlled trials. *Innovations in Clinical Neuroscience.* 2013;10(5-6 Suppl A):4S-19S.

# Bednarz Decl.

# EXHIBIT C



Search FDA 

Home    Food    Ingredients, Packaging & Labeling    Labeling & Nutrition

# Letter Updating the Phosphatidylserine and Cognitive Function and Dementia Qualified Health Claim

SHARE    TWEET    LINKEDIN    PIN IT    EMAIL    PRINT

Back to Qualified Health Claims: Letters of Enforcement Discretion

November 24, 2004

Jonathan W. Emord
Emord and Associates, P.C.
1800 Alexander Bell Drive
Suite 200
Reston, Viginia 20191

Dear Mr. Emord:

This letter is in response to your letter dated December 3, 2003 to Daniel E. Troy, Chief Counsel, Food and Drug Administration (FDA or the agency). In this letter, which presented your position concerning the use of disease treatment studies as evidence of risk reduction, you stated, "In the phosphatidylserine/dementia and phosphatidylserine/cognitive dysfunction claim context, the scientific evidence supporting the risk reduction claims there in issue came from treatment studies (dealing with patients suffering from Alzheimer's, dementia, and senility)."[1]

In response to your letter, the agency re-evaluated the scientific evidence for the qualified health claims characterizing the relationship between phosphatidylserine and cognitive dysfunction, and phosphatidylserine and dementia, which FDA had originally evaluated in a letter dated May 13, 2003 (the May 2003 letter).[2] In that letter, the agency concluded that very limited and preliminary scientific research suggested that phosphatidylserine may reduce the risk of both cognitive dysfunction and dementia. In light of that conclusion, the agency stated its intention to consider the exercise of enforcement discretion for qualified claims regarding these relationships under certain circumstances described in the letter.[3]

This letter outlines FDA's rationale for its determination that the current evidence for the proposed health claims is still appropriate for consideration of a qualified health

claim. FDA was in error in its May 2003 letter of enforcement discretion stating that all the studies were in a diseased population. Although FDA characterized all the intervention studies submitted with your petition as mitigation studies in a diseased population (i.e., studies of whether phosphatidylserine could treat dementia or cognitive dysfunction by reducing their symptoms), the agency erred in that characterization. In fact, four studies were conducted in subjects who were without diagnosed dementia or cognitive dysfunction, but who had mild to moderate cognitive deterioration, age-associated memory impairment or age-associated cognitive decline and were therefore at risk of dementia and cognitive dysfunction beyond what occurs with the normal aging process. FDA was also in error in concluding that mitigation studies in diseased populations alone constituted credible evidence to substantiate the proposed claims. In fact, for mitigation studies to be considered relevant, additional evidence from non-diseased populations is needed to demonstrate that the mechanisms for the mitigation effects measured in the diseased populations are the same as the mechanisms for risk reduction effects measured in non-diseased populations. Such additional evidence is lacking. However, because there are studies conducted in non-diseased populations demonstrating beneficial effects of phosphatidylserine on subjects at risk of dementia and cognitive dysfunction, there is some credible evidence for a risk reduction relationship.

## I. Overview of Data and Eligibility for a Qualified Health Claim

The petition cited 278 publications as evidence to substantiate the relationship for this claim (see attached bibliography). These publications consisted of 49 review articles, 41 animal studies, 62 articles on prediction of and risk factors of dementia or cognitive dysfunction, 4 treatment/drug studies, 1 letter, 1 article on the prevalence of dementia, 2 meta-analyses, 1 abstract, 97 articles on the mechanism, progression and diagnosis of dementia or cognitive dysfunction, 5 articles on the effect of outcomes other than dementia or cognitive dysfunction, and 15 articles on the effect of phosphatidylserine on the risk or treatment of dementia or cognitive dysfunction in humans. FDA focused its review of the evidence to primary reports from human intervention studies that measured the incidence of the disease or health-related condition.

### A. Substance

A health claim characterizes the relationship between a substance and a disease or health-related condition (21 CFR 101.14(a)(1)). A substance means a specific food or component of food (21 CFR 101.14(a)(2)). The petition identified phosphatidylserine as the substance that is the subject of the proposed claims and stated that it can be derived from two sources, bovine brain cortex and soy lecithin. Phosphatidylserine is found in food. As a component of food, phosphatidylserine is a substance; however, as the agency indicated in the May 2003 letter,[4] soy lecithin phosphatidylserine (S-PS) and bovine brain cortex phosphatidylserine (BC-PS) may not be the same substance since they significantly differ in their fatty acid composition. As explained in the May 2003 letter,[5] these differences, along with differences in the non-

phosphatidylserine components of these ingredient sources, lead to uncertainty in generalizing results from studies done with BC-PS containing products to products containing S-PS, and vice versa.

## B. Disease or Health-Related Condition

A disease or health-related condition means damage to an organ, part, structure, or system of the body such that it does not function properly or a state of health leading to such dysfunctioning (21 CFR 101.14(a)(5)). The petition identified dementia and cognitive dysfunction as the diseases or health-related conditions that are the subjects of the proposed claims.

As was stated in the May 2003 letter,[6] FDA could not find a standard definition of cognitive dysfunction and therefore considered it to mean a disturbance of cognitive function. Cognitive function is "an intellectual process by which one becomes aware of, perceives, or comprehends ideas. It involves all aspects of perception, thinking, reasoning, and remembering."[7] Therefore, the terms "cognitive function" or "cognitive functions" subsume a number of interrelated brain activities. Examples of such activities include memory, learning, abstract thinking, language, visuospatial perception, and higher executive functions (planning, organizing, and sequencing).

The May 2003 letter[8] described dementia as a development of multiple cognitive deficits that include memory, and at least one of the following cognitive disturbances: aphasia, apraxia, agnosia, or a disturbance in executive functioning.[9] The cognitive deficits must be sufficiently severe to cause impairment in occupational or social functioning[10] and must represent a decline from a previous higher level of functioning. Therefore, dementia indicates the presence of cognitive decline/deterioration (defined below) that is severe enough to impair occupational or social functioning. In FDA's view, dementia and cognitive dysfunction are states of brain dysfunction resulting from the process of cognitive decline/deterioration.

FDA's scientific analysis in this letter refers to a number of diseases or health-related conditions other than dementia and cognitive dysfunction. Cognitive decline, sometimes referred to as cognitive deterioration, is a progressive worsening of one's cognitive abilities that may eventually lead to cognitive dysfunction and dementia. The Global Deterioration Scale for the assessment of dementia identifies various levels of cognitive status and progression of cognitive decline, beginning with the normal older adult (level 1) and progressing to severe cognitive decline/late dementia/severe Alzheimer's disease (level 7) (Reisberg et al., 1982).

For purposes of this current health claim evaluation, FDA identified four terms representing various levels of cognitive decline that occur before the onset of dementia and that are associated with increased risk of dementia and cognitive dysfunction: 1) age-associated memory impairment (AAMI), 2) mild cognitive impairment (MCI), 3) moderate cognitive decline/deterioration, and 4) age-associated cognitive decline (AACD). The scientifically credible phosphatidylserine studies

available to FDA for review involved subjects in all of the categories except MCI.

AAMI is a term established by a National Institute of Mental Health Working Group for the purpose of calling attention to the concept of memory changes with normal aging (Crook et al., 1986). AAMI is a common condition in individuals greater than 50 years of age. It is characterized by complaints of gradual memory impairment (subjective memory decline and objective memory loss) in everyday life within the limits of what is considered normal for age and in the absence of dementia. Individuals are required to score one standard deviation below the mean established for young adults on at least one of several standardized tests. Based on the Global Deterioration Scale for assessment of dementia, individuals with AAMI have very mild cognitive decline (level 2) (Reisberg et al., 1982). Individuals with AAMI have been shown to have a three-fold greater risk for development of dementia than individuals who do not meet AAMI criteria (Goldman and Morris, 2001).

Individuals with MCI complain of impaired memory, while their daily living activities are normal. Based on the Global Deterioration Scale for assessment of dementia, individuals with MCI have mild cognitive decline/deterioration (e.g., early confusional state) (level 3) (Reisberg et al., 1982). While not all people with MCI develop dementia, people with this condition have a significantly increased risk of dementia compared to the rest of the population.[11] Based on a review of various studies, subjects with MCI progress to dementia at a rate between 10 to 15 percent per year (Petersen et al., 2001). Because none of the scientifically credible phosphatidylserine studies available for FDA's consideration involved subjects with MCI, we are defining that condition here only to provide an additional reference point on the continuum between normal aging and dementia.

The diagnosis of AACD, also known as age-related cognitive decline (ARCD), is based on a more comprehensive evaluation of cognition than AAMI (Levy, 1994). In addition to memory, AACD/ARCD criteria include learning, attention, concentration and thinking. Individuals are required to score one standard deviation below the norm for their own age group (rather than the norm for young adults, which is used as the reference for AAMI) on standardized tests. Therefore, individuals with AACD/ARCD are considered to have a further progression in cognitive decline than those with AAMI, and have also been categorized as having moderate cognitive decline (Jorissen et al., 2001). Individuals classified as having AACD/ARCD progressed to dementia at a rate of 28.6 percent over 3 years (Ritchie et al., 2001). The Global Deterioration Scale for assessment of dementia defines moderate cognitive decline/deterioration as being a late confusional state and without dementia (level 4) (Reisberg et al., 1982). Some of the symptoms of moderate cognitive decline include some deficit in memory of one's personal history and decreased knowledge of current and recent events. If progression of cognitive decline occurs, then one begins to experience moderately severe cognitive decline/early dementia (level 5).

As discussed in the May 2003 letter,[12] because the possible causes of dementia are

likely the same as those for cognitive decline/deterioration[13] that may result in cognitive dysfunction, FDA considered dementia and cognitive dysfunction together in re-evaluating the scientific evidence for the relationship with phosphatidylserine.

## II. The Agency's Reconsideration of a Qualified Health Claim

### A. Assessment of Intervention Studies

In FDA's original review, the agency evaluated 15 human intervention studies submitted with your petition for review of these qualified health claims (Crook et al., 1992; Heiss et al., 1994; Heiss et al., 1993; Amaducci and the SMID Group, 1998; Delwaide et al., 1986; Engel et al., 1992; Schreiber et al., 2000; Crook et al., 1991; Cenacchi et al., 1993; Palmieri et al., 1987; Villardita et al., 1987; Granata and DiMichele, 1987; Allegro et al., 1987; Caffarra and Santamaria, 1987; and Sinfiorani et al., 1987). The agency located through a literature search another intervention study (Jorissen et al., 2001). Of these 16 studies, 7 studies included subjects diagnosed with dementia or severe cognitive deterioration, a characteristic of dementia (Crook et al., 1992; Cenachi et al., 1993; Heiss et al., 1994; Heiss et al., 1993; Amaducci, 1988; Delwaide et al., 1986; and Engel et al., 1992).

Although a number of animal studies have been conducted to ascertain the mechanism by which phosphatidylserine may help mitigate the symptoms of dementia, the petition provided no evidence to indicate that the mechanism for treating dementia is the same as for risk reduction of dementia and/or cognitive dysfunction. Therefore, FDA does not consider these 7 studies relevant to a claim for risk reduction in the general population.

Of the 9 remaining studies, 5 were open-label designs (Schreiber et al., 2000; Granata and DiMichele, 1987; Allegro et al., 1987; Caffarra and Santamaria, 1987; and Sinfiorani et al., 1987). For reasons discussed in the May 2003 letter,[14] these uncontrolled studies are not scientifically credible and therefore were not considered in the present FDA review.

The agency considers the 4 remaining intervention studies relevant because they evaluated subjects who were at risk of dementia and cognitive dysfunction but did not have these conditions. Two of these studies involved subjects with moderate cognitive deterioration (Palmieri et al., 1987; Villardita et al., 1987) and two studies involved subjects diagnosed with age-associated memory impairment (Jorissen et al., 2001; Crook et al., 1991). Some of the subjects in the Jorissen study also fulfilled the criteria for AACD. None of the subjects in these 4 studies was diagnosed with dementia or cognitive dysfunction. Thus, FDA considers these 4 studies relevant for evaluating whether phosphatidylserine intake reduces the risk of dementia and cognitive dysfunction.

Palmieri et al. (1987) was a 2 month randomized double blind, placebo controlled trial. Based on the Clifton Assessment Procedures method, Italian men (*n*=30) and women

(*n*=57) (55-80 years of age) were determined to have moderate cognitive deterioration and to be without dementia. These men and women received either a placebo or 300 mg/day of BC-PS. Compared to the placebo, supplementation with BC-PS significantly improved memory (as measured by the Five-Word Test (acquisition and recall method), daily activities, orientation and spontaneity (as measured by Plutchik Geriatric Scale rating).

Villardita et al. (1987) was a 3 month multi-center, double-blind, placebo controlled trial. Based on the Mini-Mental Status Examination, Italian men (*n*=85) and women (*n*=85) (55-80 years of age) were determined to have early, moderate cognitive deterioration and to be without dementia. These men and women received either a placebo or 300 mg/day of BC-PS. Compared to the placebo, supplementation with BC-PS significantly improved 14 of the 24 outcome measures that tested for attention, memory, and verbal skills.

Crook et al. (1991) was a 3 month double-blind placebo controlled study. U.S. men and women (total *n*=149) (50-75 years of age) were determined to have AAMI based on the Memory Complaint Questionnaire, the Weschler Memory Scale, and the Benton Visual Retention Test, and to be without dementia (Mini-Mental Status Examination score > 27). These men and women received either a placebo or 300 mg/day of BC-PS. Two subgroups were identified retrospectively based on the level of performance across all measures at baseline (92 subjects with relatively good memory and 57 subjects with relatively impaired memory). Compared to the placebo, supplementation with BC-PS significantly improved 6 of the 20 outcome measures for the total sample, which included 5 primary outcome variables (acquisition, delayed recall, facial recognition, telephone number recall and misplaced objects recall) at 4 evaluation points. For the relatively impaired subgroup, there was significant improvement for 12 of the 20 outcome measures with BC-PS supplementation.

Jorissen et al. (2001) was a 3 month double-blind, placebo controlled study. Dutch men and women (total *n*=120) (> 57 years of age) were determined to have AAMI based on the Memory Complaint Questionnaire and to be without dementia (Mini-Mental Status Examination score > 24). These men and women received either a placebo, 300 mg/day of S-PS, or 600 mg/day of S-PS. Compared to the placebo, no significant differences were observed for any of the efficacy variables measured (e.g., visual verbal learning test, memory scanning test, verbal fluency test) for either of the groups that received S-PS.

Although these four studies were all double-blind, placebo-controlled intervention studies, their scientific reliability is limited by flaws in design and analysis. As discussed in the May 2003 letter,[15] significant flaws present in one or more of these studies included the following, among others: 1) demographic and other baseline characteristics were not statistically compared (Palmieri et al., 1987); 2) multiple comparisons were made among the measured variable in the authors' analysis of the study, without applying appropriate statistical corrections to reduce the possibility of

finding statistically significant relationships by chance alone (Palmieri et al., 1987; Villardita et al., 1987; Crook et al., 1991); 3) a dataset on those who completed the study was not provided (Villardita et al., 1987); 4) lack of information as to whether outcome measures used in the study had been standardized, validated, and generally accepted (Crook et al., 1991; Jorissen et al., 2001), and 5) randomization of subjects was not based on subgroup category, making the interpretation of the subgroup results unclear (Crook et al., 1991).

### B. Strength of the Scientific Evidence

The current FDA reanalysis identified four intervention studies relevant for evaluating a possible relationship between phosphatidylserine and dementia and cognitive dysfunction (Crook et al., 1991; Jorissen et al., 2001; Palmieri et al., 1987; Villardita et al., 1987). These 4 studies included individuals, aged 50 years or more, who were at risk of dementia and cognitive dysfunction beyond what occurs with the normal aging process because they suffered from AAMI, AACD and/or moderate cognitive deterioration (Petersen et al., 1999; Ritchie et al., 2001; Goldman and Morris, 2002; Reisberg et al., 1982). None of the subjects in the four studies was diagnosed with dementia or cognitive dysfunction. Three of the four studies supported a relationship between intake of BC-PS and reduced risk of dementia and cognitive dysfunction by demonstrating a significant benefit from intake of BC-PS in subjects with AAMI or moderate cognitive deterioration (Palmieri et al., 1987; Villardita et al., 1987; Crook et al., 1991). The one study that showed no benefit involved the use of S-PS (Jorissen et al., 2001).

Based on FDA's reanalysis of the strength of the total body of scientific evidence for qualified health claims about phosphatidylserine and reduced risk of dementia and cognitive dysfunction, FDA concludes that the credible scientific evidence regarding these substance-disease relationships, while sufficient to support a qualified health claim, is very limited and preliminary. Furthermore, for the reasons discussed in FDA's May 2003, letter,[16] there is still considerable uncertainty about whether the effects of BC-PS and S-PS on reduced risk of dementia and cognitive dysfunction are similar or different. Thus, there is considerable uncertainty in generalizing results from studies done with BC-PS containing products as the test substance to products containing S-PS, and vice versa.

## III. Conclusions

Based on the agency's reanalysis of the credible intervention studies relevant to the relationship between phosphatidylserine and dementia and cognitive dysfunction, FDA continues to believe that the science provides very limited and preliminary evidence sufficient for qualified health claims about phosphatidylserine and reduced risk of these conditions, with the same qualifying language and enforcement discretion factors as outlined in the May 2003 letter.[17]

Please note that scientific information is subject to change, as are consumer

consumption patterns. FDA intends to evaluate new information that becomes available to determine whether it necessitates a change in this decision. For example, scientific evidence may become available that will support significant scientific agreement or that will no longer support the use of a qualified claim, or that raises safety concerns about the substance that is the subject of the claim.

Sincerely,

William K. Hubbard
Associate Commissioner for Policy and Planning

---

## References

Allegro, L., V. Favaretto and G. Ziiliotto. Oral Phosphatidylserine in Elderly Patients with Cognitive Deterioration: An Open Study. *Clinical Trials Journal*, 1987; 24(1):104-108.

Amaducci, L and the SMID Group. Phosphatidylserine in the Treatment of Alzheimer's Disease: Results from a Multicenter Study. *Psychopharmacology Bulletin*, 1988; 24(1):130-134.

Caffarra, P. and V. Santamaria. The Effects of Phosphatidylserine in Patients with Mild Cognitive Decline: An Open Trial. *Clinical Trials Journal*, 1987; 24(1):109-114.

Cenacchi, T., Bertoldin, T., Farina, C., Fiori, M.G., Crepaldi, and participating investigators. Cognitive Decline in the Elderly: A Double-Blind Placebo-Controlled Multicenter Study on Efficacy of Phosphatidylserine Administration. *Aging Clinical Experimental Research*, 1993; 5(2):123-133.

Crook, T.H., Tinklenberg, J., Yesavage, J., Petrie, W., Nunzi, M.G., and D.C. Massari. Effects of Phosphatidylserine in Age-Associated Memory Impairment. *Neurology*, 1991; 41:644-649.

Crook, T., Petrie, W., Wells, C., and D.C. Massari. Effects of Phosphatidylserine in Alzheimer's Disease. *Psychopharmacology Bulletin*, 1992; 28(1):61-66.

Crook, T.H., R.T. Bartus, S.H. Ferris, P. Whitehouse, G.D. Cohen, S. Gershon. Age-associated memory impairment: Proposed diagnostic criteria and measures of clinical damage - Report of a National Institute of Mental Health work group. *Developmental Neuropsychology*, 1986; 2:261-276

Delwaide, P.J., Gyselynck-Mambourg, A.M., Hurlet, A., and M. Ylieff. Double-Blind Randomized Controlled Study of Phosphatidylserine in Senile Demented Patients. *Acta Neurologica Scandinavica*, 1986; 73:136-140.

Dorland's Illustrated Medical Dictionary, 26th Edition. W.B. Saunders Company. Philadelphia and London, 1957.

Engel, R.R., Satzger, W., Günther, W., Kathmann, N., Bove, D., Gerke, S., Münch, U., and H. Hippius. Double-blind Cross-Over Study of Phosphatidylserine vs. Placebo in Patients with Early Dementia of the Alzheimer type. *European Neuropsychopharmacology*, 1992; 2:149-155.

Goldman, W.P., J.C. Morris. Evidence that age-associated memory impairment is not a normal variant of aging. *AlzheimerDisease Associated Disorders*, 2002;15:72-79.

Granata, Q., and DiMichele, J.D. Phosphatidylserine in Elderly Patients: An Open Trial. *Clinical Trials Journal*, 1987; 24(1):99-103.

Heiss, W.D., Kessler, J., Mielke, R., Szelies, B. and K. Herholz. Long-Term Effects of Phosphatidylserine, Pyritinol, and Cognitive Training in Alzheimer's Disease. A Neuropsychological, EEG and PET Investigation. *Dementia*, 1994; 5:88-98.

Heiss, W.D., Kessler, J., Slansky, I., Mielke, R., Szelies, B. and K. Herholz. Activation PET as an Instrument to Determine Therapeutic Efficacy in Alzheimer's Disease. *Annals of the New York Academy of Sciences*, 1993; 695:327-331.

Jorissen, B.L., Brouns, F., Van Boxtel, M.P., Ponds, W.W., Verhey, F.R., Jolles, J and W.J. Riedel. The Influence of Soy-Derived Phosphatidylserine on Cognition in Age-Associated Memory Impairment. *Nutritional Neuroscience*, 2001; 4(2):121-134.

Levy, R. Aging-associated cognitive decline. Working party of the International Psychogeriatric Association in collaboration with the World Health Organization. *International Psychogeriatrics*, 1994;6:63-68.

Mani, R.B. "Memorandum Summarizing the Review and Evaluation of Clinical Data on Phosphatidylserine and Cognitive Impairment and Dementia," Division of Neuropharmacological Drug Products, Center for Drug Evaluation and Research, Food and Drug Administration, November 1, 2002.

Mosby's Medical, Nursing, and Allied Health Dictionary. Mosby, St. Louis MO, 4th Edition, 1994.

Palmieri, G., Palmieri, R., Inzoli, M.R., Lombardi, G., Sottini, C., Tavolato, B., and G. Giometto. Double-Blind Controlled Trial of Phosphatidylserine in Patients with Senile Metal Deterioration. *Clinical Trials Journal*, 1987; 24(1):73-83.

Peteresen, R.C., Doody, R., Kurz, A., Mohs, R.C., Morris, J.C., Rabins, P.V., Ritchie, K., Rossor, M., Thal, L., and Winblad, B. Current concepts in mild cognitive impairment. *Archives of Neurology*, 2001;58:1985-1992.

Reisberg, B., S.H. Ferris, M.J. de Leon, and T. Crook. The Global Deteritoration Scale

for assessment of primary degenerative dementia. *American Journal of Psychiatry*, 1982; 139(9):1136-1139.

Ritchie, K, Artero, S., Touchon, J. Classification criteria for mild cognitive impairment. *American Academy of Neurology*, 2001;56:37-42.

Schreiber, S., Kampf-Sherf, O., Gorfine, M., Kelly, D., Oppenheim, Y., and B. Lerner. An Open Trial of Plant-Source Derived Phosphatidylserine for Treatment of Age-Related Cognitive Decline. *Israel Journal of Psychiatry and Related Sciences*, 2000; 37(4):302-307.

Sinforiani, E., Agostinis, C., Merlo, P., Gualteri, S., Mauri, M., and A. Mancuso. Cognitive Decline in Ageing Brain: Therapeutic Approach with Phosphatidylserine. *Clinical Trials Journal*, 1987; 24(1):115-124.

Spilker, B. *Guide to Clinical Trials*. Raven Press, New York, NY, 1991.

Villardita, C., Grioli, S., Salmeri, G., Nicoletti, F., and G. Pennisi. Multicentre Clinical Trial of Brain PS in Elderly Patients with Intellectual Deterioration. *Clinical Trials Journal*, 1987; 24(1): 84-93.

---

[1] Letter from Jonathan W. Emord, Esq., Emord & Associates, P.C., to FDA Chief Counsel Dan Troy (December 3, 2003).

[2] Letter from Christine L. Taylor, Ph.D., FDA to Jonathan W. Emord, Esq., Emord & Associates, P.C. (May 13, 2003) <<a href="ds-ltr36.html">http://www.cfsan.fda.gov/~dms/ds-ltr36.html>.

[3] Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, pp. 11-12.

[4] Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, p. 4.

[5] Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, p. 5.

[6] Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, p. 5.

[7] Mosby's Medical, Nursing and Allied Health Dictionary, 4th edition, 1994.

[8] Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, p. 5.

[9] Aphasia is defined as defect or loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language, due to injury or disease of the brain (Dorland's Medical Dictionary, 2002). Apraxia is defined as loss of ability to carry out familiar, purposeful movements in the absence of paralysis or other motor or sensory impairment (Dorland's Medical Dictionary, 2002). Agnosia is defined as loss of the power to recognize the import of sensory stimuli; the varieties of agnosia

correspond with the several senses and are distinguished as auditory, visual, olfactory, gustatory, and tactile (Dorland's Medical Dictionary, 2002.). Executive functioning is defined as planning, prioritizing, sequencing, self-monitoring, self-correcting, inhibiting, initiating, controlling or altering behavior (, 2003).

(10)Mani, 2002

(11)The Dementias: Hope Through Research

(12)Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, p. 6.

(13)See footnote 10.

(14)Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, pp. 6-7.

(15)Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, pp. 8-9.

(16)Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, p. 5.

(17)Letter from Christine L. Taylor to Jonathan W. Emord, *supra* note 2, pp. 11-12.

---

This document was issued on November 24, 2004.
For more recent information see Dietary Supplements

---

Original petition at Dockets

Phosphatidylserine and Cognitive Dysfunction and Dementia (Qualified Health Claim: Final Decision Letter) May 13, 2003

| More in Labeling & Nutrition |
|---|
| Label Claims |
| Front-of-Package Labeling Initiative |
| Nutrition Facts Label Programs and Materials |
| Nutrition Labeling Information for Restaurants & Retail Establishments |

Page Last Updated: 04/01/2015
Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.
Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility    Careers    FDA Basics    FOIA    No FEAR Act    Site Map    Nondiscrimination

Website Policies

**U.S. Food and Drug Administration**
10903 New Hampshire Avenue
Silver Spring, MD 20993
1-888-INFO-FDA (1-888-463-6332)

Contact FDA

| | | |
|---|---|---|
| FDA Archive | Emergency Preparedness | Federal, State & Local Officials |
| Combination Products | International Programs | Consumers |
| Advisory Committees | News & Events | Health Professionals |
| Regulatory Information | Training & Continuing Education | Science & Research |
| Safety | Inspections & Compliance | Industry |

# Bednarz Decl.

# EXHIBIT D



100 S. Wacker Dr. | Suite 2000      312.466.1033 PHONE
Chicago, IL 60606                   312.884.7352 FAX

AminTalati.com

AMIN | TALATI
WASSERMAN

*# 868*

June 7, 2019

Office of Food Additive Safety (HFS-200)
Center for Food Safety and Applied Nutrition
U.S. Food and Drug Administration
5001 Campus Drive
College Park, MD 20740

**Re: Generally Recognized as Safe (GRAS) Notice for Coffeeberry® Coffee Fruit Extract**

Dear Sir/Madam:

Pursuant to 21 C.F.R. part 170, subpart E, VDF FutureCeuticals, Inc. hereby submits the enclosed notice, that use of its Coffeeberry® Coffee Fruit Extract at levels of up to 300 mg/serving in conventional foods is excluded from the premarket approval requirements of the Federal Food, Drug, and Cosmetic Act because the notifier has determined that such use is generally recognized as safe (GRAS).

Sincerely,

Abhishek Gurnani
Amin Talati Wasserman, LLP
100 S. Wacker Drive, Suite 2000
Chicago, IL 60606
(312) 327-3325 (direct)
Email: Abhishek@AminTalati.com

Encl.



RECEIVED

JUN 1 0 2019

OFFICE OF
FOOD ADDITIVE SAFETY

Lawyers for the Lifecycle of **Foods, Dietary Supplements, Cosmetics, Drugs & Medical Devices**

# EVALUATION OF THE GENERALLY RECOGNIZED AS SAFE (GRAS) STATUS OF

## COFFEEBERRY® COFFEE FRUIT EXTRACT

### AS A FOOD INGREDIENT

Prepared for:
**VDF FutureCeuticals, Inc.**
2692 N. St. Rt. 1-17
Momence, IL 60954

&

Amin Talati Upadhye, LLP
100 S. Wacker Dr., Suite 2000
Chicago, IL 60606

Prepared by:
Soni & Associates Inc.
749 46th Square
Vero Beach, FL 32968

## Panel Members

Robert L. Martin., Ph.D.
John A. Thomas, Ph.D., F.A.C.T., F.A.T.S.
Madhusudan G. Soni, Ph.D., F.A.C.N., F.A.T.S.

May, 2019

# EVALUATION OF THE GENERALLY RECOGNIZED AS SAFE (GRAS) STATUS OF COFFEEBERRY® COFFEE FRUIT EXTRACT AS A FOOD INGREDIENT

## TABLE OF CONTENTS

Part I- SIGNED STATEMENT AND CERTIFICATION .......................................................5

1.1.     Basis of Conclusion ...........................................................................5

1.2.     Name and address of organization: ....................................................5

1.3.     Name of substance: ............................................................................5

1.4.     Intended conditions of use of Coffeeberry® Coffee Fruit Extract: .......................5

1.5.     Statutory Basis for GRAS conclusion: .................................................5

1.6.     Exemption from Premarket approval requirements: ...............................5

1.7.     Availability of data and information: ...................................................6

1.8.     Data exempt from Disclosure: .............................................................6

1.9.     Certification: .....................................................................................6

1.10.    Name, position/title of responsible person who signs dossier and signature: ....... 6

1.11.    FSIS/USDA – Use in Meat and/or Poultry: ..........................................7

Part II- IDENTITY AND TECHNICAL INFORMATION ...................................................8

2.1.     Description .........................................................................................8

2.2.     Botanical identification .......................................................................8

2.3.     Specifications .....................................................................................9

2.4.     Manufacturing Process .......................................................................11

2.4.1.   Harvesting of Coffee Fruit ..................................................................11

2.4.2.   Production Process ..............................................................................12

Part III- DIETARY EXPOSURE ..................................................................................13

3.1.     Proposed Use Levels and Food Categories ..........................................13

3.2.     Estimated Daily Intake .......................................................................14

Part IV- SELF LIMITING LEVELS OF USE ..................................................................16

Part V- EXPERIENCE BASED ON COMMON USE IN FOOD BEFORE 1958 ............17

Part VI- NARRATIVE ................................................................................................18

6.1.     Traditional and Current Uses ..............................................................18

6.2.      Data Pertaining to Safety.......................................................................................**18**

6.2.1.    Pivotal Studies of Coffeeberry® Coffee Fruit Extract ..........................................**19**

6.2.1.1   Fourteen-Day Gavage Study with Coffeeberry® Coffee Fruit Extract..............**19**

6.2.1.2   Subchronic Toxicity Study of Coffeeberry® Coffee Fruit Extract .....................**20**

6.2.1.3   Mutagenicity Study of Coffeeberry® Coffee Fruit Extract (Ames Assay).........**22**

6.2.2.    Secondary Published Studies of Other CoffeeBerry® products..........................**23**

6.2.2.1.  Animal Toxicity Studies of Coffeeberry® Whole Coffee Fruit Powder and
          Coffeeberry® Coffee Fruit Water Extract ...................................................**23**

6.2.2.1.1. Seven Day Dietary Exposure Study of CoffeeBerry® Whole Coffee Fruit Powder
          ...................................................................................................................**24**

6.2.2.1.2. Fourteen Day Feeding Studies of CoffeeBerry® Whole Coffee Fruit Powder and
          Coffeeberry® Coffee Fruit Water Extract ...................................................**24**

6.2.2.2.  Mutagenicity and Genotoxicity Studies of Other CoffeeBerry® products.........**26**

6.2.2.2.1. Ames Assay ................................................................................................**26**

6.2.2.2.2. *In vivo* Micronucleus Test with Coffeeberry® Whole Coffee Fruit Powder .......**27**

6.2.3.    Human Studies .........................................................................................**28**

6.2.3.1.  Human Studies with Coffeeberry® Coffee Fruit Extract ...............................**28**

6.2.3.1.1. Reyes-Izquierdo et al. (2013a)....................................................................**28**

6.2.3.2.  Human Studies with Other Coffeeberry® Products......................................**29**

6.2.3.2.1. Ostojic et al. (2008) ...................................................................................**29**

6.2.4.    Other Studies with Coffee Fruit .................................................................**29**

6.2.4.1.  Nagasawa et al. (1995)..............................................................................**30**

6.2.4.2.  Nagasawa et al. (1996a).............................................................................**30**

6.2.4.3.  Nagasawa et al. (1996b).............................................................................**31**

6.2.4.4.  Kobayashi et al. (1996)...............................................................................**32**

6.2.4.5.  Kobayashi et al. (1997)...............................................................................**33**

6.2.4.6.  Nasagawa et al. (1999)...............................................................................**33**

6.2.4.7.  Udagawa and Nagasawa (2000) ..................................................................**34**

6.2.4.8.  Nagasawa et al. (2001)...............................................................................**35**

6.2.5.    Safety of Chlorogenic Acids .......................................................................**36**

6.2.5.1.  Metabolic Fate of Chlorogenic Acids ...........................................................**36**

**6.2.5.2.    Toxicity Studies of Chlorogenic Acids** ....................................................................**37**

**6.2.6.       Corroborative Information** ...........................................................................................**38**

**6.2.6.1.    Evaluation by Health Canada** .....................................................................................**38**

**6.7.         Expert Panel Review, Summary and Discussion**.........................................................**39**

**6.8.         Expert Panel Conclusion** ............................................................................................**42**

**Part VII- SUPPORTING DOCUMENTS AND REFERENCES**.......................................**43**

## Part I- SIGNED STATEMENT AND CERTIFICATION

### 1.1. Basis of Conclusion

This GRAS conclusion for use of Coffeeberry® Coffee Fruit Extract as a food ingredient has been reached in accordance with requirements as defined in 21 CFR 170.220.

