# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:20-cv-23564-MGC

DAVID WILLIAMS and CAROLL
ANGLADE, THOMAS MATTHEWS,
MARTIZA ANGELES, and HOWARD
CLARK, *individually and on behalf of all
others similarly situated*,

      Plaintiffs,

v.

RECKITT BENCKISER LLC and
RB HEALTH (US) LLC,

      Defendants.

---

**DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S
AUGUST 5, 2021, ORDER RE: CLASS SETTLEMENT**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     THE PROPOSED INJUNCTIVE RELIEF PROVIDES A MEANINGFUL
        BENEFIT TO THE CLASS ................................................................................ 3

        A.      Legal Authority Confirms There Is a Significant and Substantive Difference
                Between "Clinically Proven" and "Clinically Tested." ............................................ 3

        B.      RB's Market Research Confirms There Is a Significant and Substantive
                Difference Between "Clinically Proven" and "Clinically Tested." .......................... 8

        C.      Academic Research and Related Expert Testimony Confirm There Is A
                Significant and Substantive Difference Between the Claim "Clinically
                Proven" and "Clinically Tested." ....................................................................... 11

III.    THE COURT SHOULD APPROVE THIS CLASS SETTLEMENT ............................. 14

IV.     CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Becerra v. Dr Pepper/Seven Up, Inc.*,
    945 F.3d 1225 (9th Cir. 2019) ........................................................................... 4

*Chen v. Dunkin' Brands*,
    954 F.3d 492 (2d Cir. 2020) ............................................................................. 4

*Davis v. Fresh Market*,
    2020 WL 3489369 (S.D. Fla. Jun. 26, 2020).................................................... 3

*Gorss Motels, Inc. v. Safemark Sys., LP*,
    931 F.3d 1094 (11th Cir. 2019) ......................................................................... 4

*Hawyuan Yu v. Dr Pepper Snapple Grp., Inc.*,
    2020 WL 5910071 (N.D. Cal. Oct. 6, 2020) ..................................................... 4

*In re 5-Hour Marketing & Sales Prac. Litig.*,
    2017 WL 2559615 (C.D. Cal. Jun. 7, 2017)...................................................... 11

*Kwan v. SanMedica Int'l*,
    854 F.3d 1088 (9th Cir. 2017) ......................................................................... 15

*Lee v. Ocwen Loan Servicing, LLC*,
    2015 WL 5449813 (S.D. Fla. Sept. 14, 2015)................................................... 15

*Montoya v. PNC Bank, N.A.*,
    2016 WL 1529902 (S.D. Fla. Apr. 13, 2016) ................................................... 15

*Moore v. Trader Joe's Co.*,
    4 F.4th 874 (9th Cir. 2021)............................................................................... 13

*Rexall Sundown, Inc. v. Perrigo Co.*,
    651 F. Supp. 2d 9 (E.D.N.Y. 2009) ................................................................... 6

*Salters v. Beam Suntory, Inc.*,
    2015 WL 2124939 (N.D. Fla. May 1, 2015) ..................................................... 4

**OTHER AUTHORITIES**

Prove, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/prove.............................. 5

Test, Cambridge Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/test ................................. 4

Prove, Collins Dictionary,
    https://www.collinsdictionary.com/us/dictionary/english/prove ......................... 5, 7

## TABLE OF AUTHORITIES

**Page**

Test, Collins Dictionary,
https://www.collinsdictionary.com/us/dictionary/english/test ........................................... 5, 8

Prove, Dictionary.com,
https://www.dictionary.com/browse/prove ............................................................................ 5

Test, Dictionary.com
https://www.dictionary.com/browse/test .............................................................................. 5

## I.      INTRODUCTION

Reckitt Benckiser LLC and RB Health (US) LLC ("Defendants" or "RB") understand this Court's August 5, 2021, Order to ask—in essence—whether consumers would perceive a substantive difference between Neuriva that is labeled "Clinically Proven" versus Neuriva labeled "Clinically Tested." (ECF No. 84) ("August 5 Order"). The resounding answer to the Court's question—confirmed by multiple and varied sources of authority—is: Yes.

