**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No.: 1:20-cv-23564-MGC**

DAVID WILLIAMS and CAROLL ANGLADE, THOMAS MATTHEWS, MARTIZA ANGELES, and HOWARD CLARK, *on behalf of himself and all others similarly situated*,

 Plaintiffs,

v.

RECKITT BENCKISER LLC and RB HEALTH (US) LLC,

 Defendants.

Theodore H. Frank,

Objector.

**SUPPLEMENTAL BRIEF OF THEODORE H. FRANK
REGARDING INJUNCTION VALUE PURSUANT TO DKT.**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i
INTRODUCTION .......................................................................................................................... 1
ARGUMENT .................................................................................................................................. 2
I.   "Clinically tested" and "shown" implies "clinically proven" ......................................... 2
     A.   Dictionary definitions *show* that the injunction requires no meaningful difference in labelling. ................................................................................................ 2
     B.   The proposed settlement confirms that the settling parties understand "clinically tested" to be a result just as "clinically proven" is. ............................. 4
     C.   Other authority confirms that little daylight exists between "clinically proven" and "clinically tested." ............................................................................. 4
     D.   Defendants' own study shows that "clinically tested" is statistically indistinguishable from "clinically proven" in the eyes of consumers. ............................ 7
II.  Defendant's purported expert testimony contains no methodology, commonly-accepted or otherwise, and therefor does not qualify as expert testimony. ................................. 9
CONCLUSION ............................................................................................................................ 11

> Synonyms for *tested*:
>
> approved, certified, **proved**, creditworthy, dependable, loyal, reliable, safe, tried-and-true, trustworthy, trusty.

Synonyms for tested, thesaurus.com, https://www.thesaurus.com/browse/tested.

## INTRODUCTION

The Court has asked for evidence concerning "whether consumers (or potential consumers) appreciate any substantive difference between a health-related product which is said to be clinically or scientifically 'proven' and a health-related product which is represented to be clinically or scientifically 'tested.'" Dkt. 84.

Objector Theodore H. Frank appreciates the opportunity to brief this issue, but respectfully observes that this inquiry is too narrow for two reasons. First, the proposed settlement does not merely swap out the term "proven" with "tested," but expressly allows defendants Reckitt Benckiser LLC and RB Health (US) LLC ("Defendants") to assert that Neuriva has been "clinically tested" *and* "shown" to have whatever claimed benefits the defendant wishes to advertise. Dkt. 52-1 at 9. Any connotation conveyed by "clinically proven" can be captured with the words "clinically tested" buttressed by "shown." Second, to support final approval of the settlement, the injunction must not merely create some hypothetical impression on potential purchasers of Neuriva—it must actually *benefit* class members. Appreciating a substantial difference between the labelling is a necessary requisite to any imaginable settlement benefit. Even if this hurdle could be cleared, the settling parties have not carried their burden to show the injunction has any value—especially considering that the most aggrieved class members are the least likely to examine a bottle of Neuriva again. Frank Objection, Dkt. 75 at 22 n.10. The question becomes whether the injunction has any value at all. It does not.

The term "clinically proven" does not significantly differ from "clinically tested"—and any daylight disappears entirely with the word "shown"—because the implication of both claims is that the product was *tested* and *shown* to have the claimed properties. A reasonable consumer would conclude that "clinically tested" would not be advertised for products that *failed* the test—this

1

interpretation is backed by dictionary definitions, the settlement itself, and other authority. Frank joins Truth in Advertising's supplemental brief (Dkt. 92), and incorporates and adopts its arguments by reference here.

Defendants' own marketing study confirms this empirically. Dkt. 98-2. A 1050-participant study found no statistical difference between "clinically proven" and "clinically tested" whatsoever—fully 28% of surveyed consumers found the latter term would suggest "likelihood to work" compared to 29% who found this for the former term. *Id.* at 19. Defendants asks the Court to look at only a cherry-picked slice of the study—a 150-participant "Brain Health" survey regarding the product's "likelihood to work," but even this panel survey shows a mere 2% difference in participants' "likelihood to buy." *Id.* at 21. Plus, contrary to Defendant's self-serving testimony, it has marketed Neuriva using terms with identical scores to the "clinically tested" under Defendant's cherry-picked sample, confirming that the terms are virtually equivalent from customers' perspective.

