**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO.  20-cv-23564-MCG**


DONALD WILLIAMS and
CAROLL ANGLADE,

                    Plaintiffs,

        vs.
                                    Miami, Florida
                                    August 17, 2021
RECKITT BENCKISER LLC, and          Pages 1-99
RB HEALTH (US) LLC,

                    Defendants.
_____

              **TRANSCRIPT OF FAIRNESS HEARING**
            **CONDUCTED VIA ZOOM VIDEOCONFERENCE**
          **BEFORE THE HONORABLE JONATHAN GOODMAN**
              **UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:
FOR THE PLAINTIFFS:
                    *Milberg, Coleman, Bryson,*
                    *Phillips, Grossman, PLLC*
                    **BY:  MARTHA A. GEER, ESQ.**
                    **BY:  PATRICK M. WALLACE, ESQ.**
                    900 West Morgan Street
                    Raleigh, North Carolina 27603

                    *Barbat, Mansour, Suciu & Tomina, PLLC*
                    **BY:  NICK SUCIU, ESQ.**
                    **BY:  SARAH WESCOT, ESQ.**
                    6905 Telegraph Road - Suite 115
                    Bloomfield Hills, Michigan 48301
FOR THE DEFENDANT:
                    *Perkins Coie, LLP*
                    **BY:  DAVID T. BIDERMAN, ESQ.**
                    **BY:  STEVEN HWANG, ESQ.**
                    **BY:  CARRIE AKINAKA, ESQ.**
                    1888 Century Park East
                    Suite 1700
                    Los Angeles, California 90067

**PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCE**
**TRANSCRIPT PRODUCED BY MANUAL STENOGRAPHY**
**AND COMPUTER-AIDED TRANSCRIPTION**

1    **(Appearances continued)**

2                              *Bilzin, Sumberg, Baena,*
                             *Price & Axelrod, LLP*
3                              BY:  **MELISSA CADE PALLETT-VAZQUEZ, ESQ.**
                             BY:   **ILANA DRESCHER, ESQ.**
4                              *1450 Brickell Avenue*
                             *Suite 2300*
5                              *Miami, Florida 33131*

6    **FOR TRUTH IN ADVERTISING:**
                             BY:  **LAURA SMITH, ESQ.**
7                              *115 Samson Rock Drive*
                             *Suite 2*
8                              *Madison, Connecticut 06443*

9    **FOR THE OBJECTOR**
     **THEODORE H. FRANK:**
10                             *Center for Class Action Fairness*
                             *Hamilton Lincoln Law Institute*
11                             BY:  **FRANK BEDNARZ, ESQ.**
                             *1145 East Hyde Park Boulevard*
12                             *Apt. 3A*
                             *Chicago, Illinois 60615*
13                             ***Admitted pro hac vice***

14   **TRANSCRIBED BY:**         DAWN M. SAVINO, R.P.R., C.R.R.
                             **Official Federal Court Stenographer**
15                             **400 N. Miami Avenue, 10S03**
                             **Miami, Florida  33128**
16                             **Telephone:  305-523-5598**

17

18

19

20

21

22

23

24

25

<pre>
 1                     P-R-O-C-E-E-D-I-N-G-S
 2          THE COURT:  Good morning, folks.  This is Jonathan
 3     Goodman.  We're here for a hearing and -- a fairness hearing, a
 4     final fairness hearing.  So if you're participating, please put
 5     your cameras on.
 6          And Trina, would you please go ahead and call the case.
 7          COURTROOM DEPUTY:  The United States District Court is
 8     now in session, the Honorable Jonathan Goodman presiding.
 9          Calling case David Williams, et al versus Reckitt
10     Benckiser, LLC et al, case number 20-23564-civil-Cooke.
11          Counsel, please state your appearance for the record.
12          THE COURT:  Starting first with the Plaintiff, please.
13          MS. GEER:  Yes, Your Honor.  I'm Martha Geer of the
14     Milberg Law Firm on behalf of class counsel for the Plaintiffs.
15          THE COURT:  Thank you.
16          MR. WALLACE:  Pat Wallace also of the Milberg Law Firm
17     appearing on behalf of the Plaintiffs.
18          THE COURT:  I'm sorry.  I'm just looking for you.
19     You're on the upper left-hand corner of my screen there.  Thank
20     you.
21          For the defense.
22          MR. SUCIU:  I'm sorry.  Nick Suciu on behalf of
23     Plaintiffs.
24          THE COURT:  All right.  Fair enough.
25          MS. WESTCOT:  Sarah Westcot also on behalf of the
</pre>

1    Plaintiffs, Your Honor.

2          THE COURT:  All right.  I shouldn't have jumped the gun

3    there.  So we now have four lawyers for the Plaintiff.  Are

4    there any other Plaintiff lawyers here on this Zoom hearing

5    call?

6          For the defense please.

7          MR. BIDERMAN:  Good morning, Your Honor.  David

8    Biderman on behalf of Defendants.

9          THE COURT:  Thank you.  Are there any other lawyers for

10   the defense?

11         MS. PALLETT:  Yes, Your Honor.  Melissa Pallett of

12   Bilzin Sumberg on behalf of the defense.  I also have my

13   colleague Ilana Drescher listening in on the phone.

14         THE COURT:  All right.  Ms. Drescher, do you want to

15   put your camera up please?

16         MS. DRESCHER:  I don't think she's participating, I

17   think she's just listening in.  But I will defer to her.

18         THE COURT:  Well, here's the way I look at it.  This

19   Zoom hearing is supposed to be a substitution for an actual

20   in-court hearing.  So if we were in my actual courtroom, which

21   is about 20 feet to the west through this wall, if your

22   colleague were in court, I would see her; and if she was

23   speaking, I would hear her.  So unless there's some good reason

24   why Ms. Drescher doesn't want to appear on camera --

25         MS. DRESCHER:  I'm sorry, Judge.  Here I am.  I just

1    wasn't expecting to appear in court, but I'm right here.

2              THE COURT:  All right.  Thank you very much.

3              MR. BIDERMAN:  Your Honor, David Biderman again.  On

4    that note, two of my colleagues are here.  They are not admitted

5    and they would be in the -- were we in a real courtroom they

6    would be in the audience, but they're here.  Steven Hwang and

7    Carrie Akinaka.

8              MR. HWANG:  Good morning.  Steven Hwang here.

9              MS. AKINAKA:  Good morning.  Carrie Akinaka.

10             THE COURT:  Good morning to all of you.  And to the

11   extent that any of you folks are associates in a big law firm,

12   you're now officially on the record, so congratulations to you

13   associates.

14             Anybody else here on behalf of either an Objector or an

15   Amicus.  Sir, your microphone is on mute so I can't hear

16   anything that you're saying.  Sir?  Sir?  Hello?  I can't --

17   sir, I can't hear anything that you're saying.

18             MR. BEDNARZ:  Your Honor, I'm joined by teleconference,

19   so it wasn't clear to me that --

20             THE COURT:  Sir, I'm having a great deal of difficulty

21   hearing you.

22             MR. BEDNARZ:  I'm sorry, Your Honor.  What was that?

23             THE COURT:  I said I'm having a great deal of

24   difficulty hearing you.

25             MR. BEDNARZ:  Yeah.  When I joined on the Zoom, Your

6

1    Honor, it said that my speakers were not working on my phone, so

2    I have to listen to you on the phone.  But I guess it's still

3    picking up through the Zoom application on my computer.

4            THE COURT:  All right.  Well, whether it's the

5    microphone on your phone or the microphone in your computer, I

6    can hear you now, but it looks like you're looking at a computer

7    screen and also holding your phone.  All right.

8            So can you state your name for the record please, sir?

9    I can't hear anything that you're saying now, sir.  This is not

10   working very well.

11           MR. BEDNARZ:  I'm sorry, Your Honor.  I am Frank

12   Bednarz on behalf of the Objector Theodore H. Frank.

13           THE COURT:  All right.  So my suggestion is if you're

14   going to be speaking, you're going to need to hold your phone up

15   to your mouth or close to your mouth so I can hear you.  And now

16   I can't hear you at all, sir.  I don't know what's happening.

17           MR. BEDNARZ:  Okay, Your Honor.  It looks like the

18   microphone is actually still on my laptop.  When I'm on the

19   conference call, I guess you can't pick that up.

20           THE COURT:  Well now I'm hearing you.  I can see you

21   and I can also now hear you.  Can you say one sentence?  No, now

22   I'm not hearing you again.  Mr. Bednarz, I see your lips moving

23   sir, but I hear nothing.  I still see your lips moving and I

24   still cannot hear anything.

25           MR. BEDNARZ:  Okay, Your Honor.  I guess that I am

7

1     speaking through my phone in fact; is that right, Your Honor?

2            THE COURT:  I'm hearing you now, correct.

3            MR. BEDNARZ:  Okay.  Thank you.

4            THE COURT:  Is Mr. Frank here?

5            MR. BEDNARZ:  No, Mr. Frank is being represented by me.

6     He is not an attorney in this district.

7            THE COURT:  No, no, I wasn't asking if he was here in

8     his capacity as an attorney representing someone, I was

9     wondering if he was here in his capacity as a purported

10    Objector.

11           MR. BEDNARZ:  Your Honor, no.

12           THE COURT:  All right.  So just a few introductory

13    comments, folks.  First of all, nobody is allowed to record or

14    rebroadcast this hearing.  If you would like a transcript,

15    please go through the clerk's office.

16           Number two, please state your name before speaking.

17    The reason for that is if anyone were to ever order a

18    transcript, the court reporter transcribing the hearing would

19    need to know who is speaking, and he or she likely would not

20    recognize your voice.  So please state your name before you

21    speak.

22           In addition, before you speak, please hesitate for

23    about half a second, hopefully that will decrease the likelihood

24    that you inadvertently interrupt the person speaking before you.

25           When you're not speaking, please put your microphones

1    on mute.  The reason for that is I have been told by certain

2    technical experts that the audio quality increases the fewer

3    active microphones are there, so it looks like everybody now has

4    their microphones on mute.

5              So before we begin, let me just start off with

6    basically a procedural history of how we got to where we are

7    here today.  I typically do this at a fairness hearing.  Please

8    bear with me, it may take me a few minutes to go through that

9    history, but trust me, I will, at some point, stop speaking.  It

10   may seem to you, similar to the old Jerry Seinfeld episode that

11   to you it sounds like "yada, yada, yada", and perhaps it may

12   sound that way, but trust me, I will stop talking as soon as I

13   get through this procedural history.

14             First of all, the case began back in October -- I'm

15   sorry, August 26, 2020, ECF Number 1, with the complaint.

16             Then on November 20th, ECF 33, the trial scheduling

17   order.

18             ECF 36, on December 1st, the amended complaint.

19             January 7th of this year, ECF 47, notice of settlement

20   and joint motion to stay deadlines.

21             ECF Number 48, January 8th, order administratively

22   closing the case.

23             January 27th, ECF 51, amended complaint.

24             February 8th, ECF 52, unopposed motion for preliminary

25   approval of class action settlement.

1          ECF 53 on February 9th, order referring ECF 52 to me,

2     that's how you folks got me involved in the case at this point

3     as the paired federal magistrate judge.

4          ECF 57, on April 23rd stipulated order granting

5     unopposed motion for preliminary approval of class action

6     settlement and certification of the settlement class.  In that

7     order, there was a certification of a nationwide settlement

8     class, all persons who purchased for personal consumption and

9     not for resale one or more of the Neuriva products.  By the way

10    am I pronouncing it right?  Is it pronounced Neuriva?

11    Mr. Biderman, your microphone is on mute.

12          MR. BIDERMAN:  Neuriva, that's right.

13          THE COURT:  Neuriva.  All right.  One or more of the

14    Neuriva products from Defendants or any authorized reseller in

15    the United States from January 1, 2019.  And the date of

16    preliminary approval of the settlement class indicates that

17    class members have a deadline of July 27th to opt out of the

18    settlement for purposes of the damages claims only, and certain

19    procedures were established.  It also indicated what a class

20    member must do to object, and there are certain specific

21    procedures that are listed.

22          ECF Number 58, on April 26th is an order requiring

23    memoranda on injunctive relief and pinpointing certain topics to

24    be discussed.

25          ECF 61, on May 24th Plaintiffs' memorandum on

1    injunctive relief, basically explaining, among other things, no

2    basis for enjoining the sales of Neuriva products, and no

3    allegations that the Neuriva products are harmful or that the

4    products are being unlawfully sold.

5         ECF 62 from May 24th, Defendants' supplemental brief

6    regarding injunctive relief indicating, among other points, that

7    the proposed injunctive relief provides a meaningful benefit to

8    the class.  It agreed to a change of the settlement agreement's

9    injunctive relief provision, and clarifies that the revised

10   labeling makes claims only to the product's active ingredients

11   which have both been clinically tested and science tested, and

12   it also indicates that the revised claims do not refer to the

13   products themselves, but instead to their ingredients.  And that

14   memorandum also gives examples of cases where courts have

15   approved similar injunctive relief in similar consumer fraud

16   cases, and it presented a revised settlement agreement.

17        ECF 69, July 19th, Plaintiffs' motion for fees,

18   expenses and services awards.  It indicates that the settlement

19   provides $8 million, or up to $8 million in monetary benefits

20   with only minimal claim requirements.  Points out that class

21   counsel may apply for attorney's fees and expenses and costs not

22   to exceed $2.9 million, and it reserves jurisdiction on

23   requested service awards of $2,000 each for five named

24   Plaintiffs.

25        ECF 72, which is July 26th, Theodore Frank's notice of

1    intent to appear at fairness hearing through his attorney Frank

2    Bednarz and Matthew Sarelson.

3         ECF 74 from July 26th, unopposed motion by Truth in

4    Advertising, Inc. for leave to file an Amicus brief.  It

5    mentions that the motion and the brief are entirely independent

6    and are not supported or motivated in any way financially or

7    otherwise by any outside parties or organizations.

8         By the way, is there anybody here this morning from

9    Truth in Advertising, Inc.?

10        MS. SMITH:  Yes.  Good morning, Your Honor.  This is

11   Laura Smith.  As I'm not admitted in Florida, I'm here as an

12   observer.  And we would like to rest on the papers, but of

13   course if you have any questions for me, I'm happy to answer

14   them.  But just so that the Court knows, I'm not admitted in

15   your district.

16        THE COURT:  All right.  Fair enough.  Thank you for

17   that clarification.

18        ECF 75 from July 26th is Mr. Frank's objection filed by

19   his attorneys, along with a 29-page memorandum of law and a

20   30-page declaration signed by Mr. Frank.  In his objection,

21   Mr. Frank says he's a member of the settlement class because he

22   purchased Neuriva products for personal consumption and not

23   resale in the United States between January 1, 2019 and April

24   23, 2021, and therefore he says he has standing to object.  And

25   specifically he indicates he made a purchase on February 2, 2021

1   for $21.95.  He also mentions that neither he nor his counsel

2   engage in quid pro quo settlement unlike some Objectors who he

3   says seek to be, quote, bought off, unquote.  He also indicates

4   that he will not withdraw an objection or an appeal in exchange

5   for a payment.  And the submission also indicates that Mr. Frank

6   founded the nonprofit center for Class Action Fairness.

7           ECF Number 76 from July 26th is a declaration from his

8   attorney Frank Bednarz, and it basically attaches copies of

9   certain resource materials.

10          ECF 79 from July 27th is my order granting the

11  unopposed motion for Truth in Advertising to file an Amicus

12  brief.

13          ECF 84 -- by the way, Ms. Smith, since you are here,

14  would you please turn your camera on?  So far you're the only

15  one who hasn't.  Same analogy.  If we were in a courtroom,

16  whether you were simply observing or otherwise, I would be able

17  to see you in the courtroom.  Thank you for turning your camera

18  on.

