UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-cv-23564-MGC

DAVID WILLIAMS and CAROLL ANGLADE, THOMAS MATTHEWS, MARTIZA ANGELES, and HOWARD CLARK, *individually and on behalf of all others similarly situated*,

    Plaintiffs,

v.

RECKITT BENCKISER LLC and RB HEALTH (US) LLC,

    Defendants.

**DEFENDANTS' NOTICE REGARDING
FIRST AMENDED SETTLEMENT AGREEMENT**

Defendants Reckitt Benckiser LLC and RB Health (US) LLC ("Defendants" or "RB") hereby provide notice that on September 13, 2021, the Parties executed a First Amended Settlement Agreement and Release ("Amended Settlement Agreement")[1] to amend the injunctive relief portion of the Settlement of this Action. A true and correct copy of the executed Amended Settlement Agreement is attached hereto as **Exhibit A**. Therein the Parties agreed that Defendants would not only (1) revise all label and marketing references for Neuriva Original, Neuriva Plus, and Neuriva De-Stress (collectively "Neuriva") from "clinically proven" to "clinically tested," as contemplated by the original Settlement Agreement and Release preliminarily approved on April 23, 2021, but also (2) refrain from making any reference to "clinically shown" or similar language, such as "clinical studies have shown." *See* Exhibit A at Section IV.A.1.a-d.

Respectfully, the Amended Settlement Agreement therefore moots the concerns regarding "shown" as raised by putative objectors Theodore H. Frank and Truth in Advertising (TINA), *see* Dkt. Nos. 75 and 82, and the request by this Court for further briefing regarding consumers' perception of "shown." *See* Dkt. No. 105.

As more thoroughly discussed below, Defendants continue to maintain that the Neuriva products' "clinically proven" label and marketing claim has always been substantiated because ample competent and reliable evidence shows that Neuriva's active ingredients have, indeed, been clinically tested and proven to be effective as advertised. *See infra* Section I. Thus, any iteration of this claim—whether clinically "tested" or "shown"— would be just as substantiated. Notwithstanding, to avoid the expense, inconvenience, and distraction associated with continued litigation, Defendants have agreed to make the label and marketing changes described above, and the representative revised Neuriva label incorporating these changes was made final long before any objectors arrived in this Action.

---

[1] All relevant signatures have been secured with the exception of one (of two) remaining signature from RB, which was unavailable at time of filing for logistical reasons. RB will update its filing promptly with that final signature as soon as it is received.

*See infra* Section II and **Exhibit B**, attached hereto, which is the Supplemental Declaration of RB's Innovation & Strategy Director Rachel Sexton.

I. **Defendants' Label and Marketing Claims Are, and Have Always Been, Substantiated.**

Defendants have always maintained that the labeling of Neuriva as having "clinically proven" ingredients is truthful and substantiated. This is because RB extensively studied Neuriva's active ingredients—NeuroFactor (whole cherry coffee extract), soy-PS (phosphatidylserine), and melon concentrate containing a potent antioxidant, SuperOxide Dismutase ("SOD")—before bringing Neuriva to market. As such, RB has a substantial body of scientific evidence to support claims relating to Neuriva's active ingredients, as currently reflected on product packaging ("clinically proven") as well as any claims that the active ingredients are "clinically tested" and "clinically shown" to be effective as advertised. In fact, several well-designed scientific studies demonstrate that Neuriva's active ingredients are effective at supporting key indicators of brain health, such as focus, accuracy, memory, learning, and concentration. *See* Declaration (ECF No. 62-1) and Supplemental Declaration (ECF No. 86-1) of Gary W. Small, M.D. Dr. Small, the Chair of Psychiatry at Hackensack University Medical Center and the Physician in Chief, Behavioral Health at Hackensack Meridian Health, is an expert in the field of cognitive decline and the medical treatment of those and related mental health conditions. *See* ECF No. 62-1 at 24-25 ("Small Decl."). Dr. Small's declaration includes a study-by-study analysis of the clinical studies relied on by RB to substantiate Neuriva's labeling claims. *Id.* at 28-39. Dr. Small ultimately concluded that these studies "support[] the promotional and implied claims" relating to Neuriva's principal ingredients. *Id.* at 39.

