**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-23564-CIV-COOKE/GOODMAN**

DAVID WILLIAMS, et al.,

      Plaintiffs,

v.

RECKITT BENCKISER LLC, et al.,

      Defendants.

_____/

**REPORT AND RECOMMENDATIONS**
<u>**REGARDING CLASS ACTION SETTLEMENT**</u>

Words matter.

The choice of words also matters.

Saying a person "meanders," for example, sends a different message than describing that person as "walking slowly."

In many settings, the selection of words can have a huge impact.

At times, the mere addition or modification of only one or two words can cause a dramatically different result.

In international diplomacy, the precise interpretation of an ambassador's comments to assess her country's position on a critical and dicey topic can boil down to the use of two or three specific words, rather than two or three other words.

In romantic relationships, a partner may focus on hearing three special words.

With poetry, a few well-chosen words can trigger an emotional response.

One mean and hurtful word from a bully is sometimes all it takes for a child to cry.

And in litigation, the specific words used in a lawsuit's allegations (e.g., "false and deceptive," as opposed to "vague and incomplete") frame the issues, determine whether a proper claim has been asserted, guide the scope of discovery, and set the stage for summary judgment motion practice.

This Report and Recommendations will, in part, need to assess the words in the current version of the class action Complaint. It also will need to analyze the exact words Defendants will be required to eliminate should the settlement be approved.

In their current version of the class action Complaint filed in this District against the manufacturers/distributors of Neuriva brain-health-promotion products, Plaintiffs contend that the products do not provide any actual tangible benefits. They say consumers are being defrauded because the products do not improve memory, focus, concentration, and other components.

Having made those allegations with those strong words, Plaintiffs now want this Court to approve a class action settlement which will provide some monetary relief for those who submit compliant claims but will permit Defendants to continue selling the same supposedly useless and expensive products (but without certain marketing and sales representations about the products' efficacy).

Defendants have agreed to the settlement, but they vigorously challenge the critical allegations. They argue that the products *do* in fact work and that their ingredients have been successfully demonstrated to provide benefits for promoting brain health.

The parties tout the injunctive relief (which restricts what Defendants can say about the products) as a critical part of the settlement. Instead of marketing and labeling Neuriva products as providing results which are scientifically and clinically "proven" or which "show" benefits after being "tested," Defendants would, under the settlement agreement (i.e., the First Amended Settlement Agreement and Release), be required for two years to (1) revise all label and marketing references for Neuriva Original, Neuriva Plus, and Neuriva De-Stress (collectively "Neuriva") from "clinically **proven**" to "clinically *tested*," as contemplated by the original Settlement Agreement and Release preliminarily approved on April 23, 2021; (2) refrain from making any reference to "clinically *shown*" or similar language, such as "clinical studies have shown" or "clinically tested and shown," as required by the First

Amended Settlement Agreement and Release, entered into on September 7, 2021 [ECF No. 116-1]; and (3) limit the use of authorized language about the studies or testing to refer to only Neuriva's <u>ingredients</u>, not to Neuriva as a *whole*.

The parties have convinced me that these language limits and changes are significant. As noted, words matter; important words associated with the sale and marketing of the Neuriva products will be prohibited under the First Amended Settlement Agreement. [But this assessment depends on a specific interpretation of language in the First Amended Settlement Agreement. Defendants are urged to carefully review the interpretation, which bans words similar to "shown" -- and requires Defendants to promptly act if they disagree with the interpretation.].

In addition, Plaintiffs have highlighted other provisions of the injunctive relief which restrict what Neuriva's manufacturers and distributors, Defendants Reckitt Benckiser, LLC and RB Health (US) LLC, may say or do about and with the products. Plaintiffs also stress the importance of settlements in class action lawsuits. As Plaintiffs noted at the Final Fairness Hearing (and in their memorandum), they could lose the litigation on the merits. They emphasized that a similar lawsuit against another company selling a competitive brain health product (Prevagen) hit a significant roadblock when the district judge decertified the class after a hung jury.

The injunctive relief has value, and it should therefore be factored into the overall analysis of the settlement.

For these reasons (and others explained in greater detail in this Report and Recommendations), the Undersigned **respectfully recommends** that the Court **approve** the proposed national class settlement and grant Plaintiffs' motion [ECF No. 69] for final approval of the Settlement.

This recommendation **approves** the injunctive relief and the requested amount of attorney's fees, costs, and expenses (of $2.9 million). It neither approves nor rejects an incentive award to Class Representatives and Additional Plaintiffs, as that request has not yet been made here and will await a possible further decision by the Eleventh Circuit Court of Appeals concerning the propriety of such awards. *See Johnson v. NPAS Sols.*, LLC, 975 F.3d 1244, 1260 (11th Cir. 2020) (holding that incentive awards are precluded).[1] The Undersigned recommends that the Court retain jurisdiction to entertain a motion for class representative service awards should Eleventh Circuit law

---

[1]     The First Amended Settlement provides for service awards not to exceed $2,000 to each Class Representative. However, it also acknowledged that *Johnson v. NPAS Sols.* prohibits service awards. In a November 9, 2020 Order, the Clerk of the appellate court advised that the mandate in the appeal was being withheld. The Eleventh Circuit's original opinion was issued on September 17, 2020. Since then, a petition for rehearing *en banc* has been filed, along with several *amicus curiae* briefs.

Given *NPAS Sols.*, the Class Representatives in the instant case are not now seeking Court approval of service awards. They ask the Court to retain jurisdiction for the limited purpose of addressing service awards if the Eleventh Circuit holds an *en banc* proceeding in *NPAS Sols.* and reverses the panel decision.

change.[2] Finally, the Undersigned also recommends that the objections (including criticisms leveled by an *amicus curiae*), which were extensively briefed, be **overruled.**

Factual and Procedural Background

In their Consolidated Amended Class Action Complaint, Plaintiffs (David Williams and four other individuals) allege that Defendants are involved in "false and misleading" marketing promotions for their Neuriva products. [ECF No. 51, p. 2]. They allege that Defendants are engaged in "deceptive conduct" and contend that "scientific evidence shows that it is biochemically impossible for the [active] ingredients to improve brain performance." *Id.* at p. 4.

---

[2]      The First Amended Settlement Agreement provides that the determination of the service awards "will not impact the validity or fulfillment of the Settlement Agreement." [ECF No. 116-1, V(C)]. Although the Eleventh Circuit has not issued the mandate in *NPAS Sols.*, it applied the holding there notwithstanding the possibility that it might hear the case *en banc*. *See Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1282 (11th Cir. 2021) ("It is true that *NPAS Solutions* binds us here.").

Because the First Amended Settlement Agreement expressly states that the service award issue will not impact the agreement's validity, the Undersigned can recommend approval by not considering the still-unlawful-under-*NPAS* service-awards provision, which is not included in the pending motion for final approval in any event. *See Equifax* (affirming order approving class action settlement but reversing approval of incentive awards); *cf. Poblano v. Russell Cellular, Inc.*, No. 8:19-cv-665, 2021 WL 2914985, at *1 (M.D. Fla. June 10, 2020) (noting that *NPAS* is binding precedent even though mandate withheld; not approving class action settlement containing unlawful service award provision when agreement did not have severability clause or similar language and because Court would not engage in "speculation as to whether the Eleventh Circuit might change its precedent").

According to Plaintiffs' lawsuit, Defendants' misrepresentations fall into two categories: (1) actively representing that the "purported beneficial effects are scientifically proven and clinically proven to provide the promised and advertised improvements in brain function," and (2) making "health claims," such as enhanced brain performance "across all adult age groups and cognitive statuses." *Id.* at p. 10. But, according to Plaintiffs, "both categories of representations are false and/or misleading." *Id.*

The Consolidated Amended Class Action Complaint alleges that "none of the Neuriva Products has [sic] ever been clinically studied[.]" [ECF No. 51, p. 4].

In addition, the lawsuit alleges that "no publicly available study of Neuriva exists, and Plaintiffs have found no indication that Neuriva's efficacy has ever been studied or tested." *Id.* at p. 23.

But Defendants say that their "marketing claims are backed by reliable and competent scientific evidence." [ECF No. 62, p. 1]. They note that the injunctive relief was "crafted after Plaintiffs received and reviewed discovery providing extensive scientific support for the labeling claims that the injunctive relief permits." *Id.*

More specifically, Defendants contend that "several well-designed scientific studies show that Neuriva's active ingredients support key indicators of brain health, such as focus, accuracy, memory, learning, and concentration." [ECF No. 62, p. 2]. Therefore, Defendants say, they have "overwhelming scientific evidence relating to

these ingredients." *Id.* Similarly, Defendants contend that "abundant scientific substantiation" support the claims Plaintiffs challenge. *Id.* at p. 3.

Three of Neuriva's ingredients are NeuroFactor (a trade name used to refer to whole coffee cherry extract), soy-PS, and melon concentrate containing SuperOxide Dismutase ("SOD"). *Id.* at p. 3. According to Defendants, three human clinical studies on NeuroFactor (the Robinson study, the Auburn study, and the Reed study) show a statistically significant and clinically relevant improvement compared to placebo in performance on common cognitive assessments related to focus, accuracy, memory, learning and concentration. *Id.* at pp. 6-9. Moreover, they say that two other published studies on NeuroFactor (the two Reyez-Izquierdo studies) show an increased level of a neuroprotein known to strengthen connections between neurons (brain-derived neutrophic factor ("BDNF")) in the brains of subjects taking NeuroFactor compared to placebo. *Id.* at p. 4.

Defendants contend that clinical studies demonstrate supplementation with melon concentrate containing high levels of "SOD" reduces stress and mental and physical fatigue. *Id.* at p. 13.

Defendants further note that clinical studies likewise show that PS (phosphatidylserine) supplementation can support memory and other brain functions. *Id.* at p. 4. They say a long body of research supports the conclusion that supplementation with PS (including soy-PS) supports brain health, and they note that

PS has been sold as part of brain health supplements for many years. *Id.* Defendants' substantiation is not limited to these studies. They highlight that the benefits of NeuroFactor and PS have also been reviewed and validated by Dr. Gary W. Small, M.D., the Chair of Psychiatry at Hackensack University Medical Center and the Physician in Chief, Behavioral Health, at Hackensack Meridian Health. *Id.*

Dr. Small's declaration is 16 pages, plus exhibits [ECF No. 62-1]. After discussing the studies of the ingredients in the Neuriva products, Dr. Small reaches the following conclusion:

> The scientific evidence supports the promotional and implied claims that individuals who take Neurofactor and PS, the ingredients in Neuriva, experience a **noticeable improvement in cognitive function** including focus, concentration, memory, learning, reasoning, and accuracy. These ingredients, at doses that are included in the formulation, were shown in clinical studies to increase BDNF and help with mental focus, accuracy memory, learning and concentration which contribute to reasoning and accuracy. Meanwhile, clinical studies have shown that supplementation with melon concentrate containing high levels of SOD decreases stress and fatigue.

[ECF No. 62-1, p. 17 of 106] (emphasis added).

On the other hand, an Objector and a separate *amicus curiae* take issue with these claims and Dr. Small's declaration. More on this later, when the Report discusses their involvement.

The First Amended Settlement Agreement is intended to resolve four lawsuits: this one (filed in the Southern District of Florida); *Matthews v. Reckitt Benckiser LLC, et*

*al.*, Case No. 1:20-cv-00854 (E.D. Cal.); *Angeles v. Reckitt Benckiser LLC, et al.*, Case No. 1:20-cv-07138 (S.D.N.Y.); and *Clark v. Reckitt Benckiser LLC, et al.* (unfiled).

The allegations in the other two filed lawsuits are similar to the ones asserted here.

The *Matthews* Amended Class Action Complaint alleges that the statements promoting Neuriva as "clinically proven" to fuel "brain performance" are "false and misleading." [20-cv-00854 (E.D. Cal.) ECF No. 35 at ¶4]. It also alleges that Defendants, in order to exploit the "ballooning and lucrative brain health supplement market," *id.* at ¶4, have "engaged in a uniformly deceptive advertising and marketing campaign, including the product label and packaging." *Id.* at ¶6. More specifically, the *Matthews* Plaintiffs allege:

> In reality, since Neuriva has never been clinically studied, "Science" has not proven Neuriva's effectiveness or even its safety. And with respect to the purportedly "Clinically Proven" ingredients, for Coffee Cherry Extract and the Melon Concentrate, scientific evidence shows that it is biochemically impossible for the ingredients to improve performance. Moreover, as to all the ingredients, Defendants' cited studies themselves demonstrate that Defendants' claims of clinical and scientific "proof" are false or, at least, disturbingly misleading.

*Id.* at ¶12.

The *Angeles* Complaint makes the identical allegations as the *Matthews* Amended Complaint asserted in paragraphs 4 and 6. [20-cv-07138 (S.D.N.Y.) ECF No. 1].

And the *Clark* action, being "unfiled," is not available for the Undersigned to review on a court's electronic docket.

The instant case has the most-developed docket, so the Undersigned will outline in detail the procedural developments underlying the First Amended Settlement Agreement.

Plaintiffs filed an Unopposed Motion for Preliminary Approval of Class Action Settlement and Certification of the Settlement Class. [ECF No. 52]. The motion attached the Settlement Agreement and Release and a nine-page declaration [ECF No. 52-2] from Daniel K. Bryson, one of Plaintiffs' attorneys. The declaration summarized the history of the litigation and negotiations, explained the financial and injunctive benefits, and concluded with a succinct argument about why he and Class Counsel believe the settlement to be fair and reasonable. [ECF No. 52-2].

The motion also attached the declaration of Steven Weisbrot, a partner at Angeion Group, LLC, a class action notice and settlement administration firm. [ECF No. 52-3]. The declaration summarized the notice program and provided details of the different methods which would be used. *Id.*

The Settlement Agreement and Release attached to the motion provided for both injunctive and monetary relief. [ECF No. 52-1].

The injunctive relief was to begin six months after the Final Approval Order and Judgment and would remain in effect for two years thereafter. It required all

references to "Clinically Proven" on Neuriva product labels and ancillary marketing to be changed to "Clinically Tested," or similar language, such as "clinical studies have 'shown.'" Similarly, it required all references to "Science Proved" on the product labels or in ancillary marketing to be changed to "Science Tested," or similar language, such as "scientific studies have 'shown.'"

In addition, the injunctive relief provided for the Court's continuing jurisdiction over any disputes about the labeling or marketing practices. It also permitted Defendants to revise or modify their representations if they possess "competent and reliable scientific evidence substantiating that a representation is true" by providing Plaintiffs' counsel with 180 days' written notice of the proposed representations and the underlying scientific evidence. [ECF No. 52-1, p. 8]. Plaintiffs' counsel could either agree or challenge a representation and the Court would have continuing jurisdiction to rule on the challenge.

The monetary relief in the initial Settlement Agreement required payment to Settlement Class Members under a two-tier, capped, claims-made structure. Those members who provided proof of purchase could recover up to $32.50 per valid claim, and they could submit up to two claims, for a maximum of $65.00. Those members who did not provide proof of purchase could recover $5.00 per claim, and they could submit up to four claims, for a maximum of $20.00. The monetary relief was capped at $8 million.

United States District Judge Marcia G. Cooke referred the unopposed motion to the Undersigned [ECF No. 53], and I entered an initial Stipulated Order granting the unopposed motion for preliminary approval of the class action settlement and certification of the settlement class [ECF No. 57].[3] The Undersigned then ordered the parties to submit, either jointly or individually, a memorandum which (1) explains how the proposed injunctive relief provides any meaningful benefit and why it is not illusory; (2) provides examples of orders in other class action cases involving alleged fraudulent misrepresentations where injunctive relief similar to the relief proposed here was approved even though a supposedly worthless product would still be sold; and (3) discusses why this Court should approve this settlement (in which an allegedly ineffective brain improvement product would still be permitted to be sold as a brain enhancement supplement). [ECF No. 58].

The parties submitted the required memoranda.

_____

[3]     The Court also provisionally certified the Settlement Class for settlement purposes, approved the procedure for giving Class Notice to the members of the Settlement Class, and scheduled a final approval hearing. The Undersigned finds that the Class Notice substantially in the form approved by the Court in its preliminary approval order was given in the manner ordered by the Court, constitutes the best practicable notice, and was fair, reasonable, and adequate, and that the Parties have complied with their notice obligations under the Class Action Fairness Act, 28 U.S.C. § 1715.