### 1.2. Name and address of organization:

**VDF FutureCeuticals, Inc.**
2692 N. St. Rt. 1-17
Momence, IL 60954
USA

Phone: 1-815-507-1470
Fax: 1-815-472-3529
Email: RWexler@futureceuticals.com

### 1.3. Name of substance:

The name of the substance of this GRAS assessment is Coffeeberry® Coffee Fruit Extract.

### 1.4. Intended conditions of use of Coffeeberry® Coffee Fruit Extract:

Coffeeberry® Coffee Fruit Extract is intended to be used as a food ingredient and as an antioxidant in selected conventional food products, such as Flavored Water/Energy Drink; Coffee/Tea; RTM Beverages; Milk Products (pre-work out); Clusters/Bars; Fruit Juices; Vegetable Juices/Blends; Chocolate; Candy; and Chewing gum, at use levels of up to 300 mg/serving (reference amounts customarily consumed, 21 CFR 101.12). It is recognized that there are Standard of Identity requirements for some of the specified foods and these foods will not be referred to by their commonly recognized names.

### 1.5. Statutory Basis for GRAS conclusion:

This GRAS conclusion is based on scientific procedures in accordance with 21 CFR 170.30(a) and 170.30(b).

### 1.6. Exemption from Premarket approval requirements:

VDF FutureCeuticals, Inc. (FutureCeuticals) has concluded that Coffeeberry® Coffee Fruit Extract is not subject to the premarket approval requirements of the Federal Food, Drug, and Cosmetic Act based on our conclusion that Coffeeberry® Coffee Fruit Extract, meeting the specifications cited herein, and when used as a food ingredient and as an antioxidant, is GRAS and is therefore exempt from the premarket approval requirements.

It is also our opinion that other qualified and competent scientists reviewing the same publicly available toxicological and safety information would reach the same conclusion. Therefore, we have also concluded that Coffeeberry® Coffee Fruit Extract, when used as described in this dossier, is GRAS based on scientific procedures.

### 1.7. Availability of data and information:

The data and information that are the basis for this GRAS conclusion will be made available to FDA upon request by contacting Mr. Wexler at the below address. The data and information will be made available to FDA in a form in accordance with that requested under 21 CFR 170.225(c)(7)(ii)(A) or 21 CFR 170.225(c)(7)(ii)(B).

Mr. J. Randal Wexler
Vice President and General Counsel
VDF FutureCeuticals, Inc.
2692 N. St. Rt. 1-17
Momence, IL 60954
USA

Phone: 1-815-507-1439
Email: RWexler@futureceuticals.com

### 1.8. Data exempt from Disclosure:

Part I through Part VII of this GRAS assessment does not contain any privileged or confidential information such as trade secrets and/or commercial or financial information and can be made publicly available.

### 1.9. Certification:

FutureCeuticals certifies that, to the best of its knowledge, this GRAS conclusion is based on a complete, representative, and balanced dossier that includes all relevant information, available and obtainable by FutureCeuticals, including any favorable or unfavorable information, and pertinent to the evaluation of the safety and GRAS status of the use of Coffeeberry® Coffee Fruit Extract. FutureCeuticals accepts responsibility for the GRAS conclusion that has been made for Coffeeberry® Coffee Fruit Extract as described in this dossier.

### 1.10. Name, position/title of responsible person who signs dossier and signature:

Mr. J. Randal Wexler
Vice President and General Counsel
VDF FutureCeuticals, Inc.
2692 N. St. Rt. 1-17
Momence, IL 60954
USA

Signature: 

**1.11. FSIS/USDA – Use in Meat and/or Poultry:**

FutureCeuticals does not intend to add Coffeeberry® Coffee Fruit Extract to any meat and/or poultry products that come under USDA jurisdiction.  Therefore, 21 CFR 170.270 does not apply.

## Part II- IDENTITY AND TECHNICAL INFORMATION

### 2.1. Description

The subject of this GRAS assessment, Coffeeberry® Coffee Fruit Extract is a standardized powder derived from coffee fruit of the plant *Coffea arabica*. The extract is a tan-brown colored powder with characteristic odor and taste. It is prepared by water/ethanol extraction of whole ground coffee fruit (including the coffee bean). General descriptive characteristics of Coffeeberry® Coffee Fruit Extract are summarized in Table 1. The active constituents of the extract are phenolic acids.

**Table 1. General Descriptive Characteristics of Coffeeberry® Coffee Fruit Extract**

| Parameter | Description (FutureCeuticals, 2017)* |
|---|---|
| Plant Source | *Coffea Arabica* |
| Part used | Fruit |
| Starting material | Ground and dried whole fruit |
| Active constituents | Phenolic acids |
| Synonyms | Coffee cherry extract |
| Appearance | Dried powder |
| Color | Tan brown |
| Odor | Characteristic |
| Taste | Characteristic |
| Storage | Cool, Dry |
| Shelf life | 2 years |

*Based on information provided by FututreCeuticals (2017)

### 2.2. Botanical identification

The hierarchical classification of the source material, *Coffea arabica* is presented in Table 2. The plant is famous for its seeds or "beans," which are the source for a commonly consumed drink around the world, coffee. The genus Coffea is taxonomically placed within the flowering plants of the family Rubiaceae and is considered to comprise three subgenera: Subgenus Coffea (having about 90 spp.) with significant commercial relevance, and subgenera Psilanthopsis and Baracoffea that have only minor commercial relevance (Chevalier, 1942; 1947; Leroy, 1961). The Coffea plant, an evergreen shrub or small tree having dark green, glossy leaves, is thought to have originated in southern Asia or in Africa. It is now cultivated as an agricultural crop in various parts of the world, mostly at latitudes less than 30 degrees north or south of the equator, and most commonly at elevations of 1000-2000 meters (Wrigley, 1988). The fruit is a small green cherry that turns bright red when ripe.

**Table 2. Taxonomical Classification of *Coffea arabica***

| Rank | Scientific Name and Common Name |
|---|---|
| Kingdom | Plantae – Plants |
| Subkingdom | Tracheobionta – Vascular plants |
| Superdivision | Spermatophyta – Seed plants |
| Division | Magnoliophyta – Flowering plants |
| Class | Magnolipsoda- Dicotyledons |
| Subclass | Asteridae |
| Order | Rubiales |
| Family | Rubiaceae – Madder family |
| Genus | *Coffee* L. – coffee |
| Species | *Coffea arabica* L. – Arabian coffee |

USDA, Natural Resources Conservation Service[1]

## 2.3. Specifications

Food grade specifications of Coffeeberry® Coffee Fruit Extract by FututreCeuticals are summarized in Table 3. The phenolic acid content of Coffeeberry® Coffee Fruit Extract is 40% or greater, while the caffeine content is approximately 1-2%. Analytical results from four non-consecutive lots (Table 4) demonstrate that Coffeeberry® Coffee Fruit Extract is produced consistently and meets the food grade specifications. Coffeeberry® Coffee Fruit Extract is completely soluble in water. The residual solvent levels for ethanol used in the extraction are below the Joint FAO/WHO Expert Committee on Food Additives (JECFA) and/or Code of Federal Regulations (CFR) limits for these solvents in the manufacturing of other food ingredients. The composition and nutritional profile of Coffeeberry® Coffee Fruit Extract is presented in Table 5.

**Table 3. Specifications of Coffeeberry® Coffee Fruit Extract\***

| Parameter | Characteristics | Method |
|---|---|---|
| Particle size | ≥98% passing through #40 sieve | FCCM P.2.1 |
| Moisture (%) | ≤10 | FCCM P.1.1 |
| Color | Tan/brown | Visual |
| Solubility in water | Soluble | In house |
| Phenolic acids (%) | ≥40 | FCCM C.2.5 |
| Caffeine (%) | 1-2 (approximately) | USP |
| Residual solvent (ethanol) levels (mg/kg) | 1000 | USP |
| Identity | Characteristic | FTIR |
| **Contaminants** | | |
| Pesticides | Meets EPA Limits | AOAC 2007.01 |
| Aflatoxins Sum of B1, B2, G1, G2 | < 4 ppb | AOAC 994.08 |
| Ochratoxin A | <10 ppb | AOAC 994.08 |
| **Heavy metals** | | |
| Arsenic (mg/kg) | ≤ 1 | AOAC 993.14 |
| Cadmium (mg/kg) | ≤1 | AOAC 993.14 |
| Lead (mg/kg) | ≤1 | AOAC 993.14 |
| Mercury (mg/kg) | ≤0.5 | AOAC 993.14 |
| **Microbiological purity** | | |
| Aerobic plate count (cfu/g) | ≤10,000 | AOAC 990.12 |
| Yeast and mold (cfu/g) | ≤200 | AOAC 997.02 |
| Coliforms (cfu/g) | ≤10 | AOAC 991.14 |
| *E. coli* (cfu/g) | <10 | AOAC 991.14 |
| *Salmonella* spp. (in 375 g) | Negative | FDA BAM, Ch. 5 |
| Coag.+ *Staph*. (in 1 g) | Negative | FDA BAM, Ch. 12 |

\*Based on information provided by FututreCeuticals (2017)

**Table 4. Results of Testing of Four Lots of Coffeeberry® Coffee Fruit Extract Powder**

| Parameter | Specifications | Lot Number |
|---|---|---|

[1] Available at: https://plants.usda.gov/core/profile?symbol=COAR2

| Particle size | ≥98% passing through #40 sieve | 100% | 100% | 100% | 100% |
|---|---|---|---|---|---|
| Moisture (%) | ≤10 | 1.5 | 1.5 | 3.8 | 1.6 |
| Color | Tan/brown | Complies | Complies | Complies | Complies |
| Solubility | Soluble | Complies | Complies | Complies | Complies |
| ORAC (μmol TE/g) | ≥6,000 | 8,326 | 7,572 | 9,642 | 8,770 |
| Phenolic acids (%) | ≥40 | 43.1 | 42.6 | 45.03 | 50.80 |
| Caffeine (%) | 1-2 (approximately) | 1.0 | 1.0 | 2.7 | 2.2 |
| Residual solvent (ethanol) levels (mg/kg) | 1000 | <200 | <200 | <200 | <200 |
| **Contaminants** | | | | | |
| Pesticides | Meets EPA Limits | Complies | Complies | Complies | Complies |
| Aflatoxins Sum of B1, B2, G1, G2 | <4 ppb | ND | ND | ND | ND |
| Ochratoxin A | <10 ppb | ND | ND | ND | ND |
| **Heavy metals** | | | | | |
| Arsenic (mg/kg) | ≤1 | <0.020 | <0.020 | <0.020 | <0.020 |
| Cadmium (mg/kg) | ≤1 | <0.020 | <0.020 | <0.020 | <0.020 |
| Lead (mg/kg) | ≤1 | 0.105 | 0.121 | 0.035 | 0.031 |
| Mercury (mg/kg) | ≤0.5 | 0.061 | 0.081 | 0.021 | <0.020 |
| **Microbiological** | | | | | |
| APC (cfu/g) | ≤10,000 | <1,000 | <1,000 | <1,000 | 2,000 |
| Yeast/mold (cfu/g) | ≤200 | <10 | <10 | <10 | 10 |
| Coliforms (cfu/g) | ≤10 | <10 | <10 | <10 | <10 |
| E. coli (cfu/g) | ≤10 | <10 | <10 | <10 | <10 |
| C. + Staph. | Negative | Complies | Complies | Complies | Complies |
| Salmonella | Negative | Complies | Complies | Complies | Complies |

Source: FutureCeuticals (2017)

**Table 5. Compositional Analysis of Coffeeberry® Coffee Fruit Extract**

| Parameter | Quantitative composition |
|---|---|
| Moisture (%) | 2.0 |
| Protein (%) | 9.0 |
| Carbohydrates (%) | 11.4 |
| Total fat (%) | 0.2 |
| Saturated fat (%) | 0.1 |
| Monounsaturated fat (%) | <0.1 |
| Polyunsaturated fat (%) | <0.1 |
| Ash (%) | 16.2 |
| Polyphenols (%) | 52.0 |
| Trigonelline (%) | 3.4 |
| Organic Acids (%) | 3.8 |
| Caffeine (%) | 2.0 |

Source: FutureCeuticals (2017)

## 2.4. Manufacturing Process

### 2.4.1. Harvesting of Coffee Fruit

The *Coffea* plant produces clusters of simultaneously blooming white flowers, each of which subsequently develops into an oval cherry-like fruit. Each cherry consists of an exocarp, pulp, mucilage, and generally two central seeds (or "beans"). The fruit usually achieves ripeness in seven to nine months. Immature fruit is green, but the fruit gradually turns bright red as it ripens (Wrigley, 1988; Sivetz and Desrosier, 1979). During conventional coffee production, coffee processers strip off the fruit that surrounds the seed (Rothfos, 1980; Clarke and Macrae, 1987). Only the seeds of the *Coffea* fruit are used to produce the well-known and much-consumed beverage known as coffee, while the entire fruit is used to produce Coffeeberry® Coffee Fruit Extract, the subject of the present GRAS assessment.

During designated times within the coffee harvest season, the whole coffee fruit is harvested by hand at specific growth stages ranging from sub-ripe to maturity. Only unblemished fruit is selected. After harvesting, the fruit is washed and subsequently quick-dried in food-grade stainless-steel coffee-cherry dryers according to a proprietary protocol. This process yields a dried whole coffee fruit that can be ground for use as a food ingredient or further processed by various extraction methods.

The coffee fruit has long been recognized as having inherent nutritional and health-enhancing potential, including antioxidant capacity (Napolitano et al. 2007; Garcia et al. 2008; Serafini and Testa, 2009). However, the cherry is highly perishable (Pittet et al., 1996; Bucheli et al., 2000) and, until a recent discovery (Miljkovic et al., 2004a, 2004b), has been prone to rapidly develop both extensive bacterial contamination and molds that generate undesirable toxic secondary metabolites known as mycotoxins.

Frank et al. (1965) analyzed the bacterial load of decomposing Kona coffee fruits and concluded that it was dominated by Gram negative organisms, especially *Erwinia dissolvens*. Later analyses by Silv et al. (2000) of Brazilian coffee fruits isolated over 44 bacterial genera and several yeast genera in which they found that Gram negative bacteria dominated in wet years while Gram positive bacteria were more prevalent during dry years. The primary risk factor is contamination by pectinolytic yeasts such as *Saccharomyces* and *Aspergillus* species (Agate and Bhat, 1966) and *Aspergillus* species which produce ochratoxin A (Bucheli et al., 2000; Bucheli and Taniwaki, 2002; Viani, 2002; Napolitano et al., 2007). Consequently, the coffee fruit, other than its seed, has traditionally been considered to be waste material unsuitable for food use, and has typically been discarded or used as fertilizer (Pandey et al., 2000).

The new proprietary technology for cultivation, harvesting, and subsequent processing of whole coffee fruit (including the seed) has eliminated the risk of bacterial and fungal contamination and the production of mycotoxins (Miljkovic et al., 2004a, 2004b). The whole coffee fruit can then be used to produce dried whole coffee fruit powders and granules.

In order to characterize the degree of concentration achieved by water/ethanol extraction, total polyphenols and Oxygen Radical Absorbent Capacity (ORAC) levels were measured in 8 lots of whole fruit powder and 6 of water/ethanol extract powder. The mean levels of total polyphenols were 4.32 and 45.10% respectively, indicating a concentration of polyphenols of 10.43 times higher in the water/ethanol extract as compared to the whole fruit powder. Based on mean ORAC levels, concentrations of water/ethanol extract over whole fruit powder was 8.18.

Averaging the degrees of concentration of these two markers—total polyphenols and ORAC levels—it appears that reasonable figures for the overall degree of concentration is 9 for the water/ethanol extract.

### 2.4.2. Production Process

The production process for Coffeeberry® Coffee Fruit Extract is illustrated in Figure 1. Coffeeberry® Coffee Fruit Extract is manufactured according to current good manufacturing practices (GMPs). In brief, the manufacturing starts with harvesting fresh fruits that are subjected to washing with water within six hours of harvest. The washing is repeated one more time and the washed fruits are dried for 12-48 hours to achieve a moisture content of $\leq$ 12%. The dried fruit is then milled to an appropriate size, augered into slurry tanks, and subjected to extraction with water/ethanol. The extract is then filtered before concentration by evaporation. This is followed by the removal of caffeine via gravimetric phase separation with no added solvents. Next, the material is autoclaved for 30 minutes at 98°- 100° and spray dried. Finally, the material is subjected to sifting, metal detecting, and packaging. The preparation procedure assures a consistent and high-quality product. The extract is a powder that is standardized to 40% or greater phenolic acids and about 1-2% caffeine.

Food-grade ethanol used for extraction of Coffeeberry® Coffee Fruit Extract powder is an unlisted GRAS substance widely used as a solvent in food processing. The ethanol used in the production meets current Food Chemical Codex (FCC) specifications. Except for potable water, no other chemical substances are used in the manufacture of Coffeeberry® Coffee Fruit Extract.

**Figure 1. Manufacturing process of Coffeeberry® Coffee Fruit Extract**



## Part III- DIETARY EXPOSURE

### 3.1. Proposed Use Levels and Food Categories

FutureCeuticals intends to use Coffeeberry® Coffee Fruit Extract in 10 food categories at a maximum proposed use level ranging from 20 to 300 mg per serving. The food serving size to which the extract will be added corresponds to the gram weight or mL volume of food as specified by References Amounts Customarily Consumed (RACCs) for food labeling based on FDA's final rule, effective July 26, 2016, with the compliance date of July 26, 2018 (Federal Register, 2016). Table 6 lists the 10 food categories to which Coffeeberry® Coffee Fruit Extract is proposed for use, descriptions of the types of foods within the category that was included in the assessment, the serving size associated with each food type, and the maximum use level of the extract. The Coffeeberry® Coffee Fruit Extract will not be used in any foods for which food standards would preclude its use. Foods that are intended for infants and toddlers, such as infant formulas or foods formulated for babies or toddlers, and meat and poultry products that come under USDA jurisdiction are excluded from the list of intended food uses of Coffeeberry® Coffee Fruit Extract.

**Table 6. Proposed Uses of Coffeeberry® Coffee Fruit Extract in Foods**

| Proposed Use Category | Description of Foods Selected for Analysis | Serving Size[a] | Maximum Use Level (mg/serving) |
|---|---|---|---|
| Flavored Water/Energy Drink | Sport drinks (i.e., Gatorade, Powerade, etc.), energy drinks (i.e., Monster, Red Bull, etc.), and enhanced/fortified waters (i.e., Propel, Glaceau, etc.) | 360 ml | 300 |
| Coffee/Tea | RTD/bottled/canned coffees and teas. Coffee excludes brewed, instant, and frozen types. Tea excludes hot and brewed tea leaf. Coffee and tea both exclude decaffeinated types. | 360 ml | 100 |
| RTM Beverages | Non-reconstituted protein powders (i.e., Muscle Milk powder) | Amount to make 240 ml | 100 |
| Milk Products (pre-work out) | Ensure, Boost, and RTD high protein nutritional drinks such as Monster Milk | 240 ml | 100 |
| Clusters/Bars | Nutrition bars including Balance, PowerBar, Clif, Zone, etc. | 40 g | 100 |
| Fruit Juices | Fruit juice blends and drinks, carbonated fruit juice drinks, coconut waters | 240 ml | 100 |
| Vegetable Juices/Blends | Carrot juice, tomato juice, celery juice, mixed vegetable juice, fruit and vegetable blend juices | 240 ml | 100 |
| Chocolate | Milk chocolate and dark chocolate with or without caramel, nuts, toffee, and/or dried fruits/seeds inclusions | 30 g | 100 |
| Candy | Gummy candy including Life Savers Gummi Savers and other gummy animals/shapes | 30 g | 20 |
| Chewing gum | Chewing gum, regular and sugar free | 3 g | 20 |

[a] Serving sizes correspond to values in Table 2 – Reference Amounts Customarily Consumed per Eating Occasion: General Food Supply as cited in FR Vol 81, No. 103, Friday, May 27, 2016, pp 34000-47. Available at: https://www.govinfo.gov/content/pkg/FR-2016-05-27/pdf/2016-11865.pdf. RTD = ready-to-drink

## 3.2. Estimated Daily Intake

Intake estimates of Coffeeberry® Coffee Fruit Extract and one of its constituents, caffeine, were based on food consumption records collected in the What We Eat in America (WWEIA) dietary component of the National Health and Nutrition Examination Survey (NHANES) conducted in 2009-2010, 2011-2012, and 2013-2014 (NHANES 2009-2014). The survey data is provided for the total United States (U.S.) population 2 years (y) and older and the following five subpopulation: children 2-12 years, adolescents 13-18 years, adults 19-49 years and 50+ years, and women of childbearing age (WCBA) 14-49 years. The NHANES is a continuous survey that uses a complex multistage probability sample designed to be representative of the civilian U.S. population (NCHS, 2013; 2014; 2016). NHANES datasets provide nationally representative nutrition and health data and prevalence estimates for nutrition and health status measures in the United States. Statistical weights are provided by the National Center for Health Statistics (NCHS) to adjust for the differential probabilities of selection and non-response. The intake analysis was conducted by Exponent, Inc. and the complete report is attached as Appendix I.

The two-day average intake of Coffeeberry® Coffee Fruit Extract from the proposed uses in 10 food categories combined are expressed in units of mg/person/day and mg/kg-bw/day and are provided in Tables 7A and 7B, respectively. Among the U.S. population two years and older, the all users mean and 90th percentile of intake of Coffeeberry® Coffee Fruit Extract is 170 mg/person/day (2.7 mg/kg-bw/day) and 393 mg/person/day (5.9 mg/kg bw/day), respectively. Among the different populations, the highest 90th percentile intake of 459 mg/person/day was noted in adults 19-49 years. On body weight basis the highest intake of 9.6 mg/kg bw/day was noted in children 2 to 12 years of age.

**Table 7A. Summary of the Estimated Daily Intake of Coffeeberry Coffee Berry Extract per Person from Proposed Food-Uses in the United States by Population Group (NHANES 2009-2014 Data)**

| Population Group | Unweighted $N^a$ | % Users | All-Person Consumption (mg/person/day) | | All-Users Consumption (mg/person/day) | |
|---|---|---|---|---|---|---|
| | | | Mean | 90th Percentile | Mean | 90th Percentile |
| U.S. 2+ years | 12,379 | 55 | 94 | 263 | 170 | 393 |
| Children 2-12 years | 3,386 | 63 | 27 | 188 | 112 | 247 |
| Adolescent 13-18 years | 1,531 | 61 | 126 | 310 | 207 | 432 |
| Adults 19-49 years | 4,264 | 57 | 114 | 338 | 200 | 459 |
| Adults 50+ years | 3,198 | 49 | 72 | 203 | 146 | 335 |
| WCBA 14-49 years | 2,909 | 57 | 87 | 240 | 152 | 340 |

$^a$ Un-weighted number of users; % users, per capita and per user estimates for NHANES derived using the statistical weights provided by the NCHS. Note: Refer to Table 6 for the proposed uses of the extract.

**Table 7B. Summary of the Estimated Daily Intake of Coffeeberry Coffee Berry Extract on Body Weight Basis from Proposed Food-Uses in the United States by Population Group (NHANES 2009-2014 Data)**

| Population Group | Unwated $N^a$ | % Users | All-Person Consumption (mg/kg bw/day) | | All-Users Consumption (mg/kg bw/day) | |
|---|---|---|---|---|---|---|
| | | | Mean | 90th Percentile | Mean | 90th Percentile |
| U.S. 2+ years | 12,379 | 55 | 1.5 | 4.2 | 2.7 | 5.9 |
| Children 2-12 years | 3,386 | 63 | 2.7 | 7.4 | 4.3 | 9.6 |
| Adolescent 13-18 years | 1,531 | 61 | 1.9 | 5.0 | 3.1 | 6.4 |
| Adults 19-49 years | 4,264 | 57 | 1.4 | 4.1 | 2.5 | 5.9 |
| Adults 50+ years | 3,198 | 49 | 0.9 | 2.6 | 1.8 | 3.9 |
| WCBA 14-49 years | 2,909 | 57 | 1.2 | 3.4 | 2.2 | 5.0 |

[a] Un-weighted number of users; % users, per capita and per user estimates for NHANES derived using the statistical weights provided by the NCHS. Note: Refer to Table 6 for the proposed uses of the extract.

In addition to the intake of the Coffeeberry® Coffee Fruit Extract the resulting intake of caffeine from the proposed uses as well as background intake of caffeine from other sources was also determined. As regards caffeine intake from the proposed uses, among the U.S. population two years and older, the per user caffeine intake that is associated with the proposed use of Coffeeberry® Coffee Fruit Extract at the per user mean and 90th percentile of intake is estimated as 3.4 mg/person/day (0.05 mg/kg-bw/day) and 7.8 mg/person/day (0.12 mg/kg-bw/day). The caffeine intake from background sources (food and dietary supplement) pre-introduction of Coffeeberry® Coffee Fruit Extract at the per user mean and 90th percentile of intake is estimated as 141 mg/person/day (1.8 mg/kg-bw/day) and 338 mg/person/day (4.2 mg/kg-bw/day), respectively. The cumulative caffeine intake from background sources and the proposed use of Coffeeberry® Coffee Fruit Extract combined at the per user mean and 90th percentile of intake is 137 mg/person/day (1.8 mg/kg-bw/day) and 332 mg/person/day (4.2 mg/kg bw/day), respectively. This intake analysis for caffeine shows that the maximum (90th percentile) additional intake of 7.8 mg caffeine/person/day from the proposed uses of the extract is minor as compared to the existing background intake of caffeine. However, it is interesting to note that the cumulative 90th percentile caffeine (background + current proposed uses) intake of 332 mg/person/day is slightly lower than the background caffeine intake of 338 mg/person/day. The possible reason for this is described below.

The cumulative caffeine intake includes consumers of caffeine from background sources and/or proposed uses of Coffeeberry® Coffee Fruit Extract, whereas the background intake includes consumers of caffeine from the background alone (i.e., pre-introduction of Coffeeberry® Coffee Fruit Extract). Hence, the increase in the user sample size from the background to cumulative analysis is due to the inclusion of NHANES participants who did not consume caffeine but who consume one or more of the foods with the proposed Coffeeberry® Coffee Fruit Extract use coupled with the lower intake of caffeine from these proposed uses that result in slightly lower caffeine intakes for almost all populations in the cumulative intake analysis. In other words, the combined caffeine intake distribution, which includes background and proposed Coffeeberry® Coffee Fruit Extract sources, shifted the mean and 90th percentile of intake lower due to the inclusion of lower caffeine intakes associated with the proposed uses of the extract.

**Part IV- SELF LIMITING LEVELS OF USE**

Coffeeberry® Coffee Fruit Extract has a characteristic taste. Excessive amounts of this product are unlikely to be added to food products because of the unpleasant taste at high levels. Additionally, the cost of the product will prohibit excessive use.

**Part V- EXPERIENCE BASED ON COMMON USE IN FOOD BEFORE 1958**

The statutory basis for the conclusion of the GRAS status of Coffeeberry® Coffee Fruit Extract in this document is not based on common use in food before 1958. The GRAS assessment is based on scientific procedures. Notwithstanding this, the source material of the extract – coffee cherries – has been commonly present in food prior to 1958, as described below.

## Part VI- NARRATIVE

### 6.1. Traditional and Current Uses

Originating in Ethiopia, the coffee plant has been used for centuries in a variety of preparations (Ota, 2018). The popular drink known as coffee – a water extraction made from roasted coffee seeds or "beans" – was likely first consumed in Yemen in the first half of the fifteenth century (Ota, 2018). After spreading from the Middle East and Arabian Peninsula to Europe in the seventeenth century, coffee became widely consumed in global markets by the 1800s, with methods of consumption varying by geographic location (Ota, 2018; Pendergrast, 2010).

In addition to preparations made from roasted coffee beans, the fruit surrounding the coffee bean also has a longstanding history of consumption. "Qishr," a tea made from coffee fruit, has been widely consumed throughout the Middle East for centuries, including in Tihamah, Rayy, and Mecca (Ota, 2018, Thesiger, 1947). In fact, Qishr has traditionally been more popular than coffee in Yemen (Ota, 2018). Coffee fruit has also been used as a source of food. Seventeenth-century reports from Ottoman scholar Katip Celebi detail the consumption of crushed coffee fruit by Yemenis shayks and Islamic mystics. In addition, the Galla tribe in Ethiopia combined fat with crushed whole coffee fruit for food, and natives in equatorial South Sudan and Uganda consumed coffee fruit both raw and after boiling and drying (Ota, 2018).

Today, coffee fruit and its preparations are marketed as ingredients in a wide variety of food applications including ready-to-mix and ready-to drink beverages, chocolate, and other snacks foods. Notable examples include the "Cascara Latte" introduced by Starbucks Corporation in 2017, Kishr's line of "Organic Coffee Fruit" teas, the "Caffé Monster" by Monster Energy Company, and several of the "SuperTea" beverages produced by Bai Brands LLC, all of which contain either coffee fruit or coffee fruit extract.

Furthermore, in 2016, Health Canada evaluated a Novel Food notification from FutureCeuticals and, following a comprehensive assessment, the agency responded that it has no objection to the sale of Coffeeberry® whole coffee fruit derivatives - including the subject of the present GRAS assessment, Coffeeberry® Coffee Fruit Extract - as ingredients for use at levels up to 300 mg/serving in foods and beverages sold in Canada.

This information suggests that coffee fruit and its preparations is consumed as a food without any reported adverse effects.

### 6.2. Data Pertaining to Safety

In a series of well-designed toxicity studies, conducted as per current accepted guidelines, FutureCeuticals investigated the effects of whole coffee fruit preparations (Coffeeberry® products), such as whole coffee fruit powder, dried water extract powder, and dried water/ethanol extract powder (Coffeeberry® Coffee Fruit Extract), in animals and *in vitro* experimental systems. The overall findings from all these studies are published in the journal *Food and Chemical Toxicology* (Heimbach et al., 2010). In the following section, relevant toxicological and other studies on coffee fruit and its preparations are summarized in the order of their importance and in support of the conclusions drawn in this assessment. This information is provided in the following sequence: published pivotal studies, secondary published studies, corroborative unpublished studies and regulatory agency assessments. Efforts have been made to

present both the data supporting the safety as well as any data on the adverse effects of coffee fruit and its preparations.

### 6.2.1. Pivotal Studies of Coffeeberry® Coffee Fruit Extract

### 6.2.1.1 Fourteen-Day Gavage Study with Coffeeberry® Coffee Fruit Extract

Coffeeberry® Coffee Fruit Extract (the water/ethanol extract; subject of the present GRAS assessment) was tested for its potential toxicity. Based on the initial observations from 14-day feeding studies of whole powder and water-extract powder that revealed palatability issues, for this study, gavage was chosen rather than feeding in the range-finding study of Coffeeberry® Coffee Fruit Extract. The toxicity of Coffeeberry® Coffee Fruit Extract was investigated in Sprague-Dawley (Hsd:SD) rats for a period of 14 days (Heimbach et al., 2010) as per OECD Guideline 407 and US FDA *Redbook 2000*. In this study, groups of 10 rats/sex/dose were orally intubated daily with Coffeeberry® Coffee Fruit Extract at doses of 0 (distilled water vehicle control), 1000, 2000, or 4000 mg/kg bw/day. For this study rats used were approximately 8 weeks of age and males weighed 241±6.05 g, while females weighed 189±7.18 g at the start of treatment. Feed intake and body weight were measured on days 1, 4, 8, 11, and 14. The dose preparations were prepared daily based on the most recent body weights. Fasted rats were placed in metabolism cages one day before scheduled termination to collect urine.

All rats survived until the scheduled termination. During early and intermittently throughout the treatment period, clinical signs in treated animals, such as brown litter staining, facial/ano-genital staining, some nasal/ocular discharge, and piloerection were noted. The study authors considered these signs, which appeared more frequently in test animals than in controls but were not clearly dose-dependent, to be treatment-related but non-adverse. As compared to control, a significant decrease in mean body weights throughout the study (days 1-14) was noted in high-dose rats of both sexes. As compared to control, a significant decrease in mean daily body weight gain in mid- and high-dose males was noted at the start of the study, but became significantly increased from controls on days 4-8 for mid-dose males and days 8-11 for high-dose males. For females, mean daily body weight gain was significantly increased from controls throughout the study at the high dose and during days 11-14 at the lower doses. Generally, feed consumption decreased at the beginning of treatment and increased toward the end of the study in both sexes, particularly at the highest dose level. Feed efficiency followed a similar pattern (Heimbach et al., 2010).

A dose-dependent increase in urine volume collected via metabolism cages was noted that was significantly higher from controls in all treated males (7.4 ml, 18.3 ml, 32.9 ml, and 43.6 ml for control, low-dose, mid-dose, and high-dose, respectively) and high-dose females (7.1 ml, 13.1 ml, 25.8 ml and 42.0 ml for control, low-dose, mid-dose, and high-dose, respectively). Urine volume collected directly from the bladder at necropsy did not differ between groups. Macroscopic examination revealed a proteinaceous white substance of variable size and shape in the urinary bladder of 3/10 control males, 1/10 low-dose males, 3/10 mid-dose males, and 4/10 high-dose males, identified as proteinaceous plugs (Hard et al., 1999). In more than half of treated males, full bladders were noted. Colon/intestinal distention was seen, but not measured, in 1/10 low-dose males, 1/10 mid-dose males, 2/10 high-dose males, and 3/10 high-dose females; it was not observed in controls or in low- or mid-dose females. In one high-dose male and one high-dose female, red nasal discharge and/or facial staining were/was noted. As noted earlier,

this may be attributable to the red color of the test article. Some incidental findings (e.g., small left testis and epididymis and fluid-filled uteri) were reported in both treated and control animals. No other macroscopic observations were reported including any abnormal observations in the lung (Heimbach et al., 2010).