**Relevant law confirms that there is a significant and substantive difference between the claim "Clinically Proven" and "Clinically Tested."** The controlling legal principle that applies to the interpretation of words or phrases on product labels is how a "reasonable consumer" would interpret that label. In applying this standard, courts look to the common meaning of words found in dictionaries. Here, there is an established distinction between the word "tested" (which refers to a process) and "proven" (which refers to an outcome). So, as a matter of law, there is a resulting meaningful and substantive difference between "Clinically Tested" and "Clinically Proven."

The amicus brief submitted by Truth in Advertising, Inc. ("TINA") (ECF No. 83) purports to suggest otherwise by pointing to decisions from the National Advertising Division ("NAD") of the Better Business Bureau. In truth, *none* of the NAD cases cited by TINA (which in all events are non-binding) address the issue of whether or how consumers perceive a difference between the claim "Clinically Tested" versus "Clinically Proven." There is, however, an NAD decision bearing on that specific issue.  That decision, attached hereto as Exhibit 1 (Living Essentials, Chaser, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 4365 (July 9, 2005)), considered specifically a supplement product previously advertised as "Clinically Proven," changed to instead state "Clinically Tested." The NAD approved that change, characterizing it as "significant," "appropriate," "necessary," and "proper." Ex. 1 at 4–6. This authority further confirms the significance of the Settlement's injunctive relief.

**RB market research pre-dating this lawsuit and specifically directed at brain health supplements confirms that there is a significant and substantive difference between the claim "Clinically Proven" and "Clinically Tested."** In the spring and summer of 2019—well before this lawsuit was initiated—RB conducted survey-based market research that looked specifically at how consumers perceive the claims "Clinically Proven" and "Clinically Tested" on the labels of brain health supplements. This research revealed that "Clinically Proven" was interpreted by brain health supplement consumers to be among the most persuasive in communicating product efficacy, while "Clinically Tested" was considered by among the least persuasive. *See* Declaration of Rachel Sexton ("Sexton Decl."), attached hereto as Exhibit 2, ¶¶ 25–28, 31. Indeed, among dozens of claims tested, "Clinically Proven" was one of only three claims measured as having a statistically significant positive difference among consumers. *See id.* at ¶ 31. Thus, as RB's Innovation & Strategy Director Rachel Sexton explains, because brain health supplement consumers considered "Clinically Proven" so much more compelling than "Clinically Tested," were it not for the Settlement, RB would not have voluntarily agreed to make that change on Neuriva's labels. *See id.* at ¶¶ 30, 32. In short, RB's own research shows that "Clinically Proven" provides a stronger, more positive message to its consumers than "Clinically Tested," and RB is making a significant and substantive concession in agreeing to this change in labelling and marketing.

**Expert testimony confirms that there is a significant and substantive difference between the claim "Clinically Proven" and "Clinically Tested" for consumers of brain health products.** The Declaration of Dr. Punam Keller, a chaired marketing Professor and Deputy Dean at Dartmouth's Tuck School of Business, confirms that potential Neuriva consumers would recognize a substantive difference between the claims "Clinically Proven" and "Clinically Tested." Dr. Keller, an expert in consumer perception of health related claims, relies on decades of academic research on consumer perception and specific information on Neuriva consumers, the brain health consumer segment, and the targeted messaging of the proposed change in label claims to reach her conclusion that there is a significant and

substantive difference between the claims. The three critical factors determining the impact of a particular claim (1) the words and phrases used in the Message; (2) the specifics of the Individual Consumer (*e.g.*, age; income; education), and (3) Context (*e.g.*, prevention vs. promotion health products) all support a conclusion that consumers will perceive a substantive difference between "Clinically Proven" and "Clinically Tested" for Neuriva. *See* Declaration of Prof. Punam Keller ("Keller Decl."), attached hereto as Exhibit 4 at ¶ 9. There is a well-recognized difference between "proven" and "tested", the consumers of Neuriva are generally higher-income and well-educated and thus more attentive to health claims, and the claim is a product-efficacy health message that draws the attention of target consumers. *See id.* at ¶¶ 26–38. In addition to these factors, the Settlement's robust Notice—approximately 80% of Neuriva consumers saw up to four separate communications specifically alerting them to the anticipated change—further strengthens the conclusion that targeted consumers will detect a significant and substantive difference between "proven" and "tested". *See id.* at ¶ 39.