Finally, Defendants' purported expert testimony provides no discernable methodology at all, so is not actually expert testimony.

The settlement provides up to $2.9 million in attorneys' fees, premised on a fictional $8 million fund that Defendants will never pay and currently has perhaps $450,000 claims against it. Because the injunction provides no value to class members—not even a statistically significant difference, let alone any class-wide *benefit*—the upside-down settlement should be rejected.

## ARGUMENT

### I. "Clinically tested" and "shown" implies "clinically proven"

#### A. Dictionary definitions *show* that the injunction requires no meaningful difference in labelling.

Defendants attempt to draw a bright line between "clinically tested" referring to a *process* and "clinically proven" referring to an *outcome*. Dkt. 98 at 1. While superficially correct, in the context of consumer behavior the former implies the latter, particularly when combined with the word "shown," an outcome-oriented term which Defendants simply ignore.

Objector Frank agrees that dictionary definitions can inform Courts on how reasonable consumers might interpret promotional materials. Dkt. 98 at 4. These definitions show that "clinically tested" and "clinically proven and shown" have overlapping meaning.

Defendants stress that "test" generally defines a process whereas "proven" specifies a specific outcome for such test, but this is an irrelevant distinction because the settlement does not limit Defendants to "clinically tested." The settlement expressly allows Defendants to advertise Neuriva as "clinically tested" (through a process) *and* "shown" (a claimed result). Defendants do not once mention this, even though Objector Frank emphasized it in his objection. Dkt. 75 at ##.

Thus, Defendants repeatedly underemphasize the overlap of the terms. Defendants quote one of the definitions of "test" from Collins Dictionary, but they fail to report that the first non-archaic definition under "American English" reads "an examination, experiment, or trial, as to **prove** the value or ascertain the nature of something" (emphasis added).[1] And Collins Dictionary's first American English definition for "prove" is "to **test by experiment**, a standard, etc.; subject to a testing process; try out" (emphases added).[2]

Thus, a product *tested and shown* to do something has been *proven* to do that thing.

Likewise, Defendants quote the dictionary.com definition of "test," but neglects to mention that "proved" is listed as the third synonym for "tested" on the sister site theasaurus.com.[3] Dictionary.com's fourth definition of "prove" likewise reads "to subject to a test, experiment, comparison, analysis, or the like, to determine quality, amount, acceptability, characteristics, etc."[4]

Because the settlement allows Defendants to falsely claim its products have been both *tested and shown* to have various superlatives, the proposed settlement does *not* "obligate[] RB to adopt a claim that has a less compelling meaning." Dkt. 98 at 5.

Even if Defendants were forbidden from also using the result-oriented word "shown" the context of the labelling makes clear that consumers should infer *proven*. As FTC attorney Richard Cleland explained to TINA:

> a significant number of consumers would not see any difference between the statement "clinically or scientifically proven" and the statement "clinically or scientifically tested." Both statements, one express and the other implied,

---

[1] *See* https://www.collinsdictionary.com/us/dictionary/english/test.

[2] *See* https://www.collinsdictionary.com/us/dictionary/english/prove.

[3] *See* https://www.thesaurus.com/browse/tested.

[4] *See* https://www.dictionary.com/browse/prove.

> convey that there is substantial scientific evidence supporting the underlying claim. With regard to the tested claim, whatever reason would there be for the advertiser to claim that a product had been "clinically or scientifically tested" if those tests did not support the underlying claim.

Dkt. 92-1 (August 9, 2021 email from Cleland).

### B. The proposed settlement confirms that the settling parties understand "clinically tested" to be a result just as "clinically proven" is.

In addition to dictionaries, the settling parties serve as their own lexicographers, and the settlement here confirms that "clinically tested" is both a process and a result. The settlement does not merely permit Defendants to use the word "shown," it understands that "clinically tested" is an equivalent phrase:

> Any references to "Clinically Proven" on the Neuriva Product labels, an example attached hereto as Exhibit E, shall be changed to "Clinically Tested" **or similar language, such as clinical studies have "shown;"**

Settlement, Dkt. 52-1 at 9 (emphasis added).