19          MS. SMITH:  Happy to, Your Honor.

20          THE COURT:  ECF 84, August 5th, is an order asking for

21  additional information about any studies or authorities

22  discussing whether consumers or potential consumers appreciate

23  or would appreciate any distinction between a brain product said

24  to be scientifically or clinically proven as opposed to one

25  represented to be clinically or scientifically tested.

1          ECF 85 from August 10, 2021, Plaintiffs' response to

2     Mr. Frank's objection, and also to the Amicus brief filed by

3     Truth in Advertising.  Plaintiffs' take issue with their

4     position.  It notes that there was no objection to the motion

5     for leave to file an Amicus brief.  It notes that no federal or

6     state regulator has opposed the settlement agreement.  This

7     submission describes Mr. Frank as a serial class action

8     Objector, but further contends that he is not a class member

9     here.  In the submission, Plaintiffs describe Mr. Frank and says

10    that his sole purchase (sic) in making a Neuriva purchase was to

11    lodge an objection.  They say his objection should be dismissed

12    as being made in bad faith.

13         Concerning Truth in Advertising, the Plaintiffs'

14    submission says that they applaud the organization for its work,

15    and the Plaintiff says it is largely in agreement with TINA's

16    criticism of Neuriva.  Nevertheless, it says that the proposed

17    solution to reject the settlement entirely is not desirable

18    because it would lead to years of additional litigation and also

19    because there would be litigation risks if the case were not

20    settled.

21         ECF 86 is the Defendants' motion to strike the

22    submissions of both Mr. Frank and Truth in Advertising, called

23    TINA.  It indicates that according to the Defendants, Mr. Frank

24    lacks standing to object because the so-called injury he

25    sustained is self-inflicted.  They describe his purchase as a

1   trap purchase, and they also say that Mr. Frank is not in fact

2   an aggrieved class member because his chief complaints about the

3   settlement concern the injunctive relief.  However, the

4   Defendants say Mr. Frank has already said he will not be buying

5   Neuriva in the future, therefore injunctive relief will not

6   apply to him and will not affect him.

7        The submission from Defendants also indicate that

8   Mr. Frank is entitled to complete refund of the $21.95 he spent

9   to buy Neuriva.  The submission also indicates that TINA does

10  not deport -- does not purport, I should say, to be a class

11  member or otherwise claim standing, so its admission can be

12  disregarded on that basis alone.  Points out that TINA lacks

13  standing, but we all know the Defendant did not oppose the

14  motion, TINA's motion for leave to file an Amicus brief.  It

15  indicates that the class action or the Center for Class Action

16  Fairness lawyers are not qualified to raise certain scientific

17  assertions, and the submission from the Defendant also attaches

18  the supplemental declaration of Dr. Gary Small and the

19  supplemental declaration of Steven Weisbrot, Esquire which

20  discusses the voluntary supplemental notice program.

21        ECF 87 from August 13th is TINA's opposition to the

22  motion to strike, and it points out that the Defendants

23  consented to TINA's motion for leave to file an Amicus brief as

24  well as the brief itself.

25        ECF 88 from August 13th is TINA's supplemental brief.

1    It forwards an e-mail from an FDA official, I believe it's an

2    FDA attorney, opining that consumers would not see any

3    difference between clinically proven and clinically tested.

4         ECF 93 from August 13th is Defendants' reply in support

5    of the motion to strike.  Clarifies that the consent to the

6    Amicus brief was linked to a reciprocal agreement that the

7    Defendants could submit a responsive filing, and that the motion

8    to strike is in fact the responsive filing.

9         It also notes that the parties cannot stipulate to

10   subject matter jurisdiction, and that TINA lacks Article III

11   standing regardless of the Defendants' consent that TINA could

12   file an Amicus brief.

13        ECF 94 from August 13th, Plaintiffs' filing the

14   supplemental declaration of Daniel Bryson who is the co-lead

15   settlement class counsel for the Plaintiff.  It discusses the

16   cooperation between the five Plaintiff law firms and the

17   attorney hours worked.  It indicates that there is a $1.2

18   million lodestar for the attorney's fees, and it also provides a

19   status report about the claims received as of August 13th

20   indicating the total claims as of then was 22,706, and of those,

21   5,728 were submitted after August 2nd.

22        I'm getting to the end folks, so hang in there please.

23        ECF 95 from August 14th is an order requiring more

24   detail about the claims filed.

25        ECF 96 from August 15th order requiring calculations on

1    a hypothetical claim history.

2            ECF 97 from August 15th establishes a briefing schedule

3    on the motion to strike, and requiring Mr. Frank and TINA to

4    provide more information about their involvement in objections

5    to class settlements and how other courts have treated them and

6    their purported standing.  That deadline has not yet expired.

7            ECF 98 from August 15th is the Defendants' supplemental

8    brief regarding injunctive relief, and it discusses the

9    distinction between proven and tested.

10           ECF 99 from August 16th is Plaintiffs' supplemental

11   brief concerning those same distinctions between proven and

12   tested.

13           ECF 100 is Mr. Frank's supplemental brief regarding the

14   value of the injunctive relief, including language or arguments

15   or points about the distinction between different precise

16   terminology.

17           ECF 101 from August 16th is the supplemental

18   declaration of Brian Devery of the Angeion Group, basically

19   providing a breakdown of the claim filing.

20           And finally, our most recent filing from this morning

21   at about 8:50 a.m. is ECF 102, another supplemental declaration

22   from Ms. Bryson -- I'm sorry.  Mr. Bryson giving a projection of

23   total claims based on the hypothetical dates that I provided,

24   including a hypothetical date for the final approval by Judge

25   Cooke if she were to approve the settlement, and basically the

1    projection indicates that the amount paid out would be between

2    1.049 million and 1.181 million, based on an

3    all-things-remaining-equal perspective.

4              So that brings us up, folks, to today.  So thank you

5    for listening so patiently.

6              Let me also compliment the lawyers on all of their

7    briefing.  I found the quality of the writing top-notch, so

8    thank everybody for that.  When I first took this job 11 years

9    ago and became a federal magistrate judge, I assumed, perhaps

10   naively, that all the writing that I review in federal court

11   would be top-notch and stellar and a pleasure to read.  Turns

12   out that that's not the case.  I certainly receive a lot of

13   top-quality memoranda, and this certainly fits into that

14   category.  So whoever did the drafting for you, I don't know if

15   it was the big-shot named partners or a team of associates or a

16   committee, but you know what they say about work done by a

17   committee, I think they say that a zebra is a horse created by

18   committee.  But in any event, I want to compliment everybody for

19   the fine memoranda. So there we have it.

20             Let me first hear from the Plaintiffs on why you

21   believe approval is appropriate.

22             MS. GEER:  Good morning, Your Honor.  I'm Martha Geer

23   of the Milberg Law Firm on behalf of the Plaintiffs.

24             Even though on its face the settlement may not look

25   unusual or unexpected, and in significant ways it is.  We

1    reached this settlement only a year and a half after Neuriva

2    first hit the market, and it hit the market hard.  It was going

3    gangbusters with commercials.  You couldn't watch TV without

4    seeing a commercial trumpeting that Neuriva's ingredients are

5    clinically proven, they're scientifically proven.  Now we know

6    from Defendants' August 15th submission that they chose those

7    words carefully.

8            The most important criteria, as their materials show,

9    the most important criteria for consumers of brain supplements

10   is will it work.  And when they see the words "clinically

11   proven", the purchasers think that means it will definitely

12   work.  But now with this settlement, Defendants will have to

13   drop what was a key phrase in their advertising.  The phrase

14   that made consumers believe that their product, Defendants'

15   product, would in fact work.  They have to substitute language

16   that their own research has indicated won't persuade consumers

17   that this is a product that works.  And we got this done without

18   spending what undoubtedly would have been years of litigation

19   and appeals.  All that time, consumers would continue to hear

20   and see the words "clinically proven", and think that means

21   Neuriva is sure to work.  And after all those years of

22   litigation, we could lose.

23           As you've been able to see, in just this approval

24   process there would have been a major battle of experts.  And if

25   we want to have a demonstration of how real that risk of loss

1  is, all we have to do is review what happened in one of the

2  Prevagen cases which didn't have nearly the same expert battle

3  that we would have. After the plaintiffs won every single

4  motion, the case went to trial in California and the jury --

5          THE COURT:  Are you talking about the *Racies* case?

6          MS. GEER:  Exactly, Your Honor.  The jury hung and the

7  class was decertified.  So we could go through, in this case,

8  years of litigation and the class could end up getting nothing

9  and the marketing would just continue.  Instead, as a result of

10 the settlement, if approved, not only would the Defendants be

11 forced to drop the most troubling part of their marketing

12 campaign, but they would also have to pay up to $8 million with

13 another key component that isn't typical in settlements like

14 this one.  The purchasers who have no receipt, as well as those

15 who do have ability to prove a proof of purchase, will be able

16 to file claims.  How many of us keep our drugstore receipts?

17 You know, with this settlement --

18         THE COURT:  You've obviously never met my wife.  She is

19 the chief financial officer of the Goodman family.  If I order

20 something from Amazon and it's $4.63, by golly if there's not a

21 receipt in the receipt drawer when the credit card bill comes

22 in, I'm cross-examined.

23         GOVERNMENT 1:  Well, and that's impressive since you

24 can even retrieve Amazon, but Walgreens not so much.  But we

25 find that most of the people purchasing Neuriva that we have

1    spoken with over the time that we have been working on this case

2    do not have their receipt.  They may have a bottle but, you

3    know, we had to really fight, you know, in the mediation to get

4    this ability for people who don't have a receipt to get some

5    reimbursement.

6         You know, the $8 million is also real and we had to

7    fight for that as well.  There were two mediations, and I -- and

8    really aggressive, tenacious, I don't know how many adjectives I

9    could use mediator that got us all to compromise.  She wouldn't

10   give up.  And in addition to the two mediations, we had numerous

11   phone calls with her, numerous phone calls with each other and

12   got to this deal.

13        We could have continued to litigate.  The damages would

14   have gotten bigger.  Maybe we could have, down the road, gotten

15   a larger dollar figure, but instead we have money that will now

16   go back into people's pockets now.

17        You know, the claims-made settlement nature of this

18   settlement is not at all unusual.  And the Eleventh Circuit says

19   in looking at the -- you know, the strength of the settlement,

20   you look at the benefits made available and not the actual

21   payout.  The *JP Morgan Chase* case, the *Spartan Race* case.  And

22   that makes sense because there are lots of reasons why claimants

23   don't file claims.  You know, they don't want to be involved in

24   litigation, they're busy.  They don't believe in the justice

25   system.  They've got sympathy for the defendant.  Maybe they

1     even think the product works.

2          But we do have a robust notice campaign.  The

3     affidavits from Angeion lay that out.  They are doing a

4     supplemental notice and they are extremely experienced class

5     action administrators and they designed that notice.  We are

6     making every effort, and Defendants are making every effort, to

7     get as many claims filed as possible.

8          You know, the bottom line, Your Honor, is after a

9     robust notice process, not a single real Objector to the

10    settlement exists.  We have a lawyer who purchased the product,

11    we believe specifically in order to object, and we have an

12    Amicus brief by an advocacy organization.  As our one of our

13    filings indicated, we admire and respect the working done by

14    TINA, but the role of advocacy organization is very different

15    from litigation in the trenches where we're trying to make the

16    best decision for the class we can.  Is it better for the class

17    to battle for years letting the advertising continue unabated

18    and risk having the class receive nothing.  We have to face the

19    realities of litigation.  The nature of mediation is that no one

20    thinks the result is perfect, but we concluded that this is a

21    good resolution given all the risks, and it ensures that the

22    advertising stops on the key element that we are most concerned

23    about.

24          With respect to the injunctive relief, the arguments

25    that both Mr. Frank and TINA make regarding that relief don't

1   really home in on the true issue which is what do consumers

2   actually believe when they see "clinically proved" or

3   "clinically tested."  Dictionary definitions, N.A. decisions,

4   the NAD decisions from the Better Business Bureau and the FDA's

5   views don't tell us what a reasonable consumer actually

6   believes.  That's the standard.  And typically, or frequently,

7   expert analysis from surveys of consumers is used in class cases

8   to show that that is the -- you know, is what a reasonable

9   consumer would believe.

10       And the reason you have experts is because lawyers

11   aren't experts in what people think any more than they are

12   experts in scientific studies.  Defendants have supplied the

13   consumer survey that we may well have been using, or one like

14   that if we litigated further down the road.  In class action

15   litigation, the use of experts doing surveys to show what

16   consumers believe, reasonable consumers believe, is not

17   uncommon, and that supports the injunctive relief that we have

18   agreed in the settlement agreement here.

19       The NAD decisions, which aren't the equivalent of a

20   consumer survey, also come out both ways.  As Defendants show,

21   there is the *Living Essentials* decision which is on -- you know,

22   it supports our position that this is -- you know, that moving

23   from clinically proven to clinically tested is a material and

24   important change, and you've got Mr. Frank and TINA pointing to

25   other NAD decisions.  But NAD decisions do not reflect consumer

1    views.  They reflect industry decisions.  These are voluntarily

2    agreed-to participants, industry participants.  It's not a

3    court, it's not a consumer.

4          And when Mr. Frank and TINA point to the standards that

5    the FTC and FDA rely on, they also do not acknowledge that we

6    are not in the same position as the FTC and the FDA.  Defendants

7    in cases like this routinely argue, and they did in this case,

8    that, you know, claims that are based on -- that challenge the

9    sufficiency of their studies, as Mr. Frank does, amount to

10   requirement that, you know, the Defendants, the manufacturer,

11   substantiate their claims.  In fact, only the government such as

12   the FTC, the FDA, can, in litigation, demand that the company

13   produce evidence substantiating its claims.

14         I have to say, there are -- when I say only the

15   government, there are courts across the country.  It is the law

16   in California, it is the law in a number of other jurisdictions

17   and, you know, some jurisdictions like Florida, it's as the

18   federal courts have said in Florida "we don't know."  But this

19   is a major defense in almost every false advertising case,

20   certainly that involves supplements that you are -- any

21   arguments that the Plaintiffs are making amount to essentially

22   to requiring Defendants to substantiate their claims and that

23   we're not allowed to argue that.

24         The defense argument is that consumers must -- you

25   know, the only thing that consumers can do is sue to show that

1    the statements are actually false, that no evidence in fact

2    exists, and that's -- the burden is on the consumer to do that.

3    And we agreed to the injunctive relief that fits what we

4    believed we could show under that standard through litigation.

5         "Clinically proven", it's our position that "clinically

6    proven" is false.  Nothing, no ingredient has been proven.

7    "Clinically tested" and "clinically shown" are tougher.  And you

8    can look at the war that, you know, Mr. Frank and Defendants

9    have had going through over the studies, and you've got expert

10   declarations.  And, you know, we worked with an expert, and if

11   we proceeded with the arguments that TINA and Mr. Frank are

12   urging, there's no showing that we would actually prevail on

13   them.  And real-world experience says that after years of

14   litigation, we could very well lose.

15        Now, I'm not going to go all the way through, you know,

16   Mr. Frank's brief and, you know, he misreads Corbett (ph), he

17   misreads *Brady*.  Both were actual falsity cases.  If you read

18   the judge's opinion in Corbett, you can see that he

19   misunderstood our claim but rejected -- adopted the defendant's

20   argument that it was a substantiation claim.  It, in fact,

21   demonstrates exactly what we're talking about.

22        With respect to the monetary relief, Your Honor, just

23   like the injunctive relief arguments, Mr. Frank's and TINA's

24   arguments about the monetary relief are not grounded in

25   real-world considerations.  They object to the limits on the

1    number of purchases.  In doing that, they're ignoring that all

2    settlements are compromises. Realistically, no litigator can

3    expect 100% reimbursement in a settlement, especially when

4    you're not requiring proof of purchase.  For proof of purchase

5    claimants in this case, they can get 32.50 for one purchase, a

6    maximum of that for one purchase which is 100% of the Neuriva

7    original price, or $62 for two.  No, they're not getting

8    reimbursement, not every class member is getting reimbursement

9    for every bottle they bought.  But that cannot reasonably be

10   expected.  If we settled on the eve of trial after prevailing at

11   the motion to dismiss, class certification and summary judgment

12   stages, reasonable litigators still would not expect full

13   reimbursement for all purchases.