Indeed, as RB has clearly demonstrated through its prior court submissions, including Dr. Small's two declarations, science supporting Neuriva's ingredient claims provide more than sufficient substantiation under the FDA and FTC's substantiation standard. The FDA adopted the FTC's substantiation standard of "competent and reliable scientific science" for

claims regarding the benefits and safety of dietary supplements. *See* Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403 (r) (6) of the Federal Food, Drug, and Cosmetic Act" ("FDA Guidance") at 3 (ECF No. 76-A). Here, Neuriva's ingredient claims are substantiated by several peer-reviewed and published clinical studies utilizing randomized, double-blind, placebo-controlled test designs, the gold standard for studies of safety and efficacy of clinical interventions. *See* Dr. Small's Supplemental Declaration ("Small Supp. Decl.") at 4-5. As Dr. Small explained, these kinds of studies remain the most convincing research design in which randomly assigning the intervention can eliminate the influence of unknown or immeasurable confounding variables such as placebo effects that may otherwise lead to biased and incorrect estimate of treatment effects. *See id.* Also, randomization eliminates confounding by baseline variables and blinding eliminates confounding by co-interventions, thus eliminating the possibility that the observed effects of intervention are due to differential use of other treatments. *See id.*

Moreover, the fact that the clinical studies supporting Neuriva's ingredient claims involve all age groups, both young and old, as well as both healthy adults and those with mild cognitive impairment provides further credibility to the significance of the results reached in those studies regarding the cognitive benefits of treatment with WCCE and PS. *See id*. at 5. Such well-designed clinical studies have shown that individuals who take WCCE and PS experience a noticeable improvement in cognitive function. *See id.* at 2. Similarly, clinical studies have also shown that supplementation with SOD decreases stress and fatigue. *See id*.

**A.   Clinical Studies of WCCE (Neurofactor)**

As Dr. Small explained, the mechanism of action of WCCE (Neurofactor) is directly linked to an increase in plasma levels of brain-derived neurotropic factor ("BDNF"). *See id*. at 6. BDNF is a neuro-protein that is directly involved in neurogenesis (the formation of new neurons in the brain) and is the most prevalent growth factor in the central nervous system (CNS), essential for the development of the CNS and for neuronal plasticity. *See id*. BDNF is known to influence a variety of functions including maintaining the health of existing brain

cells, inducing the growth of new neurons and synapses, and supporting overall cognitive function, including memory and learning. *See id*. Neurofactor supplementation at the levels provided by Neuriva Original (100 mg/day) and Neuriva Plus (200 mg/day) have been the subject of five unique clinical trials assessing cognitive performance.

Three clinical studies—the Robinson study (2019)[2], the Robinson study (2021)[3], and the Reed study (2019)[4] —show a statistically significant and clinically relevant improvement compared to placebo in performance on common cognitive assessments related to focus, accuracy, memory, learning and concentration. For instance, the results in the Robinson study (2019) indicate that WCCE has a significant impact on reaction time in as little as seven days and these benefits persist throughout a 28-day period. *See id*. at 7. Overall, the reductions in reaction time suggest that, during periods of cognitive challenge, WCCE supports motor response and executive function (performance); reduces mental fatigue; and benefits attention, motivation, and alertness. *See id*. These results were confirmed in the second Robinson Study (2021) in which the group receiving WCCE, showed decreased reaction time and significantly better results on key mental performance tasks when compared to the placebo group. *See id*. The Reed study (2019) also revealed that supplementation with WCCE improved cognitive function including decrease in mental fatigue and an increase in alertness. *See id*. at 8.

Meanwhile, the Robinson study (2021) and two other published studies on Neurofactor (Reyes-Izquierdo studies 2013a and 2013b)[5] showed an increased level of BDNF in the brains of subjects taking 100mg of WCCE compared to the placebo groups. *See id*. at 7-9. In the Robinson study, researchers found levels of BDNF increased within 90 minutes, crossed the blood-brain barrier and led to significantly better results on cognitive function tasks compared to placebo. *See id*. at 7. The first Reyes-Izquierdo study also showed increases

---

[2] Attached as Exhibit 2 to Defendants' Supplemental Brief Regarding Injunctive Relief ("Supplemental Brief") (ECF No. 62).
[3] Attached as Exhibit 3 to Defendants' Supplemental Brief.
[4] Attached as Exhibit 4 to Defendants' Supplemental Brief.
[5] Attached as Exhibits 5 and 6 to Defendants' Supplemental Brief.

in plasma BDNF levels by 148% compared to baseline while the second study, conducted to confirm and further investigate this effect, similarly resulted in an increase of plasma BDNF by 91% compared to placebo. *See id*. As Dr. Small affirmed, these studies demonstrate that individuals who supplement with WCCE will have increased levels of BDNF which crosses the blood barrier and improves cognitive function. *See id*. at 6-9.