Plaintiffs' memorandum argued that the litigation, absent a settlement, would "likely take years" and that Defendants would continue to market and sell their Neuriva products with the allegedly misleading claims during the pendency of the litigation, even if Plaintiffs ultimately prevailed -- a prospect they described as uncertain. [ECF No. 61]. Plaintiffs described the proposed injunctive relief as meaningful because it required Defendants to change their marketing from a deceptive claim (i.e., that the products and their ingredients are clinically and scientifically "proven") to one with purported support (i.e., that the ingredients are "tested" or have "shown" certain results). *Id.*

In addition, Plaintiffs' memorandum provided clarification and explained that the parties agreed to revise the settlement agreement to make clear that any claims regarding clinical or scientific testing refer only to the Neuriva products' *ingredients*, and not to the Neuriva products as a whole. *Id.*

Plaintiffs' memorandum also noted that Defendants submitted the relied-upon studies to Plaintiffs, and that Plaintiffs reviewed the studies and, while perhaps disagreeing with the conclusions drawn by Defendants, recognized that interpretation of the studies would involve a battle of experts. *Id.*

According to Plaintiffs' memorandum, the distinction between studies clinically or scientifically proving a claim and studies clinically or scientifically testing an ingredient or showing a particular effect is an important one. *Id.*

Finally, Plaintiffs' memorandum notes that the Complaint does not request injunctive relief barring Defendants from selling the Neuriva products and contends that they could not even ask for *that* type of relief. *Id.* The memorandum emphasizes that the Complaint does not allege that the Neuriva products are in fact *harmful* if ingested or are being *unlawfully sold. Id.* Therefore, Plaintiffs argue, their Complaint does not authorize consumers to seek an injunction prohibiting the sale of the Neuriva products. *Id.*

Defendants' memorandum asserts several categories of positions: (1) the initial proposed injunctive relief provides a meaningful benefit to the class because the labeling and marketing changes are significant; (2) the proposed injunctive relief is a critical term of the settlement agreement; (3) scientific evidence supports the proposed injunctive relief; (4) courts have approved similar injunctive relief in similar consumer fraud cases; (5) there is a strong judicial policy which favors the pretrial settlement of class actions; (6) the settlement resolves multiple federal class action lawsuits; and (7) the settlement agreement provides significant monetary and injunctive relief. [ECF No. 62].

Defendants' memorandum goes into considerable detail concerning the specific ingredients in the Neuriva products and the scientific studies which they rely upon to validate the efficacy of the ingredients for promoting the five key indicators of cognitive function (i.e., focus, concentration, accuracy, memory, and learning). *Id.*

Plaintiffs then filed the instant motion, seeking final approval of the Settlement, attorney's fees, expenses (and to reserve jurisdiction for service awards). [ECF No. 69].

Plaintiffs' motion seeks attorney's fees and costs of $2.9 million, based on the results achieved (i.e., injunctive relief and payment of up to $8 million in claims).

Theodore H. Frank, an attorney, filed a notice advising of his intent to appear at a fairness hearing, through his attorney, who would discuss his objections to the Settlement. [ECF No. 72].

Truth in Advertising, Inc. ("TINA"), which describes itself as a "nonpartisan, nonprofit consumer advocacy organization whose mission is to combat the systemic and individual harm caused by deceptive marketing," filed an unopposed motion for leave to file an *amicus curiae* brief in opposition to the Settlement. [ECF No. 74]. The Undersigned granted [ECF No. 79] the motion and TINA submitted its brief, with exhibits [ECF No. 83].

TINA's *amicus curiae* brief argued that the deceptive marketing alleged in the Complaint would remain unchanged if the Court were to grant final approval and that class members, "most of whom will receive nothing from the resolution of this case," will "never be able to do anything about it." [ECF No. 83]. The brief contains an argument with the heading "the injunctive relief is valueless and serves only to protect RB," and contends that the injunctive relief is illusory and benefits only the company. *Id.* The brief emphasizes that Defendants would be prohibited from using only a single

word -- "proven" -- but could use the phrase "clinically tested" or other "synonyms" for "proven." *Id.* According to TINA, the phrase "clinically tested" implies that the product has been clinically "proven" to achieve the result. *Id.* In other words, TINA contends that the phrase "clinically tested" "conveys the exact same message" as "proven." *Id.*

TINA also stresses that the so-called "meaningless" labeling restrictions are binding for only two years, a scenario it criticizes as unfair to class members, who would be permanently prohibited from suing over the allegedly false marketing of the Neuriva products at issue. *Id.*

TINA's *amicus curiae* brief also attacks the amount of the monetary award as "exceedingly modest" and lambasts the proposed attorney's fees as "exorbitant." *Id.*

TINA filed a supplemental brief which includes language from a Monday, August 9, 2021, email from Richard Cleland, Assistant Director of Advertising Practices at the Federal Trade Commission's Bureau of Consumer Protection. [ECF No. 92]. Cleland's succinct email responded to a Friday, August 6, 2021, email from TINA, asking if the FTC "had any insights" into an Order I entered on the proposed class action settlement. *Id.* The inquired-about Order asked for studies or other authority discussing whether consumers or potential consumers appreciate any substantive difference between a health-related product which is said to be clinically or specifically

"proven" and a health-related product which is represented to be clinically or scientifically "tested." [ECF No. 84].

Cleland's email, sent the next business day after TINA's request for insights, said:

> A significant number of consumers would not see any difference between the statements "clinically or scientifically proven" and the statement "clinically or scientifically tested." Both statements, one express and the other implied, convey that there is substantial scientific evidence supporting the underlying claim. With regards to the tested claim, whatever reason would there be for the advertiser to claim that a product has been "clinically or scientifically tested" if those tests did not support the underlying claim?"[4]

[ECF No. 92-1] (footnote added).

Meanwhile, Frank filed an objection, which is a 29-page memorandum of law and an attached 30-page declaration he signed. [ECF No. 75]. In his declaration, Frank represented that on February 2, 2021, during the class period, he purchased a 30-count bottle of Neuriva Original from Amazon (sold by Pharmapacks) for $21.95 "for personal consumption." [ECF No. 75-1]. He attached a copy of the receipt. *Id.*

Frank's declaration says that he founded the non-profit Center for Class Action Fairness ("CCAF"), a 501(c)(3) nonprofit public-interest law firm based out of Washington, DC, in 2009. *Id.* In 2015, CCAF merged into the non-profit Competitive

---

[4]   Neither TINA, Frank, nor any party has advised the Court of any FTC enforcement action against the Neuriva products or of any formal agency action against this proposed class action settlement.

Enterprise Institute ("CEI") and became a division within their law and litigation unit. *Id.* In January 2019, CCAF became part of the Hamilton Lincoln Law Institute ("HLLI"), a new, non-profit public-interest law firm he co-founded with Melissa Holyoak in 2018. *Id.*

It also explains that he filed a claim in this case on the settlement website on July 25, 2021, and then received a confirmation code. *Id.* Therefore, his declaration says, he is a member of the putative settlement class and has standing to object. *Id.* His declaration further notes that "the proposed injunctive relief is prospective, and I currently have no plans to purchase any Neuriva Product in the future." *Id.* He also says that "the injunctive relief provides me no benefit." *Id.*

Frank's Objection contends that the initial Settlement (before an amended one was submitted) "retains and validates all false and misleading claims," and it describes the change in language (required by the injunctive relief) to be only a cosmetic difference which provides "no benefit." *Id.* It also posits that the $2.9 million award for attorney's fees and costs is premised on a "fictional" $8 million fund which Defendants will "never pay assuming typical claim rates." *Id.*

The Undersigned then required supplemental briefing on studies and/or authority discussing whether consumers appreciate any substantive difference between a health-related product described as clinically or scientifically "proven" and a similar product which is represented to be clinically or scientifically "tested." [ECF

No. 84]. I later entered another Order requiring additional submissions on the distinctions, if any, between how a reasonable consumer would understand a label or marketing reference for a Neuriva product described as "clinically proven" and how she would understand a reference for the same product described as "clinical studies have shown [some benefit to brain performance and/or brain health, including learning, memory focus, reasoning, accuracy or concentration]." [ECF No. 105].

Following these Orders, there was extensive briefing on the injunctive relief.

Defendants' brief argues that there is a significant distinction between proven and tested but also contends that *both* claims are true here. [ECF No. 98]. Defendants explain that market research specifically directed at brain health supplements confirms the difference in interpretation and attached a supporting declaration from a Dartmouth professor [ECF No. 98-4]. Defendants argue that the reasonable consumer standard should be used and that this standard involves an assessment of dictionary definitions. [ECF No. 98]. Defendants' memorandum says that dictionary definitions support their view that "proven" has a significantly different definition than "tested." *Id.*

Therefore, Defendants concluded in this memorandum, they are making a "significant and material concession in agreeing to this change." *Id.*

Defendants then submitted a "Notice Regarding First *Amended* Settlement Agreement." [ECF No. 116] (emphasis added). This Notice contained a memorandum

of law [ECF No. 116], the "First Amended Settlement Agreement and Release" [ECF No. 116-1], and a supplemental declaration from Rachel Sexton [ECF No. 116-2], who is employed at Defendant Reckitt Benckiser as "Innovation and Strategy Director, Vitamins Minerals and Supplements."

The Notice explained that the Plaintiffs and Defendants had entered into a revised settlement agreement to amend the injunctive relief portion of the Settlement Agreement. [ECF No. 116]. The Notice further pointed out that the amended version of the agreement revises the labeling and marketing references for Neuriva products from "clinically proven" to "clinically tested" and requires Defendants to **refrain** from using "clinically shown" or similar language, such as "clinical studies have shown." *Id.*

### Does the First Amended Settlement Require Additional Notice?

The Court in *Keepseagle v. Vilsack*, provided a helpful summary of the legal principles governing the consequences of a modification to a class action settlement agreement:

> Courts generally find that Rule 23(e)[5] applies to a modification of a previously approved settlement only when the settlement will be "materially alter[ed]." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 n. 10, 182 (3d Cir. 2013). Phrased more specifically, an amendment requires supplemental notice only when it "would have a material adverse effect on the rights of class members." *In re Diet Drugs Prods. Liability Litig.*, No. 99–20593, 2010 WL 2735414, at *6 (E.D. Pa. July 2, 2010); *see also Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985)

---

[5] Federal Rule of Civil Procedure 23(e) imposes requirements for the settlement of a class action lawsuit.

("Under these limited circumstances where the amendment is narrow and it is clearly apparent that the interests of the classes are not substantially impaired, the court is of the opinion that the notice already given is adequate and that additional notice is not required pursuant to Rule 23(e)."); *cf.* Manual for Complex Litigation § 21.61 (4th ed.) ("If the fairness hearing leads to substantial changes adversely affecting some members of the class, additional notice, followed by an opportunity to be heard, might be necessary.") . . . . Where an amendment would merely "provide[ ] many additional benefits, including additional funding for research relating to [a medical condition connected to the class's injury] and a guarantee ... regarding [defendant's] continued payment obligations," no legal right was adversely affected and Rule 23(e) did not apply. *In re Diet Drugs*, 2010 WL 2735414, at *6; *see also Shaffer v. Continental Cas. Co.*, 362 F. App'x 627, 631 (9th Cir. 2010) ("Although changes were made to the release after potential class members received the notice, the changes did not render the notice inadequate because they narrowed the scope of the release."); *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) (supplemental notice not required where a proposed amendment merely "expand[s] the rights of class members"); *In re Prudential Ins. Co. Sales Practices Litig.*, 962 F. Supp. 450, 473 n. 10 (D. N.J. 1997) ("Class members need not be informed of the Final Enhancements to the settlement because the Proposed Settlement is only more valuable with these changes."), *aff'd*, 148 F.3d 283 (3d Cir. 1998). Even if a modification does not provide additional benefits, Rule 23(e) has been found not to apply to a modification that made only "minor modifications ... [, which] did not impair class members' rights even indirectly." *Jones v. Gusman*, 296 F.R.D. 416, 467 (E.D. La. 2013).

102 F. Supp. 3d 306, 313 (D.D.C. 2015) (some alterations to internal citations) (alterations in original) (footnote added).

In the instant case, the amendment to the Settlement Agreement provides *more* benefits to class members because it *expands* the restrictions imposed on Defendants' labeling and marketing.

Given the reality of stronger injunctive relief, which can only benefit class members, the rule requiring supplemental notice is inapplicable here. *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) (supplemental notice not required where a proposed amendment merely "**expand[s]** the rights of class members") (emphasis added); *In re Prudential Ins. Co. Sales Practices Litig.*, 962 F. Supp. 450, 473 n. 10 (D. N.J. 1997) ("[C]lass members need not be informed of the Final Enhancements to the settlement because the Proposed Settlement is only more valuable with these changes."), *aff'd* 148 F.3d 283 (3d Cir. 1998); *In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 386 (E.D. Pa. 2015) ("Because these changes **improved** the deal for Class Members without providing any concessions to the NFL Parties, an additional round of notice for Class Member is unnecessary.") (emphasis supplied).

For example, in *Dunn v. Dunn*, 318 F.R.D. 652 (M.D. Ala. 2016), the court found that additional notice was not necessary when, after objections, the parties agreed to remove the additional intellectual testing for death row inmates (the objectors feared additional testing might have adversely impacted the death row inmate's ability to assert an intellectual-disability defense to execution). The court found additional notice unnecessary because the change affected only a small subsection of the agreement, the number of plaintiffs affected would be very small, and it did not constitute a final resolution on the issue. *Id.* at 673.

<u>Procedure-Based Reactions to the First Amended Settlement Agreement</u>

Neither Defendants, Frank nor TINA have taken a position that the amendment to the Settlement Agreement triggers Rule 23(e). They have not articulated a position either way. Plaintiffs, however, *have* expressly noted that "improvements to a settlement do not require additional notice to class members." [ECF No. 124, n. 2]. Plaintiffs cited two authorities for this position: *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) and *Knuckles v. Elliott*, No. CV 15-10175, 2016 WL 3912816, at *5 (E.D. Mich. July 20, 2016) (holding improvements to a settlement do not require additional notice and citing cases).

Confirming their view that the amendment did not implicate Rule 23(e), Plaintiffs advised that, in their view, "the changes in the [First Amended Settlement Agreement] **markedly improve** an already fair, reasonable, and adequate settlement by further constraining Defendants' marketing and bringing it in line with what Defendants' own analysis of the scientific literature can support: that the Neuriva Products' ingredients have been subjected to clinical and scientific testing." [ECF No. 124, p. 2].

<u>Other Developments Concerning the First Amended Settlement Agreement</u>

Given the existence of an amended settlement agreement, the Undersigned provided Frank, TINA, and Plaintiffs with the opportunity to submit memoranda on the changes in the injunctive relief provision of the First Amended Settlement Agreement. [ECF No. 121]. Frank, TINA, and Plaintiffs each submitted a

24

memorandum. [ECF Nos. 122; 124; 125]. The Undersigned also authorized Defendants to submit a memorandum on these changes, and they did so. [ECF Nos. 131; 132].

The Notice (advising of the amended settlement agreement) represents that the amended agreement moots the concerns regarding "shown," as raised by Frank and TINA. [ECF No. 116]. It also explains that the illustrative revised Neuriva label incorporating these changes was made "long before any objectors arrived in this Action." *Id.* at p. 2.

The Notice first discusses Defendants' view that the labeling of Neuriva products as having "clinically proven" ingredients is truthful and substantiated. *Id.* It then outlines -- on a detailed, ingredient-by-ingredient basis -- the science which Defendants say provides more than sufficient substantiation under the FDA and FTC's substantiation standard. *Id.*

Finally, the Notice provides the background and context underlying the label change and the creation of the First Amended Settlement Agreement. *Id.* Defendants explain that they provided the context to "clarify that, to the extent that putative objectors Mr. Frank and TINA may assert they played a role in prompting a label change, RB's response is an unequivocal 'no.'" *Id.* at p. 8.

According to the First Amended Settlement Agreement and Release, the Settlement Class is

> All persons (with certain designated exceptions) who purchased for personal consumption and not for resale, one or more of the Neuriva Products, from Reckitt or an authorized reseller, in the United States, between the dates of January 1, 2019 and the date of Preliminary Approval of the Settlement by the Court.

[ECF No. 116-1].