In summary, oral gavage administration of Coffeeberry® Coffee Fruit Extract at dose levels of 0, 1000, 2000, and 4000 mg/kg bw/day for 14 days showed clinical signs in treated animals that were treatment-related but non-adverse and not clearly dose dependent. A significant decrease in mean body weights throughout the study (days 1-14) was noted in high-dose rats of both sexes. Generally, feed consumption decreased at the beginning of treatment and increased toward the end of the study in both sexes, particularly at the highest dose level. Feed efficiency followed a similar pattern. The finding from this study suggest that exposure to high doses of the extract affects feed consumption.

### 6.2.1.2 Subchronic Toxicity Study of Coffeeberry® Coffee Fruit Extract

In order to mimic the distributed intake patterns that humans would have with the intended use of Coffeeberry® Coffee Fruit Extract (water/ethanol extract; the subject of present GRAS), the dietary route of exposure was preferred. It was also recognized that the short-term palatability issues noted in 14 day feeding studies with whole powder and water extract (described later) is unlikely to compromise the results of a longer study. Given this, the subchronic study of Coffeeberry® Coffee Fruit Extract was performed as a feeding study. The study was conducted in compliance with good laboratory practice (GLP) with the exception of the serology analysis, which was not performed under GLP by an outside laboratory. The toxicity of Coffeeberry® Coffee Fruit Extract was evaluated in Sprague-Dawley (Hsd:SD) rats (Heimbach et al., 2010) following OECD guideline 408, EPA Health Effects Test Guidelines, OPPTS 870.3100: 90-Day Oral Toxicity in Rodents, EPA 712-C-98-199, August 1998, and US FDA *Redbook 2000*, IV.C.4.a. "Subchronic Toxicity Studies with Rodents." For this study, groups of 10 rats/sex/dose were fed a diet containing Coffeeberry® Coffee Fruit Extract at levels of 0 (control), 12,500, 25,000, or 50,000 ppm (Heimbach et al., 2010).

Before the initiation of the treatment, rats (6-7 weeks old) were acclimated for six days. At the start, day 0, males and females weighed 231±4.6 g and 161±5.5 g, respectively. Rats were individually housed in suspended stainless steel cages and were maintained on Purina diet and filtered tap water *ad libitum*. Coffeeberry® Coffee Fruit Extract was thoroughly mixed into the animal feed to provide appropriate concentrations on a weekly basis and refrigerated until use. Diets were analyzed for homogeneity. Ophthalmologic evaluations were conducted prior to the commencement of the study and on day 88. Towards the end of the study period (days 86-87), functional observational battery (FOB) was performed on all rats. Blood samples were taken from the orbital sinus of fasted rats while under isoflurane anesthesia for hematology and clinical chemistry during week 13. Blood samples taken for prothrombin time and partial thromboplastin time were collected via the inferior vena cava under isoflurane anesthesia at termination. Prior to scheduled blood collections during week 13 and at termination, rats were fasted for at least 15 hours and placed in metabolism cages to collect urine. At the end of the study period, animals were euthanized and subjected to full necropsy; selected organs and tissues were preserved in 10% neutral buffered formalin or modified Davidson's fixative; and histopathological examination of preserved organs and tissues from control and high-dose groups and any gross lesions of potential toxicological significance from any test group were conducted (Heimbach et al., 2010).

The mean daily intakes of the extract fed at dietary concentrations of 0, 12,500, 25,000, and 50,000 ppm were 0, 846, 1723, and 3446 mg/kg bw/day, respectively, for males and 0, 965, 2030, and 4087 mg/kg bw/day, respectively, for females. All animals survived to scheduled necropsy. Overall and weekly feed consumption and mean daily feed efficiency of all treated rats were generally comparable to controls with the following exceptions: females showed a significant increase in feed consumption during weeks 5, 8, 10 and overall (mid-dose group), and during weeks 4, 8, 10, 12, 13, and overall (high-dose group), suggesting an overall dose-response from days 0-91; and females showed a significant change in feed efficiency during week 1 (increased in low-dose group) and week 6 (decreased in mid-dose group).

Ophthalmoscopic examinations showed eyes to be normal. The FOB results were generally comparable to controls and any changes in quantitative measurements or in incidence of open field measurements were minimal and were not considered to indicate a toxicologically significant behavior change. Motor activity also was comparable to controls. Overall (days 0-91) and weekly mean body weights and mean daily body weight gains of all treated rats were comparable with controls with the following exceptions: females showed a significant increase in body weight during weeks 4, 7, 11, and 12 (low-dose group), weeks 5 and 8 (mid-dose group), and weeks 10-12 (high-dose group); and females showed a significant change in daily body weight gain during week 1 (increased in low-dose group), overall (increased in low-dose group) and week 6 (decreased in mid-dose group) (Heimbach et al., 2010).

Hematology, coagulation and clinical chemistry parameters did not reveal adverse changes. The only statistically significant changes reported were increased mean platelet (mid- and high-dose males), decreased eosinophil (low-dose males), decreased sorbitol dehydrogenase (mid-dose males), decreased alkaline phosphatase (high-dose males), decreased triglyceride (high-dose males), increased glucose (low-dose males and females), increased cholesterol (high-dose females), increased sodium (mid-dose females), and increased chloride (mid-dose females). These changes were considered non-adverse and not related to exposure because the magnitude of the change was considered not clinically significant and/or the change was not accompanied by any other corresponding pathological change. There were no test substance-related changes in blood cell morphology and serology showed no detectable titers against the tested pathogens and antigens. The only statistically significant change reported in urinalysis was increased urine volume in high-dose males (8.3±4.8 ml) compared to controls (3.5±1.5 ml), but this was not considered adverse since there were no supporting clinical chemistry or histopathology findings (Heimbach et al., 2010).

No treatment related gross abnormalities were noted following macroscopic examination. Some incidental changes such as fluid-filled bladders (mostly males of all groups) and fluid-filled uteri (females of all groups) were noted. There were some statistically significant changes in absolute and relative (to body or brain weight) organ weights but none was accompanied by histopathological changes that would suggest toxicological relevancy to treatment. All reported histopathological changes were considered incidental and related to the orbital sinus bleeds or related to the age and strain of the rat used in the study. These included episcleral inflammation, periocular muscle inflammation, microgranuloma involving the conjunctiva, inflammation, necrosis, hemorrhage, and fibroplasia of the Harderian gland, nephropathy, pulmonary alveolar histiocytosis, pituitary gland cyst, and ectopic thymus in thyroid gland. Based on all the findings, the NOAEL for this study is the highest concentration tested, 50,000 ppm, equivalent to 3446 and 4087 mg/kg bw/day for males and females, respectively (Heimbach et al., 2010).

In summary, the results of 90-day study of Coffeeberry® Coffee Fruit Extract did not reveal consistent statistically-significant dose-dependent treatment-related adverse effects at any tested level. The NOAEL was the highest concentration tested, 5% or 50,000 ppm, equivalent to approximately 3446 and 4087 mg/kg bw/day for male and female rats, respectively (Heimbach et al., 2010). The results of this study suggest that the resulting all user maximum intake of 5.9 mg/kg bw/day from the proposed uses of Coffeeberry® Coffee Fruit Extract, the NOAEL is 584-fold lower. The findings from this study support the safe use of Coffeeberry® Coffee Fruit Extract by humans.

### 6.2.1.3 Mutagenicity Study of Coffeeberry® Coffee Fruit Extract (Ames Assay)

A study on the potential mutagenic effects of Coffeeberry® Coffee Fruit Extract (water/ethanol extract) was conducted in compliance with OECD Principles of Good Laboratory Practices (ENV/MC/CHEM (98) 17 OECD, Paris, 1998), and the Chemikaliengesetz ("Chemicals Act") of the Federal Republic of Germany, Appendix 1 to § 19a as amended and promulgated on June 20, 2002 (BGB1.I Nr. 40 SA. 2090), revised October 31, 2006 (BGB1. I Nr. 50 S. 2407). The extract was tested at concentrations of 31.6, 100, 316, 1000, 2500, and 5000 µg/plate in distilled water for potential mutagenicity in *Salmonella typhimurium* strains TA98, TA100, TA1535, and TA1537 and *Escherichia coli* strain WP2 uvrA in the presence and absence of S9 liver microsomal fraction prepared from phenobarbital/ß-naphtoflavone-induced rats (Heimbach et al., 2010). The study was conducted as per OECD guideline 471, EEC Directive 2000/32, L 136, Annex 4D, B 13/14, "Mutagenicity—Reverse Mutation Test Bacteria", dated May 19, 2000, and EPA Health Effects Test Guidelines, OPPTS 870.5100 "Bacterial Reverse Mutation Assay" EPA 712-C-98-247, August 1998. Both the plate incorporation method and the pre-incubation method were performed (Ames et al., 1973a, 1973b; Maron and Ames, 1983). For each method, two independent experiments were run in triplicate for each test article (Heimbach et al., 2010).

Both negative (solvent and untreated) and positive controls were performed simultaneously. Positive controls for cultures without S9 were 4-nitro-o-phenylene-diamine (TA98 and TA1537), sodium azide (TA1535, TA100), and methyl methane sulfonate (WP2 uvrA). For cultures with S9, 2-aminoanthracene was used for all strains. For the plate incorporation method, at each concentration and bacterial strain, 100 µl test solution, negative control, or positive control was mixed in a test tube with 500 µl S9 or S9 substitution buffer (plates without metabolic activation), 100 µl bacterial suspension, and 2000 µl overlay agar. The mixture was poured over the surface of Vogel-Bonner Medium E agar plates with 2% glucose and allowed to solidify. For the pre-incubation assay, the tester strains (100 µl) were preincubated with 100 µl of test substance preparation and 500 µl of S9 or sterile buffer (plates without metabolic activation) at 37ºC. After 60 minutes, 2000 µl overlay agar was added and the mixture was poured onto Vogel-Bonner Medium E agar plates with 2% glucose and allowed to solidify. In both methods, once the plates were solidified, bacteria were incubated in the dark at 37ºC for at least 48 hours after which colonies were counted (Heimbach et al., 2010).

In the assay with Coffeeberry® Coffee Fruit Extract, no cytotoxicity was observed in any of the strains tested except in TA1535 at 5000 µg/plate in the second experiment. No precipitation was seen in any of the strains tested. There were no biologically relevant increases in the number of revertant colonies of any of the strains tested at any concentration with or without S9. The positive controls induced a distinct increase in the number of revertant colonies,

indicating the validity of the study. It was concluded that Coffeeberry® Coffee Fruit Extract is not genotoxic under the conditions of the experiments (Heimbach et al., 2010).

### 6.2.2. Secondary Published Studies of Other CoffeeBerry® products

In addition to the studies on Coffeeberry® Coffee Fruit Extract, extensive safety analyses have also been conducted on similar substances derived from coffee fruit, including other products in VDF FutureCeuticals' Coffeeberry® line. These studies primarily focus on coffee fruit water extract and the whole coffee fruit itself, which is the raw material used for Coffeeberry® Coffee Fruit Extract. While these substances are not identical in composition to Coffeeberry® Coffee Fruit Extract, the studies nevertheless provide further support for its safety.

### 6.2.2.1. Animal Toxicity Studies of Coffeeberry® Whole Coffee Fruit Powder and Coffeeberry® Coffee Fruit Water Extract

The toxicity potentials of CoffeBerry® products that are similar to the subject of the present GRAS were investigated in short-term repeat-dose toxicity studies that included a 7-day dietary/palatability study and a 14-day gavage range finding study. The physical characteristics and composition of the test articles used in these studies are compared with the subject of this GRAS document in Table 6. These studies were conducted according to OECD Principles of Good Laboratory Practices [ENV/MC/CHEM(98)17 OECD, Paris 1998] and U.S. FDA Good Laboratory Practices (21 CFR 58, 1987) and consistent with OECD and Redbook Guidelines. The short-term studies were intended primarily to test palatability, dose levels and methods of administration prior to the repeat-dose long-term (subchronic) study with the subject of present GRAS.

It should be noted, the range of caffeine levels (0.6 to 9.08%) in the water/ethanol extract reported by Heimbach et al. (2008) and presented in Table 6 is considerably wider compared to the range of caffeine levels (1.0 to 2.0%) reported in Tables 3, 4, and 5. This narrower range is not the result of any change in product composition or manufacturing process; rather, since 2008, FutureCeuticals has taken steps to narrow the caffeine range by *optimizing* the manufacturing process. These steps include improved temperature controls, more precise phase separation to eliminate excess caffeine, and testing the caffeine levels of incoming coffee fruit to mitigate natural variation in caffeine content of the bean.  As summarized in Table 3, 4 and 5, the caffeine content of Coffeeberry® Coffee Fruit Extract, the subject of the present GRAS assessment, is approximately 1.0-2.0%, not 0.6-9.08%.

**Table 6. Typical Characteristics of Coffeeberry® Products: Whole Powder, Water Extract, and Water/Ethanol Extract (Coffeeberry® Coffee Fruit Extract), Tested in Toxicity Studies** *

| Characteristics | Whole Powder | Water Extract | Water/Ethanol Extract[c] |
|---|---|---|---|
| Appearance | Tan/brown powder | Brown powder | Brown powder |
| Extraction solvent | None | Water | Water/ethanol |
| Solids | ≥90% | 96% | 90% |
| Solubility in water | Partially soluble | 100% soluble | 100% soluble |
| Total phenolic acids[a] | ≥2% | 5.0% | 35-40% |
| Caffeine | 0.7-1.0% | 1.0% max. | 0.6 - 9.08% |
| ORAC[b] | 800 μmole/g average | 1500 μmole/g | 6,000 μmole/g |

[a]Chlorogenic acid, caffeic acid, quinic acid, ferulic acid; [b]Oxygen radical absorption capacity; [c]Subject of present GRAS- Coffeeberry® Coffee Fruit Extract; *Adapted from Heimbach et al. (2010)

For each repeat-dose toxicity study, animals were observed twice daily for mortality and once daily for any abnormal clinical signs. Every few days (3 times in the 7-day study and 4 times in the 14-day studies), all animals underwent a more detailed clinical examination including changes in skin, fur, eyes, and mucous membranes, occurrence of secretions and excretions, autonomic activity, and changes in behavior. For the 7- and 14-day studies, feed (PMI LabDiet® Purina Certified Rodent Meal #5002) and filtered tap water were provided *ad libitum*. Body weights and feed consumption were recorded regularly throughout the study and mean daily body weight gain, mean feed consumption, feed efficiency, and mean daily intakes of the test substance were calculated. At the end of the study (for studies up to 14 days), animals were euthanized by carbon dioxide asphyxiation and subjected to gross necropsy (i.e., examination of external surface of the body, all orifices, and the thoracic and abdominal cavities and their contents).

### 6.2.2.1.1. Seven Day Dietary Exposure Study of CoffeeBerry® Whole Coffee Fruit Powder

In a short-term study, CoffeeBerry® whole coffee fruit powder was tested for palatability and toxicity in Sprague-Dawley (Hsd:SD) rats for a period of 7 days (Heimbach et al., 2010) as per OECD Guideline 407 and US FDA *Redbook 2000*, IV.C.3a. For these investigations, groups of 5 rats/sex/dose (8-week-old) were fed the powder at dietary concentrations of 0 (control), 80,000, 100,000, or 120,000 ppm. The test substance, at the appropriate concentrations, was thoroughly mixed into the animal feed at the start of the study and refrigerated until used. The mean daily intakes of whole powder fed, over the study period, at dietary concentrations of 0, 80,000, 100,000, and 120,000 ppm for male and female rats corresponded to 0, 6586, 7904, and 9055 mg/kg bw/day, and 0, 7419, 8758, and 10574 mg/kg bw/day, respectively. No mortality in any of the test groups and no treatment-related abnormal clinical findings were noted. In treated females, body weight gains and final body weights were similar to control values but treated males tended to show a dose-related decrease in body weight gain and final body weight. For example, on day 7, mean male body weights (standard deviation) were 277.6±7.44, 262.0±7.11, 260.0±5.39, and 248.0±9.51 g for 0, 80,000, 100,000, and 120,000 ppm groups, respectively. The trend toward reduced body weight gain in males was seen only in the first two days; by days 3-7, body weight gain recovered to comparable or greater levels.

Feed consumption in treated females was similar to that of controls, while treated males showed decreases in daily feed intake as compared to controls that were most notable on days 0-3. Feed efficiency in both sexes was decreased in an apparent dose-related manner compared to controls, showing greater reductions during days 0-3 but recovering on days 3-7. Gross necropsy showed no abnormal findings other than an incidental finding of red mottled tissue on the thymus of one low-dose female. These findings indicated that rats should tolerate a dietary concentration of CoffeeBerry® whole coffee fruit powder at levels up to 120,000 ppm (approximately 9055 and 10574 mg/kg bw/day for males and females, respectively) in a 14-day study. Based on this finding, it was believed that the 14-day studies of whole powder and water-extract powder at concentrations up to 100,000 ppm could be conducted as feeding rather than gavage studies without encountering palatability problems.

### 6.2.2.1.2. Fourteen Day Feeding Studies of CoffeeBerry® Whole Coffee Fruit Powder and Coffeeberry® Coffee Fruit Water Extract

Coffeeberry® whole coffee fruit powder and water extract powder were tested for toxicity in Sprague-Dawley (Hsd:SD) rats for a period of 14 days (Heimbach et al., 2010). These

studies were designed as per OECD Guideline 407 and US FDA *Redbook 2000*, IV.C.3a. In these studies groups of 10 rats/sex/dose were fed a diet containing whole powder or water extract powder at levels of 0 (control), 25,000, 50,000, or 100,000 ppm. At the start of the experiments, rats were approximately eight weeks old and males weighed 236±7.07 g, while females weighed 178±7.10 g. Each test substance at the appropriate concentrations was thoroughly mixed into the animal feed at the start of the study and refrigerated until use.

For the whole powder study, over the period of the study, the mean daily intakes of whole powder fed at dietary concentrations of 0, 25,000, 50,000, and 100,000 ppm for male and female rats were calculated to be equivalent to 0, 2188, 4335, and 8309 mg/kg bw/day and 0, 2108, 4458, and 8858 mg/kg bw/day, respectively. No mortality was noted in any of the test groups. During the middle of the study, reduced fecal volume was noted in a couple of treated animals from each dose group. This reduction was resolved by the end of the study. As compared to the male control group, mean weekly body weights of high-dose males were significantly lower on days 3, 7, and 10 but not on day 14. In the female rat groups, body weights were similar to control values at all time points. In the male rat groups, mean daily body weight gain of mid- and high-dose groups was significantly lower as compared to controls. In females, the mid- and high-dose groups showed significant increases in mean daily body weight gain at different intervals during the study. However, these increases were considered incidental. As compared to control, a significant decrease in feed consumption was noted throughout the study (interval days 0-14) in high-dose males. Feed consumption was significantly increased during the days 7-10 and 10-14 intervals in mid- and high-dose males (Heimbach et al., 2010).

At the beginning of the study, in mid- and high-dose males fed whole powder, feed efficiency was significantly decreased, but was significantly increased in these groups in mid-study period. Feed consumption and feed efficiency in females were comparable to controls. Macroscopic examination showed no abnormal findings in rats of either sex from the control and low-dose groups and in female rats from the high-dose group, but some black speckles were noted in the lungs of 2/10 males in both the mid- and high-dose groups. Also, at the high dose, 2/10 males had somewhat reddish lungs and 5/10 males had urinary bladders containing white, semi-solid material (approximately 0.2 x 0.1 cm). The veterinary pathologist determined these changes to be proteinaceous plugs resulting from abnormal ejaculation and secretion from the male accessory sex glands during euthanasia; these plugs represent an agonal change rather than pathological lesions and are considered to be incidental findings of no toxicological significance (Hard et al., 1999). As Coffeeberry® products are bright red when fresh, although they tend to turn brown when dried, the slightly reddish lungs seen in two of the high-dose males may have resulted from inhalation of volatile color from the feed dish (Heimbach et al., 2010).

In the study with water extract powder, the mean daily intakes of the extract fed at dietary levels of 0, 25,000, 50,000, and 100,000 ppm to male and female rats were equivalent to 0, 2179, 4382, and 7889 mg/kg bw/day, and 0, 2234, 4393, and 8861 mg/kg bw/day, respectively. No mortality was noted in any of the test groups. In the majority of treated animals from each dose group, reduced fecal volume was noted during the middle of the study but was resolved by the end of the study. On day 10 of the study, hyperactivity was noted in two high-dose females. As compared to control, mean weekly body weights were significantly decreased in mid-dose males on days 3 and 7 and in high-dose males throughout the study. As compared to control, high-dose females showed a significant decrease in body weights on day 7. The decrease in mean daily body weight gain in mid- and high-dose males was significant throughout the study. All treated

females showed a significant increase in mean daily body weight gain during days 3-7 and high-dose females also showed this increase on days 7-10. These increases were considered compensatory for the decreases noted during the first week. A decrease in feed consumption was significant from controls during days 0-3 in mid-dose males and days 0-14 in mid-dose males but feed consumption was significantly increased during days 7-10 and 10-14 in mid-dose males. Females generally showed no differences from controls (Heimbach et al., 2010).

In both male and female rats, feed efficiency showed a similar pattern. At necropsy, no gross abnormalities were seen in the control animals. Macroscopic examination showed black speckles in the lungs of 1/10 low-dose males and slightly reddish lungs in 2/10 mid-dose males and 1/10 high-dose males, again possibly due to the red color of the test article. Urinary bladders containing white, semi-solid material of variable, measurable size were reported in males from all dose levels (1/10 low-dose male, 5/10 mid-dose males, and 6/10 high-dose males). This material was again identified by the veterinary pathologist as proteinaceous plugs (Hard et al., 1999). At the mid-dose, 2/10 males had enlarged bladders, one of which was accompanied by the white, semi-solid material. No other macroscopic findings attributable to treatment were reported (Heimbach et al., 2010).

In summary, the findings from these feeding studies indicate that male rats tolerated less than 25,000 ppm Coffeeberry® whole powder (equivalent to 2188 mg/kg bw/day or water extract powder (equivalent to 2179 mg/kg bw/day), based on reduced feed intake, feed-conversion efficiency, and weight gain, although these effects reflect poor palatability and intolerance rather than toxicity. Female rats tolerated up to 100,000 ppm (8858 and 8861 mg/kg bw/day for whole powder and water extract, respectively).

## 6.2.2.2. Mutagenicity and Genotoxicity Studies of Other CoffeeBerry® products

These studies were conducted in compliance with OECD Principles of Good Laboratory Practices (ENV/MC/CHEM (98) 17 OECD, Paris, 1998), and the Chemikaliengesetz ("Chemicals Act") of the Federal Republic of Germany, Appendix 1 to § 19a as amended and promulgated on June 20, 2002 (BGB1.I Nr. 40 SA. 2090), revised October 31, 2006 (BGB1. I Nr. 50 S. 2407). All work undertaken by the testing laboratory was in accordance with the most recent *Guide for the Care and Use of Laboratory Animals, (*DHEW/NIH, 1996), operated under the surveillance of the Regierung von Oberbayern (German regulatory authority) according to AAALAC standards and accreditation.

### 6.2.2.2.1. Ames Assay

All three Coffeeberry® products—the whole powder, the water extract, and the water/ethanol extract (Coffeeberry® Coffee Fruit Powder)—were tested at concentrations of 31.6, 100, 316, 1000, 2500, and 5000 µg/plate in distilled water for potential mutagenicity in *Salmonella typhimurium* strains TA98, TA100, TA1535, and TA1537 and *Escherichia coli* strain WP2 uvrA in the presence and absence of S9 liver microsomal fraction prepared from phenobarbital/ß-naphtoflavone-induced rats (Heimbach et al., 2010). Additional details related to the assay, including regulatory guidelines followed and the methods are similar to those described in Section section 6.2.3.1.

In the assay with whole powder, no cytotoxicity to *S. typhimurium* (strains TA98, TA100, TA1535, and TA1537) or *E. coli* (strain WP2 uvrA) in the presence or absence of S9 at the concentrations tested was observed except for *S. typhimurium* strain 1537, which showed toxic

effects at a concentration of 5000 µg/plate without S9 in the first experiment and at concentrations of 316 µg/plate and higher without S9 in the second experiment. Precipitation was observed in all strains at concentrations of 100 µg/plate and higher with S9 and 316 µg/plate and higher without S9 in the first experiment and at concentrations of 316 µg/plate and higher with and without S9 in the second experiment. There were no biologically relevant increases in the number of revertant colonies of any of the strains tested at any concentration with or without S9. The positive controls induced a distinct increase in the number of revertant colonies, indicating the validity of the study. It is concluded that the whole powder is not genotoxic under the conditions of the experiment (Heimbach et al., 2010).

In the assay with water extract powder, no cytotoxicity was observed in any of the strains tested. Precipitation was noted in all strains at concentrations of 1000 µg/plate with or without S9 in the first experiment and at concentrations of 316 µg/plate with or without S9 in the second experiment. There were no biologically relevant increases in the number of revertant colonies of any of the strains tested at any concentration with or without S9. The positive controls induced a distinct increase in the number of revertant colonies, indicating the validity of the study. It is concluded that the water extract powder is not genotoxic under the conditions of the experiment (Heimbach et al., 2010).

In the assay with water/ethanol extract, no cytotoxicity was observed in any of the strains tested except in TA1535 at 5000 µg/plate in the second experiment. No precipitation was seen in any of the strains tested. There were no biologically relevant increases in the number of revertant colonies of any of the strains tested at any concentration with or without S9. The positive controls induced a distinct increase in the number of revertant colonies, indicating the validity of the study. It is concluded that the water/ethanol extract (subject of present GRAS assessment) powder is not genotoxic under the conditions of the experiment (Heimbach et al., 2010).

### 6.2.2.2.2. *In vivo* Micronucleus Test with Coffeeberry® Whole Coffee Fruit Powder

The potential genotoxicity of Coffeeberry® whole coffee fruit powder was investigated in the micronucleus test using peripheral blood cells of NMRI mice following accepted guidelines and recommendations (Heimbach et al., 2010). In this study, male and female NMRL mice aged 7-12 weeks were used. The whole powder was extracted in 0.9% NaCl for 1 hour at 37±1°C in an ultrasonic bath with a mass/volume ratio of 0.2 g/ml and prior to administration the extract was filtered using folded paper filters. The extraction process was used because of technical issues including insolubility and bacterial contamination of the test item. Based on the results of a preliminary toxicity study, the maximum tolerable dose was determined to be 10 ml/kg bw of a 100% extract concentration. Mice (5 mice/sex/dose) were intraperitoneally injected with this dose, while negative (0.9% NaCl) and positive (cyclophosphamide) controls (5/sex/group) were run simultaneously.

Following administration of the samples, blood was collected from the tail vein at 44 and 68 hours and blood cells were immediately fixed in ultracold methanol for at least 16 hours. Prior to analysis, fixed cells were washed in Hank's balanced salt solution, centrifuged at 600 x g for 5 minutes and the supernatant was discarded. Blood cell populations were discriminated using specific antibodies against CD71 (expressed only at the surface of immature erythrocytes) and CD61 (expressed at the surface of platelets) and the DNA content of micronuclei was determined by the use of DNA-specific stain (propidium iodide). A flow cytometer was used to evaluate all samples. Anti-CD71 and anti-CD61 antibodies were labeled with fluorescein

isothiocyanate and phycoerythrin, respectively. Particles were differentiated using forward scatter and side scatter parameters of the flow cytometer. A minimum of 10,000 immature erythrocytes per mouse was examined for the incidence of micronucleated immature erythrocytes and the ratio between immature and mature erythrocytes was determined and expressed as relative PCE (proportion of polychromatic erythrocytes among total erythrocytes). A finding was considered positive if there was a dose-related increase in the number of micronucleated cells and/or a biologically relevant increase in the number of micronucleated cells for at least one dose group.

Four hours following injection of the NaCl extract of whole powder, mice showed reduction of spontaneous activity, cramps, rough fur, and prone position. These signs cleared by 44 hours (time of first blood sampling). There was no dose-related increase in the number of micronucleated cells and all mean values were within the range of the historical control data of the negative control. Statistical analysis ($p<0.05$) verified these results. The study fulfilled the validity criteria. The investigators concluded that under the experimental conditions tested, the whole powder did not induce structural or numerical chromosomal damage in the immature erythrocytes of the mouse, and thus the test article is considered to be non-mutagenic with respect to clastogenicity and aneugenicity.

### 6.2.3. Human Studies

### 6.2.3.1. Human Studies with Coffeeberry® Coffee Fruit Extract

### 6.2.3.1.1. Reyes-Izquierdo et al. (2013a)

In a single-dose study, Reyes-Izquierdo et al. (2013a) investigated the effect of Coffeeberry® Coffee Fruit Extract, green coffee caffeine powder, grape seed extract powder and green coffee bean extract powder on blood levels of brain-derived neurotrophic factor (BDNF). In this study, randomly assorted groups of fasted subjects consumed a single, 100 mg dose of each material. Plasma samples were collected at time zero and at 30 min intervals afterwards, up to 120 min. A total of two control groups were included: subjects treated with silica dioxide (as placebo) or with no treatment. The inclusion criteria required participants to be between the ages of 18 and 55 years and have a BMI between 18 and 25 kg/m². The collected data revealed that treatments with green coffee caffeine powder and grape seed extract powder increased levels of plasma BDNF by about 31% under these experimental conditions, whereas treatment with whole coffee fruit concentrate powder increased it by 143% (n=10), compared with baseline. The investigators suggested that the results of this study indicate that whole coffee fruit concentrate powder could be used for modulation of BDNF-dependent health conditions. However, larger clinical studies are required to support this possibility.

Reyes-Izquierdo et al. (2013a) also performed a single dose, placebo-controlled, within-subject study to confirm and further investigate the effect noted in the above study. This experiment was performed to verify the reproducibility of the effect of whole coffee fruit concentrate powder. In this subsequent study, 20 healthy subjects with ages ranging from 25 to 35 participated. All subjects fasted and resting subjects received placebo on day 1, whole coffee fruit concentrate powder on day 2, and a cup of freshly brewed coffee on day 3. Treatment with whole coffee fruit concentrate powder resulted in a statistically significant increase in plasma BDNF compared to placebo (p=0.0073) or coffee (p=0.0219) during first 60 minutes. Furthermore, oral whole coffee fruit concentrate powder consumption acutely increased BDNF levels in serum. The

investigators suggested that available results justify further clinical investigation of whole coffee fruit concentrate powder as a tool to manage BDNF-dependent health conditions.

### 6.2.3.2. Human Studies with Other Coffeeberry® Products

### 6.2.3.2.1. Ostojic et al. (2008)

In a 4-week prospective, randomized, double-blind, placebo-controlled trial, Ostojic et al. (2008) investigated the changes in total antioxidant capacity and aerobic and anaerobic performance induced by supplementation of whole coffee fruit powder in college athletes. In this study, 20 healthy college athletes (14 males and 6 females, mean age = $22.1\pm2.7$ years; mean body weight = $74.1\pm15.0$ kg; mean fat mass = $15.6\pm7.0$; mean basal metabolic rate = $1847\pm378$ kcal) ingested one tablet containing 400 mg of whole coffee fruit powder (n=10) or cellulose placebo (n=10) twice a day for 28 days. All subjects were instructed to consume a standardized diet four weeks prior to whole coffee fruit powder ingestion and seven days prior to baseline testing. Baseline testing of all the parameters studied was conducted. At the end of 28-day exposure period, blood was drawn from an antecubital vein and analyzed for total antioxidant capacity based on chemiluminescence, glucose, triacylglycerol, lipoproteins, and total cholesterol. After the blood draw, the participants completed a warm-up followed by a 60-second vertical jump test and a shuttle-run, at the end of which heart rate and blood lactate levels were measured.

No significant differences between the experimental and control groups in plasma glucose, triacylglycerol, high- or low-density lipoprotein, or total cholesterol was noted. However, antioxidant capacity of the group receiving whole coffee fruit powder was significantly higher at the end of the treatment period than in the pretest as well as significantly higher than that of the controls. Following exercise, the treated group showed significantly quicker heart recovery rate (a reduction during the first minute post-exercise of $38\pm4$ beats/min versus $32\pm5$ beats/min from the maximum rate observed during exercise) and lower levels of blood lactate ($5.5\pm2.6$ mmol/l versus $8.5\pm3.0$ mmol/l) as compared to placebo controls. No adverse effects were reported following ingestion of 800 mg/day of whole coffee fruit powder or approximately 10.8 mg/kg bw/day for 28 days. The investigators concluded that ingestion of whole coffee fruit powder did not significantly affect endurance or anaerobic performance indicators of college athletes but improved total antioxidant capacity and "does not induce any acute adverse effects."

### 6.2.4. Other Studies with Coffee Fruit

Besides the above described specific studies of Coffeeberry® products, very few pertinent studies were found in the published literature. In a series of published articles from 1995 to 2001, anticarcinogenic effects of the coffee cherry with the bean removed for coffee production, focusing on spontaneous mammary tumors in a high-mammary-tumor strain of SHN/Mei virgin mice, were investigated. The test article in all these studies (with one exception) was prepared by repeated extraction of dried coffee cherry with hot water. The supernatant from these extractions was pooled, dried *in vacuo*, and dissolved in tap water to provide a final test concentration of 0.5% of extracted coffee cherry which was used as the single test dose. In these studies, control mice received plain tap water. The mice were housed 4-5 animals/cage in Teflon cages with wood shavings, and with feed and water available *ad libitum*. Unless specifically stated, it was not clear in the reported studies whether treated animals received the 0.5% water extract in lieu of untreated tap water (i.e., *ad libitum*) or if a specific volume of the 0.5% water extract was administered to the mice. However, based on the

descriptions provided in the later studies by the same investigators, it was assumed that, for all the studies, the 0.5% water extract of coffee cherry replaced the drinking water in treated groups.