Final Approval is overwhelmingly warranted here. The injunctive relief component of the Settlement is substantive and meaningful as is the monetary relief provided to any Neuriva consumer who choses—after significant notice—to make a claim. The law mandates that these benefits must be weighed against the risks to the class in proceeding. Here, those risks were substantial. Given the strength of RB's defenses, there is a real risk that Plaintiffs would not have prevailed were the case to proceed. The Settlement requires a significant and substantive label and marketing change and is reasonable, fair, and of substantial benefit to the class.

## II.    THE PROPOSED INJUNCTIVE RELIEF PROVIDES A MEANINGFUL BENEFIT TO THE CLASS

### A.    Legal Authority Confirms There Is a Significant and Substantive Difference Between "Clinically Proven" and "Clinically Tested."

The "reasonable consumer" standard governs the interpretation of product labels and advertising. *See*, *e.g.*, *Davis v. Fresh Market*, 2020 WL 3489369, at *4 (S.D. Fla. Jun. 26, 2020)

("Plaintiffs do not plausibly allege that a reasonable consumer would be misled by Defendants' promotional materials."). When applying the "reasonable consumer" standard to contested words or claims courts consistently look to dictionary definitions, *i.e.*, those words' common meanings. *See, e.g.*, *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1101 (11th Cir. 2019) (relying on Oxford English dictionary definition of "advertisement" to determine what a reasonable consumer would understand by an agreement to receive "faxed advertisements"); *Salters v. Beam Suntory, Inc.*, 2015 WL 2124939, at *1 (N.D. Fla. May 1, 2015) (relying on Oxford English dictionary definitions to find that "no reasonable person would understand 'handmade' in this context [involving a mass-produced bourbon] to mean literally made by hand" without the use of substantial equipment); *see also Chen v. Dunkin' Brands*, 954 F.3d 492, 500–01 (2d Cir. 2020) (relying on Merriam-Webster dictionary definition of "steak" and affirming dismissal on reasonable consumer grounds); *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1229 (9th Cir. 2019) (relying on Merriam-Webster dictionary definition of "diet" to affirm dismissal of complaint premised on contrary definition of that word). This analysis applies equally to a comparison of competing terms. *See Hawyuan Yu v. Dr Pepper Snapple Grp., Inc.*, 2020 WL 5910071, at *6 (N.D. Cal. Oct. 6, 2020) (reviewing authority "focusing on the dictionary definition of the word 'pure'" but noting "'[p]ure' and 'natural' [the word at issue] are obviously different terms").

A plaintiff cannot—as a matter of law—prevail on a theory of consumer deception where the interpretation that plaintiff offers is contradicted by the definition of what the words at issue actually mean. *Becerra*, 945 F.3d at 1229. So, as a matter of law, when interpreting whether there is a difference between the claims "Clinically Proven" and "Clinically Tested," the correct starting point is the dictionary definitions of the words "proven" and "tested." Multiple dictionaries confirm the substantive difference between the two.

The word "tested" is defined as a process by which issues are questioned or examined. *See*, *e.g.*, Cambridge Dictionary ("test. n. a way of discovery, by questions or practical activities, what someone knows, or what someone or something can do or is like") (available

at https://dictionary.cambridge.org/us/dictionary/english/test); Collins Dictionary ("test. n. a test is a deliberate action or experiment to find out how well something works") (available at https://www.collinsdictionary.com/us/dictionary/english/test); Dictionary.com ("test. n. 1. the means by which the presence, quality, or genuineness of anything is determined; a means of trial. 2. the trial of the quality of something") (available at: https://www.dictionary.com/browse/test).

Thus, "tested" does not connote a definitive outcome or result, but instead refers to a process of examination conducted with rigor. By contrast, "proven" connotes a higher level of examination whereby an outcome has been definitively shown. *See*, *e.g.*, Cambridge Dictionary ("prove. v. to show a particular result after a period of time") (available at: https://dictionary.cambridge.org/us/dictionary/english/prove); Collins Dictionary ("2. prove. tr.v. If you prove that something is true, you show by means of argument or evidence that it is definitely true.") (available at https://www.collinsdictionary.com/us/dictionary/english/prove); Dictionary.com ("prove. v. 1. to establish the truth or genuineness of, as by evidence or argument") (available at https://www.dictionary.com/browse/prove).