The word "shown," like "proven" is a result, not a process, and the proposed settlement expressly finds the term "similar" to "clinically tested." Defendants' attempt to distinguish the terms on this basis cannot withstand scrutiny.

### C. Other authority confirms that little daylight exists between "clinically proven" and "clinically tested."

The tern "clinically tested" can—and here does—falsely "imply there was scientific support for these claims but in fact no reasonable scientific expert would conclude" support exists. *Mullins v. Direct Dig., Ltd. Liab. Co.*, 795 F.3d 654, 673 (7th Cir. 2015) (affirming certification). A consumer would not naturally understand that "clinically tested" means "clinically tested *and proved ineffective*" or even "clinically tested and *unproven*." Neither a reasonable consumer nor anyone else would draw a clear line between the terms in conjunction with Defendants' myriad health claims. Plaintiffs—including plaintiffs represented by plaintiffs' counsel here—regularly argue that "clinically tested" implies effectiveness and is therefore misleading. *See Corbett v. Pharmacare U.S., Inc.*, 2021 U.S. Dist. LEXIS 113801, 2021 WL 2473950 (S.D. Cal. Jun. 17, 2021) (complaint of Coleman and Suciu law firms alleging that "clinical studies of Defendants' proprietary extract have not conclusively established that the Products are in fact effective, making the 'scientific testing' representation misleading."); *Brady v.*

*Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 235 (E.D.N.Y. 2015) (complaint of Bursor & Fisher firm that "clinically tested" claim was misleading).

While scientifically a product could be tested and proved ineffective or tested and unproven either way, the impression of the overall consumer message suggests the product was tested and proved. "Deception may be found based on the 'net impression' created by a representation." *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *see also FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200-01 (9th Cir. 2006). As a reminder, this discussion is somewhat academic in the case of Neuriva because neither it nor a supplement containing the same ingredients has ever been tested or achieved any results whatsoever. Objection, Dkt. 75 at 4; *see also Bellion Spirits LLC v. United States*, __F.4th__, 2021 WL 3438533, 2021 U.S. App. LEXIS 23374, at *19 (D.C. Cir. Aug. 6, 2021) (agreeing that studies did not allow scientific conclusions to be drawn about claims where they "included only one component of the [product] rather than the full compound.").

FTC guidance confirms this commonsense interpretation. Concerning a hypothetical claim that a product has been "studied for years" would require support because "[i]n addition to the explicit claim that the product has been studied, such phrases **likely convey to consumers an implied claim that there exists a substantial body of competently-conducted scientific research** supporting the efficacy of the product." FTC, DIETARY SUPPLEMENTS: AN ADVERTISING GUIDE FOR INDUSTRY.[5] *See also* TINA Supplement, Dkt. 92 at 2-3 (discussing other examples of FTC observing that terms like "clinically tested," "clinic tested ingredients," and "established" imply not only testing—but also proof or scientific legitimacy). FTC also enforced the FTC Act against a manufacturer that used claims like "clinically tested" and "research-based" since these imply scientific evidence supporting the claim.[6]

---

[5] *Available at* https://www.ftc.gov/tips-advice/business-center/guidance/dietary-supplements-advertising-guide-industry.

[6] Lesley Fair, *The Younger Games? FTC challenges anti-aging claims as unsubstantiated* (Feb. 21, 2018) available at https://www.ftc.gov/news-events/blogs/business-blog/2018/02/younger-games-ftc-challenges-anti-aging-claims. The settling parties observe that private plaintiffs cannot enforce the FTC Act, but the agency's enforcement decisions and expertise are relevant to the Court's inquiry—how consumers are likely to interpret the revised labelling under the proposed settlement.