14       And Your Honor, you know, basically our point is that

15   we meet with respect to the settlement, this is really very

16   straightforward.  What is unique about it is it is occurring

17   early on, early in the life span of Neuriva eliminating a key --

18   one of their key, and what we believe really false marketing

19   statements, and it ends up allowing for early resolution, early

20   injunctive relief and an early chance for consumers to receive

21   compensation.

22       Turning briefly to our motion for attorney's fees,

23   Mr. Frank is basically -- his argument is Your Honor, don't pay

24   any attention to the Eleventh Circuit.  Look to other circuits,

25   and let's not a apply Eleventh Circuit authority.  We believe

1    that the Court should, use contrary to Mr. Frank, the

2    constructive fund approach which has been recognized by the

3    Eleventh Circuit in the *Home Depot* case that we cite, and used

4    in other cases in the Southern District of Florida; *In Re:*

5    *Managed Care* and *American Suzuki* where you combine the fund with

6    the fees in this case, the $8 million fund with the $2.9 million

7    in fees which is being paid separate from the fund and will not

8    diminish the fund in order to determine the reasonableness of

9    the percentage.  The Eleventh Circuit does not use a lodestar

10   cross-check, and as we pointed out in our brief, actually I

11   think it's in Mr. Bryson's supplemental declaration on

12   attorney's fees, expenses and service awards, I think what the

13   *In Re: Checking Account Overdraft* litigation decision from the

14   Southern District of Florida said, the lodestar approach should

15   not be imposed through the back door via a cross-check, and

16   that's precisely what Mr. Frank is asking the Court to do.

17        Instead, you look at the total fund.  And in this case,

18   you use the constructive fund approach where we've got $10.9

19   million as a constructive fund, and then you look at what is

20   being requested which is $2.9 million in fees, and you look at

21   the percentage to see whether it's reasonable.  As Judge Cooke

22   noted in *Fernandez*, a decision we've cited in our motion for

23   final approval and motion to approve the attorney's fees, Judge

24   Cooke said that really the analogy here is contingent

25   litigation.  So when you look -- she was looking at what is an

1   appropriate reasonable percentage in the market.  What is the --

2   you know, should be the market rate.  And what she pointed out

3   is in complex contingent litigation, and this is in 2017, the

4   going rate in Florida was -- I think I believe she said it was

5   40%, and she was awarding 35% of the fund.  We, of course, are

6   requesting here 27% of the fund.  And so we squarely come within

7   what has been approved by the Eleventh Circuit, as she said up

8   to 35% or perhaps more has been approved.  We are squarely

9   within the amount that both the Eleventh Circuit has said is

10   appropriate, and also what Judge Cooke has noted as appropriate.

11        THE COURT:  What was the name of the case, Ms. Geer,

12   that you --

13        MS. GEER:  Fernandez.

14        THE COURT:  Fernandez?

15        MS. GEER:  Yes.  We cite it on Page 15 of our motion

16   for final approval.  It is 2017 Westlaw 7798110.  And where

17   she's talking about -- she starts talking about this at Page 4,

18   the Westlaw Page 4, and at that place she says courts within the

19   circuit have routinely awarded fees of 33% or more of the gross

20   settlement fund.  And then she has, at page -- where she's

21   talking about the market rate is also at Page 4.

22        And the last point that I think she makes that's

23   relevant here in that opinion is she also had in that settlement

24   a clear sailing provision.  She didn't call it a clear sailing

25   provision, but that's what it was.  There was agreement not to

1  -- by defense counsel to oppose the fees, and she specifically

2  -- you know, she had no problem with that.  And, you know, that

3  makes sense because the Eleventh Circuit in the *Waters* case,

4  *Waters versus International Precious Metals* at 190 F.3d 1291,

5  1291 and it's 1293, footnote four, said clear sailing provisions

6  are reasonable because, quote, the defendants want to know their

7  total maximum exposure and the plaintiffs do not want to be

8  sandbagged, end quote.

9         So we would respectfully request that the Court approve

10  the fees that we have requested.

11         Then the last issue is --

12         THE COURT:  Let me interrupt you for just one minute.

13  You were talking to me about the *Fernandez* case and the various

14  percentages, and you said here in this case we're asking for,

15  and I wrote down a number but I'm not 100% sure that I heard you

16  correctly.  Did you say it was here you're requesting 27% of the

17  fund?

18         MS. GEER:  Yes, I believe that's right.  Because you

19  look -- it's a constructive common fund.  So you take the 8

20  million and add the $2.9 million for $10.9 million, and then you

21  would -- the relevant percentage is what percentage of the $10.9

22  million is the $2.9 million.

23         And then the last issue on that motion, our motion for

24  approval and for fees, is the service awards which is, we all

25  know, complicated right now as we wait to find out what the

1    Eleventh Circuit will do.  We've requested that the Court

2    reserve jurisdiction.  Another alternative would be to direct --

3    one court has done this in the *Harvey versus Hamill Kaplan* case

4    in the Middle District of Florida, direct the Defendant to

5    deposit service awards into a registry of the court to be held

6    until the Eleventh Circuit's issuance of a mandate in *Johnson*,

7    and then another alternative would be to allow the Plaintiff to

8    petition for service awards at a later date.  And that happened

9    in another case in the Middle District of Florida in *Shark*.

10          But you know, Your Honor, we believe that this

11   settlement and the fees that we are -- that the settlement

12   itself is fair, reasonable and adequate.  We ask that the Court

13   find that the settlement is fair, reasonable and adequate.  And

14   it is clear from the reaction of the class with no objections

15   that they resoundingly agree.

16          We also ask the Court to approve our request for

17   attorney's fees and expenses, it's combined together in the

18   amount of $2.9 million.

19          And I'm happy to respond, to answer any questions that

20   you may have.

21          THE COURT:  Good.  Because I have a few.

22          MS. GEER:  I expected.

23          THE COURT:  Well I could have allowed Mr. Biderman to

24   speak next.  Is it Biderman or Biderman?  Microphone please.

25   Microphone.

1        MR. BIDERMAN:  It's Biderman.  Thank you for asking,

2   Your Honor.

3        THE COURT:  Okay.  It's like the old joke.  One of the

4   major movies here in the past 20 years, one of these action

5   figure movies is the Spider-Man series of movies.  And I said in

6   my family we call it Spitterman.

7        In any event, so Ms. Geer, you were talking about the

8   fact that in your view there's not here even one single real

9   Objector because in your view, Mr. Frank is not a real Objector.

10  And I know there's a motion filed which is still pending

11  concerning his status and whether he has standing.

12        So in terms of him being a real Objector or not being a

13  real Objector, frequently parties and lawyers toss about the

14  term "a serial Objector", which is often used to refer to

15  somebody or a lawyer or somebody typically represented by the

16  same lawyer, who files objections, and some people view it as

17  green mail, and that it's basically an attempt to get bought off

18  and that somebody files an objection, not because he or she or

19  it has a bonafide objection, but because they expect the parties

20  to pay them a bunch of money to go away.  And sometimes they get

21  their objection resolved; i.e. they get paid at the trial level;

22  sometimes they file an objection, the objection is overruled,

23  the case goes up on appeal, they're the ones sometimes appealing

24  the approval, and then they get paid while the case is pending

25  on appeal.  But in any event, that's often what people refer to

1    by an Objector not proceeding in good faith.

2          Here we have the fact that Mr. Frank has represented as

3    an officer of the court that he's not doing this for financial

4    purposes, he will not take a settlement, he will not accept any

5    money, and he's doing it simply to promote the policy objectives

6    of his organization Class Action Fairness.  So what are your

7    comments about that?

8          MS. GEER:  Well Your Honor, we don't believe in, you

9    know, attacking -- well, when we say "serial" in our materials,

10   we're not intending that as a pejorative.  It is what he does

11   and he does it because he has, as you just said, policy

12   objectives.  And when I said he's not a real Objector, I think

13   to be more precise is that he purchased -- he purchased the

14   Neuriva in order to promote his policy objectives.  Whether or

15   not that means he ends up legally an Objector is one issue.

16         But the other issue is if the Court is looking at what

17   the reaction of the class is to this settlement, when getting

18   notice of this settlement, it is -- when we say he is not a real

19   Objector, his view is one driven by his own policy agenda and

20   objectives and is not driven by what the rest of the class's

21   perspective is, whether they think this is a fair and reasonable

22   settlement, you know, a settlement.  And so there is no member

23   of the class that is purely responding to the settlement based

24   on whether it is appropriate given what happened with respect to

25   Neuriva.

 1            There is only a single Objector who is an attorney who
 2    makes -- what he does for a living is challenge settlements.
 3    That is very -- I think it's very different from a true Objector
 4    who is objecting because they don't think that the settlement is
 5    adequate given what Defendants have done.  And I would clarify
 6    that when I say no real Objector, you know, there is no real
 7    Objector.  What I mean by that is there is no real class member.
 8    A class member that, you know, is a member of the class solely
 9    because they purchased Neuriva as opposed to wanting to advance
10    policy objectives.
11            MR. BEDNARZ:  Your Honor should I -- this is
12    Mr. Bednarz.  Should I hold until my sentence or can I present
13    on this a little bit?
14            THE COURT:  You cannot now present.  You're going to
15    have to just wait.  If you have a point that you want to make
16    and you don't want to forget it, maybe you can jot it down, but
17    right now I'm talking with Ms. Geer.  All right?  Thank you so
18    much.
19            MR. BEDNARZ:  Thank you.
20            MS. GEER:  I would say just, Your Honor, that how we
21    perceive the facts as set forth in the objection -- and Your
22    Honor, I don't understand, you're not the main face on the
23    screen anymore.  I have Mr. Bednarz.  But so --
24            THE COURT:  That's because the screen highlights the
25    last person who spoke.  Am I now in a more prominent position?

1      MS. GEER:  You are.  You are.  You would think I would

2  know that by now.

3      But basically from the -- what is laid out in the

4  objection, it appears to us that this objection has been

5  manufactured to achieve the policy objectives and not -- and is

6  not as a true member of the class.

7      THE COURT:  So it's interesting that you said to me

8  that in a mediation nothing is perfect.  I don't know if you

9  know this, but federal magistrate judges, at least here in our

10 district, frequently do mediations as the mediator.  So I've

11 probably mediated, gosh, in 11 years it's probably close to 400

12 cases.  And in those mediations, I always tell the parties that

13 I can always tell when there's a good settlement reached at a

14 mediation because everybody leaves miserable.  That's the test.

15     MS. GEER:  That's right.

16     THE COURT:  But in any event, let's just talk a little

17 bit more about the injunctive relief.  And we spent a lot of

18 time today, and also in the memoranda talking about the

19 difference between "scientifically proven", "clinically proven"

20 and "scientifically tested" or "clinically tested."  And that's

21 what I asked you folks to brief.

22     But what about this additional point?  In the

23 settlement agreement, under Roman Numeral IV(a), injunctive

24 relief, it designates what the Defendant must do with its

25 labeling and marketing references, and it says references to

1   "clinically proven" on the Neuriva product labels shall be

2   changed to "clinically tested", or similar language such as

3   clinical studies have, quote, shown, closed quote.  So under

4   this settlement agreement, Neuriva would be able to have their

5   label saying "scientifically tested" or "clinically tested" or

6   "clinical studies have shown", and presumably there would be

7   something after that.  "Clinical studies have shown" something,

8   okay.

9       So in your view, if Neuriva were to, in compliance with

10  the settlement agreement, have labels which said "clinical

11  studies have shown" something, would that still be providing

12  tangible injunctive relief?  I already know your position on

13  "clinically tested" or "scientifically tested" because you've

14  briefed that, but what about this other possibility involving

15  "clinical studies have shown?"

16      MS. GEER:  Yes, Your Honor.  The "clinically shown" is

17  -- the reason we agreed to it is for very similar reasons to the

18  "clinically tested", and that is it is the way it is treated

19  when you're in litigation and are arguing that the statement

20  that you know something is clinically shown, we - again we are

21  not allowed to argue -- we have to argue that that is actually

22  false, and we would only be able to get injunctive relief

23  requiring them to remove "clinically shown" just as with

24  "clinically tested" by showing that the statements that it was

25  something that was "clinically shown" was actually false.  And

1   in this instance, there are arguments, we believe that if we

2   continue to litigate and went down the road, hopefully we would

3   prevail, but that there are arguments to be made that in fact

4   some of their -- that their ingredients have been clinically

5   shown to do, you know, various of the things that are on their

6   labels.

7            So that while yes, we are not happy with agreeing to

8   "clinically shown", we don't -- it falls into the category of

9   exactly what you were just discussing which is yeah, we're not

10  real happy about that in mediation, but still it is -- we

11  sincerely view that "clinically shown" as being a less powerful

12  statement than "proven."

13           THE COURT:  So basically if you had your druthers, you

14  would want the Defendant to not be able to say on the label

15  "clinically shown", but given the nature of settlements which

16  involve concessions and compromise, in your view "clinically

17  shown" is not as bad as "clinically proven."

18           MS. GEER:  That is correct.

19           THE COURT:  All right.  Anything further that you would

20  like to add right now?

21           MS. GEER:  No, Your Honor.  I stand ready to answer any

22  other questions.

23           THE COURT:  Perhaps I'll have some later.  We'll see.

24           Let me hear next from the defense.

25           MR. BIDERMAN:  Thank you, Your Honor.  David Biderman

1    on behalf of the defense.  Thanks also for the comments about

2    the quality of the writing.  I wanted to show you that yours

3    truly had nothing to do with that, that there was the team that

4    you see that you're witnessing here as well as one

5    (unintelligible) member.

6         THE COURT:  You know, it's funny because sometimes I'll

7    read, let's say, an article in a legal magazine and it will be a

8    particular topic by law firm big-shot partner, and then there

9    will be a little footnote and the bottom of the footnote will

10   say something like this:  Big-shot partner would like to

11   acknowledge the help of the following associates, and then they

12   list three or four associates, so we know what that means.  That

13   article was researched and written by those associates, and the

14   big-shot partner reviewed it and said yeah, you can put my name

15   on it.  So thank you for acknowledging what I suspected that

16   other people did a lot of the work.  I am sure that you reviewed

17   it and edited and strategized with your associates and

18   supervised the whole process, but I had a feeling that others

19   were, I was about to say, putting pen to paper, but we don't put

20   pen to paper anymore, finger to keyboard.

21        MR. BIDERMAN:  Thank you, Your Honor.  Thank you also

22   for at least acknowledging or suggesting I had some involvement

23   in this.

24        And then also Your Honor, I did want to make a point

25   that Your Honor made a comment about the quality of the briefs

1   over the years.  And I've been doing this, better or worse, 40

2   years, and I did want to note that I think while difficult for

3   us and, frankly prompted we think unnecessarily by an 11th hour

4   Objector who is trying to make us rewrite an agreement that we

5   worked very, very, very hard to reach, but nonetheless, I did

6   want to acknowledge that this Court is one of the most engaged

7   courts I've encountered over the course of that time period, and

8   so it's good to have.

9          THE COURT:  Well, thank you for that.  Let me just

10  quickly respond for the benefit of my law clerk who is on the

11  call, Daniel Walsh.  Daniel has been a lawyer for many years,

12  but he recently moved over here from the local state attorney's

13  office to working with me here.  So Daniel, what you just heard

14  from Mr. Biderman is a classic illustration of what we call in

15  the law "sucking up".  So thank you for the sucking up comments.