**B.      Clinical Studies of Phosphatidylserine (PS)**

Similarly, several studies have revealed that soybean-derived PS supplementation can improve memory and other cognitive function in humans of various age groups. *See* Small Decl. at 12-13. PS plays an essential role in keeping nerve cell membranes healthy and in forming myelin, the insulating sheath surrounding many nerve fibers. *See id*. A body of evidence supports the functional significance of PS in the brain and PS is known to facilitate the activation of signaling proteins and receptors that are critical for neuronal survival, differentiation and synaptic neurotransmission. *See id*. Despite its constitutive nature, membrane PS is often an indispensable participant in signaling events and/or influences the signaling in a concentration-dependent manner. *See id*. These PS functions are associated with normal memory formation and learning, and PS plays an important role in keeping your mind and memory sharp. *See id*.

In the Kato-Kataoka study (2010)[6], the PS group demonstrated a significant influence of PS on cognitive function and greater accuracy of responses on neuropsychological testing following 6 months of administration versus baseline as well as at the 3-month post-treatment follow-up. *See* Small Supp. Decl. at 9-10. There was a significant difference on neuropsychological testing between the PS and placebo groups including cognitive improvements in delayed verbal recall, a sensitive memory measure. *See id.* In the Yong study (2011)[7], another randomized, double-blind placebo study, supplementation with 100mg of PS resulted in significant improvements in healthy young adult subjects in several measures of

---

[6] Attached as Exhibit 9 to Defendants' Supplemental Brief.
[7] Attached as Exhibit 10 to Defendants' Supplemental Brief.

cognitive performance, including directed memory, associative learning, free memory of images, recognition of meaningless figures, and portrait-features linked to memory. *See id.* at 10. Meanwhile, the Crook study[8] showed that treatment with soybean-derived PS (100 mg/day and 300 mg/day) improved memory functions, such as memorizing names and faces, in elderly people with age-associated memory impairment. *See id.* at 9.

### C. Clinical Studies on Melon Concentrate (SuperOxide Dismutase)

The other active ingredient in Neuriva De-Stress, melon concentrate contains a potent antioxidant, SuperOxide Dismutase ("SOD"). SOD is one of the main antioxidant enzymes found in living cells and organisms. *See id.* at 10. A growing body of evidence demonstrates that a daily intake of melon juice concentrate rich in SOD may have a positive effect on several signs and symptoms of stress and fatigue. *See id.* Specifically, the Milesi study (2009) and the Carillon study (2014) suggest that melon concentrate (with 140 IU SOD) supplementation is an effective and natural way to reduce stress and fatigue, supporting the SOD ingredient claims in Neuriva De-Stress. *See id.* at 10-11.

Taken together, Dr. Small's declarations and the clinical studies on Neurofactor, PS and melon concentrate (SOD) provide more than adequate substantiation for both the current Neuriva labeling claims as well as the proposed labeling and marketing changes under the Amended Settlement Agreement.

### II. Nevertheless, Defendants Agreed to Make Certain Label and Marketing Changes that Pre-Date Any Objections in This Action

Despite the ample scientific evidence supporting Neuriva's current claim that its active ingredients are "clinically proven," Defendants nevertheless agreed to revise this claim to reflect that the Neuriva ingredients are "clinically tested," in an effort to avoid the expense, inconvenience, and distraction associated with continued litigation. The Parties entered into a Confidential Settlement Proposal Term Sheet ("MOU") regarding the required label changes on December 31, 2020. As part of that agreement, RB would change references of

---

[8] Attached as Exhibit 8 to Defendants' Supplemental Brief.

"clinically proven" ingredients to "clinically tested;" RB also retained the right to use similar descriptive language in addition to "clinically tested," such as "clinical studies have shown." The injunctive relief terms in the MOU were eventually memorialized verbatim in the Settlement Agreement and Release executed by the Parties on February 1, 2021. *See* ECF No. 52-1 at Section IV.A.1.a-c.