In a Court-required declaration filed on August 13, 2021, attorney Bryson submitted a Supplemental Declaration concerning the request for attorney's fees. [ECF No. 94-1]. The Supplemental Declaration explains that five law firms worked on the case for Plaintiffs, and it attached the retainer agreements. *Id.* It explained that the present action had its "genesis with separate firms representing separate plaintiffs who ultimately worked together in what became this consolidated action." *Id.* at p. 2. It further noted that "this decision to work cooperatively with other firms litigating over the same subject matter against the same defendants ultimately led to greater efficiencies and avoided unnecessary and duplicative litigation." *Id.*

Bryson's Supplemental Declaration also advised that it "was chiefly because Class Counsel opted to cooperate with one another (rather than engage in drawn-out leadership battles) that they were able to efficiently negotiate the nationwide class settlement currently before the Court for final approval." *Id.*

Bryson collected billing records through August 11, 2021 and consolidated the hours into a table showing that the attorneys spent 1,893.75 hours on the case. *Id.* The table used the Laffey Matrix to determine hourly rates, based on experience. Using

those hourly rates, the table concludes that approximately $1.2 million in attorney time was incurred. *Id.* The Supplemental Declaration advises that Plaintiffs' counsel believes the common fund approach, not a lodestar analysis, should be used to determine attorney's fees in this case.[6] *Id.*

Plaintiffs' counsel has incurred additional time in this case since August 11, 2021, but the Undersigned has not been provided with any additional specifics. However, the Court acknowledges that Plaintiffs' counsel filed a Supplemental Brief on August 16, 2021 [ECF No. 99], a Notice of Filing (of a supplemental declaration regarding the submission and filing of claims) on August 16, 2021 [ECF No. 101], a Notice of Supplemental Authority on August 31, 2021 [ECF No. 110], a Response to an Order to Show Cause on September 16, 2021 [ECF No. 120], a September 29, 2021 Supplemental Memorandum [ECF No. 124], and an October 21, 2021 supplemental declaration of Bryson (along with a motion for leave to do so) [ECF Nos. 128; 130].

Bryson's Supplemental Declaration provides updated information on the status of submitted claims: "As of October 14, 2021, the Settlement Administrator has received a total of 50,634 claims. Of the submitted claims, 49,961 claims were submitted

---

[6]    The Supplemental Declaration also represents that Class Counsel incurred $27,413 in expenses for which they seek reimbursement. [ECF No. 94-1].

through the settlement website (https://www.rbsettlement.com) and 673 claims were submitted via USPS." [ECF No. 130, ¶ 6].

Under the Settlement, class members with proof of purchase may submit a claim for two purchased products for a maximum benefit of $65.00, while class members without proof of purchase may file a claim for up to four purchased products for a maximum benefit of $20.00 ($5.00 per product). After applying the requested benefits per claim, the Supplemental Declaration notes, the requested claims total approximately **$935,332.50**, as of October 14, 2021. *Id.* at ¶ 7 (emphasis added).

The First Amended Settlement Agreement has a cap of **$8 million** for valid claims. If class members submit more than $8 million in claims, then Defendants would reduce the settlement benefit payable for each valid claim on a pro rata basis. Likewise, Defendants have the right, but not the obligation, to terminate the Agreement if class members submit more than $8 million in claims.

<u>The Fairness Hearing</u>

Counsel for Plaintiffs, Defendants, Frank, and TINA appeared at the hearing. [ECF No. 107]. Attorney Frank Bednarz appeared for Frank. Bednarz began his comments by addressing Frank's standing as a class member who purchased a Neuriva product for personal consumption and by responding to Defendants' motion to strike Frank, which was pending and not yet ripe for a written response.

Bednarz's comments took issue with Defendants' contention, in their motion to strike [ECF No. 86, p. 1], that Frank has no standing because any injury he suffered is "entirely self-inflicted." Defendants argued that "the only rational conclusion to be drawn from the timing and nature of Mr. Frank's Neuriva purchase -- given his admission that his entire law practice is devoted to filing objections to class settlements -- is that he bought Neuriva for the sole purpose of attempting to object to the Settlement."

Bednarz advised that the motion "is premised on the lazy assumption that our client committed perjury." [ECF No. 107, p. 54]. He represented that Frank "purchased a product **before** he even knew that this case had settled." *Id.* at p. 55 (emphasis added). He described the motion to strike as "astonishingly frivolous" and advised that Frank is "considering moving for sanctions." *Id.* at p. 56.

A week after the hearing, Frank submitted his opposition to Defendants' motion to strike. [ECF No. 108]. The opposition included two supplemental declarations: one from him and one from Bednarz. Frank's declaration explained that, before he purchased Neuriva, an attorney told him in a telephone conversation that he heard there would be a claims-made settlement involving Neuriva and offered to find him a client who would object. [ECF No. 108-2].

Frank explained that Bednarz apparently understood from prior communications with him that Frank was not aware of a settlement when he

purchased Neuriva for personal use and that this was "arguably incorrect because I was aware of rumors of a settlement." *Id.* Frank argued that any inaccuracy is "legally immaterial," but said he understands "the importance of precision" and explained that he "should have insisted that we nail down precise facts before the fairness hearing" during his vacation and then said that he and Bednarz "both regret the error." *Id.*

Bednarz's declaration explained that both he and Frank were on vacation and that this coincidental timing caused him to "not discover" his "mistaken impression" about Frank's knowledge of a potential Neuriva settlement as of February 2, 2021. [ECF No. 108-1]. Bednarz said he correctly understood that Frank purchased Neuriva for personal use and that neither Frank nor a Center for Class Action Fairness attorney reviewed any filings from the docket -- but mistakenly believed that Frank had no knowledge of the potential settlement. *Id.*

Therefore, the declaration explained, Bednarz incorrectly said (at the fairness hearing) that Frank had no knowledge of the settlement when he made his February 2, 2021 purchase. *Id.* Bednarz said he regrets the error but argued that his misunderstanding is legally immaterial to Frank's standing to object because Frank's purchase was for personal consumption. *Id.* The declaration went on to explain that Bednarz personally knows that Frank did not plan to file an objection until several months after his purchase. *Id.*

Meanwhile, a few hours after the hearing (but a week before Frank and Bednarz filed their declarations conceding an incorrect representation), Defendants withdrew a section of their motion to strike "in response to representations made by counsel for putative objector" Frank. [ECF No. 104]. Specifically, Defendants said they were withdrawing their argument challenging Frank's standing because Bednarz represented that Frank "did not purchase Neuriva with the intent to object to the Settlement." *Id.*

After Frank and Bednarz filed their supplemental declarations, however, Defendants submitted a Reply in which they explain that Frank's declaration is a "revelation [which] places RB in the compromised position of having withdrawn an argument based on representations made by opposing counsel that were not true." [ECF No. 111, p. 4]. Nevertheless, Defendants did not attempt to withdraw their withdrawal of their challenges to Frank's standing in order to "maintain the integrity of its prior withdrawal." *Id.*

The Undersigned entered an Order denying Defendants' Motion to Strike. [ECF No. 123].

Frank never filed the sanctions motion his attorney threatened to pursue at the fairness hearing.

And Frank has not withdrawn his representation that he will not accept payment or fees in exchange for withdrawing his objection. [ECF No. 75-1, p. 2].

<u>Applicable Legal Standards and Analysis</u>

<u>Class Action Settlements (In General)</u>

The Undersigned begins the analysis of the motion for final approval of the First Amended Settlement Agreement with the fundamental principle that settlements are "highly favored in the law" because "they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1257 (11th Cir. 2021) (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977)) (quotation marks omitted).

Settlements "ha[ve] special importance in class actions with their notable uncertainty, difficulties of proof, and length." *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) (citation omitted). "Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice[.]" *Id.* "There exists an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation omitted).

Phrased differently, "there is a strong judicial policy favoring the pretrial settlement of class actions. *Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649, 2015 WL 5449813, at *4 (S.D. Fla. Sept. 14, 2015) (citing *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class

action lawsuits.")); *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlement.").

"Before approving a settlement, the district court must find that it 'is fair, adequate and reasonable and is not the product of collusion between the parties.'" *Nelson v. Mead Johnson & Johnson Co.,* 484 F. App'x 429, 434 (11th Cir. 2012) (quoting *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984)). The Court's "judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Id.*

The settlement here is a prime example of why class action settlements are highly favored in the law. Absent the settlement, the class action could have faced serious hurdles to recovery, and now the class is entitled to significant settlement benefits that may not have even been achieved at trial.

This observation about potential pitfalls is not mere speculation. A substantially similar class action lawsuit involving another purported brain health product (i.e., Prevagen) resulted in a mistrial and the mistrial caused the district judge to decertify the class. *Racies v. Quincy Bioscience, LLC,* No. 15-cv-00292, 2020 WL 2113852 (N.D. Cal. May 4, 2020). Less than a month later, the plaintiff and the defendant, Quincy Bioscience, LLC, filed a stipulation to the plaintiff's dismissal of his individual claims without prejudice. The docket reflects no further activity as of that May 28, 2020 stipulation.

Because this discussion starts by highlighting the importance of settlements in class action litigation, it is appropriate to mention a few other rules governing class action settlement approval orders.

First, our appellate court reviews an order approving a class action settlement for abuse of discretion. *Equifax,* 999 F.3d at 1273 (citing *Disney World Ault v. Walt Co.,* 692 F.3d 1212, 1216 (11th Cir. 2012)).

Second, because "[d]etermining the fairness of the settlement is left to the sound discretion of the trial court," the Eleventh Circuit will not overturn the district court's decision "absent a <u>clear</u> showing of abuse of that discretion." *Id.* at 1273. (citing *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984)) (emphasis in original).

Third, phrased differently, appellate courts review the class action settlement approval decision "under a highly deferential abuse of discretion standard." *Id.* (citing *4* Newberg on Class Actions § 13:47 5th ed.).

Fourth, the deference afforded a decision approving a class action settlement "makes sense" because "[s]ettlements resolve differences and bring parties together for a common resolution." *Id.* (citing *In re Nissan Motor Corp. Antitrust Litig.,* 552 F.2d 1088, 1105 (5th Cir. 1977) ("Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits.").

As noted above, a class action may be settled only with court approval, which requires the court to find the settlement "fair, reasonable, and adequate" based on a number of factors. Fed. R. Civ. P. 23(e)(2).[7] The Eleventh Circuit Court of Appeals has also instructed district courts to consider several additional factors other than those in Rule 23.

Courts in the Eleventh Circuit evaluate six factors in determining whether to approve a class action settlement: (1) the existence of fraud or collusion among the parties in reaching the settlement; (2) the complexity, expense, and duration of the litigation; (3) the stage of proceedings at which the settlement was achieved and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, the class representatives, and the substance and amount of opposition to the settlement.

---

[7]    The Rule 23(e)(2) factors include whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

*Leverso v. S. Trust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986.

In considering the settlement, the district court "may rely upon the judgment of experienced counsel for the parties." *Nelson*, 484 F. App'x at 434 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). "Absent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" *Id.* (quoting *Cotton*, 559 F.2d at 1330).

<u>Six-Factor Analysis</u>

Reviewing these considerations generates the conclusion that the settlement warrants final approval:

(a)    **<u>There is no evidence of fraud or collusion among the parties.</u>** Although Frank and TINA argue that the requested attorney's fees are excessive and challenge other portions of the settlement as well, they do not expressly accuse the parties of collusion. "Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) (citing *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 470 (S.D. Fla. 2002)); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004) ("[T]he courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement.").

There is every indication that this settlement was negotiated at arm's length and after significant investigation by Plaintiffs' counsel.

First, based on Class Counsel's representations, the Undersigned notes that before negotiating the Settlement, Class Counsel spent significant time communicating with Plaintiffs; investigating Defendants' marketing and advertising of the Neuriva products on television, in print, on their website, and on social media; gathering and reviewing studies related to the active ingredients of Neuriva; and gathering and reviewing other materials related to brain supplements. Class Counsel say that they also interviewed numerous other consumers apart from Plaintiffs about their purchases of Neuriva products.

In addition, Class Counsel also say that they worked with a biostatistics expert consultant who reviewed and analyzed studies of one of Neuriva's key ingredients and assessed the studies' methodologies and the statistical validity of the studies' conclusions. Class Counsel also worked extensively with a pharmacology/ neuroscience expert consultant regarding relevant biochemistry principles, the state of the research regarding Neuriva's active ingredients, and an analysis of studies cited by Defendants. During the settlement negotiations, Class Counsel continued to consult with the pharmacology/neuroscience expert regarding studies relied on by Defendants for purposes of the mediation.

Additionally, Class Counsel say they researched the law in California, Florida, and New York and related federal law, including applicable federal regulations and relevant FDA and FTC guidance regarding dietary supplements. According to Class Counsel, they also reviewed the filings and court decisions in similar litigation addressing comparable supplements.

As a result of this work, Class Counsel entered the mediation amply informed about the merits of the Settlement Class members' claims and were well positioned to vigorously advance the position of Plaintiffs and the Settlement Class members while also being fully prepared to continue to litigate the cases rather than accept a settlement that was not in the best interests of Plaintiffs and the Settlement Class.

While the *Matthews* and *Williams* cases were proceeding, the parties agreed to mediate all the cases and, after engaging in informal discovery regarding Defendants' basis for their claims and data regarding Neuriva's sales, participated in a one-day mediation session on October 2, 2020, with mediator Jill Sperber, Esq. (from Judicate West). Ms. Sperber is a respected mediator with significant complex litigation experience, both as a litigator and as a mediator.

The October 2nd mediation lasted into the evening, but it ended without a settlement and without an agreement to engage in any future mediation or negotiations. [ECF No. 69-1, p. 6]

When the parties failed to reach a settlement at that mediation, Ms. Sperber continued to engage in discussions with the parties, and ultimately the parties agreed to participate in a second mediation session on November 30, 2020. On the second day of the November 30, 2020 mediation, the parties were able to substantially agree on the monetary amount of the settlement fund for the Class. Subsequently, with Ms. Sperber's assistance, the parties continued to negotiate telephonically and ultimately agreed to injunctive relief terms.

Before later agreeing to a revised settlement, the parties agreed to the final material terms of the Settlement, although they continued their discussions of the finer details of the Settlement Agreement through January 2021. At all times, the negotiations were at arm's-length, and Ms. Sperber agrees that the resulting settlement is a fair, reasonable, and adequate resolution for the Settlement Class.

Ms. Sperber's involvement and her opinion are facts that weigh in favor of settlement approval. *See, e.g., In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004) (fact that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion). There is no suggestion of fraud or collusion here. *Cf. Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014) (reversing district court's approval due to the presence of "almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the

lookout for," including, inter alia, the lead class representative's "fatal conflicts of interest").[8]

> (b)     **The litigation involved complex claims.** "The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 996 (N.D. Ohio 2016) (citing *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)).

The Settlement covers legal claims on behalf of what Class Counsel believes to be thousands of members. The 56-page Amended Complaint includes six counts for

---

[8]     This Court in *Wilson v. Everbank* succinctly summarized some of the "danger signs" identified by the *Eubank* Court as follows:

> [O]pposition by named plaintiffs; a provision requiring class members to risk recovering nothing by submitting their claims to arbitration, where the defendants had reserved defenses, in order to be eligible for any meaningful settlement distribution; an award of only coupons to a portion of the class; twelve-to-thirteen-page claim forms requiring class members to submit "a slew of arcane data, including the product identity stamp," "Unit ID Label," and purchase order number of the product at issue; and an unnecessarily complex settlement notice.

**Error! Main Document Only.**No. 14-CIV-22264, 2016 WL 457011, at *11 (S.D. Fla. Feb. 3, 2016) (citing *Eubank*, 753 F.3d at 725-26). These danger signs are not present in the Amended Settlement Agreement and Release. *See also Hall v. Bank of America,* No. 1:12-cv-22700-FAM, 2014 WL 7184039, at *3, n.4 (S.D. Fla. Dec. 17, 2014) (discussing *Eubank* danger signs in Order approving class action settlement agreement).

deceptive and unfair business practices, all of which would involve a comprehensive assessment of the viability and effectiveness of several ingredients.

Litigating these claims to resolution would have undoubtedly proven difficult and consumed significant time, money, and judicial resources. Even if Plaintiffs were ultimately to have prevailed, that success would likely have borne fruit for the Class only after years of trial and appellate proceedings and the expenditure of millions of dollars by both sides. This factor weighs in favor of approving the settlement. *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d 891, 932 (E.D. La. 2012) *aff'd* 2014 WL 103836 (5th Cir. Jan. 10, 2014) ("Even assuming litigation could obtain the results that this Settlement provides, years of litigation would stand between the class and any such recovery. Hence, this . . . factor weighs strongly in favor of granting final approval to the Settlement Agreement.").

For all practical purposes, the litigation would have involved the retention of expert witnesses to analyze clinical studies and to investigate the medical and scientific theories purportedly underlying the Defendants' claims about the Neuriva products.

Moreover, there is no guarantee that Plaintiffs would have prevailed at trial. Indeed, as explained earlier, one recent California federal jury trial involving a similar brain health product resulted in a mistrial.

Therefore, this Settlement offers the Settlement Class significant relief that "could very well exceed [their] likely recovery at trial." *Hall v. Bank of America, N.A.,*

No. 12-cv-22700, 2014 WL 7184039, at *4 (S.D. Fla. Dec. 17, 2014) (approving settlement in force-placed insurance class actions involving claims-made process and overruling arguments asserted by objectors).