### 6.2.4.1. Nagasawa et al. (1995)

In this study, Nagasawa et al. (1995) reported that 2-month-old mice (n=24) ingesting the 0.5% water extract of coffee cherry (amount not stated) for a period up to 12 months showed a statistically significant reduction in the development of spontaneous mammary tumors compared with control mice (n=18) receiving untreated tap water. Body weight was recorded and feed and water consumption were estimated (over a 3-day period) at the start of treatment and monthly thereafter for seven months (no explanation was provided as to why body weights were not recorded to the end of the study). Urine was collected at 2 and 5 months and analyzed using a spectrometer. In addition, vaginal smears were taken daily from 5 test mice and 6 controls for 30 days at 1-2 months treatment to assess estrous cycle.

In this study, mice were palpated once a week for mammary tumors until first tumor appearance or until the end of the treatment period. When a tumor was identified, mice were killed by decapitation under light anesthesia. Blood was collected from the trunk and serum was analyzed for free fatty acid and prolactin levels. In surviving mice, blood was collected at eight months for determination of glucose level. At necropsy, the bilateral third thoracic glands were examined for normal and preneoplastic mammary gland growth; the bilateral inguinal glands were removed and prepared to determine the activities of thymidylate synthetase and thymidine kinase; anterior pituitary, adrenals, and ovaries were removed and weighed; adrenals and ovaries were examined histologically; and the unilateral uterine horns were removed and histologically examined for adenomyosis (Nagasawa et al., 1995).

Appearance of tumors were first noted in controls at around four months and in test mice at six months. The cumulative incidence of tumors was significantly lower in test mice as compared to controls. However, the number of tumors per mouse (1-2) was similar in test and control groups. Areas of normal and preneoplastic mammary glands were significantly smaller in test mice as compared to controls. In tumor-bearing mice, serum free fatty acid levels were significantly lower in treated mice than controls. After two months of treatment, body weights were significantly lower in test mice compared to controls, but feed intake did not differ between groups. Water intake was significantly reduced in test mice compared to controls. Some urinary components were significantly higher in test mice as compared to controls: urea, allantoin, and creatinine at 2 and 5 months; taurine and betaine at two months; and citric acid at five months. Endocrine organ weights and histology, estrous cycle, blood glucose level, uterine adenomyosis, activities of thymidylate synthetase and thymidine kinase, and serum prolactin level did not differ between test and control groups. Although data was not provided, visual examination of a graph presented in the published article led to an estimate of water intake of about 4.5 ml/mouse/day, resulting in an estimated intake of coffee cherry extract of about 22.5 mg/mouse/day or 900 mg/kg bw/day assuming a mouse weighs 25 g (Nagasawa et al., 1995).

### 6.2.4.2. Nagasawa et al. (1996a)

In another study by the same investigators, Nagasawa et al. (1996a) reported that mice that were "retired after the 2nd or 3rd lactation" (this was the only indication of age reported) were palpated once a week for mammary tumors until first tumor appearance. After tumors developed, half of the tumor-bearing mice were assigned to receive the 0.5% water extract of

coffee cherry (n=13; details of amount administered not stated) and the remainder received plain water (n=9). On the 10th day of the treatment, mice were euthanized by decapitation under light anesthesia and the number and size of tumors were recorded. Body weights were recorded at the start and end of treatment. As in the previous study, blood was collected from the trunk and serum was analyzed for free fatty acid levels. At necropsy, the bilateral third thoracic glands were examined for normal and preneoplastic mammary gland growth; the portions of mammary tumors with no necrosis were removed and prepared to determine the activities of thymidylate synthetase and thymidine kinase; anterior pituitary, adrenals, lung, and ovaries were removed and weighed; and adrenals, lung, and ovaries were examined histologically. Both growth in the palpable size of the tumors and the activity of thymidylate synthetase in the tumors were significantly reduced by ingestion of coffee-cherry extract. It was reported that normal and preneoplastic mammary gland growth, serum free fatty acid, change in body weight, and endocrine organ weight and histopathology were not significantly affected. No metastasis to the lung was noted (Nagasawa et al., 1996a).

### 6.2.4.3. Nagasawa et al. (1996b)

Nagasawa et al. (1996b) also tested a methanol extract of coffee cherry instead of the water extract for potential effects on spontaneous tumorigenesis in SHN mice. The methanol extract was prepared by repeated extraction of dried coffee cherry with 60% methanol, then the supernatants were pooled and dried *in vacuo*. The water-soluble fraction of dry matter was dissolved in tap water to provide a final concentration of 0.25% methanol-soluble extract of coffee cherry. The water-insoluble fraction was prepared as a 2.0% fat emulsion and then diluted to produce a final concentration of 0.25% methanol-insoluble extract of coffee cherry. Two-month-old SHN mice were given 0.25% methanol soluble extract in their drinking water until all controls (mice receiving untreated tap water concurrently) developed mammary tumors. The number of animals in the study was not clearly reported; different numbers of animals ranging from 5 to 20 appeared in the various results tables. Tumor-bearing mice were killed one week after first tumor appearance. According to the results tables, treatment continued for up to five months, although "some" control and treated mice that did not develop tumors were terminated after two months of treatment. Both the soluble and insoluble methanol extracts were given for 10 days to groups of multifarious retired mice (age and number not specified) with palpable mammary tumors. Mice were palpated weekly for mammary tumors and tumor size was recorded on days 0 (the day prior to start of treatment), 3, 6, and 10. Feed and water consumption were estimated over a 3-day period at the start of treatment and monthly thereafter (Nagasawa et al., 1996b).

Urine was collected (schedule not stated; taken only from non-tumor-bearing mice terminated at two months) and analyzed using a spectrometer. In addition, vaginal smears were taken daily from treated and control mice (number not stated) for 30 days after one month of treatment to assess estrous cycle. Prior to necropsy, blood was collected from the trunk and serum was analyzed for free fatty acid and prolactin levels. At necropsy, the bilateral third thoracic glands were examined for normal and preneoplastic mammary gland growth; the bilateral inguinal glands were removed and prepared to determine the activities of thymidylate synthetase and thymidine kinase; anterior pituitary, adrenals, ovaries, kidney, pancreas, liver, thymus, and/or spleen were removed and weighed; adrenals, uterus, and ovaries were examined histologically; and thymus, spleen, peripheral blood, and natural killer cells in the spleen were

prepared to determine surface antigenic markers (only in non-tumor-bearing mice terminated at two months) (Nagasawa et al., 1996b).

In mice given the methanol soluble extract, time-to-tumor was similar to that of controls (four months) but the cumulative incidence of tumors was significantly lower in treated mice compared to controls. Tumor growth was similar between treated and control mice. In mice with established tumors, the activity of thymidine kinase, but not thymidylate synthetase, was significantly lower in treated mice. Water intake was significantly lower in treated mice than controls, which was considered to be due to the bad taste of the extract. The estrous cycle and serum prolactin and free fatty acid levels did not differ between groups. The only organ weight changes noted in mice receiving the methanol soluble extract was a significant increase in ovary weight in non-tumor-bearing animals terminated after two months of treatment compared to corresponding controls and a significant increase in adrenal weight in mice treated for 10 days (Nagasawa et al., 1996b).

Ingestion of the methanol soluble extract showed no effect as assessed by histological examination. Normal and preneoplastic growth was similar between treated and control groups. Treated mice showed a significant increase in urine hippurate, creatinine, and citrate, but not urea, allantoin, creatine, taurine, betaine, oxoglutarate, acetate, or lactate when compared to controls. A significant increase compared to controls was observed in the percentages of thymocytes expressing helper/inducer (CD4$^+$8$^-$), cytotoxic/suppressor (CD4$^-$8$^+$) or pre-T (CD4$^-$8$^-$) phenotypes with a concomitant significant decrease in immature (CD4$^+$8$^+$) thymocytes. A significant decrease compared to controls was observed in the percentages of splenic lymphocytes expressing helper/inducer (CD4$^+$8$^-$) or cytotoxic/suppressor (CD4$^-$8$^+$). Natural killer cell activity in the spleen showed no difference from controls. In mice receiving methanol insoluble extract (testing was limited due to the small amount of the test material), tumor growth, thymidylate synthetase and thymidine kinase activities, normal and preneoplastic mammary gland growth, pituitary gland and ovary weights, and adrenal and ovary histology were similar to those of controls. Adrenal weight was significantly lower than that of controls. Water intake of the mice treated with the soluble extract was estimated (based on inspection of a graph) to be about 4.5 ml/mouse/day, resulting in an estimated intake of coffee cherry extract of about 22.5 mg/mouse/day or 900 mg/kg bw/day, assuming a mouse weighs 25 g (Nagasawa et al., 1996b).

### 6.2.4.4. Kobayashi et al. (1996)

In an attempt to examine the possible immunomodulating effect of coffee cherry as a part of the mechanism for suppressing mammary tumors in virgin SHN mice, Kobayashi et al. (1996) treated 2-month-old mice (n=12) with 0.5% water extract of coffee cherry (amount not stated). Controls (n=11) received tap water only. After two months of treatment, mice were killed by decapitation under light anesthesia. At necropsy, blood was collected from the trunk. Thymus and spleen were removed and weighed and cell suspensions were prepared. Thymic cells were incubated with phycoerythrin (PE)-conjugated rat anti-mouse CD4 IgG and fluorescein isothiocyanate (FITC)-conjugated rat anti-mouse CD8a IgG monoclonal antibody. Splenic and peripheral blood lymphocytes were stained with PE-conjugated rat anti-mouse CD25 IgG and FITC-conjugated hamster anti-mouse CD3$_E$ monoclonal antibody. After washing, all treated cells were analyzed by flow cytometer. To assess natural killer activity, splenic cells also were prepared to determine cytotoxicity against YAC-1 lymphoma cells in an enzyme-release assay and to measure released lactate dehydrogenase by a Cyto Tox 96 non-radioactive cytotoxicity assay kit.

As compared to control, the spleen weights were significantly higher in treated mice, although there were no changes in natural killer activity of splenic cells. A significant increase compared to controls was observed in the percentages of cells expressing helper/inducer ($CD4^+8^-$) or pre-T ($CD4^-8^-$) phenotypes with a concomitant significant decrease in immature ($CD4^+8^+$) thymocytes. The increase reported in cytotoxic/suppressor ($CD4^-8^+$) phenotypes did not reach statistical significance. CD25 expression showed no differences between treated and control groups (Kobayashi et al., 1996).

### 6.2.4.5. Kobayashi et al. (1997)

In another study, Kobayashi et al. (1997) investigated the effects of coffee cherry on the activation of splenic lymphocytes in SHN mice. For these studies, two different extracts were prepared: (1) the 0.5% water extract and (2) the 0.25% methanol soluble extract, both previously described (see above). Two-month-old mice (number not reported) received either 0.5% water extract or 0.25% methanol soluble extract as drinking water for three weeks. A group of control mice received plain tap water. At the end of study period, mice were euthanized by decapitation under light anesthesia. At necropsy, the spleen was removed and weighed, and cell suspensions were prepared. Splenic lymphocytes were stained with PE-conjugated rat anti-mouse CD25 IgG and FITC-conjugated rat anti-mouse CD45R/B220 monoclonal antibodies. After washing, all treated cells were analyzed by flow cytometer. To assess mitogenic activity, splenic lymphocyte suspensions were incubated in 96-well plates with concanavalin A (a lymphocyte mitogen) or *E. coli*-lipopolysaccharide for 48 hours at 37ºC in 5% $CO_2$. Alamarblue solution was added and the cells were further incubated for four hours after which the optimal density of each well was measured using a micro plate reader (Kobayashi et al., 1997).

As compared to control, no changes in spleen weights were noted in the treated group. The lymphocyte response to mitogen exposure was not affected by either of the coffee cherry extracts, but the lipopolysaccharide response was significantly enhanced with increased percentages of CD45R/B220+ cells in the splenic lymphocytes and CD25+ cells in B-lymphocytes. Water intake was estimated to be 4.5 and 2.4 g/mouse/day for the water and methanol soluble extract, respectively, resulting in an intake of coffee cherry extract of about 22.5 and 6 mg/mouse/day or 900 and 240 g/kg bw/day, respectively, assuming a mouse weighs 25 g (Kobayashi et al., 1997).

### 6.2.4.6. Nasagawa et al. (1999)

In yet another study, Nasagawa et al. (1999) investigated the effects of ingestion of the 0.5% water extract of coffee cherry with or without simultaneous treatment with hydroxyapatite. In this study, two-month-old control mice (n=40) were given feed pellets formulated with 5% calcium carbonate while 2-month-old treated mice (n=30) were given feed pellets formulated with 5% hydroxyapatite. Both groups received untreated tap water for 3 months and then treated mice were switched to the 0.5% water extract of coffee cherry. The feed pellets, plain tap water (controls), and treated water containing 0.5% extract of coffee cherry were provided *ad libitum* to the mice. Mice were palpated weekly and treatment continued until a week after the appearance of mammary tumors or, in the absence of tumor formation, for nine months. To assess tumor growth, "some" tumor-bearing mice were continued on the treatment regime for an additional 12 days after the mean tumor size reached 5-6 mm in diameter. Feed and water intake were estimated over 5 consecutive days (time within study not specified) and body weights were recorded monthly. At necropsy, the bilateral third thoracic glands were examined for normal and

preneoplastic mammary gland growth. The unilateral uterine horns were removed and histologically examined for adenomyosis; and anterior pituitary, adrenals, and ovaries were removed and weighed. At seven months, blood was collected from 10 fasted mice/group at intervals of 30, 60, and 120 minutes following intraperitoneal injection of glucose for determination of glucose level. Also, at seven months, urine was collected and urine components were determined by spectrometer (Nagasawa et al., 1999).

Feed intake in both controls and treated groups decreased for the first six months, then stabilized. After about four months of treatment, water intake was significantly higher in treated mice as compared to controls. Body weight changes were similar to those of control mice for the first five months, but then treated mice showed a significant increase compared to controls until the end of the study. The time-to-tumor and incidence of mammary tumors were significantly lower in treated mice compared to controls at each month from 2-8 months of treatment. Ovarian weights were significantly greater than those of controls. Most of the urinary components (hippurate, allantoin, creatinine, creatine, taurine, betaine, acetate, and lactic acid) showed no difference between treated and control animals. However, urea was significantly higher in treated mice whereas citrate was significantly lower in treated mice. Mammary tumor growth, normal and preneoplastic mammary gland growth, uterine adenomyosis, glucose tolerance, and anterior pituitary and adrenal weights did not differ between treated and control groups. It was noted by the study authors that co-administration of hydroxyapatite with water extract of coffee cherry did not enhance any of the studied effects but actually showed a reduction in any reported effects. Water intake was estimated to be about 7.5 ml/mouse/day (based on graph in the published paper) resulting in an estimated intake of coffee cherry extract of about 37.5 mg/mouse/day or 1340 mg/kg bw/day, assuming an average body weight of 28 g (also estimated by visual inspection of a graph) (Nagasawa et al., 1999).

### 6.2.4.7. Udagawa and Nagasawa (2000)

In another study, Udagawa and Nagasawa (2000) investigated the effects of concurrent treatment with 0.5% water extract of coffee cherry and whole-body hyperthermia on the growth of spontaneous mammary tumors in SHN mice. In this study, three-month-old mice were palpated for mammary tumors twice a week until tumors reached a diameter of 5-7 mm. At this time, tumor-bearing mice were divided into treated (n=21) and control (n=20) groups. The drinking water of treated animals was switched from plain tap water to 0.5% water extract of coffee cherry, while controls were maintained on untreated tap water. Approximately half of the mice from each group (n=11 for treated; n=10 for control) were weighed and then exposed to whole-body hyperthermia (room temperature was maintained at 37-42ºC for this session) for 3 hours/day for 5 consecutive days. Mammary tumor growth was measured daily. Five days after the last whole-body hyperthermia treatment, mice were weighed and killed by decapitation under light anesthesia. Prior to necropsy, mice were fasted for 18 hours and blood was collected from the trunk for determination of plasma components. At necropsy, the bilateral third thoracic glands were examined for normal and preneoplastic mammary gland growth; and anterior pituitary, adrenals, and ovaries were removed and weighed.

In mice receiving 0.5% water extract of coffee cherry, mammary tumor growth was significantly lower regardless of exposure to whole-body hyperthermia. Treated mice with or without exposure to whole-body hyperthermia had significantly higher body weights than corresponding controls. Ovarian weight was significantly higher in treated mice exposed to whole-body hyperthermia compared to corresponding controls, while all other organ weights

were similar to controls. Normal and preneoplastic mammary gland growth did not differ between treated and control groups with the exception of a significant increase in the number of hyperplastic alveolar nodules in treated mice exposed to whole-body hyperthermia compared to corresponding controls. Plasma component levels were similar between treated and control groups with the exception of albumin, which was significantly lower in treated mice not exposed to whole-body hyperthermia compared to corresponding controls (Udagawa and Nagasawa, 2000).

### 6.2.4.8. Nagasawa et al. (2001)

In the most recent study from this group that involves measurements of some safety parameters, Nagasawa et al. (2001) administered the 0.5% water extract of coffee cherry or plain tap water to 2-month-old female SHN mice (number of animals not reported) for 60 days. At the start of treatment, just after motor skills testing, and prior to necropsy, body weights were recorded. Feed and water intake were estimated over three consecutive days starting after one week of treatment (details of schedule not mentioned). After 30 and 60 days of treatment, blood and urine were collected for plasma component and urine component levels, and spontaneous motor activity was assessed by a sensor monitor mounted above the cage to detect body heat. Both urinalysis and plasma measures included the following: albumin, alkaline phosphatase, alanine aminotransferase, amylase, aspartate aminotransferase, globulin, total bilirubin, urea nitrogen, calcium, cholesterol, creatinine, glucose, and total protein. At necropsy, the bilateral third thoracic glands were examined for normal and preneoplastic mammary gland growth; and anterior pituitary, adrenals, ovaries, thymus, spleen, heart, lung, pancreas, liver, and kidneys were removed and weighed.

Water intake was estimated to be 5.5-6.5 g/mouse/day resulting in an intake of coffee cherry extract of about 27.5-32.5 mg/mouse/day or 1100-1300 mg/kg bw/day, assuming a mouse weighs 25 g [estimated from body weight data reported in Nagasawa et al. (1995; 1996b; 1999) and Kobayashi et al. (1997)]. At 30 days of treatment, body weight in treated mice was significantly lower than that of controls. However, at day 60, body weight was similar between treated and control groups. Spontaneous motor activity and feed and water intake were similar between treated and control groups. In the plasma of treated mice, when compared to control values, alanine aminotransferase, aspartate, aminotransferase, and blood urea nitrogen levels were significantly lower at 60 days; cholesterol levels were significantly lower at 30 days but significantly higher at 60 days; amylase levels were significantly lower at 30 days but not at 60 days; and creatinine levels were significantly higher at 30 days but not at 60 days. In the urine of treated mice, when compared with control values, alanine aminotransferase, aspartate aminotransferase, and glucose levels were significantly lower at 60 days. All other plasma and urine parameters were similar to those of controls. The only significant difference reported in organ weight was a significant increase in the weight of the pancreas. Normal and preneoplastic mammary gland growth did not differ between treated and control groups with the exception of a significant decrease in the number of hyperplastic alveolar nodules in treated mice (about one-third that of controls).

In summary, none of the above described studies were designed to investigate the toxicity of ingestion of coffee-cherry extracts. However, these studies did not reveal any adverse effects at the tested concentrations of 0.25% and 0.5% of the coffee cherry extracts, equivalent to approximately 900-1340 mg coffee cherry extract/kg bw/day.

## 6.2.5. Safety of Chlorogenic Acids

Among the phenolic acids (≥40%) found in Coffeeberry® Coffee Fruit Extract, chlorogenic acid has been reported as a major component present at levels up to 40%. Chlorogenic acids are a family of esters formed between certain cinnamic acids (such as caffeic, *p*-coumaric, and ferulic acids) and quinic acid. The term "chlorogenic acid" encompasses at least 5 subclasses including caffeoylquinnic acid, dicaffeoylquinic acids, feruloylquinic acids, *p*-coumaroylquinic acid, and caffeoylferuloylquinic acid, with each subclass containing at least 3 isomers (Monteiro et al., 2007).

The available information shows that chlorogenic acids are found naturally in fruits, leaves, and other tissues of many dicotyledonous plant species (NTP, 1998). Standard coffee products typically contain 70 to 350 mg of chlorogenic acids per serving (Clifford, 1999). In addition to its presence in coffee beans, chlorogenic acid is found at high concentrations in a number of fruits and vegetables (Gonthier et al., 2003). The daily intake of chlorogenic acid among coffee drinkers has been reported to vary from 500 to 1000 mg, whereas coffee abstainers consume approximately <100 mg of chlorogenic acid/day (Olthof et al., 2001). Based on the concentration of chlorogenic acid (40%) and the 90th percentile intake of Coffeeberry® Coffee Fruit Extract of 393 mg/person/day, the resulting maximum intake of chlorogenic acid from the proposed uses of Coffeeberry® Coffee Fruit Extract is estimated as 157mg/person/day.

### 6.2.5.1. Metabolic Fate of Chlorogenic Acids

The absorption, distribution, metabolism and excretion of chlorogenic acids has been extensively studied in animals and human subjects. The available studies in animals suggest that small amounts of ingested chlorogenic acids are absorbed intact from the stomach and small intestines, while the majority is transported intact to the lower gastrointestinal tract (Azuma et al., 2000; Gonthier et al., 2003; Lafay et al., 2006a,b; Ren et al., 2007). Upon reaching the colon, chlorogenic acids are hydrolyzed to caffeic acid and quinic acid that are further metabolized through common metabolic pathways mediated by the intestinal microflora. Quinic acid is converted to benzoic acid, which can be further metabolized in the liver by conjugation reaction with glycine to produce hippuric acid. Gonthier et al. (2003) reported that approximately 60% of an ingested dose of chlorogenic acid is recovered as metabolites in the urine of rats, with hippuric acid being the predominant metabolite accounting for 36.5% of the ingested dose.

The available studies in humans also indicate that approximately 70% of an ingested dose of chlorogenic acid is transported to the colon intact (Olthof et al., 2001; Farah et al., 2008). Only small amounts (less than 2% of an administered dose) of intact chlorogenic acid have been recovered in the urine unchanged following oral ingestion. Olthof et al. (2003) reported that humans have a high metabolic capacity for chlorogenic acid. No evidence of saturation of metabolic pathways was noted at doses up to 2 g/day as indicated by the small amount of intact chlorogenic acid recovered in the urine even at this high dose. The urinary metabolites identified in humans were derivatives of caffeic acid, ferulic acid and quinic acid, as well as their glucuronidated and sulfated forms (Rechner et al., 2001; Olthof et al., 2003, Monteiro et al., 2007; Farah et al., 2008; Stalmach et al., 2009, 2010). Some of these metabolites are likely to be formed through metabolism mediated by the colonic microflora.

### 6.2.5.2. Toxicity Studies of Chlorogenic Acids

Chlorogenic acid is of low acute toxicity. In a study in female Wistar rats, no mortality or morbidity were observed following administration of chlorogenic acid *via* intraperitoneal route at a dose of 2437 mg/kg bw (Chaube and Swinyard, 1976). In short-term oral toxicity studies, chlorogenic acid was without toxicologically relevant adverse effects when supplemented to the diets of rats at 1%, corresponding to approximately 1000 mg/kg bw/day, for 3 weeks (Eklund, 1975). In another study, female BALB/C mice fed diets supplemented with 0.2% chlorogenic acid, corresponding to intakes at approximately 300 mg/kg bw/day, for 10 weeks did not reveal any significant adverse effects on total body weight, as well as liver and intestinal weights (Kitts and Wijewickreme, 1994). There is limited data pertaining to developmental/reproductive toxicity of chlorogenic acids. Intraperitoneal administration of chlorogenic acid at doses up to 500 mg/kg bw/day to rats during gestational days 5 to 12 was without toxicologically relevant effects in the dams or offsprings (Chaube and Swinyard, 1976).

In various genotoxicity/mutagenicity studies, conducted *in vitro*, both positive and negative results have been obtained. However, the positive results occurred under experimental conditions that were deemed not physiologically relevant, and as such, these findings were not considered to be of concern with respect to human health. Findings from an *in vivo* micronucleus test conducted in mice provided further evidence that chlorogenic acid was not genotoxic/mutagenic. Moreover, several *in vitro* and *in vivo* studies have suggested that chlorogenic acid may in fact possess anti-mutagenic and anti-genotoxic properties. Mori et al. (1986) reported that supplementation of chlorogenic acid to the diets of Syrian golden hamsters at doses providing approximately 30 mg/kg bw/day for 24 weeks did not induce any neoplasms or hyperplastic lesions in the liver, small intestines, or large intestines.

Among the metabolites of chlorogenic acid, only caffeic acid is considered to be of toxicological relevance. Hirose et al. (1987) reported evidence of hyperplasia in the forestomach epithelium following supplementation of caffeic acid to the diets of rats at 2% (corresponding to approximately 2000 mg/kg bw/day) for 28 days. It is notable that in this study, chlorogenic acid did not produce forestomach hyperplasia (Hirose et al., 1987). In a long-term study, Hagiwara et al. (1991) reported hyperplasia and squamous-cell papillomas and carcinomas in the forestomach of rats and mice following chronic supplementation of caffeic acid in the diet for durations of up to 96 to 104 weeks. In this same study, some evidence of renal tubular-cell hyperplasia and adenomas were also observed in the rodents (Hagiwara et al., 1991). However, these findings are of limited relevance as the dose of caffeic acid used (1000 to 2000 mg/kg bw/day) are vastly higher than levels that would be expected from the exposure to Coffeeberry® Coffee Fruit Extract. The relevance of forestomach tumors in rodents to human carcinogenesis is also unclear. Furthermore, both chlorogenic acid and caffeic acid have been reported to have anti-carcinogenic effects in animal studies (Lesca, 1983; Huang et al., 1988; Steele et al., 1994; NTP, 1998; Park et al., 2010).

In summary, the available information suggests that chlorogenic acid present in Coffeeberry® Coffee Fruit Extract is unlikely to cause any adverse effects.

### 6.2.6. Corroborative Information

### 6.2.6.1. Evaluation by Health Canada

In 2016, Health Canada's Food Directorate critically assessed FutureCeuticals' Novel Food notification on Coffeeberry® whole coffee fruit derivatives, including the extract that is the subject of the present GRAS assessment, and the agency responded that it has no objection to the sale of these preparations as ingredients for use at levels up to 300 mg/serving in foods and beverages (Health Canada, 2016). The safety assessment performed by the Food Directorate considered the development of the products, their intended use, the estimated level of consumption by consumers, the incidental intake of heavy metals and mycotoxins, the nutritional and anti-nutrient composition, the microbiological and toxicological information, and the presence of potential allergens.

In its assessment, the Food Directorate also critically reviewed the toxicological studies to support the safety of Coffeeberry® products that included a sub-chronic (90-day) oral toxicity study in rats, an *in vitro* bacterial reverse mutation assay, and an *in vivo* micronucleus assay in mice. These studies were conducted in accordance with accepted international standards. A scientific rationale was provided in the Novel Food notification to support the safe use of the products by pregnant women. Dietary exposure was also calculated for caffeine and chlorogenic acids (CGA), the major active constituents of Coffeeberry® products. The Food Directorate concluded that the information provided was sufficient to assess the safety of the Coffeeberry® whole powder and aqueous ethanolic extract (the subject of the present GRAS assessment – Coffeeberry® Coffee Fruit Extract) in foods.

The Food Directorate noted that the sub-chronic oral toxicity study conducted in rats used Coffeeberry® Coffee Fruit Extract at doses ranging from 0 to 5.0% in the diet. A No Observed Adverse Effect Level (NOAEL) of 5% in the diet was established, which is equivalent to 3446 and 4087 mg/kg bw/day for males and females, respectively. The dietary intake estimate considered that individuals would consume up to 8 servings/day of Coffeeberry® products; 4 servings from beverages and 4 servings from other foods. This is equivalent to doses of 34.3 mg/kg bw/day in adults weighing 70 kg and 68.6 mg/kg bw/day in a 35 kg child. As compared to the NOAEL established in the 90-day study, a margin of exposure (MOE) was determined to be 100 for adults and 50 for children. The lower MOE in children reflects the assumption that children would consume the same amount of Coffeeberry® from food and beverages as an adult. The Food Directorate considered this MOE large enough to be safe for consumption of Coffeeberry®.

Regarding exposure to caffeine, the Coffeeberry® whole coffee fruit powder contains about 1% caffeine while Coffeeberry® Coffee Fruit Extract contains 1-2%. Based on a maximum daily intake of 2400 mg of the extract, the maximum dietary intake of caffeine from consuming 8 servings would be 48 mg/day. The agency noted that this amount would be below the Health Canada guidelines for caffeine in all populations except for young children in whom it would be marginally above their recommended levels (Recommended Maximum Daily Intake of caffeine for 4 to 6-year olds = 45 mg/day) (Health Canada, 2016). Considering the conservative exposure scenario and the fact that the daily exposure to caffeine per day would resemble consuming 1 can of cola (typically containing 36-50 mg/355 mL serving), this dietary intake of caffeine would not be expected to pose a safety concern. The Food Directorate also noted that Coffeeberry® Coffee Fruit Extract consists of < 45.0% chlorogenic acids (CGAs). CGAs are

common constituents of the diet, with the greatest intake being from the consumption of coffee. As CGAs are regularly consumed in the diet with no apparent toxicity, exposure to CGAs from the consumption of 8 servings of Coffeeberry® per day would not be expected to result in any adverse health effects (Health Canada, 2016).

The Food Directorate also noted that no reproductive studies on Coffeeberry® products were submitted. However, FutureCeuticals argued that Coffeeberry® products did not exhibit any genotoxic potential and a 90-day oral toxicity study did not result in any adverse health effects at levels much higher than those expected to be consumed in the diet. Furthermore, exposure to caffeine was within Health Canada's recommended maximum daily intake for pregnant women, and the Food Directorate noted that the level of chlorogenic acids in one serving of Coffeeberry® Coffee Fruit Extract is similar to consuming one cup of coffee or less. Compositional analyses also demonstrated that any component identified by FutureCeuticals in the extract that was not present in the coffee bean (all identified as polyphenols) was a normal constituent of other commonly consumed foods at comparable levels. No new compounds not previously known to be a component of food were identified by FutureCeuticals. Based on this information, the Health Directorate stated that there is no reason to expect that Coffeeberry® would pose a risk to pregnant women or the developing fetus (Health Canada, 2016).

In summary, based on the information presented in support of the use of Coffeeberry® Coffee Fruit Extract as a food ingredient in Canada within the proposed conditions of use, the Food Directorate concluded that there are no food safety concerns for the general population.

It should be noted that for the present GRAS assessment, the intake analysis was performed using the NHANES 2009-2014 data and the resulting maximum (90th percentile) intake of Coffeeberry® Coffee Berry Extract was 393 mg/person/day (5.9 mg/kg bw/day). This value is 6-fold lower than mentioned in Novel Food notification submitted to Health Canada. Furthermore the 90th percentile caffeine intake from the proposed uses of 7.8 mg/person/day is minor. In fact as described earlier in Section 3.2. Estimated Daily Intake the cumulative caffeine intake from background and the addition of Coffeeberry® Coffee Berry Extract to the selected food categories is lower than background intake (see Appendix I).

## 6.7. Expert Panel Review, Summary and Discussion

At the request of Amin Talati Upadhye, LLP (AminTalati), USA and its client VDF FutureCeuticals, Inc. (FutureCeuticals), an independent panel of recognized experts (hereinafter referred to as the Expert Panel)[2], qualified by their scientific training and relevant national and international experience to evaluate the safety of food and food ingredients, was convened to evaluate the Generally Recognized As Safe (GRAS) status of Coffeeberry® Coffee Fruit Extract, for use as a food ingredient and as an antioxidant in multiple selected food products, described in this dossier, and at use levels ranging from 20 to 300 mg/serving (reference amounts customarily consumed, 21 CFR 101.12). A comprehensive search of the scientific literature for safety and toxicity information on coffee fruit extract, its constituents such as caffeine, and related preparations was conducted through April 2019 and made available to the Expert Panel. The Expert Panel independently and critically evaluated materials submitted by AminTalati and

---

[2]Modeled after that described in section 201(s) of the Federal Food, Drug, and Cosmetic Act, As Amended. See also attachments (curriculum vitae) documenting the expertise of the Panel members.

FutureCeuticals and other information deemed appropriate or necessary. Following an independent, critical evaluation, the Expert Panel conferred on May 20, 2019 and unanimously agreed to the decision described herein.

AminTalati and FutureCeuticals ensured that all reasonable efforts were made to identify and select a balanced Expert Panel with expertise in food safety, toxicology, and nutrition. The Expert Panel was selected and convened in accordance with the Food and Drug Administration (FDA)'s guidance for industry on "Best Practices for Convening a GRAS Panel"[3]. Efforts were placed on identifying conflicts of interest or relevant "appearance issues" that could potentially bias the outcome of the deliberations of the Expert Panel and no such conflicts of interest or "appearance issues" were identified. The Expert Panel members received a reasonable honorarium as compensation for their time; the honoraria provided to the Expert Panel members were not contingent upon the outcome of their deliberations.

The *Coffea arabica* plant bears a cherry like fruit that consists of an exocarp, pulp, mucilage, and generally two central seeds (or "beans"). This coffee fruit has long been recognized as having inherent nutritional and health-enhancing potential. Despite its nutritional properties, the fruit historically could not be harvested because it is highly perishable and prone to rapidly develop both extensive bacterial contamination and molds. FutureCeuticals developed a new proprietary technology that has eliminated the risk of bacterial and fungal contamination. This technology allows FutureCeuticals to produce dried whole coffee fruit powders, granules, and extracts (Coffeeberry® products), including the water/ethanol extract that is the subject of this GRAS assessment (Coffeeberry® Coffee Fruit Extract), with high levels of phenolic acids.