The term "Clinically Proven" is a claim whose dictionary definition, and therefore its legal meaning under the "reasonable consumer" standard, connotes a definitive result. The Settlement requires RB to abandon its "Clinically Proven" claim and instead use "Clinically Tested," a claim whose dictionary definition and accompanying legal meaning is only that Neuriva's ingredients have been examined. The Settlement therefore obligates RB to adopt a claim that has a less compelling meaning and significant and substantive difference as a matter of law.[1]

---

[1] Notwithstanding the difference between the two claims, RB notes that it denies all liability under the Settlement and has expressly disclaimed any wrongdoing. Settlement Agreement ¶ XV (ECF No. 52-1). RB is thus firmly of the view that the claims "Clinically Proven" and "Clinically Tested" are *both* true and *both* fully substantiated as it pertains to Neuriva. *See* Defs.' Supplemental Briefing Regarding Injunctive Relief ("RB Injunctive Relief Brief") (ECF No. 62) (attaching multiple clinical studies affirming substantiation for Neuriva's ingredient

RB could not locate any reported federal or state court decision that suggests the claim "Clinically Proven" has the same meaning to consumers as "Clinically Tested." The absence of such case law is unsurprising, as any such decision would be at odds with accepted methods of label interpretation under the "reasonable consumer" standard. The words "proven" and "tested" simply do not mean the same thing.

On this point, at the time of this submission neither TINA nor CCAF has identified any such authority, either. Most of the federal authority those groups cite do not address that issue at all. *See, e.g.*, TINA Brief at 9; CCAF Brief at 4 (citing *Pearson v. NBTY*, 772 F.3d 778, 785 (7th Cir. 2014) (case concerns potential distinction between words "strengthen" and "renew")); TINA Brief at 3; CCAF Brief at 20 (citing *Removatron Int'l Corp. v. Federal Trade Comm.*, 884 F.2d 1489, 1497 (1st Cir. 1989) (addressing defendant's alleged lack of substantiation for any of its claims, including "clinically tested"; no discussion of distinction between "proven" and "tested")).

TINA nonetheless says that select NAD decisions show there is "no impact" on consumers between the claim "Clinically Proven" and "Clinically Tested." TINA Brief at 3 (ECF No. 74-1 at 3). As an initial matter, NAD proceedings are voluntary and its outcomes advisory: NAD decisions are thus non-binding on courts, as TINA and CCAF's own authority confirms. *See Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 36–37 (E.D.N.Y. 2009) ("Perrigo has been unable to point to any case in the United States, either in its brief or at oral argument, where NAD and NARB findings have been found to constitute admissible extrinsic evidence that could support an implied falsity claim."). As importantly, none of the NAD authority TINA cites deals with the issue of whether "Clinically Proven" means

---

claims). So, it is decidedly not the case that RB has agreed to substitute one misleading claim for another—as argued by TINA and purported objector Theodore H. Frank via the Center for Class Action Fairness ("CCAF"). *See* TINA Brief at 3; Objection of Theodore H. Frank ("CCAF Brief") (ECF No. 75) at 5–6. To the contrary, *both* claims are true. *See* RB Injunctive Relief Brief at 1, 4–5. But, for purposes of responding to the Court's August 5 Order, it is also true that "Clinically Tested" conveys a substantively different message than "Clinically Proven."

something different to consumers than "Clinically Tested." *See*, *e.g.*, TINA Brief, Ex. A (attaching HFL Solutions, Inc., Blood Sugar Optimizer Dietary Supplements, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 6000 (Sept. 9, 2016) (NAD determining that a single study did not support the claim "clinically researched" given that no statistical analysis had been done to validate study's outcome)).

But even though TINA appears to have scoured NAD records it failed to cite the only NAD ruling on point: Living Essentials, Chaser, Nat'l Adver. Div. of the Better Bus. Bureau, Case No. 4365 (July 9, 2005). In Living Essentials, the NAD opened an inquiry to determine whether a supplement manufacturer had adequate substantiation for a claim that its hangover-prevention supplement had been "clinically proven" to treat hangovers. Ex. 1 at 1. After the NAD commenced that inquiry, the manufacturer voluntarily agreed to change its "clinically proven" claim to "clinically tested." *Id.* ("The advertiser voluntarily undertook to make the following modifications…Changing the claim 'clinically proven' to 'clinically *tested*'"); *see also id.* ("Changing the claim 'Chaser has been tested and *proven* effective . . . to 'Chaser has been tested and *shown* effective . . . .") (emphases in original)). These changes, which perfectly mirror those required by the Settlement, were reviewed and approved by the NAD which deemed them "significant," "appropriate," "necessary," and "proper." *Id.* at 4–6.