Decisions by the National Advertising Division ("NAD") of the Better Business Bureau likewise suggest that "clinically tested" suggests not merely the process of testing, but also implies success. The settling parties argue that NAD decisions are not precedent, but they do bear on the Court's inquiry—how consumers would understand the term. The NAD has repeatedly held that "clinically tested" implies to consumers "a promise that there is scientific evidence." TINA *Amicus* Dkt. 83 at 4 (quoting Dkt. 83-2 through 83-4). The reason is clear: when "clinically tested" is raised "in the context of a specific performance claim [it] thereby giv[es] rise to the implication that the product has been *clinically proven*." *Id.* (quoting Dkt. 83-5); *see also Removatron Int'l Corp. v. Federal Trade Comm.,* 884 F. 2d 1489, 1497 (1st Cir. 1989) ("The common-sense net impression of petitioners' advertising claims is that their machine can remove hair permanently and that this claim is supported by scientific evidence. … [P]etitioners argue that the words 'clinically tested' do not mean, and would not be taken by a reasonable person as meaning, 'supported by rigorous scientific tests.' … Regardless of any actual differences, … petitioners have offered no basis for us to find that lay people would make such a fine distinction.").

The Defendants argue that none of these decisions is relevant and instead point to a decision involving Chaser, a product supposed to prevent hangovers. As part of the resolution, the Chaser's manufacturer agreed to replace "clinically proven" with "clinically tested," but also made several other substantive changes addressing NAD's concerns, including deleting the claims "No headache, no nausea, no regrets" and "you can completely counteract the negative effects of alcohol abuse." Dkt. 98-1 at 1, 8. The manufacturer also agreed to add several disclaimers to discourage excess drinking. *Id.* at 9. Finally—and unlike Neuriva—the manufacturer had performed a clinical study on the product, which led NAD to concluding "the advertiser established a reasonable basis for claiming that Chaser can help prevent hangovers and hangover symptoms." *Id.* at 8. Contrary to Defendants' insinuation, NAD did not make any findings about the difference between "clinically tested" and "clinically proven"—if any—but instead accepted the advertisers' voluntary adjustments while requesting several others. This decision in no way undermines NAD's consistent findings that "clinically tested" implies evidence in support of the claimed properties.

### D. Defendants' own study shows that "clinically tested" is statistically indistinguishable from "clinically proven" in the eyes of consumers.

The Defendants ask the Court to rely on a study it commissioned including 150 people supposedly screened for "Brain Health" and to ignore bottom-line results among all 1050 participants showing an insignificant difference in how consumers perceived "clinically tested" and "clinically proven." Dkt. 98 at 8. Notably, the study does not test the terms that Defendants will actually be allowed to use under the settlement—"clinically tested" *and* "shown."

Defendants' study surveyed 1050 respondents, who were sorted by some unknown criteria into seven groups of 150 participants. Dkt. 98-2 at 15. Defendants urge the court to look at only the "Brain Health" group and only the "likelihood to work" question, but this uses the smaller sample size of 150 participants, which is inherently noisy, and leads to contradictory results.[7] For example, the "Brain Health" group had 33% for "clinically proven," compared to 26% for "clinically tested," but also nonsensically returned 28% for "clinically tested & proven," which was judged the most reliable of all label claims by the full survey of 1050. *Id.* at 19. Defendants apparently suggest something idiosyncratic about "Brain Health" consumers makes them unlike other consumers, but the likelier explanation is noise from the smaller sample size of that group. For example, while supposedly only 26% of surveyed customers think "clinically tested" means "likely to work," fully 30% of them said that they "definitely would buy" such a product compared to 32% of those evaluating the "clinically proven" claim and 34% for the "clinically tested & proven claim." *Id.* at 21. The study did not survey respondents for "clinically tested and shown" language. The differences between these figures are statistically insignificant at the 95% confidence interval—that means, they are likely caused by random sampling rather than a real differences in perception of the terms and customers' willingness to buy.[8]

---

[7] Defendants stress that "*only three claims*" ranked as "significantly higher than the Average Claim Rating," but this is a product of the smaller sample size. Sixteen of the claims were statistically significant at this level in the full 1050-panelist survey.