16  Appreciate that.

17         MR. BIDERMAN:  Well, it was not intended to be sucking

18  up, but I did want to lead to a conclusion, Your Honor, and the

19  conclusion was that as difficult and as many late nights as

20  those inquiries generated, I do think the result has been a

21  very, very robust record that supports the fairness of this

22  settlement.  If there was any doubt whatsoever about whether

23  this settlement was fair to the class, whether the injunctive

24  relief is meaningful, all of that, all of those questions have

25  been answered as a result of the inquiries from the Court.  And

1    so I did want to -- while sucking up, I did want to basically

2    reach the ultimate point which is I think the record here really

3    establishes that fully that this is a fair settlement.

4         THE COURT:  I mean, listen, you could have sucked up

5    more.  You could say, Judge, in my 35 years of practice never,

6    never, sir, have I seen a federal magistrate judge with more

7    penetrating insight.  I mean, you could have done that.  You

8    could have made a comment about my looks; you could have said my

9    gosh, Judge, you're 65, you don't look a day over 50; you could

10   have done all of those things.  But you were judicial, judicious

11   and a good use of discretion in not going completely over the

12   top.

13        But listen, let's get to the actual legal argument

14   here.

15        MR. BIDERMAN:  Okay.  I will.  I did want to preface

16   that because I think the fact that we have a strong record

17   really is important to that when the Court looks at this.

18        So Your Honor, I don't want to repeat things that you

19   read before, but, you know, we do make three products; Neuriva

20   Original, Neuriva Plus Vitamins, Neuriva Distress, and all of

21   these products have ingredients where there is very significant

22   medical substantiation, and that is in the form of clinical

23   studies, peer review, randomized trial studies, and they support

24   each one of the ingredient's efficacy.  And we think we've

25   provided that information to the Court through the submission of

1  Dr. Small.

2        But I did want to make that point because in part I

3  think it's what distinguishes the settlement we reached here

4  which is, I believe, much stronger than the settlement that the

5  Court approved in the *Prevagen* case, because we did have

6  substantial substantiation.  In *Prevagen*, my understanding was

7  there was one in-house clinical study where there was basically

8  a concern that there was no distinction between the placebo and

9  the test, and that was what was relied upon.  So we are in a

10  very different place, and so I think that the relief that we've

11  provided going from "proven" to "tested", not only that, but

12  also making clear that that "proven" to "tested" applies only to

13  the ingredients, not to the product as a whole.

14        And then finally, there's another provision, Your

15  Honor, that which I don't think we've spoken about, but it's one

16  that was, you know, at risk of -- not going to talk about the

17  mediation, but it was one that was negotiated obviously, and

18  that provision basically says if we ever want to go back to

19  using that word "proven", we've got to provide the

20  substantiation to these Plaintiffs' counsel.  Give them six

21  months to look at it and come back to this Court if they don't

22  like it. And that basically puts us under the supervision of

23  them for the duration of the injunction, Your Honor.  And that

24  is a very, very significant point that I really don't think has

25  been raised, but it was a significant concession on our part on

1    top of the other concessions that we made.

2             I just wanted to also add, you know, *Prevagen* was

3    subject to FTC.  It was being challenged by the FDA as not being

4    properly drugged, it was being challenged by the New York

5    Attorney General.  We're not in that situation.  So again, not

6    trying to link the two, but I did want to make the fact known

7    that, you know, we looked obviously at the *Prevagen* settlement

8    because these lawsuits, which I won't describe as copycat, but

9    they were very similar to the lawsuits brought in the *Prevagen*

10   case, they landed on our doorstep literally, as Ms. Geer said,

11   within months of us introducing the product but at the very same

12   time that this *Prevagen* settlement was made and approved, and

13   that was obviously in the back of everyone's minds when we were

14   trying to settle this.

15            THE COURT:  So you're taking me on a stroll down memory

16   lane with the *Prevagen* case.  I think the study there was --

17   might have been called the Madison study, if I'm not mistaken.

18            MR. BIDERMAN:  That's right.  That's right.  I believe

19   that's correct, Your Honor.  And again, we have -- well, you've

20   seen the litany of studies we have.  I'm not going to walk the

21   Court through them because I'm certain it's more than we have

22   enough time for.

23            But I did want to make the point that again, the

24   injunctive relief that we provided eliminating "proven",

25   applying only to the products, giving the Plaintiffs' counsel

1    basically supervisory or equal rights over our labeling in terms

2    of going back to "proven" is a very significant concession on

3    our part, and is a very significant benefit to the class.  So I

4    can talk further about the substantiation if the Court would

5    like to hear about it.  You know, again, it's a randomized,

6    double-blind, placebo-controlled test of each one of the

7    ingredients.  We've supplied those tests to you, we've also

8    supplied the only -- and I want to emphasize, Your Honor, it's

9    the only medical expert in this case on the record and that is

10   Dr. Small who is basically, he's a brain doctor, he's a -- he

11   specializes in cognitive health.  He's board certified in

12   psychiatry, and he testifies that basically the studies that we

13   have are not only well-developed, well-executed, well-designed

14   studies, but also that they support the claims.

15         THE COURT:  Can you get a little closer to your

16   microphone please?

17         MR. BIDERMAN:  I will, Your Honor.  I have to -- my

18   notes here.  Thank you.  He emphasizes that (unintelligible) the

19   claims.  And I did want to make that point that there's no other

20   medical evidence in the record on that subject.  So that's with

21   respect to, you know, basically the substantiation.  We can go

22   through it further if the Court would like to, I could answer

23   any questions you have, but basically the stack of studies that

24   we supplied to the Court on substantiation, we think,

25   well-establishes that the product does what it says it does.

1    And then finally I did want to make the point that
2    while the Objector takes some shots at our studies basically
3    saying well, it doesn't test the product as a whole; well, we've
4    addressed that by making clear that our claim addresses only the
5    ingredients.  But they haven't set forth a single study that
6    suggests that our product doesn't function well.  There's one
7    study that basically dealt with disease, not with health, not
8    with structure function, and no other studies have been set
9    forth.  I did want to point that out also, Your Honor.  It's
10   really just -- there's a paucity of evidence that would
11   contradict the substantiation that we've provided to Your Honor.
12       On the injunctive relief, again, I don't want to repeat
13   what we have in our briefing, but I did want to make the point
14   that we did change it to make sure it applies only to the
15   ingredients.  We talked about "tested."  Your Honor, you know,
16   we're here in California.  We've got all kind of restrictions
17   about what you can do and what you can't do in restaurants here,
18   and nobody in California is going to go into a restaurant by
19   saying "I've been tested for COVID."  They're going to have to
20   show the proven results of the test, and that's the difference
21   between "tested" and "proven."  I couldn't be talking to you
22   here as a lawyer if I said oh, by the way, Your Honor, I took
23   the Bar test, I'd have to prove that I passed the Bar test, and
24   that is a fundamental distinction that really is hard to ignore,
25   Your Honor.  And it's so fundamental that really I think the

1   only way there's any suggestion that consumers aren't going to

2   -- that that's not meaningful to consumers is that somehow the

3   consumers won't read it.  I did want to point that out.

4          The second thing I wanted to point out, Your Honor, is

5   there was a number of NAD cases cited -- none of the NAD cases

6   cited by the Objectors dealt with the distinction between

7   "proven" and "tested."  The only one that did is Exhibit A to

8   our brief, the supplemental brief we recently filed which

9   basically is an NAD decision involving *Living Essential* matter,

10  and this is what the NAD said.  They changed from "clinically

11  proven" to "clinically tested", and the NAD stated that is

12  necessary and proper to avoid overstating scientific findings,

13  end of quote, Your Honor.  That's in that NAD decision.

14         And what's more, Your Honor asked about "shown" and

15  this is what the same decision said about "shown."  The NAD

16  approved the change from "clinically tested" and "proven" to

17  "clinically tested" and "shown" in this *Living Essential* matter.

18  And again, the NAD said that is necessary and proper to avoid

19  overstating scientific findings.  So the NAD itself, Your Honor,

20  recognizes the distinction between proven and shown and we can

21  talk about that a little bit further later if we could.

22         And again, I think it's fundamental that our own

23  research -- you know, I can hold this notebook before Your

24  Honor.  Our own research, we did research like 35 different

25  claims, you know, and there were five -- you know, there was a

1   top five, sort of like, you know, the top five, the top five

2   hits, whatever.  But among the top five, number three in the top

3   five was "clinically proven".  And you don't think we want to

4   use that claim because it's in the top five?  We sure do, Your

5   Honor.  But we're agreeing not to do it as part of this

6   settlement.  "Clinically tested" is not in this top five.  I'm

7   going to get to Page 5, it has a report which is an exhibit to

8   the declarations we submitted in connection with our recent

9   brief.  And again, with respect to brain health, the study

10  looked and said what's most important to consumers.  And the

11  thing that's most important to consumers was efficacy.  Does it

12  work.  And with respect to brain health, efficacy, there was a

13  statistical significance, a difference between "clinically

14  proven" and "clinically tested."  "Clinically proven" was shown

15  to be above the average by a statistically significant amount.

16  "Clinically proven" was shown to be below.  And that's with

17  respect to brain health.  And that's the relevant test because I

18  think as our expert makes clear, and I'll talk a little bit

19  further about our expert, you have to look at the context in

20  which claims are being made, and it varies depending upon, you

21  know, the particular treatment that you're having or the

22  particular improvements that you're seeking in your health.

23       And then just to talk quickly about our expert and

24  again, we have one expert on communications before Your Honor.

25  There is no other expert that's been submitted by the Objectors.

1    Nothing submitted by the Objectors at all.

2          In terms of expert testimony --

3          THE COURT:  By the way, you used the term Objectors,

4    plural.

5          MR. BIDERMAN:  Pardon me.

6          THE COURT:  It's a single Objector.

7          MR. BIDERMAN:  You're right, Your Honor.  I linked TINA

8    inadvertently with the Objector, so I apologize.  I'm not sure

9    how to phrase TINA's status.

10         THE COURT:  Amicus.

11         MR. BIDERMAN:  Amicus?  Okay.  That's fair.  Again,

12   neither TINA nor the Objector has submitted any expert on

13   communications.  We found -- and it was on short notice, we were

14   fortunate to find it, we found Dr. Punam Keller who is the

15   chaired professor of marketing at Dartmouth.  Her expertise is

16   in health communications.  That's what she does, Your Honor.

17   And she doesn't do it for lightweights, she does it for the CDC,

18   she does it for the National Institute of Health.  And because I

19   think the Amicus submitted some information about the

20   perceptions of the elderly, and she also worked -- does work for

21   the National Institute of Aging.  So she works for all three of

22   those basically nonprofit or government-related organizations,

23   as well as many others, but she looked at the specifics of the

24   communication here.  She didn't generalize.  She looked at the

25   product, she looked at the message, and she looked at the

1    consumers of the product and -- because all of those things

2    determine how perceptions are made.  And in terms of looking at

3    the consumers, she basically concluded correctly that the

4    consumers of this product are more affluent, they're more

5    educated, they pay a lot more than the typical supplement

6    purchaser.  These products average about $30 per bottle.  And

7    the point is that this group is highly attuned to their health

8    and they focus on health issues.

9              And Your Honor made a reference to your wife, I'll make

10   a reference to mine.  I cannot go to a restaurant with my wife

11   without her asking for some special order of the health, the --

12   you know, without the oil, without this, without that, because

13   she fit that demographic perfectly, for better or for worse.

14   And I think that's a true characterization of that demographic.

15   It's very concerned with its own health.

16             And also, the point is that they're also more

17   interested in treatment rather than prevention.  I'm sorry.

18   Prevention rather than treatment.  Because we're talking about

19   prevention issues, not treatment.  And that area of

20   communication, that particular line of communication talking

21   about prevention is something that that particular demographic

22   focuses on because they want to prevent themselves from getting

23   hurt.

24             And I'll just mention one -- I don't mean to jump

25   around, but in terms of what that demographic is not

1    particularly interested in is global warming.  And the reason

2    they're not particularly interested in global warming is because

3    they figure that by the time global warming has any significant

4    effect, I'm going to be long gone.  And one of the studies that

5    the Amicus submitted was basically on the elderly's perception

6    of global warming, and are they worried about global warming and

7    they found perhaps that the younger people are more worried

8    about global warming than the elderly, and that's probably not a

9    surprise.

10            And then the other point that I think is most

11   significant is, as Dr. Keller concluded, the consumers here,

12   they're not just simply looking at a bottle at a retail shelf in

13   a drugstore.  They're looking at -- basically they're getting

14   notice from a class action administrator.  Your Honor has

15   requested a lot of information about the class action

16   administrator, but that notice to the class had 80% reach

17   specifically identified for the consumers, prospective or

18   current consumers of the product, that the injunctive relief

19   that was to be given, the injunctive relief was described in the

20   short-form notice, it was described in the long-form notice, it

21   was described in the FAQs, on the website, the settlement

22   website.  So it's not as if we're just making a change on the

23   bottle and shipping the bottle out.  We're giving everybody

24   notice that we're making a change.  So that too enhances the

25   fact that this is going to be a meaningful change for the class.

```
 1          And then finally Your Honor, I know you're probably
 2   tired of looking at bottles here, but I did want to point out
 3   that the language that we're talking about, it's not some
 4   obscure language that's in the back of the supplement facts.
 5   It's right there at the very top of the package where the
 6   consumer could see it.  We've got (unintelligible) settlement
 7   agreement, Your Honor, but it's right there at the top.  That's
 8   where it said "clinically proven" and where we're going to
 9   change it to "clinically tested."  Not willingly, but as a
10   result of our desire to get out of these lawsuits.
11          And again, Ms. Geer did emphasize it but, you know, we
12   saw what Prevagen went through, we saw that they went through
13   years and years and years of litigation and trial and frankly,
14   we think our product is far well-more substantiated and that we
15   have a very strong defense, but we didn't want to go down that
16   road if we can avoid it with a fair settlement and that was --
17   and we don't want to burden this Court.  We could be here for a
18   long time, but we tried to basically avoid the litigation.  We
19   had five separate sets of lawyers suing us in New York,
20   California, Florida, and there were -- that basically there were
21   threats that if we didn't resolve the case there would be
22   lawsuits elsewhere and there typically would be in Chicago, et
23   cetera.  So we tried to -- that was a big factor in our decision
24   to try to resolve the matter.
25          That's basically what I had to say about the
```

1   substantiation.  I can distinguish the authorities submitted by

2   the Amicus.  None of the NAD cases the Amicus submitted,

3   although they say the NAD makes the distinction, the only

4   evidence that the NAD makes the distinction is the case that we

5   cited.  None of the cases that -- the NAD cases that they

6   submitted address whether there was a meaningful difference

7   between "clinically proven" and "clinically tested."  They

8   submitted an e-mail from somebody at the FTC, and I just wanted

9   to note, Your Honor, that every communication that that

10  gentleman has to -- outside of the context that is the

11  government, he has the following disclaimer, and with -- this

12  disclaimer is on a PowerPoint presentation we found which we'll

13  be glad to give the Court the PowerPoint presentation.  But

14  basically the disclaimer is:  My comments reflect my own views

15  and do not necessarily reflect the commission or any individual

16  commissioner.  That's Page 2 of the PowerPoint which we

17  (unintelligible) and here's the printout of it.  The lighting is

18  terrible.

19          THE COURT:  That's a standard disclaimer that any

20  government employee gives at any seminar, webinar, workshop,

21  convention.  I mean, I've been to dozens of seminars over the

22  years where you have a government official on the panel and

23  before they say word one, they give that disclaimer.

24          MR. BIDERMAN:  Yeah.  And that disclaimer was not in

25  the e-mail.  But Your Honor, you got to believe that that same

1   disclaimer would cover a stray e-mail that's not issued through

2   notice and comment and the appropriate administrative

3   procedures.

4         THE COURT:  The point that you just made before that,

5   you said none of the NAD cases discuss, and then I didn't catch

6   the last part of what you said.