Shortly after the Parties entered into the MOU, in or around January 2021 RB began the process of removing the "clinically proven" claim and replacing it with "clinically tested" language. *See* Supplemental Declaration of Rachel Sexton, Exhibit B at ¶ 4 ("Sexton Supp. Decl."). RB began this process at the earliest opportunity because the lead time to revise product labeling is typically four to six months. *Id.* At the time that this label re-design took place, RB understood that the Settlement would permit the company to use the term "clinically shown" on the products' label—*e.g.* "clinical studies have shown" or words to that effect. *Id.* at ¶ 5. However, in re-designing the labels of Neuriva, RB elected not to use "clinically shown," or any variation thereof, so that, instead, "clinically tested" would be the one consistent claim across the label. *Id.* at ¶ 6. The representative revised Neuriva label was made final on June 25, 2021. *Id.* at Ex. 1 and ¶ 8 (clarifying that the "notation on the right-hand side of the full pre-production proof of the label stating 'Date Work Performed: 06-25-21' refers to the completion of the label's design" and identifying a "similar notation on the lower portion of the label itself, stating '062521'"). The representative label reflects the use of "clinically tested" on both the front and side panels; nowhere does the label use the term "clinically shown" or any variety of a "shown" claim. *Id.* at Ex. 1; *see also* Exhibit A at Ex. E. Instead, the side panel of the revised Neuriva label states that Neurofactor® is "clinically tested to increase levels of the vital neuroprotein BDNF." *Id.* at ¶ 7, Ex. 1. The label likewise states that "Plant Sourced Sharp PS® is a phospholipid that is clinically tested to support memory and learning." *Id.* Per the representative label, these changes will go into effect across all Neuriva products later this year. *Id.* at ¶ 8.

Again, the design process began in January 2021 and the revised Neuriva label was

finalized on June 25, 2021. *Id.* During this time, RB was unaware that any person or entity had or would object to the Settlement in this case. *Id.* Therefore, RB's decision to use the term "clinically tested" exclusively throughout the label was not motivated, influenced, or affected in any way by any objectors. *Id.* Indeed, RB's marketing team did not become aware of putative objectors Mr. Frank and TINA—including their objection to "clinically shown" language—until approximately the week of August 9, 2021, long after RB had already decided not to use "clinically shown" or any similar language on the label. *Id.* at ¶ 9.

Because RB's independently conducted label revision process referred to above had already determined not to use the term "shown," and to accurately reflect RB's intended plans for the revised Neuriva label going forward, Defendants entered into an executed Amended Settlement Agreement with Plaintiffs on September 13, 2021. *Id.* at ¶ 10; *see also* Exhibit A at Section IV.A.1.a-d. Therein RB expressly agreed not to use the term "shown" in reference to clinical studies on Neuriva labels or in ancillary marketing (*e.g.* "clinically shown") or the term "clinically tested and shown." *Ids.* Although the Parties have executed the Amended Settlement Agreement, the Agreement requires Court approval in order to be considered final. *See* Exhibit A at Section XXI.A.

RB provides the Court with the above context for the label change and Amended Settlement Agreement to clarify that, to the extent that putative objectors Mr. Frank and TINA may assert they played a role in prompting a label change, RB's response is an unequivocal "no." As Ms. Sexton's Supplemental Declaration and the June 25, 2021 representative label show, RB decided not to use "clinically shown," or any varietal, long before these purported objectors arrived in this case on July 26, 2021.

### III.   CONCLUSION

Defendants respectfully submit this Notice to advise the Court of the revised terms of agreed-upon injunctive relief and request that the Court recommend final approval of the Amended Settlement Agreement.

Dated: September 13, 2021                               Respectfully Submitted,

*/s/ Lori P. Lustrin*
Melissa C. Pallett-Vasquez, Esq.
Florida Bar No.: 715816
Lori P. Lustrin, Esq.
Florida Bar. No.: 59228
**BILZIN SUMBERG BAENA PRICE
 & AXELROD LLP**
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131-3456
Telephone: (305) 374-7580
Facsimile: (305) 374-7593
Email: mpallett@bilzin.com
Email: llustrin@bilzin.com

*/s/ David T. Biderman*
David T. Biderman, *Pro Hac Vice*
Perkins Coie LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone: (310) 788-9900
Facsimile: (310) 788-3399
Email: DBiderman@perkinscoie.com

Charles C. Sipos, *Pro Hac Vice*
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359-3983
Facsimile: (206) 359-4983
Email: CSipos@perkinscoie.com

*Counsel for Defendants
Reckitt Benckiser LLC and RB Health (US) LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 13, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Lori P. Lustrin*
Lori P. Lustrin