There was nothing to be gained from litigating the complex claims presented for years more; doing so would only have cost the Court, the parties, and absent class members valuable time, resources, and money.

(c)     **The parties finalized a settlement after the completion of informal discovery.** The stage of proceedings at which settlement is achieved is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (citation omitted). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some **reasonable** amount of discovery should be required to make these determinations." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) (emphasis added); *see, e.g., In re Remeron End-Payor Antitrust Litig.*, No. 02-2007, 2005 WL 2230314, at *21 (D.N.J. Sept. 13, 2005) ("Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements, especially in complex class action cases, should be done." (citation omitted)); *Lipuma*, 406 F. Supp. 2d at 1324 ("[C]ourts favor early settlement.").

The parties to this action agreed to the terms of the Settlement after Plaintiffs obtained informal discovery, including Neuriva's historical sales data. Moreover, the settlement was reached after Defendants filed a well-briefed motion to dismiss the initial Complaint [ECF No. 23] and a similarly compelling motion to dismiss the Amended Complaint [ECF No. 39]. Those motions challenged myriad aspects of the Complaints.

(d)   **Plaintiffs faced significant risks had they proceeded with litigation.**

"[T]he likelihood and extent of any recovery from the defendants absent . . . settlement" must be considered in assessing the reasonableness of a settlement. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993). Put simply, while Class Counsel and Plaintiffs say that they believe they have a strong and compelling case, Plaintiffs faced the risk of losing at class certification, summary judgment, at trial, or on appeal. Therefore, "because success at trial is not certain for Plaintiff[s], this factor weighs in favor of accepting the settlement." *Burrows v. Purchasing Power, LLC*, No. 1: 12-CV-22800, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013); *see generally In re Polyurethane*, 168 F. Supp. 3d at 997 (noting the "real possibility" that class "could have received much less – even zero – from a jury at trial or following an appeal").

Moreover, even if Plaintiffs prevailed at trial, any recovery could be delayed for years by an appeal. This Settlement provides substantial relief to Settlement Class

Members without further delay. *Lipuma*, 406 F. Supp. 2d at 1322 (noting that the likelihood appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement).

Plaintiffs faced the real possibility of zero recovery or recovery and label changes obtainable only years in the future, allowing Defendants' alleged false marketing to continue unabated during the intervening years.

Plaintiffs would have faced motions for summary judgment, orders on their class certification motion and Defendants' motion to exclude their experts, and possibly a lengthy trial and an appeal. A claim based on similar facts and the same or similar legal theories as those advanced here met with mixed results. *See Racies*, 2020 WL 2113852.

Defendants mounted a vigorous presentation on the legitimacy and efficacy of their products, including myriad studies. If Plaintiffs had continued to litigate the case, then they would have been confronted with a substantial amount of evidence presented by Defendants. Defendants presented some of their scientific-type evidence in memoranda and exhibits submitted since the initial settlement was reached. There is reason to believe that their efforts would have been more tenacious had they been forced to defend the merits of Neuriva at the summary judgment and trial stages.

Moreover, Plaintiffs might not have been able to have the requested class certified in light of *Brown v. Electrolux Home Products, Inc.*, a case about "smelly washing machines." 817 F.3d 1225, 1230 (11th Cir. 2016).

In *Electrolux*, the plaintiffs filed class action lawsuits in multiple states against the manufacturers of front-loading washing machines because the rubber seal on the front door of the initial models retains water, which allows mildew to grow. *Id.* The mildew, the plaintiffs alleged, stains clothes and creates a foul odor. *Id.* Consumers from California and Texas filed a class action against Electrolux, a Delaware corporation headquartered in Georgia, and the district court certified two statewide classes. *Id.* The Eleventh Circuit held that the district court abused its discretion in determining the predominance requirement of Fed. R. Civ. P. 23(b)(3) and vacated the order. *Id.*

In doing so, the *Electrolux* Court articulated several broad principles which might have made it extremely difficult for Plaintiffs to have obtained class certification had Defendants not settled and opposed the class certification. Specifically, the appellate court held that the district court misstated the law when it said that (1) it "resolves doubts related to class certification in favor of certifying the class," (2) it "accepts the allegations in the complaint as true," and (3) it would "draw[] all inferences and present all evidence in the light most favorable to" the party seeking class certification. *Id.* at 1231. The Eleventh Circuit held that the party seeking class

certification has a "burden of *proof,* not a burden of pleading." *Id.* at 1234 (emphasis in original). And it noted that the trial court must conduct a "rigorous analysis" to determine whether the class certification movant has met his burden of proving that the requirements are "in fact" met. *Id.*

Moreover, a recent United States Supreme Court case emphasized the need for "every class member [to have] Article III standing in order to recover individual damages" and highlighted the requirement for all class action members to have suffered a concrete injury. *See TransUnion LLC v. Ramirez,* 141 S.Ct. 2190, 2208 (June 25, 2021) (to have Article III standing to sue in federal court, class action plaintiffs must demonstrate they suffered a concrete harm; class members whose misleading credit reports were not provided to third-party businesses lacked standing to sue on a Fair Credit Reporting Act claim that a credit reporting agency failed to use reasonable procedures to ensure the accuracy of their credit files).

In the Amended Complaint, Plaintiff David Williams alleges that he "purchased seven to eight bottles of Neuriva Original" in January 2020, and Plaintiff Caroll Anglade alleges that she "purchased Neuriva on several occasions in 2019"— but neither Plaintiff alleges that he or she purchased Neuriva *Plus* and *De-Stress* specifically. [ECF No. 36, ¶¶ 131, 137].

Thus, it seems that neither Plaintiff has standing to bring claims as to the Neuriva Plus or Neuriva De-Stress products. *Toback v. GNC Holdings, Inc.,* No. 13-

80526, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013) ("Because [the plaintiff] alleges that he purchased the TriFlex Vitapak, but not other TriFlex products, he has failed to plead that he suffered any injury with regard to products other than the TriFlex Vitapak."); *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) ("[The plaintiff] lacks Article III standing to bring claims on behalf of the Neutrogena products he did not purchase because he cannot conceivably allege any injuries from products that he never purchased or used. Therefore, all of [the plaintiff's] claims related to unpurchased products are dismissed.").

All of these risk factors weigh strongly in favor of final approval. At the risk of again invoking the "something-is-better-than-nothing" maxim, the legal challenges afflicting this case are hardly insignificant, and they supply a compelling reason to approve a settlement which provides relief when a non-settlement script might lead to an adverse result. *See generally In Re Polyurethane*, 168 F. Supp. 3d at 1002 (settlement must be assessed as a function of both the size of the amount relative to the best possible recovery and the likelihood of non-recovery or reduced recovery).

(e)     **The Settlement offers class members monetary relief as well as injunctive relief.** "The range of potential recovery 'spans from a finding of non-liability through varying levels of injunctive relief,' in addition to any monetary benefits to class members." *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1326, (S.D. Fla. 2007) (citing *Lipuma*, 406 F. Supp. 2d at 1322). "In considering the question of

possible recovery, the focus is on the possible recovery at trial." *Saccoccio*, 297 F.R.D. at 693 (citation omitted). "[T]he Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id.* (citation omitted).

"[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate . . . . A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]" *Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988); *see also In re Polyurethene*, 168 F. Supp. 3d at 1001 (noting that "settlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion").

The monetary relief made available to the Settlement Class will provide class members who submit claims a substantial recovery, particularly considering that this result was borne of compromise.

Defendants have agreed to pay up to $8,000,000 in monetary relief to Settlement Class Members for purchases of Neuriva products, *exclusive of* administrative costs, attorney's fees and expenses, and court-ordered service awards. Settlement Class Members with proof of purchase will receive up to $32.50 per valid claim, and Settlement Class Members may make up to two claims for a maximum of $65.00. Settlement Class Members may not receive more than the amount reflected on their

proof of purchase. For those without proof of purchase, Settlement Class Members will receive $5.00 per valid claim, and Settlement Class Members may make up to four claims for a maximum of $20.00.

The Settlement provides immediate and substantial monetary relief to the Settlement Class, with payments approximating a significant percentage of Settlement Class Members' actual damages. (Bryson Decl. ¶¶ 29, 30, [ECF No. 69-1]). And Defendants will have to make significant label changes -- specifically removing the language at the heart of this case -- within six months after final approval (as opposed to years down the road).

The Settlement's claims-made structure also satisfies the applicable standard. The Court is not charged with choosing the payment structure that will provide the *best* possible relief to all class members or deciding whether a claims-made structure is absolutely necessary, but, instead, with determining whether the settlement presented is fair, reasonable, and adequate given the inherent risks and expense of further litigation. *See, e.g., Casey v. Citibank, N.A.*, No. 13-cv-820, 2014 WL 4120599 (N.D.N.Y. Aug. 21, 2014) (finding claims-made structure fair, reasonable, and adequate because, *inter alia*, defendants would not have agreed to direct-pay and "[t]he Court does not have the authority to impose a preferred payment structure upon the settling parties").

Thus, claims-made settlements have been found to be fair, reasonable, and, in fact, more than adequate in class action litigation. *See, e.g., Hall*, 2014 WL 7184039, at *6 ("There is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment." (citation omitted)); *Saccoccio*, 297 F.R.D. at 696 (same); *Hamilton v. SunTrust Mortg., Inc.*, No. 13-60749, 2014 WL 5419507, at *6 (S.D. Fla. Oct. 24, 2014) ("Filing a claim form is a 'reasonable administrative requirement' which generally does not impose an undue burden on members of a settlement class." (citation omitted)); *Casey*, 2014 WL 4120599 (granting final approval of claims-made force-placed insurance settlement).

The Eleventh Circuit has affirmed claims-made settlements affording less relief to class members than that afforded here. *See, e.g., Poertner v. Gillette Co.*, 618 F. App'x 624 (11th Cir. 2015) *cert. denied sub nom. Frank v. Poertner*, No. 15-765, 2016 WL 1079040 (U.S. March 21, 2016) (unpublished) (affirming approval of claims-made settlement offering class members between six and twelve dollars for filing a claim, as well as injunctive relief); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1238 (11th Cir. 2012) (upholding claims-made settlement that gave class members opportunity to resubmit warranty claims to the defendants through a procedure with enhanced consumer protections); *Nelson*, 484 F. App'x at 432, 434-35 (upholding claims-made settlement where defendant agreed to send claimants free product up to a certain aggregate value).

Thus, by way of summary, this monetary recovery and injunctive relief[9] --
assured without the expense, uncertainty, and delay of litigation -- is a valuable and
timely result for the Class. *See, e.g., Beber et al. v. Branch Banking & Trust Co. et al.*, No.
15-cv-23294, ECF No. 109 (S.D. Fla. Jan. 10, 2017) (approving similar settlement with
payment percentages of damages of 10%, 8%, and 5%); *Saccoccio*, 297 F.R.D. at 693
(return of 12.5% of premiums charged for FPI with prospective relief that "very likely
exceeds what Plaintiffs could have won at trial"); *In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (range of 9% to 45% of damages was an
"exemplary" result).

The ability of Class Members who do not have proof of purchase to receive
monetary benefits is particularly noteworthy, as most Members do not have proof of
purchase and Defendants have no way of independently verifying who actually
purchased an over-the-counter product like Neuriva. Further, the monetary settlement
benefits per purchase available to those without proof of purchase constitute
approximately 22% of the manufacturer's price for Neuriva Original or 15% for
Neuriva Plus. (Bryson Decl. ¶ 30 [ECF No. 69-1]).

---

[9] The Undersigned will discuss the benefits of the injunctive relief in greater
detail later in this Report, when I evaluate the Objections, which primarily target the
injunctive relief and label it illusory.

These settlement amounts meet or exceed the standards established by this and other courts. *See Bennett*, 737 F.2d at 986 (holding that 5.6% recovery was fair and adequate in view of risks of further litigation and litigation objectives); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1346 ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims.").

In fact, the monetary benefits made available to Settlement Class Members compare favorably with a substantially similar case. *See Collins v. Quincy Bioscience, LLC*, Case No. 1:19-cv-22864, ECF No. 200 (S.D. Fla. Nov. 18, 2020) (granting final approval to brain supplement class settlement providing up to $12 without proof of purchase and up to $70 with proof of purchase).

In light of the costs, uncertainties, and delays of litigating through trial -- and possibly an appeal -- "the benefits to the class of the present settlement become all the more apparent." *See Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

(f) **The Opinions of Class Counsel, the Class Representatives, and Absent Class Members.** A court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa*, 693 F. Supp. 1051, 1060 (M.D. Fla. 1988). Class Counsel in this case have long track records of successfully litigating a wide variety of consumer class actions nationwide, including those involving supplements. (Bryson Decl. ¶ 40 [ECF No. 69-

1]). Class Counsel relied on their experience and their deep familiarity with the factual and legal issues in this case, considered the risks associated with continued litigation, and determined that the Settlement is fair, reasonable, adequate, and in the best interests of the Settlement Class Members.

Concerning the view of absent class members, as of July 15, 2021, the Settlement Administrator had not received any opt out requests. As far as the Undersigned is aware, there is one Objector (Frank) and one non-Objector *amicus* (TINA), a scenario strongly supporting the fairness and reasonableness of the Settlement. *See, e.g., Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with 45 objections out of 90,000 notices); *Saccoccio*, 297 F.R.D. at 694 (opposition amounting to .018% of the class was termed as "low resistance to the settlement" and weighed "in favor of approving the settlement").[10]

This Court, like others, "considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness." *Hall v. Bank of Am., N.A.*, No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014).

---

[10]    Although Defendants submitted supplemental *claims* information after the motion for final settlement approval was filed, they did not provide any updated information on the number of opt-out requests. In the absence of any additional information, the Undersigned will use the no-opt-outs scenario.

Obviously, "a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable." *Saccoccio,* 297 F.R.D. at 694.

The First Amended Settlement Agreement has met with near-universal approval. Only one Class Member objected. Neither the United States Attorney General, a state attorney general, nor any federal[11] or state regulator has objected.

These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval. *See Hall,* 2014 WL 7184039, at *5 (where objections from LPI settlement class members "equates to less than .0016% of the class" and "not a single state attorney general or regulator submitted an objection," "such facts are overwhelming support for the settlement and evidence of its reasonableness and fairness"); *Hamilton v. SunTrust Mortg, Inc.,* No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (where "not a single state attorney general or regulator submitted

---

[11]   The Undersigned does not consider the email from Mr. Cleland, at the FTC, to be a formal Federal Trade Commission objection to the Settlement. That email is simply an informal response to a request for his opinion on how a consumer might interpret certain language. If the FTC wanted to officially and formally object, then it could have done so, and it certainly knows how to do so. For example, the FTC sometimes files motions to intervene in order to object to a proposed class action settlement. *See e.g., In re First Databank Antitrust Litig.,* 205 F.R.D. 408, 414-16 (D.D.C. 2002) (granting the FTC's request to intervene for the limited purpose of opposing class counsel's fee request, finding that the FTC is permitted to intervene "in furtherance of [its] official responsibilities on behalf of the public interest").

an objection," and there were few objections to LPI class settlement, "such facts are overwhelming support for the settlement"); *Burrows v. Purchasing Power, LLC*, No. 12-22800, 2013 WL 10167232, at *7 (S.D. Fla. Oct. 7, 2013) ("No members of the Settlement Class oppose the settlement, nor have any governmental agencies filed opposition.").

The Objections[12]

There are three overarching categories of objections: (1) the argument that the injunctive relief is worthless because it is illusory; (2) the position that the monetary relief is inadequate; and (3) the contention that the amount of attorney's fees requested is unfair. The Undersigned will discuss the attorney's fees and monetary portion of the Settlement later in this Report, after the injunctive relief is analyzed.

The Undersigned previously entered an Order denying Defendants' motion to strike the submissions of Frank and TINA. [ECF No. 123]. Plaintiffs have described Frank as a "professional, serial class action objector." But, as the Undersigned explained in that earlier Order, Frank's status (either individually or through CCAF) as a frequent Objector, while factually correct, is insufficient to justify a conclusion

---

[12]    The Objections discussion includes the positions and arguments raised by TINA, which is not an Objector because it is not a member of the Settlement Class. Given the Undersigned's Order granting TINA leave to file an *amicus* brief and given TINA's continued submissions, the Undersigned is evaluating TINA's contentions under the Objections section of this Report (even though TINA is technically not an actual Objector).

condemning him. *See generally Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205, 206 (D.D.C. 2013) (describing CCAF's objection as "comprehensive and sophisticated" and explaining that "[o]ne good objector may be worth many frivolous objections in ascertaining the fairness of a settlement").