FutureCeuticals intends to market the standardized Coffeeberry® Coffee Fruit Extract, produced from whole ground coffee fruits by water/ethanol extraction, as an antioxidant and as a food ingredient in selected conventional food products such as Flavored Water/Energy Drink; Coffee/Tea; RTM Beverages; Milk Products (pre-work out); Clusters/Bars; Fruit Juices; Vegetable Juices/Blends; Chocolate; Candy; and Chewing gum at use levels of ranging from 20 to 300 mg/serving (reference amounts customarily consumed, 21 CFR 101.12). The extract is a tan brown colored powder with characteristic odor and taste. FututreCeuticals has developed the food grade specifications of Coffeeberry® Coffee Fruit Extract. The phenolic acid content of Coffeeberry® Coffee Fruit Extract is greater than 40%, while the caffeine content is approximately 1 to 2%. Coffeeberry® Coffee Fruit Extract is manufactured according to current good manufacturing practices. The intended use of Coffeeberry® Coffee Fruit Extract in the above mentioned conventional foods and beverages is estimated to result in the U.S. population two years and older, the per user mean and 90th percentile of intake of Coffeeberry® Coffee Fruit Extract of 170 mg/person/day (2.7 mg/kg-bw/day) and 393 mg/person/day (5.9 mg/kg bw/day), respectively. Coffeeberry® preparations are also marketed as dietary supplements. Health Canada has permitted the use of Coffeeberry® products, including the subject of the present GRAS assessment, in conventional foods.

In a series of specifically designed studies, the potential toxicity of Coffeeberry® products has been extensively investigated. These studies included 7- and 14-day feeding studies of Coffeeberry® whole powder and water extract powder, a 14-day oral-gavage study of Coffeeberry® Coffee Fruit Extract, and a 90-day feeding study of Coffeeberry® Coffee Fruit Extract (the subject of the present GRAS assessment). Additionally, genotoxicity studies

---

[3] Available at: https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/ucm583856.htm

included Ames assays of all three Coffeeberry® products and a mouse micronucleus test of the whole powder. All of these studies were published in the peer-reviewed scientific literature. In the short-term feeding studies, some issues with palatability and tolerance of the extract were noted, however no toxicity was observed. The no observed adverse effect level (NOAEL) in the 90-day feeding study was the highest level tested, 5% dietary concentration, equivalent to 3446 and 4087 mg/kg bw/day for male and female rats, respectively. No evidence of genotoxicity under the conditions of the experiments was noted with the Coffeeberry® products. As compared to the NOAEL of 3446 mg/kg determined from the subchronic toxicity study (the highest dose tested), the maximum intake of 5.9 mg/kg bw/day (for an individual weighing 60 kg) of Coffeeberry® Coffee Fruit Extract from its proposed food uses at levels up to 300 mg/serving is over 580-fold lower.

As Coffeeberry® Coffee Fruit Extract is derived from whole coffee fruit, it naturally contains caffeine at levels of approximately 1-2%. It was estimated that the addition of Coffeeberry® Coffee Fruit Extract to conventional foods and beverages as proposed will result in 7.8 mg caffeine/person/day (0.12 mg/kg-bw/day) at 90th percentile. This additional intake of caffeine is minor and will have a negligible impact on total daily caffeine intake. The available information suggest that chlorogenic acid present in Coffeeberry® Coffee Fruit Extract is unlikely to cause any adverse effects.

In summary, there is sufficient qualitative and quantitative scientific evidence, including animal data, to assess the safety-in-use for Coffeeberry® Coffee Fruit Extract, the subject of this present GRAS assessment. The safety assessment of Coffeeberry® Coffee Fruit Extract is based on the totality of available evidence, including a variety of specifically designed animal toxicity studies. The totality of available evidence supports the safety of Coffeeberry® Coffee Fruit Extract at the maximum (90th percentile) all users intake of 393 mg/person/day. On the basis of scientific procedures[4], the consumption of Coffeeberry® Coffee Fruit Extract as an added food ingredient is considered safe at use levels up to 300 mg/serving. The intended uses are compatible with current regulations, *i.e.,* Coffeeberry® Coffee Fruit Extract is used in specified foods (described in this document) and is produced according to current good manufacturing practices (cGMP).

---

[4] 21 CFR §170.3 Definitions. (h) Scientific procedures include those human, animal, analytical, and other scientific studies, whether published or unpublished, appropriate to establish the safety of a substance.

### 6.8. Expert Panel Conclusion

Based on a critical evaluation of the publicly available data, summarized herein, the Expert Panel members whose signatures appear below, have individually and collectively concluded that Coffeeberry® Coffee Fruit Extract, meeting the specifications cited herein, and when used as an antioxidant at use levels ranging from 20 to 300 mg/serving in conventional foods such as Flavored Water/Energy Drink; Coffee/Tea; RTM Beverages; Milk Products (pre-work out); Clusters/Bars; Fruit Juices; Vegetable Juices/Blends; Chocolate; Candy; and Chewing gum (when not otherwise precluded by a Standard of Identity) as described in this monograph, and resulting in the maximum (90th percentile) estimated intake of 393 mg Coffeeberry® Coffee Fruit Extract/person/day, is safe.

It is also our opinion that other qualified and competent scientists reviewing the same publicly available toxicological and safety information would reach the same conclusion. Therefore, we have also concluded that Coffeeberry® Coffee Fruit Extract, when used as described, is Generally Recognized As Safe (GRAS) based on scientific procedures.

### Signatures

Robert L. Martin, Ph.D.

May 21, 2019
Date

John A. Thomas, Ph.D., F.A.T.S., F.A.C.T.

May 23, 2019
Date

Madhusudan G. Soni, Ph.D., F.A.C.N., F.A.T.S.

May 24, 2019
Date

## Part VII- SUPPORTING DOCUMENTS AND REFERENCES

Agate, A.D., Bhat, J.V. 1966. Role of pectinolytic yeasts in the degradation of mucilage layer of *Coffea robusta* cherries. *Appl Microbiol* 14:256-260.

Ames, B.N., Durston, W.E., Lee, F.D. 1973a. Carcinogens are mutagens: A simple test system combining liver homogenates for activation and bacteria for detection. *Proc Natl Acad Sci* 70:2281-2285.

Ames, B.N., Lee, F.D., Durston, W.E. 1973b. An improved bacterial test system for the detection and classification of mutagens and carcinogens. *Proc Natl Acad Sci* 70:782-786.

Azuma, K., Ippoushi, K., Nakayama, M., Ito, H., Higashio, H., Terao, J., 2000. Absorption of chlorogenic acid and caffeic acid in rats after oral administration. *J Agric Food Chem* 48(11):5496-5500.

Bucheli, P., Kanchanomai, C., Meyer, I., Pittet, A. 2000. Development of ochratoxin A during robusta (*Coffea canephora*) coffee cherry drying. *J Agric Food Chem* 48:1358-1362.

Bucheli, P., Taniwaki, M.H. 2002. Research on the origin, and on the impact of post-harvest handling and manufacturing on the presence of ochratoxin A in coffee. *Food Addit Contam* 19:655-665.

Chaube, S., Swinyard, C.A., 1976. Teratological and toxicological studies of alkaloidal and phenolic compounds from *Solanum tuberosum L. Toxicol Appl Pharmacol* 36(2):227-237.

Chevalier, A. 1942. Caféiers du globe, fasc. 2: Iconographie des caféiers sauvages et cultivés. *Encycl Biol* 22:1-36 (article in French).

Chevalier, A. 1947. Caféiers du globe, fasc. 3: Systématique des caféiers et faux-caféiers maladies et insectes nuisibles. *Encycl Biol* 28:1-35 (article in French).

Clarke, R.J., Macrae, R. 1987. *Coffee Vol. 2 - Technology*. London, Elsevier Applied Science Publishers.

Clifford, M.N., 1999. Chlorogenic acid and other cinnamates - nature, occurrence and dietary burden. *J Sci Food Agric* 79(3):362-372.

Eklund, A., 1975. Effect of chlorogenic acid in a casein diet for rats. Nutritional and pathological observations. *Nutr Metab* 18(5& 6):258-264.

Farah, A., Monteiro, M., Donangelo, C.M., Lafay, S., 2008. Chlorogenic acids from green coffee extract are highly bioavailable in humans. *J Nutr* 138(12):2309-2315.

Federal Register, 2016. U.S. Food and Drug Administration. Labeling: Serving Sizes of Foods That Can Reasonably Be Consumed At One Eating Occasion; Dual-Column Labeling;

Updating, Modifying, and Establishing Certain Reference Amounts Customarily Consumed; Serving Size for Breath Mints; and Technical Amendments. Fed. Reg. 81(103): 34000-34047. Available at: https://www.govinfo.gov/content/pkg/FR-2016-05-27/pdf/2016-11865.pdf.

Frank, H.A., Lum, N.A., Delacruz, A.S. 1965. Bacteria responsible for mucilage-layer decomposition in Kona coffee cherries. *Appl Microbiol* 13:201-207.

FutureCeuticals. 2017. Information on Description, Specification, Identity, Composition, Manufacturing, Certificates of Analysis, etc., provided by VDF FutureCeuticals, Inc. for Coffeeberry® Coffee Fruit Extract GRAS assessment (unpublished).

Garcia, R., Aquilera, A., Contreras-Esquicel, J.C., Rodriguez, R., Aguilar, C.N. 2008. Extraction of condensed tannins from Mexican plant sources. *Z Naturforsch C* 63:17-20.

Gonthier, M.P., Verny, M.A., Besson, C., Rémésy, C., Scalbert, A., 2003. Chlorogenic acid bioavailability largely depends on its metabolism by the gut microflora in rats. *J Nutr* 133(6):1853-1859.

Hagiwara, A., Hirose, M., Takahashi, S., Ogawa, K., Shirai, T., Ito, N., 1991. Forestomach and kidney carcinogenicity of caffeic acid in F344 rats and C57BL/6N x C3H/HeN F(1) mice. *Cancer Res* 51(20):5655-5660.

Hirose, M., Masuda, A., Imaida, K., Kagawa, M., Tsuda, H., Ito, N., 1987. Induction of forestomach lesions in rats by oral administrations of naturally occurring antioxidants for 4 weeks. *Jpn J Cancer Res* 78(4):317-321.

Hard, G.C., Alden, C.L., Bruner, R.H., Frith, C.H., Lewis, R.M., Owen, R.A., Krieg, K., Durchfeld-Meyer, B. 1999. Non-proliferative lesions of the kidney and lower urinary tract in rats. In *Guides for toxicologic pathology*. Washington DC: STP/ARP/AFIP.

Health Canada. 2016. Novel Food Information - Coffeeberry Whole Coffee Fruit Derivatives. Available at: https://www.canada.ca/en/health-canada/services/food-nutrition/genetically-modified-foods-other-novel-foods/approved-products/novel-food-information-coffeeberry-whole-coffee-fruit-derivatives/summary.html

Heimbach, J.T., Marone, P.A., Hunter, J.M., Nemzer, B.V., Stanley, S.M., Kennepohl, E. 2010. Safety studies on products from whole coffee fruit. *Food Chem Toxicol* 48:2517-2525.

Huang, M.T., Smart, R.C., Wong, C.Q., Conney, A.H., 1988. Inhibitory effect of curcumin, chlorogenic acid, caffeic acid, and ferulic acid on tumor promotion in mouse skin by 12-*O*-tetradecanoylphorbol- 13-acetate. *Cancer Res* 48(21):5941-5946.

Kitts, D.D., Wijewickreme, A.N., 1994. Effect of dietary caffeic and chlorogenic acids on in vivo xenobiotic enzyme systems. *Plant Foods Hum Nutr* 45(3):287-298.

Kobayashi, T., Yasuda, M., Iijima, K., Toriizuka, K., Cyong, J.C., Nagasawa, H. 1996. Effects of coffee cherry on the immune system in SHN mice. *Anticancer Res* 16:1827-1830.

Kobayashi, T., Yasuda, M., Iijima, K., Toriizuka, K., Cyong, J.C., Nagasawa, H. 1997. Effects of coffee cherry on the activation of splenic lymphocytes in mice. *Anticancer Res* 17:913-916.

Lafay, S., Gil-lzquierdo, A., Manach, C., Morand, C., Besson, C., Scalbert, A., 2006a. Chlorogenic acid is absorbed in its intact form in the stomach of rats. *J Nutr* 136(5):1192-1197.

Lafay, S., Morand, C., Manach, C., Besson, C., Scalbert, A., 2006b. Absorption and metabolism of caffeic acid and chlorogenic acid in the small intestine of rats. *Br J Nutr* 96(1):39-46.

Leroy, J-F. 1961. Coffeae novae Madagascarienses. *J Agric Trop Bot Appl* 8:1-20.

Lesca, P., 1983. Protective effects of ellagic acid and other plant phenols on benzo[a]pyrene-induced neoplasia in mice. *Carcinogenesis* 4(12):1651-1653.

Maron, D.E., Ames, B.N. 1983. Revised methods for the Salmonella mutagenicity test. *Mut Res* 113:173-215.

Miljkovic, D., Duell, B., Miljkovic, V. 2004a. *Low-mycotoxin coffee cherry products*. Int Patent App Publ WO 2004/098303.

Miljkovic, D., Duell, B., Miljkovic, V. 2004b. *Methods for coffee cherry products.* Int Patent App Publ WO 2004/098320.

Monteiro, M., Farah, A., Perrone, D., Trugo, L.C., Donangelo, C., 2007. Chlorogenic acid compounds from coffee are differentially absorbed and metabolized in humans. *J Nutr* 137(10):2196-2201.

Mori, H., Tanaka, T., Shima, H., Kuniyasu, T., Takahashi, M., 1986. Inhibitory effect of chlorogenic acid on methylazoxymethanol acetate-induced carcinogenesis in large intestine and liver of hamsters. *Cancer Lett* 30(1):49-54.

Nagasawa, H., Yasuda, M., Sakamoto, S., Inatomi, H. 1995. Protection by coffee cherry against spontaneous mammary tumour development in mice. *Anticancer Res* 15:141-146.

Nagasawa, H., Yasuda, M., Sakamoto, S., Inatomi, H. 1996a. Suppression by coffee cherry of the growth of spontaneous mammary tumours in SHN mice. *Anticancer Res* 16:151-153.

Nagasawa, H., Yasuda, M., Inatomi, H. 1996b. Further study on the effects of coffee cherry on spontaneous mammary tumourigenesis in mice: Effects of methanol extract. *Anticancer Res* 16:3507-3513.

Nagasawa, H., Hirayama, T., Inatomi, H. 1999. Effects of simultaneous treatment with hydroxyapatite and coffee cherry, the residue left after the removal of coffee beans, on spontaneous mammary tumourigenesis and related parameters in SHN mice. *In Vivo* 13:385-388.

Nagasawa, H., Yada, E., Udagawa, Y., Inatomi, H. 2001. Effects of coffee cherry, the residue left after removal of the beans from the coffee fruit, on mammary glands, automatic behavior and related parameters in mice. *Am J Chin Med* 29:119-127.

Napolitano, A., Fogliano, V., Tafuri, A., Ritieni, A. 2007. Natural occurrence of ochratoxin A and antioxidant activities of green and roasted coffees and corresponding byproducts. *J Agric Food Chem* 55:10499-10504.

NCHS, 2016. National Center for Health Statistics. National Health and Nutrition Examination Survey Data 2013-2014. Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. Available at: https://wwwn.cdc.gov/nchs/nhanes/ContinuousNhanes/Default.aspx?BeginYear=2013.

NCHS, 2014. National Center for Health Statistics. National Health and Nutrition Examination Survey Data 2011-2012. Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. Available at: https://wwwn.cdc.gov/nchs/nhanes/ContinuousNhanes/Default.aspx?BeginYear=2011.

NCHS, 2013. National Center for Health Statistics. National Health and Nutrition Examination Survey Data 2009-2010. Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. Available at: https://wwwn.cdc.gov/nchs/nhanes/ContinuousNhanes/Default.aspx?BeginYear=2009.

NTP, 1998. Chlorogenic Acid [327-97-9] and Caffeic Acid [331-39-5]: Review of Toxicological Literature [Nomination Background for NTP Testing Status]. Submitted by Research Triangle Park (NC): Integrated Laboratory Systems. Prepared for Research Triangle Park (NC): National Toxicology Program (NTP), National Institute of Environmental Health Sciences (NIEHS). Available at: http://ntp.niehs.nih.gov/ntp/htdocs/Chem_Background/ExSumPdf/ChlorogenicAcid.pdf.

Olthof, M.R., Hollman, P.C.H., Katan, M.B., 2001. Chlorogenic acid and caffeic acid are absorbed in humans. *J Nutr* 131(1):66-71.

Olthof, M.R., Hollman, P.C.H., Buijsman, M.N.C.P., van Amelsvoort, J.M.M., Katan, M.B., 2003. Chlorogenic acid, quercetin-3-rutinoside and black tea phenols are extensively metabolized in humans [published correction appears in J Nutr 133(8):2692]. *J Nutr* 133(6):1806-1814.

Ostojic, S.M., Stojanovic, M.D., Djordjevic, B., Jourkesh, M., Vasiljevic, N. 2008. The effects of a 4-week CoffeeBerry supplementation on antioxidant status, endurance, and anaerobic performance in college athletes. *Res Sports Med* 16:281-294.

Ota, K. 2018. Coffee as a global beverage before 1700. *J. International Economic Studies* 32:43-55.

Pandey, A., Soccol, C.R., Nigam, P., Brand, D., Mohan, R., Roussos, S. 2000. Biotechnological potential of coffee pulp and coffee husk for bioprocesses. *Biochem Eng J* 6:153-162.

Park, H.J., Davis, S.R., Liang, H.Y., Rosenberg, D.W., Bruno, R.S., 2010. Chlorogenic acid differentially alters hepatic and small intestinal thiol redox status without protecting against azoxymethane-induced colon carcinogenesis in mice. *Nutr Cancer* 62(3):362-370.

Pendergrast, M. 2010. Uncommon Grounds: The History of Coffee and How It Transformed Our World. Basic Books. p. 5. ISBN 978-0-465-02404-9.

Pittet, A., Tornare, D., Huggett, A., Viani, R. 1996. Liquid chromatographic determination of ochratoxin A in pure and adulterated soluble coffee using an immunoaffinity column cleanup procedure. *J Agric Food Chem* 44:3564-3569.

Rechner, A.R., Spencer. J.P., Kuhnle, G., Hahn, U., Rice-Evans, C.A., 2001. Novel biomarkers of the metabolism of caffeic acid derivatives *in vivo*. *Free Radic Biol Med* 30(11):1213-1222.

Ren, J., Jiang, X., Li, C., Li, K., Chen, Z., Ma, G., 2007. Absorptive profile of chlorogenic acid in rats. *Pharmazie* 62(9):689-692.

Reyes-Izquierdo, T., Nemzer, B., Shu, C., Huynh, L., Argumedo, R., Keller, R., Pietrzkowski, Z., 2013a. Modulatory effect of coffee fruit extract on plasma levels of brain-derived neurotrophic factor in healthy subjects. *Br. J. Nutr.* 110(3):420-425.

Rothfos, B. 1980. *Coffee Production.* Hamburg: Gordian-Max-Rieck

Serafini, M., Testa, M.F. 2009. Redox ingredients for oxidative stress prevention: The unexplored potentiality of coffee. *Clin Dermatol* 27:225-229.

Silv, C.F., Schwan, R.F., Sousa Dias, E.S., Wheals, A.E. 2000. Microbial diversity during maturation and natural processing of coffee cherries of *Coffea arabica* in Brazil. *Int J Food Microbiol* 60:251-260.

Sivetz, M., Desrosier, N.W. 1979. *Coffee Technology*. Westport CT: AVI Publishing.

Stalmach, A., Mullen, W., Barron, D., Uchida, K., Yokota, T., Cavin, C. et al., 2009. Metabolite profiling of hydroxycinnamate derivatives in plasma and urine after the ingestion of coffee by humans: identification of biomarkers of coffee consumption. *Drug Metab Dispos* 37(8):1749-1758.

Stalmach, A., Steiling, H., Williamson, G., Crozier, A., 2010. Bioavailability of chlorogenic acids following acute ingestion of coffee by humans with an ileostomy. *Arch Biochem Biophys* 501(1):98-105.

Steele, V.E., Moon, R.C., Lubet, R.A., Grubbs, C.J., Reddy, B.S., Wargovich, M. et al., 1994. Preclinical efficacy evaluation of potential chemopreventive agents in animal carcinogenesis models: methods and results from the NCI Chemoprevention Drug Development Program. *J Cell Biochem Suppl* 20:32-54.

Thesiger, W. 1947. A journey through the Tihama, the 'Asir, and the Hijaz mountains. *Geographical J.* 110 (4/6):192.

Udagawa, Y., Nagasawa, H. 2000. Effects of combined treatment with coffee cherry and whole-body hyperthermia on the growth of spontaneous mammary tumours in SHN mice. *In Vivo* 14:431-435.

Viani, R. 2002. Effect of processing on ochratoxin A (OTA) content of coffee. *Adv Exp Med Biol* 504:189-193.

Wrigley, G. 1988. *Coffee*. Essex: Longman Scientific.

# Bednarz Decl.

# EXHIBIT E

EFSA Journal 2010;8(10):1749

### SCIENTIFIC OPINION

# Scientific Opinion on the substantiation of health claims related to phosphatidyl serine (ID 552, 711, 734, 1632, 1927) pursuant to Article 13(1) of Regulation (EC) No 1924/2006[1]

## EFSA Panel on Dietetic Products, Nutrition and Allergies (NDA)[2, 3]

European Food Safety Authority (EFSA), Parma, Italy

**SUMMARY**

Following a request from the European Commission, the Panel on Dietetic Products, Nutrition and Allergies was asked to provide a scientific opinion on a list of health claims pursuant to Article 13 of Regulation (EC) No 1924/2006. This opinion addresses the scientific substantiation of health claims related to phosphatidyl serine. The scientific substantiation is based on the information provided by the Member States in the consolidated list of Article 13 health claims and references that EFSA has received from Member States or directly from stakeholders.

The food constituent that is the subject of the health claims is phosphatidyl serine related to the following claimed effects: "memory and cognitive functioning in the elderly", "mental health/cognitive function" and "stress reduction and enhanced memory function". Nutritional phosphatidyl serine supplements can be derived from either animal or plant sources. The animal and plant sourced phosphatidyl serine differ in fatty acid composition. Bovine brain cortex- and soy-based phosphatidyl serine are different substances and might, therefore, have different biological activities. Thus, there is considerable uncertainty in generalising results from studies done with bovine brain cortex phosphatidyl serine as the test substance to soy-based phosphatidyl serine, and vice versa. The information in the consolidated list and the references provided do not allow the Panel to characterise the food constituent, phosphatidyl serine, that is the subject of the health claims. The Panel considers that phosphatidyl serine is not sufficiently characterised.

The Panel concludes that a cause and effect relationship cannot be established between the consumption of phosphatidyl serine and the claimed effects considered in this opinion.

---

[1] On request from the European Commission, Question No EFSA-Q-2008-1339, EFSA-Q-2008-1498, EFSA-Q-2008-1521, EFSA-Q-2008-2368, EFSA-Q-2008-2660, adopted on 09 July 2010.

[2] Panel members: Carlo Agostoni, Jean-Louis Bresson, Susan Fairweather-Tait, Albert Flynn, Ines Golly, Hannu Korhonen, Pagona Lagiou, Martinus Løvik, Rosangela Marchelli, Ambroise Martin, Bevan Moseley, Monika Neuhäuser-Berthold, Hildegard Przyrembel, Seppo Salminen, Yolanda Sanz, Sean (J.J.) Strain, Stephan Strobel, Inge Tetens, Daniel Tomé, Hendrik van Loveren and Hans Verhagen. Correspondence: nda@efsa.europa.eu

[3] Acknowledgement: The Panel wishes to thank for the preparatory work on this scientific opinion: The members of the Working Group on Claims: Carlo Agostoni, Jean-Louis Bresson, Susan Fairweather-Tait, Albert Flynn, Ines Golly, Marina Heinonen, Hannu Korhonen, Martinus Løvik, Ambroise Martin, Hildegard Przyrembel, Seppo Salminen, Yolanda Sanz, Sean (J.J.) Strain, Inge Tetens, Hendrik van Loveren and Hans Verhagen. The members of the Claims Sub-Working Group on Mental/Nervous System: Jacques Rigo, Astrid Schloerscheidt, Barbara Stewart-Knox, Sean (J.J.) Strain, and Peter Willatts.

Suggested citation: EFSA Panel on Dietetic Products, Nutrition and Allergies (NDA); Scientific Opinion on the substantiation of health claims related to phosphatidyl serine (ID 552, 711, 734, 1632, 1927) pursuant to Article 13(1) of Regulation (EC) No 1924/2006. EFSA Journal 2010;8(10):1749. [15 pp.]. doi:10.2903/j.efsa.2010.1749. Available online: www.efsa.europa.eu/efsajournal.htm

© European Food Safety Authority, 2010

**KEY WORDS**

Phosphatidyl serine, health claims.



Phosphatidyl serine related health claims

**TABLE OF CONTENTS**

Summary ......................................................................................................................................... 1

Table of contents ............................................................................................................................. 3

Background as provided by the European Commission ................................................................... 4

Terms of reference as provided by the European Commission ....................................................... 4

EFSA Disclaimer ............................................................................................................................. 4

Information as provided in the consolidated list .............................................................................. 5

Assessment ...................................................................................................................................... 5

Characterisation of the food/constituent (ID 552, 711, 734, 1632, 1927) ..................................... 5

Conclusions ..................................................................................................................................... 6

Documentation provided to EFSA ................................................................................................... 6

References ........................................................................................................................................ 6

Appendices ...................................................................................................................................... 8



**BACKGROUND AS PROVIDED BY THE EUROPEAN COMMISSION**

See Appendix A

**TERMS OF REFERENCE AS PROVIDED BY THE EUROPEAN COMMISSION**

See Appendix A

**EFSA DISCLAIMER**

See Appendix B



**INFORMATION AS PROVIDED IN THE CONSOLIDATED LIST**

The consolidated list of health claims pursuant to Article 13 of Regulation (EC) No 1924/2006[4] submitted by Member States contains main entry claims with corresponding conditions of use and literature for similar health claims. EFSA has screened all health claims contained in the original consolidated list of Article 13 health claims which was received by EFSA in 2008 using six criteria established by the NDA Panel to identify claims for which EFSA considered sufficient information had been provided for evaluation and those for which more information or clarification was needed before evaluation could be carried out[5]. The clarifications which were received by EFSA through the screening process have been included in the consolidated list. This additional information will serve as clarification to the originally provided information. The information provided in the consolidated list for the health claims which are the subject of this opinion is tabulated in Appendix C.

**ASSESSMENT**

The approach used in the evaluation of Article 13(1) health claims is explained in the briefing document for stakeholders published by EFSA[6].

In assessing each specific food/health relationship that forms the basis of a health claim the NDA Panel considers the extent to which:

1. the food/constituent is defined and characterised;

2. the claimed effect is defined and is a beneficial physiological effect ("beneficial to human health");

3. a cause and effect relationship is established between the consumption of the food/constituent and the claimed effect (for the target group under the proposed conditions of use).

Substantiation of the claim is dependent on a favourable outcome of the assessment of 1, 2 and 3 above. Thus, a cause and effect relationship is considered not to be established if the outcome of any one of these assessments is unfavourable.

For a claim, each relationship between a food/constituent and a claimed effect is assessed separately and individual assessments are combined, as appropriate, to form coherent opinions.

**Characterisation of the food/constituent (ID 552, 711, 734, 1632, 1927)**

The food constituent that is the subject of this opinion is phosphatidyl serine related to the following claimed effects: "memory and cognitive functioning in the elderly", "mental health/cognitive function" and "stress reduction and enhanced memory function". Phosphatidyl serine is a phospholipid present in large quantities in the brains of animals. Dietary phosphatidyl serine supplements, however, can be derived from either animal or plant sources. The bovine brain cortex phosphatidyl serine is extracted from bovine cerebral tissue and purified (Calderini et al., 1985). The soy-based phosphatidyl serine is derived from soy lecithin that has been treated with serine and an enzyme to convert the phospholipids contained in soy to phosphatidyl serine (Sakai et al., 1996). The resulting phosphatidyl serine molecule comprises serine and two fatty acids. The animal and plant

---

[4] Regulation (EC) No 1924/2006 of the European Parliament and of the Council of 20 December 2006 on nutrition and health claims made on foods. OJ L 404, 30.12.2006, p. 9–25.
[5] Briefing document for stakeholders on the evaluation of Article 13.1, 13.5 and 14 health claims:
http://www.efsa.europa.eu/en/ndameetings/docs/nda100601-ax01.pdf
[6] See footnote 5



sourced phosphatidyl serine differ in fatty acid composition. For example, the phosphatidyl serine from soy contains 7 % alpha-linolenic acid (n-3) and 47 % linoleic acid (n-6), while the phosphatidyl serine derived from bovine brain cortex contains mostly saturated and monounsaturated fatty acids besides 8 % docosahexaenoic acid (n-3) and 2 % arachidonic acid (n-6) (FDA, 2003).

Bovine brain cortex- and soy-based phosphatidyl serine are different substances and might, therefore, have different biological activities. Thus, there is considerable uncertainty in generalising results from studies done with bovine brain cortex phosphatidyl serine as the test substance to soy-based phosphatidyl serine, and vice versa (FDA, 2003).

The references provided do not allow the Panel to characterise the food constituent, phosphatidyl serine, that is the subject of the health claims. The Panel notes that the source of phosphatidyl serine has not been defined in the conditions of use for IDs 711, 734. In ID 552 and ID 1632, the Panel notes that the phosphatidyl serine in the conditions of use is given as a soy phosphatidyl serine extract which is part of a food bar containing other substances including vitamins. In ID 1632, the Panel notes that although the phosphatidyl serine source is identified as soy, it is in the form of a combination of phospholipids. In ID 1937, the Panel notes that the phosphatidyl serine is derived from a milk protein concentrate as part of a product containing other substances, including other phospholipids.

The Panel considers that the food constituent, phosphatidyl serine, which is the subject of this opinion is not sufficiently characterised in relation to the claimed effects considered in this opinion.

The Panel concludes that a cause and effect relationship cannot be established between the consumption of phosphatidyl serine and the claimed effects considered in this opinion.

## CONCLUSIONS

On the basis of the data presented, the Panel concludes that:

- The constituent, phosphatidyl serine, which is the subject of this opinion, is not sufficiently characterised in relation to the claimed effects considered in this opinion.

- A cause and effect relationship cannot be established between the consumption of phosphatidyl serine and the claimed effects considered in this opinion.

## DOCUMENTATION PROVIDED TO EFSA

Health claims pursuant to Article 13 of Regulation (EC) No 1924/2006 (No: EFSA-Q-2008-1339, EFSA-Q-2008-1498, EFSA-Q-2008-1521, EFSA-Q-2008-2368, EFSA-Q-2008-2660). The scientific substantiation is based on the information provided by the Member States in the consolidated list of Article 13 health claims and references that EFSA has received from Member States or directly from stakeholders.

The full list of supporting references as provided to EFSA is available on: http://www.efsa.europa.eu/panels/nda/claims/article13.htm.

## REFERENCES

Calderini G, Aporti F, Bonetti AC, Zanotti A and Toffano G, 1985. Serine Phospholipids and Aging Brain. Progress in Clinical Biological Research, 192, 383-386.

Sakai M, Yamatoya H and Kudo S, 1996. Pharmacological effects of phosphatidylserine enzymatically synthesized from soybean lecithin on brain functions in rodents. Journal of Nutritional Science and Vitaminology, 42, 47-54.

FDA (Food and Drug Administration), 2003. Phosphatidylserine and Cognitive Dysfunction and Dementia (Qualified Health Claim: Final Decision Letter. Available from http://vm.cfsan.fda.gov/~dms/ds-ltr36.html.



**APPENDICES**

**APPENDIX A**

**BACKGROUND AND TERMS OF REFERENCE AS PROVIDED BY THE EUROPEAN COMMISSION**

The Regulation 1924/2006 on nutrition and health claims made on foods[7] (hereinafter "the Regulation") entered into force on 19th January 2007.

Article 13 of the Regulation foresees that the Commission shall adopt a Community list of permitted health claims other than those referring to the reduction of disease risk and to children's development and health. This Community list shall be adopted through the Regulatory Committee procedure and following consultation of the European Food Safety Authority (EFSA).

Health claims are defined as "any claim that states, suggests or implies that a relationship exists between a food category, a food or one of its constituents and health".

In accordance with Article 13 (1) health claims other than those referring to the reduction of disease risk and to children's development and health are health claims describing or referring to:

   a) the role of a nutrient or other substance in growth, development and the functions of the body; or

   b) psychological and behavioural functions; or

   c) without prejudice to Directive 96/8/EC, slimming or weight-control or a reduction in the sense of hunger or an increase in the sense of satiety or to the reduction of the available energy from the diet.

To be included in the Community list of permitted health claims, the claims shall be:

   (i) based on generally accepted scientific evidence; and

   (ii) well understood by the average consumer.

Member States provided the Commission with lists of claims as referred to in Article 13 (1) by 31 January 2008 accompanied by the conditions applying to them and by references to the relevant scientific justification. These lists have been consolidated into the list which forms the basis for the EFSA consultation in accordance with Article 13 (3).

**ISSUES THAT NEED TO BE CONSIDERED**

**IMPORTANCE AND PERTINENCE OF THE FOOD[8]**

Foods are commonly involved in many different functions[9] of the body, and for one single food many health claims may therefore be scientifically true. Therefore, the relative importance of food e.g. nutrients in relation to other nutrients for the expressed beneficial effect should be considered: for functions affected by a large number of dietary factors it should be considered whether a reference to a single food is scientifically pertinent.