The NAD's analysis as to the appropriateness of the change tracked the dictionary-based "reasonable consumer" analysis distinguishing between "proven" and "tested." The NAD noted that the clinical studies substantiating that manufacturer's claims did not, in its view, rise to the level of "consensus or significant scientific agreement," which is the level of proof the NAD would have considered necessary to support a "proven" claim for that manufacturer. *Id.* at 5. This dovetails with the meaning of "proven" shown in dictionaries. *Compare* Ex. 1 at 5 ("consensus or scientific agreement") *with* Collins Dictionary ("prove . . . show by means of argument or evidence that it is definitely true"). By contrast, NAD considered the "clinically tested" claim appropriate because the manufacturer had clinical evidence it deemed "significant and promising…[that] represent[s] emerging science."

Exhibit 1 at 5. This analysis tracks the meaning of "tested." *See* Collins Dictionary ("test. n. a test is a deliberate action or experiment to find out how well something works").

The Living Essentials decision directly supports a conclusion that there is a substantive difference between the claim "Clinically Proven" and "Clinically Tested."

**B.    RB's Market Research Confirms There Is a Significant and Substantive Difference Between "Clinically Proven" and "Clinically Tested."**

Well before this lawsuit was initiated, RB conducted market research that examined the precise issue raised by the Court's August 5 Order: Do consumers of brain health supplements perceive a substantive difference between the claims "Clinically Proven" and "Clinically Tested"? That research showed a marked difference between the effect of those two claims on brain health consumers, with "Clinically Proven" ranking as significantly more compelling. *See* Sexton Decl. at ¶ 25–28, 31.

Rachel Sexton, Innovation & Strategy Director, Vitamins Minerals and Supplements ("VMS") at RB, has been involved in market research on behalf of the company for over a decade. *See id.* at ¶ 12. Ms. Sexton explains that in April of 2019, RB commissioned consumer research to determine likely purchase intent and perceived product efficacy for dietary supplements, by evaluating a series of potential labeling claims. *See id.* at ¶ 17. The study was survey-based and conducted on RB's behalf by Hauser & Associates, Inc., a third-party marketing research and consulting firm. *See id.* at ¶ 18; *see* Declaration of Michael Becker ("Becker Decl."), attached hereto as Exhibit 3, at ¶ 2; *see also* Sexton Decl. ¶ 18. The research was conducted among a pool of 1,050 supplement consumers. *See* Sexton Decl. at ¶ 19. These 1,050 participants were then further sub-divided such that a portion of the survey was directed specifically at purchasers of brain health supplements. *See id.* at ¶ 23 (describing "Brain Health" consumer segment of survey). Survey participants were asked to evaluate thirty-eight (38) potential labeling claims, including the specific claims "Clinically Proven" and "Clinically Tested." *See id.* at ¶ 24.

One of the chief purposes of the study was to determine which of the claims communicated to consumers whether the product was likely to work (referred to as the "Likelihood to Work" measure). *See id.* at ¶ 25. This "Likelihood to Work" criteria was of heightened importance, because the VMS Driver Study had separately shown that product "Efficacy" and product "Benefit"—in other words, whether the product works—were the most important product characteristics to supplement consumers. *See id.* at ¶ 21 ("One of the VMS Driver Study's principal conclusions was that supplement consumers considered 'Efficacy (the product does what it [is] supposed to do) and 'Benefit' to be the most important characteristics when deciding what supplement product to buy. Within the study population, 91% of consumers identified 'Efficacy' as either 'Extremely Important' or 'Very Important,' and 93% of consumers identified 'Benefit' as either 'Extremely Important' or 'Very Important.'").

The results of this research were provided to RB in a July 12, 2019 PowerPoint presentation entitled "RB VMS Rapid Results 2019 Program: VMS Drivers of Efficacy." *See id.* at ¶ 19. A true and correct copy of this PowerPoint is attached to both the Sexton Declaration and Becker Declaration as Exhibit A (referred to hereinafter as "VMS Driver Study").