[8] Statistical significance is a measure of the likelihood two sampled results indicate the measurement of different underlying values rather than random sampling variation. For example, if in reality 30% of consumers find the term "clinically tested" meaningful, and supposing only 150 are surveyed, then 95% of the time, the results of the survey will fall between 22.67% and 37.33%. In terms of a public opinion poll, one would say the margin of error is ±7.33%. In statistical terms, if one were to take a fair sample of the population and poll 150 people each time, then 95% of the time

Defendants' own actions prove that they know the small "Brain Health" subgroup is not especially reliable and undermines its self-serving testimony. Rachel Sexton declares that:

> "Clinically Tested" was, at 26% for the Likelihood to Work measure, lower even than the average claim score of 28%. I interpret these results to mean that, as to the measure of Likelihood to Work, that "Clinically Tested" would be among the least likely of the claims tested that RB would ever voluntarily choose to use in its marketing or labeling.

Dkt. 98-2.

According to this self-serving testimony then, Defendants would not "voluntarily" choose to use the slogan "nature made it, science proved it" for Neuriva because even though it's one of the strongest of the 38 claims examined in the full 1050-panelist survey, exactly like "clinically tested" it got only 26% in the Brain Health category. *Id.* at 19. However, RB does use that slogan to market Neuriva. On information and belief, it does so voluntarily, and it makes sense that it does. The large 1050-panelest survey shows that both "clinically tested" and "clinically proven" are among the most compelling label claims—at 28% and 29% for "likelihood to work." The 1% gap between these terms is not only statistically insignificant, it reflects an artificial environment where consumers ranked 38 different claims side-by-side in a survey. The marketplace is much more subtle, and most

Fig. 1 from Dkt. 1 at 13

---

the results would land between the confidence interval.

Mathematically, confidence intervals are calculated using the formula $p \pm Z^*\sqrt{p^*(1-p)/n}$, where $Z^*$, called the "critical value" is looked up depending on the desired confidence interval. Scientists generally use confidence intervals of 95%, which has a value of 1.96. Therefore, the confidence interval around the "definitely would buy" results from the "Brain Health" group is $0.3 \pm 1.96\sqrt{(0.3^*(1-0.3)/150)}$, or in other words $30\% \pm 7.33\%$. From this it can be seen that the difference between "clinically tested" and "clinically proven" at 30% and 32% is statistically insignificant—so has a high probability of not reflecting a true difference in consumer views, but only the small sample size of the "Brain Health Group."

8

consumers will not have a chance to compare the new and old-packaging side-by-side, and even if multiple different types of package coexist, consumers would not know to look for the changes. Defendant make no showing that the statistically insignificant survey difference of 2% in "likelihood to buy" will translate into any market difference at all. Much less does it show that the subtle change constitutes a *class benefit*, which is the relevant consideration to grant final approval to the proposed settlement.

**II. Defendant's purported expert testimony contains no methodology, commonly-accepted or otherwise, and therefor does not qualify as expert testimony.**

Finally, Defendants offers the testimony Dr. Punam Keller, who opines that consumers would recognize a difference between "tested" and "proven."

The Defendants, which argue in its motion to strike that the Court should apply *Daubert* to these proceedings (Dkt. 83 at 13)[9] makes no effort to qualify the Keller declaration as expert testimony with a reliable methodology. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (all expert testimony subject to *Daubert*, not merely the hard sciences). In order for a Court to ascertain reliable expert testimony, it must determine whether "the methodology by which the expert reaches his conclusions is sufficiently reliable," which might entail consideration of "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

The Keller declaration does not make it this far—it is not that Dr. Keller uses an unreliable methodology, but that she uses no discernable methodology at all. To use a reliable methodology, one must necessarily use a methodology (i.e. replicable and systematic process of some sort). Keller does

---

[9] As will be explained in the forthcoming opposition to Defendants' Motion to Strike, Theodore H. Frank's objection relies on no expert testimony, but instead upon easily-verifiable facts that none of the studies cited by the Defendants in support of their label claims actually involve Neuriva nor even any product with the same ingredients as Neuriva. The settling parties ask the court to strike the Frank declaration based on a shockingly cavalier and false suggestion that Frank committed perjury when he declared that he purchased Neuriva for personal use. In fact, Frank became a class member before he or any CCAF attorney had reviewed a single document from this litigation.