7         MR. BIDERMAN:  Pardon me.  I'm sorry if I'm not

8   speaking up.  None of those cited by the Amicus address whether

9   there is a meaningful difference between "clinically proven" and

10  "clinically tested."  There's one on weight loss, there's one

11  that basically they're cases where the NAD determines there has

12  to be some substantiation.  The two FTC decisions that were

13  submitted by the Amicus, *In The Matter of Porter and Dietsch*,

14  D-I-E-T-S-C-H, *In The Matter of Bristol-Myers*, neither of those

15  FTC decisions are relevant.  Neither of those discuss the

16  distinction between "clinically proven" and "clinically tested,"

17  they basically say you have to have substantiation with

18  competent scientific proof.  And again, that's -- there's a

19  statement from the ABA, and that's the same Your Honor.  So

20  that's with respect to the effectiveness of the injunction, Your

21  Honor.

22         Your Honor asked about "shown," of course that wasn't

23  raised until the 11th hour yesterday.  I'm not suggesting that

24  it's improper for us to discuss it because we should, but

25  "shown" does not have the same kind of scientific strength as

1   "proven."  If you look at the definition of "shown," it

2   basically says to cause or allow to be seen, exhibit, display,

3   to present or perform as a public entertainment.  This is from

4   the college English dictionary, Your Honor.  He showed what he

5   meant.  It's typically about showing emotions, it's not like

6   "proven" where you suggest probabilities.  It's more like

7   Mr. Frank has shown that he's unhappy with the settlement.  It's

8   not the same.  It doesn't have the same mathematical certainty.

9       Just let me look at the notes here.  Oh, yeah.  And --

10   well, as the dictionary points out, look at horse races, Your

11   Honor.  Win, place or shown.  Shown is third place there.  And

12   that too is relevant.  It doesn't have the aura of sort of

13   scientific testing and precision that "clinically proven" has.

14   I mean, proof is different than show, and I do believe that's

15   the case and that's why we do not believe it's a meaningful

16   difference.  And that's what the NAD said in the decision that

17   we've cited where basically they stated that a change from

18   "proven" to "shown" was an effective change on behalf of the

19   consumers in terms of clarifying the strength of the scientific

20   evidence.  And that's again Exhibit 1 to our document.

21       Your Honor, I don't think I have anything further to

22   talk about.  As I said, there were some articles on aging that

23   were submitted by the Amicus at the last minute.  One involved

24   drug costs.  It omitted the full quote from the article.  It

25   suggests the OG, the older population, relies more on the gist

1    of presented information.  The exact quote, Your Honor, on Page

2    1 is older populations rely more on heuristic processing,

3    meaning things that they've learned over time, and tend to focus

4    more on the gist of presented information.  So basically they

5    misstated the conclusion of the article to Your Honor.  And as I

6    said, one article correlated the global warming.  And the third

7    is basically a general article that tries to set forth the model

8    for evaluating -- it doesn't reach any conclusions, but the one

9    thing it says is simple language is better and simple language

10   is clearly what we're using here if we're using "tested" versus

11   "proven."

12          So again, we think we've made a meaningful concession,

13   Your Honor.  We think that there's been nothing submitted to

14   Your Honor in terms of -- with evidentiary value in terms of

15   expert science on communications, expert science on

16   substantiation.  Nothing has been submitted to this Court in any

17   form other than what we have submitted to Your Honor.

18          And with that, I'll be glad to answer any questions.

19          THE COURT:  Thank you.  Mr. Bednarz, let's talk about

20   your situation first.  By the way, let's make sure that your

21   phone is on so I can hear you.

22          MR. BEDNARZ:  Yes, Your Honor.  This is Frank Bednarz

23   for the Objector.

24          THE COURT:  Thank you.  Mr. Bednarz, are you a member

25   of our Southern District Bar down here, or otherwise admitted

1    *pro hac vice*?

2              MR. BEDNARZ:  I am admitted *pro hac vice*, Your Honor.

3              THE COURT:  All right.  Thank you for that.

4              And you're here representing the Objector, Mr. Frank?

5              MR. BEDNARZ:  Yes.

6              THE COURT:  So here's the procedural dilemma that we're

7    in.  Mr. Frank, through you, has made certain submissions,

8    memoranda of law, a declaration, exhibits.  There's a motion to

9    basically strike him or exclude him or demonstrate that nothing

10   he says should be considered because he has a lack of standing.

11   But the response to that motion is not yet due.  The briefing

12   schedule that I provided has not yet ripened, so the issue

13   technically is not ripe for a ruling.

14             So let me tell you what I propose to do, and then I'll

15   hear your thoughts and then the thoughts of Ms. Geer and

16   Mr. Biderman.  What I'm basically thinking of doing is

17   permitting you to speak provisionally; in other words, by

18   letting you speak, I'm not necessarily saying that your client

19   has standing or that I will, in fact, consider your comments.

20   It's simply a recognition of the practical reality, namely

21   you're here, you filed papers, Mr. Frank has filed papers and a

22   declaration, and I have not yet entered a ruling on the motion

23   to strike him or entered a ruling on his standing.  So I'll

24   basically take it subject to a later ruling.

25             How does that sound to you, Mr. Bednarz?

1    MR. BEDNARZ:  Your Honor, we will be filing our

2    response.

3          THE COURT:  I can't hear you.

4          MR. BEDNARZ:  I would like to present on that a little

5    --

6          THE COURT:  Sir, can you hold --

7          MR. BEDNARZ:  We'll be presenting a little bit that we

8    do have standing, Your Honor.  The entire motion to strike is

9    premised on the lazy assumption that our client committed

10   perjury.  There is no support for it in the record, the record

11   -- so Your Honor, we can support this.

12         THE COURT:  So what happens, Mr. Bednarz, is I think

13   when you turn your head to the side a little bit, it's not

14   picking up the audio.  So maybe once every 5th word I'm not

15   hearing.

16         So I guess let me sharpen my question.  What is your

17   response to my procedural suggestion that I permit you to speak

18   now subject to a later ruling on the motion to exclude your

19   client and to determine that he lacks standing?  Are you okay

20   with that or if not, what's your other suggestion?

21         MR. BEDNARZ:  We support that, Your Honor.

22         THE COURT:  Ms. Geer, what are your thoughts about my

23   procedural suggestion?

24         MS. GEER:  We're fine with that, Your Honor, because I

25   assume you'll allow us to respond.

```
1              THE COURT:  Mr. Biderman?

2              MR. BIDERMAN:  Yes, Your Honor.  Makes a lot of sense.

3    Thank you.

4              THE COURT:  All right.  So with that understanding

5    Mr. Bednarz, as the saying goes, I'm all ears.

6              MR. BEDNARZ:  Your Honor, our client does have

7    standing.  The only record evidence shows that he purchased the

8    product for personal consumption, not even personal use.

9              Your Honor, as our supplemental declaration will show,

10   he purchased a product before he even knew that this case had

11   settled.  No attorney had even looked at a single filing for

12   this case for three weeks.  So in the first place, the

13   Defendants' motion is based on an assumption of perjury, and

14   it's quite astonishing to me that they say this with so little

15   factual support.  Not only that, but all of the arguments are

16   legally unsupported.  It's the Defendants that are seeking the

17   jurisdiction of the Court here by having the settlement approved

18   that will waive the claims against absent class members like

19   Mr. Frank, but all of the absent class members.  They need the

20   jurisdiction, not us, and they're the ones asking the Court for

21   the jurisdiction.  And the Objector to the jurisdiction -- to

22   waive our client's claims, to waive my client's claims.  So not

23   only is it factually unsupported, and quite astonishing that so

24   many attorneys sign their signature to filings that contain just

25   a false assumption based on any -- as far as I can tell nothing,
```

1    but it also is legally meaningless because they defined the

2    definition of the class, the settling parties did, and none of

3    them can argue that being a purchaser of the product within the

4    claims period means that he's not a class.  Instead, they are

5    arguing for some sort of novel extension, and they cite no

6    examples of any court doing that when there's a bad faith

7    exception.

8            Not only do they assume bad faith which is unwarranted,

9    given that my client is an attorney and knows the meaning of

10   signing things under the penalty of perjury, but also that

11   having assumed the bad faith they argue there should be a bad

12   faith exception to being class members.  The only case that the

13   Defendant cited where a court had done anything like forbid an

14   attorney from presenting was the *Trump* case, and that's an

15   astonishing thing also because that case was reversed by the

16   Ninth Circuit.

17           Your Honor, I just want to start out by saying that the

18   motion to strike is astonishingly frivolous, and we will be

19   filing an opposition to it.  And honestly, we are also

20   considering moving for sanctions.  If the Defendant, Defendants,

21   believed that my client had committed perjury, I would

22   appreciate if they could have asked for clarification of that

23   because his declaration, I don't think, is ambiguous about the

24   point of him being a class member.

25           THE COURT:  Let me just follow up on a point you just

1  made.  I want to make sure that I understand.  Are you saying to

2  me that in the motion challenging Mr. Frank's standing, that the

3  Defendants cited to a case which you called the *Trump* case,

4  which has been reversed and they did not disclose to me or the

5  Court that the case was reversed.  Is that what you're saying?

6          MR. BEDNARZ:  Yes, Your Honor.

7          THE COURT:  So just so I'm clear.

8          MR. BEDNARZ:  That's the --

9          THE COURT:  Tell me the name of the case that was

10 actually reversed.

11         MR. BEDNARZ:  It's *Low versus Trump University LLC*.

12         THE COURT:  Lowell?

13         MR. BEDNARZ:  Low, L-O-W.

14         THE COURT:  Okay.  *Low versus Trump University LLC*.

15 And on what page of the Defendants' motion is that?

16         MR. BEDNARZ:  Your Honor, hold on.

17         THE COURT:  Take your time.

18         MR. BEDNARZ:  Your Honor, I just realized it would

19 probably be faster for me to find this in the PDF.  Your Honor,

20 it's cited on Page 9 spanning over to ten, and this is Docket

21 Entry 86.

22         THE COURT:  Let me just get there.  Okay.  Okay.  Low,

23 all right.  So it's on pages nine and ten of the Defendants'

24 motion, which is ECF 86, and that is cited for the proposition

25 an Objector did not have aggrieved class member status to object

1    to settlement's opt-out provisions where modification of that

2    term would not benefit her.  And what is it, if you happen to

3    know it, the citation of the case reversing the district court

4    opinion?

5         MR. BEDNARZ:  Yes, Your Honor.  That's 881 F.3d 1111 at

6    1111, 17, and footnote three.

7         THE COURT:  What does the footnote say?

8         MR. BEDNARZ:  I'm sorry, Your Honor.  I don't have it

9    in front of me.  We will be filing this in our supplemental --

10   excuse me, in our response to the motion to strike but --

11        THE COURT:  All right.  Well then I can certainly wait

12   until you file that.

13        MR. BEDNARZ:  The objection.

14        THE COURT:  I'm not hearing you, sir.  Maybe it's

15   because you're tilting your head, but I lost the last two

16   sentences of what you were trying to say.

17        MR. BEDNARZ:  Your Honor, the Objector had standing.

18        THE COURT:  All right.  So the appellate court, which I

19   assume would be the Ninth Circuit because it's a Southern

20   District of California case, so the Ninth Circuit reversed the

21   ruling and said that the Objector did have standing.

22        MR. BEDNARZ:  Yes, Your Honor.  And the Court has asked

23   us to submit a more comprehensive list of different things that

24   courts might have been treated.  We will take a little while to

25   -- we will take until Monday to respond to all of those because

1    there's lots of cases where, for example, we represented an

2    Objector and the court said well, this particular argument you

3    don't have standing because you're in a different state.  Or

4    there was another case where we -- Objector and they filed their

5    objection late, and we were only representing them on appeal and

6    the appellate court said well, that's jurisdictional.  There are

7    different examples like that, but there's not a single case

8    where something like the Defendants' motion was filed and we

9    were not permitted to advance our objection.  And that's why the

10   Defendants don't have a case -- like that.

11          Also, the entire history of all of our objections is

12   available in the Frank declaration.  It's color-coded, it's one

13   of the requirements to the settlement that we disclosed all of

14   the settlements that where he was either represented or are

15   still Objectors.  And so the entire history of our work is laid

16   bare in that filing.  But we will, of course, be answering all

17   of the Court's specifics on that, and it will just take us a few

18   more days.  We had hoped to file the response to the motion to

19   strike before today.  But it's astonishing --

20          THE COURT:  So did you have anything further that you

21   wanted to say on the standing issue, or did you want to move

22   into the substance of the objection?

23          MR. BEDNARZ:  Your Honor, I can move -- objection.

24   It's, again, just astonishing to me that Defendants have

25   multiplied proceedings based on an assumption that my client

1    committed perjury.

2          But as for the objection itself, we are sensitive to

3    what the Plaintiffs have said that the settlement is a

4    compromise.  But the thing here is that the Plaintiffs'

5    attorneys did not compromise when it comes to their fees.

6    Whereas the class has -- with only indirect internet advertising

7    as notice, whereas we have cited examples in our objection,

8    other settlements, they had provided more direct notice by

9    subpoenaing different vendors that sell these products.  In this

10   case they were just left with an indirect notice process and

11   people can file claims online, but it's now very clear, based on

12   Plaintiff's declaration this morning, that the attorney's fees

13   will out strip the amount of actual class -- over.

14         THE COURT:  Sir, I'm missing many of the words that

15   you're saying.  I'm not a computer services technician, I don't

16   know exactly the reason for this glitch.  I don't know if it's

17   the angle of your head, if you're talking too fast, if you're

18   slightly pulling the phone away, but it's problematic for me.

19         MR. BEDNARZ:  Your Honor, I have never had this Zoom

20   before.  I'm very sorry that this has happened.  I'm wondering

21   if we could take a recess so I can reboot my computer and come

22   back?

23         THE COURT:  Well listen, I've found over the years that

24   whatever the computer problem is, turning it of the off and

25   turning it back on again works about half the time, that simple

1    of a solution.  So I'm happy to give the opportunity to turn off

2    your computer and reboot it in the hopes that you'll be able to

3    use the audio component of your computer rather than this

4    inadequate phone work-through.  I will not talk to any of the

5    other lawyers on this Zoom call until you appear again, either

6    solely through your computer or through the existing

7    arrangement.  We'll just wait for you to come back.  Maybe we'll

8    chitchat about some other topic having nothing to do with the

9    merits of the case.  But I'll give you two or three minutes to

10   go through that reboot process.

11          MR. BEDNARZ:  Thank you, Your Honor.  I'll be right

12   back, I hope.

13          THE COURT:  I hope so too.  All right.

14          So I always ask this question during a Zoom hearing.

15   Sometimes I can tell whether the lawyers are Zooming in from

16   their home or from their office, and it appears to me that the

17   only one Zooming in perhaps from the office is Mr. Hwang; is

18   that right, sir?  You're in your office?

19          MR. HWANG:  Yes, Your Honor, I am.  I've got a

20   two-year-old and a 10-month-old at home, so I thought it would

21   be prudent of me to do the hearing here in the office.