In any event, as explained above, the precise nature of the injunctive relief has changed since the motion to finally approve the settlement was filed.

**The Injunctive Relief (Challenges and Responses)**

The "reasonable consumer" standard governs the interpretation of product labels and advertising. *See, e.g., Davis v. Fresh Market*, No. 1:19-cv-24245, 2020 WL 3489369, at *4 (S.D. Fla. June 26, 2020) ("Plaintiffs do not plausibly allege that a reasonable consumer would be misled by Defendants' promotional materials."). When applying the "reasonable consumer" standard to contested words or claims courts consistently look to dictionary definitions, i.e., those words' common meanings. *See, e.g., Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1101 (11th Cir. 2019) (relying on Oxford English dictionary definition of "advertisement" to determine what a reasonable consumer would understand by an agreement to receive "faxed advertisements"); *Salters v. Beam Suntory, Inc.*, 2015 WL 2124939, at *1 (N.D. Fla. May 1, 2015) (relying on Oxford English dictionary definitions to find that "no reasonable person would understand 'handmade' in this context [involving a mass-produced bourbon] to mean literally made by hand" without the use of substantial equipment).

Frank

Frank contends that the change in language is still illusory, even after the parties

agreed to additional restrictions in the First Amended Settlement Agreement. Frank

argues that consumers would likely understand "clinically tested" to imply "clinically

proven." He also says that Defendants would still be permitted to "deliver the

impression that Neuriva itself, not merely its ingredients, have been clinically tested.

He contends that Neuriva itself has never been clinically tested and that marketing

statements about studies of ingredients remain misleading.

In addition, Frank argues that Defendants do not view the deletion of "shown"

(from the phrases "clinically tested and shown" and "clinical studies have shown") as

being significant because they represented that they did it voluntarily for aesthetic

reasons.

Moreover, Frank similarly argues that the First Amended Settlement

Agreement permits Defendants to claim that Neuriva products "fuel[] 6 indicators of

brain health" and that their ingredients were "clinically tested to help support brain

health."

One of Frank's primary initial objections has been obviated by the amended

version of the Settlement Agreement. Frank argued that Neuriva itself has never been

tested as a product and that the only studies Defendants rely upon are those

concerning *ingredients*. But the latest version of the injunctive relief requires

Defendants to limit their representations about studies to studies of their products' ingredients.

But Frank argues that allowing Defendants to link clinically tested to the ingredients and not the product as a whole is further misleading because "it at least implies that clinical testing of individual ingredients is relevant when, in fact, the FDA has made clear it is not." [ECF No. 75, p. 24].

On the other hand, Frank also highlights the allegations that Neuriva "cannot and does not work as represented because (1) its purported natural ingredients are food, which gets digested into constituent parts, long before they enter the bloodstream"; (2) the "key ingredients no longer exist in their original form after digestion"; and (3) "even if the molecules of Neuriva's ingredients somehow survive digestion, they could never get into the brain and have any effect because the Blood Brain Barrier would prevent them from ever entering the brain at all or in any meaningful amount." *Id.* at p. 8.

Frank also provides criticism of the studies submitted by Defendants (i.e., those involving coffee cherry extract and those involving phosphatidylserine). Likewise, he offers negative comments about the analysis provided by Dr. Gary Small, the Chair of Psychiatry at Hackensack University Medical Center (and a past president of the American Association for Geriatric Psychiatry) whose declaration was submitted by Defendants. [ECF No. 62-1]. Dr. Small's conclusion is:

The scientific evidence supports the promotional and implied claims that individuals who take Neurofactor and PS, the ingredients in Neuriva, experience a noticeable improvement in cognitive function including focus, concentration, memory, learning, reasoning, and accuracy. These ingredients, at doses that are included in the formulation, were shown in clinical studies to increase BDNF and help with mental focus, accuracy memory, learning and concentration which contribute to reasoning and accuracy. Meanwhile, clinical studies have shown that supplementation with melon concentrate containing high levels of SOD decreases stress and fatigue.

[ECF No. 62-1, p. 17].

TINA

Similar to Frank, TINA argues that the difference between the latest version of the Settlement Agreement and the earlier one is only a temporary ban (of two years) of one additional word ("shown") from Defendants' marketing materials, thereby bringing the number of prohibited words to two: "proven" and "shown."

Because Defendants would still be permitted to use "clinically tested" or similar language, TINA says, they could also use other words, synonymous to the banned language, such as "confirmed by science," "demonstrated," "backed by science" or other equivalent terminology.

[*Note*: The First Amended Settlement Agreement provides, in Section IV(A)(1)(d), that Defendants "shall not use the term 'Clinically Tested and Shown,' 'clinical studies have shown' **or similar** 'shown' claims on Neuriva Products labels or in ancillary marketing." [ECF No. 116-1, p. 9 of 54] (emphasis added). The

Undersigned construes "similar 'shown' claims" to **prohibit language stating or implying that studies have "confirmed," "demonstrated," "established," (or other words or phrases which are synonymous to "shown") that the ingredients do in fact promote brain health functions.**

This Report and Recommendations is <u>expressly based on this interpretation of the subparagraph of the First Amended Settlement Agreement.</u> Thus, TINA's concern about Defendants' ability to use the words it proffered in its memorandum is inapposite. However, if Defendants take issue with the Undersigned's view of the language and believe that the First Amended Settlement Agreement (if approved) somehow still permits them to use the terminology mentioned above (or similar language), **then they shall within three days of the date of the Report file a notice disclosing its position].**

Moreover, TINA contends that the phrase "clinically tested" is susceptible to more than one reasonable interpretation and is, in effect, a promise that there is scientific evidence that proves or establishes the truth of the statement.

Therefore, according to TINA, the temporary elimination of two specific words is "merely cosmetic" and "will have no impact on the deceptive message communicated to consumers." [ECF No. 122, p. 2]. At bottom, TINA says, the settlement "does not remedy the deceptive marketing alleged in the operative complaint." [ECF No. 83, p. 14].

<u>Plaintiffs' Initial Responses</u>

Plaintiffs begin their presentation by noting that only one "professional objector" (i.e., Frank) and one *amicus* submitted anything in opposition to the motion to approve the settlement. They also highlight that no other class member filed an objection and that no federal or state regulator has opposed the settlement.

As noted, Plaintiffs label Frank as "a professional, serial class action objector" [ECF No. 85, p. 2]. They say he "has an admittedly long track record of inserting himself and the [Center for Class Action Fairness] in class action settlements through lodging objections, and it is through objecting to class action settlements that Frank has made a career." *Id*. Noting that Frank has represented that neither he nor CCAF should be awarded any fees in this case, Plaintiffs point out that CCAF is partially funded by attorney's fees awarded from his work in objecting to class settlements.

As for TINA, Plaintiffs say they applaud its work and believe it serves an important role in educating consumers. Nevertheless, they also say that TINA's proposed solution of rejecting the settlement entirely is not desirable because it would lead to prolonged litigation with an uncertain result and would stop a reasonable compromise.

Plaintiffs brand as unrealistic the argument that the settlement should be rejected because it does not impose a requirement that Defendants **substantiate** the efficacy of the Neuriva products. Specifically, they argue that several courts have

barred private litigants from bringing substantiation claims in false advertising cases. *See e.g., Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1095 (9th Cir. 2017) ("These courts have precluded private citizens from bringing actions that allege that the challenged advertising language lacked proper scientific substantiation."); *Franulovic v. Coca Cola Co.*, 390 F. App' x 125, 127-28 (3d Cir. 2010) (the plaintiff "claimed that Coca Cola was required to adequately substantiate its advertising claims prior to marketing…No New Jersey or Third Circuit decision has applied the prior substantiation theory to the New Jersey Consumer Fraud Act, and we, therefore, decline to do so here").[13]

Given this case law authority, Plaintiffs argue that efforts to demand substantiation of Defendants' marketing claims about the Neuriva products "risks dismissal in false advertising class actions." Moreover, Plaintiffs contend that Defendants' efforts in this lawsuit to substantiate the products, if successful, risks triggering dismissal of the lawsuit on preemption grounds. Plaintiffs cite *Dachauer v. NBTY, Inc.*, 913 F.3d 844 (9th Cir. 2019) for this concern.[14]

---

[13]     Plaintiffs note [ECF 85, p. 6] that Florida law is "admittedly less developed" on whether lack of substantiation claims can proceed. *See Garcia v. Clarins USA, Inc.*, No. 14-CV-21249-HUCK/OTAZO-REYES, 2014 WL 11997812, at *8 (S.D. Fla. Sept. 5, 2014) ("Under Florida law, it is not clear whether a lack of substantiation claim is available under FDUTPA."); *Toback v. GNC Holdings, Inc.*, No. 13-80526-CIV, 2013 WL 5206103, at *3 (S.D. Fla. Sept. 13, 2013) (same).

[14]     In *Dachauer*, the appellate court affirmed an order granting, on preemption grounds, summary judgment in favor of manufacturers of vitamin E supplements who

According to Plaintiffs, Frank and TINA appear to urge that Plaintiffs pursue the "actual falsity" route in continued litigation, but Plaintiffs argue that this strategy carries a higher burden and also creates a heightened risk of dismissal as a result of a "battle of the experts."

First, Plaintiffs suggest that they might not overcome *Daubert* motions in their entirety. Thus, if that concern were to evolve into an actual negative result, the lawsuit would be more problematic and challenging.

Second, they argue that Frank seemingly ignores the reality that Plaintiffs would need to make an affirmative showing of actual falsity. Plaintiffs note that Frank, "an attorney without a pharmacological or medical background," does not promise that Plaintiffs "have a 100% chance or even a probability of affirmatively establishing actual falsity."

Third, they say that Frank's attack on Dr. Small, Defendant's expert, does not provide insight into how Plaintiffs would be able to establish actual falsity.

------

allegedly violated California laws against false advertising. The Ninth Circuit Court of Appeals explained that (1) although the Federal Food, Drug and Cosmetic Act requires manufacturers to have substantiation for their structure/function claims, California law does not allow private plaintiffs (like the Plaintiffs here) to demand substantiation for advertising claims; (2) a private plaintiff bears the burden of producing evidence to prove that the challenged statement is false or misleading.

Plaintiffs also highlight the possibility that Plaintiffs, if they continued litigation (rather than resolving the lawsuit with a Court-approved class action settlement) could survive *Daubert* and dispositive motions, get a class certified -- and *then* lose at trial. Significantly, this is precisely what happened in *Racies*, 2020 WL 2113852, where the jury deadlocked, the judge declared a mistrial and then decertified the class.

In addition to the unfortunate (for the plaintiffs) result in *Racies*, there are other instances of negative results which Plaintiffs provided as illustrations of their concern about an actual trial. They all reveal the dangers associated with taking to trial a national false advertising case involving health-related products which made claims deemed to be false and misleading because the products are incapable of providing the advertised health benefits.[15]

_____

[15]  For example, in *Allen v. Hyland's, Inc.*, the plaintiff lost a 13-day class action trial involving homeopathic products where the defendant advertised the products as providing specific benefits that no homeopathic product could provide. *Allen* was a nationwide class with damages for refunds of $255 million. The claims involved similar allegations as here -- that the products were false and misleading because they are incapable of providing the advertised health benefits. *See* No. 2:12-cv-01150, 2021 WL 718295 (C.D. Cal. Feb. 23, 2021). The trial court also followed the jury's finding in ruling against plaintiff on the equitable claims for restitution and injunctive relief.

Similarly, in *Farar v. Bayer AG*, the plaintiffs alleged Bayer's One-A-Day products contained false and misleading heart health, immunity, and energy claims in violation of consumer protection statutes from California, Florida, and New York. *See* No. 3:14-cv-04601, 2017 WL 5952876 (N.D. Cal. Nov. 15, 2017). The plaintiffs survived a motion to dismiss and motion for summary judgment. However, the four-year litigation ended in a jury verdict for Bayer. *Farar*, ECF No. 327 (Judgment). Before the loss at trial, the plaintiffs had successfully argued a full refund damages model, which exposed Bayer to a $4 billion verdict.

Plaintiffs also contend that there is a significant distinction between "clinically proven" and "clinically tested."

Plaintiffs concede that they would prefer longer than two years for the injunctive relief, but they explain that the only alternative is continued litigation, which can last for several years.

Plaintiffs' Supplemental Positions

Plaintiffs filed a supplemental memorandum after the parties entered into their First Amended Settlement Agreement and Release (which further restricted the marketing claims which Defendants could make about the Neuriva products by prohibiting them from using both "proved" and "shown" type claims). [ECF No. 124].

According to Plaintiffs, this additional restriction limits Neuriva's marketing representations to claims which are not in dispute: that Neuriva's ingredients have been tested.

Plaintiffs rebut TINA's argument that Defendants would still be permitted to use terms synonymous with "shown." To the contrary, they say, those terms will be prohibited under the First Amended Settlement Agreement.

Plaintiffs also stress what they describe as their "powerful supervisory role over Defendants' marketing." [ECF No. 124, p. 4]. Defendants must give Plaintiffs' counsel 180 days' notice in writing if they seek to change the marketing of the Neuriva products, and Plaintiffs may then raise issues with the Court. They also highlight their

ability to block any marketing which is not substantiated by available evidence, a benefit Plaintiffs say is a stronger standard than they have in litigation, where private parties are susceptible to having their cases dismissed when they have demanded defendants to substantiate marketing claims.

Comparing Neuriva to other brain supplements, Plaintiffs contend that the First Amended Settlement Agreement removes an unfair advantage which Neuriva currently enjoys over their competitors. For example, they say, other products use the "shown" language and Defendants would be required to weaken their representations by eliminating "proven" and "shown." Therefore, not only would Neuriva lose its marketing advantage, but it would place Defendants' products at a *disadvantage* to its competitors, who could still use "shown" or similar language.

Thus, Plaintiffs conclude, the injunctive relief will result in marketing which is "not false or deceptive" (because the ingredients have been tested) and which "in several instances is *more* constrictive than how similar brains supplements are marketed." [ECF No. 124, p. 7] (emphasis supplied).

<u>Defendants' Positions</u>

Defendants argue that the Court should ignore all of Frank's criticisms of the science supporting Neuriva's ingredients because he is an attorney, not a scientific expert, and is therefore not qualified to provide opinions about efficacy. [ECF No. 111]. Defendants note that CCAF's Objection [ECF No. 75, pp. 10-16] refers to Frank's

"study-by-study review" [of Dr. Small's studies] which "prompted Mr. Frank and his lawyer to opine 'from the science discussed above it is more likely than not that Neuriva does not work as represented.'" *Id.* at p. 9. They contend that Frank's science-based analysis should be ignored, as he lacks the requisite scientific credentials.

Defendants say that the additional injunctive relief (from the First Amended Settlement Agreement) – that they would not refer to "shown," in addition to not using "proven," addresses Plaintiffs' claims of purported deception. To help support their position, Defendants have submitted two expert declarations from Professor Punam Keller,[16] who concludes that a Neuriva labeling and marketing effort which consistently requires use of the phrase "Clinically Tested" will result in "consumers

---

[16]     Professor Keller is the Charles Henry Jones Third Century Professor of Management, a chaired professor in the marketing area, and Senior Associate Dean for Advancement and Tuck-Dartmouth Programs at the Tuck School of Business at Dartmouth College in Hanover, New Hampshire. According to her supplemental declaration, Professor Keller's research "develops theory on how people process marketing communications, in particular health appeals, and includes the application of social marketing principles and behavioral theory to enhance voluntary consumer and employee health and saving behaviors." [ECF No. 132-1, ¶ 2].

She has also advised several organizations in the health sector regarding health-related communications. Dr. Keller worked with the Centers for Disease Control and Prevention's Division of Cancer Prevention and Control to design an online health communication marketing tool (MessageWorks) to help health researchers and practitioners develop effective health messages. In addition, she created health messages to increase prescription drug adherence for CVS Health. Similarly, she has created health messages for the Mayo Clinic to help reduce heart failure readmission rates. And Dr. Keller has also provided health messaging expertise to several medical teams supported by funding from the National Institute on Aging and the National Institute for Health. [ECF No. 98-4, ¶ 5].

[who] are likely to correctly conclude that Neuriva's ingredients have been tested, without necessarily drawing additional inferences about the level of proof or certainty those tests revealed." [ECF Nos. 132, p. 1; 132-1, ¶¶ 12-13].