---

[7] OJ  L12, 18/01/2007
[8] The term 'food' when used in this Terms of Reference refers to a food constituent, the food or the food category.
[9] The term 'function' when used in this Terms of Reference refers to health claims in Article 13(1)(a), (b) and (c).



It should also be considered if the information on the characteristics of the food contains aspects pertinent to the beneficial effect.

**SUBSTANTIATION OF CLAIMS BY GENERALLY ACCEPTABLE SCIENTIFIC EVIDENCE**

Scientific substantiation is the main aspect to be taken into account to authorise health claims. Claims should be scientifically substantiated by taking into account the totality of the available scientific data, and by weighing the evidence, and shall demonstrate the extent to which:

(a) the claimed effect of the food is beneficial for human health,

(b) a cause and effect relationship is established between consumption of the food and the claimed effect in humans (such as: the strength, consistency, specificity, dose-response, and biological plausibility of the relationship),

(c) the quantity of the food and pattern of consumption required to obtain the claimed effect could reasonably be achieved as part of a balanced diet,

(d) the specific study group(s) in which the evidence was obtained is representative of the target population for which the claim is intended.

EFSA has mentioned in its scientific and technical guidance for the preparation and presentation of the application for authorisation of health claims consistent criteria for the potential sources of scientific data. Such sources may not be available for all health claims. Nevertheless it will be relevant and important that EFSA comments on the availability and quality of such data in order to allow the regulator to judge and make a risk management decision about the acceptability of health claims included in the submitted list.

The scientific evidence about the role of a food on a nutritional or physiological function is not enough to justify the claim. The beneficial effect of the dietary intake has also to be demonstrated. Moreover, the beneficial effect should be significant i.e. satisfactorily demonstrate to beneficially affect identified functions in the body in a way which is relevant to health. Although an appreciation of the beneficial effect in relation to the nutritional status of the European population may be of interest, the presence or absence of the actual need for a nutrient or other substance with nutritional or physiological effect for that population should not, however, condition such considerations.

Different types of effects can be claimed. Claims referring to the maintenance of a function may be distinct from claims referring to the improvement of a function. EFSA may wish to comment whether such different claims comply with the criteria laid down in the Regulation.

**WORDING OF HEALTH CLAIMS**

Scientific substantiation of health claims is the main aspect on which EFSA's opinion is requested. However, the wording of health claims should also be commented by EFSA in its opinion.

There is potentially a plethora of expressions that may be used to convey the relationship between the food and the function. This may be due to commercial practices, consumer perception and linguistic or cultural differences across the EU. Nevertheless, the wording used to make health claims should be truthful, clear, reliable and useful to the consumer in choosing a healthy diet.

In addition to fulfilling the general principles and conditions of the Regulation laid down in Article 3 and 5, Article 13(1)(a) stipulates that health claims shall describe or refer to "the role of a nutrient or other substance in growth, development and the functions of the body". Therefore, the requirement to



describe or refer to the 'role' of a nutrient or substance in growth, development and the functions of the body should be carefully considered.

The specificity of the wording is very important. Health claims such as "Substance X supports the function of the joints" may not sufficiently do so, whereas a claim such as "Substance X helps maintain the flexibility of the joints" would. In the first example of a claim it is unclear which of the various functions of the joints is described or referred to contrary to the latter example which specifies this by using the word "flexibility".

The clarity of the wording is very important. The guiding principle should be that the description or reference to the role of the nutrient or other substance shall be clear and unambiguous and therefore be specified to the extent possible i.e. descriptive words/ terms which can have multiple meanings should be avoided. To this end, wordings like "strengthens your natural defences" or "contain antioxidants" should be considered as well as "may" or "might" as opposed to words like "contributes", "aids" or "helps".

In addition, for functions affected by a large number of dietary factors it should be considered whether wordings such as "indispensable", "necessary", "essential" and "important" reflects the strength of the scientific evidence.

Similar alternative wordings as mentioned above are used for claims relating to different relationships between the various foods and health. It is not the intention of the regulator to adopt a detailed and rigid list of claims where all possible wordings for the different claims are approved. Therefore, it is not required that EFSA comments on each individual wording for each claim unless the wording is strictly pertinent to a specific claim. It would be appreciated though that EFSA may consider and comment generally on such elements relating to wording to ensure the compliance with the criteria laid down in the Regulation.

In doing so the explanation provided for in recital 16 of the Regulation on the notion of the average consumer should be recalled. In addition, such assessment should take into account the particular perspective and/or knowledge in the target group of the claim, if such is indicated or implied.

## TERMS OF REFERENCE

### HEALTH CLAIMS OTHER THAN THOSE REFERRING TO THE REDUCTION OF DISEASE RISK AND TO CHILDREN'S DEVELOPMENT AND HEALTH

EFSA should in particular consider, and provide advice on the following aspects:

➢ Whether adequate information is provided on the characteristics of the food pertinent to the beneficial effect.

➢ Whether the beneficial effect of the food on the function is substantiated by generally accepted scientific evidence by taking into account the totality of the available scientific data, and by weighing the evidence. In this context EFSA is invited to comment on the nature and quality of the totality of the evidence provided according to consistent criteria.

➢ The specific importance of the food for the claimed effect. For functions affected by a large number of dietary factors whether a reference to a single food is scientifically pertinent.

In addition, EFSA should consider the claimed effect on the function, and provide advice on the extent to which:



➢ the claimed effect of the food in the identified function is beneficial.

➢ a cause and effect relationship has been established between consumption of the food and the claimed effect in humans and whether the magnitude of the effect is related to the quantity consumed.

➢ where appropriate, the effect on the function is significant in relation to the quantity of the food proposed to be consumed and if this quantity could reasonably be consumed as part of a balanced diet.

➢ the specific study group(s) in which the evidence was obtained is representative of the target population for which the claim is intended.

➢ the wordings used to express the claimed effect reflect the scientific evidence and complies with the criteria laid down in the Regulation.

When considering these elements EFSA should also provide advice, when appropriate:

➢ on the appropriate application of Article 10 (2) (c) and (d) in the Regulation, which provides for additional labelling requirements addressed to persons who should avoid using the food; and/or warnings for products that are likely to present a health risk if consumed to excess.



**APPENDIX B**

**EFSA DISCLAIMER**

The present opinion does not constitute, and cannot be construed as, an authorisation to the marketing of the food/food constituent, a positive assessment of its safety, nor a decision on whether the food/food constituent is, or is not, classified as foodstuffs. It should be noted that such an assessment is not foreseen in the framework of Regulation (EC) No 1924/2006.

It should also be highlighted that the scope, the proposed wordings of the claims and the conditions of use as proposed in the Consolidated List may be subject to changes, pending the outcome of the authorisation procedure foreseen in Article 13(3) of Regulation (EC) No 1924/2006.



**APPENDIX C**

Table 1. Main entry health claims related to phosphatidyl serine, including conditions of use from similar claims, as proposed in the Consolidated List.

| ID | Food or Food constituent | Health Relationship | Proposed wording |
|---|---|---|---|
| 552 | Phosphatidyl serine | Memory and cognitive functioning in the elderly | May improve memory in the elderly |
| | | | May improve cognitive performance in the elderly. |
| | | | May improve memory and cognitive performance in the elderly |
| | | | Support of cognitive functions in young people |
| | | | Contributes to the maintenance of cognitive functions with aging |
| | | | Supports memory and brain performance in aging adults |
| | | | Plays an important role in healthy nerve function through the central nervous system including the brain |
| | | | Contributes to the resistance against stress |
| | | | Helps concentration and mental performance in cases of stress |

| Conditions of use |
|---|
| - Adults |
| - 200 mg/day |
| - 300 mg/day for minimum 6 weeks |
| - 400 mg/day |
| - 300 mg, upper level 400mg |
| - 1000 mg |
| - The product should contain at least 15% of the minimum effective dose, which is 300 mg/day. Thus, products containing =45 mg phosphatidyl-serine per 100 g or 100 mL would qualify to carry the proposed claims. |
| - No adverse effects are associated with phosphatidyl-serine |
| - Riegel - angereichert mit einem phosphatidxlserinhaltigen Sojalecithinextrakt und Vitaminen, 3 riegel pro woche |
| - SUPER GEHIRN FORMEL: PS 150 mg;PC 150 mg; Acetyl-Lcarnitin 500 mg |

| ID | Food or Food constituent | Health Relationship | Proposed wording |
|---|---|---|---|
| 711 | Phosphatidyl serine | Memory and cognitive functioning in the elderly | May improve memory in the elderly |
| | | | May improve cognitive performance in the elderly |



| | | May improve memory and cognitive performance in the elderly |
| | | PS is a naturally occurring phospholipid (lecithin) present in all cells.  It is most concentrated in the brain where it plays a role in healthy brain functions |
| | | PS is essential to the functioning of all cells of the body, but is most concentrated in the brain and can help maintain healthy brain function |
| | | PS is a food ingredient intended to support brain function |

**Conditions of use**

- Vor allem in Kombination mit anderen Aminosäuren wie z.B. Glutamin sowie den Vitaminen B12, B1, B2 und B6

| ID | Food or Food constituent | Health Relationship | Proposed wording |
|---|---|---|---|
| 734 | Phosphatidyl serine | Mental health / Cognitive function | Support of cognitive functions in young people |
| | | | Contributes to the maintenance of cognitive functions with aging |
| | | | Supports memory and brain performance in aging adults |
| | | | Plays an important role in healthy nerve function through the central nervous system including the brain |
| | | | Contributes to the resistance against stress |
| | | | Helps concentration and mental performance in cases of stress. |

**Conditions of use**

- 300-400 mg per day

| ID | Food or Food constituent | Health Relationship | Proposed wording |
|---|---|---|---|
| 1632 | Phosphatidyl serine | Mental health / Cognitive function | Support of cognitive functions in young people |
| | | | Contributes to the maintenance of cognitive functions with aging |
| | | | Supports memory and brain performance in aging adults |

Conditions of use

- Adults

- 200-400 mg/day

- Food supplement with 100-300mg of phophatidylserine in the daily dose



| | |
|---|---|
| | - 150mg Phospatidylserin je Portion (330ml Jogurt-Buttermilch bzw. 150g Jogurt) 300mg Phospatidylsein / Tag–(= 1 Packung Jogurt-Buttermilch bzw. 2 Packungen Jogurt |
| | - Riegel - angereichert mit einem phosphatidxlserinhaltigen Sojalecithinextrakt und Vitaminen / 3 Riegel pro Woche |
| | - 417 - 834 mg of phospholipids from soy containing 100 - 200 mg of phosphatidyl serine |
| | - SUPER GEHIRN FORMEL: PS 150 mg; PC 150 mg; Acetyl-Lcarnitin 500 mg |
| | - Upper level 400 mg |

| ID | Food or Food constituent | Health Relationship | Proposed wording |
|---|---|---|---|
| 1927 | Lacprodan PL-20; Milk protein concentrate with a high content of phospholipids. (Effective component: Phosphatidyl serine) | Stress reduction and enhanced memory function | Reduce mental and emotional stress and enhance memory |

| | |
|---|---|
| **Conditions of use** | |
| - 13.5 g Lacprodan PL-20 pr day for three weeks (~310 mg phosphatidyl serine pr day) | |
| - 200-600 mg phosphatidyl serine pr day for 30-60 days | |

# Bednarz Decl.

# EXHIBIT F

*Nutritional Neuroscience*, Vol. 4, pp. 121–134
Reprints available directly from the publisher
Photocopying permitted by license only

© 2001 OPA (Overseas Publishers Association) N.V.
Published by license under
the Harwood Academic Publishers imprint,
part of The Gordon and Breach Publishing Group.

# The Influence of Soy-derived Phosphatidylserine on Cognition in Age-Associated Memory Impairment

B.L. JORISSEN[a,*], F. BROUNS[b,†], M.P.J. VAN BOXTEL[a], R.W.H.M. PONDS[a], F.R.J. VERHEY[a], J. JOLLES[a] and W.J. RIEDEL[a]

[a]*Experimental Psychopharmacology Unit, Brain & Behaviour Institute, Department of Psychiatry and Neuropsychology;* [b]*Novartis Nutrition Research Unit, Universiteit Maastricht, PO Box 616, 6200 MD Maastricht, The Netherlands*

*(Received 20 September 2000)*

Phosphatidylserine (PS) is a phospholipid widely sold as a nutritional supplement. PS has been claimed to enhance neuronal membrane function and hence cognitive function, especially in the elderly. We report the results of a clinical trial of soybean-derived PS (S-PS) in aging subjects with memory complaints.

Subjects were 120 elderly (> 57 years) of both sexes who fulfilled the more stringent criteria for age-associated memory impairment (AAMI); some also fulfilled the criteria for age-associated cognitive decline. Subjects were allocated at random to one of the three treatment groups: placebo, 300 mg S-PS daily, or 600 mg S-PS daily. Assessments were carried out at baseline, after 6 and 12 weeks of treatment, and after a wash-out period of 3 weeks.

Tests of learning and memory, choice reaction time, planning and attentional functions were administered at each assessment. Delayed recall and recognition of a previously learned word list comprised the primary outcome measures.

No significant differences were found in any of the outcome variables between the treatment groups. There were also no significant interactions between treatment and 'severity of memory complaints'.

In conclusion, a daily supplement of S-PS does not affect memory or other cognitive functions in older individuals with memory complaints.

*Keywords*: Age-associated memory impairment, Cognitive functioning, Neuronal membrane function, Nutritional supplement, Phosphatidylserine, Phospholipid

## INTRODUCTION

Cognitive aging, age-associated cognitive decline, and mild cognitive impairment are all defined as the decline of cognitive functioning with age. The aging of the population results in an increasing prevalence of diminished cognitive functioning, and widespread requests for therapeutic agents to attenuate cognitive decline. Despite worldwide concern about the increasing problem of cognitive decline in the aging population,

* Corresponding author. Tel.: +31 43 3875573. Fax: +31 43 3884092. E-mail: b.jorissen@np.unimaas.nl
† Present address: Eridania Beghin Say, Health and Nutrition Group, Havestraat 84, B 1800 Vilvoorde, Belgium.

122                                                                 B.L. JORISSEN et al.

not much research has been devoted to empirically studying the influence of nutritional supplements on human cognitive functioning, particularly in the elderly. There are few placebo-controlled studies of nutritional supplements in the elderly in the recent literature (Riedel and Jorissen, 1998). Nonetheless, many nutritional supplements are advocated on the grounds that they might enhance cognitive function, especially in the elderly. One such example, phosphatidylserine (PS), is a naturally occurring phospholipid, the daily intake of which is about 0.1 mmol (approximately 75 mg) in human diet (Bruni et al., 1989). PS can be derived from several sources. Bovine cortex PS (BC-PS) has until recently been used in all PS efficacy studies. However, because of the obvious safety considerations for products of animal origin, alternative sources of PS have been developed, for example, soybean (S-PS) or eggs (E-PS).

PS influences the functioning of neuronal membranes, for example, the release of vesicles containing neurotransmitters from the presynaptic terminal (Nishizuka, 1984), signal transduction (Nishizuka, 1984), cell to cell communication, preservation of the cellular sodium–potassium and calcium–magnesium balance (Toffano, 1987) and regulation of cell growth (Nunzi et al., 1990). In addition PS can restore the diminished acetylcholine release seen in cortical slices obtained from aging rats (Vannucchi and Pepeu, 1987). PS is also capable of counteracting scopolamine-induced amnesic effects in rats (Furushiro et al., 1997; Zanotti et al., 1986). This implies that PS may affect the cholinergic system. Finally, it has been shown that BC-PS elevates the reduced NMDA-receptor density in aged mice by approximately 25% (Cohen and Muller, 1992), and generates an increase in the efficacy of hippocampal synaptic transmission (Borghese et al., 1993). Since the content of PS, expressed as percentage of total phospholipids, is higher in human brain than in other human tissues, and this percentage decreases with age (White, 1973), the administration of PS may be

beneficial in preventing and treating cognitive impairment in the elderly. This is consistent with 'the membrane hypothesis of aging' (Sun and Sun, 1979), which states that age-related changes in the molecular structure and lipid–protein interactions of biological membranes in the central nervous system may impair their function. These changes may thus contribute to acceleration of the cognitive aging process.

Double-blind, placebo-controlled studies showed that BC-PS improved cognitive function in Alzheimer patients (Amaducci, 1988; Delwaide et al., 1986; 1989), in senile mentally deteriorated patients (Palmieri et al., 1987), and in subjects with mild to severe cognitive deterioration (Cenacchi et al., 1993; Villardita et al., 1987) such as in Age-Associated Memory Impairment (AAMI) (Crook, 1998; Crook et al., 1991; Gindin et al., 1993). The diagnostic term AAMI refers to complaints of memory impairment in tasks of daily life. People with AAMI also have an impaired performance on psychological tests (Crook et al., 1986). On the basis of these double-blind studies and several open trial studies (Allegro et al., 1987; Caffarra and Santamaria, 1987; Granata, 1987; Sinforiani et al., 1987), it has been suggested that BC-PS is effective in the treatment of cognitive impairment in the elderly. Crook and colleagues (1991) found improvement of memory and learning after 12 weeks of treatment with 300 mg BC-PS in a double-blind placebo-controlled study with 149 AAMI subjects. Additional analyses showed that this effect was only present in a subgroup of patients with lower memory performance at baseline.

Since its introduction, only one placebo-controlled study into the cognition-enhancing effects of S-PS has been reported as an abstract (Gindin et al., 1993). In this study with initially 72 AAMI-subjects memory and mood improved significantly in the 300 mg S-PS treatment group compared to placebo. However, in contrast to the findings of Crook et al. (1991), this effect was stronger in a subgroup of subjects with a better memory performance at baseline. These

TABLE I   Exclusion criteria

- evidence of delirium, confusion, or other disturbances of consciousness;
- any neurological disorder that could produce cognitive deterioration as determined by history, clinical neurological examination, or neuroradiological examination;
- history of any infective or inflammatory brain disease;
- evidence of significant cerebral vascular pathology as determined by a Hachinski Ischemic Score (HIS) over 4 (Small, 1965);
- history of head injury;
- current psychiatric diagnosis according to DSM-IV criteria of a major psychiatric disorder;
- current diagnosis or history of alcoholism or drug dependence;
- any medical disorder that could produce cognitive deterioration;
- use of any psychotropic drug or any other drug that may significantly affect cognitive function during the month prior to psychometric testing;
- known hypersensitivity of PS.

findings at least cast some doubt on the efficacy of PS in AAMI.

The present study evaluated the efficacy of two doses of S-PS (300 mg or 600 mg daily), in a double-blind, placebo-controlled study of subjects with AAMI. The primary objective of this study was to ascertain the possible dose-related enhancing effects of 300 mg S-PS, 600 mg S-PS, compared to placebo on memory and other cognitive functions after 12 weeks of treatment. The secondary objective was to investigate a possible differential effect of S-PS between subgroups of subjects with AAMI because previous clinical studies with BC-PS (Crook et al., 1986) and also of other treatments of AAMI (Israel et al., 1994) have shown that the treatment response is correlated positively to the severity of the cognitive impairment at baseline.

## METHODS

### Subjects

Subjects were recruited through advertisements in the local newspaper and local television, and through posters in general practitioners' waiting rooms and at places where the elderly meet, such as sport or recreation centers for the elderly. Subjects were older than 57. All subjects fulfilled the criteria for AAMI (Crook et al., 1986). They had complaints of memory impairment in every day life (a score of over 24 on the

memory complaints questionnaire (MAC-Q) (Crook et al., 1992)) and their memory test performance was at least one standard deviation below the mean established for young adults on at least one of the following standardized tests: Benton Visual Retention Test (Benton, 1975), Logical Memory Subtest of the Revised Wechsler Memory Scale (Wechsler, 1974) or the Paired Associates Learning Subtest of the Revised Wechsler Memory Scale (Wechsler, 1974). Their intellectual function was adequate, as determined by an IQ score equivalent to 90 or more (raw score of at least 32), assessed with the Vocabulary Subtest of the Wechsler Adult Intelligence Scale (WAIS) (Wechsler, 1955). They did not suffer from dementia, as determined with the Mini-Mental State Examination (Folstein et al., 1975) (MMSE score > 24); or depression, as assessed with Geriatric Depression Scale (score < 15) (Yesavage and Brink, 1983). The exclusion criteria are listed in Table I. A shortened version of the Groningen Intelligence Test (Luteijn and van der Ploeg, 1983) (GIT), with three subtasks, was used to estimate the IQ score. A subgroup of AAMI subjects also fulfilled the criteria for Age-Associated Cognitive Decline (AACD) (Rediess and Caine, 1996). This AACD subgroup had memory scores (delayed recall at intake) of at least one standard deviation below the norm for their own age group (Houx, 1991). The AACD subgroup is in this study referred to as the 'moderate' group, and the Non-AACD subgroup is referred to as the

B.L. JORISSEN *et al.*

TABLE II    Subject characteristics at baseline

|  | Placebo | 300 mg PS | 600 mg PS |
|---|---|---|---|
| Number of subjects | 39 | 40 | 41 |
| Number of females | 19 | 21 | 21 |
| Number of males | 20 | 19 | 20 |
| Number of AACD* | 9 | 18 | 14 |
| Mean Age (S.E.) | 64.6 (0.9) | 65.3 (0.9) | 65.8 (1.1) |
| Mean IQ (S.E.) | 120.3 (1.9) | 115.1 (1.7) | 117.7 (1.9) |

*AACD stands for Age-Associated Cognitive Decline.

'mild' group. The Medical Ethics Committee of the University Hospital of Maastricht approved the study and all subjects gave written informed consent.

In all, 546 subjects were recruited, of whom 132 entered the study. Of these, 120 subjects completed the treatment according to protocol (placebo: $n = 39$, 300 mg S-PS: $n = 40$ and 600 mg S-PS: $n = 41$). The treatment groups were not significantly different in IQ, age or sex. The subjects' characteristics at baseline are summarized in Table II. Drop-outs were distributed equally over the three groups: four in the placebo group, five in the 300 mg S-PS group and three in the 600 mg S-PS group. The reasons for drop-out were not related to the treatment according to an independent physician.

## Study Design

The study was conducted according to a randomized, double-blind, placebo-controlled, parallel group design. Subjects were consecutively assigned to the placebo, the 300 mg S-PS, or the 600 mg S-PS group following a predetermined order based on a randomization schedule using balanced blocks of six subjects. After psychological and medical screening, subjects underwent a training session followed by a 1-week placebo lead-in, 12 weeks of treatment (placebo, 300 mg or 600 mg S-PS), and a 3-week placebo washout (see Figure 1). The neuropsychological test assessments took place at baseline, after 6 weeks and 12 weeks of treatment, and after washout.

## Treatment

Phosphatidylserine Leci-PS-40P, a substance of food-grade quality (supplied by Novartis Consumer Health SA, Nyon, Switzerland), is produced from soya lecithin by enzymatic transesterification. The product Leci-PS-40P is a powder and contains 40% PS, 13% phosphatidylcholine, 9% phosphatidylethanolamine, 5% phosphatidylinositol, 5% phosphatidic acid, and 28% polyunsaturated fatty acids.



FIGURE 1    Treatment Schedule of the study to the influence of a 12-weeks treatment with two dosages phosphatidylserine (PS) or placebo on cognition in subjects with Age-Associated Memory Impairment.

The study substance was packaged in 7-day packs containing three blister trays, each containing 14 soft gelatin capsules. Each active capsule contained a phospholipid mixture of the composition described above in an amount equivalent to 0 mg (placebo), 50 mg or 100 mg pure S-PS. The mixture was diluted with medium chain triglycerides (MCT) oil to fill the remainder of the soft gelatin capsule. The MCT oil contained 95% polar lipids (coconut and palm oil) and 5% carbohydrates. Two capsules were taken three times daily: two at breakfast, two at lunch, and two at dinner. S-PS 50 mg, S-PS 100 mg, and placebo capsules looked and tasted the same.

## Outcome Measures

### Visual Verbal Learning Test (VVLT)

This test is an improved version of one originally devised by Rey (Brand and Jolles, 1985; Rey, 1964). During this test 15 monosyllabic words are presented for 1 second on a computer monitor. There is a 2-second inter-stimulus interval between words. After word presentation the subjects are requested to report in any order as many words they can remember (immediate recall). This procedure is repeated five times. The total immediate recall is the sum of the immediate recall measured in the five different trials. After 20 minutes, delayed recall and delayed recognition are tested. During the delayed recognition test a list of 30 words is presented with 15 words from the learned list and 15 new (but comparable) words. Each word is presented for 1 second, and the maximum time interval between two words is 3 seconds. The subjects are requested to push one of two hand-held buttons: green for yes with the preferred hand if they recognize the word, and red for no with the other hand. The number of correctly recognized words, corrected for the subjects' response tendency (sensitivity measure A'), is determined by means of the following formula: $A' = 1 - 1/4(FR/CR + (1-CR)/(1-FR))$. CR is the number of correctly recognized words

(hits) and FR is the number of falsely recognized words (misses) (Pollack and Norman, 1964). A' was arcsin transformed before it was used in statistical analyses because of its skewed distribution. Delayed recognition reaction time was also measured.

### Memory Scanning Test

Memory scanning measures the speed of the memory search process. The underlying principle is that the extra time needed to complete a test in which there is a stepwise increase in the amount of information to be kept in memory, is a measure of the ease with which information is processed in working memory (Sternberg, 1975). Briefly, 20 items are to be crossed out on four test sheets containing matrices of letters in 10 lines by 12 columns. The items to be crossed out have to be memorized before the subtask is started. In the first subtask, the memory set contains one item, in the second subtask two items, and so on. With increasing memory load, each task invariably takes more time to complete. Individual slopes, intercepts, and linearities of the completion time are calculated as a function of memory load as measures of the speed of processing information in working memory. Memory scanning slopes and intercepts were used in this study.

### Verbal Fluency test

The fluency test can be regarded as a measure of strategy-driven retrieval of information from semantic memory (Luteijn and van der Ploeg, 1983). The subjects are asked to produce, within 1 minute, as many four-letter words as possible starting with a given letter. The number of correct responses and errors are recorded. Nonsense words are not accepted, but names, conjugations and plurals are allowed. Starting letters were H, L, R and M. These letters yielded a similarly high number of correct responses (average: 9.5 to 10.7 words) in a population aged between 58 and 83 years with an average age of 70 (Houx, unpublished data).

126                                          B.L. JORISSEN *et al.*

### Stroop Color Word Test (SCWT)

The SCWT has often been used to test selective attention (Houx *et al.*, 1993). The test involves three cards each displaying a hundred stimuli: color names, colored patches, and color names printed in incongruously colored ink. The amount of extra time needed to discard irrelevant but very salient information (verbal) in favor of a less obvious aspect (color naming) is recorded. The outcome parameters of this test are the time needed to complete each subtest. The interference denotes the percentage of extra time needed to complete card III, relative to the average of cards I and II: (time card III/((time card I + time card II)/2)) * 100%.

### Signal Detection Test (SDT)

The SDT measures the ability to continuously scan the entire computer screen, searching for rarely occurring 'signals' (Schuhfried, 1991). During the task, 20 dots are presented on the screen in a random fashion. Every second three dots change position. When four dots form a square, the subject has to push a button as quickly as possible (within 2 seconds). In this study the perceptual sensitivity measure A' and the reaction time were taken as dependent variables.

### Motor Choice Reaction Time (MCRT)

Speed of information processing was assessed by measuring reaction times (RTs) as a function of task complexity (Houx and Jolles, 1993). The test consists of a simple, choice and incompatible reaction time test. This yields RTs consisting of an initiation phase (time from stimulus onset until release of a hold button) and a movement phase (time from release of the hold button until the response button is pushed). The measures used for analysis are the median initiation RTs of the simple, the choice, and the incompatible condition.

### Concept Shifting Test (CST)

The CST consists of three parts (Jolles *et al.*, 1995). On each test sheet, 16 small circles (diameter = 15 mm) are grouped in a larger circle, with a radius of 8 cm. In the smaller circles, the test items (numbers (A), letters (B), or both (C)) appear in a fixed random order. Subjects are requested to cross out the items in the right order. In parts A and B, the subjects have to connect the numbers (1–2–3-etc.) and the letters (A–B–C-etc.) respectively. In part C, the subject is requested to alternate between these sequences (1–A–2–B-etc.). An exact estimate of the slowing due to shifting between concepts can be obtained by calculating the concept shifting interference, by comparing part C (digits and letters) with part A and part B.

### Tower of London (TOL)

The TOL is a test of planning (Shallice, 1982). The test consists of three colored balls, which must be arranged on three sticks to match a picture with the goal positions. Varying the minimum number of moves to reach the goal positions alters the complexity of the problem. Each trial consists of a 2-, 3-, 4-, 5-, 6- and 7-move problem. Prior to each problem the subjects are told the minimum number of moves in which the problem can be solved. The number of moves, time to solve the problem, and time between presentation of the goal positions and the first move (decision time) are recorded. In this study the TOL was only assessed twice: at baseline and after 12 weeks of treatment. The maximum number of steps were used in this study.

### Primary and Secondary Outcome Measures

The Visual Verbal Learning Test provided the primary outcome measures, namely, delayed recall, delayed recognition reaction time, and delayed recognition sensitivity. These three

primary variables give an indication of long-term memory performance. Total immediate recall of the verbal learning test, slope and intercept of the memory scanning, fluency, stroop interference, sensitivity and reaction time of the signal detection test, reaction times of the MCRT (simple, choice and incompatible condition), the concept shifting interference, and the maximum number of steps of the TOL were the secondary outcome measures.

## STATISTICAL ANALYSIS

Data collected at the end of the placebo lead-in were taken as baseline scores, and data collected after 6 and 12 weeks of treatment were taken as the outcome measures. The MANOVA procedure was used to analyze the data in SPSS 8.0 for Windows. For the outcome measures collected after 6 weeks of treatment and at the end of the active treatment period (week 12), its corresponding baseline scores were entered as covariates in a two-way $3 \times 2$ analysis of variance, using treatment (0, 300, 600 mg) and the 'severity of memory decline' (mild versus moderate) as between-subjects factor and time as within-subjects factor in a repeated measures design. All outcome measures were analyzed separately and possible significant differences were corrected with Bonferroni–Holme correction for multiple hypothesis testing (Holm, 1979). Similar analyses were carried out to evaluate changes during the wash-out period. The outcome scores assessed at week 15 were analyzed in a MANOVA with the baseline scores as covariate.

## RESULTS

### Primary Outcome Variables

The means and standard errors of the primary outcome variables and the secondary outcome variables are listed in Table III. There were no

effects of treatment on long-term memory performance for delayed recall ($F(2, 113) = 1.25$, ns), delayed recognition sensitivity ($F(2, 113) = 0.15$, ns) and delayed recognition reaction time ($F(2, 113) = 1.33$, ns) after 6 and 12 weeks of S-PS treatment (see Figure 2 for delayed recall). There was a significant effect of 'severity of memory decline' for delayed recall ($F(1, 113) = 23.29$, $p < .001$) and delayed recognition sensitivity ($F(1, 113) = 17.64$, $p < .001$). Subjects with moderate memory decline performed lower on delayed recall and delayed recognition sensitivity compared with that of subjects with mild memory decline. There was no 'severity of memory decline' effect for delayed recognition reaction time ($F(1, 113) = 0.15$, ns).

After the wash-out period there were no treatment effects for delayed recall ($F(2, 113) = 0.71$, ns), delayed recognition sensitivity ($F(2, 113) = 0.95$, ns) and delayed recognition reaction time ($F(2, 113) = 0.80$, ns). There were no 'severity of memory decline' effects for delayed recall ($F(1, 113) = 0.61$, ns), delayed recognition sensitivity ($F(1, 113) = 8.52$, ns after Bonferroni-Holme correction with $p = .004$) and delayed recognition reaction time ($F(1, 113) = 0.51$, ns) after the washout-periods.

None of the MANOVA results for the primary outcome variables showed interaction effects between treatment and 'severity of memory decline', or between treatment and time.