The VMS Driver Study revealed that 33% of those surveyed in the Brain Health segment responded that the claim "Clinically Proven" would communicate to them that the product is "Extremely Likely" to work as it is supposed to. Sexton Decl. at ¶ 26. Of the 38 claims surveyed, at 33% the "Clinically Proven" claim was the second highest-ranking claim for the Likelihood to Work measure. *See id.* The "Average Claim Rating" was only 28% for the Likelihood to Work measure (*i.e.*, among the 38 claims tested the average percentage of consumers who marked those claims as "Extremely Likely" was just 28%). *See id.* "Clinically Proven" was thus classified in the VMS Driver Study as one of *only three claims* that ranked "significantly higher" than the Average Claim Rating, at a 90% confidence level. *See id.* By contrast, only 26% of consumers in the Brain Health segment said that the claim "Clinically

Tested" would communicate to them that a product is "Extremely Likely" to work as it is supposed to. *See id.* at ¶ 27. "Clinically Tested" was thus among the lower-ranking claims on the Likelihood to Work measure. *See id.* So, as distinguished from the "Clinically Proven" claim, "Clinically Tested" performed measurably worse than even the average claim score. *See id.* at ¶ 32.[2]

As Ms. Sexton explains, the VMS Driver study proves that a change from "Clinically Proven" to "Clinically Tested" is likely to meaningfully impact Neuriva consumers' perception of the product. *See id.* at ¶ 30. The study showed that for the Brain Health segment—the portion of the survey population that corresponds with Neuriva buyers— "Clinically Proven" is significantly more persuasive on measures related to product efficacy than "Clinically Tested." *See id.* at ¶ 31; *see also* VMS Driver Study at 8. Ms. Sexton thus concludes, "Based on my own marketing expertise and as informed by the VMS Driver Study, I would consider 'Clinically Proven' to be among the most preferable and motivating claims to consumers in the Brain Health supplement segment and thus for Neuriva purchasers. I conclude from the VMS Driver Study that there is a meaningful difference between those two claims perceived by consumers, and that 'Clinically Tested' is unlikely to be as effective as 'Clinically Proven.'" Sexton Decl. at ¶ 35.

In short, RB's own marketing team—supported by outside research—conclude that "Clinically Proven" has a greater, substantive and significant, impact on consumer perception of the efficacy of the RB product at issue. RB is making a significant and material concession in agreeing to this change.

---

[2] The VMS Driver study also showed a difference between "Clinically Proven" and "Clinically Tested" on the "Likelihood of Buying" measure, which evaluated the claims presented by asking consumers if those claims would make the consumer likely to buy the product. Sexton Decl. at ¶ 28. For the Brain Health segment, 32% of consumers surveyed responded that they "Definitely would buy" a supplement labeled "Clinically Proven," while only 30% answered that way for the claim "Clinically Tested." *See id.* So, while the difference was not as significant in the Likelihood of Buying measure versus the Likelihood to Work measure, there was still a quantifiable difference that favored the "Clinically Proven" claim. *See id.*

**C.**   **Academic Research and Related Expert Testimony Confirm There Is A Significant and Substantive Difference Between the Claim "Clinically Proven" and "Clinically Tested."**

To fully meet the Court's request for further information on whether consumers appreciate a substantive difference between a *brain health-related product* which is represented as clinically "proven" and a brain health-related product which is represented as clinically "tested," RB retained one of the country's top experts in health related communications, Dr. Punam Keller at Dartmouth, *See* Keller Decl.at ¶ 2. Courts regularly receive expert testimony from experts such as Dr. Keller when assessing the effect of advertising in putative class actions. *See In re 5-Hour Marketing & Sales Prac. Litig.*, 2017 WL 2559615, at *8 (C.D. Cal. Jun. 7, 2017) (relying on testimony from expert to assess impact of defendants' advertising on putative class).

Dr. Keller, a chaired professor in marketing at Dartmouth's Tuck School of Business, is eminently qualified to speak to these issues. Her specialized areas of academic research and consulting include health-related marketing. Keller Decl. at ¶¶ 3–6. She has consulted for the Center for Disease Control, the Mayo Clinic, the National Institute on Aging, and the National Institute for Health on health-related communications. *See id.* at ¶ 5. Her focus in these areas include how communications can motivate consumers to take steps to improve health. She studies and writes on how people process marketing communications, in particular health appeals, to enhance voluntary consumer and employee health and saving behaviors. *See id.* at ¶ 4.