not.Her declaration observes that the definitions of "tested" and "proven" differ. It then cites evidence not provided to the Court that apparently shows Neuriva purchasers are higher-income, older, and more well-educated than average. Dkt. 98-4 at 10-12 ("Research conducted or assembled by the marketing professionals in connection with the marketing of the product."). The Keller declaration then argues that this means potential customers will better understand the different definitions of "target" and "proven." There is no methodology in this testimony—it consists of rehashing Defendants' dictionary arguments and asserting that because Neuriva's alleged customers are knowledgeable—that Neuriva customers should know that "tested" is different than "proven" because the latter is an outcome rather than a process. Keller does not explain why the word "shown" does not serve the same role as "proven." Keller does not explain why a well-educated consumer would not also better understand the context that "clinically tested" implies "clinically proven" because the term would be meaningless without this implication. Nor does Keller address a point raised by TINA—that empirical research proves that older consumers are more likely to absorb the *gestalt* of advertising rather than fine details. Dkt. 92 at 4. "[T]he only connection between the conclusion and the existing data is the expert's own assertions." *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004). And "a bald assertion cannot carry the *Daubert* burden." *United States v. Pon*, 963 F.3d 1207, 1221 (11th Cir. 2020).

Finally, Keller opines that the settlement administration process itself will highlight the change because "at least 13 million actual and target customers of Neuriva…likely saw up to four communications specifically aimed at alerting these customers that the product claim had changed." Dkt. 98-4 at 22. In fact, as the Facebook ads themselves demonstrate, class notice primarily alerts potential class members they could file a claim. *Id.* at 53. Given that only 0.17% of the 13 million audience has submitted 22,706 claims to date—and likely many of these are not really class members at all, but are individuals seeking $20 payments available without proof—it's doubtful that a significant portion of class members have noticed the proposed label change. *See Roes v. SFBSC Mgmt.*, LLC, 944 F.3d 1035, 1046 n.7 (9th Cir. 2019) (reasoning that a poor claims rate is an indication of inadequate notice). Once again, Keller provides no methodology whatsoever to arrive at her conclusion that Neuriva's "customers are particularly likely to appreciate and attend to such changes." *Id.* at 22. The

court should consider the declaration as an extension of Defendants' filing, which it substantially rehashes. Under *Daubert*, Keller's *ipse dixit* testimony must be excluded.

## CONCLUSION

Objector Frank does not categorically oppose early settlements to class action lawsuits, but settlements should put the interests of class members ahead of attorneys. Here, the settling parties announced a "$8 million settlement" which currently amounts to perhaps $450,000 in claims filed with a $2.9 million unopposed attorneys' fee award, which will easily outstrip class recovery. The settling parties provide no evidence the injunction is worth anything to class members, and Defendants' own research proves the labels statistically indistinguishable in terms of likely sales. Such an injunction cannot justify a settlement negotiated to provide attorneys significantly more than class members. The settlement should be denied, so that parties can continue litigation, or (more likely) renegotiate a settlement that prioritizes class members and not attorneys.

Date: August 16, 2021

Respectfully submitted,

*/s/ Matthew Seth Sarelson*
Matthew Seth Sarelson
DHILLON LAW GROUP, INC.
2100 Ponce De Leon Blvd. Ste 1290
Coral Gables, FL 33134
Phone: 305-773-1952
Email: Msarelson@dhillonlaw.com

M. Frank Bednarz (*pro hac vice*)
IL ARDC No. 6299073
HAMILTON LINCOLN LAW INSTITUTE
CENTER OF CLASS ACTION FAIRNESS
1145 E. Hyde Park Blvd. Unit 3A
Chicago, IL 60615
Phone: 801-706-2690
Email: frank.bednarz@hlli.org

*Attorneys for Objector Theodore H. Frank*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed with the Court via the CM/ECF system, which will send notification of such filing to all attorneys of record.

*/s/ Matthew Seth Sarelson*
Matthew Seth Sarelson