22          THE COURT:  And what city are you located in?

23          MR. HWANG:  Los Angeles.

24          THE COURT:  I've heard of it.  So you must have gotten

25   up pretty early this morning.

```
 1              MR. HWANG:  A little bit.  Not too early but, yeah,
 2         THE COURT:  Not necessarily because of this hearing.
 3    With a two-year-old child you may be getting up early anyway.
 4              MR. HWANG:  Correct.  That is true, Your Honor.
 5         THE COURT:  So but for this hearing, would you have
 6    been working today from home or you come into the office anyway?
 7              MR. HWANG:  I do both.  I've already -- I guess a lot
 8    of companies are going to the hybrid sort of model, and I've
 9    been doing that for quite a bit now.  So I come in maybe half
10    the week, and then try to be home and help out with the kids the
11    other half of the week.
12         THE COURT:  Mr. Biderman, I can't tell where you're
13    calling from.  I'm guessing home, because it looks like curtains
14    in back of you.  So I'm guessing that you're home, but maybe in
15    your office you have curtains.  I don't know.
16              MR. BIDERMAN:  Your Honor, I'm -- I reside in
17    California, but I'm in Philadelphia in a hotel in a conference
18    room that I asked for to make this appearance.  They even gave
19    me a podium, Your Honor, but I couldn't figure out how to use
20    the camera at the podium at the same time, so I got rid of it.
21         THE COURT:  I see.  All right.  And you just happened
22    to be in Philadelphia on business or that's where you normally
23    work out of?
24              MR. BIDERMAN:  No, Your Honor.  Kids as usual.  A
25    children-driven trip.  My daughter is starting Drexel
```

```
1    University.

2              THE COURT:  I see.  Well, congratulations for that.

3              MR. BIDERMAN:  I think so.  We'll see.

4              THE COURT:  Understood.  And everybody else is Zooming

5    in from home?  Actually, Ms. Akinaka, you have behind you the

6    law firm background, that faux background.  So you could either

7    be at home or in the office, but I'm going to go out on a limb

8    and guess that you're at home.

9              MS. AKINAKA:  I'm at home, and this would is my default

10   background, otherwise it would be just a white wall which I

11   suppose would have been fine too.  But I am at home.  I'm --

12   actually home is in Hawaii right now, I'm otherwise based out of

13   the LA office.

14             THE COURT:  Is that right?

15             MS. AKINAKA:  Yes.

16             THE COURT:  So interesting that you say that because

17   for the past several nights I've been watching this documentary

18   on HBO called the *100 Foot Wave*.  It's about big wave surfing.

19             MS. AKINAKA:  That sounds terrifying.

20             THE COURT:  My gosh, it is terrifying.  I get nervous

21   stepping out of a bath tub.  But in any event, the group of

22   leading big wave surfers, many of them live in Hawaii or surf

23   out of Hawaii, and there's this one area in Hawaii which is

24   probably has the biggest waves.  What's the name of that area?

25   Does that ring a bell?
```

1          MS. AKINAKA:  Jaws.

2          THE COURT:  Jaws.  That's exactly right.

3          MS. AKINAKA:  That's right where my husband grew up.

4    You can hear Jaws breaking by his parents' house.

5          THE COURT:  Right.  So that they have some pretty

6    massive waves there, but this particular documentary focuses on

7    this place in Portugal which supposedly has the largest waves in

8    the world, and they get up to, you know, 80, 90 feet which

9    basically when you're surfing on those waves, if you fall it's

10   like jumping off of an eight-story building into some water.

11         So in any event, I see Mr. Bednarz, your name appears

12   now, but I don't see your image nor do I see a microphone icon.

13   Are you there, sir?  Mr. Bednarz?

14         By the way, it's called Nazaré, Portugal is the name of

15   this big wave location.

16         Mr. Bednarz, are you there, sir?

17         As you can probably imagine, many of these big wave

18   surfers, when they fall, they take terrible spills and then they

19   have surgery.  They're doing -- it's crazy, and they're surfing

20   in these suits where they have all sorts of cushions and

21   padding, and they have this device where you have padding on you

22   with sort of like a gas-propelled inflater so that if you fall,

23   your suit will generate additional cushioning in order to

24   protect you from the pounding that you're going to get from the

25   waves.

1          So probably as an associate at your firm, you have no

2     free time to watch any recreational television whatsoever, but

3     if you ever do get a spare hour or two that you don't need to be

4     billing for, you might be able to watch the *100 Foot Wave*, which

5     I recommend.

6          MS. AKINAKA:  I'll have to remember that.

7          THE COURT:  Your husband is from Hawaii and is familiar

8     with Jaws, I think he would probably get a kick out of it.  Is

9     he a surfer as well?

10         MS. AKINAKA:  He is more so a spearfisherman, but he

11    has a surfing background.  His dad was actually quite big into

12    surfing.

13         THE COURT:  In this documentary they also have from

14    time to time some comments from this pretty well-known surfer

15    named Laird Hamilton who is also, I think, based out of Hawaii.

16    And then they have some women big wave surfers, one of whom is

17    from France, one is from Brazil, and they are just as fearless

18    as the other surfer.

19         MS. AKINAKA:  That's great.

20         THE COURT:  All right.  Mr. Bednarz, I now see you.

21    Are you on your computer, sir?

22         MR. BEDNARZ:  Well, I might be.  But it seems to have

23    frozen up, so the application on my computer is not working but

24    I'm optimistic that you can hear me on my phone.

25         THE COURT:  Well, I can hear you, sir, but you're

1   literally upside down.  So maybe you can turn that around.

2           MR. BEDNARZ:  Okay.

3           THE COURT:  Well, you're still upside down.  I have a

4   great view of your nostrils looking upwards.  Not a good look.

5   Gosh, for a second he flipped around, then he was sideways

6   momentarily.

7           All right.  Mr. Bednarz, you're now where you should be

8   visually.  How is it working out with the audio?  Your

9   microphone is on mute, that maybe has something to do with it.

10          MR. BEDNARZ:  It seems to be fine, assuming you can

11  hear me.

12          THE COURT:  I can hear you and you don't need to hold

13  up your phone.

14          MR. BEDNARZ:  Well, I mean, I am holding up my phone.

15          THE COURT:  You are.

16          MR. BEDNARZ:  Yeah.

17          THE COURT:  Oh.  Well, okay.  Well, you're not holding

18  it up in the same way that you were before because I don't see

19  it in the image.  It's not right up to the side of your face or

20  in front of your mouth.  But listen, so whatever works for you,

21  and this seems to be working.  Let's proceed and let's hope that

22  things remain the way they are without any further technical

23  glitches.

24          So you made a point a little while ago that you

25  appreciate and understand the fact that a settlement is a

1    compromise, but that the Plaintiff attorneys did not compromise

2    on their fees.  Let's pick it up from there.

3        MR. BEDNARZ:  Right.  And our issue with that is the

4    disproportion of the settlement.  There is relief available, but

5    it's been cordoned off and it's been allocated only for the

6    purpose of attorney's fees, and the Court can't fix this in any

7    way because it can reduce the fees, but it cannot give more to

8    class members even though the Defendant was clearly willing to

9    pay much more than the million dollars they're likely to pay in

10   claims.  And, you know, 3 million, almost $3 million for the

11   attorney's fees, which in this case, even given the billing

12   records we have which are just top level hours records, they're

13   not detailed billing, shows that it's well over twice the

14   lodestar.  So from the perspective of Plaintiffs' counsel who

15   negotiated the deal, it's not a compromise.  It's a compromise

16   for class members like Attorney Frank, and that's why he's

17   objecting.  This allocation makes the settlement untenable.

18       Ms. Geer mentioned that we don't take the common fund

19   approach, and that's incorrect.  On Page 25 of our objection, we

20   explain how we absolutely agree with the common fund approach.

21   The common fund though has to be reckoned against actual class

22   benefits, and in this case even under the most optimistic

23   scenarios the class benefits are maybe $1.1 million versus $2.9

24   million, so the settlement is upside down.  There's $4 million

25   of constructive common fund, more or less, given the optimistic

1   scenario, and 2.9 of it has been allocated solely toward

2   attorney's fees.  And if the Court were to attempt to correct

3   this by reducing the fee award, then the only beneficiary is the

4   Defendant because that's how the settlement was structured.  So

5   for example, if the Court would say well, let's only award 33%

6   of the actual class benefits and therefore the settlement would

7   result in maybe $350,000 attorney's fees, well that's just an

8   enormous windfall to the Defendant which agreed to pay a lot

9   more than that to get rid of these claims.  And that's the

10  hazard, it's what they call an agency problem with class action

11  settlements is that the people who are the beneficiaries are not

12  directly at the table.  They're relying on counsel.  And it's

13  not that the parties collude, it's just that oftentimes the

14  parties who are in the room when it happened, they can come up

15  with a mutually beneficial arrangement.  And again, no collusion

16  at all is necessary.  It's sometimes -- we refer to it as

17  self-dealing, but in this case the Plaintiffs' attorneys did not

18  compromise their own attorney's fees, but they did compromise

19  class claims.  And in fact, Ms. Geer, if I understood what she

20  responded to your question, reported that even "shown", which

21  the settlement expressly allows the labels to say, to say that

22  it's been "tested" and "shown," that if she had her druthers I

23  think Your Honor said, that that would be considered false.  But

24  it's a compromise, and that claim was compromised, but not the

25  attorney's fees.  And that's the reason that the entire

1    settlement should be rejected and sent back.

2            It's interesting --

3            THE COURT:  Wait, Mr. Bednarz.  Listen, I just had a

4    thought and at age 65, I don't really get thoughts very often so

5    I need to act upon them immediately.

6            So here's my thought.  My question.  I understand your

7    point that if I were to reduce the amount of the requested fees

8    and costs, in your view that would result only in a windfall to

9    the Defendants.  Now, just hypothetically speaking, because the

10   thought just popped into my mind right now, what if I were to be

11   sympathetic to some of your arguments, reduce the attorney's

12   fees and costs, let's say hypothetically, from $2.9 million to

13   $2 million.  And instead of giving the Defendants a $900,000

14   windfall, we simply add it to the money paid to the class

15   members who submitted valid claims on a prorata basis.  What

16   about that?

17           MR. BEDNARZ:  Well, the parties would have to agree to

18   that kind of modification of the settlement.  In principle a

19   modification like that might make the fees more proportional,

20   and we would be receptive toward it.  But of course then the

21   Plaintiffs' counsel would have to be receptive to reallocating

22   some of the funds to the class.  But absolutely, that's the kind

23   of solution that could make a settlement like this proportional.

24           And Your Honor, an example of a case where Mr. Frank

25   himself objected is the *Pierson* case, which I believe that we

1  cited in our objection.  But it was glucosamine, chondroitin

2  sulfate pills he takes because, by the way, he takes tons of

3  vitamins and supplements.  He buys all sorts of things hoping to

4  improve his mental alertness in particular.  And in that

5  settlement, the court instead approved it, it went up on appeal

6  and then it was rejected and the parties got together and made

7  basically exactly the same thing that you proposed.  They cut

8  the fees and increased their award to class members.  And if the

9  parties were to agree to do that directly, it would be a lot

10  more efficient than what happened in the *Pierson* case, and that

11  was the net result in that case.

12          THE COURT:  So what happened in the *Pierson* case?

13          MR. BEDNARZ:  Well again, Mr. Frank was the Objector.

14  The district court cut the fees, and the district court -- it

15  went on appeal, the Seventh Circuit reversed it.  The settlement

16  was vacated, the parties renegotiated.  They went back to the

17  table almost immediately because when there's a sum of money --

18  and our main objection is too much is in this bin and not enough

19  in that bin.  They agreed to shift some of the money over.  So

20  from the defendant's perspective, I'm not sure if the settlement

21  was much larger, but it was much more beneficial to the class

22  members and then it was the re-approved.

23          By the way, the settlement actually had an afterlife

24  after that because there were other Objectors who were

25  self-interested professional Objectors that then objected to the

 1   new settlement, which we didn't.  And then they appealed and
 2   then they dismissed their appeals and we said on information and
 3   belief you got paid off, and we discovered through the district
 4   court they did get paid off.  And we established a precedent
 5   last year in the Seventh Circuit on the same case and its
 6   afterlife that we could seek disgorgement from these
 7   self-interested Objectors for the benefit of class members.  And
 8   so I'm very proud of that case.  That's one of the things -- you
 9   know, we always get a little bit apprehensive about serial
10   Objectors because oftentimes people have a negative connotation
11   with it.  And I appreciate that Ms. Geer said that it's just
12   descriptive in this case.  But we are not like the ones that
13   want to get paid off, and that's one of the reasons that
14   Mr. Frank or others of us are so often Objectors ourselves is
15   because we can't get paid off.  If I were an Objector and I got
16   paid off then I would have to find a new job.  It's convenient
17   for us as an organization to advance objections that we think
18   will benefit class members that we tie ourselves to the ship
19   whereas when we represent other Objectors, twice in our history
20   we represented outside Objectors and on appeal they come up and
21   say well, what if I paid off your mortgage?  And then if you go
22   to tell the wife well, I got offered to pay off this mortgage
23   for this principle Objector objection that I have in this
24   whatever court, it turns out a lot of people will say yeah,
25   let's pay off the mortgage instead.

1            THE COURT:  So Mr. Bednarz, in this *Pierson* case when

2    the appellate court reversed, what was the basis of the

3    reversal?  Did the appellate court conclude that the attorney's

4    fees were too high?  Did the appellate court conclude that the

5    proceeds going to the class members was insufficient or some

6    other reason or some combination of reasons?

7            MR. BEDNARZ:  Yeah, it agreed with us that the

8    settlement was upside down, that it provided more in fees, and

9    also that the disclosures were not meaningfully valuable to

10   class members.  And so it's actually very similar to this case

11   right down to the fact that Ted Frank was an Objector and it's

12   because he buys all sorts of pills, because he does.  I don't

13   myself.  I don't understand people that are interested in that

14   kind of stuff, but that's how Ted Frank is.

15           THE COURT:  So the class -- so the appellate court in

16   *Pierson* reversed on a number of grounds, and then that caused

17   the parties to renegotiate.  And from what I hear you saying,

18   the renegotiation involved not just fees but other things as

19   well?

20           MR. BEDNARZ:  Well, it was primarily shifting the

21   amount that had been allocated toward fees under the original

22   settlement so that it --

23           THE COURT:  Toward payment of the claims so you're not

24   quite as upside down?

25           MR. BEDNARZ:  Exactly.

1          THE COURT:  Understood.

2          MR. BEDNARZ:  And Ms. Geer mentioned that we're not

3     looking at Eleventh Circuit case law supposedly, but our view is

4     that the Eleventh Circuit hasn't contradicted the views of other

5     courts that say you should look at actual benefit.  The cases

6     they cite on main are district court opinions that have

7     interpreted Eleventh Circuit precedent that way.  But when you

8     look for it in Eleventh Circuit case law, I don't see a firm

9     statement, and there's good reason for that.  Because if this

10    settlement had actually allocated an $8 million fund that has to

11    benefit class members, hell or high water, attorneys find a way

12    to get those class members paid.  It's not actually that hard,

13    as it turns out, to get people paid.  But it would be unfair to

14    award a settlement that hypothetically makes $8 million

15    available, but as a matter of fact and given the history and

16    given the history of settlement administrators knowing how other

17    settlements of this type work out will, in fact maybe get an 8th

18    of that amount.  It doesn't make any sense, as a matter of fact

19    in law, to treat these two scenarios the same way.  And if this

20    case had actually provided an $8 million fund that was an actual

21    common fund and would, hell or high water, be allocated between

22    attorneys and class benefit, honestly we wouldn't be here

23    because the settlement in proportionality terms would be fair,

24    reasonable and adequate.

25          But in this one, Plaintiffs' attorneys basically they

1   shape the settlement and they agreed to these terms which will,

2   as it turns out, provide them probably close to triple the

3   relief that is being given to class members, and that kind of

4   upside down settlement is unfair, unreasonable, inadequate.  And

5   if the parties won't accept a modification of it prior to this

6   Court's ruling on it, because the Court can only approve or

7   disapprove the whole settlement, cannot line out terms and

8   change provisions on its own, if this is what is being presented

9   to the Court, Your Honor, we submit that it should be rejected.

10  And that may result in further litigation, but in our experience

11  in the vast majority of cases where parties can agree to a

12  settlement that where the Defendant is agreeing to pay millions

13  of dollars and the only problem is the allocation, in our

14  experience attorneys can figure out a new settlement that

15  allocates it and addresses the objection.