In her initial 25-page declaration, Dr. Keller discussed the significant concession RB made in agreeing to "clinically tested" or similar language, such as clinical studies have "shown." [ECF No. 98-4, ¶¶ 3–6, 9]. That declaration further established that consumers would perceive a meaningful difference between the claims "Clinically Tested" and "Clinically Proven," with the "tested" claim connoting a *process* versus the "proven" claim connoting a *result*. *Id.* ¶¶ 23, 26–27. These conclusions were based on Dr. Keller's review of the record, the specific demographics of Neuriva buyers, RB's own marketing research, and related academic research in the relevant field. *Id.* ¶ 8.

Dr. Keller concluded that the original injunctive relief represented a significant concession by RB and a value to consumers. *See id.* ¶¶ 9, 37, 40, 45. She has now reviewed the Amended Settlement and the revised Neuriva labels and concluded that Defendants have further strengthened the significant relief afforded in the first settlement. [ECF No. 132-1].

As before, Dr. Keller's testimony establishes that consumers' perception largely turns on three factors: (1) the words and phrases used in the message (*e.g.*, clinically tested vs. clinically shown); (2) the individual consumer (*e.g.*, age; income; education); and (3) context (*e.g.*, prevention vs. promotion health products). *Id.* ¶ 5. According to

her analysis, these same three factors once again establish that consumers will perceive a meaningful difference between a "clinically shown" versus a "clinically tested" claim. *Id.* ¶¶ 7–12.

To reach conclusions about a reasonable consumer's understanding of the definition of words used to support any health claim, Professor Keller analyzed (from the Collins Dictionary) the dictionary definitions of "test," "prove," and "show." *Id.* ¶ 7. She points out that the definition of "test" is "generally used to describe a process, while "proof" or "prove" is used to describe the quality of an outcome. *Id.* Moreover, according to the Collins Dictionary, "[i]f a picture, chart, movie, or piece of writing *shows* something, it represents it or gives information about it." *Id.* (emphasis added). Thus, as explained by Dr. Keller, [i]f you *show* that something is true or correct, you present evidence supporting your position." *Id.* (emphasis added).

Following up on the dictionary assessment of the words at issue, Dr. Keller wrapped up as follows:

> Thus, the standard English definitions of the terms "show" and "proof" highlight that the word "shown" has a less definitive meaning than "proven." While "proven" relates to demonstrating an outcome or result that is reliably true or correct, "shown" often relates to presenting evidence that **may not be proven to be true or correct.**

[ECF 132-1, p. 4] (emphasis supplied).

Dr. Keller also explained that older consumers, such as those 55 years and older, are typically more familiar with pitches in health advertising. *Id.* ¶ 7 She noted that

more than half of Neuriva's sales are from this group of consumers. *Id.* She also pointed out that higher-income consumers, who are typically those buying supplements at a price point such as Neuriva's (from $30 to $80 per package, depending on package size and formulation), are typically "more educated and more health literate than lower income and less-educated consumers." *Id.*

Professor Keller's initial declaration concluded that, given the specific claims at issue ("clinically proven" v. "clinically tested"), the types of individuals who compromise Neuriva consumers, and the context of the health claims, "academic research would predict that Neuriva consumers would appreciate the proposed change in the Neuriva claims from "clinically proven" to "clinically tested." [ECF No. 98-4, p. 5].

In her Supplemental Declaration, Professor Keller opines that:

[…] refraining from claims involving "shown," such as "clinically shown" or "clinical studies have shown," **strengthens or supplements the removal of the claim "clinically proven"** which again would be distinguished from the "clinically tested" claim, especially by Neuriva consumers who (based on their demographics and the context of the message) are more likely to be attuned to, interested in, and scrutinizing of health-related messaging. Amongst the words "proven," "tested," and "shown," "proven" is the most definitively stated claim as it connotes a specific outcome related to theoretical or empirically-driven hypothesis—that the outcome has been proven true or correct. "Shown," on the other hand, relates to a theoretical or empirically-driven hypothesis but it does not suggest a specific outcome that has been definitively proven to be true or correct. "Shown" is therefore a softer claim than "proven" but similar in that it is also outcome-based.

"Tested," however, is the **most conservative** claim insofar as it does **not connote any particular outcome, only a process.**

[ECF No. 132-1, pp. 5-6] (emphasis added).

Framed by these distinctions between these three words, Dr. Keller reminds the reader of her prior conclusion that "Neuriva consumers would appreciate a difference between 'clinically tested' and 'clinically proven'" and she then emphasizes that this "same conclusion holds true now, **even more so**, with the elimination of any 'shown' language." [ECF No. 132-1, ¶ 12] (emphasis added).

Significantly, Dr. Keller concludes her declaration by explaining that "the Amended Settlement Agreement's restriction on the permitted simultaneous use of the terms 'tested' and 'shown' on the same label lend a degree of precision and clarity for consumers' perception of the Neuriva products' labels beyond the relief in the prior iteration of the Settlement Agreement." [ECF No. 132-1, ¶ 13].

By giving up their pre-settlement ability to use the terms "clinically proven" and "clinically shown" (and similar "shown" synonyms) and to limit themselves to the term "clinically tested," Defendants will be providing a marketing message that Defendants say neither Plaintiffs, Frank, nor TINA can successfully dispute -- that "the active ingredients in Neuriva have, in fact, been clinically tested for their advertised benefits." [ECF No. 132, p. 1].

<u>Conclusion About Injunctive Relief's Value</u>

A settlement's fairness should be evaluated in its entirety, including both monetary and non-monetary benefits, and weighed against the risks of proceeding. *See Wilson v. EverBank*, No. 14-civ-22264, 2016 WL 457011, at *11 (S.D. Fla. Feb. 3, 2016) ("[C]ourts rightly consider the value of injunctive *and* monetary relief together in assessing whether a class action settlement provides sufficient relief to the class."). Applying this principle, the *Wilson* Court evaluated the value of injunctive relief in the settlement of a class action lawsuit concerning "force-placed" insurance or lender-placed insurance under the "range of possible recovery" factor, one of six factors the Eleventh Circuit considers in evaluating a settlement. *Id.*

As the Eleventh Circuit held in *Poertner v. Gillette Co.*, injunctive relief that requires a defendant to forego challenged labeling statements because of the underlying litigation provides "substantial evidence" that the relief provides benefit to the settling class. 618 F. App'x 624, 629 (11th Cir. 2015) ("[W]e conclude that the district court's valuation of the nonmonetary relief was supported by the record.") (applying substantial evidence standard).

*Poertner* affirmed the final approval of a class settlement similarly objected to by Objector Frank, who argued that the labeling restrictions agreed to by the defendant were "illusory" because the defendant was no longer selling the underlying product at the time of the settlement. *Id*. Even in that context, the Eleventh Circuit *still* concluded the injunctive relief should be considered of value to the class, focusing on

the reality that the litigation prompted the defendant to make the labeling change: "The record . . . makes clear that [defendant's] decision to stop selling and marketing [the challenged product] with the challenged statements on the packaging was motivated by the present litigation. Frank did not present any contradictory evidence to the district court." *Id.*

This principle from *Poertner*, that a settlement-induced label change provides value to the class for approval purposes, has been clearly and repeatedly applied within the Southern District of Florida. *See Marty v. Anheuser-Busch Cos., LLC*, No. 13-cv-23656, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015) ("Under Eleventh Circuit law, injunctive changes such as label modifications represent a benefit to the class and should be considered when approving a class settlement.") (citing *Poertner* and overruling objection claiming injunction offered no value); *Ferron v. Kraft Heinz Foods Co.*, No. 20-cv-62136, 2021 WL 2940240, at *15 (S.D. Fla. July 13, 2021) ("Lastly, the Settlement provided a value to all Class Members in the form of the Programmatic Relief, requiring a label change that Defendant would not have agreed to absent the Agreement."); *Janicjevic v. Classica Cruise Operator, LTD.*, No. 20-cv-23233, 2021 WL 2012366, at *1, 6 (S.D. Fla. May 20, 2021) ("The Court finds [injunctive-relief based] policies certainly have an important value to the class that would not have been brought about by individual actions. . . . ("[C]ourts rightly consider the value of injunctive *and* monetary relief together in assessing whether a class action settlement

73

provides sufficient relief to the class.") (applying *Poertner* to settlement-induced policy changes) (italics in original); *cf. Wilson*, 2016 WL 457011, at *11 ("[T]he Settlement will put an end to the practices complained of by the [p]laintiffs.") (same).

Defendants have established through unrebutted testimony that the changes agreed to in the First Amended Settlement Agreement, specifically the limitation requiring the use of the term "Clinically Tested" and eliminating "shown" and similar language, was the **product of this litigation** and Plaintiffs' claims. *See* Sexton Decl. [ECF. No. 98-2, ¶ 30] ("RB would not willingly or voluntarily remove the claim 'Clinically Proven' and replace it with 'Clinically Tested,' absent the settlement requiring us to do so."); *see also* Sup. Sexton Decl. [ECF No. 116-2, ¶ 3] (RB considered prior labeling truthful and change to limit labeling to "Clinically Tested" and not use "Clinically Proven" or "Clinically Shown" was prompted by class settlement).

This causation link alone proves up the injunctive relief's value under *Poertner*. 618 F. App'x at 629; *see also Ferron*, 2021 WL 2940240, at *11 ("The Court also finds that [the defendant] would not have implemented the labeling changes required by the Settlement had [the plaintiff] not brought this lawsuit.").

The changes prompted by the lawsuit are not merely cosmetic, nor are they inconsequential. To the contrary, they relate directly to the allegations of deception, the heart of Plaintiffs' lawsuit.

For example, the Amended Complaint alleged that the "proven" language on Neuriva's pre-settlement labeling misleadingly communicated the products' efficacy with a body of "overwhelming evidence" representing a "consensus in the scientific community" that is "widely accepted in [the] applicable field." Am. Compl. [ECF No. 51, ¶¶ 65, 66, 82, 85] ("Defendants' statements on their labels and in their advertising convey to reasonable consumers, and reasonable consumers would believe, that the state of the science regarding Neuriva and its ingredients has *reached a level of scientific consensus . . . . [N]o scientific consensus exists* that there is clinical and scientific proof . . . . [T]here is *no consensus in the scientific community*" and pointing to "limited" research) (emphases added).

Defendants have agreed to restrict their labeling to statements that Neuriva's ingredients have been "Clinically Tested." And by limiting itself to "Clinically Tested," instead of "proven," Defendants have adopted labeling that does not suggest some definitive scientific outcome or consensus (which is what Plaintiffs emphasized as misleading on the pre-settlement labels) in favor of revised labeling that connotes only the accurate point that Neuriva's active ingredients have been subjected to evaluation and testing.

Revising Neuriva's labels to address the deception claimed in the lawsuit further confirms that the First Amended Settlement's injunctive relief has value. *Wilson*, 2016 WL 457011, at *11; *see also Ferron*, 2021 WL 2940240, at *4 (approving

settlement with labeling-based injunctive relief that included removal of the challenged language from products' labels).

In addition, by agreeing to not use the term "shown" or similar words, Defendants are avoiding language which Frank and TINA argue is suggestive of "proven." TINA suggests that decisions from the National Advertising Division ("NAD") of the Better Business Bureau support its view that there is not a meaningful and substantive difference between "clinically tested" and "clinically proven." But the Undersigned finds persuasive the Defendants' argument distinguishing the NAD cases TINA relies upon in its briefing.

As a threshold matter, neither Frank nor TINA has challenged Defendants' representation [ECF No. 98, p. 6] that they could not locate any reported federal or state court decisions holding (or even specifically suggesting) that "clinically proven" has the same meaning to consumers as "clinically tested."[17] Defendants argue that the absence of such case law authority is "unsurprising," as "any such decision would be at odds with accepted methods of label interpretation under the "reasonable consumer" standard. Defendants therefore raise the following succinct point: "the words 'proven' and 'tested' simply do not mean the same thing." *Id.*

---

[17]    The informal, unverified email from an FDA employee who provides, in conclusory fashion, his opinion, is, of course, not a decision from a Court. Nor is it an official agency position or a formal agency objection.

TINA says that select NAD decisions show there is "no impact" on consumers between the claim "Clinically Proven" and "Clinically Tested." [ECF No. 74-1, p. 3]. As an initial matter, NAD proceedings are voluntary and its outcomes advisory: NAD decisions are thus non-binding on courts, as TINA and CCAF's own authority confirms. *See Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 36–37 (E.D.N.Y. 2009) ("Perrigo has been unable to point to any case in the United States, either in its brief or at oral argument, where NAD and NARB findings have been found to constitute admissible extrinsic evidence that could support an implied falsity claim.").

Moreover, none of the NAD authority TINA cites deals with the critical issue here of whether "Clinically Proven" means something different to consumers than "Clinically Tested." *See, e.g.,* [ECF No. 83-1] (attaching *HFL Solutions, Inc., Blood Sugar Optimizer Dietary Supplements, Nat'l Adver. Div. of the Better Bus. Bureau*, Case No. 6000 (Sept. 9, 2016) (NAD determining that a single study did not support the claim "clinically researched," given that no statistical analysis had been done to validate study's outcome)).

But TINA failed to cite what Defendants say is the only on-point NAD decision: *Living Essentials, Chaser, Nat'l Adver. Div. of the Better Bus. Bureau*, Case No. 4365 (July 8, 2005). In *Living Essentials* [ECF No. 98-1], the NAD opened an inquiry to determine whether a supplement manufacturer had adequate substantiation for a claim that its hangover-prevention supplement had been "clinically proven" to treat hangovers.

After the NAD commenced that inquiry, the manufacturer voluntarily agreed to change its "clinically proven" claim to "clinically tested." ("The advertiser voluntarily undertook to make the following modifications . . . Changing the claim 'clinically proven' to 'clinically *tested*' . . . . Changing the claim 'Chaser has been tested and *proven* effective . . . to 'Chaser has been tested and *shown* effective . . . .") (emphases in original)).

These changes, which mirror those required by the Settlement (and Amended Settlement), were reviewed and approved by the NAD, which deemed them "significant" and "appropriate." NAD also concluded that the modifications were "necessary" and "proper" to "avoid overstating the scientific findings or exaggerating the product's performance . . . ." *Id*. at 4–6.

The NAD's analysis as to the appropriateness of the change tracked the dictionary-based "reasonable consumer" analysis distinguishing between "proven" and "tested." The NAD noted that the clinical studies substantiating that manufacturer's claims did not, in its view, rise to the level of "consensus or significant scientific agreement," which is the level of proof the NAD would have considered necessary to support a "proven" claim for that manufacturer. *Id*. at 5.

The *Living Essentials* decision directly supports a conclusion that there **is** a substantive difference between the claim "Clinically Proven" and "Clinically Tested."

Continuing with the question about whether the removal of "proven," "shown," and synonymous terms from Neuriva's marketing and labeling will have any significance on consumers' understanding, Plaintiffs argue that an examination of how Neuriva's competitors market their own products illustrates the impact of these terms.

For example, other brain supplements that compete with Neuriva will continue to use "shown" language. Focus Factor, while also claiming to have a "clinically tested formula," additionally says that it is "*proven* to improve memory, concentration and focus." Focus Factor Original, https://www.focusfactor.com/products/focus-factor-original (last visited Dec 13, 2021) (emphasis added). Similarly, Irwin Naturals' Brain Awake claims that "[i]t delivers key ingredients that have been *shown* to: Promote focus and mental clarity; Enhance performance on cognitive tasks; Support retention of information." *See* Irwin Naturals: Brain Awake, https://irwinnaturals.com/products/brain-awake (last visited Dec. 13, 2021) (emphasis added).

Therefore, the Undersigned agrees with the notion that the removal of "shown" and other similar language will put the Neuriva products at a disadvantage with its competitors. To argue that removing "shown" language in the Neuriva products' marketing and labeling produces *no* impact is either to dismiss the role of marketing language altogether or to disregard (without evidence) any advantage obtained by Defendants' brain supplement competitors.

Thus, in real and practical terms, the removal of "shown" or other similar language from the universe of potential marketing claims has significance because it decouples the potential connection between what was "tested" and what was "shown" by the testing.

Switching to a different argument, in their Supplemental Memorandum [ECF No. 132], Defendants also point out that, since the First Amended Settlement has been pending, at least one court again acknowledged that private lawsuits challenging "clinically proven" language on the labels of dietary supplements are subject to a complete bar under the "prior substantiation" doctrine and must be dismissed. *See Yamasaki v. Zicam LLC*, No. 21-cv-02596, 2021 WL 4951435, at *5 (N.D. Cal. Oct. 25, 2021) (granting motion to dismiss false advertising claim because it is based on an improper lack of substantiation theory, noting that "it is well settled [under California law] that private litigants may not bring false advertising claims based on an alleged lack of substantiation and concluding that "[t]he Court is **not persuaded** by Plaintiff's conclusory allegations that the words 'clinically proven' **imply** to reasonable consumers that there is a scientific consensus about the efficacy of Defendant's products or that the studies on which Defendant relies have been published and peer-reviewed") (emphasis supplied)).