### Secondary Outcome Variables

The MANOVA analysis of the secondary outcome measures revealed the same pattern of results as the primary outcome measures did. There were no effects of treatment at week 6 and week 12 for total immediate recall ($F(2, 113) = 0.54$, ns), memory scanning intercept ($F(2, 113) = 1.28$, ns), memory scanning slope ($F(2, 113) = 2.82$, ns), fluency ($F(2, 113) = 0.48$, ns), stroop interference ($F(2, 113) = 1.40$, ns), signal detection sensitivity ($F(2, 113) = 1.77$, ns), signal detection reaction time ($F(2, 113) = 1.82$, ns),

128                                                    B.L. JORISSEN *et al.*

TABLE III   Means (±SE) of the primary and secondary variables for the treatment groups at baseline, at 6 and 12 weeks after treatment (wk 6 and wk 12), and after a wash-out period of 3 weeks (wk 15). The number of subjects ($n$) is 39 in the placebo group, 40 in the 300 mg PS group and 41 in the 600 mg PS group

| | Treatment group | Mn (se) Wk 0 baseline | Mn (se) Wk 6 efficacy | Mn (se) Wk 12 efficacy | Mn (se) Wk 15 washout |
|---|---|---|---|---|---|
| *Primary outcome variables* | | | | | |
| Delayed recall | Placebo | 8.4 (0.4) | 9.5 (0.4)* | 10.3 (0.5)* | 9.3 (0.5) |
| (# words) | 300 mg PS | 7.7 (0.6) | 8.8 (0.5)* | 8.6 (0.6)* | 8.3 (0.50) |
| | 600 mg PS | 8.2 (0.5) | 8.8 (0.5)* | 9.4 (0.5)* | 9.3 (0.5) |
| Recognition | Placebo | 95.4 (0.7) | 95.8 (0.6)* | 96.7 (0.4)* | 97 (0.4) |
| sensitivity (%) | 300 mg PS | 93.7 (0.8) | 95.1 (0.7)* | 95 (0.8)* | 94.2 (1.1) |
| | 600 mg PS | 94.6 (0.7) | 95.6 (0.5)* | 95.7 (0.6)* | 95.4 (0.8) |
| Recognition RT (msec) | Placebo | 770.2 (18.5) | 729.7 (15.5) | 714.8 (15.4) | 713.6 (13.6) |
| | 300 mg PS | 764.8 (16.9) | 732.1 (13) | 740.5 (13.1) | 722 (13.5) |
| | 600 mg PS | 788.7 (20) | 758.6 (16.7) | 745.9 (14.7) | 739.8 (16.5) |
| *Secondary outcome variables* | | | | | |
| Immediate total recall | Placebo | 44.7 (1.5) | 47.5 (1.3)* | 49.9 (1.4)* | 49.2 (1.4) |
| (# words) | 300 mg PS | 41.2 (1.5) | 45 (1.3)* | 44.4 (1.7)* | 45.4 (1.5) |
| | 600 mg PS | 44.2 (1.6) | 46.3 (1.6)* | 47.3 (1.2)* | 48.2 (1.3) |
| Memscan slope | Placebo | 13.3 (0.8) | 12.9 (0.8) | 13.9 (0. 8) | 14.1 (1) |
| | 300 mg PS | 13.8 (1.1) | 14.2 (0.9) | 15.7 (1.2) | 14.7 (1) |
| | 600 mg PS | 14.4 (1) | 14 (0.8) | 13.8 (0.8) | 14.4 (0.8) |
| Memscan intercept (sec) | Placebo | 27.3 (0.9) | 27.6 (0.9) | 27.7 (0.7) | 27.7 (1) |
| | 300 mg PS | 30.7 (1) | 32 (1.3) | 33.6 (1.5) | 32.6 (1.3) |
| | 600 mg PS | 30.5 (1.1) | 31 (1.1) | 32 (1.2) | 32.4 (1.3) |
| Fluency (# words) | Placebo | 11.5 (0.8) | 12.3 (0.7) | 12.1 (0.7) | 13 (0.7) |
| | 300 mg PS | 9.8 (0.5) | 10.6 (0.7) | 11.2 (0.6) | 10.8 (0.8) |
| | 600 mg PS | 10.7 (0.6) | 11.1 (0.6) | 10.9 (0.7) | 12.2 (0.6) |
| Stroop interference (sec) | Placebo | 83.8 (4.4) | 77.8 (3.7) | 78.4 (3.8) | 73.1 (3.3) |
| | 300 mg PS | 87.5 (4.9) | 83.2 (4.4) | 76.4 (4.5) | 74.2 (4.1) |
| | 600 mg PS | 92.3 (4.8) | 91.3 (5.1) | 86.1 (3.6) | 82.3 (3.6) |
| SDT sensitivity (%) | Placebo | 0.7 (0.02) | 0.7 (0.02) | 0.7 (0.02) | 0.7 (0.02) |
| | 300 mg PS | 0.7 (0.01) | 0.7 (0.02) | 0.7 (0.01) | 0.7 (0.02) |
| | 600 mg PS | 0.6 (0.02) | 0.7 (0.02) | 0.7 (0.02) | 0.7 (0.02) |
| SDT RT (msec) | Placebo | 843.3 (14.7) | 855.4 (12.8) | 830.5 (14.2) | 842.7 (16.4) |
| | 300 mg PS | 877.5 (15.8) | 892.2 (14.7) | 880.8 (15.1) | 873.4 (22.4) |
| | 600 mg PS | 946.0 (17.4) | 945.2 (22.2) | 889.9 (14.7) | 913.8 (20.5) |
| MCRT SimpleRT (msec) | Placebo | 307.5 (5.5) | 310.1 (5.9) | 312.6 (6.3) | 308.4 (4.9) |
| | 300 mg PS | 325.5 (6.3) | 323.1 (7.7) | 320.4 (7.9) | 318.3 (7.1) |
| | 600 mg PS | 333.7 (7.5) | 329.3 (7.9) | 328.2 (7.6) | 328.2 (7.5) |
| MCRT ChoiceRT (msec) | Placebo | 54.7 (4.4) | 51.4 (4.5) | 51.7 (5.7) | 56.8 (4.3) |
| | 300 mg PS | 38.6 (3.9) | 48.7 (3.7) | 43.7 (5.3) | 53.6 (3.8) |
| | 600 mg PS | 54.7 (4.8) | 53.7 (5.4) | 62.1 (4. 6) | 55.7 (4.3) |
| MCRT IncompRT (msec) | Placebo | 128.8 (7) | 126 (7.2) | 114.4 (6.6) | 107 (5.4) |
| | 300 mg PS | 129.4 (7.7) | 117.7 (7.4) | 113.8 (7.7) | 96.9 (7.8) |
| | 600 mg PS | 144.5 (8.8) | 132.3 (7.1) | 127.2 (6.9) | 127 (6.3) |
| CST Interference (sec) | Placebo | 52.44 (6.1) | 47.9 (5) | 35.9 (3.9) | 44.6 (4.3) |
| | 300 mg PS | 51.70 (7.2) | 55.3 (6) | 48.1 (4.9) | 46.9 (5.4) |
| | 600 mg PS | 57.34 (6.4) | 61.2 (6.1) | 55.8 (5) | 55.8 (6.2) |
| Tower of London | Placebo | 6.82 (0.1) | | 6.7 (0.1) | |
| | 300 mg PS | 6.53 (0.2) | Not assessed | 6.6 (0.2) | Not assessed |
| | 600 mg PS | 6.80 (0.1) | | 6.9 (0.1) | |

* denotes a significant 'severity of memory' effect, which indicates a difference in performance between subjects with moderate memory decline and subjects with mild memory decline.



FIGURE 2   Mean (±SE) delayed recall scores of the VVLT at baseline, at 6 and 12 weeks after treatment (wk 6 and wk 12), and after a wash-out period of 3 weeks (wk 15). The number of subjects ($n$) is 39 in the placebo group, 40 in the 300 mg PS group and 41 in the 600 mg PS group.

MCRT simple reaction time ($F_{(2, 113)} = 0.40$, ns), MCRT choice reaction time ($F_{(2, 113)} = 0.87$, ns), MCRT incompatible reaction time ($F_{(2, 113)} = 0.85$, ns) and for concept shifting interference ($F_{(2, 113)} = 3.32$, ns after Bonferroni–Holme correction with $p = .040$). There was also no treatment effect for the TOL maximum number of steps ($F_{(2, 113)} = 1.38$, ns) after week 12. 'Severity of memory decline' effects on total immediate recall were present. Immediate recall performance was worse in the moderate subgroup than in the mild subgroup ($F_{(1, 113)} = 19.84$, $p < .001$). The other secondary variables did not show 'severity of memory decline' effects after 6 and 12 weeks of treatment.

No significant treatment differences were measured after the washout period for total immediate recall ($F_{(2, 113)} = 0.29$, ns), memory scanning intercept ($F_{(2, 113)} = 1.15$, ns), memory scanning slope ($F_{(2, 113)} = 1.03$, ns), fluency ($F_{(2, 113)} = 2.77$, ns), stroop interference ($F_{(2, 113)} = 0.20$, ns), signal detection sensitivity ($F_{(2, 113)} = 0.06$, ns), signal detection reaction time ($F_{(2, 113)}$ = 1.08, ns), MCRT simple reaction time ($F_{(2, 113)}$ = 1.53, ns), MCRT choice reaction time ($F_{(2, 113)}$ = 0.95, ns), MCRT incompatible reaction time ($F_{(2, 113)}$ = 3.74, ns after Bonferroni–Holme correction with $p = .027$) and for concept shifting interference ($F_{(2, 113)} = 0.14$, ns). There were no 'severity of memory decline' effects after the washout period.

Furthermore there were no significant interactions between treatment and 'severity of memory decline' or between treatment and time at week 6, week 12 or after the wash-out period.

## DISCUSSION

This double-blind, placebo-controlled study showed that S-PS treatment did not have any effect on cognitive performance in subjects older than 57 years of age with age-associated memory impairment.

We will first discuss some methodological issues that might have influenced the results of this study (for example due to sampling error).

B.L. JORISSEN *et al.*

There might have been a confounding factor present in the distribution of the subjects between treatment groups. Although there were no significant differences in IQ, age, or sex, mean IQ appeared higher in the placebo group (mean IQ = 120) than in the treatment groups (mean IQ = 115 for 300 mg S-PS and 118 for 600 mg PS). However, none of the outcome measures at baseline, with the exception of the Concept Shifting Test and the Fluency Test scores, were significantly associated with IQ scores. Even if there was a significant group difference, the baseline correction which we applied in our analyses should have dealt with this problem.

Another factor that could have influenced the results concerns the sensitivity of the cognitive tests to detect treatment effects, defined as the test–retest reliability. The latter has been identified as the most appropriate single summary measure of reliability (Parrott, 1991). Average intraclass correlation coefficients, which are overall correlations of multiple assessments, were analyzed over five assessments (including training). The analyses revealed an adequate test–retest reliability higher than 0.8 for the primary variables to detect treatment effects. The test–retest reliabilities was higher than 0.8 for the secondary variables, except for choice reaction time (0.7), concept shifting interference (0.6), and the number of steps of the tower of London (0.3) which was only assessed at baseline and at week 12. This indicates that only the concept shifting test and the tower of London test may not have been sensitive enough to detect a treatment effect.

Concerning the sample size, a priori power analysis showed that 117 subjects were the minimum total sample size in a three group design, in order to detect a treatment difference on delayed recall of 1.25 (with standard deviation of 2) with a power of 80%. In case of a smaller effect size, indeed, power would have been too low. However, a smaller effect then should have emerged as a trend in the data.

A potentially important treatment-related issue is the presence of small amounts of phosphatidylcholine (PC), phosphatidylethanolamine (PE), and phosphatidylinositol (PI) in the phosphatidylserine substance used in our study. It would have been better had S-PS been the only phospholipid in the capsules because the other phospholipids may have influenced the treatment effect of S-PS. In rat studies it has been shown that the administration of PS liposomes increases calcium-dependent acetylcholine release from the cerebral cortex in anaesthetized rats, with PE being about half as active as PS whereas PC was inactive in this respect (Casamenti *et al.*, 1979). Despite these less pronounced effects of PC and PE on acetylcholine release, the mechanisms of action of the phospholipids may have interacted with those of the S-PS treatment in our study. Eagger *et al.* (1991) showed that 150 mg tacrine (a cholinesterase inhibitor) in combination with 10.8 g lecithin (containing 15% PC) also improved cognitive function in Alzheimer patients, although the authors mentioned that lecithin was unlikely to have an influence because the treatment had no effect on plasma choline concentrations. The lecithin dose was about 30 times higher than the effective dose of BC-PS. Therefore, although in principle we cannot exclude effects of PC and PE, we doubt whether they would have had an effect because they were present in very small amounts.

We assumed that the AAMI criteria are suitable to demonstrate a treatment effect in normally aging individuals. Crook *et al.* (1986) published the diagnostic criteria for AAMI to stimulate research into the epidemiological, clinical characterization, and treatment aspects of 'normal' later-life memory loss. Several drugs have been tested for their cognition-enhancing effects on AAMI or age-associated cognitive decline (AACD), although no cognition enhancer has reliably and repeatedly been demonstrated to be effective (Riedel and Jolles, 1996). Subjects with AAMI may not be suitable as a clinical population in studies of drugs or nutrients.

However, as most nutritional supplements are aimed at normally aging subjects, this argument may not hold for nutrient studies. AAMI-subjects hardly differ from 'normal-aging' subjects and for this purpose, application of the AAMI criteria may be a well-tuned pragmatic approach in efficacy studies of nutritional supplements for the elderly. As such, the AAMI criteria fulfill the function of excluding successfully aging subjects from study participation. Smith et al. (1991) discussed some problems of reliability and expressed concerns regarding the AAMI criteria. One of their suggestions was the use of age-appropriate norms, since the AAMI criteria do not consider the discontinuity of normal test performance between the younger old and the older old. We used the AAMI criteria so that we could compare our results with those of previous PS studies (Crook, 1998; Crook et al., 1991; Gindin et al., 1993). We also used age-appropriate norms to define the group with more severe memory decline.

Finally, we assumed that ingested S-PS would be available in the brain. Whereas nothing is known about the amount of BC-PS or S-PS that passes through the gastrointestinal tract and the blood–brain barrier after oral administration in humans. In rats, orally administered radioactive-labeled BC-PS ($^{14}$C-PS) passes the gastrointestinal tract very slowly, and an intravenously injected dose was halved very rapidly and only 0.25% of an injected dose reached the brain tissue after 20 minutes (Orlando et al., 1987). However in humans, Rosadini et al. (1990) using indirect quantitative EEG methods, showed an increase of the power on the 'alpha' frequency at the anterior electrode after a 50-mg dose of intravenously administered BC-PS, and over the whole scalp after a 75-mg dose of BC-PS. This implies that BC-PS induced cerebral activity after intravenous administration. Plasma concentrations of PS after oral administration in humans have not been reported in the literature.

In future studies, attention should be paid to the fatty-acid content of PS. Essential fatty acids may control the modulation of neuronal membrane fluidity and thus might influence cognitive functions (Yehuda et al., 1999). Treatment with a 1:4 ratio of n-3 and n-6 fatty acids improved mood, cooperation, appetite, sleep, ability to navigate in the home, and short-term memory in a placebo-controlled trial with 100 Alzheimer patients (Yehuda et al., 1996). In our study, linoleic acid (n-6) accounted for approximately 58% of the polyunsaturated fatty acids in and linolenic acid (n-3) for 7%. No information is available of the fatty acid content of PS used in other human studies. In animal studies (Blokland et al., 1999; Sakai et al., 1996), there was a large difference in fatty acid content of the S-PS and BC-PS formulas used, and even between the different S-PS formulas. This might be important for the efficacy of specific PS formulas.

Another aspect that needs to be addressed is the way of production of S-PS by enzymatic conversion. Some enzyme may be included in the final product, which may lead to a partial degradation of S-PS with time. In our study, the capsules contained 50% of the initial value of S-PS after 15 months. This final level was still higher than the level of supplementation used in studies with BC-PS, and the last treatment was finished 11 months after the capsules were prepared.

Despite these reservations, PS would appear to have only doubtful cognitive enhancing effects in subjects with AAMI. PS did not influence cognitive functions in our AAMI population, whereas Crook and colleagues showed that S-PS and BC-PS enhanced both name recall immediately and an hour after introduction, and learning and recall of written information in AAMI subjects (Crook, 1998). However, this effect was only present in the subgroup of patients with the most severe cognitive impairment. Crook compared the placebo and BC-PS group from the 1991 study (Crook et al., 1991) with a new S-PS group, without introducing a new placebo group. Thus the data were not analyzed according to a double-blind procedure, which is very important

132                                   B.L. JORISSEN *et al.*

in clinical trials. Gindin and colleagues showed, in a double-blind, placebo-controlled study, a significant improvement of memory and mood in 72 AAMI-subjects (Gindin *et al.*, 1993). In contrast to the study by Crook *et al.*, subjects with higher baseline scores had an improved memory function after treatment.

The behavioral effects of S-PS have also been studied in animals. Blokland *et al.* (1999) compared the behavioral effects of an intraperitoneal injection of BC-PS with S-PS and E-PS in a placebo controlled rat study. BC-PS and S-PS had similar effects on tests of avoidance learning, but not on tests of spatial discrimination learning. Sakai *et al.* (1996) also found that orally administered S-PS and BC-PS improved scopolamine-induced deterioration of passive avoidance. Compared to the cognition-enhancing effects in rats of other cholinesterase inhibitors, such as metrifonate (Blokland *et al.*, 1995; van der Staay *et al.*, 1996), the magnitude of the effects obtained with BC-PS and S-PS were only marginal.

Thus while BC-PS and S-PS may have cognition-enhancing effects in animals, their effects in humans are not yet clear. This difference in effect might be caused by the difference between animal and human research. In animal research the methodological conditions can be controlled more accurately. For instance, the diet of the animals is the same, whereas in human PS studies, including our study, the diet of the free-living volunteers was not controlled. The diet composition, for example, a high fat versus a low fat diet, might influence the uptake of S-PS in the gastrointestinal tract.

In summary, this study showed that oral administration of S-PS did not improve memory or other cognitive functions in people suffering from AAMI. Since others (Crook *et al.*, 1991; Gindin *et al.*, 1993) have shown cognition-enhancing effects of BC-PS in different subgroups of AAMI subjects, and the plasma concentration of PS after oral administration has not been measured in humans, the efficacy of PS is still questionable. Future research could benefit from the development of methods to assess changes in the relatively low plasma concentrations of PS after its oral administration in humans.

### Acknowledgements

This research was sponsored by Novartis Consumer Health SA, Nyon, Switzerland. The authors wish to express their gratitude especially to those people who provided medical and/or logistic support: Pauline Aalten, René Albers, Sylvia Bours, Angelique Haex, Myra Nods, Anita van Oers, Gian-Piero Serafino and Sjacko Sobczak; and to Arjan Blokland, Edwin Klinkenberg and Jeroen Schmitt for their comments during the preparation of this article.

### References

Allegro, L., Favaretto, V. and Ziliotto, G. (1987) Oral phosphatidylserine in elderly patients with cognitive deterioration: An open trial. *Clin. Trials J.* **24**, 104–108.

Amaducci, L. (1988) Phosphatidylserine in the treatment of Alzheimer's disease: results of a multicenter study. *Psychopharmacol. Bull.* **24**, 130–134.

Benton, A. (1975) The Revised Visual Retention Test: Clinical and Experimental Applications (New York: Psychological Corporation).

Blokland, A., Hinz, V. and Schmidt, B.H. (1995) Effects of Metrifonate and Tacrine in the Spatial Morris Task and Modified Irwin Test: Evaluation of the Efficacy/Safety Profile in Rats. *Drug Development Research* **36**, 166–179.

Blokland, A., Honig, W., Brouns, F. and Jolles, J. (1999) Cognition-Enhancing Properties of Subchronic Phosphatidylserine (PS) Treatment in Middle-Aged Rats: Comparison of Bovine Cortex PS with Egg PS and Soybean PS. *Nutrition* **15**, 778–783.

Borghese, C.M., Gomez, R.A. and Ramirez, O.A. (1993) Phosphatidylserine increases hippocampal synaptic efficacy. *Brain Res. Bull.* **31**, 697–700.

Brand, N. and Jolles, J. (1985) Learning and retrieval rate of words presented auditorily and visually. *J. of Gen. Psychol.* **112**, 201–210.

Bruni, A., Mietto, L., Bellini, F., Boarato, E. and Toffano, G. (1989) Pharmacological and autopharmacological action of phosphatidylserine. In: Bazan, N.G., Horrocks, L.A. and Toffano, G. (Eds), *Phospholipids in the Nervous System: Biochemical and Molecular Pathology* (Padova: Liviana Press), Vol. 17, pp. 217–224.

Caffarra, P. and Santamaria, V. (1987) The effects of phosphatidylserine in patients with mild cognitive decline: An open trial. *Clin. Trials J.* **24**, 109–114.

Casamenti, F., Mantovani, P., Amaducci, L. and Pepeu, G. (1979) Effect of phosphatidylserine on acetylcholine output from the cerebral cortex of the rat. *J. Neurochem.* **32**, 529–533.

Cenacchi, T., Bertoldin, T., Farina, C., Fiori, M.G. and Crepaldi, G. (1993) Cognitive decline in the elderly: a double-blind, placebo-controlled multicenter study on efficacy of phosphatidylserine administration. *Aging Milano* 5, 123–133.

Cohen, S.A. and Muller, W.E. (1992) Age-related alterations of NMDA-receptor properties in the mouse forebrain: partial restoration by chronic phosphatidylserine treatment. *Brain Res.* 584, 174–180.

Crook, T., Bartus, R.T., Ferris, S.H., Whitehouse, P., Cohen, G.D. and Gershon, S. (1986) Age-associated memory impairment: propose diagnostic criteria and measures of clinical change – report of a National Institute of Mental Health Work Group. *Dev. Neuropsychol.* 2, 262–276.

Crook, T.H. (1998) Treatment of age-related cognitive decline: effects of phosphatidylserine. In: Klatz, R.M. and Goldman, R. (Eds), *Anti-aging Medical Therapeutics* (California: Harina del Rey), Vol. II, pp. 20–28.

Crook, T.H., Feher, E.P. and Larrabee, G.J. (1992) Assessment of memory complaint in age-associated memory impairment: the MAC-Q. *Int. Psychogeriatr.* 4, 165–176.

Crook, T.H., Tinklenberg, J., Yesavage, J., Petrie, W., Nunzi, M.G. and Massari, D.C., (1991) Effects of phosphatidylserine in age-associated memory impairment. *Neurology* 41, 644–649.

Delwaide, P.J., Gyselynck Mambourg, A.M., Hurlet, A. and Ylieff, M. (1986) Double-blind randomized controlled study of phosphatidylserine in senile demented patients. *Acta. Neurol. Scand.* 73, 136–140.

Delwaide, P.J., Maertens de Noordhout, A., De Paqua, V., Ylieff, M., Gyselinkc-Mambourg, A.M. and Hurlet, A. (1989) Effects of phosphatidylserine (BC-PS) on aged brain in normal subjects and senile demented patients. In: Bazan, N.G., Horrocks, L.A. and Toffano, G. (Eds), *Phospholipids in the Nervous System: Biochemical and Molecular Pathology* (Padova: Liviana Press), Vol. 17, pp. 261–268.

Eagger, S.A., Levy, R. and Sahakian, B.J. (1991) Tacrine in Alzheimer's disease [see comments]. *Lancet* 337, 989–992.

Folstein, M.F., Folstein, S. and McHugh, P.R. (1975) Mini-Mental State: A practical method for grading the cognitive state of patients for the clinician. *J. Psychiat. Res.* 12, 189–198.

Furushiro, M., Suzuki, S., Shishido, Y., Sakai, M., Yamatoya, H., Kudo, S., Hashimoto, S. and Yokokura, T. (1997) Effects of oral administration of soybean lecithin transphosphatidylated phosphatidylserine on impaired learning of passive avoidance in mice. *Jpn. J. Pharmacol.* 75, 447–450.

Gindin, J., Kedar, D., Naor, S., Novikov, M., Walter-Ginzburg, A. and Levi, S. (1993) The effect of herbal phosphatidylserine on memory and mood in community elderly. *Gerontologist* 33, 230 (Abstract).

Granata, Q.a.D.M., J. (1987) Phosphatidylserine in elderly patients, an open trial. *Clin. Trial J.* 24, 99–103.

Holm, S. (1979) A simple sequentially rejective multiple test procedure. *Scand. J. Statist.* 6, 65–70.

Houx, P. (1991) Cognitive Aging and Health-Related Factors (Rijksuniversiteit Limburg, Maastricht).

Houx, P.J. and Jolles, J. (1993) Age-related decline of psychomotor speed: effects of age, brain health, sex and education. *Perceptual Motor Skills* 76, 195–211.

Houx, P.J., Vreeling, F.W. and Jolles, J. (1993) Stroop interference: aging effects assessed with the Stroop Color-Word Test. *Aging Res.* 19, 209–224.

Israel, L., Melac, M., Milinkevitch, D. and Dubois, G. (1994) Drug therapy and memory training programs: A double-blind randomized trial of general practice patients with age-associated memory impairment. *Int. Psychogeriatr.* 6, 155–170.

Jolles, J., Houx, P.J., van Boxtel, M.P.J. and Ponds, R.W.H.M. (1995) The Maastricht Aging Study, Determinants of cognitive aging. (Maastricht: Maastricht University).

Luteijn, F. and van der Ploeg, F.A.E. (1983) Manual Groningen Intelligence Test (GIT) (Lisse, The Netherlands: Swets and Zeitlinger).

Nishizuka, Y. (1984) Turnover of inositol phospholipids and signal transduction. *Science* 225, 1365–1370.

Nunzi, M.G., Milan, F., Guidolin, D., Zanotti, A. and Toffano, G. (1990) Therapeutic properties of phosphatidylserine in the aging brain. In: Hanin I. and Pepeu, G. (Eds), *Phospholipids: Biochemical, Pharmaceutical and Analytical Considerations* (New York: Plenum Press), pp. 213–218.

Orlando, P., Battistella, A. and Toffano, G. (1987) Pharmacokinetics of radiolabelled brain phosphatidylserine. *Clinical Trials Journal* 24, 18–24.

Palmieri, G., Palmieri, R., Inzoli, M.R., Lombardi, G., Sottini, C., Tavolato, B. and Giometto, B. (1987) Double-blind controlled trial of phosphatidylserine in patients with senile mental deterioration. *Clin. Trials J.* 24, 73–83.

Parrott, A.C. (1991) Performance tests in human psychopharmacology: I. Test reliability and standardization. *Hum. Psychopharmacol.* 6, 1–9.

Pollack, I. and Norman, D.A. (1964) A non-parametric analysis of recognition experiments. *Psychonomic. Sci.* 1, 125–126.

Rediess, S. and Caine, E.D. (1996) Aging, cognition and DSM-IV. *Aging, Neuropsychol., and Cognit.* 3, 105–117.

Rey, A., (1964) L'examen psychologique dans les cas d'encéphalopathie traumatique (Paris: Presses Universitaires de France).

Riedel, W.J. and Jolles, J. (1996) Cognition enhancers in age-related cognitive decline. *Drugs Aging* 8, 245–274.

Riedel, W.J. and Jorissen, B.L. (1998) Nutrients, age and cognitive function. *Curr. Opin. Clin. Nutr. Metab. Care* 1, 579–585.

Rosadini, G., Sannita, W.G., Nobili, F. and Cenacchi, T. (1990) Phosphatidylserine: quantitative EEG effects in healthy volunteers. *Neuropsychobiology* 24, 42–48.

Sakai, M., Yamatoya, H. and Kudo, S. (1996) Pharmacological effects of phosphatidylserine enzymatically synthesized from soybean lecithin on brain functions in rodents. *J. Nutr. Sci. Vitaminol. Tokyo* 42, 47–54.

Schuhfried, G. (1991) Wiener Testsystem: Signal Detektion [Vienna Test System: Signal Detection Test] (Mödling, Austria: Schuhfried GmbH).

Shallice, T. (1982) Specific impairments of planning. *Philos. Trans. R. Soc. Lond. B. Biol. Sci.* 298, 199–209.

Sinforiani, E., Agostinis, C., Merlo, P., Gualtieri, S., Mauri, M. and Mancuso, A. (1987) Cognitive decline in ageing brain: Therapeutic approach with phosphatidylserine. *Clin. Trials J.* 24, 115–124.

Small, G. (1965) Revised ischemic score for diagnosing multi-infart dementia. *J. of Clin. Psychiatr.* 46, 514–517.

Smith, G., Ivnik, R.J., Petersen, R.C., Malec, J.F., Kokmen, E. and Tangalos, E. (1991) Age-associated memory impairment diagnoses: problems of reliability and concerns for terminology. *Psychol. Aging* 6, 551–558.

134                                                                  B.L. JORISSEN *et al.*

Sternberg, S. (1975) Memory scanning: New findings and current controversies. *Q. J. Exp. Psychol.* **27**, 1–32.

Sun, A.Y. and Sun, G.Y. (1979) Neurochemical aspects of the membrane hypothesis of aging. In: Meier-Ruge, W. (Ed), *CNS Aging and its Neuropharmacology, Experimental and Clinical Aspects* (Basel: S. Karger), Vol. 15, pp. 34–53.

Toffano, G. (1987) The therapeutic value of phosphatidylserine effect in the aging brain. In: Hanin, I. and Ansell, G.B. (Eds), *Lecithin: Technological, Biological, and Therapeutic Aspects* (New York: Plenum Press), pp. 137–146.

van der Staay, F.J., Hinz, V.C. and Schmidt, B.H. (1996) Effects of metrifonate, its transformation product dichlorvos, and other organophosphorus and reference cholinesterase inhibitors on Morris water escape behavior in young-adult rats. *J. Pharmacol. Exp. Ther.* **278**, 697–708.

Vannucchi, M.G. and Pepeu, G. (1987) Effect of phosphatidylserine on acetylcholine release and content in cortical slices from aging rats. *Neurobiol. Aging* **8**, 403–407.

Villardita, C., Grioli, S., Salmeri, G., Nicoletti, F. and Pennisi, G. (1987) Multicentre clinical trial of brain phosphatidylserine in elderly patients with intellectual deterioration. *Clin. Trials J.* **24**, 84–93.

Wechsler, D. (1955) Manual for the Wechsler Adult Intelligence Scale (New York: The Psychological Corporation).

Wechsler, D. (1974) Wechsler Memory Scale Manual (New York: The Psychological Corporation).

White, D.A. (1973) The phospholipid composition of mammalian tissues. In: G.B. Ansell, J.N. Hawthorne and R.M.C. Dawson, (Eds), *Form and Function of Phospholipids* (Amsterdam: Elsevier Scientific Publishing Company), Vol. 3, pp. 441–482.

Yehuda, S., Rabinovitz, S. and Mostofsky, D.I. (1999) Essential fatty acids are mediators of brain biochemistry and cognitive functions. *J. Neurosci. Res.* **56**, 565–570.

Yehuda, S., Rabinovtz, S., Carasso, R.L. and Mostofsky, D.I. (1996) Essential fatty acids preparation (SR-3) improves Alzheimer's patients quality of life. *Int. J. Neurosci.* **87**, 141–149.

Yesavage, J. and Brink, T. (1983) Development and validation of a geriatric depression scale: A preliminary report. *J. of Psychiatr. Res.* **17**, 37–49.

Zanotti, A., Valzelli, L. and Toffano, G. (1986) Reversal of scopolamine-induced amnesia by phosphatidylserine in rats. *Psychopharmacology Berl.* **90**, 274–275.

# Bednarz Decl.

# EXHIBIT G

The Wayback Machine - https://web.archive.org/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagin…

# Qualified Health Claim: Final Decision Letter - Phosphatidylserine and Cognitive Dysfunction and Dementia

**Back to Qualified Health Claims: Letters of Enforcement Discretion**
**(/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm072756.htm)**

Jonathan W. Emord
Andrea G. Ferrenz
Emord and Associates, P.C.
5282 Lyngate Court
Burke, Virginia 22015

RE: Health Claim Petition - Phosphatidylserine and Cognitive Dysfunction; Phosphatidylserine and Dementia
Dear Mr. Emord and Ms. Ferrenz:

This letter responds to your health claim petition submitted on April 19, 2002, on behalf of Doctor Kyl Smith, requesting the Food and Drug Administration (FDA or the agency) to authorize two health claims concerning the relationship between the consumption of phosphatidylserine as a dietary supplement and dementia and the relationship between the consumption of phosphatidylserine as a dietary supplement and cognitive dysfunction. Specifically, your petition requests that FDA authorize the following claims: 1) consumption of phosphatidylserine may reduce the risk of cognitive dysfunction in the elderly, and 2) consumption of phosphatidylserine may reduce the risk of dementia in the elderly. After mutual agreement to extend the 100-day deadline, FDA filed the petition for comprehensive review on September 13, 2002, in accordance with section 403(r)(4)(A)(i) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 343(r)(4)(A)(i)).

Under 21 CFR 101.70(j)(3), the deadline for FDA action on your petition was December 12, 2002, 90 days after it was filed for comprehensive review. By mutual agreement, the deadline was extended three times. The final agreed-upon deadline was February 24, 2003.

On January 28, the agency sent you a letter explaining its concerns about each of the two referenced health claims set out above. We discussed these concerns with you and your client at a February 3 meeting. In a letter sent to you on February 11, the agency offered two disclaimers (one for each claim) and explained the circumstances under which it would consider the exercise of enforcement discretion for the proposed claims, if accompanied by an agreed upon disclaimer. The two disclaimers offered in FDA's letter were identical except for the name of the disease (dementia or cognitive dysfunction). On February 13, you sent us an electronic letter suggesting alternative disclaimer language acceptable to your client. On February 21, the agency sent to you an electronic letter amending our offer of a disclaimer for the proposed claims. After negotiations about the wording of the disclaimers, your client agreed to the terms proposed by FDA, as modified during the negotiations. On February 24, FDA issued a letter memorializing the agreement and stating its intention to issue within 60 days its formal decision on the phosphatidylserine health claim petition. We regret the delay in issuing that decision.

After reviewing the scientific evidence in your petition and other evidence relevant to your proposed claims, FDA evaluated the claims under the "significant scientific agreement" standard. FDA's current regulations, which mirror the statutory language in 21 U.S.C. 343(r)(3)(B)(i), provide that the agency may issue a regulation authorizing a health claim only "when it determines, based on the totality of publicly available scientific evidence (including evidence from well-designed studies conducted in a manner which is consistent with generally recognized scientific procedures and principles), that there is significant scientific agreement, among experts qualified by scientific training and experience to evaluate such claims, that the claim is supported by such evidence" (21 CFR 101.14(c)). For reasons set forth below, your petition does not meet the "significant scientific agreement" standard.

FDA next considered whether it would be appropriate to consider the exercise of enforcement discretion for qualified claims about the substance-disease relationship consistent with the agency's approach to evaluating proposed health claims for use on dietary supplements when the significant scientific agreement standard is not met. This letter outlines FDA's rationale for its determination that the evidence supporting your proposed health claims for phosphatidylserine does not meet the significant scientific agreement standard, the agency's rationale for why the evidence is appropriate for consideration of qualified health claims for phosphatidylserine, and the conditions under which the agency intends to consider the exercise of its enforcement discretion for certain qualified health claims in the labeling of phosphatidylserine dietary supplements.

# I. Safety Review

Under 21 CFR 101.14(b)(3)(ii), the proponent of a health claim must demonstrate to FDA's satisfaction that the use of a substance at levels necessary to justify a claim is safe and lawful under applicable food safety provisions. For dietary supplements, the applicable safety provisions require, among other things, that the dietary ingredient not present a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling or, if no conditions of use are suggested or recommended in the labeling, under ordinary conditions of use (section 402(f)(1)(A) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 342(f)(1)(A)). Further, a dietary supplement must not contain a poisonous or deleterious substance which may render the supplement injurious to health under the conditions of use recommended or suggested in the labeling (21 U.S.C. 342(f)(1)(D)).