Dr. Keller concludes that consumers will perceive a meaningful difference between "Clinically Proven" and "Clinically Tested." *See id.* at ¶¶ 40, 45.  She bases her conclusion on academic research, her own work on consumer perceptions, the specific demographics of Neuriva consumers, RB's marketing research, and the robust notice campaign that communicated the change in labelling and marketing to consumers. *See id.* at ¶ 8. Academic research indicates that consumers' understanding of labeling claims turn largely on: (1) the words and phrases used in the Message (*e.g.*, clinically tested vs. clinically proven), (2) the

Individual Consumer (*e.g.*, age; income; education), and (3) Context (*e.g.*, prevention vs. promotion health products). *See id.* at ¶ 9. The interaction of these three factors helps determine that the "proven" and "tested" claims are discernably different. *See id.* She considered the differences in the actual messaging claims, the nature of the customers who are the consumers of these products, and the context of these messages. She explains:

- "Test" applies to a process, whereas "Proof" is about an outcome or result.

- "Proven" and "Tested" are generally expected to meet different levels of scientific investigation and different levels of statistical certainty.

- Older consumers, such as those 55 years and older, are typically more literate and more savvy about health advertising manipulation. Notably, more than half of Neuriva's sales are from this group of consumers.

- Higher income consumers, who are typically those buying supplements of any kind, particularly supplements at a price point such as Neuriva's (from $30 to $80 per package depending on package size and formulation), are typically more educated and more health literate.

- Consumers place different requirements for product performance and claim interpretation based on the product category and type of claim (*i.e.*, whether the product is promising health improvements, prevention of health decrements or recovery of health losses). *See id.* at ¶ 23.

Given these characteristics, Dr. Keller confirms that it is likely that Neuriva consumers would appreciate the change in product claims. *See id.* at ¶ 24.

*First*, Neuriva consumers occupy a market segment very likely to be attuned to health-related marketing messages. Neuriva consumers are typically older, as over 57% of Neuriva consumers are aged 55 or older. *See id.* at ¶ 30. Neuriva consumers also tend more to have a 4-year college degree or a graduate degree and make $80,000 to $100,000 per year. *See id.* High income individuals, particularly those who are more well educated, are more likely to exhibit greater attention to health messages and are more likely to use supplements. *See id.* at

¶ 35. As Dr. Keller notes, each of these factors has been found to correspond with higher interest in health issues, which have been found to correspond with higher attention to health claims in advertising. *See id.* at ¶ 30. These differences are explained by evidence indicating that older adults are more involved and interested in the specific health messages, have a better vocabulary, and are generally more skeptical or savvier consumers of advertising. *See id.* at ¶ 31.

Dr. Keller further explains that age may have a particularly important effect on the interest in and interpretation of *health* messages. *See id.* at ¶ 34.  Research indicates that the older a population is, the higher their interest in health and the higher their consideration of health messages. *See id.* Here, since Neuriva and health supplement consumers are older, more educated, and wealthier, characteristics which have been found to be tied to high consumer involvement in health-based decision making and a high level of literacy about health issues, Neuriva consumers are particularly likely to focus on the key terms in the message and more likely to appreciate the differences between "Clinically Proven" and "Clinically Tested." *See id* at ¶ 37.[3]

*Second*, the context in which the "Clinically Proven" and "Clinically Tested" claims are presented make it likely that consumers will appreciate the substantive difference between the two messages. *See id.* at ¶ 40.  Research indicates a prevention goal (further loss reduction or safety and security) evokes different expectations than a promotion goal (performance related to enhanced achievement and accomplishment). *See id.* at ¶ 38. In this context, preventing brain health deficits may be linked to a consumer's preference for non-inferior product claims (or point-of-parity), whereas promoting enhanced brain health may be linked to superior (point-of-difference) product claims. *See id.* Since the Neuriva ingredient claims

---

[3] The law is also consistent with the academic literature and Dr. Keller's analysis. The Ninth Circuit recognized that consumers of a "niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care" than the average consumer when evaluating product labels. *Moore v. Trader Joe's Co.*, 4 F.4th 874 (9th Cir. 2021) (dismissal of case holding that defendant's labeling claims were not misleading to a reasonable consumer as a matter of law).