16          And so Your Honor, I think I'd like to turn to the

17  injunction.  And our contention is that the injunction doesn't

18  have any value and that it is still in fact false.  And as we --

19  as you asked Ms. Geer, you know, if they had the highest and

20  best, Plaintiffs would agree that even with the revisions, even

21  being able to say as it says in the settlement agreement that

22  it's both "tested" and "shown," that this is false.  Your Honor

23  has said that this would be like an attorney saying that he's

24  Bar tested and Your Honor, it's not like that because it's as if

25  on one panel it says Bar tested and then on the other side of

```
 1    the sign it says handles estates, handles criminal matters,

 2    patent applications.  That's what the packaging says.  It says

 3    at the very top of it, it says yes, it says "clinically tested"

 4    and then it says "shown," it says "fuels these indicators of

 5    brain health".  And so reading the entire thing in context, Your

 6    Honor, being able to say "clinically tested" and "shown" doesn't

 7    have very much dictionary daylight between "clinically proven."

 8            and Your Honor, the marketing materials that the

 9    Defendants submitted are very interesting.  And as we pointed

10    out in our response, this is sort of an example of

11    cherry-picking.  There are lots of metrics that they could have

12    chosen to pick out of their survey, and they decide to focus on

13    the one line that seems to show the largest difference between

14    "clinically shown" and -- excuse me, "clinically proven" and

15    "clinically tested."  And you know, it's because they say that

16    for this sub-category of purchasers, the most important thing to

17    them, and this is the most important thing to Mr. Ted Frank

18    which is why he won't be purchasing Neuriva again, is whether

19    it's actually effective.  But on the other hand from the

20    perspective of the Defendant, why is the most important thing

21    not whether they actually purchased the product?  And the answer

22    is is because they chose this particular metric because it shows

23    the largest gap.  If you look at the survey two pages after the

24    one they cite -- and so I have to cite pages of the PDF because

25    they're sort of attachments to two declarations, it lists how
```

1   likely consumers are to buy.  And it says 30% for clinically

2   tested and 32% for clinically proven.  And that's not a very

3   large gap, Your Honor.  And these are in situations that are

4   unlike the actual situations that are likely to unfold in

5   grocery stores or online where they get to see these products

6   side by side and say oh yes, actually this term has a somewhat

7   different connotation than this term, and so I'm going to rate

8   them differently because I'm seeing these abstract terms and

9   being able to compare them.  Your Honor, we submit that in the

10   real world, this 2% gap, which is not statistically significant,

11   won't translate into any class benefit, and that's before

12   getting to the issue about whether it provides a class benefit

13   at all given that many class members, including Mr. Frank, won't

14   be purchasing it again.  It provides a benefit arguably to third

15   parties who are on the market for these kind of things, it

16   provides arguably a benefit for competitors of Neuriva, but it's

17   not in any case clear, Your Honor, it's providing a class

18   benefit.

19          Your Honor, I'd like to address the NAD decision that

20   the Defendant attached to exhibit -- as Exhibit A to their

21   Sunday filing.  Your Honor, this decision is, first of all,

22   older than any of the ones that were cited by the Amicus, 2005,

23   and it concerns a situation where the manufacturer of this

24   chaser product came to NAD and said we were making these four

25   changes voluntarily.  And one of those changes is changing

1   "clinically tested" to clinically -- excuse me, "clinically

2   proven" to "clinically tested", but it's a combination of four

3   different changes including several that were making outright

4   claims about the product being able to help you recover from

5   hangovers.  And they agreed to eliminate -- to make all of these

6   changes at once, and it's only after all of those changes that

7   NAD said that this is necessary and appropriate.  And

8   interestingly, NAD then suggests that they should make further

9   changes, but that was related to wanting to deter people from

10  over-drinking.  So they don't really discuss the difference, and

11  the more recent NAD decisions, which it's true all concern the

12  term "clinically tested" alone say that "clinically tested"

13  alone is creating a false impression on the market when they're

14  not actually tested as both the Plaintiffs, the named Plaintiffs

15  in this case.  And we contend and TINA contend in this case they

16  are not clinically tested.

17          Again, it could be fine as part of a compromise to do

18  this sort of thing, but it comes back to the disproportion of

19  class benefits in this case.  There's no expert testimony

20  showing that there's an actual real benefit to class members

21  here.  There's no evidence at all in fact showing that this

22  change will benefit class members.  We do have a business

23  professor that argues that likely purchasers of Neuriva are

24  especially educated and wealthy and concerned about their

25  health, but Your Honor, we contend in the first place that's not

1   actually expert testimony because there's no methodology at all.
2   And if Your Honor is receptive, we would file a motion to strike
3   that on *Daubert* grounds.  But further it's a double-edged sword.
4   If they're very knowledgeable about interpreting language, they
5   know that when something says "tested" on one side and then on
6   the other side it says "fuels six indicators of brain health,"
7   that the implication is that it was tested and it actually did
8   those things.  It wouldn't make sense to say well, it's tested.
9   It's not in isolation.  It doesn't just say "clinically test in
10  isolation," it's clinically tested along with a whole host of
11  claims on the packaging.

12        Your Honor, the Defendant said that we had argued about
13  "shown" for the first time in our filing yesterday.  That's
14  incorrect.  It was on the first page of our objection, and it
15  was discussed in depth on Page 4, because the settlement itself
16  allows the Defendant to say both "clinically tested and shown."
17  And it expressly allows that.  And our argument from the
18  objection itself is that there is not a whole lot of difference
19  when you can use both of those things together between the
20  "clinically tested and shown" and "clinically proven."

21        Your Honor, I think the Defendant also mentions
22  something about the last minute argument of the Amicus.  Because
23  the Amicus is not licensed in this district, I do think it
24  appropriate to say that they've made their filing on Friday
25  which is three days before it was due, and also this was

1      necessary.  There is a staffing issue because it's my

2      understanding that there has been a death related to somebody in

3      the TINA organization.  But Your Honor, we had no idea that TINA

4      would also be filing an Amicus in this case.  We were surprised

5      to find each other's filings on the docket that Monday we filed

6      our objection, and I'm very glad to have them with us in

7      opposition to this settlement that we believe would be harmful

8      to class members.

9            And Your Honor I think that's all I have for the notes,

10     but I probably forgot some things, but maybe that means I should

11     take some Neuriva, but although not according to --

12           THE COURT:  Well, at least you didn't say maybe you

13     should take some Prevagen.  Some competition product.

14           So when you say that the Court can either only approve

15     or disapprove, you're talking about the settlement agreement

16     itself, but the Court can, in its discretion, as long as it

17     doesn't abuse its discretion, determine an amount of fees and

18     costs in an amount less than applied for.  That's permissible,

19     correct?

20           MR. BEDNARZ:  Yes, that's right.  Your Honor, the Court

21     has absolute discretion on the fee award.  In fact, if there was

22     extraordinary misconduct or something, it could even zero out

23     attorney's fees, but cannot rewrite the agreement between the

24     parties.  It could be that the Court says that it's troubled by

25     the disproportion and that if there was an agreement like such

1    and so, that it would be an easier decision.  I certainly see in

2    other courts do that kind of soft-power efficient thing, but

3    unless the parties themselves agree to modify the terms of the

4    agreement itself, it cannot be rewritten by the Court's order.

5            THE COURT:  Right.  I understand.  And I'm not in any

6    way suggesting that I would do this or Judge Cooke would do

7    this, but I'm just -- again, a thought popped into my mind based

8    on something you just said, and this may be triggered in part by

9    my status as being a magistrate judge who has presided over 400

10   mediations.

11           So would there be anything inappropriate in saying for

12   example listen, parties, I'm going to give you a week to let me

13   know if you would agree to a modified settlement where the fees

14   and costs are reduced and the reduction, rather than generating

15   a windfall for the Defendant, would be distributed on a prorata

16   basis to claimants who submitted valid claims.  Then at the end

17   of the deadline, the parties could submit a filing saying yes,

18   we agree or no, we don't.  I could do that, right?

19           MR. BEDNARZ:  Your Honor, I don't know off the cuff

20   whether anyone has challenged something like that.  Again, we

21   have seen cases where courts have made concerns known and then

22   the parties directly address those concerns, but I'm not sure if

23   we start getting into something that seems more like an

24   ultimatum whether one or both parties might object to that.  I'm

25   just not sure if there's case law.  We can file a supplement if

1    the Court is curious about whether that's something that might

2    be available to it.

3              THE COURT:  Anything further, Mr. Bednarz?

4              MR. BEDNARZ:  No, Your Honor.  We rest on our papers

5    and again, we are filing the response to the motion to strike

6    with all of the additional information that Your Honor requested

7    by Monday.

8              THE COURT:  All right.  So let me -- I have a question

9    for the Plaintiff, and actually also for the defense as well.

10   Bear with me just a minute please.

11             Basically, Ms. Geer and Mr. Spitterman --

12   Mr. Spitterman.  See, that's what I get for coming up with that

13   anecdote about the Spider-Man movie.  Mr. Biderman.  In any

14   event, Mr. Bednarz made the argument that the common fund

15   approach often used here in this circuit is actually used by

16   district courts, and that if you try to trace back the appellate

17   origin of that approach; in other words, an Eleventh Circuit

18   opinion, it gets far more attenuated and far more difficult.

19             Are you aware, either of you, of and on-point Eleventh

20   Circuit case which says here in the Eleventh Circuit we use the

21   common fund approach based on the potential payout as opposed to

22   some other method such as a lodestar approach or a common fund

23   based on actual payout rather than potential?  Is there an

24   Eleventh Circuit case which stands for those propositions, first

25   Ms. Geer?

1      MS. GEER:  Your Honor, I think we have cited cases --

2  first one thing I would like to say, I mean, I think you have to

3  go back even further to *Camden I Condominium Association* which

4  is the Eleventh Circuit opinion, which says -- well, as it's

5  called is the preeminent case in this circuit dealing with the

6  issue of attorney's fees in common fund class action cases.  A

7  district court called it that.  But there's no question that

8  *Camden I* is the Eleventh Circuit law, and says that this circuit

9  is a common fund circuit.

10      And I really do find it quite extraordinary to use --

11  to dismiss district court decisions the way that Mr. Bednarz

12  has.  You know, in my experience, the district court judges are

13  -- their responsibility is to implement Eleventh Circuit

14  decisions, and I think it's really quite cavalier to say oh, I

15  really don't care what the district court judges have to say,

16  it's only if the Eleventh Circuit has implemented it.  And so I

17  think they provide important authority.

18      I think if you start with what I would say -- when you

19  walk through -- if you look at *Home Depot*, which is an Eleventh

20  Circuit case, they -- it was not a constructive fund case, it

21  was argued, but the Eleventh Circuit specifically held you can

22  call it dicta, but if I were a district court judge I would not

23  to want to just ignore the strength of the statement that was

24  made by the appellate court.  *Home Depot* specifically recognized

25  the constructive fund case.

1      And let me explain, we're talking about two things.

2   The common fund is the law within the Eleventh Circuit, and the

3   district courts have -- you know, there's been repeated efforts

4   by defense counsel, by, you know, Objectors to say oh no, no,

5   no, we should have a lodestar cross-check.  We should do like

6   other people in other circuits.  We should apply other circuits'

7   law, and the law in the Eleventh Circuit is common fund and we

8   don't do cross-check.

9      We cited a district court -- O'Harz (ph), a district

10  court case that says we don't do -- we are not going to do

11  back-door lodestar cross-checks.  That is not the way the

12  Eleventh Circuit handles these cases.  Then what we've got in

13  *Home Depot,* even though it was -- they -- the Eleventh Circuit

14  distinguished it, they specifically recognized the concept of a

15  constructive fund common fund case.  Because a common fund case,

16  a pure common fund case is when fees are being taken out of the

17  money that is going to the class members.  And the *Home Depot*

18  was recognizing a constructive common fund case in which you

19  already have -- the negotiations were done for a settlement fund

20  for the class members.  That money is sacrosanct.  It goes only

21  to the class members, and then after that negotiation is

22  completed, completely completed, agreed on, the parties then

23  discuss attorney's fees and an agreement is reached as to the

24  amount that -- the maximum amount that the defendants will pay

25  for attorney's fees not to come out of the money that is going

84

1   to the class members.  And they called this in *Home Depot* a

2   constructive common fund case.  And they indicated -- and the

3   district courts indicated that what you do to figure out what

4   the constructive common fund is is you total the two figures.

5       THE COURT:  Sorry, say that again?

6       MS. GEER:  You total the two figures; the settlement

7   fund that's going to the class members, and then the amount that

8   the defendants are paying for attorney's fees.  So you total

9   those two figures, you get the common fund and then you apply

10  the well-established principles from *Camden I* and the host of

11  district court decisions that we -- in the Eleventh Circuit is

12  what the courts say only do a percentage of the common fund.

13  And what you look -- what the rule is is you don't go look at

14  what their attorney's fees are.  As Judge Cooke -- and I would

15  hope that Mr. Bednarz would say that Judge Cooke's opinion is

16  relevant, her decision in *Fernandez* makes it clear that the

17  analysis is that when we have a common fund, that we are

18  awarding a percentage of that fund, because it is like a

19  contingency fee case.  And I cited for Your Honor the pages to

20  her *Fernandez* decision on that.  And her decision, as well as

21  scores of other district court decisions say -- hold that if you

22  -- if the fees, the percentage fees come within a certain range

23  and, you know, we don't know what the top figure is, you know,

24  but if they are coming in, you know, certainly she -- Judge

25  Cooke approved a 35%, but if they come within the range, then

1  they will be approved.  That's what the courts in the Eleventh

2  Circuit are saying.  And none of those cases have been

3  distinguished by Mr. Frank and his counsel.

4         Our percentage is 27%.  It's not 35%.  There are some

5  that are higher.  Judge Cooke pointed out that in her *Fernandez*

6  opinion that really what this is is like contingency fee cases.

7  And they went and she looked at the market and she said the

8  market rate for complex contingent litigation in 2017 was 40%.

9  And yes, that means sometimes you may get more money than you

10 have lodestar, they don't even call it -- if you have a personal

11 injury case there are going to be the cases in which you have,

12 you know, very few hours in, that you're going to get a bigger,

13 you know, amount, and there are going to be cases in which you

14 get zero, or you get a very small amount.  And as Your Honor

15 knows, you've run into that.

16        And so here, what are the risks?  We took on these

17 cases really with very substantial risk because of the arguments

18 regarding substantiation.  Because of the expert -- you know,

19 experts issues.  We went into this knowing that we were going to

20 have to have very substantial expert costs, we were going to

21 have very substantial hours.  We did -- even just doing the

22 complaints and even just doing all of the research so that we

23 could get the allegations, so that we would survive a motion to

24 dismiss, we put in a tremendous number of hours and had we

25 continued on, the expenses and -- you know, we don't get to bill

1   somebody else for the expenses, we front the expenses knowing

2   that we could come out with zero.  It is -- there is a -- in

3   this context with cases that go on forever, you will be putting

4   in hours, you'll be putting in expenses and you may ultimately

5   never recover.  Or if you recover, it may be way down the road.

6   Now, you know, this it -- you know -- so there's nothing

7   extraordinary about this.

8          In the Eleventh Circuit, the amount that we are talking

9   about, the 27% is well within -- well within the amount that's

10  allowed.  The way this is set up, it means that the full $8

11  million, if enough class members file, will get that benefit.

12  They don't have to pay for -- you know, money is not taken out

13  of their share and it is -- I don't see -- I have not heard

14  anything that suggests that -- cites any authority within the

15  Eleventh Circuit that supports the back-door lodestar saying oh,

16  it's only two times.

17          THE COURT:  Ms. Geer, Ms. Geer, I'm sorry.  My question

18  was far more limited.  So thank you for all these additional

19  comments, but I think you're starting to repeat some of the

20  points.

21          MS. GEER:  All right.  I do apologize, Your Honor.

22          THE COURT:  But let me ask you this:  I think I heard

23  you say that one of the suggested approaches, sort of a

24  constructive common fund approach, would be you take the amount

25  of the potential settlement, the amount of the potential claims

1    payout, you then add in the amount of the requested fees and

2    then you apply the standard percentage for fees and expenses and

3    that yields the award that the court will issue.  Is that what

4    you told me?