Neither Frank nor TINA challenge the view that the value of the injunctive relief here must be considered through the lens of the "range of possible relief" that Plaintiffs

might have received (otherwise described as the "likelihood of success" in proceeding. *Wilson*, 2016 WL 457011, at *6 n.11 (citing *Leverso v. S. Trust Bank of Ala. N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994)).

Thus, the outcome in this case might very well have been a Rule 12 prior substantiation dismissal – which would mean that Plaintiffs and the class would receive no money whatsoever and Neuriva would continue to sell its products with unchanged labels (i.e., continuing to use "clinically proven"). This potential scenario further proves the injunctive relief's value. *Ferron*, 2021 WL 2940240, at *11 ("An example of the risk of continued litigation is evidenced by the recent dismissal without prejudice of a factually similar case.").

As noted in Plaintiffs' motion to approve the settlement, Class Counsel refused to settle this case without a change in Neuriva's marketing. [ECF No. 69, p. 13]. Courts have found that such relief (requiring changes to marketing claims) provides significant benefits to class members. *See Marty v. Anheuser-Busch Companies, LLC,* No. 13-cv-23656-JJO, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015); *Hazlin v. Botanical*, No. 13-cv-00618-KSC, 2015 WL 11237634, at *3-4 (S.D. Cal. May 20, 2015); *Bezdek v. Vibram USA Inc.*, 809 F.3d 78, 84 (1st Cir. 2015); *Arnold v. Fitflop USA LLP,* No. 11-cv-00973W-KSC, 2014 WL 1670133, at *1, *8 (S.D. Cal. Apr. 28, 2014); *Nigh v. Humphreys Pharmacal, Inc.*, No. 12-cv-02714-MMA-DHB, 2013 WL 5995382, at *2, *8 (S.D. Cal. Oct. 23, 2013); *United States v. Washington Mint*, *LLC*, 115 F. Supp. 2d 1089, 1105 (D. Minn. 2000).

**Amount of Settlement**

Frank and TINA argue that the amount of the settlement is inadequate, but this position seems to ignore the principle that the possibility of a higher monetary award at trial does not in and of itself mean that the Court should reject the settlement. *See e.g., In re Chicken Antitrust Litig.*, 560 F. Supp. 957 (N.D. Ga. 1980) ("The court's task is one of balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial.").

Generic desires to receive "more" money or a "better" result is not a proper objection. *See Braynen v. Nationstar Mortgage, LLC*, No. 14-CV-20726, 2015 WL 6872519, at *12 (S.D. Fla. Nov. 9, 2015) (citing *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1382 (S.D. Fla. 2007) (overruling objections of class members who "desired to 'have a better deal'")). "Such objections lack merit because the objectors could simply opt out and file their own individual lawsuits if they have concerns about releasing their claims." *Id.* (citing *Diaz v. HSBC USA, N.A.*, No. 13-21104, 2014 WL 5488161, at *3 (S.D. Fla. Oct. 29, 2014)); *see also Braynen*, 2015 WL 6872519, at *12 (quoting *Behrens*, 118 F.R.D. at 542) (noting a settlement can "be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery").

In the instant case, there is only one Objector, Frank, and he has advised the Court in his Declaration that he has not opted out. [ECF No. 75-1].

Because "[m]onetary relief is difficult to quantify," in evaluating a class settlement, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Lipuma*, 406 F. Supp. 2d at 1322-23 (finding that settlement recovering 8.1% of possible damages was fair, adequate, and reasonable). "[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair and inadequate . . . A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery[.]" *Behrens v. Wometco Enter. Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988).

Here, the Settlement provides an $8 million fund out of which to pay Settlement Class Members. Settlement Class Members who provide proof of purchase may be entitled to potentially a full refund for two purchases of Neuriva products, up to $32.50 each or $65.00 total. (Bryson Decl. ¶ 29 [ECF No. 69-1]).

Settlement Class Members who do **not** have proof of purchase may file a claim for up to four purchases of Neuriva products, for a total of $20. *Id.* The ability of Class Members who do not have proof of purchase to receive monetary benefits is particularly noteworthy, as Defendants have no way of independently verifying who actually purchased an over-the-counter product like Neuriva. Neither Frank nor TINA have suggested a method to confirm who actually purchased the products or in what amounts, absent a receipt or other proof of purchase.

Further, as explained in Plaintiffs' motion to approve the Settlement and award attorney's fees and costs, the monetary settlement benefits per purchase available to those without proof of purchase constitute approximately 22% of the manufacturer's price for Neuriva Original or 15% for Neuriva Plus. (Bryson Decl. ¶ 30 [ECF No. 69-1]). These settlement amounts meet or exceed the standards established by this and other courts in other cases. *See also Bennett*, 737 F.2d at 986 (holding that 5.6% recovery was fair and adequate in view of risks of further litigation and litigation objectives); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1346 ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims.").

In fact, the monetary benefits made available to Settlement Class Members compare favorably with a class action settlement in a substantially similar case, which the Undersigned also approved. *See Collins v. Quincy Bioscience, LLC*, Case No. 1:19-cv-22864, ECF No. 200 (S.D. Fla. Nov. 18, 2020) (granting final approval to brain supplement class settlement providing up to $12 without proof of purchase and up to $70 with proof of purchase).

Frank and TINA argue that the touted dollar value of the settlement is illusory and substantially overstated because the actual money paid out will be far less than $8 million and because the unpaid settlement funds will revert back to (or, to be more technically correct, will *remain* with Defendants).

But these types of claims-made class action settlement are frequently approved, even if unclaimed funds revert to defendants. *See Casey v. Citibank*, No. 12-cv-820 (N.D.N.Y.) (ECF No. 222 at ¶ 6) (approving virtually identical claims-made settlement and finding that regardless of the take rate, "[t]he settlement confers substantial benefits upon the Settlement Class members, is in the public interest, and will provide the parties with repose from litigation"); *Shames v. Hertz Corp.*, No. 07-cv-2174, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) (approving claims-made settlement over objections because "there is nothing inherently objectionable with a claims-submission process, as class action settlements often include this process, and courts routinely approve claims-made settlements") (citations omitted); *Lemus v. H & R Block Enters. LLC*, No. 09-cv-3179, 2012 WL 3638550 (N.D. Cal. Aug. 22, 2012) (approving, over objections, claims-made settlement in wage case where unclaimed funds reverted to the defendants); *Atkinson v. Wal-Mart Stores, Inc.*, No. 8:08-cv-00691-T-30TBM, 2011 WL 6846747, at *5 (M.D. Fla. Dec. 29, 2011) (approving claims-made settlement with full reversion in class action case involving the estates of persons whose lives were insured under Corporate Owned Life Insurance policies purchased by Wal-Mart or a Wal-Mart Trust while they worked as Wal-Mart associates in Florida and whose deaths resulted in the payment of insurance policy benefits to Wal-Mart or the Trust).

Finally, courts rightly consider the value of injunctive *and* monetary relief in assessing whether a class action settlement provides sufficient relief to the class. *See,*

*e.g.*, *Poertner*, 618 F. App'x at 630 (noting that objector's valuation of settlement based on monetary benefits alone was "flawed," and affirming approval based on inclusion of injunctive and *cy pres* relief); *Hamilton*, No. 13-60749, ECF No. 178, p. 7 (S.D. Fla. Oct. 23, 2014) ("The Court finds the injunctive changes provided in the Settlement Agreement are important and have significant value to the class members nationwide."); *Perez*, 501 F. Supp. 2d at 1381 (describing important injunctive relief in discussing range of possible recovery); *Lipuma,* 406 F. Supp. 2d at 1323 (valuing injunctive relief as part of "significant relief" made available to class and determining that settlement was fair, adequate, and reasonable).

The Undersigned finds that the dollar amount of the settlement, evaluated through the prisms of potential recovery and the value of the injunctive relief, is fair and reasonable.

**Attorney's Fees and Costs**

Frank and TINA object to the amount of the requested fees and costs. They say there is no real settlement fund which exists because the $8 million settlement is merely a legal fiction which will never materialize, predicting that the amount of compliant claims timely submitted will be for an amount far less than $8 million. Therefore, they say, the requested (and negotiated) fee is out of proportion with the class recovery.

Frank and TINA also criticize the fees as being unreasonably preferential (in favor of the attorneys) and say that this condemnation is strengthened by the so-called

"clear sailing" and "kicker" provisions of the Settlement Agreement. A clear sailing provision means that Defendants agree in advance to not oppose a request for fees up to a certain amount. A kicker provision means that the fees are part of a segregated fund where any unawarded amount (i.e., the difference between the maximum permissible amount and the amount ultimately awarded by the Court and paid by Defendant) is retained by Defendant (or reverts to Defendant). *Poertner*, 618 F. App'x at 630, n. 6.

Some courts have suggested that a clear-sailing provision may be a warning sign of a collusive bargain. "The inclusion of such a 'clear sailing' provision within the settlement agreement's terms, however, merely justifies the Court's application of heightened scrutiny when evaluating the class counsel's ultimate fee request; it should not be read as an independent ground for withholding approval of the entire settlement." *Matter of Skinner Group, Inc.*, 206 B.R. 252, 263 n.14 (Bankr. N.D. Ga. 1997); *see also Braynen*, 2015 WL 6872519, at *11.

Indeed, while a clear-sailing provision *could* indicate that the settling parties compromised class members' interests to give class counsel favorable treatment on attorney's fees, it could just as easily be included for purposes of finality and risk avoidance. *See Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985) (a clear-sailing provision "is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be

sandbagged"); *see also Poertner*, 618 F. App'x at 630 (rejecting objections -- raised by Frank, coincidentally – based on clear sailing and kicker clauses because "Frank's self-dealing contention is belied by the record: the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced, court-appointed mediator").

Even giving the Settlement heightened scrutiny, the Court finds the clear-sailing provision to be immaterial. The Court has already found that the Settlement was negotiated at arm's-length. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 335 (3d Cir. 1998) (overruling objection to clear-sailing provision since there was "no indication the parties began to negotiate attorneys' fees until after they had finished negotiating the settlement agreement"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 693 (N.D. Ga. 2001) (finding no collusion where attorneys' fees were "negotiated separately from the rest of the settlement, and only after substantial components of the class settlement had been resolved").

As explained earlier in this Report, there was no collusion. And absent collusion, a clear-sailing provision should not bar a class settlement's approval, as courts in this Circuit have repeatedly emphasized. *See, e.g., Poertner,* 618 F. App'x at 630 (*per curiam*); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 n.4 (11th Cir. 1999) (summarizing different views but declining to address the clear sailing provision because appellate court was convinced that district judge fulfilled the Rule 23

supervisory function); *Fladell v. Wells Fargo Bank, N.A.*, No. 0:13-cv-60721, 2014 WL 5488167, at *4 (S.D. Fla. Oct. 29, 2014) (rejecting argument about clear-sailing provision as "immaterial" because there "was no collusion in the settlement negotiations and the [p]arties began negotiations regarding attorney's fees only after finishing the negotiating the Settlement itself"); *Ingram*, 200 F.R.D. at 693 (rejecting argument that collusion was present in the Settlement, noting that a highly experienced mediator was involved and reasoning that "[p]arties colluding in a settlement would hardly need the services of a neutral third party to broker their deal").

The Undersigned notes that any attorney's fees approved by this Court will be paid separately by Defendants and will not reduce or impact payments to Class Members. In addition, Class recovery is not conditioned on approval of any attorney's fees amount. Courts view these factors favorably, grouping them in the column of reasons to *approve* a class action settlement. *See e.g.*, *Junior v. Infinity Ins. Co.*, No. 6:18-cv-1598, 2021 WL 4944311, at *4 (M.D. Fla. Apr. 29, 2021).

Frank and TINA also argue that the fees requested should be cross-checked with class counsel's lodestar (i.e., the amount of attorney hours incurred, multiplied by a reasonable hourly rate).

In the absence of any evidence of collusion or detriment to the class, the Court should give substantial weight to a negotiated fee amount, assuming that it represents the parties' "'best efforts to understandingly, sympathetically, and professionally

arrive at a settlement as to attorney's fees.'" *Ingram*, 200 F.R.D. at 695-696 (citing *Elkins v. Equitable Life Ins. Co.*, 1998 WL 133741 (M.D. Fla. Jan. 27, 1998) (quoting *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 720 (5th Cir. 1974), *overruled on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)).

Both the United States Supreme Court and the Eleventh Circuit have expressly approved calculating fees by applying the percentage-of-recovery method to the total value of the settlement. *See Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295-96 (11th Cir. 1999) (affirming fee award of 33-1/3% of total amount made available to class, and determining that attorney's fees may be determined based on total fund, not just actual payout to class); *see also*, *Poertner*, 618 F. App'x at 628 (quoting *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("[A]ttorney's fees awarded from a common fund shall be based on a reasonable percentage of the fund established for the benefit of the class.")); *David v. Am. Suzuki Motor Corp.*, No. 08-cv-22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (settlement with ascertainable benefits may be treated as a common fund to which a percentage fee may be awarded, even if the fee is separately paid by the defendant).

Fees are based on a percentage of the total benefits made *available*, **regardless of the actual payout to the class**. *See Waters*, 190 F. 3d at 1295-96. As explained in *Wilson*,

2016 WL 457011, at *10, [t]his is so because "[a] settlement's fairness is judged by the *opportunity* created for the class members, *not by how many submit* claims . . . What matters is the settlement's value to each class member–it is ultimately up to class members whether to participate or not." (internal citation omitted) (emphasis added) (quoting *Hall*, 2014 WL 4672458, at *13).

The Eleventh Circuit reaffirmed its support for this percentage-of-the-common-fund approach in *Poertner*, where it explained that 25 percent is the "bench mark" attorney's fee award. 618 F. App'x at 628-629 (pointing out that class counsel's fee award should also be based on consideration of "any non-monetary benefits conferred upon the class by the settlement," such as injunctive relief, as well as "the economics involved in prosecuting a class action." (citing *Camden*, 946 F.2d at 770, 774-75)).

While Frank says that the "fund" established in this case includes both the monetary benefits made available to the Settlement Class members and attorney's fees, such a "constructive common fund" approach has in fact been recognized by the Eleventh Circuit. *See In re Home Depot Inc.*, 931 F.3d 1065, 1080 (11th Cir. 2019) ("Where class action settlements are concerned, courts will often classify the fee arrangement as a 'constructive common fund' that is governed by common-fund principles even when the agreement states that fees will be paid separately."); *see also In re: Managed Care Litig., Class Plaintiffs v. Aetna Inc., & Aetna - US Healthcare, Inc., Defendants.*, No. MASTER00-1334-MD-MOR, 2003 WL 22850070, at *6 (S.D. Fla. Oct. 24, 2003) ("Because

the fee award is being paid by Defendant AETNA, when added to the total benefits being given directly to the Class, the total settlement benefit appears to be between $400 and $450 million."); *David v. Am. Suzuki Motor Corp.*, No. 08-CV-22278, 2010 WL 1628362, at *8 (S.D. Fla. Apr. 15, 2010) (exercising discretion to include amount paid separately in attorneys' fees as part of common fund).

Consequently, the Undersigned rejects Frank's challenge to the so-called "constructive common fund" approach.

Moreover, in the Eleventh Circuit, "the lodestar approach should not be imposed through the back door via a 'cross-check.'" *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1362 (citing, *inter alia*, Alba Conte, ATTORNEY FEE AWARDS § 2.7, at 91 n.41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases.")).

In *Camden I*, the court criticized the inefficiencies of lodestar approach, 946 F.2d at 773-75, and other courts have called it into question because it "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). "Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all." *Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1363 (citation omitted).

Nevertheless, although our Circuit has decided "that a lodestar calculation is not proper in common fund cases, we *may* refer to that figure for *comparison*." *Waters*, 190 F.3d at 1302 (emphasis supplied); *see also Smith v. Costa Del Mar, Inc.*, No. 3:18-cv-1011, 2021 WL 4295282 (M.D. Fla. Sept. 21, 2021) (approving coupon-type class action Settlement involving allegations that sunglass manufacturer charged unlawful fees and related upcharges for repairs).

Although Frank and TINA want the Court to evaluate the attorney's fees request by comparing it to the lodestar, they skip over the reality that "[i]n complex cases," courts "routinely approve multipliers of three or more." *Costa Del Mar*, 2021 WL 4295282, at *16 (*citing Parson v. Brighthouse Networks, LLC*, No. 2:09-CV-267, 2015 WL 13629647, at *15 (N.D. Ala., Feb. 5, 2015)); *see also Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Craft v. City of San Bernardino*, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (allowing a multiplier of 5.2 when "there is ample authority for such awards resulting in multipliers in this range or higher").