Phosphatidylserine is a phospholipid that is a structural component of biological membranes of plants, animals and other life forms. The petition identifies two sources of phosphatidylserine: 1) bovine brain cortex (BC-PS), and 2) soy lecithin (S-PS). The petition provided evidence that phosphatidylserine is safe and lawful. This evidence is derived from human studies, and the petition also cites the absence of reports of adverse reactions in the published literature. However, the petition noted that the "safety of phosphatidylserine obtained from animal sources has come under criticism" because of the risk of virus transmission (Scientific Report of Dr. Michael Glade, Attachment 1 to Petition, at 9).[1]

FDA concludes that the use of phosphatidylserine as a dietary supplement is safe and lawful under 21 C.F.R. § 101.14 provided that bovine-derived sources, if used, are not derived from bovine tissues from cattle born, raised, or slaughtered in any country where BSE exists.[2]

# II. Scientific Evaluation

FDA reviewed the scientific evidence from your petition and other publicly available sources to evaluate the potential benefits of phosphatidylserine. FDA also reviewed the literature for generally recognized definitions and measures related to the evaluation of dementia and cognitive dysfunction that are the focus of your proposed health claims. FDA focused its review of the evidence for the relationships between phosphatidylserine and reduction of risk of cognitive dysfunction and dementia on primary reports of human experimental data.

# A. Substance

7/26/2021    Cvb edd of Nutrient Quality Health Claims: Final Rule-Serine - Phosphatidylserine and Cognitive Dysfunction and Dementia

Case 1:20-cv-23564-MGC   Document 77-1   Entered on FLSD Docket 07/27/2021   Page 125 of 134

In your petition, you noted two sources of phosphatidylserine: bovine brain cortex and soy lecithin (Petition at page 4). Your petition also states that the "petitioner derives phosphatidylserine from soy lecithin" (Petition at page 4). FDA evaluated whether, for purposes of the proposed health claims, BC-PS and S-PS are the same substance or are different substances because of differences in their overall composition. Chemically, the phosphatidylserine molecule consists of a glycerol-phosphate backbone, serine, and two fatty acids. Information included in your petition showed that the fatty acid composition of the bovine and soy phosphatidylserine molecules differ (PDR® for Nutritional Supplements, Attachment 2 to Petition, at 354). For example, the phosphatidylserine molecule from soy lecithin contains mainly polyunsaturated acids, while the phosphatidylserine molecule from bovine brain cortex contains mainly saturated and monounsaturated fatty acids and long-chain polyunsaturated fatty acids (e.g., docasahexaenoic acid). Additionally, the relative proportions of fatty acids from the omega-3 and omega-6 series[3] vary in the phosphatidylserine molecules from bovine and soy products. For example, the phosphatidylserine molecule from soy has 7% alpha-linolenic acid (omega-3) and 47% linoleic acid (omega-6), while the phosphatidylserine molecule derived from bovine brain cortex has 8% docasahexaenoic acid (omega-3) and 2% arachidonic acid (omega-6) (see Phosphatidylserine (Sodium Salt), Attachment 2 ). Different fatty acids differ in their metabolism, biological activity, and potency (Food and Nutrition Board, 2002). Because the phosphatidylserine molecules from bovine brain cortex and soy lecithin differ significantly in their fatty acid composition, they may not be the same substance.

In addition to the differences in the fatty acid composition of the phosphatidylserine molecules from bovine brain cortex and soy lecithin, there are also differences in the non-phosphatidylserine components of these ingredient sources. These non-phosphatidylserine components are primarily other phospholipids and free fatty acids. BC-PS is prepared by extracting and separating the phospholipid classes from brain material. The final extract will contain up to 8% of its weight as non-phosphatidylserine components (Folch, 1948). S-PS is prepared from soy lecithin that has been treated with serine and an enzyme to convert the native phospholipids in soy lecithin to phosphatidylserine (Sakai et al., 1996). The resulting phosphatidylserine content depends on the composition of starting soy lecithin product and processing conditions such as enzyme activity. For S-PS from one manufacturer, the non-phosphatidylserine components can range from 15% to 80% (Degussa, 2002). The non-phosphatidylserine components are free fatty acids and phospholipids which, as noted above, may have biological activity independent of phosphatidylserine. These other components outside the phosphatidylserine molecule of the soy sources of phosphatidylserine differ incomposition and amounts, and perhaps also in biological activity, from the non-phosphatidylserine components in BC-PS. For products of high purity (i.e., relatively low amounts of non-phosphatidylserine components), uncertainties as to any biological effects of the non-phosphatidylserine components would be minimized.

For the reasons summarized above, FDA considers that bovine brain cortex- and soy lecithin-sources of phosphatidylserine may be different substances and may, therefore, have different biological activities. Thus, there is considerable uncertainty in generalizing results from studies done with BC-PS containing products as the test substance to products containing S-PS, and vice versa.

## B. Dementia and Cognitive Dysfunction as a Disease or Health-related Condition

To define dementia and cognitive dysfunction, the subjects of the proposed health claims, FDA looked for generally accepted definitions of these two conditions. The essential feature of dementia is the development of multiple cognitive deficits that include memory, and at least one of the following cognitive disturbances: aphasia, apraxia, agnosia, or a disturbance in executive functioning.[4] The cognitive deficits must be sufficiently severe to cause impairment in occupational or social functioning and must represent a decline from a previous higher level of functioning. A diagnosis of dementia should not be made if the cognitive deficits occur exclusively during the course

of "delirium" (American Psychiatric Association, 2000). Therefore, in effect, the term "dementia" indicates the presence of cognitive decline/deterioration that is sufficient to impair occupational or social functioning (Mani, 2003).

FDA did not find any standard definition of "cognitive dysfunction." Therefore, FDA considered it to mean a disturbance of "cognitive function." "Cognitive" is defined as "Pertaining to the mental processes of comprehension, judgment, reasoning, as contrasted with emotional and volitional processes" (Mosby's Medical, Nursing and Allied Health Dictionary, 1994). "Cognitive function" is defined as "An intellectual process by which one becomes aware of, perceives, or comprehends ideas. It involves all aspects of perception, thinking, reasoning, and remembering" (Mosby's Medical, Nursing and Allied Health Dictionary, 1994). Therefore, the terms "cognitive function" or "cognitive functions" subsume a number of interrelated brain activities. Examples of such activities include memory, learning, abstract thinking, language, visuospatial perception, and higher executive functions (planning, organizing, and sequencing) (Mani, 2003). "Cognitive dysfunction" may be considered to mean a disturbance of cognitive function.

FDA considered dementia and cognitive dysfunction together in evaluating the scientific evidence for the relationship with phosphatidylserine because the possible causes of dementia are likely the same as those for cognitive decline and deterioration (Mani, 2003).

## C. Phosphatidylserine and Reduced Risk of Dementia or Cognitive Dysfunction

FDA focused its review of the evidence for the relationships between phosphatidylserine and reduced risk of dementia and cognitive dysfunction on primary reports of human experimental data. You submitted 15 intervention studies that evaluated the effects of phosphatidylserine on dementia or impaired cognitive function (Crook et al., 1992; Heiss et al., 1994; Heiss et al., 1993; Amaducci and the SMID Group, 1998; Delwaide et al., 1986; Engel et al., 1992; Schreiber et al., 2000; Crook et al., 1991; Cenacchi et al., 1987; Palmieri et al., 1987; Villardita et al., 1987; Granata and DiMichele, 1987; Allegro et al., 1987; Caffarra and Santamaria, 1987; and Sinfiorani et al., 1987). The agency located through a literature search another intervention study (Jorissen et al., 2001). In each of these 16 studies, the individuals enrolled were diagnosed with some form of dementia or cognitive dysfunction. The purpose of these studies was to examine the effect of phosphatidylserine on mitigating (reducing) the symptoms of various levels of severity of dementia and cognitive dysfunction in a diseased population, not on reducing the risk of dementia or cognitive dysfunction in the general population. Thus, none of the studies directly evaluated the relationship that is the subject of the claims, phosphatidylserine and reduced risk of dementia or cognitive dysfunction.

Most of the studies identified BC-PS as their test product (Crook et al., 1992; Amaducci and the SMID Group, 1998; Delwaide et al., 1986; Engel et al., 1992; Palmieri et al., 1987; Villardita et al., 1987; Crook et al., 1991; Cenachi et al., 1993; Caffarra and Santamaria, 1987; Allegro et al., 1987; Sinfioriani et al., 1987; and Granata and DiMichele, 1987). Two studies used a soy-derived of phosphatidylserine (Jorissen et al., 2001; Schreiber et al., 2000), and two did not identify the source of the phosphatidylserine (Heiss et al., 1993; Heiss et al., 1994). Only one of the studies (Jorissen et al, 2001) provided any information on the overall composition or purity of the test or placebo products.

Of the studies, five were open-label designs (Schreiber et al., 2000; Granata and DiMichele, 1987; Allegro et al., 1987; Caffarra and Santamaria, 1987; and Sinfiorani et al., 1987). FDA did not include these studies in its evaluation of the relationship between phosphatidylserine and dementia or cognitive dysfunction. In open-label studies, both the investigator and subjects know what substance is being tested and know that subjects are receiving the test substance. Placebo effects alone may be responsible for any apparent changes in outcome measures. Open label trials are uncontrolled, as they involve only a treatment group. Without a concurrent control group that receives a placebo and is evaluated according to the same measures as the treatment group, it is not possible to determine whether effects on outcome measures are due to the test substance or to other extraneous

factors. For example, because subjects took tests of cognitive function several times throughout the course of these studies, the repeated measures and increased familiarity with the testing protocols and content alone may have resulted in improved scores regardless of whether the subjects were consuming S-PS.

Randomization (assigning subjects randomly to the control and test groups) is an important study design feature because it ensures that extraneous factors that might influence the results are equally divided between control and test groups (Spilker, 1991). For example, the baseline cognitive abilities of study participants might vary greatly. Without randomization, the test and control groups might differ in their baseline cognitive abilities. Unequal baseline differences in cognitive abilities would cause test results to inappropriately appear to favor one protocol over another protocol. In an open-label study, there is no randomization because there is no concurrent control group. Thus, there is no way to control for extraneous variables independent of the test substance that might be affecting results. Studies using controlled, and blinded, as well as randomized procedures provide the most compelling evidence to minimize and attempt to eliminate most, if not all biases (Spilker, 1991). An open-label study is flawed in that none of these types of controls is included. Thus, open-label studies are subject to serious biases and false results (Spilker, 1991), and cannot provide credible evidence for relating intakes of phosphatidylserine to reduced risk of dementia or cognitive dysfunction.

Additionally, one study was a cross-over design (Engel et al., 1992). FDA also did not include this study in its evaluation because cross-over designs are not considered appropriate for evaluating the relationship between phosphatidylserine and dementia or cognitive dysfunction (Mani, 2003). Dementia and cognitive dysfunction are characterized by progressive declines in status. Cross-over studies, to be valid, must be able to have the baseline levels of participants be equal at the beginning of each phase (Spilker, 1991). In a cross-over study, half of the subjects start with the treatment phase followed by the control phase; the other half of the subjects start with the control phase followed by the treatment phase. If the dementia is progressive, then the group that starts with the placebo phase will be in worse shape at the beginning of their treatment phase than they were at the beginning of the control phase. Thus, the basic premise of a cross-over study, i.e., that the baseline levels of subjects at the beginning of both the placebo and treatment phases are equal, cannot be met for progressive diseases such as dementia or cognitive dysfunction. Additionally, study results may be uninterpretable if the effects of a test product from the treatment phase carry over to the control phase. Indeed, the authors of this study (Engel et al., 1992) conclude that, "In retrospect, the requirements of the cross-over design were not fulfilled in this study."

Of the 10 intervention studies that formed the basis of FDA's evaluation, all were seriously flawed or limited in their reliability in one or more ways. Therefore, generalization of the results from these studies to the proposed health claims involved numerous uncertainties. For example, as discussed above, none of these studies directly evaluated the risk reduction relationship that is the subject of the proposed health claims. There is considerable uncertainty about whether the effects of phosphatidylserine in the general population for which risk reduction is claimed are similar to the effects of phosphatidylserine in the diseased populations that served as the participants for all of the available intervention studies. Only one of the studies (Jorissen et al., 2001) provided data on the composition of the phosphatidylserine-containing product used.

Thus, generalizability of results for products of unknown or different composition to marketed products is uncertain. Several of the intervention studies had very small sample sizes, making generalizability of results questionable (e.g., n=10, Heiss et al., 1993; n=17-18, Heiss et al., 1994; n= 21, Delwaide et al., 1986). Each of the 10 studies conducted analyses on "completers" rather than on an "intent to treat" basis, thus potentially causing bias in results if the original randomization assignments were altered by the drop-outs. This is particularly problematic in those studies where the number of drop-outs was relatively large and somewhat uneven across treatment and placebo groups (e.g., Cenacchi et al., 1993), or when information on numbers of completers and the data set used for analysis is unclear (e.g., Villardita et al., 1987). Several of the studies used outcome measures in which it was unclear whether the measures represented standardized, validated, and generally accepted instruments (Crook et al, 1992; Crook et al., 1991; Jorissen et al., 2001). Without such instruments, interpretation of results is questionable since it is not possible to predict how changes on the instrument will relate to changes in disease

status. Most studies made multiple comparisons among measured variables in their analysis steps but failed to apply appropriate statistical corrections to reduce the possibility of finding statistically significant relationships by chance alone (Crook et al., 1992; Amaducci and the SMID Group, 1988; Delwaide et al., 1986; Heiss et al., 1993; Heiss et al., 1994; Palmieri et al., 1987; Villardita et al., 1987; Crook et al., 1991; Cenacchi et al., 1993; and Jorissen et al., 2001). Thus, nominally statistically significant results in an analysis uncorrected for multiple comparisons could become non-significant when the appropriate statistical procedures are applied. Several studies conducted subgroup analyses that appeared to show stronger relationships between phosphatidylserine and outcome measures than were observed for the overall group results (Crook et al, 1992; Crook et al., 1991). However, these subgroup analyses are of questionable validity, given that randomization was not based on subgroup category (Spilker, 1991). Thus, interpretation of results is unclear. Finally, several studies included evaluation of outcome measures that were not relevant to the proposed health claims (EEG and cerebral metabolic rate for glucose in Heiss et al, 1993; Heiss et al., 1994). These irrelevant outcome measures were not considered in FDA's evaluation.

Of the 10 studies that formed the basis of FDA's evaluation, three found no statistically significant effect (p<0.05) of phosphatidylserine on outcome measures of dementia or cognitive dysfunction (Amaducci and the SMID group, 1988; Heiss et al., 1993; and Jorissen et al., 2001). Additionally, although the Heiss et al. (1994) study observed nominally significant relationships for several measures at weeks 8 and 16, these effects were apparently transient or not real, as they were not sustained beyond 16 weeks. Thus four of the 10 studies showed no effect of phosphatidylserine on any outcome measures of dementia or cognitive dysfunction when followed for the full duration of the study.

The six remaining studies found no statistically significant relationship for many of the outcome measures evaluated but did find that a relatively small number of the evaluated measures were nominally significant (Crook et al., 1992; Delwaide et al., 1986; Palmieri et al., 1987; Villardita et al., 1987; Crook et al., 1991; and Cenacchi et al., 1993). As noted above, however, the analysis of results in these studies involved numerous comparisons. When making multiple comparisons such as this, it is necessary to use statistical procedures to "correct" for the probability that multiple comparisons will, by chance alone, result in some relationships appearing to be statistically significant. Since these studies did not make the appropriate corrections for multiple comparison effects, the validity of nominally statistically significant results is uncertain. For example, given the information reported on statistical significance (i.e., "p values" at or near the cut-off level of p<0.05), it is uncertain whether the nominally statistically significant results reported in the Delwaide et al., 1986, study would remain statistically significant if appropriate statistical procedures were applied.

Thus, only five of the 10 intervention studies included in the FDA evaluation might be considered to show any evidence of effectiveness (Palmieri et al., 1987; Villardita et al., 1987; and Cenachi et al., 1993; Crook et al., 1992; and Crook et al., 1991). In all cases, the effects that might remain statistically significant after statistical corrections for multiple comparisons were seen in only one or a few outcome measures. In the two Crook et al. studies (1991 and 1992), information on the statistical significance (i.e., "p values") of individual variables is missing, making it difficult to evaluate whether the few nominally statistically significant findings would remain significant with appropriate statistical procedures. None of these studies showed statistically significant effects on multiple endpoints, across the broad spectrum of cognitive functions and impairment of daily living activities, that together characterize dementia and cognitive dysfunction. Additionally, it is not clear what data set was used for analysis of the Villardita et al. (1987) or Palmieri et al. (1987) reports, making it difficult to interpret results. The Cenacchi et al. (1993) analysis was based on completers only, despite the fact that the study had a significant number of drop-outs during the course of the study. It was unclear whether the instruments used to assess outcome measures in the Crook et al. (1992 and 1991) studies represented standardized, validated, and generally accepted instruments.

In summary, the scientific evidence available consists of mitigation studies. There is considerable uncertainty about whether data on mitigation effects apply to the risk reduction relationships that are the subject of your proposed claims for phosphatidylserine. Moreover, all of the studies had serious flaws or limitations that warrant caution in

7/26/2021    Cybergenics Nutrition Quality Health Claim – Final Determination – Phosphatidylserine and Cognitive Dysfunction and Dementia

Case 1:20-cv-23564-MGC Document 77-1 Entered on FLSD Docket 07/27/2021 Page 129 of 134

applying their results to the proposed health claims. In the few cases in which nominally statistically significant relationships were reported, the relationships were limited to a few selective cognitive functions and did not demonstrate an effect on the range of cognitive and functional components that are characteristic of dementia and cognitive dysfunction. Thus, generalization of the limited results from these studies to the proposed health claims is fraught with considerable uncertainty.

## III. Agency's Consideration of Significant Scientific Agreement

FDA reviewed information about the composition of the two ingredient sources of phosphatidylserine (i.e., bovine brain cortex and soy), definitions of the diseases of interest (i.e., dementia and cognitive dysfunction), and the intervention trials that evaluated the relationship of phosphatidylserine to dementia and cognitive dysfunction. The compositional information identified differences between BC-PS and the S-PS products, suggesting that BC-PS and S-PS may be different substances. Thus, there is considerable uncertainty about whether their effects on dementia and cognitive dysfunction are similar or different. The only intervention trial in which S-PS was the test product showed no effect on the disease outcome. As noted above, there is also considerable uncertainty as to whether results from trials done with BC-PS are relevant to products containing S-PS as the source of the phosphatidylserine.

The definitions of cognitive dysfunction and dementia describe an integrated relationship among various disturbances in cognitive functions and impairments in daily activities that together characterize these disease conditions. Three intervention studies showed very limited findings of statistical significance in a few selected measures of cognitive functioning, but not in the majority of outcome measures or concurrently with impairments in daily activities.

Finally, none of the intervention studies directly evaluated the proposed health claims, i.e., the effect of phosphatidylserine in reducing the risk of dementia or cognitive dysfunction in the general population. All the studies were mitigation studies in persons already diagnosed with dementia or cognitive dysfunction. There is considerable uncertainty about whether phosphatidylserine will act similarly in the general population relative to disease risk reduction as it does in diseased populations where mitigation of existing symptoms is the outcome of interest. Moreover, all the intervention studies were flawed in some way, thus limiting the usefulness of any results that they may have reported.

Therefore, based on its evaluation of the totality of the publicly available scientific evidence, the agency concludes that there is not significant scientific agreement among qualified experts that a relationship exists between phosphatidylserine and reduced risk of dementia or cognitive dysfunction.

## IV. Agency's Consideration of a Qualified Health Claim

For claims that do not meet the significant scientific agreement standard, FDA considers whether to exercise enforcement discretion for qualified health claims about the relationship between the substance and the disease. After reviewing the scientific evidence in your petition and other relevant scientific evidence, FDA concludes that most of the evidence does not support a relationship between phosphatidylserine and reduced risk of dementia or cognitive dysfunction, and that the evidence that does support such a relationship is very limited and preliminary. This latter conclusion is based on the fact that in five of the 10 intervention trials, a very small number of outcome measures, out of the large number of measured outcomes, indicated statistically significant relationships between intakes of phosphatidylserine and measures of cognitive function relating to mitigation of symptoms of dementia and cognitive dysfunction. Therefore, although most of the evidence does not support an effect of phosphatidylserine intake on reduced risk of dementia and cognitive dysfunction, a few nominally significant relationships provide a very limited and preliminary basis for suggesting a possible relationship between phosphatidylserine and reduced risk of dementia or cognitive dysfunction, and this evidence provides a basis for

qualified claims. Additionally, the uncertainties as to whether results for BC-PS-containing products are relevant to S-PS-containing products will be minimized if manufacturers use S-PS products of high purity, thus assuring phosphatidylserine levels similar to those in BC-PS-containing products.

## V. Other Requirements

Phosphatidylserine dietary supplements bearing the qualified claims for which FDA has indicated that it intends to exercise its enforcement discretion must still meet all applicable statutory and regulatory requirements under the Federal Food, Drug, and Cosmetic Act. For example, such supplements must be labeled consistent with 21 CFR §101.36 (b)(3). Dietary supplements also must not pose an unreasonable risk of illness or injury to consumers, contain substances that may render the product injurious to health, or be otherwise adulterated or misbranded.

## VI. Conclusions

We have considered the scientific evidence submitted with your petition and, as appropriate, have also considered other pertinent scientific evidence. Our conclusion is that there is not significant scientific agreement that phosphatidylserine may reduce the risk of dementia or cognitive dysfunction in the elderly. However, the science provides very limited and preliminary evidence for qualified health claims about these relationships. Because such claims would be potentially misleading, however, they must be qualified so as not to mislead consumers. Thus, FDA proposed disclaimers to accompany your proposed claims. After a change made during negotiations regarding disclaimer wording, the qualified claims that you agreed to on behalf of your client are:

Dementia claim and disclaimer:

> "Consumption of phosphatidylserine may reduce the risk of dementia in the elderly.
>
> Very limited and preliminary scientific research suggests that phosphatidylserine may reduce the risk of dementia in the elderly. FDA concludes that there is little scientific evidence supporting this claim."

Cognitive dysfunction claim and disclaimer:

> "Consumption of phosphatidylserine may reduce the risk of cognitive dysfunction in the elderly.
>
> Very limited and preliminary scientific research suggests that phosphatidylserine may reduce the risk of cognitive dysfunction in the elderly. FDA concludes that there is little scientific evidence supporting this claim."

7/26/2021    Cyberology.com MGC – Qualified Health Claim – Final Decision – Phosphatidylserine and Cognitive Dysfunction and Dementia

Case 1:20-cv-23564-MGC Document 77-1 Entered on FLSD Docket 07/27/2021 Page 131 of 134

FDA intends to consider exercising enforcement discretion for the above qualified claims when: (1) the applicable disclaimer is placed immediately adjacent to and directly beneath your claims, with no intervening material, in the same size, typeface, and contrast as the claim itself; (2) the claim meets the general requirements for health claims in 21 CFR 101.14, except for the requirement that the evidence for the claim meet the significant scientific agreement standard, the requirement that the claim be made in accordance with an authorizing regulation, and the requirement that the claim specify the daily dietary intake necessary to achieve the claimed effect[5]; and (3) if S-PS is used, it is of very high purity.

Please note that scientific information is subject to change. FDA intends to evaluate new information that becomes available to determine whether it necessitates a change in this decision. For example, scientific evidence may later become available that will support significant scientific agreement or that will no longer support the use of a qualified claim. If and when such information becomes available, FDA intends to inform you of this new information and its implications by letter.

Sincerely,

Christine L. Taylor, Ph.D.
Director
Office of Nutritional Products, Labeling and Dietary Supplements
Center for Food Safety and Applied Nutrition

## Attachments

### Reference list

---

[1] FDA concern about the need for vigilance in the documentation and handling of bovine-derived ingredients from countries with cattle infected with bovine spongiform encephalopathies (BSE) is a matter of record (See FDA Action Plan April 24, 2001. http://www.fda.gov/oc/oca/roundtable/bse/fda_actionplan.html). The group of human and animal diseases known as transmissible spongiform encephalopathies (TSEs) is characterized by a sponge-like appearance of the brain and is associated with deposits in the brain of unique proteins called prions. The prions can be transmitted from one host to another, not only between members of a single species, but also from one species to another. In the mid-1980s, a new TSE, bovine spongiform encephalopathy (BSE), was first described in cattle in the United Kingdom. Humans are also susceptible to TSEs, one form of which is Creutzfeldt-Jakob disease (CJD). In 1996, a new variant of CJD (vCJD) was described in patients in the United Kingdom. Epidemiological data implicate the consumption of beef products contaminated with the agent of BSE as the probable cause of vCJD in humans. Unfortunately, there is no sensitive, specific pre-mortem diagnostic test in either humans or animals. Diagnosis is confirmed only by post-mortem examination of brain tissue. At present, animal and human TSEs have no treatments or preventative vaccines. All are invariably fatal. Routine materials and processes that destroy traditional human and animal pathogens do not appear to destroy prions, and no established methods can reliably decontaminate or sterilize articles contaminated with prions. For all these reasons, FDA recommends that firms that manufacture or import dietary supplements or dietary ingredients containing specific bovine tissues, including extracts or substances derived from such tissues, take all necessary steps to ensure that such ingredients do not come from cattle born, raised, or slaughtered in countries where BSE exists.

[2] A list of countries where BSE is known to exist is maintained by the U.S. Department of Agriculture and codified in Title 9, Code of Federal Regulations, Part 94.18.

7/26/2021    Lynn – 23564: Qualified Health Claim – Final Letter for Phosphatidylserine and Cognitive Dysfunction and Dementia

Case 1:20-cv-23564-MGC Document 77-1 Entered on FLSD Docket 07/27/2021 Page 132 of 134

[3] Omega-3 fatty acids include a-linolenic acid (18:3), eicosapentaenoic acid, (20:5) docosapentaenoic acid (22:5), and docosahexaenoic acid (22:6). Omega-6 fatty acids include linoleic acid (18:2), α-linolenic acid (18:3), dihomo-γ-linolenic acid (20:3), arachidonic acid (20:4), adrenic acid (22:4) and docosapentaenoic acid (22:5). (Food and Nutrition Board, 2002).

[4] Aphasia is defined as defect or loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language, due to injury or disease of the brain centers; Apraxia is defined as 1) loss of previously acquired ability to perform intricate skilled acts, and 2) mind blindness; a condition in which there is a lack of a proper apprehension of the true nature of things, leading to the performance of preposterous acts; Agnosia is defined as loss of the power to recognize the import of sensory stimuli; the varieties of agnosia correspond with the several senses and are distinguished as auditory, visual, olfactory, gustatory, and tactile (Dorland's Medical Dictionary, 1957); Executive functioning is defined as planning, prioritizing, sequencing, self-monitoring, self-correcting, inhibiting, initiating, controlling or altering behavior (About Brain Injury, 2003.)

[5] FDA finds that the provision in § 101.14(d)(2)(vii) stating, "If the claim is about the effects of consuming the substance at other than decreased dietary levels,... the claim must specify the daily dietary intake necessary to achieve the claimed effect...." does not apply to the qualified claim for phosphatidylserine and reduced risk of dementia or cognitive dysfunction. The scientific evidence for this relationship is very limited and preliminary and does not support the establishment of a level of effect that could serve as the basis for a recommended daily dietary intake level.

---

# ATTACHMENT 1

### References

About Brain Injury. A Glossary of Terms. 2003. http://www.waiting.com/glossarye.html

Allegro, L., Favaretto, V. and G. Ziiliotto. Oral Phosphatidylserine in Elderly Patients with Cognitive Deterioration: An Open Study. *Clinical Trials Journal* 1987; 24(1):104-108.

American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revised (DSM-IV-TR). American Psychiatric Publishing, Inc. Washington, D.C., 2000.

Amaducci, L and the SMID Group. Phosphatidylserine in the Treatment of Alzheimer's Disease: Results from a Multicenter Study. *Psychopharmacology Bulletin*, 1988; 24(1):130-134.

Caffarra, P. and V. Santamaria. The Effects of Phosphatidylserine in Patients with Mild Cognitive Decline: An Open Trial. *Clinical Trials Journal*, 1987; 24(1):109-114.

Cenacchi, T., Bertoldin, T., Farina, C., Fiori, M.G., Crepaldi, and participating investigators. Cognitive Decline in the Elderly: A Double-Blind Placebo-Controlled Multicenter Study on Efficacy of Phosphatidylserine Administration. *Aging Clinical Experimental Research*, 1993; 5(2):123-133.

Crook, T.H., Tinklenberg, J., Yesavage, J., Petrie, W., Nunzi, M.G., and D.C. Massari. Effects of Phosphatidylserine in Age-Associated Memory Impairment. *Neurology*, 1991; 41:644-649.

Crook, T., Petrie, W., Wells, C., and D.C. Massari. Effects of Phosphatidylserine in Alzheimer's Disease. *Psychopharmacology Bulletin*, 1992; 28(1):61-66.

Degussa. Product Overview: Phospholipids-Phosphatidylserine, 2002.

Delwaide, P.J., Gyselynck-Mambourg, A.M., Hurlet, A., and M. Ylieff. Double-Blind Randomized Controlled Study of Phosphatidylserine in Senile Demented Patients. *Acta Neurologica Scandinavica*, 1986; 73:136-140.

Dorland's Illustrated Medical Dictionary, 23rd Edition. W.B. Saunders Company. Philadelphia and London, 1957.

Engel, R.R., Satzger, W., Günther, W., Kathmann, N., Bove, D., Gerke, S., Münch, U., and H. Hippius. Double-blind Cross-Over Study of Phosphatidylserine vs. Placebo in Patients with Early Dementia of the Alzheimer type. *European Neuropsychopharmacology* 1992; 2:149-155.

Folch, J. The Chemical Structure of Phosphatidyl Serine. *Journal of Biological Chemistry*, 1948; 174:439-449.

Food and Nutrition Board, Institute of Medicine, National Academy of Science, Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids. Chapters 8 and 11. National Academy Press, Washington, D.C. 2002.

Granata, Q., and DiMichele, J.D. Phosphatidylserine in Elderly Patients: *An Open Trial Clinical Trials Journal*, 1987; 24(1):99-103.

Heiss, W.D., Kessler, J., Mielke, R., Szelies, B. and K. Herholz. Long-Term Effects of Phosphatidylserine, Pyritinol, and Cognitive Training in Alzheimer's Disease. A Neuropsychological, EEG and PET Investigation. *Dementia,* 1994; 5:88-98.

Heiss, W.D., Kessler, J., Slansky, I., Mielke, R., Szelies, B. and K. Herholz. Activation PET as an Instrument to Determine Therapeutic Efficacy in Alzheimer's Disease. *Annals of the New York Academy of Sciences*, 1993; 695:327-331.

Jorissen, B.L., Brouns, F., Van Boxtel, M.P., Ponds, W.W., Verhey, F.R., Jolles, J and W.J. Riedel. The Influence of Soy-Derived Phosphatidylserine on Cognition in Age-Associated Memory Impairment. *Nutritional Neuroscience*, 2001; 4(2):121-134.

Mosby's Medical, Nursing, and Allied Health Dictionary; Mosby, St. Louis MO, 4th Edition; 1994.

Palmieri, G., Palmieri, R., Inzoli, M.R., Lombardi, G., Sottini, C., Tavolato, B., and G. Giometto. Double-Blind Controlled Trial of Phosphatidylserine in Patients with Senile Metal Deterioration. *Clinical Trials Journal*, 1987; 24(1):73-83.

Schreiber, S., Kampf-Sherf, O., Gorfine, M., Kelly, D., Oppenheim, Y., and B. Lerner. An Open Trial of Plant-Source Derived Phosphatidylserine for Treatment of Age-Related Cognitive Decline. *Israel Journal of Psychiatry and Related Sciences*, 2000; 37(4):302-307.

Sinforiani, E., Agostinis, C., Merlo, P., Gualteri, S., Mauri, M., and A. Mancuso. Cognitive Decline in Ageing Brain: Therapeutic Approach with Phosphatidylserine. *Clinical Trials Journal*, 1987; 24(1):115-124.

Spilker, B. *Guide to Clinical Trials*; Raven Press; New York, NY, 1991.
U. S. Food and Drug Administration. Action Plan Transmissible Spongiform Encephalopathies including Bovine Spongiform and Chronic Washington, D.C. April 24, 2001 Office of Regulatory Affairs. *Summary of ORA BSE Import Bulletin 99B-14*. March 1, 2001. http://www.fda.gov/oc/oca/roundtable/bse/fda-actionplan.html

Villardita, C., Grioli, S., Salmeri, G., Nicoletti, F., and G. Pennisi. Multicentre Clinical Trial of Brain PS in Elderly Patients with Intellectual Deterioration. *Clinical Trials Journal*, 1987; 24(1): 84-93.

This document was issued on May 13, 2003.
For more recent information see **Dietary Supplements
(/web/20171114183737/https://www.fda.gov/Food/DietarySupplements/default.htm)**

---

Original petition at **Dockets
(/web/20171114183737/https://www.fda.gov/RegulatoryInformation/Dockets/default.htm)**

---

**More in Labeling & Nutrition
(/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/default.htm)**

**Label Claims
(/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm2006873.htm)**

**Front-of-Package Labeling Initiative
(/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm202726.htm)**

**Nutrition Facts Label Programs and Materials
(/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm20026097.htm)**

**Nutrition Labeling Information for Restaurants & Retail Establishments
(/web/20171114183737/https://www.fda.gov/Food/IngredientsPackagingLabeling/LabelingNutrition/ucm459729.htm)**