-13-

target brain health enhancement, interested consumers would be more focused on finding superior products and are likely more attuned to the difference between "test" and "prove." *See id.*

The likelihood that consumers' context-based attention will identify the differences between the two claims is enhanced here because of the notice issued as part of the Settlement. *See id.* at ¶ 39. Multi-media communications were targeted to reach at least 13 million actual and target consumers of Neuriva, *i.e.*, those who had used vitamin and dietary supplements within the prior 6 months. *See* Declaration of Steven Weisbrot (ECF No. 52-3), ¶ 18. These communications were determined to reach 80% of qualified consumers with an average frequency of 3.99 times. *See id.* at ¶ 36. Moreover, these social media posts and other communications did not simply rely on consumers observing a change to the product label on shelf, rather these communications highlighted the change to be made to the label ("proven" changed to "tested") in specific descriptions of the injunctive relief in on-line postings, FAQ's, class action notices, and other media .  *See id.* at ¶ 26. At least 80% of actual Neuriva consumers likely saw up to four communications specifically aimed at alerting these customers that the product claim had changed, such customers are particularly likely to appreciate such changes. *See* Keller Decl. at ¶ 39.

*Third*, Dr. Keller has reviewed the declaration of Ms. Sexton and the associated VMS Driver Study and concluded that it corroborates her context-based analysis about how Neuriva purchasers are likely to perceive the two claims. *See id.* at ¶¶ 8, 42,45. Dr. Keller observes that the VMS Study "emphasize[s] the importance and effectiveness of message and context on measures of consumer perception and preference…[and] supports the conclusion that brain health supplement consumers perceive a 'clinically proven' product as being significantly more important to determine efficacy." *Id.* at ¶¶ 44–45.

## III.    THE COURT SHOULD APPROVE THIS CLASS SETTLEMENT

The Settlement's injunctive relief component is substantial, as RB's proof demonstrates the label change RB is making is significant and substantial. RB is making this

change as a significant concession. And absent the settlement, it would not otherwise make any such change.

RB makes this concession when, it is speculative that the Plaintiffs could have received injunctive relief of the type the Settlement provides, or any injunction at all. Plaintiffs' (or Mr. Frank or TINA's) demand that RB must marshal greater proof to support either a "Clinically Proven" or "Clinically Tested" labeling claim is very likely barred under the prior substantiation doctrine. *See Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1095 (9th Cir. 2017) ("These courts have precluded private citizens from bringing actions that allege that the challenged advertising language lacked proper scientific substantiation."). RB's claims are, in fact, substantiated (*see* RB Injunctive Relief Brief, Exs. 1–19), but the salient point here is that under the law there is real risk to Plaintiffs that a demand for injunctive relief could be summarily rejected on legal grounds if the case were to proceed.

As this Court has repeatedly recognized, "[t]here is a strong judicial policy in favoring the pretrial settlement of class actions." *Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, at \*4 (S.D. Fla. Sept. 14, 2015) (*citing In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors pretrial settlement of class action lawsuits"). Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. *Montoya v. PNC Bank, N.A.*, 2016 WL 1529902, at \*7 (S.D. Fla. Apr. 13, 2016). This policy applies in full force here.

## IV.   CONCLUSION

For the foregoing reasons, along with those in its prior submissions supporting the Settlement, Defendants respectfully request that the Court grant Final Approval.

Dated:  August 15, 2021                    Respectfully Submitted,

                                           */s/ Lori P. Lustrin*
                                           Melissa C. Pallett-Vasquez, Esq.
                                           Florida Bar No.: 715816
                                           Lori P. Lustrin, Esq.
                                           Florida Bar. No.: 59228

**BILZIN SUMBERG BAENA PRICE**
  **& AXELROD LLP**
1450 Brickell Avenue, 23rd Floor
Miami, Florida  33131-3456
Telephone:  (305) 374-7580
Facsimile:  (305) 374-7593
Email:  mpallett@bilzin.com
Email:  llustrin@bilzin.com

*/s/ David T. Biderman*
David T. Biderman, *Pro Hac Vice*
Perkins Coie LLP
1888 Century Park East, Suite 1700
Los Angeles, California  90067-1721
Telephone:  (310) 788-9900
Facsimile:  (310) 788-3399
Email:  DBiderman@perkinscoie.com

Charles C. Sipos, *Pro Hac Vice*
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington  98101-3099
Telephone:  (206) 359-3983
Facsimile:  (206) 359-4983
Email:  CSipos@perkinscoie.com

*Counsel for Defendants*
*Reckitt Benckiser LLC and RB Health (US) LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 15, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ Lori P. Lustrin
Lori P. Lustrin