5         MS. GEER:  I'm not sure, Your Honor.  What I was trying

6    to say is that -- and I apologize for having gone on.  That you

7    take the $8 million, not the payout.

8         THE COURT:  I'm sorry?

9         MS. GEER:  You take the $8 million, not how much that

10   is actually paid out for the class members.

11        THE COURT:  Right.  Right.  I get it.  Yeah.  Okay.

12        MS. GEER:  Yeah.  You add those two together and then

13   --

14        THE COURT:  Add what two?

15        MS. GEER:  The $8 million plus the $2.9 million which

16   is the agreed-upon fees.

17        THE COURT:  Right.

18        MS. GEER:  And then you look at the percentage which is

19   the two point -- see what percentage is the $2.9 million of that

20   total amount.

21        THE COURT:  Yes.  I understand.  Right.  Okay.

22        Now, you were talking a little bit about whether or not

23   we should be looking at various district court opinions as

24   opposed to Eleventh Circuit opinions, and I will often read and

25   rely upon and cite other district court opinions.  I feel more

1 comfortable naturally relying on an on-point Eleventh Circuit

2 opinion, but as I always say, one nonbinding district court

3 opinion is just as nonbinding as another.  And so I'm not even

4 bound by my own opinions.

5   And so you folks have cited to me the *Collins versus*

6 *Quincy Bioscience*, which in my chambers I call the Prevagen

7 case.  And I wrote some opinions in that case, but they're not

8 binding on me.  I can change my mind.  I mean, maybe when I

9 wrote those opinions I was in an exceptionally flexible mood

10 that year, and now I'm a little bit more cynical.  Who knows.

11 But I'm not bound by the district court cases.  So I'll read

12 them and I may in fact find them persuasive and sometimes do.

13   So let me just cut to the chase.  What's your best or

14 two best Eleventh Circuit cases articulating the common fund or

15 constructive common fund case?  It sounds like you are saying to

16 me *Camden I* and *Home Depot*.

17   MS. GEER:  That's correct.

18   THE COURT:  Is that right?

19   MS. GEER:  Yes.  *Home Depot* is dicta, but it is --

20   THE COURT:  All right.

21   MS. GEER:  Has its analysis.

22   THE COURT:  All right.  So those are your two best

23 Eleventh Circuit cases?

24   MS. GEER:  Yes.

25   THE COURT:  With that theory.

```
 1              MS. GEER:  Yep.

 2              THE COURT:  All right.  Let me ask defense.  What are

 3     your two best Eleventh Circuit cases for this approach?

 4              MR. BIDERMAN:  Your Honor, the case that we would refer

 5     the Court to is the Gillette case.

 6              THE COURT:  I'm sorry?

 7              MR. BIDERMAN:  We would refer the Court to the Gillette

 8     case --

 9              THE COURT:  Gillette.

10              MR. BIDERMAN:  -- that we cited in our materials where

11     the Mr. Frank was an Objector.  The total claims amount that was

12     given out in that case was $344,000, and the Eleventh Circuit

13     affirmed the propriety of that settlement and did look at the

14     amount that -- the cap as the funds available as a basis for

15     calculating Plaintiffs' attorney's fees.

16              Your Honor, we're not here to argue on behalf of the

17     Plaintiffs for their attorney's fees.  We agreed not to object

18     to those.

19              And one thing I did want to point out is that there's

20     statements about if the attorney's fees are disallowed that's

21     going to be a quote, unquote, windfall to the Defendants.  It's

22     not, Your Honor.  The attorney's fees are going to be determined

23     by the Court independent of basically the amount that is

24     suggested.  We understand the Court is going to do an

25     independent determination, and so the suggestion that we're
```

1   going to get some sort of, you know, basic windfall is not

2   correct, Your Honor.  We didn't go into this settlement

3   expecting this Court to approve that amount.  We went into this

4   settlement expecting the Plaintiffs would have to make an

5   application.  We agreed we wouldn't oppose it, but their fees

6   are determined independent of the amount that we're contributing

7   otherwise to the class.

8        THE COURT:  Well, but -- yes, I understand that the

9   fees were negotiated separately, I understand that they're not

10  linked.  But as a practical matter, if the Plaintiffs are asking

11  for $2.9 million, and for whatever reason I come up with some

12  other number, let's say $2 million, that means that your client

13  will be paying 2 million, not $2.9 million.  So that's a savings

14  of $900,000.  Mr. Bednarz chose to call that a windfall, let's

15  use the less flamboyant term of a savings.  It is a $900,000

16  savings for your client under that hypothetical, right?

17       MR. BIDERMAN:  It's money that we're not going to have

18  to pay; that's correct, Your Honor.  But it's money that we're

19  not going to have to pay because the Court made a determination

20  about what the fair settlement award was.  And that's -- I know

21  Your Honor suggested somehow redistributing that to those that

22  have made claims, some have already made claims, you talk about

23  windfalls Your Honor, we believe the product works fine.  We

24  provided the supplement -- the supplemental authority showing

25  that we've got the substantiation, and that kind of allocation

1     is results with certain claimants getting very substantial

2     amounts of money.

3            And the other point I would make, again, the

4     (unintelligible) was claims made.

5            THE COURT:  I'm sorry?

6            MR. BIDERMAN:  I'm sorry.  The other point I was going

7     to make was the claims made, and I think the Court is focusing

8     more on attorney's fees than claims made versus common fund.

9     But just to address the claims made issue Your Honor, it's not

10    as easy as counsel for the Objector suggests to identify retail

11    consumers.  The way to do it is the way that we are doing it.

12    We're doing notice and now we're doing a supplemental notice,

13    Your Honor, which we've provided a declaration about and then

14    there's -- then the time period is not going to run until after

15    the final approval, should that occur, which we think it should,

16    which is as Your Honor suggested could be some time in October,

17    meaning that the claims period will run until December.  And

18    that notice will run, we've refreshed the notice, we've done our

19    absolute best to distribute this money and identify the

20    consumers, and we think that the declarations from the class

21    action administrators demonstrate that.

22            THE COURT:  The *Gillette* case that you just mentioned

23    to me, which particular submission of yours is that cited in?

24            MR. BIDERMAN:  Your Honor, I can't represent -- as Your

25    Honor knows, I'm not the best person --

1          THE COURT:  Well, let's ask one of your -- let's ask

2     one of your associates.

3          MS. GEER:  Your Honor, we have -- we have cited it in

4     our brief, and I can give you the page and I can give you --

5          THE COURT:  All right.  Go ahead.

6          MS. GEER:  It's on Page 15 of our -- the motion for

7     final approval, and it is 618, it's unpublished 618, F. App'x

8     624 at Page 630.  And also on that you'll see, I should have

9     cited this case to you as well, *waters*, 190 F.3d 1291, Page

10    1295, and that's where the Eleventh Circuit said contrary to

11    defendant's assertion, no case has held that a district court

12    must consider only the actual payout in determining attorney's

13    fees.

14         THE COURT:  Understood.  All right.  Thank you very

15    much for that clarification.

16         Let me just quickly go through my notes and see if

17    there were any additional questions I had for anybody.

18         MS. GEER:  Your Honor, if you had a moment, there's one

19    thing on the injunction.

20         THE COURT:  Ms. Geer, listen.  I'm an old school guy.

21    I could either listen to you --

22         MS. GEER:  Yes.

23         THE COURT:  -- or go through my notes, but I really

24    can't go through my notes and listen to you.  I know my son who

25    is 33 and my daughter who is 31, they can listen to earphones,

1    go on the TV, have their phone here, pet the dog, sip on a

2    smoothie all at the same time.  I can't do that.

3            So should I put down what I'm reading and listen to

4    you?

5            MS. GEER:  No, no, Your Honor.  I apologize.

6            THE COURT:  I'm happy to do that if you want me to.

7            MS. GEER:  No, by all means.

8            THE COURT:  Write down a note so you don't forget what

9    you want to tell me but I'll be back to you in just a minute,

10   all right?

11           Can you tell me offhand where in your submission you

12   cite *Camden I*?

13           MS. GEER:  Yes, Your Honor.  It's that same page, 15,

14   and it is 946 F.2d 768.

15           THE COURT:  Thank you.

16           Yes Ms. Geer.  Your microphone is on mute.

17           MS. GEER:  Yes, Your Honor.  I wanted to just follow up

18   on something that Mr. Biderman had said with regard to the

19   injunction, because I neglected to mention I think another

20   aspect of the injunction that is very important.  Because we

21   have -- Defendant made an additional concession to us with

22   respect to the injunctive relief and that provides that Section

23   4(a)(4) of the settlement agreement, if science or law changes

24   in any way that we think justifies a stronger injunction during

25   the injunctive period, we can come back to the Court and ask for

1    a revision to the injunction.  And we believe that was a big

2    concession, and we believe that's a very important aspect of the

3    injunction.  And I apologize for having omitted mentioning it in

4    my first presentation.

5             THE COURT:  And so you can reapply for a stronger

6    injunction if, what did you say?  Science changes?

7             MS. GEER:  If science or the law -- actually I have the

8    exact language here.  I apologize.  New research, information or

9    regulatory or legal developments is the precise language.

10            THE COURT:  Thank you.

11            Mr. Biderman, anything further from the defense?

12            MR. BIDERMAN:  Just two things, Your Honor.  One is I

13   thank Ms. Geer for pointing that last component of the

14   injunctive relief out, which is significant.  Not only if we

15   want to change to the more affirmative do we have to go to them,

16   but if we want to be -- if they think the current is too strong,

17   they can come to us.  And frankly, having that kind of

18   supervision by a prominent plaintiff's law firm is not exactly

19   what this company wants to do, but we did so in the interest of

20   trying to reach a resolution.  And I want to emphasize that that

21   is a significant concession and does distinguish our settlement

22   from the Prevagen case further. I wanted to make that comment.

23            And I hate to conclude on this note, Your Honor, but I

24   did want to address the statement that we may have miss-cited a

25   case.  If we did Your Honor, we obviously didn't intend to do

1    so, and we will look at it and we'll make whatever corrective

2    filing needs to be made if one does, in fact, need to be made.

3    We were looking at the notes during the course of the argument

4    and it's a little unclear whether or not it goes to the issue

5    that was raised.  But if there is a problem, we'll address it, I

6    assure you.  Thank you.

7           THE COURT:  Thank you.  And Mr. Bednarz, anything

8    further from you, sir, on behalf of Mr. Frank?

9           MR. BEDNARZ:  Yes.  I would like to answer the same

10   question that Your Honor had.  There is not an Eleventh Circuit

11   case that says "made available" should be part of the class.

12   And the best case that we have is actually the same one that the

13   Defendants cited which is the *Portner* case, because although

14   lots of district courts have cited that case as if it stands for

15   the proposition that the "made available" hypothetical portion

16   of the fund can be counted, that actual opinion, which is an

17   unpublished Eleventh Circuit opinion, affirmed a district court

18   that had looked at such a $50 million fund where only a small

19   part of it had been claimed and said I'm not going to count this

20   as $50 million because it's not.  It's fictional.  And our view

21   is that the settlements are best served by fact than fiction.

22          And again, there isn't a more on-point Eleventh Circuit

23   case, but we also cite the *Holmes* decision --

24          THE COURT:  Wait.  Wait, Mr. Bednarz.  That one case

25   that you just cited, I didn't hear the name of the case.

1          MR. BEDNARZ:  The *Portner versus Gillette* case.

2          THE COURT:  Oh, *Portner versus Gillette*.  You call it

3    *Portner*, Mr. Biderman calls it *Gillette*.  Got it.

4          MR. BEDNARZ:  *Portner versus Gillette*, yes.

5          THE COURT:  You say pot-a-to, he says pot-ah-to.  Okay.

6          MR. BEDNARZ:  And Your Honor, it isn't just that a

7    single case in the filing was mistaken, because attorneys make

8    mistakes all of the time.  The fact is that the Defendant filed

9    a motion to strike that is entirely premised on the idea that my

10   client committed perjury.

11         THE COURT:  Counsel, please stop.  I'm only asking for

12   new points or to add gloss on existing points.  Do you have

13   anything that would meet that classification?

14         MR. BEDNARZ:  Your Honor, just as a precaution, we

15   would object to any proposed orders that are submitted in camera

16   without public review, and we are filing our response to the

17   motion to strike on Monday.  We may raise other arguments that

18   have just come up in the last couple of days, but we're not

19   trying to open a new can of worms.  It's just that the

20   settlement approval process usually depends on facts that are

21   available to class members in advance, and to the extent that

22   we're relying on new facts, we reserve our rights to respond to

23   them.  And with that, we will rest on our filings including the

24   forthcoming one on Monday.

25         THE COURT:  Thank you, sir.  I don't know what your

 1    experience is with other judges, but when I ask lawyers to

 2    submit to me proposed orders, it's all done publicly, above

 3    board, nothing Sub Rosa.  I have the lawyers file their proposed

 4    orders on the docket.  I also ask them to send me a courtesy

 5    copy in Word so if I want to use some of it or all of it or

 6    excerpt portions, it's easier for me to do.  But I have never,

 7    in 11 years, had a lawyer secretly file a proposed order without

 8    letting the other side know what's going on.  So thank you for

 9    the comment, but that's not how I run my chambers.

10         MR. BEDNARZ:  That's excellent, Your Honor.  We just

11    had a recent bad experience with that, and we never thought to

12    ask for it either.  And I'm glad that Your Honor has a fair and

13    public court.  And again, like the Defendant, I'm also most

14    appreciative about how active you are about inquiring,

15    especially about the claims rate in this case.  It's phenomenal

16    engagement by a judge, which is very unusual.

17         THE COURT:  So Mr. Walsh, that's now another lawyer

18    engaging in what we call suck-up behavior.  Pretty good,

19    comparable to Mr. Biderman.

20         Ms. Geer, do you want to chime in with a suck-up

21    comment or are you good?  I want to give you that opportunity.

22         MS. GEER:  There is something I would like to say on

23    that score which is -- and follow-up with my own omission which

24    is thank you for recognizing that the hard work, the laboring

25    work is done by others than who have been speaking with you.

1   And as Mr. Biderman has shamed me, Pat Wallace, who has been

2   through the -- you know, through all of this and is invaluable,

3   he has helped create the strong record on our part.  He's the

4   one we have to thank.  He's been invaluable.

5           THE COURT:  All right.  Good.  So Mr. Wallace, I

6   suggest that you, on your own, order up this transcript and that

7   particular page.  You blow that up to poster size, and when your

8   law firm has its associate or partner compensation committee

9   meeting where you're advocating for your compensation next year,

10  you can attach that as Exhibit A.

11          All right, folks.  Listen.  It's good spending several

12  hours with you.  My gosh, it's 1:21.  We've been together for

13  almost three hours, although a part of that time was me doing

14  the "yada, yada, yada" version of Jerry Seinfeld when I

15  summarized the highlights of the procedural history.

16          I look forward to seeing your submission, Mr. Bednarz,

17  and if the Defendants are going to be filing an optional reply

18  or if Ms. Smith is filing an optional reply, I'm happy to read

19  that as well.  Given what I've seen so far, let me just say I

20  will be very surprised if the optional reply were not filed.  I

21  think if I was a gambling man, I would wager -- I'd base it on a

22  99.999% that we're going to be seeing a reply at a minimum from

23  the Defendant.

24          So in any event folks, good to see you.  It is lunch

25  time, so we will be in recess folks.  Take care.  Bye now.

1          MR. BIDERMAN:  Take care, Your Honor.

2          MR. BEDNARZ:  Thank you.

3          (PROCEEDINGS CONCLUDED)

4                       *  *  *  *  *

5                  **C E R T I F I C A T E**
   I certify that the foregoing is a correct transcript from the
6  digital audio recording of proceedings in the above-entitled
   matter.

7

8  8/22/2021                /s/ Dawn M. Savino, R.P.R., C.R.R.
   Date                     DAWN M. SAVINO, R.P.R., C.R.R.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25