The $2.9 million sought by Class Counsel for fees and expenses[18] constitutes 36% of the value of just the monetary relief made available to the Settlement Class, which is well within the range approved by the Eleventh Circuit. *See, e.g., Camden I*, 946 F.2d at 774 (20%-50% of value provided); *David*, 2010 U.S. Dist. LEXIS 146073, at *26 n.15 (20% to 50% of common fund is "the customary fee in class actions that result in substantial benefits").

This percentage calculation does not take into account the value of the injunctive relief, which is surely worth *some* amount.

As already pointed out, courts may also consider the non-monetary relief provided to the Class as "part of the settlement pie." *Poertner*, 618 F. App'x at 628.

"When the non-cash relief can be reliably valued, courts often include the value of this relief in the common fund and award class counsel a percentage of the total fund." *In re: Checking Acct. Overdraft Litig.*, 1:09-MD-02036-JLK, 2013 WL 11319391, at *13 (S.D. Fla. Aug. 5, 2013). And when analyzing the value of non-monetary benefits, courts should consider **changes to a defendant's business practices**. *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243-44 (11th Cir. 2011) (portion of fee properly

---

[18]     The motion explains that Class Counsel incurred $27,413.68 in expenses, which would be subsumed within the attorney's fees award, not added to it. [ECF No. 69, p. 15 n.6].

allocated to compensation for "non-monetary benefits [counsel] achieved for the class—like company-wide policy changes . . .").

Whatever amount is used to assess the value of the injunctive relief, that value would mean that the attorney's fees percentage of the value of the relief would decrease from the percentage calculated without factoring in a number for the value of the injunctive relief.

Unlike the scenario in some cases (e.g., *Costa Del Mar*), no party submitted any evidence on how to monetize or value the injunctive relief. In *Costa Del Mar*, for example, Class Counsel's expert used data from a survey completed by 200 participants to determine (1) how much value consumers place on a "Lifetime Warranty," versus a "Limited Lifetime Warranty," and (2) how consumers define and quantify the value of a "nominal fee." 2021 WL 4295282, at *6.

The expert there concluded that the potential monetary value of injunctive relief is between $47.6 and $58.2 million. *Id.* at n.8. On the other hand, Defendant's Vice President/Controller said that the cost of replacing packaging and/or implementation of program changes costs $5 million at minimum for Costa. *Id.* at *9.

The Court rejected Class Counsel's expert's estimate as seemingly inflated and theoretical, based on data from a relatively small sample size. It was satisfied that the injunctive relief is worth at least $5 million, which it used to assess the reasonableness

and fairness of the Settlement Agreement and to calculate the amount of attorney's fees.

Significantly, the *Costa Del Mar* Court used a 2.8 multiplier as a check on the percentage-of-recovery approach. *Id.* at *16.

If the Undersigned were to use the same 2.8 multiplier on the $1.2 million in attorney's fees which were incurred as of August 13, 2021 [ECF No. 94-1], then the attorney's fees award would be $3.36 million, which is more than $400,000 greater than the amount actually requested. If I were to use a 2.5 multiplier, then the attorney's fees under the lodestar-with-multiplier approach would be $3 million, which is close to the amount being requested.

The Undersigned does not consider a 2.5 multiplier to be an unreasonable number to use for purposes of comparing the amount requested.

But *Costa Del Mar* is a coupon/voucher type of settlement, while the instant case is not. In addition, the Court there received evidence on the value of the relief, while this Court has not been presented with evidence concerning the value of the injunctive relief. Instead, all we have been told is that the injunctive relief is a *factor* to be *considered* (whatever that means).

As this Court has previously observed (listing cases awarding fees between 33% and 38% of the common fund), "[c]ourts within this Circuit have routinely awarded attorneys' fees of 33 percent or more of the gross settlement fund." *Fernandez v. Merrill*

*Lynch, Pierce, Fenner & Smith Inc.*, No. 15-22782-CIV, 2017 WL 7798110, at *4 (S.D. Fla. Dec. 18, 2017). Indeed, as the *Fernandez* Court pointed out, the Eleventh Circuit in *Camden I* held: "To avoid depleting the funds available for distribution to the class, an upper limit of 50% may be stated as a general rule, although even larger percentages have been awarded." *Id.* at *4 (quoting *Camden I*, 946 F.2d at 774-75).

Here, Class Counsel seeks $2.9 million for attorney's fees and expenses, which, as noted immediately above, equals 36% of the Class Settlement fund. As noted, that percentage would decrease if a monetary value were to be allocated to the value of the injunctive relief. Given the nature of the relief (changing marketing and labeling language), combined with the lack of evidence, it is extremely difficult to ascertain a monetary value. At this point, the Undersigned feels comfortable concluding that the injunctive relief has some value but articulating a specific dollar range would be speculative.

However, no concern exists regarding potential depletion of funds available to the class because Defendants will, under the Settlement Agreement, pay Class Counsel's attorney's fees and expenses *separate and apart* from the $8 million fund established for paying Class Members' claims. In contrast, while this Court in *Fernandez* approved attorney's fees equal to 35% of the common fund, those fees and expenses were to be *deducted* from the fund, thus lessening the total amount available to the class. In this case, Class Counsel's requested fees and expenses actually represent

27% of the *total* amount Defendants are obligated to pay under the Settlement Agreement ($8,000,000 + $2,900,000).

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class action counsel include, as pertinent to the case, (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases. *See Camden I*, 946 F.2d at 772 n.3.

This Court may also consider the time required to reach settlement, the existence of substantial objections and non-monetary benefits, and the economics of prosecuting a class action. *Id*. at 775. The factors set forth in *Camden I* support the full award requested.

**<u>The Contingent Nature of the Fee, the Financial Burden Carried by Counsel, and the Economics of Prosecuting a Class Action</u>:** A determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure

and nonpayment in a class action are extremely high -- with the risk of failure the foremost factor. *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334, 1339 (S.D. Fla. 2007). In this case, Class Counsel received no compensation during the litigation, incurred expenses with no guarantee of repayment, and faced a substantial risk that after protracted, complex, and expensive litigation, the Class and Class Counsel could end up with no recovery at all.

The fee award was contingent on a good result -- Class Counsel would have recovered nothing if it had not secured recovery for the class. "For a complex and sophisticated case such as this one, class counsel took considerable financial risk in pursuing the case." *Saccoccio*, 297 F.R.D. at 695.

The risks undertaken by class counsel in class actions are often "exacerbated by the existence of competing parallel proceedings in other courts, which may reach settlement or certification first, and the considerable amount of labor that is usually undertaken to litigate a class action to resolution." *Wilson*, 2016 WL 457011, at *19.

And these results were real possibilities -- a court in a similar case decertified the class after a hung jury mistrial.

**The Market Rate in Complex, Contingent Litigation:** As this Court pointed out in *Fernandez*, when awarding an attorneys' fee of 35%, that percentage "falls within the range of the customary fee in the private marketplace, where 40 percent fee contracts are common for complex cases such as this." 2017 WL 7798110, at *4. As a

result, Class Counsel's requested fee of 36% is within the customary range for cases of this nature, especially given that Class Counsel's fees and expenses will not be deducted from the Class Settlement fund and the Settlement provides the Class with important prospective injunctive relief.

**The Novelty and Difficulty of the Questions at Issue:** The factual issues in this case were complex and numerous, including the subject matter of the case (nutraceutical advertising and labelling), scientific issues (including the pharmacological effect of the Neuriva products' active ingredients and the ability of the various orally-consumed ingredients to enter the blood stream, travel to the brain, cross the blood-brain barrier, and impact brain performance); review of scientific literature (including analysis of studies with respect to the adequacy of their design, potential bias, legitimacy of conclusions, propriety of statistical analysis, and the validity and accuracy of the conclusions).

The legal issues were also complex, involving, among others, whether Plaintiffs' claims are preempted by federal law, whether Plaintiffs' claims constitute solely a challenge to a lack of substantiation of the product, whether Defendants' claims amount to false and misleading statements under federal and state law, and whether Plaintiffs can assert claims for products they did not purchase based on universal misrepresentations. Finally, class actions are inherently complex cases, and Plaintiffs' cases would have been no different.

**The Skill, Experience, and Reputation of Class Counsel:** This litigation required a high degree of skill and experience. Class Counsel have decades of experience successfully litigating national class actions. Beyond that, Class Counsel's reputation, diligence, expertise, and skill are reflected in how they have handled this case and the results they have achieved. They resolved this dispute efficiently and effectively despite the potential hurdles presented and the arguments raised by Defendants detailed above. The quality of Class Counsel and their achievement in this case is equally shown by the strength of their *opponents*, Perkins Coie LLP and Bilzin Sumberg Baena Price & Axelrod LLP, who are excellent defense firms. (Bryson Decl., ¶ 13 [ECF No. 69-1]) (mentioning the Perkins Coie firm). This factor thus also favors awarding the requested fee.

**The Result Achieved for the Class:** The result achieved is a major factor to consider in making a fee award and, here, this factor perhaps best establishes the propriety of the requested fee award. *See Hensley v. Eckerhart,* 461 U.S. 424, 436, (1983) ("[C]ritical factor is the degree of success obtained."); *Pinto,* 513 F. Supp. 2d at 1342; *Behrens,* 118 F.R.D. at 547–48 ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained."). In considering the results, courts examine the value of *both* monetary and injunctive relief. *See Poertner,* 618 F. App'x at 629; *Perez v. Asurion Corp.,* 501 F. Supp. 2d 1360 (S.D. Fla. 2007); *LiPuma,* 406 F. Supp. 2d at 1323. In *In re: Checking Acct. Overdraft Litig.,* No. 1:09-MD-02036-JLK,

2013 WL 11319391, at *13-14 (S.D. Fla. Aug. 5, 2013), the Court specifically emphasized
the importance of compensating class counsel for their work in extracting non-cash
relief when using the percentage-of-the-fund approach.

The results here -- a settlement providing $8 million in cash and prospective
injunctive relief -- are excellent. Defendants are required to remove the precise
statements challenged by Plaintiffs from their product labeling and ancillary
marketing. These results are powerful evidence supporting the fee award. Indeed,
even before final approval of the injunctive relief, Defendants have changed the
labelling and marketing on a brand-new Neuriva product not covered by the
Settlement.

**The Time and Labor of Class Counsel**: According to Class Counsel, before
filing suit, they thoroughly investigated all aspects of this case, including (a) becoming
thoroughly grounded in the relevant federal regulations and FDA and FTC guidance;
(b) reviewing all labelling and marketing of the Neuriva products, including all
available public statements; (c) researching the studies relied upon by Defendants,
including investigating potential conflicts of interest and other credibility issues; (d)
retaining and working with the consulting experts in reviewing the studies and
scientifically evaluating Defendants' claims; (e) interviewing consumers who had
purchased Neuriva products and identifying class representatives; (f) researching

relevant supplement case law and controlling state law; (g) reviewing the records in other relevant supplement cases; and (h) carefully crafting the complaints.

After filing suit, Class Counsel explained, they thoroughly reviewed and researched Defendants' motions to dismiss and prepared Amended Complaints addressing those motions; researched legally and factually Defendants' motion to transfer the *Williams* case; and spent substantial time in contentious settlement negotiations, working with the settlement administrator to design an effective notice program, and were involved in overseeing the claims process. Additionally, Class Counsel explain that they have responded to, and will continue to respond to, questions from class members about the settlement and their claims. All of this work was critical in view of the issues involved, the manner in which the case was defended, and the quality of Defendants' counsel.

**The Reaction of the Class to the Settlement:** To date, only a single class member has opted out or objected to the Settlement, which supports the fee request. *Pinto*, 513 F. Supp. 2d at 1343.

Further, the Settlement requires a continuing role for Class Counsel after final approval.

Accordingly, the Court finds that $2.9 million is a reasonable amount for attorneys' fees in this action.

The Undersigned therefore **recommends** that Judge Cooke approve Class Counsel's application for attorney's fees and **grant** the motion.

**Class Representative Service Awards**

As outlined earlier in this Report, Plaintiffs have not yet actually filed an application for service awards because they are currently not authorized in the Eleventh Circuit. But the Undersigned recommends that the Court retain jurisdiction to entertain such a request should the law change.

**Overall Conclusion**

The challenges to the First Amended Settlement Agreement and Release raised by Frank and TINA are not sufficient to persuade the Undersigned to recommend denial of the motion to approve the agreement. Their "armchair-quarterbacking" and "wishing-for-more does not provide valid grounds to disapprove the settlements." *In re Polyurethene*, 168 F. Supp. 3d at 1002.

This case is certainly distinct from oft-cited opinions from the Seventh Circuit because, unlike the settlement here, those settlements were rife with indicia of collusion between the parties and other questionable conduct. In *Eubank v. Pella,* for example, former appellate Judge Richard Allen Posner (7th Circuit judge, 1981 to 2017) authored an opinion rejecting a claims-made settlement so problematic that he termed "inequitable–even scandalous." 753 F.3d 718, 721 (7th Cir. 2014).

The settlement reflected "almost every danger sign in a class action settlement," including "fatal conflicts of interest"; opposition by named plaintiffs; a provision requiring class members to risk recovering nothing by submitting their claims to arbitration, where the defendants had reserved defenses, in order to be eligible for any meaningful settlement distribution; an award of only coupons to a portion of the class; twelve-to thirteen-page claim forms requiring class members to submit "a slew of arcane data, including the "product identity stamp," "Unit ID Label," and purchase order number of the product at issue; and an unnecessarily complex settlement notice. *See id.* at 725–26.

Because the settlement "flunked the 'fairness' standard by the one-sidedness of its terms and ... fatal conflicts of interest[,]"it could not survive the closer scrutiny that might be warranted where "kicker" and "clear-sailing" provisions are part of a class action settlement. *see id.* at 729.

The Seventh Circuit similarly rejected the settlement in *Pearson v. NBTY, Inc.,* 772 F.3d 778 (7th Cir. 2014), a case which Frank relies upon repeatedly in his Objection Memorandum [ECF No. 75, pp. 1, 4, 25, 26, 27, 28), because the district court had valued the settlement to include the costs of notice to the class and attorney's fees, and of the $5.63 million to be made available to the class, approximately $4.77 million was reserved solely for counsel fees and expenses, notice costs, and *cy pres* and service

awards, with only $865,284 left for the settlement class, which amounted to only **seven cents per class member**. *See id.* at 780-81, 783–84.

The *Pearson* Court also criticized the claim form and filing requirements as too onerous when weighed against the "low ceiling on the amount of money that a member of the class could claim[,]" *id.* at 783; the *cy pres* award as excessive when weighed against the minimal relief made available to class members, *id.* at 784; the potential ineffectiveness of the proposed injunctive relief, *id.* at 785; and the court's sense that the parties had colluded to "sell out the class by agreeing ... to recommend that the judges approve a settlement involving a meager recovery for the class but generous compensation for the lawyers[.]" *See id.* at 787 (citing *Eubank,* 753 F.3d at 720).

As discussed in detail above, the relief provided by *this* Settlement, however, stands in stark contrast to the relief provided in *Eubank* and *Pearson* and in almost every other respect.

The Court finds that the Settlement is "fair, reasonable, and adequate" -- and likely exceeds what could be expected given that "settlements are born of compromise." *Wilson*, 2016 WL 457011, at *12.[19] *See also Ferron v. Kraft Heinz Foods Co.*, No. 20-CV-62136, 2021 WL 2940240, at *21 (S.D. Fla. July 13, 2021) (approving

---

[19]     The discussion of the two Seventh Circuit cases (*Pearson* and *Eubank)* comes from *Wilson*, with the Undersigned quoting that section extensively. *Id.* at *11-12.

settlement in case involving label changes for thirty-five separate and distinct products, a "significant non-monetary benefit").

The Undersigned therefore **recommends** that Judge Cooke (1) approve the settlement; (2) award Plaintiffs' counsel $2.9 million in attorney's fees and costs; (3) reserve jurisdiction to entertain a motion for class representative service awards, should such a motion get filed (assuming the law in this Circuit changes); and (4) retain jurisdiction to implement, administer, consummate and enforce the First Amended Settlement Agreement.

Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Marcia G. Cooke. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in this Report and Recommendations and shall bar the parties from attacking on appeal any factual or legal conclusions contained in this Report and Recommendations and to which they did not object, except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v.*

*Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); CTA11

Rule 3-1.

      **DONE AND ORDERED** in Chambers, in Miami, Florida, on December 15,

2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to</u>:**
The Honorable Marcia G. Cooke
All counsel of record